IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| NATIONAL WILDLIFE FEDERATION, IDAHO WILDLIFE FEDERATION, WASHINGTON WILDLIFE FEDERATION, SIERRA CLUB, TROUT UNLIMITED, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, IDAHO RIVERS UNITED, IDAHO STEELHEAD AND SALMON UNITED, NORTHWEST SPORTFISHING INDUSTRY ASSOCIATION, FRIENDS OF THE EARTH, SALMON FOR ALL, and COLUMBIA RIVERKEEPER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CV 01-640-RE |
| NATIONAL MARINE FISHERIES SERVICE, | ) ) | OPINION AND ORDER |
| Defendant, | ) ) | |
| and | ) ) | |
| NORTHWEST IRRIGATION UTILITIES, PUBLIC POWER COUNCIL, WASHINGTON STATE FARM BUREAU FEDERATION, FRANKLIN COUNTY FARM BUREAU FEDERATION, GRANT COUNTY FARM BUREAU FEDERATION, and INLAND PORTS AND NAVIGATION GROUP, | ) ) ) ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

REDDEN, Judge:

The matters before the court are plaintiffs' motion (doc. 281) for summary judgment;

defendant's motion (doc. 349) for summary judgment; defendant-intervenor State of Idaho's motion

1 -    OPINION AND ORDER

(doc. 356) for summary judgment; and defendant-intervenor Inland Ports and Navigation Group's

motion (doc. 361) for summary judgment.  Oral argument was held April 21, 2003.[1]

## NATURE OF THE ACTION

On December 21, 2000, following consultation under section 7 of the Endangered Species

Act (ESA), 16 U.S.C. § 1536(a)(2), the National Marine Fisheries Service (NOAA)[2] issued a

biological opinion (2000BiOp) to the action agencies[3] operating the Federal Columbia River Power

System (FCRPS).  The 2000BiOp addressed the effects of proposed FRCPS action on threatened

or endangered salmon and steelhead in the Columbia River basin, and concluded that the continued

operations of the FRCPS would jeopardize a number of species and adversely modify their critical

habitat.  Pursuant to section 7(b)(3)(A) of the ESA, 15 U.S.C. § 1536(b)(3)(A), and 50 C.F.R. §

402.14(h)(3), NOAA proposed a reasonable and prudent alternative course of action (RPA) that it

concluded will avoid jeopardy and adverse modification of the critical habitat of the fish.  In

conjunction with the RPA, NOAA issued an Incidental Take Statement.

Plaintiffs seek a declaration that the RPA and accompanying Incidental Take Statement in the

2000BiOp are arbitrary and capricious and therefore violate section 7's consultation requirements.

They seek an injunction requiring NOAA to (1) withdraw the 2000BiOp,

including the RPA and Incidental Take authorization, and (2) reinitiate consultation with the action

---

[1]  Before oral argument, the court advised all counsel that it would bifurcate the issues, and hear argument only on the first issue presented, *i.e.*, whether the 2000BiOp relied upon improper factors in reaching its no-jeopardy conclusion.  The court sent all counsel a draft opinion outlining its tentative conclusions in that regard.  As a result of the oral argument, the court has focused on those issues that it believes is determinative on this issue. Although the court's ultimate conclusions have not changed, all counsel are commended on the quality of the oral argument.

[2]  NMFS is a subagency of the National Oceanic and Atmospheric Administration (NOAA). NMFS has now changed its name to NOAA Fisheries.  To avoid confusion, this memorandum adopts the name change and NMFS is referred to as "NOAA" throughout, even for reference to historical agency actions that occurred before the effective date of the name change.

[3]  The action agencies are the U.S. Army Corps of Engineers, the Bonneville Power Administration and the U.S. Bureau of Reclamation.

2 -    OPINION AND ORDER

agencies.[4]

## THE PARTIES AND *AMICI* ON SUMMARY JUDGMENT

Plaintiffs are sixteen non-profit environmental and conservation organizations, including the NW Energy Coalition, whose members use the Columbia River and its tributaries for recreational, scientific, aesthetic, and commercial purposes.

Plaintiffs' *amici* are:  The State of Oregon; and the Nez Perce Tribe, Confederated Tribes and Bands of the Yakima Indian Nation, Confederated Tribes of the Umatilla Indian Reservation, and Confederated Tribes of the Warm Springs Reservation of Oregon (collectively "Treaty Tribes").

Defendant is NOAA**.**

Intervenor-defendants[5] are:  The State of Idaho; and Northwest Irrigation Utilities, Public Power Council, and *amicus* Pacific Northwest Generating Cooperative (collectively "Utilities"); Washington State Farm Bureau, Franklin County Farm Bureau, and Grant County Farm Bureau (collectively "farm bureaus"); and Inland Ports & Navigation Group.

Defendant's *amici* are:  The State of Montana and the State of Washington.

## BACKGROUND

**A**.    **The FCRPS and Salmon.**

In 1991, NOAA listed the Snake River sockeye as an endangered species under the ESA. Since then, 11 additional Columbia River Basin salmon and steelhead Evolutionary Significant Units (ESU) have been listed as threatened or endangered under the ESA.  This case is one of a long line of cases dealing with the effect of continued operation of the FCRPS on these threatened and endangered salmon species in the Columbia River basin.  *See, e.g.*, Idaho Dept. of Fish and Game v. NMFS, 850 F.Supp. 886 (D. Or. 1994), vacated as moot, 56 F.3d 1994 (9th Cir. 1995) (IDFG).

---

[4]    Defendant argues that the court does not have authority to require defendant to reinitiate consultation with the action agencies and, even if the court had such authority, plaintiffs have failed to give the required 60-day written notice under the ESA, 42 U.S.C. § 1540(g)(2)(a)(1) and thus the court may only remand the BiOp to NOAA.

[5]    The intervenor-defendants and *amici* address some but not necessarily all of the issues raised by the principal parties.  This opinion analyzes the principals' arguments and refers to the arguments of other parties or *amici* if there is a significantly different approach, or if a particular argument is made with greater clarity.

3 -    OPINION AND ORDER

The FCRPS consists of 14 dams, with their associated powerhouses and reservoirs, located in the Snake River basin and the upper and lower Columbia River basin, which operate for multiple purposes, including flood control, navigation, power, fish and wildlife, recreation, water supply, and water quality.  In IDFG, the court found that the NMFS 1993 biological opinion for continuing FCRPS operations was insufficient to avoid jeopardy to salmon species.  "[T]he process is seriously, 'significantly,' flawed because it is too heavily geared towards a status quo that has allowed all forms of river activity to proceed in a deficit situation–that is relatively small steps, minor improvements and adjustments–when the situation literally cries out for a major overhaul."  IDFG at 900.

