IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, IDAHO WILDLIFE FEDERATION, WASHINGTON WILDLIFE FEDERATION, SIERRA CLUB, TROUT UNLIMITED, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, IDAHO RIVERS UNITED, IDAHO STEELHEAD AND SALMON UNITED, NORTHWEST SPORTFISHING INDUSTRY ASSOCIATION, FRIENDS OF THE EARTH, SALMON FOR ALL, and COLUMBIA RIVERKEEPER,

            Plaintiffs,

            vs.

NATIONAL MARINE FISHERIES SERVICE, and UNITED STATES ARMY CORPS OF ENGINEERS,

            Defendants,

   and

NORTHWEST IRRIGATION UTILITIES, PUBLIC POWER COUNCIL, WASHINGTON STATE FARM BUREAU FEDERATION, FRANKLIN COUNTY FARM BUREAU FEDERATION, GRANT COUNTY FARM BUREAU FEDERATION, and INLAND PORTS AND NAVIGATION GROUP,

            Intervenor-Defendants.

CV 01-640-RE

OPINION AND ORDER

Page 1   -   OPINION AND ORDER

REDDEN, Judge:

The matter before the court is plaintiffs' Motion for Preliminary Injunction (doc. 507). Plaintiffs ask the court to enjoin the U.S. Army Corps of Engineers (the "Corps") from implementing its July 6, 2004 Statement of Decision ("SOD") to curtail summer spill at The Dalles and Bonneville dams from August 1, 2004, through August 31, 2004, and at Ice Harbor and John Day dams from August 26, 2004, through August 31, 2004. Plaintiffs also ask the court to enjoin the National Marine Fisheries Service ("NMFS" or "NOAA Fisheries") to withdraw its July 1, 2004, Findings Report approving the Corps' decision to curtail summer spill.

A hearing on the motion was held on July 28, 2004, at which time the court heard arguments and announced its decision to grant in part, and deny in part, the motion. The court announced the terms of the injunction and denied defendants' oral motion to stay the injunction pending appeal. The court also stated that a written opinion would be issued on July 29, 2004.

## BACKGROUND

In December 2000, NOAA Fisheries issued a biological opinion (the "2000 BiOp") pursuant to Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), regarding the impact of Federal Columbia River Power System ("FCRPS") operations on twelve salmon Evolutionary Significant Units ("ESUs"). NOAA Fisheries concluded that continuing FCRPS operations are likely to jeopardize the continued existence of, and to adversely modify the critical habitat of, eight salmon ESUs.

To avoid jeopardy and adverse modification of critical habitat, the 2000 BiOp proposed a Reasonable and Prudent Alternative ("RPA"). The RPA included short-term federal actions to modify hydro-power operations to improve the survival of salmon passing through FCRPS dams and reservoirs. One of the RPA measures to which NOAA Fisheries assigned "the highest priority" for improving the survival rate of juvenile salmon passing through the dams is the summer spill program (2000 BiOp at 9-82), which the Corps seeks to curtail this summer with NOAA Fisheries' approval.

The RPA in the 2000 BiOp also included short- and long-term federal actions relating to mitigation activities affecting salmon habitat, hatchery, and harvest (the "three Hs") and short-

Page 2 - OPINION AND ORDER

and long-term non-federal, state, regional, tribal, and private off-site mitigation actions, primarily related to the three Hs.  NOAA Fisheries concluded that jeopardy to the eight affected salmon ESUs would be avoided if the RPA measures were implemented.

Plaintiffs, non-profit environmental and conservation organizations, supported by several Treaty Tribes and the State of Oregon acting as *amici curiae,* challenged the 2000 BiOp on the ground that NOAA Fisheries' no-jeopardy conclusion in the RPA relied on future federal, state, and private mitigation actions that had not undergone Section 7 consultations and/or are not reasonably certain to occur.  In addition, plaintiffs and the Treaty Tribes challenged the science used by NOAA Fisheries in reaching its no-jeopardy conclusion in the RPA.

