UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, IDAHO WILDLIFE FEDERATION, WASHINGTON WILDLIFE FEDERATION, SIERRA CLUB, TROUT UNLIMITED, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, IDAHO RIVERS UNITED, IDAHO STEELHEAD AND SALMON UNITED, NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION, SALMON FOR ALL, COLUMBIA RIVERKEEPER, AMERICAN RIVERS, INC., FEDERATION OF FLY FISHERS, and NW ENERGY COALITION, | CV 01-640-RE<br>OPINION AND ORDER |

      Plaintiffs,

 and

STATE OF OREGON,

      Intervenor-Plaintiff,

 v.

NATIONAL MARINE FISHERIES SERVICE,
U.S. ARMY CORPS OF ENGINEERS, and U.S.
BUREAU OF RECLAMATION

      Defendants,

PAGE 1 - OPINION AND ORDER

and

STATE OF IDAHO, STATE OF MONTANA, KOOTENAI TRIBE OF IDAHO, NORTHWEST IRRIGATION UTILITIES, PUBLIC POWER COUNCIL, WASHINGTON STATE FARM BUREAU FEDERATION, FRANKLIN COUNTY FARM BUREAU FEDERATION, GRANT COUNTY FARM BUREAU FEDERATION, BPA CUSTOMER GROUP, and CLARKSTON GOLF & COUNTRY CLUB,

        Intervenor-Defendants.

REDDEN, Judge:

        On April 10, 2007, the court received an anonymous phone message alleging that Bonneville Power Administration (BPA) intentionally violated biological fish restrictions during "the first part of April, end of March" to satisfy its hydro-power commitments, and sought to declare a system emergency to conceal the variance.[1] I conferred with the parties, and requested written responses to those allegations from Federal Defendants, Plaintiffs, the Treaty Tribes, and the State of Oregon. The responses are public documents and available online. I am concerned by BPA's actions during the early phase of the 2007 spill operations, and the damaging effect that those actions likely had on migrating juvenile salmon. After considering the parties' responses, I find it appropriate to clarify and reiterate Federal Defendants' legal obligations

---

[1] Generally, the Ninth Circuit Court of Appeals has exclusive jurisdiction over claims against BPA relating to its compliance with the Endangered Species Act. 16 U.S.C. § 839f(e)(5); Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv., 818 F. Supp. 1399, 1403-04 (W.D. Wash. 1993). Although not a party to this action, BPA clearly has some ability to order the generation of additional power to meet its marketing requirements. Id.; see also Dec. of Stephen R. Oliver, at 8-9 (If BPA did not supply a balanced schedule for power, "their Automatic Generation Control (AGC) systems likely would simply increase generation from certain projects in the federal hydrosystem in order to force such a balance.").

PAGE 2 - OPINION AND ORDER

under the Endangered Species Act (ESA), the 2004 Federal Columbia River Power System Biological Opinion (2004 FCRPS BiOp), and the 2007 Operations Agreement.

Federal dam operations on the Columbia and Snake Rivers are governed primarily by Federal Defendants' 2004 FCRPS BiOp. I granted Plaintiffs' and the Treaty Tribes' requests for injunctive relief in 2005, and again in 2006, ordering the U.S. Army Corps of Engineers to modify its proposed dam operations under the 2004 FCRPS BiOp by increasing spring and summer spill at five Columbia and Snake River dams. The spill was necessary to assist juvenile salmon and steelhead migrating to the ocean, and to avoid irreparable harm to listed juvenile salmon and steelhead that would otherwise occur.

Plaintiffs decided not to file a separate request for injunctive relief after they learned that Federal Defendants entered into a formal agreement with the Treaty Tribes for the 2007 spring and summer spill operations. Under the agreement, Federal Defendants agreed to continue the spring and summer spill operations ordered by the court in 2006.

The agreement also provides, with an exception not relevant here, "[a]ll other operations not specified in the [agreement] will be consistent with the operations identified in the 2004 FCRPS Biological Opinion . . . ." The 2004 FCRPS BiOp provides that the action agencies "will continue operating the FCRPS to achieve the hydrosystem standards described in the 2000 BiOp," which requires the Corps and BPA to "operate turbines within 1% peak efficiency during the juvenile and adult migration seasons . . . ." The Final 2007 Water Management Plan also requires Federal Defendants to operate Bonneville, The Dalles, and McNary dams "within 1% of best efficiency," for the benefit of listed species.

On April 3, 2007, a combination of required flood control drafts, higher than forecast

PAGE 3 - OPINION AND ORDER

demand for power, marketing commitments, and human error, created a situation that made it difficult for BPA to meet both its power commitments and to provide the fish-protection measures enumerated in the 2000 and 2004 BiOps. In the few days before April 3, 2007, BPA overestimated, and consequently oversold the amount of surplus power it expected to generate that day, resulting in a shortfall of power. Colder-than-forecasted regional temperatures also contributed to the energy shortfall. To meet its April 3, 2007 obligations, BPA undertook a diligent, but unsuccessful effort to buy back the needed power. BPA also sought power from Dworshak, Hungry Horse, and the Willamette Project dams to meet the shortfall. BPA even considered declaring a system emergency to avoid violating fish protection measures, but did not do so because there was, in fact, no power system emergency. Having failed to acquire sufficient power to meet its commitments, BPA generated additional power by operating Bonneville, The Dalles, and McNary dams outside the 1% peak turbine efficiency standard for several hours on April 3, 2007. Fortunately, spring spill had not yet started at those dams.

