

**United States District Court**
**District of Oregon**
1527 United States Courthouse
1000 S.W. Third Avenue
Portland, Oregon 97204-2902

Chambers of
JAMES A. REDDEN
United States District Judge

FILED'09 FEB 18 13:51 USDC-ORP

Phone: 503-326-8370
Fax: 503-326-8379

February 18, 2009

To:   Counsel of Record, <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>, CV 01-640 RE
Re:   March 6, 2009 Oral Argument

Dear Counsel,

    I commend Federal Defendants for their efforts in collaborating with the sovereigns in developing a biological opinion for the Federal Columbia River Power System ("2008 BiOp"), and committing themselves to substantial funding for habitat and hatchery improvement throughout the Columbia River Basin.

    At oral argument on March 6, 2009, the parties should be prepared to answer and discuss the questions that I have attached to this letter. These questions go to the heart of the 2008 BiOp. Though the questions are addressed primarily to Federal Defendants (and they will speak first), all of the parties will have an opportunity to address the issues. It is not necessary, however, for every attorney to answer every question. Be prepared to address the issues that are most pertinent to your clients' interests. Avoid unnecessarily repeating other counsel's arguments. Realize that <u>all</u> of us are familiar with the factual and procedural background in this case. Our time will be best spent addressing the discrete questions attached to this letter. Discuss the BiOp and the law—not the other parties' motivations.

    It is not necessary to discuss the Plaintiffs' claims related to the Clean Water Act or killer whales. I am inclined to deny their Motion for Summary Judgment on those issues. Similarly,

we will not discuss Defendants' judicial estoppel or standing arguments.

My goal is to have enough time at oral argument to discuss how to resolve this matter if the 2008 BiOp fails. I have no desire to remand this biological opinion for yet another round of consultation. The revolving door of consultation and litigation does little to help endangered salmon and steelhead. Federal Defendants and the sovereigns have worked very hard on this biological opinion and it shows—we have come a long way from the 2004 BiOp. I am concerned, however, about the "trending towards recovery" jeopardy standard, the proposed reduction in spill, and the lack of certainty and the assumed benefits associated with the proposed habitat mitigation measures. If we have time after oral argument, please be prepared to discuss ways to "bolster" the biological opinion, if necessary. We will also discuss spill. To ensure the continuation of the status quo while the court resolves the parties' various motions, I will ask Federal Defendants to agree to implement the Independent Scientific Advisory Board's September 2008 recommendation to continue recent court-ordered spill operations for Spring 2009.

Very Truly Yours,

James A. Redden
United States District Judge

JAR:js

Counsel of Record, CV 01-640-RE
February 18, 2009
Page 3

Questions for March 6, 2009 Oral Argument

A. The "Trending Toward Recovery" Jeopardy Standard

(1) The Endangered Species Act ("ESA") regulations define jeopardy as an action that "reduce[s] appreciably the likelihood of both survival and recovery of a listed species . . . ." Federal Defendants contend that a species avoids jeopardy if it is "trending toward recovery," or is in position for "eventual progress towards recovery." Neither of those terms appear in the regulation and Federal Defendants make no attempt to determine <u>what</u> actual recovery means. Are they entitled to deference in their interpretation?

(2) The 1995 and 2000 BiOps held that a lawful jeopardy analysis required the agency to determine the survival levels necessary to support actual recovery and established a time frame for reaching that goal. Federal Defendants' now argue that they need not consider actual recovery. Have they provided a rational explanation for the departure from their previous position?

(3) Does Federal Defendants' current position square with the Ninth Circuit's holding that the 2004 BiOp "inappropriately evaluated recovery impacts without knowing the in-river survival levels necessary to support recovery"?

(4) Should Federal Defendants be required to use the recovery data developed by the Interior Columbia Technical Recovery Team ("ICTRT")? Why, in the 2000 BiOp, did they commit to using that data? Is that the best "available" scientific data? Would the use of ICTRT recovery data result in a jeopardy conclusion?

(5) Federal Defendants urge that if there is any positive growth in abundance or productivity (<i>i.e.</i>, a greater than 1 to 1 ratio of adult returns per spawner), a species is "trending toward recovery" and thus, not likely to be "jeopardized." Does this mean that an incremental survival improvement is sufficient to avoid jeopardy regardless of the already vulnerable status of the species? Stated differently, if Federal Defendants anticipate that 100 listed adult Sockeye

Counsel of Record, CV 01-640-RE
February 18, 2009
Page 4

will return to the river in 2018 and approximately 90 returned in 2008, does Federal Defendants' approach mandate a "no jeopardy" conclusion even though 90 returning Sockeye is still so low as to be considered a continued threat to the species' extinction? Does the best available science support such a conclusion?

