UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


NATIONAL WILDLIFE FEDERATION, et al.,                    CV 01-00640-RE

        Plaintiffs,

                                    OPINION AND ORDER

    v.


NATIONAL MARINE FISHERIES SERVICE, et
al.

        Defendants.

_____

REDDEN, Judge:

    This Opinion and Order addresses the validity of the 2008 and 2010 Biological Opinions

("2008/2010 BiOp") issued by NOAA Fisheries[1] to the U.S. Army Corps of Engineers ("the

_____

    [1]Defendant National Marine Fisheries Service changed its name to NOAA Fisheries after
Plaintiffs filed this case.

PAGE 1 - OPINION AND ORDER

Corps"), and the U.S. Bureau of Reclamation ("BOR") (collectively, "Federal Defendants")
under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536. Section 7 requires
Federal Defendants to "insure" that the operation of the Federal Columbia River Power System
("FCRPS"), which is comprised of 14 sets of hydroelectric dams, powerhouses, and associated
reservoirs, "is not likely to jeopardize the continued existence" of any species listed under the
Act. Id. § 1536(a)(2). NOAA Fisheries concludes that through 2018, FCRPS operations are not
likely to jeopardize the continued existence of any listed species, based on measures to be
implemented by Federal Defendants to mitigate for the significant salmon mortality caused by
the existence and operation of the hydroelectric power system.

Federal Defendants have failed, however, to identify specific mitigation plans to be
implemented beyond 2013. Because the 2008/2010 BiOp's no jeopardy conclusion is based on
unidentified habitat mitigation measures, NOAA Fisheries' opinion that FCRPS operations after
2013 will not jeopardize listed species is arbitrary and capricious.

Accordingly, I DENY Federal Defendants' Cross-Motion for Summary Judgment
(doc. #1556), and Supplemental Cross-Motion for Summary Judgment (doc. #1805), Northwest
River Partners' Motion for Summary Judgment (doc. #1539); Confederated Salish and Kootenai
Tribes' Joint and Cross-Motions for Summary Judgment (docs. #1542 and 1551); and
Washington's and Idaho's Cross-Motion for Summary Judgment (doc. #1553), and Supplemental
Motion for Summary Judgment (doc. #1819). I GRANT in part, and DENY in part, NWF's
Motion for Summary Judgment (doc. #1498), and Supplemental Motion for Summary Judgment
(doc. #1793), and Oregon's Motion for Summary Judgment (doc. #1507), and Supplemental
Motion for Summary Judgment (doc. #1801).

PAGE 2 - OPINION AND ORDER

I remand the 2008/2010 BiOp to NOAA Fisheries to reevaluate the Federal Defendants'

reliance on unidentified mitigation measures. Because the 2008/2010 BiOp does, however,

identify specific and beneficial mitigation measures through the end of 2013, this BiOp and the

accompanying incidental take statement shall stay in place until then. No later than January 1,

2014, NOAA Fisheries shall produce a new or supplemental BiOp that relies only on identified

mitigation measures that are reasonably certain to occur. During the remand period, Federal

Defendants shall fund and implement all of the reasonable and prudent alternative actions set

forth in the 2008/2010 BiOp, including the Memoranda of Agreement they have executed with

the various sovereigns. In addition, Federal Defendants shall continue to collaborate with the

sovereigns to develop mitigation actions to be included in the proposed action, and to develop

data to support any proposed mitigation.

Finally, I GRANT Plaintiffs' Corrected Motion for Preliminary Injunction (doc. #1627)

with respect to spill. Federal Defendants shall implement spring and summer spill operations in

a manner consistent with this court's previous spill orders. I DENY Plaintiffs' motion, however,

with respect to flow augmentation and reservoir storage operations. To the extent possible,

Federal Defendants shall operate the FCRPS to meet the flow augmentation objectives in the

2008/2010 BiOp.

## The Endangered Species Act

Section 7(a)(2) of the ESA requires each federal agency to "insure that any action

authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). If a federal

agency determines that a proposed action "may affect" a listed marine or anadromous species or

PAGE 3 - OPINION AND ORDER

its critical habitat, the agency is required to engage in a formal consultation with NOAA

Fisheries. 50 C.F.R. § 402. 14(a).