After the court's ruling in IDFG, NOAA, as part of the major overhaul suggested by the court, issued its 1995 biological opinion (1995BiOp) which concluded that FCRPS operations would likely jeopardize three salmon ESUs and adversely modify their critical habitat.  In the 1995BiOp, NOAA proposed an RPA designed to avoid jeopardy to the three ESUs involving "actions to be taken by federal, state and private entities across all phases of the salmon life-cycle (the four 'Hs' of Habitat, Hatcheries, Harvest, and Hydropower) to restore the runs."  Def. S.J. Memo., p. 6.   The 1995BiOp was upheld in American Rivers v. NFMS, CV 96-384-MA (D. Or. Oct. 17, 1997), aff'd, No. 97-36159 (9th Cir., Mar. 8, 1999).  The 1995BiOp remained in place until the 2000BiOp was issued.

**B**.    **The 2000BiOp.**

The 2000BiOp is a continuation of the major overhaul.  NOAA "developed its biological opinion on the effects of FCRPS operations in coordination with other ongoing Federal and regional processes" including the Basinwide Salmon Recovery Strategy (BSRS).  2000BiOp, p. 2-9.  In the BSRS, NOAA acknowledges that "native salmon and steelhead, and many resident fish species, remain in a state of perilous decline throughout the Columbia River Basin concurrent with rapidly increasing human population growth and even greater pressure on existing natural resources." BSRS Executive Summary, B104.

From this context, the 2000BiOp concluded that continuing operations of the FCRPS are likely to jeopardize the continued existence of, and to adversely modify the critical habitat of, eight salmon ESUs.  2000BiOp, pp. 8-1 to 8-26.  To avoid jeopardy and adverse modification of

critical habitat, the 2000BiOp proposed an RPA . 2000BiOp, ch. 9. The RPA includes short-term federal actions to modify hydro-power operations to improve the survival of salmon passing through FCRPS dams and reservoirs, 2000BiOp, pp. 9-53 to 9-130, and short- and long-term federal actions relating to mitigation activities affecting habitat, *id.* at pp. 9-133 to 9-143; hatchery, *id.* at pp. 9-143 to 9-151; and harvest, *id.* at pp. 9-151 to 9-161 (the three "Hs"). The RPA also includes plans to research, monitor, and evaluate the effectiveness of the proposed federal actions, *id.* at pp. 9-161 to 9-180, utilizing a system of "check-ins" at 3-, 5-, and 8-year intervals that will require NOAA to report on whether the action agencies are meeting or falling short of expectations.

The BSRS includes, *inter alia,* a variety of short- and long-term non-federal, state, regional, tribal, and private off-site mitigation actions, primarily related to the three "Hs," which, if implemented, would "provide survival improvements needed to avoid jeopardy" to eight of the salmon ESUs. *Id.* at p. 9-282.

NOAA concluded that "[t]he increased reliability of implementing the [BSRS] measures, together with other ongoing Federal measures . . . ensure that each of the eight ESUs will have a high likelihood of survival and a moderate-to-high likelihood of recovery." *Id.* at pp. 9-281 to 9-282. NOAA further concluded that if the RPA does not achieve the stated goal of avoiding jeopardy to the eight ESUs, reinitiation of consultation under section 7 of the ESA would be required. *Id.* at p. 9-51.

The 2000BiOp authorizes incidental take of salmon related to FCRPS operations, but does not authorize incidental take of salmon related to the off-site mitigation activities.

**C.** **NOAA's Analytical Approach to the 2000BiOp.**

Following its review of the proposed action agency plans for the continued operation of the FCRPS, NOAA concluded that the plans would improve salmon survival in the short term but did not adequately address the long term potential for recovery. 2000BiOp, ch. 8, p. 3-25.

> NOAA found an acceptably low risk of extinction [of salmon species] for the next 24 years. This means that NOAA Fisheries and the FCRPS action agencies have the decision space to build on the immediate improvements required by the RPA and <u>phase in additional actions through a coordinated program over the next ten years that will address the long term needs of salmon</u>.

Def. S.J. Memo., p. 14 (emphasis added). Because improvements from the FCRPS on-site

5 -    OPINION AND ORDER

operations alone would not insure the continued existence of eight of the salmon species (hence the "jeopardy" finding), NOAA concluded that "the greatest opportunity to improve species survival is the first or second year of their life cycle . . . . Thus the analysis shows that improvements to spawning and rearing habitat in the tributaries and estuary are most likely to achieve the biological requirements for survival and recovery." *Id*. (Hence, the focus on off-site habitat, hatchery, and harvest mitigation actions in the RPA). To satisfy the need for certainty and specificity regarding the off-site mitigation program, NOAA incorporated annual FCRPS planning, regional sub-basin planning, and ESU-specific recovery planning into the RPA. 2000BiOp, ch. 9, pp 23-35. To insure that the off-site mitigation program "is, and stays on track," the RPA contains comprehensive 3-, 5-, and 8-year check-ins and monitoring, evaluation, and performance measures. Def. S.J. Memo., p. 15; 2000BiOp, ch. 9, pp. 3 and 7-19. "NOAA determined that the combination of the hydro-system measures and the RPA's offsite mitigation program will provide enough benefit to the affected stocks to satisfy the [ESA] § 7(a)(2) standards." Def. S.J. Memo., p. 15.

In the "qualitative" analysis used to predict the likelihood of survival or recovery of the salmon species, NOAA used a "quantitative modeling" approach involving four "indicator criteria": 24-Year (short-term) Survival; 100-Year (long term) Survival; 48-Year (short-term) Recovery; and 100-Year (long-term) Recovery. For purposes of predicting "survival," NOAA used an "absolute extinction" standard, *i.e.*, the species "survives" if one fish returns. Def. S.J. Memo., p. 16; 2000BiOp, appendix, A-1 to A-2.

Based on the above analysis, NOAA concluded that of the 12 salmon ESUs, five would not likely go extinct in the next 24 years, even if the FCRPS operations did not change, regardless of the implementation of RPA survival improvements. Five other ESUs might need some survival improvements, relating to hatchery activities -- four using a 20 percent hatchery effectiveness assumption and one using an 80 percent hatchery effectiveness assumption. The extinction risk for two remaining ESUs could not be determined because of inadequate data. Def. S.J. Memo., pp. 19-20.