On May 7, 2003, the court granted plaintiffs' motion for summary judgment on the basis that the 2000 BiOp's no-jeopardy opinion was arbitrary and capricious:

> [NOAA Fisheries'] reliance on federal range-wide, off-site mitigation actions that have not undergone section 7 consultation and non-federal range-wide, off-site mitigation actions which are not reasonably certain to occur was improper and, as to eight of the salmon ESUs, the no-jeopardy opinion in the RPA is arbitrary and capricious.

The court also concluded:

> [R]emand is appropriate in order to give [NOAA Fisheries] the opportunity to consult with interested parties to insure that only those range-wide off-site federal mitigation actions which have undergone section 7 consultation, and range-wide off-site non-federal mitigation actions that are reasonably certain to occur, are considered in the determination whether any of the 12 salmon ESUs will be jeopardized by continued FCRPS operations.

Opinion and Order, May 7, 2003, p. 26.[1]

The court remanded the 2000 BiOp, maintained supervision over the remand process, and allowed the 2000 BiOp to remain in effect during the remand period.  NOAA Fisheries will release, on August 31, 2004, a draft revised 2000 BiOp addressing the defects identified by the court.

During the remand period, the Corps and Bonneville Power Administration ("BPA") issued a series of proposals regarding modifications to spill operations.  On June 22, 2004, those agencies released the Final Proposal for FCRPS Summer Juvenile Bypass Operations.  The

---

[1] The court deferred addressing whether the science relied on by NOAA Fisheries supported its no-jeopardy opinion.

Page 3  - OPINION AND ORDER

June 22 proposal formed the basis for the Amendment to the 2004/2004-2008 Implementation Plan for the FCRPS Biological Opinion Remand issued by the Corps, BPA, and the Bureau of Reclamation ("BOR"). That proposed amendment was submitted on June 23, 2004 to NOAA Fisheries for review.

On July 1, 2004, NOAA Fisheries issued its Findings Regarding Adequacy of the FRCPS Action Agencies' 2004 Annual Implementation Plan (the "Findings Report") approving the reduced spill proposal and asserting that it was "consistent with the determinations, assumptions, and analyses of the Opinion's RPA when NOAA concluded that it would satisfy the ESA 7(a)(2) standards." Findings Report, p. 9 (Corps AR at 169).

On July 6, 2004, the Corps released its SOD committing itself to modify summer spill operations as set forth in the Amendment to the 2004/2004-2008 Implementation Plan. As is evident from the relief sought by plaintiffs in their motion for preliminary injunction, the modified operations entail ending spill at certain dams earlier than in past years. The parties are in agreement that the ESU most impacted by such a change is the Snake River Fall Chinook ESU.

On July 9, 2004, plaintiffs filed a Supplemental Complaint for Declaratory and Injunctive Relief. Among other things, the Supplemental Complaint added the Corps as a defendant and added a claim for relief under the ESA and the Administrative Procedures Act ("APA") on the grounds that NOAA Fisheries and the Corps have illegally modified the summer spill program set forth in the RPA.

## LEGAL STANDARDS

"The standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties." Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003). The plaintiff must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." Id. "These two alternatives represent extremes of a single continuum, rather than two separate

tests. . . . Thus, the greater the relative hardship to [the party seeking the preliminary injunction,] the less probability of success must be shown." Id. (citation and internal quotations omitted).

Under the ESA, the test for entitlement to a preliminary injunction is not the traditional test. National Wildlife Federation v. Burlington Northern Railroad, Inc., 23 F.3d 1508, 1510 (9th Cir. 1994). Instead, "the balance of hardships and the public interest tips heavily in favor of the protected species." Id. at 1511, citing Tennessee Valley Authority v. Hill, 437 U.S. 153, 174 (1978). To establish an entitlement to a preliminary injunction based on an alleged violation of the ESA, "the plaintiff must make a showing that a violation of the ESA is at least likely in the future." National Wildlife Federation, 23 F.3d at 1511.