      That same day, an unrelated equipment failure caused Little Goose dam to fall below minimum operating pool (MOP). To restore the reservoir to the proper elevation, the Corps reduced power generation and spill discharge at Little Goose dam, which resulted in similar reductions at each of the other Lower Snake River dams.

      Federal Defendants acknowledge BPA violated the 1% peak efficiency standard set out in the 2000 and 2004 BiOps. They contend, however, that the biological impact on migrating juvenile salmon was "minimal" because so few smolts were present. But that result is more likely a product of good fortune rather than reasoned decision-making or planning. Moreover, given the dangerously low rate of returning adult fish and the "evidence suggest[ing] that

operations outside of 1% peak efficiency [are] highly detrimental to fish survival," I do not accept Federal Defendants' conclusory assertion that the impact of these violations was "minimal." See Attachment 4 to State of Oregon's Reply, Federal and Tribal Fisheries Agencies Joint Technical Staff letter to U.S. Army Corps of Engineers (April 2, 2004), at 1.

In any event, it is not clear that BPA's actions would have differed substantially even if a similar energy shortfall occurred during peak migration season, when the impacts on ESA-listed species would not have been "minimal." According to Stephen R. Oliver, rather than breaking sales contracts to ensure a balance between power supply and sales commitments, BPA's "Automatic Generation Control (AGC) systems likely would simply increase generation from certain projects in the federal hydro system in order to force such a balance." Dec. of Stephen R. Oliver, at 8-9 (emphasis added). Oliver explained that "only . . . if there were a serious problem with transmission grid reliability" would BPA cut delivery of power to purchasers. Id. (emphasis added). In this case, BPA voluntarily violated fish-protection measures to meet its sales obligations. But if I understand correctly, BPA's AGC systems (*i.e.*, computer system?) will automatically increase power generation to rectify an energy shortfall, regardless of harm to ESA-listed species. Apparently, BPA's sales commitments to customers always trump its obligation to protect ESA-listed species. BPA must realize, however, that the fish-protection measures detailed in the 2000 and 2004 BiOps are not optional. Nor is compliance with the ESA. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 481 F.3d 1224 (9th Cir. 2007).

I recognize that operating the FCRPS is "an incredibly complex task," and that BPA was faced with a "difficult choice" on April 3, 2007. BPA's choice, however, "to operate certain turbines outside the 1% peak efficiency requirement" standard set out in the 2000 and 2004

PAGE 5 - OPINION AND ORDER

FCRPS BiOps, and sacrifice the biological needs of listed species to satisfy its sales commitments to customers was wrong. This was not a system emergency. It was a marketing error, and ESA-listed salmon and steelhead paid the price. This, the law does not permit. Under the circumstances here, threatened and endangered species must come before power generation.

There is no evidence that BPA intended to either violate the 2007 Operations Agreement, or harm listed species. I remain concerned, however, that BPA and the Corps do not view their commitments under the current operating agreement as binding legal obligations. To emphasize the point, I find it appropriate to incorporate the terms of the 2007 Operations Agreement into a court order. Federal Defendants do not object. Subject to any further orders, during the remainder of the 2007 spring and summer migration seasons, Federal Defendants shall:

(1) Comply with the terms of the 2007 Operations Agreement for spill. To the extent not specified in that agreement, all FCRPS operations shall be consistent with the 2004 BiOp. As noted above, although the 2004 BiOp does not address turbine efficiency, the 2004 BiOp provides that the action agencies "will continue operating the FCPRS to achieve the hydrosystem performance standards described in the 2000 BiOp." The 2000 BiOp requires the Corps and BPA to operate turbines within 1% of peak efficiency during the juvenile and adult migrating seasons. Therefore, under the 2007 Operations Agreement, Corps and BPA shall operate the FCRPS turbines within the 1% peak efficiency standard.

(2) In the absence of a declared system emergency, BPA and the Corps shall take all reasonable and practicable steps to notify the court and the parties prior to any future departure from the fish-protection requirements set out in the 2007 Operations Agreement, or the 2004 BiOp. If unforseen circumstances arise that preclude BPA or the Corps from notifying the court

prior to a variation from required fish-protection measures, they shall report those violations directly to the court as soon as practicable. Federal Defendants shall report to the court any violation of required fish-protection measures, and the mitigation measures that may be appropriate to account for such violation. The other parties shall have an opportunity to respond.

(3) To ensure that BPA is fully aware of its obligations, Federal Defendants shall make this Opinion and Order available to all BPA employees with authority and duties regarding FCRPS operations.

Federal Defendants are commended for their forthright and prompt response to the recent and unfortunate violations of fish-protection measures. This Opinion and Order is not a product of anger, but frustration. The ESA is the law of the land, and has been since it was signed into law by President Richard Nixon in 1973. Its mandate is clear: federal agencies must "afford first priority to the declared national policy of saving endangered species." Tennessee Valley Authority v. Hill, 437 U.S. 153, 185 (1978). It is clearly written because the drafters sought desirable goals, and knew it would require some sacrifice to save our nation's precipitously diminishing species. The duty of federal agencies under ESA has been litigated, and reaffirmed in federal courts across the country. Proposed amendments to the Act have repeatedly failed, and its regulations stand firm. We might as well get it right.

IT IS SO ORDERED.

DATED this  23rd  day of May, 2007.

/s/ James A. Redden
James A. Redden
United States District Judge

PAGE 7 - OPINION AND ORDER