B. Estuary Habitat Analysis

(1) Federal Defendants appear to rely on estuary habitat improvements in reaching their "no jeopardy" conclusion. They estimate that implementation of estuary habitat actions will cost $500 million over the next 25 years. Yet, Federal Defendants and the Bonneville Power Administration are committed to only $5.5 million per year for the next 10 years, and much of that funding requires Congressional approval. Additionally, many of the proposed estuary habitat actions rely on private and third-party actions. How can these actions be characterized as reasonably certain to occur?

(2) The Estuary Recovery Module, at Table B-1, lists 23 survival improvement targets, 16 of which are described as "not supported in the literature." If that is the case, is Federal Defendants' reliance on those estuary measures to avoid jeopardy arbitrary and capricious?

(3) In March 2008, the Independent Scientific Advisory Board ("ISAB") concluded that the Estuary Recovery Module ("the Module") "does not meet ISAB standards as a scientific document." ISAB criticized the Module's lack of critical scientific review and the lack of scientific support for many of its optimistic assumptions. In light of those criticisms, how can the Module be characterized as the "best available science"? If it has no scientific basis, is it arbitrary and capricious for Federal Defendants to rely on the Module's 20 percent estuary improvement target to reach a "no jeopardy" conclusion?

C. Tributary Habitat Analysis

(1) Federal Defendants predict specific numerical survival improvements for tributary habitat actions (*e.g.*, 41% improvement for Spring Chinook in the Pahsimeroi River) while

acknowledging that they have not identified specific habitat actions, and that they have no scientific data to support the conclusion that the specific predicted survival benefits will, in fact be realized. Is this arbitrary and capricious? If Federal Defendants are unable to identify specific habitat actions beyond 2009, how can they rationally rely on benefits from such actions in reaching a "no jeopardy" conclusion?

(2) What science supports the notion that a "commitment" to x percent improvement in habitat will result in an equal percent increase in survival?

D. Proposed Spill and Hydro Operations.

(1) In light of ISAB's September 2008 recommendation to continue the current spill regime, how do the Federal Defendants justify curtailing spill in the spring and summer? Will Federal Defendants amend the BiOp to reinstate recent court-ordered spill operations?

(2) In 2003, ISAB concluded that increased quantities and better coordination of flow augmentation is beneficial to steelhead and sockeye. Since at least 1995, the government has indicated that it will pursue negotiations with BC Hydro for additional and coordinated non-treaty water releases. What is the status of those negotiations? What other sources are available to increase flow? Many of the 2008 BiOp's flow measures are merely guidelines. Are Federal Defendants able to commit to obtaining any specific volumes of additional flow?

E. Other Issues

(1) What will the Federal Defendants do if their proposed habitat mitigation actions do not result in the anticipated benefits? Why not include a contingency plan in the biological opinion, similar to the 2000 BiOp? There, Federal Defendants committed to <u>seeking</u> Congressional authority to breach the lower Snake River dams if the mitigation plans failed. The ESA requires federal agencies to avoid any irreversible or irretrievable commitment of resources that may foreclose <u>any</u> future reasonable and prudent alternative. To ensure that dam breaching retains the potential to be an effective mitigation measure (*i.e.*, that there will be listed fish in the

river that benefit), why not begin analyzing the scientific and technical feasibility of such an option now?

(2) Would Plaintiffs be satisfied if Federal Defendants agreed to implement some or all of the measures in the proposed Preliminary Injunction? Would Plaintiffs endorse such a BiOp? Are Federal Defendants willing to amend the BiOp to include some or all of those measures (*e.g.*, spill) as part of a settlement agreement?

(3) The Nez Perce Tribe has been a forceful advocate for breaching the lower Snake River dams. Does it not make sense to seek a firm commitment to the 427-487 kaf of flow augmentation from the upper Snake River before seeking authority to breach the dams? On the other hand, given the Snake River Irrigators' and the State of Idaho's strident objections to dam breaching, can those parties commit to providing the SRBA-authorized annual 427 kaf of flow augmentation to help avoid the possibility of dam breaching?

Unless the parties agree otherwise, I suggest Federal Defendants begin by addressing the "Trending Toward Recovery" questions. Plaintiffs, the State of Oregon, and the Nez Perce Tribe will then have an opportunity to respond to Federal Defendants' arguments on that issue, followed by any amici and/or intervenor. We will then proceed to the estuary habitat questions, the tributary habitat questions, and so on.