After consultation, NOAA Fisheries issues a biological opinion evaluating whether the

proposed action "is likely to jeopardize the continued existence of listed species." 16 U.S.C. §§

1536(a)(4), (b); 50 C.F.R. § 402.14.  An action jeopardizes the continued existence of a listed

species if it "would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of that species." 50 C.F.R. § 402.02.  NOAA Fisheries must base its

biological opinion on the "best scientific and commercial data available." 16 U.S.C. §

1536(a)(2).

If NOAA Fisheries concludes a proposed action will jeopardize a listed species, the

opinion must include reasonable and prudent alternatives ("RPAs")  to the agency's plans that

will likely avoid jeopardy.  Id. § 1536(b)(4). If the agency concludes that a proposed action is not

likely to jeopardize the continued existence of a listed species but determines that the action will

result in the take of listed species, the agency must issue an incidental take statement ("ITS").  Id.

An ITS authorizes a limited take of listed species that would otherwise violate Section 9's "take"

prohibition, establishes the limit of any taking of the species, and specifies measures to minimize

any taking.  16 U.S.C. §§ 1536(b)(4), 1538; 50 C.F.R. § 402.14(i).

///

///

///

PAGE 4 - OPINION AND ORDER

## Background[2]

### A. 2000BiOp

In 2000, NOAA Fisheries issued its fourth biological opinion addressing the impact of the FCRPS on endangered salmon species. This court rejected the 2000BiOp because the proposed mitigation actions and long-term comprehensive monitoring program were not reasonably certain to occur. The court, however, allowed Federal Defendants' ITS to remain to avoid a serious disruption of hydroelectric power and an unmanageable flood of litigation arising from the otherwise unlawful taking of the endangered species.

During the remand period, the court regularly met with the parties to monitor progress. It became apparent that there was no federal funding for the mitigation and monitoring measures described in the 2000 BiOp.

In the summer of 2004, the Bonneville Power Administration ("BPA") and the Corps decided to curtail summer spill at four FCRPS dams, even though the 2000 BiOp had cited summer spill as "the highest priority" for improving salmon survival and avoiding jeopardy. 2000 BiOp at 9-82. NOAA Fisheries acknowledged that their proposal could kill up to 376,000 listed fish, but concluded the spill reduction was consistent with the 2000 BiOp.

In July 2004, the court enjoined Federal Defendants' spill proposal, noting that each of their proposed mitigation measures was already required by the 2000 BiOp. In addition, NOAA Fisheries' analysis of the "new" or additional flow augmentation was based on flawed assumptions. The court found that the curtailment of spill would jeopardize the species.

---

[2] The history of Federal Defendant's lack of, or at best, marginal compliance with the procedural and substantive requirements of the ESA as to FCRPS operations has been laid out in prior Opinions and Orders in this case and is repeated here only where relevant.

### B. 2004 BiOp

In 2004, NOAA Fisheries issued a new biological opinion, concluding operation of the FCRPS would not jeopardize the continued existence of any listed species because the dams were built before enactment of the ESA and therefore, the dams were part of the environmental baseline. NOAA Fisheries interpreted the ESA regulations so as (1) to eliminate the need to consult on the FCRPS operations that NOAA Fisheries considered nondiscretionary, and (2) to analyze the effects of the proposed dam operations on listed species in a manner that did not take into account many of the adverse effects of dam operations. In addition, NOAA Fisheries announced that hatchery produced salmonids would be counted as wild fish in determining whether or not a stock required ESA protection.

This court found that biological opinion arbitrary and capricious, and ordered Federal Defendants to continue spring and summer spills. NOAA Fisheries appealed. The Ninth Circuit Court of Appeals, however, affirmed the court's Opinion and Order in all respects. Since then, the Corps has implemented spring and summer spill operations.

In October 2005, the court remanded the 2004 BiOp to NOAA Fisheries for further Section 7 consultation. This court also ordered Federal Defendants to collaborate with the sovereigns to (1) develop the proposed action, and (2) reach agreement or narrow the areas of disagreement on scientific and technical information. Federal Defendants appealed, but the Ninth Circuit affirmed the remand order.

### C. 2008 BiOp

In 2008, BPA, the Corps, and BOR entered into ten-year agreements with the States of Idaho and Montana, the Confederated Tribes of the Warm Springs Reservation of Oregon, the

Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes and Bands of the Yakama Nation, the Confederated Tribes of the Colville Reservation, and the Columbia River Inter-Tribal Fish Commission ("CRITFC") called the Columbia Basin Fish Accords ("Fish Accords"). Under the Fish Accords, the Action Agencies committed to spending up to $933 million on salmon mitigation measures over the life of the BiOp. In return, the Fish Accord parties signed Memoranda of Agreement ("MOAs"), agreeing to support the 2008 BiOp in any subsequent litigation. The Fish Accords are the foundation of the Federal Defendants' habitat restoration plan and provide firm commitment to funding much of the BiOp's mitigation plan. Relying on the Fish Accords and other promised mitigation, NOAA Fisheries concluded FCRPS dam operations would not jeopardize listed species through 2018.