NOAA summarizes its argument justifying its analysis in the 2000BiOp, RPA, and resulting "no jeopardy" opinion as follows:

6 -    OPINION AND ORDER

NOAA has proposed an aggressive program of FCRPS operational improvements (both short- and long-term), off-site habitat and hatchery improvements, and research, and has concluded that these measures are, in its opinion, sufficient to avoid jeopardizing the species. However, NOAA recognizes that it could be wrong in its conclusion given the huge amount of scientific uncertainty that exists. Accordingly, it has proposed short-term survival improvements, a series of check-ins to determine whether its earlier conclusions were correct, and a safety-net hatchery program to ensure that the stocks do not go extinct in the interim. All these measures are intended to be hedges against the uncertainty that NOAA may not be correct in its assessment.

Def. S.J. Memo., p. 21.

## SUMMARY OF ISSUES IN DISPUTE

The following is a summary of the issues in dispute on summary judgment, including identification of the parties and *amici* who take a position on the particular issues.

**A.**    **Plaintiffs' Issues and Defendant's Response.**

**1.**    **The 2000BiOp no-jeopardy conclusion is invalid because it relies on improper factors.**

Plaintiffs, supported by the Treaty Tribes and the State of Oregon, contend that the "no-jeopardy" conclusion improperly relies on future federal, state, and private mitigation actions that have not undergone section 7 consultations and/or are not reasonably certain to occur.

NOAA, supported by all intervenor-defendants and defendant's *amici,* contends that the 2000BiOp properly considered future mitigation activities.

**2.**    **The 2000BiOp does not rationally connect NOAA's no-jeopardy conclusion with available information.**

Plaintiffs, supported by the Treaty Tribes, contend that NOAA's no-jeopardy analysis does not explain what weight it gave to all the relevant information available to it. Plaintiffs argue that the analysis (a) relies too heavily on survival improvements relating to off-site habitat and hatchery measures, *i.e.*, those that are less certain to occur; (b) is flawed because it makes a "conclusory qualitative" judgment that the RPA measures will be enough to avoid jeopardy; (c) does not account adequately for the effects of delay in implementing survival improvements; and (d) does not account for how emergency provisions allowing for the action agencies to forego implementation of survival improvements in the RPA, such as curtailment of flow and spill measures, would impact salmon.

NOAA, supported by the intervenor-defendants, contends that the rationale it set forth for reaching a no-jeopardy conclusion, and the analysis supporting it, applied the best science available and are appropriate.

### 3.    The Incidental Take Authorization fails to account for previous incidental take.

Plaintiffs contend that NOAA has failed to track previously authorized incidental take of salmon and therefore is in no position to determine the effect on salmon of the actions now authorized, which will involve an incidental take.

NOAA, supported by intervenor-defendant State of Idaho, labels plaintiffs' argument "ridiculous," contending that NOAA tracks incidental take through the use of models.

### 4.    The 2000BiOp fails to ensure that the RPA will not jeopardize Snake River salmon.

Plaintiffs contend that the juvenile fish transportation program whereby Snake River salmon smolt are collected and transported around the FCRPS dam system continues to jeopardize four ESUs (Snake River salmon).

NOAA and intervenor-defendant State of Idaho contend that the juvenile fish transportation program is the same one previously upheld by Judge Marsh in American Rivers v. NMFS, *supra*.

### B.    NOAA's and Intervenor-Defendants' Issues.

NOAA and the intervenor-defendants seek summary judgment on all issues raised by plaintiffs. NOAA seeks a ruling that plaintiffs are not entitled to an injunction requiring reinitiation of consultation with the action agencies. *See supra* footnote 3. NOAA contends that if the court finds fault with the 2000BiOp, the appropriate remedy is to remand to NOAA.

Intervenor-defendant Inland Ports and Navigation Group joins in NOAA's motion for summary judgment and opposes any ruling by the court allowing the lowering of the navigation channel in the Columbia or Snake Rivers below 14 feet. Thus far, that issue has not been raised.

### ESA CONSULTATION PROCESS

Because the salmon species at issue are listed as threatened or endangered under the ESA, the federal action agencies are required to insure that future agency actions "are not likely to jeopardize their continued existence." 16 U.S.C. § 1536(a)(2). In this case, because the continued

8 -    OPINION AND ORDER

operations of the FCRPS are likely to affect the salmon species, the action agencies were required to

consult with NOAA to assess the likelihood that the FCRPS operations will jeopardize the salmon

species and result in adverse modification of critical habitat.  16 U.S.C. § 1536(a)(3) and (4); 50

C.F.R. §§ 402.14(a) and (c).  Because the 2000BiOp concludes that continued FCRPS operations

will jeopardize the salmon species, NOAA was required to include an RPA to avoid the jeopardy.

50 C.F.R. § 402.14(h)(3).  An RPA

> refer[s] to alternative actions identified during formal consultation that can be
> implemented in a manner consistent with the intended purpose of the action, that can
> be implemented consistent with the scope of the Federal agency's legal authority and
> jurisdiction, that is economically and technologically feasible, and that the Director
> believes would avoid the likelihood of jeopardizing the continued existence of listed
> species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R.§ 402.02 (emphasis added).

NOAA was also required to issue an Incidental Take Statement specifying, *inter alia*, the

amount or extent of incidental taking and reasonable and prudent measures necessary or appropriate

to minimize the take.  50 C.F.R. § 402.14(i)(1)(i) and (ii).

## STANDARDS OF REVIEW

NOAA's consultation with the action agencies and resulting issuance of the 2000BiOp,

including the RPA and Incidental Take Statement, constituted final agency action under 16 U.S.C. §

1536 and are subject to judicial review.  Because the ESA has no specific provision for judicial

review of final agency actions, the scope of review is governed by the Administrative Procedures Act

(APA), 5 U.S.C. § 701 *et seq.*  The court must determine whether NOAA's action in issuing the

2000BiOp was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).  To determine if NOAA violated the arbitrary and capricious standard,

the court must determine whether the agency articulated a rational connection between the facts

found and the choice made.  The court is not empowered to substitute its judgment for that of the

agency.  As long as the agency decision was based on the relevant factors and there is no clear error

of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious.

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).

> With regard to review of the RPA in NOAA's 2000BiOp, the Ninth Circuit has held
> that: [u]nder the ESA, the Secretary [is] not required to pick the first reasonable

9 -    OPINION AND ORDER

> alternative the [agency] came up with in formulating the RPA.  The Secretary [is] not even required to pick the best alternative or the one that would most effectively protect the [species] from jeopardy. [Citation omitted] . . . . [T]he agency's decision need not be ideal . . . so long as the agency gave at least minimal consideration to the relevant facts contained in the record.

Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998).  Review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency.  Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).  "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matter."  United States v. Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817 (1990).

## PARTIES' ARGUMENTS

As noted above, the court advised counsel to limit the April 21st oral argument to the issue of whether the 2000 BiOp no-jeopardy conclusion is invalid because it relied on improper factors.   At oral argument, all counsel agreed that if the court were to find in favor of the plaintiffs on this issue, it would be premature to address the remaining issues at this stage of the proceedings.  Thus, that threshold issue is the one addressed in this opinion.

A.    **Plaintiffs' Arguments**.

Plaintiffs, the Treaty Tribes, and the State of Oregon contend that the no-jeopardy conclusion in the 2000 BiOp is arbitrary and capricious, and therefore invalid, because it relies on future federal mitigation actions that have not undergone section 7 consultation.  Moreover, plaintiffs contend that the no-jeopardy conclusion also relies on the implementation of non-federal off-site mitigation actions that are not reasonably certain to occur.

In support of their arguments, plaintiffs rely on the regulations implementing the ESA, 50 C.F.R. §§ 402.02 and 402.14, as well as Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987) (Sierra Club), and Center for Biological Diversity v. Rumsfeld, 198 F.Supp2d 1139 (D. Az. 2002) (Rumsfeld).

Under the implementing regulations, 50 C.F.R §§ 402.02 and 402.14, NOAA must render a biological opinion as to whether a particular agency "action" is likely to jeopardize the continued

10 -    OPINION AND ORDER

existence of a species or adversely modify critical habitat. In so doing, NOAA must consider the "effects of the action" and the "cumulative effects" within "the action area." 50 C.F.R. § 402.14(g)(3). Each of those terms is defined in the regulation:

> "Action" means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal Agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) <u>actions intended to conserve listed species or their habitat</u>; . . . .
>
>                            . . . .
>
> "Action area" means all areas to be affected directly or indirectly by the Federal action, <u>and not merely the immediate area involved in the action</u>.
>
>                            . . . .
>
> "Cumulative effects" are those effects of future State or private activities, not involving Federal activities, <u>that are reasonably certain to occur within the action area of the Federal action subject to consultation</u>.
>
>                            . . . .
>
> "Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes . . . <u>the anticipated impact of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation,</u> and the impact of State or private actions which are contemporaneous with the consultation in process. <u>Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur</u> . . . . .

50 C.F.R. § 402.02 (emphasis added).

In <u>Sierra Club</u>, the Fish and Wildlife Service, following a section 7 consultation, issued a biological opinion that an Army Corps of Engineers highway and flood control project would jeopardize the continued existence of two birds, the rail and the tern, unless the Corps were to acquire and preserve nearby wetlands acreage. The Army Corps reinitiated consultation with the Fish and Wildlife Service and agreed to the acquisition and preservation of the wetlands. The Fish and Wildlife Service thereafter issued its final biological opinion that the birds' continued existence was not jeopardized based upon the mitigation plans relating to the wetlands acquisition. Unfortunately, the acquisition of the wetlands was dependent upon the timely cooperation of the county that owned them, which did not occur. The Fish and Wildlife Service then requested

11 -    OPINION AND ORDER

reinitiation of consultation with Corps based on Corps' failure to acquire the wetlands in a timely manner, thereby leaving the continued existence of the birds in jeopardy if construction began on the highway project in the meantime.  The Corps refused to reinitiate consultation on the ground that consultation was premature given the number of permits that would be needed before construction began.

The Sierra Club filed an action to stay construction on the ground that the federal action violated the ESA..  The district court refused the motion to stay.  The Ninth Circuit reversed, stating:

> We conclude that the [ESA] dictates that if an agency plans to mitigate its project's adverse effects on an endangered species by acquiring habitat and creating a refuge, it must insure the creation of that refuge before it permits destruction or adverse modification of other habitat.

Sierra Club, 816 F.2d at 1389 (emphasis added).  The court cautioned, however, that:

> [w]e do not hold that every modification of or uncertainty in a complex or lengthy project requires the action agency to stop and reinitiate consultation .  The circumstances here go far beyond the problems and doubts of any large endeavor. The creation and management of a refuge for the birds is the most important of many modifications the [Fish and Wildlife Service] considered
>
> absolutely necessary to insure that the project was not likely to jeopardize their continued existence.

Id. at 1388 (emphasis added).  The court held that the Corps violated the ESA by failing to reinitiate consultation with Fish and Wildlife Service when it learned that the anticipated mitigation efforts were delayed or might not take place at all.

In Rumsfeld, the Fish and Wildlife Service issued a biological opinion that the Department of the Army's continued short- and long-term activities at Fort Huachuca would not jeopardize or adversely modify critical habitat of the willow flycatcher bird and water umbel plant.  The cause for concern was the effect of the Fort's uncontrolled pumping of groundwater on the Upper San Pedro River and its surrounding habitat, resulting in a groundwater deficit that jeopardized the flycatcher and umbel plant.  In the biological opinion, FWS conditioned a no-jeopardy finding on an RPA requiring the Army to develop base-wide and regional water conservation plans within three years that would insure a long-term (10 year) remedy of the groundwater problem.  Included within the RPA was a monitoring and annual reporting requirement detailing the progress being made in implementing the

plans.

In reviewing the biological opinion, the court stated:

> To avoid a substantive violation of the prohibition against jeopardy, the agency must develop mitigation measures–either as part of the proposed project or as RPAs in the biological opinion.  16 U.S.C. § 1536(a)(2).  <u>Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise–enforceable obligations</u>, and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.  <u>Sierra Club v. Marsh</u>, 816 F.2d 1376 (9th Cir. 1987).

<u>Rumsfeld</u> at 1152 (emphasis added).   The court held that the no-jeopardy conclusion was arbitrary and capricious because the biological opinion "covers all proposed activities over the next ten years without including standards and guidelines [that] will be developed and implemented in three years." *Id.* at 1157.  The court also "reject[ed] the notion" that the annual review requirement to determine the effectiveness of mitigation measures supported a "staged" analysis of jeopardy. *Id.*

Based on the foregoing, plaintiffs make the following specific arguments:

**1.    <u>There have been no section 7 consultations for some federal mitigation actions</u>**.

As noted above, NOAA, in reviewing the "effects of the action" involving the FRCPS, must consider the anticipated impacts of future federal projects that have undergone section 7 consultation. 50 C.F.R. § 402.02.   Plaintiffs contend that the following future federal projects upon which NOAA relies to justify the no-jeopardy conclusion have not undergone section 7 consultation:

(a)    <u>Interior Columbia Basin Ecosystem Management Project (ICBEMP)</u>.