## DISCUSSION

I.  Jurisdictional Issues

Defendants and intervenors argue that this court lacks jurisdiction under the ESA because plaintiffs did not provide a sixty-day notice before filing their Supplemental Complaint. See 16 U.S.C. § 1540(g)(2)(A). They assert that plaintiffs could not have given such a notice until after the Corps made its decision to curtail summer spill on July 6, 2004. Based on this reasoning, it was impossible for plaintiffs to comply with the sixty-day notice requirement. In general, the court does not subscribe to this formalistic argument for why plaintiffs should not be able to bring their claim under the ESA.

Regardless, even if plaintiffs could not technically comply with the sixty-day notice requirement, they may rely on the APA for jurisdictional purposes. See 5 U.S.C. § 704 (allowing judicial review of "final agency action for which there is no other adequate remedy in a court"). In reaching this conclusion, I reject defendants' argument that the decisions at issue were not final agency actions. Regardless of the form in which the agency decisions were made (*i.e.*, a modification to the 2004/2004-2008 Annual Implementation Plan and an opinion regarding that modification's consistency with the 2000 BiOp), they have the serious legal consequence of modifying the spill regime called for in the 2000 BiOp (including the RPA). See Bennett v. Spear, 520 U.S. 154, 178 (1997) (describing a final agency action as a decision from which "legal consequences will flow") (citations omitted).

Page 5 - OPINION AND ORDER

Finally, the court also finds unpersuasive intervenors' arguments that the Ninth Circuit has exclusive jurisdiction and that a necessary and indispensable party has not been joined by plaintiffs.

II.     The Merits of Plaintiffs' Claims

As discussed above, NOAA Fisheries concluded in the 2000 BiOp that jeopardy would occur for threatened Snake River Fall Chinook and other salmon ESUs unless mitigation measures included in the RPA were implemented. A core element of the RPA is summer spill through August at the dams in question.

Defendants argue that summer spill can be curtailed because of one new mitigation measure or "offset" that renders the modified 2004/2004-2008 Annual Implementation Plan consistent with the RPA. This proposed offset consists of the release of 100,000 acre feet of water from Brownlee Reservoir in July of this year. I conclude that there are fundamental defects in this reasoning that cause the decisions based upon it to be arbitrary and capricious.

First, a significant portion of the 100,000 acre feet of water from Brownlee Reservoir is not "new" or additional water, regardless of the fact that the BPA had a contract with Idaho Power Company to release water this year. As the State of Oregon and the Treaty Tribes persuasively argue, the 2000 BiOp is premised on assumptions that significant water releases from Brownlee Reservoir would continue and requires, as part of the RPA, that the relevant agencies secure additional water from the Hells Canyon Complex. See 2000 BiOp at 3-1 ("proposed action" includes implementing 1995 RPA, as supplemented, [which entailed significant annual releases from Brownlee Reservoir in July and August]); 2000 BiOp at 9-70 (Action 32 of the RPA requires action agencies to acquire water for instream use from the Hells Canyon Complex). It also appears that, in analyzing the impact of the modified spill proposal on Snake River Fall Chinook, NOAA Fisheries used 2003 survival estimates that took into account a release of 77,000 acre feet of water from Brownlee Reservoir in July 2003. Because NOAA Fisheries assumed a greater amount of "new" water than has, in fact, been released from Brownlee Reservoir this July, no confidence can be placed in its conclusions about the impact on the fish.

Page 6 - OPINION AND ORDER

Second, NOAA Fisheries premised its conclusion that the Brownlee release would create a net improvement for juvenile fish on the unsupportable assumption that the water would be released at a uniform rate over a period of 21 days, thus keeping water temperature changes within an acceptable range. See Findings Report, pp. 6-7, Attachment 1 (Corps AR at 176-77, 181). This assumption was made by the agency despite the fact that the agreement with Idaho Power Company did not require the water to be released at a uniform rate (see Agreement between BPA and Idaho Power Company (Corps AR at 1173-76)) and there was no rational basis to conclude that the water would be released in such a manner given the pattern of releases in prior years. Based on argument presented at the July 28 hearing, it appears that the assumption of uniform flow was made to accommodate the limits of the model used by NOAA Fisheries rather than to reflect real river conditions.