*(1) The Jeopardy Framework*

The 2008 BiOp's jeopardy framework asks "whether the species can be expected to survive with an adequate potential for recovery." 2008 BiOp, at 1-10. An "adequate potential for recovery" is evident if the species is on a "trend toward eventual recovery." 2008 BiOp, at 1-12. Plaintiffs argue this framework does not comply with the ESA. For the reasons set forth below, however, the court need not reach this issue.

*(2) Habitat Improvement*

To avoid jeopardy, the Action Agencies rely on a variety of tributary and estuary habitat, hydropower, and hatchery measures. From 2007 to 2009, NOAA Fisheries required the Action Agencies to complete specific habitat actions to achieve population-specific survival improvements. For 2010 to 2018, NOAA Fisheries required the Action Agencies to commit to specific habitat quality improvements, but did not require them to identify particular projects.

PAGE 7 - OPINION AND ORDER

The Action Agencies promised funding and/or technical assistance to implement specific habitat projects to achieve the specified habitat improvements.

### (3) Adaptive Management Implementation Plan

In September 2009, in response to the court's concerns, NOAA Fisheries issued an Adaptive Management Implementation Plan ("AMIP").  As part of the AMIP, the State of Washington and Federal Defendants executed the Columbia River Estuary Memorandum of Agreement ("Estuary MOA"), which added estuary restoration projects, as well as research, monitoring, and evaluation ("RM&E"), and committed an additional $4.5 million annually for the life of the BiOp.  Federal Defendants also executed an MOA with the Shoshone-Bannock Tribes, and agreed to provide them $61 million over 10 years for habitat restoration projects. The AMIP also modified the 2008 BiOp to provide for annual evaluation of spring and summer spill by the Regional Implementation Oversight Group ("RIOG").

**D. The 2010 Amended BiOp**

Because the AMIP was not part of the administrative record and therefore, not properly before the court, the court granted Federal Defendants' motion for a voluntary remand to incorporate the AMIP as part of a final agency action.

In December 2010,  NOAA Fisheries issued the 2010 Supplemental BiOp, which incorporated the AMIP into the 2008 BiOp.  NOAA Fisheries, however, did not alter its jeopardy framework or methodologies for measuring the benefits of habitat restoration.  NOAA Fisheries updated various quantitative data, and identified specific habitat mitigation actions for 2010 through 2013.  NOAA Fisheries again concluded there was a high likelihood of survival and an adequate potential for recovery under the effects of the action.

PAGE 8 - OPINION AND ORDER

## Standard of Review

The Administrative Procedure Act ("APA"), governs the court's review of a biological

opinion issued by a federal agency under Section 7. Bennett v. Spear, 520 U.S. 154, 174-77

(1997).  Under the APA, an agency's final action must be upheld unless it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).

A decision is arbitrary and capricious "only if the agency relied on factors Congress did

not intend it to consider, entirely failed to consider an important aspect of the problem, or offered

an explanation that runs counter to the evidence before the agency or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." Lands Council

v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (citations omitted), abrogated on other grounds by

Winter v. Natural Res. Def. Ctr. 555 U.S. 7 (2008).  Review under the arbitrary and capricious

standard is "narrow" and this court may not substitute its judgment for that of the agency.  Lands

Council, 537 F.3d at 987.  An agency action will be upheld so long as it correctly applied the law

and "considered the relevant factors and articulated a rational connection between the facts found

and the choice made."  Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries

Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (citation omitted).

Additionally, the court must be "most deferential when the agency is making predictions,

within its [area of] special expertise, at the frontiers of science." Lands Council , 537 F.3d at 993

(alteration in original; quotations omitted).  Even if a biological opinion is based on "admittedly

weak best available science," the court must not "substitute [its] judgment for that of the

agency."  ALCOA v. BPA, 175 F.3d 1156, 1160-61 (9th Cir. 1999).  Courts are not to "act as a

PAGE 9 - OPINION AND ORDER

panel of scientists that instructs [the agency] how to validate its hypotheses . . . chooses among scientific studies, . . . and orders the agency to explain every possible scientific uncertainty." Lands Council, 537 F.3d at 988. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Id. at 1000 (quotation omitted). The question is not whether the court would have come to a different conclusion, but whether the agency's conclusion is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1985). The ESA "does not require that the [agency] act only when it can justify its decision with absolute confidence." Arizona Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160, 1164 (9th Cir. 2010).