Implementation of the ICBEMP is part of NOAA's justification for the no-jeopardy finding. The ICBEMP is a Forest Service and Bureau of Land Management plan to provide land managers with long-term guidance for managing habitat in the Columbia River Basin and its watersheds.  In the BSRS, which outlines the strategy for preserving the salmon species, NOAA states that the ICEBMP "will also play a key role in future habitat protection and restoration activities in the basin."  BSRS, vol III, p. 96.  Plaintiffs argue that the ICEBMP is required to but has not yet undergone section 7 consultation and, conceivably, may never be implemented.

(b)    <u>Mid-Columbia Habitat Conservation Plan (HCP)</u>.  Implementation of the

HCP is part of the BSRS and is expected to address additional improvement in juvenile and adult survival. NOAA states that the HCP "must assure a high likelihood of survival and a moderate-to-high likelihood of recovery over time, taking into account actions in the other H's." BSRS, vol. I, p. 29. Like the ICEBMP, plaintiffs argue that the HCP must undergo future section 7 consultation and may never be implemented.

        (c)      <u>Unspecified Federal Actions</u>. The BSRS states:

> Finally, with respect to other federal actions affecting the listed stocks, this Strategy expects that applying the **jeopardy** standard of ESA Section 7(a)(2) will ensure that such actions will provide additional survival protections and improvements that will complement the actions specifically identified here.

BSRS, vol. I, p. 29 (emphasis in original).

Plaintiffs argue that incorporated into the no-jeopardy finding are a number of federal agency actions proposed in the BSRS relating to habitat, harvest and hatchery mitigation that will require but have not undergone section 7 consultation. 2000BiOp, ch. 9, p. 133; BSRS, vol. I, pp. 50-58. Plaintiffs contend that the above specified and unspecified federal actions cannot be relied upon to support the no-jeopardy conclusion because they were not the subject of section 7 consultation, in violation of 50 C.F.R. §§ 402.02 and 402.14(g)(3). "To allow the agency to include the effects of future federal actions which have not undergone § 7 consultation as benefits that justify a no-jeopardy conclusion for a pending action would invite speculation about what the future effects of such actions might be without any of the insurance § 7's strict procedures provide." Pl. Amended S.J. Memo., p. 7.

The Treaty Tribes contend that "[t]he bar against consideration of future federal actions is necessary to prevent reliance on the benefits of some future federal project that may never occur, may be substantially modified, or may be found to jeopardize the species upon closer scrutiny during future consultation." Treaty Tribes Amended Jt. S.J. Memo., p. 13.

     **2.**   **<u>Actions by the States, Regions, Treaty Tribes, and private parties are not certain to occur</u>**.

In chapter 7 of the 2000BiOp, NOAA sets forth the cumulative effects of various regional actions of the States (Oregon, Washington, Idaho, and Montana) and Treaty Tribes that will have a

14 -   OPINION AND ORDER

beneficial impact on salmon species if they are implemented.  As to private parties, NOAA acknowledges that their actions are the "most uncertain" in analyzing cumulative effects from the standpoint of benefit to salmon species.  NOAA does not identify specific private actions that might benefit salmon species.  The State, regional, and tribal actions are summarized as follows:

**(a)  State Actions.**

(1)  <u>Oregon</u> - Implementation of the "Oregon Plan for Salmon and Watershed" measures, which includes multiple agency actions, and the requisite funding, relating, *inter alia,* to water quality, water use, fish habitat and fish passage.

(2)  <u>Washington</u> - Implementation, *inter alia,* of the "Statewide Strategy to Recover Salmon," the "Watershed Planning Act", the "Wild Stock Recovery Initiative," the "Forest and Fish Plan," and various water use and water quality improvement proposals.

(3)  <u>Idaho</u> - Implementation of the "Forest Practices Act," continuation of diversion screening, improvement of fish passage, completion of watershed effects assessments, imposition of 30-foot buffers along Class II streams, and resolution of groundwater rights conflicts.

(4)  <u>Montana</u> - Implementation of water quality restoration plans and permits and a watershed restoration project to be undertaken by local authorities.

**(b)  Regional Actions.**

(1)  <u>Habitat Reforms</u> - Prioritize watersheds and assist in local watershed planning; integrate federal, state and regional planning; and cooperate with federal, tribal, and local governments to implement the National Estuary Program for the lower Columbia River, including the creation of salmon sanctuaries.

(2)  <u>Harvest Reforms</u> - Research the use of more selective fishing techniques and a license buy-back program, increase harvest selectivity, establish terminal fisheries below Bonneville Dam, strengthen the law enforcement program, and increase opportunities for fishing predatory fish.

(3)  <u>Hatchery Reforms</u> - Implement reforms in the 1999 Artificial Production Review Report submitted to Congress, support fish managers and increased monitoring and

15 -   OPINION AND ORDER

evaluation, and identify hatchery fish that pose a threat to listed fish.

(4) <u>Funding</u> - Seek funding assistance for existing activities designed to improve ecosystem health and fish and wildlife health and protection, and create a standardized, accessible information system to document regional recovery progress.

NOAA concludes that if the above recommendations are implemented by the States individually and regionally, they should have beneficial effects on listed species and their habitat. 2000BiOp, ch 7.

**(c)    Tribal Actions.** Participation in efforts involving watershed and basin planning designed to improve aquatic and fish habitat, and implementation of the objectives of the "Spirit of the Salmon" plan which, overall, should have positive cumulative effects on listed species and their habitat.

NOAA summarizes the cumulative effects of State, regional, and tribal actions as follows:

> Although state, Tribal and local governments have developed plans and initiatives to benefit listed salmon and steelhead, they must be applied and sustained in a comprehensive manner before [NOAA] can consider them 'reasonably foreseeable' in its analysis of cumulative effects.

2000BiOp, ch. 7, p. 8.

Plaintiffs contend that NOAA's reliance on the uncertain and vaguely defined actions of third parties to protect and restore salmon habitat, and hence contribute to the survival improvements necessary to avoid jeopardy, is contrary to the "reasonably certain to occur" standard set forth in 50 C.F.R. § 402.02 and applied in <u>Sierra Club</u> and <u>Rumsfeld</u>. Pl. Amended S.J. Memo., p. 19. Likewise, the State of Oregon contends that the 2000BiOp and its RPA violate the ESA because the proposed federal, state, and private actions "are not adequately specific, adequately funded, supported by adequate authority or adequately assured." State of Oregon *Amicus* Brief, p. 6.