Because the water was released from July 7 to 18, and graphs are available that show the flow at Hells Canyon Dam during that time, it is now clear that, in fact, the water was not released uniformly.[2] Instead, there were large fluctuations in the flow, presumably due to demands for power production. Likewise, the water was released over a much shorter period than the 21 days assumed in the NOAA Fisheries analysis.[3] This information, together with the flawed assumptions relied upon by the NOAA Fisheries, undercuts any confidence in the conclusions reached by the agency regarding the impact on the fish.

The foregoing reasons are sufficient for me to conclude that plaintiffs have prevailed on the merits and have demonstrated that the decisions of the agencies are arbitrary and capricious. This conclusion is bolstered by the fact that NOAA Fisheries has itself documented that the RPA has not been implemented as planned and the predicted survival improvements for Snake River fall chinook juveniles have not materialized (see NOAA Estimation of Hydro Performance

---

[2] In response to a request by the court issued by minute order on July 23, 2004, defendants provided in a letter to the court dated July 26, 2004, a graph that reflects the rate of water released from Brownlee Reservoir and Hells Canyon Dam for the period July 7 through July 18, 2004.

[3] In addition to the fact that the water from Brownlee Reservoir was released faster and earlier than NOAA Fisheries had assumed in its analysis, the court also takes note that NOAA Fisheries apparently did not take into consideration that a significant portion of the ESU (originating from the Clearwater River rather than the Snake River) would reach the Snake River in the latter part of August which is, of course, too late to benefit from the Brownlee release.

Standards for Snake River Fall Chinook Salmon, June 20, 2004 (Corps AR at 194-95)).  Given that we are working from a deficit situation, we should not be cutting back on an effective mitigation tool.

III.   Demonstrated Harm

The court notes that the tribes have asserted their treaty rights, particularly as they relate to fish not listed under the ESA.  Given the court's concerns regarding the impact of the spill proposal on Snake River Fall Chinook, which is a listed ESU, it does not need to reach the treaty rights issue or consider the harm to non-listed fish.

With that said, it is not difficult to conclude that plaintiffs have made the requisite showing of harm.  The agencies' own analysis concludes that a curtailment of spill will kill many listed juvenile fish, yet there is no real offset offered by the government.

Regardless, this is not a numbers game.  We are faced with a conclusion reached by the government itself in the 2000 BiOp that the fish are in jeopardy unless the RPA is implemented.  Given that the government has failed to demonstrate that the proposed modifications to summer spill operations are consistent with the RPA, the prospect of jeopardy would again arise if the proposed curtailment of spill were to occur.

As the court explained at the July 28 hearing, it has given serious consideration to the fact that a decision to enjoin the government will have some impact on ratepayers.  Given the danger, however, to the juvenile fish if summer spill is curtailed, and the evidence that the plans and efforts to boost juvenile survival rates are not working, the balance of interests weighs in favor of an injunction.  This is particularly the case given that plaintiffs have not just shown a likelihood of success on the merits but, instead, have convinced the court that the defendants were arbitrary and capricious in adopting and approving the modified spill plan.

IV.   Appropriate Relief

A year ago, the government urged the court to preserve the status quo and to leave the 2000 BiOp in place despite the fact that the court had found it to be legally infirm.  The court granted the government's request in that instance.

The court now acts again to preserve the status quo. The spill operations as contemplated by the 2000 BiOp to avoid jeopardy shall continue this summer as they have in past summers. The Corps is enjoined from implementing its July 6, 2004 SOD to curtail summer spill at The Dalles and Bonneville dams from August 1, 2004, through August 31, 2004, and at Ice Harbor and John Day dams from August 26, 2004, through August 31, 2004.

Given that the court has concluded the Findings Report by NOAA Fisheries is arbitrary and capricious, and has otherwise enjoined the Corps from curtailing spill this summer, the court declines to order NOAA Fisheries to withdraw the Findings Report. As such, plaintiffs' Motion for Preliminary Injunction (doc. 507) is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

Dated this 29th day of July, 2004.

/S/ James A. Redden
James A. Redden
United States District Judge