## Discussion

Plaintiffs contend that the 2008/2010 BiOp is arbitrary and capricious. They argue, inter alia, that: (1) the BiOp's "trending toward recovery" jeopardy standard is legally flawed; (2) NOAA Fisheries failed to use the best available scientific data in measuring the effects of the action and the benefits of their proposed RPAs ; and (3) the BiOp improperly relies on future federal, state, tribal, and private actions that are not reasonably certain to occur.

Assuming, without deciding, that NOAA Fisheries' jeopardy framework and scientific methodologies are valid and based upon the best available science, I conclude it failed to adequately identify specific and verifiable mitigation plans beyond 2013 when current plans expire or are scheduled to be completed. Because it is based on unidentified habitat mitigation measures that are not reasonably certain to occur, I find NOAA Fisheries' "no jeopardy"

PAGE 10 - OPINION AND ORDER

conclusion arbitrary and capricious insofar as it extends beyond 2013.[3]

The ESA prohibits NOAA Fisheries from relying on the effects of uncertain and speculative actions that are not "reasonably certain to occur." 50 C.F.R. § 402.02; Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS I"), 254 F. Supp. 2d 1196, 1207-09 (D. Or. 2003). Mitigation measures may be relied upon only where they involve "specific and binding plans" and "a clear, definite commitment of resources to implement those measures." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS II"), 524 F.3d 917, 935-36 (9th Cir. 2008) (finding agency's "sincere general commitment to future improvements" inadequate to support no jeopardy conclusion). Mitigation measures supporting a biological opinion's no jeopardy conclusion must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987)).

Here, NOAA Fisheries improperly relies on habitat mitigation measures that are neither reasonably specific nor reasonably certain to occur, and in some cases not even identified.

---

[3] Because I find that the BiOp impermissibly relies on mitigation measures that are not reasonably certain to occur, I need not address Plaintiffs' remaining arguments. I continue to have serious concerns about the specific, numerical survival benefits NOAA Fisheries attributes to habitat mitigation. Habitat improvement is a vital component of recovery and may lead to increased survival. Neverthheless, the lack of scientific support for specific survival predictions is troubling. Indeed, NOAA Fisheries acknowledges that the benefits associated with habitat improvement may not accrue for many years, if ever. Although the court may be required to defer to NOAA Fisheries' technical and scientific "expertise" in predicting the benefits of habitat mitigation, the court is not required to defer to uncertain survival predictions that are based upon unidentified mitigation plans.

NOAA Fisheries recognizes that habitat mitigation throughout the life of the BiOp is necessary to avoid jeopardy, but it has not identified any specific habitat projects after 2013. Instead, NOAA Fisheries assumes it will be able to identify and implement the additional projects that are necessary to avoid jeopardy. 2008 BiOp at 7-45; RPA 35 ("action agencies will identify additional habitat projects"); see also 2008 BiOp at 7-43 to 7-45; A.R. B.92, att. D-l; RTC at 13 ("[t]he Action Agencies are committed to achieving the population level habitat improvements identified in [the 2008 RPA]"). By definition, however, unidentified mitigation measures are not "reasonably specific, certain to occur, and capable of implementation." Rumsfeld, 198 F. Supp. at 1152.

NOAA Fisheries relies on habitat improvement to produce the significant survival improvements necessary to avoid jeopardy. See, e.g., 2008 BiOp at 8.3-54 (Table 8.3.5-1) (predicting survival improvement for Snake River spring/summer Chinook of 17% - 41% depending on the population). NOAA Fisheries relies on two types of habitat mitigation actions. The first includes specific, identified projects scheduled to occur between 2008 and 2013. See 2008 BiOp, RPA Table at 40 (RPA Action 34) (providing funding and technical assistance to implement "specific projects identified for implementation in 2007 to 2009"); FER 71 (2010-2013 FCRPS BiOp Implementation Plan). The second, however, includes broad, unidentified categories of projects that Federal Defendants intend to develop and implement between 2013 and 2018. See BA at 2-36 (AR Doc. B.89). NOAA Fisheries concludes that both types of actions—the specific, identified habitat actions for 2008 through 2013 and the unidentified actions they intend to identify and implement after 2013—are necessary to avoid the likelihood of jeopardy. See 2008 BiOp, RPA Table at 44-46 (reporting "Estimated Percentage Habitat