**B.    Defendant's Arguments.**

NOAA contends that plaintiffs' focus on the failure of the no-jeopardy conclusion to include only those future federal actions that have undergone section 7 consultation is misplaced in that plaintiffs rely on an "action area" definition that is much broader than and contrary to NOAA's definition of the relevant action area in the 2000BiOp.

16 -    OPINION AND ORDER

NOAA apparently agrees that federal mitigation actions within the action area that are relied on must undergo section 7 analysis and, likewise, that state, regional, tribal, and private actions within the action area that are relied on must be reasonably certain to occur. Def. S.J. Memo., p. 34. NOAA, however, distinguishes between a narrower "action area" analysis and the broader "range-wide" analysis involving the federal and non-federal off-site habitat, harvest, and hatchery proposals listed in the BSRS:

> To reach a judgment about the continued existence of the species, however, NOAA must also assess the species likelihood of survival and recovery throughout its range, not just within the precise action area at issue in any particular consultation. When the range of the species is broader than that of the action area, as is the case with all salmon species, the evaluation of the species' current status incorporates measures identified as necessary for achieving the survival and recovery of the species as a whole.

Def. S.J. Memo., p. 35.

In the 2000BiOp, NOAA defines the action area as follows:

> The action area encompasses the mainstem Columbia and Snake rivers from Chief Joseph Dam and Hells Canyon Dam down to and including the estuary and plume (nearshore) ocean of the Columbia River.

2000BiOp, ch 1, p. 3.

According to NOAA, the "range-wide analysis" included federal and non-federal actions outside the action area. The "range-wide analysis provided context to but did not supplant the narrower analysis about the effects of the action within the action area." Def. S.J. Memo., p. 35. Under the regulations, an "action area analysis . . . is intended to provide a precise assessment of activities going forward in the immediate neighborhood of the action." *Id.* at 34-35. The broader range-wide analysis included the expectation of "a certain amount of improvement to take place, that one way those improvements could take place is through off-site habt measures, and that there was both monitoring and biological check-ins in the RPA to ensure that those survival improvements were occurring either due to the habitat measures or some other source." *Id.* at 37.

Thus, NOAA contends that some of the federal actions and the State, regional, and tribal off-site habitat and harvest mitigation actions proposed in the BSRS comprise its range-wide analysis. Those actions are outside the action area. Accordingly, they need not be subjected to

section 7 consultation or be reasonably certain to occur, as long as there are adequate monitoring

and evaluation standards in place on an ongoing basis to insure that the salmon species are not being

jeopardized by the failure to implement the actions.

In conjunction with the above theory, NOAA contends that it did not specifically rely on the

implementation of off-site range-wide measures, but that, when coupled with the monitoring and

evaluation check-ins, it reasonably "did expect that the needed survival improvements would likely

occur through the implementation of the BSRS." *Id.*

NOAA relies on one case in particular, Southwest Center for Biological Diversity v. U.S.

Bureau of Reclamation, 143 F.3d 515 (9th Cir. 1998) (Lake Mead), to support its contention that an

RPA with short- and long-term components satisfies the requirements of the ESA. In Lake Mead,

FWS issued a biological opinion that the continued operation of the Hoover Dam would result in

jeopardy to the endangered Southwestern Willow Flycatcher (Flycatcher), a migratory song-bird that

nests and breeds in Lake Mead during the spring and summer seasons. Lake Mead is exposed by

low water impounded by Hoover Dam. A change from dryer to wetter weather in recent years has

adversely impacted more than 1,000 acres of ideal Flycatcher habitat in Lake Mead, resulting in loss

of Flycatchers. In light of the jeopardy finding in its biological opinion, FWS issued an RPA

providing that the Bureau of Reclamation would acquire 400 acres of replacement habitat in the short

term (two years), and an additional 900 acres in the long term (four years). The RPA did not identify

specific areas that would be acquired and did not require that the replacement habitat be acquired by

a date certain before destruction of the existing habitat. *Id.* at 518.

In Lake Mead, the plaintiff argued that the Ninth Circuit's decision in Sierra Club was on

point and that the Bureau of Reclamation could not base its RPA on the acquisition of land that had

not yet occurred. The court disagreed, distinguishing the facts from those in Sierra Club:

> [In Sierra Club], [b]y relying only on the outcome of uncertain litigation to provide
> replacement habitat, the COE had not done enough to make sure that the proposed
> mitigation measures would occur in time to avoid the jeopardy its actions posed to
> endangered birds.
>
> In this case by contrast, there has been no violation of the terms of the RPA. There
> has also been no indication that Reclamation cannot acquire and restore the needed
> replacement habitat as specified in the final RPA by the required deadlines.

18 -   OPINION AND ORDER

143 F.3d at 524 (emphasis added).

In the 2000BiOp, NOAA acknowledges that although the risk of salmon species extinction is "relatively low" in the short-term (24 years):

/ / / /

> there was some potential for (in some cases substantial) population declines within the short term even though the ESUs were not likely to go extinct.  BiOp, at 9-6.  In order to hedge against uncertainty in its short-term extinction analysis and to mitigate any potential short-term declines in ESU abundance, the RPA included a number of short-term measures to immediately improve survivals and also included monitoring and other safety nets to hedge against any short-term declines.

Def. S.J. Memo., p. 24-25.

In summary, NOAA contends that the short-term federal and non-federal actions on which it relies in hedging against salmon extinction include the range-wide off-site harvest, hatchery, and habitat measures that are not within the action area and, therefore, in the case of federal actions, are not subject to section 7 consultation, and in the case of non-federal actions, need not be "reasonably certain to occur." *Id.* at 25-30.  Moreover, the further hedges against salmon extinction are the 3-, 5-, and 8-year checks-ins by which NOAA can monitor and evaluate the effectiveness of the proposals in the RPA  NOAA contends, therefore, that the no-jeopardy conclusion is valid.

## DISCUSSION

Based on the briefs filed with the court, the record, and the oral arguments of the parties, I conclude that NOAA's no-jeopardy conclusion in the 2000BiOp is arbitrary and capricious.   As discussed below, NOAA's definition of the "action area," which limits its scope to the main stems of the Columbia and Snake Rivers, is arbitrary and capricious because it is inconsistent both with the regulatory requirements and the geographic region NOAA actually considered in order to justify the no-jeopardy conclusion.  The record clearly establishes that NOAA improperly relied on range-wide off-site federal mitigation actions that have not undergone section 7 consultation and non-federal mitigation actions that are not reasonably certain to occur in order to reach the no-jeopardy conclusion as to eight of the 12 salmon ESUs.