PAGE 12 - OPINION AND ORDER

Quality Improvement from 2007-2009 Actions" and "Total Estimated Percentage Habitat Quality Improvement of 2007-2018 Actions"); see also CA (AR Doc. B.92), App. C at C-1-38 (describing how NOAA Fisheries estimated "benefits from non-specific proposed[habitat] actions"). Moreover, the majority of the predicted survival improvement associated with habitat improvement comes from actions Federal Defendants hope to identify and implement between 2013 and 2018. See, e.g., 2008 BiOp, RPA Table at 44 (reporting a 23% total habitat quality improvement for Catherine Creek population of Snake River spring/summer Chinook from 2007 through 2017, only 4% of which comes from 2007 through 2009 actions).

Federal Defendants argue that these future actions are, in fact, certain to occur because they have "committed" to achieving specific, numerical improvements in habitat quality and survival. Federal Defendants acknowledge, however, that they are unable to identify any specific projects that will occur between 2013 and 2018, and it is unclear whether they will be able to identify feasible and effective mitigation measures during that period. 2008 BiOp, RPA Table at 41-42; FER 71. Indeed, Federal Defendants merely assert that "[i]f actions from the previous cycle prove infeasible," they will develop "equally effective" replacement projects. 2008 BiOp, RPA Table at 41-42. In other words, Federal Defendants do not know what exactly will be needed to avoid jeopardy beyond 2013, or whether those unknown actions are feasible and effective, but they promise to identify and implement something. This is neither a reasonable, nor a prudent, course of action.

NOAA Fisheries' estuary habitat mitigation program is likwise plagued with uncertainty. NOAA Fisheries predicts substantial survival increases as a result of estuary habitat improvements, but it has failed to identify those future estuary actions. See, e.g., 2008 BiOp at

PAGE 13 - OPINION AND ORDER

8.5-56 (Table 8.5.5-1), 8.3-54 (Table 8.3.5-1), 8.2-37 (Table 8.2.5-1) (predicting survival

improvements from estuary actions ranging between 6% for fish with stream-type life histories

like Snake River steelhead, to 9% for species with an ocean-type life history, such as Snake River

fall Chinook). NOAA Fisheries predicts the bulk of these survival improvements will come from

unidentified estuary habitat actions. Compare RPA Table, (Action 37); CA, Attachment D-1 at

D-1-21, Table 5 (estimating a total of 33.57 possible survival benefit units for unidentified

2010-2018 actions for ocean-type salmon) with id. at D-1-20, Table 4 (assigning 11.62 survival

benefit units from 2007-2009 actions for ocean-type fish).

　　　Apart from a vague process for identifying replacement estuary projects if a particular

action proves infeasible, there is no mechanism in the 2008 BiOp to ensure that the action

agencies will implement specific projects in the 2013-2018 time frame or that "equally effective"

actions even exist. NOAA Fisheries' reliance on undefined actions for such large survival

increases is contrary to the ESA's requirement that mitigation must be specific, reliable, and

certain to occur. Reliance on a "commitment" to achieve a certain percent increase in salmon

survival does not relieve NOAA Fisheries of the requirement to rely only on those actions that

are reasonably certain to occur.

　　　This approach to tributary and estuary habitat is the same kind of general plan

the court rejected in Center for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139 (D. Ariz.

2002). The Rumsfeld court looked at measures upon which the U.S. Fish and Wildlife Service

relied to issue a no-jeopardy opinion and found that they were not "reasonably specific, certain to

occur, [or] capable of implementation." Id. at 1152. The court held that the actions were an

unacceptable "laundry list of possible mitigation measures related to water conservation, . . . but

it does not establish which projects have to be undertaken, when, nor what the conservation objectives are for the respective projects." Id. at 1153.

As in Rumsfeld, Federal Defendants' vague "commitment" to achieve a particular level of survival improvement is based on uncertain, unidentified habitat mitigation measures that they hope will prove effective. Without these unidentified mitigation measures, "there is no factual basis and no rational basis" for NOAA Fisheries' no jeopardy conclusion beyond 2013. Id. at 1154.