**A.    NOAA's defined "action area" is arbitrary and capricious**.

In the 2000BiOp, NOAA was required to assess the biological impact of the FCRPS

19 -    OPINION AND ORDER

operations on "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. In <u>San Francisco Baykeeper v. United States Army Corps of Engineers</u>, 219 F. Supp2d 1001 (N.D. Cal. 2002), the court addressed the scope of the action area as defined by the Army Corps of Engineers regarding dredging and berth projects at the Port of Oakland in San Francisco Bay. NOAA and the Fish and Wildlife Service focused their biological opinion on the impact of those projects on two species only, the California lease tern and the California brown pelican. The plaintiffs contended that the defined action area was arbitrary and capricious because NOAA and the Fish and Wildlife Service should have evaluated the indirect effects of the projects on all listed species throughout the Bay-Delta ecosystem. The court rejected that contention, finding that the defined action area was not arbitrary and capricious. "Because [the tern and pelican] were found in close proximity to the project area, they are more likely to be affected by the construction and long-term operation of the projects than other listed species in the Bay-Delta ecosystem." *Id.* at 1021.

Here, there is no question that all 12 salmon ESUs are substantially and directly impacted by the FCRPS operations because they are found in the vicinity of the immediate action area. There is no question that eight salmon ESUs are at least indirectly effected by the FCRPS operations. "Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur." 50 C.F.R. § 402.02. In the 2000BiOp and the BSRS, NOAA makes clear that the short-term survival and recovery of the eight salmon ESUs depend in part on range-wide off-site mitigation habitat, harvest, and hatchery actions. The court is left with the firm conviction that the range-wide area is therefore indirectly, if not directly, impacted by FCRPS operations. NOAA's definition of the action area in the 2000BiOp is limited to the immediate area, *i.e.*, the Columbia and Snake Rivers, impacted by the FCRPS operations, where the effect on the 12 salmon ESUs is most direct. Contrary to the mandate of the ESA implementing regulations, NOAA's action area definition does not encompass the range-wide area, where the impact is perhaps less direct but no less certain to occur.

NOAA's definition of the action area is entitled to substantial deference under the arbitrary and capricious standard. Even so, in this case, the record establishes that the definition is

20 -    OPINION AND ORDER

1   unreasonably narrow.  Indeed, in the 2000BiOp, NOAA recognized the necessity of assessing

2   biological impacts on the 12 salmon ESUs far beyond the limited action area defined in chapter 1 of

3   the 2000BiOp.  Under 50 C.F.R. § 402.02, NOAA was required to assess the "[cumulative] effects

4   of future state, Tribal, local, or private actions, not involving Federal activities, that are reasonably

5   certain to occur within the action area (described in section 1)."  In chapter 7 of the 2000BiOp,

6   NOAA specifically addresses the same range-wide off-site federal and non-federal mitigation actions

7   that it now argues are not part of the action area.

8   **B.**     **NOAA specifically relied on off-site federal actions that have not undergone**

9           **section 7 consultation and non-federal mitigation actions that are not reasonably**

10          **certain to occur in order to reach the no-jeopardy conclusion as to eight of the**

11          **12 salmon ESUs.**

12          If the proposed range-wide, off-site mitigation actions are not, in reality, part of the action

13  area, they should not have been included within the "cumulative effects" analysis of the 2000BiOp.

14  However, it is apparent that NOAA included them as part of the RPA in the 2000BiOp to justify its

15  no-jeopardy conclusion.  The BSRS, which includes many of those mitigation actions, acknowledges

16  their uncertainty.  Under the heading "Rationale," NOAA states:

17          This Basinwide Salmon Recovery Strategy recommends a program that places
18          priority on actions that can be implemented quickly, that are likely to provide solid
            and predictable biological benefits, and that will benefit the broadest range of
19          species.  .  .  .  The important questions to ask of the recovery plan are: does this
            plan as a whole have a reasonable chance of being implemented, and if so, can it
20          reasonably be expected to result in the conservation and survival of the listed stocks
            in the basin as a whole?  NMFS concludes that the answer to both questions is yes.

21
22  BSRS, vol. I, p. 23 (emphasis added).

23          The problem with this analysis is that the regulatory standard is not "reasonable chance" but

24  "reasonable certainty."  The fact that NOAA includes a "hedge" against non-performance of the

25  range-wide mitigation actions in the form of periodic check-ins is laudable but does not obviate the

26  lack of certainty in the actions.  Rumsfeld at 1154.

27          The State of Washington, in its support of NOAA and the 2000BiOp, emphasizes the

28  complexity of the task: "As the voluminous administrative record for the BiOp reveals, salmon

21 -    OPINION AND ORDER

recovery in the Basin is a daunting task filled with scientific uncertainty and multiple jurisdictions, and accordingly, conflicting policies.  Whether the RPA is reasonably specific must be judged in light of this landscape."  State of Washington *Amicus* Memo., p. 14.  The State of Washington further states that "[t]he RPA's off-site mitigation measures are also for the most part capable of implementation." *Id.*  Notwithstanding its equivocation regarding the certainty of the mitigation actions, the State of Washington concludes, without citation to any specific authority in the administrative record, that "[t]he mitigation measures which the BiOp anticipates will be completed by the NWPPC, States, the Tribe and private parties <u>are reasonably certain to occur because of the Action Agencies' obligation to fund, implement and contribute to such action.</u>"  *Id.* at 20.

In contrast to the State of Washington's optimism regarding the mitigation actions, the State of Oregon states:

> The challenged biological opinion fails to satisfy the standards of Section 7 as construed by the courts. As discussed below, <u>it relies on actions for which necessary funding is unavailable, actions for which the agencies lack authority, and actions that are not reasonably certain to occur because of the lack of binding agreements.</u>

State of Oregon *Amicus* Memo., p. 7 (emphasis added).

The State of Oregon's decidedly more pessimistic view of the likelihood that NOAA's range-wide mitigation off-site actions will be implemented is bolstered by the absence in the record of any binding commitments by the States, Treaty Tribes, and private parties to fund or implement the responsibilities devolved upon them by NOAA in the 2000BiOp, as well as the lack of certainty as to range-wide off-site mitigation actions reflected in the BSRS.

I conclude that the RPA adopted by NOAA to avoid jeopardy to salmon species, both for the short-term and the long-term, includes federal actions that have not undergone section 7 consultation, and non-federal off-site mitigation actions that are not reasonably certain to occur.