Federal Defendants' reliance on Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation ("Lake Mead"), 143 F.3d 515 (9th Cir. 1998), is misplaced. The Lake Mead RPA required the action agency to acquire a finite number of acres of replacement habitat to mitigate for the acres that would be lost by the action by a date certain. The record demonstrated that the amount of acreage required was available and there was "no indication that Reclamation cannot acquire and restore the needed replacement habitat as specified in the final RPA by the required deadlines." Id. at 524.

Unlike Lake Mead, there are no projects identified and no timetables to implement the 2013 through 2018 mitigation measures necessary to avoid jeopardy. Moreover, NOAA Fisheries' analysis fails to show that expected habitat improvements—let alone the expected survival increases—are likely to materialize. Additionally, the 2010 Supplemental BiOp reveals that habitat mitigation is already behind schedule. A number of projects have been delayed or cancelled. BOR AR BRS001333, at BRS001399. The record also indicates that funding for additional or replacement habitat actions may be unavailable. See, e.g., BOR AR BRS011306 at 011308 (for both additional estuary and tributary actions, "[t]he action agencies currently have no

PAGE 15 - OPINION AND ORDER

funds available to take such [] additional action"); BOR AR BRS010981 at 010982 (2010-2012 habitat projects must not "exceed budget constraints" of BPA).

In the estuary, only "26 percent of expected survival benefits for ocean-type fish and approximately 24 percent of expected survival benefits for stream-type fish [occurred] because some of the projects proved to be infeasible or implementation was delayed." BOR AR BRS001333 at BRS001406. The 2010 Supplemental BiOp describes 26 estuary projects "under contract" for the 2010-2012 period. Id. at BRS001533-1536. The actual location for three of those estuary projects has not been determined, and many of the 2010-2012 estuary projects appear to be carried over from 2007-2009. Id. at BRS001536 (projects listed with location "TBD"); BRS000599 at 000979-982 (2008 Action Agency Progress Report) (listing 11 estuary projects for 2008). The 2010 Implementation Plan lists 20 estuary projects for 2010-2012 that are "under development" but the location for all of these remains "to be determined." BOR AR BRS001333 at BRS001537-1539. Thus far, Federal Defendants have not implemented the habitat actions necessary to avoid jeopardy. More importantly, there is no indication that they will be able to identify and implement the actions necessary to catch up.

Federal Defendants simply cannot substitute their "commitment" to survival improvement for specific actions they have evaluated and determined will provide the necessary biological response. It is one thing to identify a list of actions, or combination of potential actions, to produce an expected survival improvement and then modify those actions through adaptive management to reflect changed circumstances. It is another to simply promise to figure it all out in the future.

Federal Defendants need not articulate every detail of a habitat mitigation plan. They

PAGE 16 - OPINION AND ORDER

must do more than they have here.  Coupled with the significant uncertainty surrounding the reliability of NOAA Fisheries' habitat methodologies, the evidence that habitat actions are falling behind schedule, and that benefits are not accruing as promised, NOAA Fisheries' approach to these issues is neither cautious nor rational.  See Sierra Club, 816 F.2d at 1386 (risk that mitigation may not succeed "must be borne by the project, not by the endangered species"); NWF v. NMFS II, 524 F.3d at 936 & n.17 (9th Cir. 2008) (if agencies cannot ensure actions will occur "the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur").

### Remand

For the reasons above, I find that the no jeopardy decision for the entire ten-year term of the BiOp is arbitrary and capricious because NOAA Fisheries has failed to identify specific mitigation plans beyond 2013, that are reasonably certain to occur.  Because the 2008/2010 BiOp provides some protection for listed species through 2013, however, I order NOAA Fisheries to fund and implement the BiOp until then.

When a biological opinion is unlawful, the ordinary remedy is to vacate and remand the BiOp to the action agencies for immediate reinitiation of consultation.  Florida Power & Light v. Lorion, 470 U.S. 729, 744 (1985).  Indeed, the APA provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).  Normally, the effect of invalidating an agency action is to reinstate the agency action or rule previously in effect.  Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir.

PAGE 17 - OPINION AND ORDER

2005).