To address this flaw, NOAA argues that it did not rely on BSRS proposed mitigation actions to justify the no-jeopardy conclusion.  As to federal actions that have not undergone section 7 consultations, NOAA states that it did not rely upon two major future programs, ICEBMP and HCP, for its short-term no-jeopardy conclusion.  It argues that if ICEBMP is not implemented, the

existing PACFISH and INFISH programs[6] and the Northwest Forest Plan can still be relied on to provide habitat improvements.  As to the HCP, NOAA contends that "although [NOAA] did not rely on the HCP, it did have some expectation that there would be additional short-term survival improvements for the Upper Columbia River Stocks."  Def. S.J. Memo., pp. 31-32.  As to non-federal mitigation actions, NOAA likewise attempts to circumvent the "reasonably certain to occur" requirement by arguing that it did not rely on them to reach the no-jeopardy conclusion.  However, its no-jeopardy conclusion on eight of the 12 salmon ESUs refutes that argument.

As to those eight ESUs (Snake River Spring/Summer Chinook Salmon, Fall Chinook Salmon, Sockeye Salmon and Steelhead; Upper Columbia River Spring Chinook Salmon and Steelhead; Middle Columbia River Steelhead; Lower Columbia River Steelhead, and Columbia River Chum Salmon), NOAA concludes that:

> [I]t is [NOAA's] biological opinion that the RPA is not likely to jeopardize the continued existence of [the ESU] or to destroy or adversely modify its designated critical habitat.  This conclusion is based on elements of the RPA that remedy shortcomings of the proposed action .  .  .  .  Specifically, the RPA includes measures to improve survival within the action area beyond those anticipated from the original proposed action and to meet action-area performance standards that have been integrated with performance standards for the full life cycle.  Additionally, the RPA will result in implementation of enough off-site mitigation that will be targeted to meet the biological requirements of [the ESU] when combined with other elements of the RPA and the conservation measures anticipated in other life stages described in the [BSRS].

2000BiOp, pp. 287.

In stark contrast to the above no-jeopardy conclusion is the no-jeopardy conclusion relating to the four remaining ESUs (Upper Willamette River Chinook Salmon and Steelhead; and Lower Columbia River Chinook Salmon and Steelhead), where NOAA concludes, without reference to the range-wide off-site mitigation actions listed in the BSRS, that "the RPA, like the proposed [FCRPS] action, is not likely to jeopardize the continued existence of [the 4 ESUs] or to destroy or adversely modify its designated critical habitat."  2000BiOp, pp. 9-283 to 9-287.

---

[6]  In anticipation of the listings of a number of salmon ESUs in the early 1990s, the Forest Service initiated both long-term and interim processes to update the existing land use plans to better address habitat requirements for salmonids and other sensitive fish species.  These strategies are known as PACFISH (the salmonid strategy) and INFISH (strategy for other species including bulltrout).  The PAVFISH and INFISH strategies amended the riparian components of eight forest plans.

Contrary to NOAA's argument on summary judgment, the RPA clearly relies on the BSRS range-wide off-site mitigation actions for the survival and recovery of eight salmon ESUs, acknowledges the necessity for reasonable certainty and the lack thereof in those actions, and sets forth its remedy for their shortcomings - the adoption of the periodic 3-, 5-, and 8-year check-in and monitoring program:

> [NOAA] concluded, however, that the degree to which [BSRS] measures will sufficiently augment survival improvements from implementing the proposed action and will ensure a high likelihood of recovery of each ESU is uncertain.  In order to conclude that the strategy of progress on non-Federal actions described in the [BSRS] would provide survival improvements needed to avoid jeopardy.  [NOAA] required a more reliable expectation of progress.

> The RPA remedies these two primary shortcomings of the proposed action:

> .   .   .   .

> [T]he certainty that the RPA will achieve the survival improvements is increased by the RPA's rigorous evaluation process, by which RPA actions and ESU performance are assessed throughout the RPA's implementation.   .   .   .   The RPA thereby greatly increases [NOAA's] ability to rely on implementation of the non-Federal conservation measures described in the BSRS.

2000BiOp, p. 9-282 (emphasis added).

As mentioned earlier, the adoption of the monitoring program may be a laudable effort on NOAA's part to diminish the likelihood of jeopardy to the salmon ESUs.  It does not, however, supplant the requirement that NOAA rely only on those federal mitigation actions that have undergone section 7 consultation and non-federal mitigation actions that are reasonably certain to occur when it renders a no-jeopardy opinion.

NOAA's reliance on Lake Mead is misplaced.  That case involved a future federal mitigation action, i.e., the acquisition of alternative land for an habitat for the Flycatcher, that was reasonably certain to occur even if the specific details of the action were not identified when the RPA was formulated.  For all the reasons set forth above, that is not the case here.

NOAA's reliance on federal range-wide, off-site mitigation actions that have not undergone section 7 consultation and non-federal range-wide, off-site mitigation actions which are not reasonably certain to occur was improper and, as to eight of the salmon ESUs, the no-jeopardy opinion in the RPA is arbitrary and capricious.  In oral argument, counsel for the State of Idaho

24 -    OPINION AND ORDER

suggested that the court must decide whether the ESA is flexible enough to accommodate the complex situation confronting the parties here. While the court understands the complexities involved in trying to balance the competing requirements of the FCRPS with the needs of the salmon, the issue before this court is limited to whether NOAA complied with the requirements of the ESA and its implementing regulations in reaching its no-jeopardy conclusion in the 2000BiOp. The court concludes that it did not, and plaintiffs' motion for summary judgment is granted.

As for the remedy, the court agrees with NOAA and the State of Oregon that remand is appropriate in order to give NOAA the opportunity to consult with interested parties to insure that only those range-wide off-site federal mitigation actions which have undergone section 7 consultation, and range-wide off-site non-federal mitigation actions that are reasonably certain to occur, are considered in the determination whether any of the 12 salmon ESUs will be jeopardized by continued FCRPS operations. The court will remand the matter after a hearing with counsel, the time and date of which will be set in a separate minute order.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion (doc. 281) for summary judgment is GRANTED on the claim that the no-jeopardy conclusion in the 2000BiOp is arbitrary and capricious and, in all other respects, DENIED AS MOOT. Defendant's motion (doc. 349) for summary judgment is DENIED. Defendant-intervenor State of Idaho's motion (doc. 356) for

/ / / /

/ / / /

/ / / /

summary judgment is DENIED. Defendant-intervenor Inland Ports and Navigation Group's motion (doc. 361) for summary judgment is DENIED.

IT IS SO ORDERED.

Dated this   7th   day of May, 2003.

/S/  James A. Redden

25 -   OPINION AND ORDER

1

James A. Redden
United States District Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28