There are, however, circumstances where vacatur is not mandatory. District courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong," and sometimes equity requires an invalid agency action to remain in place while the agency revisits the action. NWF v. NMFS II, 524 F.3d at 936 (quoting Alaska Ctr. for the Env't v. Browner, 20 F.3d 981, 986 (9th Cir. 1994)); Western Oil & Gas Ass'n v. EPA, 633 F.2d 803, 813 (9th Cir. 1980); see also Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) ("when equity demands" the invalid rule can be left in place "while the agency follows the necessary procedures"). Despite the APA's requirement that an invalid agency action be "set aside," equity can authorize the district court to keep an invalid biological opinion in place during any remand if it provides protection for listed species within the meaning of the ESA. See Defenders of Wildlife v. Salazar, ___ F. Supp. 2d ___, 2011 WL 1345670, at *6 (D. Mont. Apr. 9, 2011), quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978) ("Even when [an agency action] suffers from some legal deficiency, relying on equity to leave ESA protections in effect—rather than strip them away—while the agency revisits the issue makes sense given" the ESA's policy of "institutionalized caution.").

Additionally, the court has discretion to impose a deadline for remand proceedings. Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1381 (Fed. Cir. 2001). In the absence of "substantial justification," however, a court should not dictate to an administrative agency "the methods, procedures, and time dimension" of the remand. Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 333 (1976).

PAGE 18 - OPINION AND ORDER

Here, vacatur is inappropriate. Vacating the 2008/2010 BiOp would remove beneficial measures which even Plaintiffs acknowledge provide some protection for the species. Vacatur could also compel NOAA Fisheries to halt FCRPS operations or face severe penalties under Section 9. Because such consequences would be disastrous for the listed species, NOAA Fisheries, defendant intervenors, amici, and the region, I decline to vacate the 2008/2010 BiOp.

I will remand the BiOp to the action agencies and order NOAA Fisheries to keep this BiOp and its incidental take statement in place through 2013, when NOAA Fisheries' currently identified mitigation plans expire or are scheduled to be completed. The BiOp contains positive mitigation measures that provide adequate protection to the listed species through 2013.

The 2013 date also corresponds with the BiOp's Comprehensive Review, and will allow NOAA Fisheries to "get out of the courtroom" and get to work for the next two and a half years. An extended remand period provides an incentive for NOAA Fisheries and the various Accord parties to further develop and implement their proposed habitat mitigation measures, and provides time to study whether these habitat improvement measures are likely to produce the predicted benefits.

As noted, I continue to have serious reservations about NOAA Fisheries' habitat mitigation plans for the remainder of this BiOp. Everyone agrees that habitat improvement is vital to recovery and may lead to increased fish survival, but the lack of scientific support for NOAA Fisheries' specific survival predictions is troubling. Although the BiOp concludes that these specific survival improvements are necessary to avoid jeopardy, NOAA Fisheries' own scientists, the independent scientists who reviewed the 2008 BiOp, and the Independent

PAGE 19 - OPINION AND ORDER

Scientific Advisory Board ("ISAB") have expressed skepticism about whether those benefits will be realized.

I recognize the inherent uncertainty in making predictions about the effects of future actions. If NOAA Fisheries cannot rely on benefits from habitat improvement simply because they cannot conclusively quantify those benefits, they have no incentive to continue to fund these vital habitat improvements. Moreover, requiring certainty with respect to the effects of a mitigation plan would effectively prohibit NOAA Fisheries from using any novel approach to avoiding jeopardy, including dam removal.

No later than January 1, 2014, NOAA Fisheries shall produce a new biological opinion that reevaluates the efficacy of the RPAs in avoiding jeopardy, identifies reasonably specific mitigation plans for the life of the biological opinion, and considers whether more aggressive action, such as dam removal and/or additional flow augmentation and reservoir modifications are necessary to avoid jeopardy. As a practical matter, it may be difficult for Federal Defendants to develop a long-term biological opinion that relies only on mitigation measures that are reasonably certain to occur.

Finally, in fashioning appropriate equitable relief, this court has discretion to retain jurisdiction to ensure compliance with a court order. United States v. Metropolitan Dist. Comm'n, 930 F.2d 132, 135 (1st Cir. 1991); Alaska Ctr. for the Env't v. Reilly, 796 F. Supp. 1374, 1381 (W.D. Wash. 1992). In remanding the 2000 BiOp, I instructed NOAA Fisheries to ensure that a similarly ambitious but flawed mitigation plan was certain to occur. Instead of following this court's instructions, NOAA Fisheries abandoned the 2000 BiOp and altered its analytical framework to avoid the need for any RPA. As the parties are well aware, the resulting

PAGE 20 - OPINION AND ORDER

BiOp was a cynical and transparent attempt to avoid responsibility for the decline of listed Columbia and Snake River salmon and steelhead. NOAA Fisheries wasted several precious years interpreting and reinterpreting the ESA's regulations. Also during that remand period, NOAA Fisheries abruptly attempted to abandon summer spill, despite the 2000 BiOp's conclusion that it was necessary to avoid jeopardy. Even now, NOAA Fisheries resists ISAB's recommendation to continue recent spill operations. Given Federal Defendants' history of abruptly changing course, abandoning previous BiOps, and failing to follow through with their commitments to hydropower modifications proven to increase survival (such as spill) this court will retain jurisdiction over this matter to ensure that Federal Defendants develop and implement the mitigation measures required to avoid jeopardy.

I will also order Federal Defendants to file their annual implementation report to the court. If there are specific disputes regarding the implementation of the BiOp, Plaintiffs may petition the court for limited relief at that time, and that time only.

### Injunctive Relief

The traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA. Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc., 23 F.3d 1508, 1510 (9th Cir. 1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." Id. at 1511 (citing Friends of the Earth v. United States Navy, 841 F.2d 927, 933 (9th Cir. 1988)). "In Congress's view, projects that jeopardized the continued existence of endangered species threaten incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species." Sierra Club, 816 F.2d at 1383 (citing Hill,

PAGE 21 - OPINION AND ORDER

437 U.S. at 187-88, 194-95). The court "may not use equity's scales to strike a different balance." Sierra Club, 816 F.2d at 1383.

Accordingly, when a plaintiff establishes a violation of the ESA, together with the possibility of irreparable harm, an injunction is generally required to effectuate the purposes of the ESA. Id. at 1384. Given a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction pending compliance with the ESA. Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985). Any injunctive relief should be narrowly tailored to remedy the specific ESA violation. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 799-800 (9th Cir. 2005).

As I have previously found, there is ample evidence in the record that indicates that the operation of the FCRPS causes substantial harm to listed salmonids. See June 10, 2005 Opinion and Order, at 8. (doc. #1020-3). NOAA Fisheries acknowledges that the existence and operation of the dams accounts for most of the mortality of juveniles migrating through the FCRPS. As in the past, I find that irreparable harm will result to listed species as a result of the operation of the FCRPS.

Accordingly, I grant Plaintiffs' motion with respect to spring and summer spill. After many years of resistence, NOAA Fisheries now acknowledges that spring and summer spill is necessary to avoid excessive juvenile salmon mortality. They vigorously contend, however, that spill should be curtailed in May and late August even though ISAB has recommended against that course of action. In light of the clear survival benefits associated with spill and Federal Defendants' history of attempting to curtail spill without adequate justification, I order them to continue to spill in a manner consistent with this court's annual spill orders.

PAGE 22 - OPINION AND ORDER

I am not convinced, however, that Plaintiffs' requested flow augmentation and reservoir operations are necessary to avoid irreparable harm to the species. NOAA Fisheries has pointed out that there is a potential for unintended harm to some listed species from flow augmentation, especially the modification of the John Day Reservoir. These issues require further study, and Federal Defendants have committed to such studies.

IT IS ORDERED:

(1) The 2008/2010 BiOp's conclusion that the operation of the FCRPS does not violate the ESA is remanded to NOAA Fisheries for reconsideration consistent with this order.

(2) The 2008/2010 BiOp shall remain in place until December 31, 2013. NOAA Fisheries shall continue to fund and implement all of the mitigation measures in the BiOp during that time.

(3) No later than January 1, 2014, NOAA Fisheries shall produce a new or supplemental BiOp that corrects this BiOp's reliance on mitigation measures that are unidentified, and not reasonably certain to occur.

(4) During the remand period, NOAA Fisheries shall continue to collaborate with the sovereign entities, including the States of Idaho, Montana, Oregon, and Washington, and the Tribes who are parties or amici to this action for the purpose of developing mitigation actions to be included in the proposed action and developing scientific and technical data to support any proposed mitigation.

(5) During the remand, NOAA Fisheries shall file with the court their annual implementation reports detailing the progress of the RPA. Any party or amici shall have 10 days

PAGE 23 - OPINION AND ORDER

to comment on the reports.

(6) NOAA Fisheries shall conduct spring and summer spill operations in a manner consistent with this court's annual spill orders, and to provide monthly implementation reports.

IT IS SO ORDERED.

DATED this _2_ day of August, 2011.

_James A. Redden_
United States District Court Judge