Ted C. Knight, WSBA 39683
Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
509-953-1908
tedk@spokanetribe.com

*Attorney for the Spokane Tribe of Indians*

THE HONORABLE MICHAEL H. SIMON

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

AMERICAN RIVERS, PACIFIC COAST
FEDERATION OF FISHERMENS's
ASSOCIATIONS, INSTITUTE FOR
FISHERIES RESOURCES, SIERRA CLUB
IDAHO RIVERS UNITED, NORHTWEST
SPORTFISHING INDUSTRY
ASSOCIATION, NW ENERGY
COALITION, NATIONAL
WILDLIFE FEDERATION, COLUMBIA
RIVERKEEPER, and
IDAHO CONSERVATION LEAGUE

                Plaintiffs,
    and

STATE OF OREGON, and SPOKANE
TRIBE OF INDIANS,

          Intervenor-Plaintiffs

    v.

NATIONAL MARINE FISHERIES
SERVICE, U.S. ARMY CORPS OF

Case No. 3:01-cv-00640-SI

SPOKANE TRIBE OF INDIANS
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND
INJUNCTIVE RELIEF

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

1

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

ENGINEERS, U.S. FISH AND WILDLIFE
SERVICE, and U.S. BUREAU OF
RECLAMATION,

        Defendants,

   and

NORTHWEST IRRIGATION UTILITIES,
PUBLIC POWER COUNCIL,
COLUMBIA-SNAKE RIVER
IRRIGATORS ASSOCIATION,
WASHINGTON STATE FARM BUREAU
FEDERATION, FRANKLIN COUNTY
FARM BUREAU FEDERATION,
GRANT COUNTY FARM BUREAU
FEDERATION, NORTHWEST RIVER
PARTNERS, CLARKSTON GOLF &
COUNTRY CLUB, CONFEDERATED
SALISH AND KOOTENAI TRIBES,
STATE OF MONTANA, INLAND
PORTS AND NAVIGATION GROUP,
KOOTENAI TRIBE OF IDAHO, and
STATE OF WASHINGTON,

        Intervenor-Defendants.

## INTRODUCTION

1.    The destruction of the Spokane Tribe of Indians way of life on the

Columbia and Spokane Rivers began with the over harvest of anadromous fish

throughout the Columbia River after the arrival of settlers, and quite literally arrived at

the Tribe's door with the completion in 1911 of Little Falls Dam (built within the Tribes'

Reservation on the Spokane River). This small dam blocked the migration of salmon and

importantly the prized June Hogs (Summer-run Chinook),[1] steelhead and lamprey from

---

[1] Exhibit 1

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

2

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

the cold spring-fed waters of Tshimikain Creek, the Little Spokane River, Hangman

Creek and the stretch of the mainstem Spokane River from Little Falls Dam to what is

currently the City of Spokane, along with many smaller tributaries in between.

2.      This was followed by the construction of Grand Coulee Dam which began

in 1933 and would eventually rip the Spokane Tribe of Indians away from a critical food

source, much of its lands and resources, and the way of life that had sustained it from

beyond memory.  Grand Coulee Dam cut off access for salmon, steelhead and lamprey to

the thousands of miles of habitat throughout the upper Columbia River Basin, including

into British Columbia. Up until then the Spokane and Columbia Rivers were the Spokane

Tribe's metaphorical grocery store. Salmon, steelhead and lamprey from these waters

sustained not only Upper Columbia Tribes, but downstream Tribes as the fish returned to

the Spokane and further upstream into Canada. Grand Coulee Dam severely altered the

Tribe's relationship with the Rivers.

3.      Construction of Grand Coulee Dam and the continued choice of the

federal government to operate and manage Grand Coulee Dam without salmon and

steelhead passage, by means utilized throughout the Region: including truck and haul,

juvenile collection facilities, fish ladders, and by other passage systems, has been nothing

short of an attempt to permanently destroy a culture. As one writer succinctly stated:

"Grand Coulee Dam was built with a ruthless disregard for Indians as human beings,

creating a dammed-up river that drowned the culture it had nourished."[2]

---

[2] Blaine Harden, <u>A River Lost, The Life and Death of the Columbia</u> 115 (1996).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

3

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

4.      For the Spokane Tribe returning and restoring anadromous fish to their Reservation's waters and ancestral homelands is among its highest priorities. As the current Spokane Tribe's Chairwoman Carol Evans has stated, "bring back the salmon then our people will heal." From the Tribe's perspective, the salmon restoration effort within the Columbia River Basin will only succeed when there are healthy and harvestable populations of anadromous fish above Chief Joseph and Grand Coulee Dams. For the Tribe it is simple: the area above Chief Joseph and Grand Coulee Dams includes over 40% of the previously occupied anadromous habitat[3] in the Columbia River Basin that is currently blocked, and until anadromous fish are reestablished in these previously occupied habitats the salmon and steelhead restoration effort in the Columbia River Basin will continue to fail to meet regional goals for both Endangered Species Act listed and non-listed species.[4]

---

[3] Current reports regarding available habitat indicate the following: "The U.S. portion of the blocked area of the upper Columbia River has 355.8 mi (1.797 mi2) of potential spring Chinook habitat and 1,161.6 mi (5.621 mi2) of potential steelhead habitat within regional tributaries. An additional 470.5 mi of spring Chinook and 692.3 mi steelhead migration corridors exists in reservoirs and tributaries leading to and between potential habitats. Many reaches of these tributaries are shared by both species. This is expected to be the case for reintroduced summer/fall Chinook and sockeye salmon as well." *Identification of Potential Habitats for Blocked Area Reintroduction, An Intrinsic Potential Analysis to Identify Tributary Habitats Available for Reintroduced Anadromous Spring Chinook and Summer/Fall Steelhead in the Upper Columbia River*, June 2018, *available at* https://ucut.org/wp-content/uploads/2019/05/Giorgi-2018-Potential-Habitats-for-Reintroduction.pdf (last visited January 27, 2021).

[4] Northwest Power and Conservation Council's goals are: "Increase total adult salmon and steelhead runs of Columbia River origin to a 10-year rolling average of five million annually by 2025, in a manner that emphasizes increases in the abundance of the populations that originate above Bonneville Dam." *Available at* https://www.nwcouncil.org/sites/default/files/2020-9.pdf (Last visited January 27, 2021).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

5.     The May 4, 2016 order in *National Wildlife Federation, et al v. National Marine Fisheries Service*, *et al*., 01-cv-00640-SI, Dkt. 2065, 184 F. Supp. 3d 861 (D. Or. 2016)("2016 Order"), directing the Bureau of Reclamation ("BOR") and the Army Corps of Engineers ("Corps") (collectively "Action Agencies")[5] to carry out their mandatory duties under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. gave the Tribe hope that the Region would finally take the opportunity to reflect upon the health of the Columbia River Basin now, and where the Region would like it to be in the future. This NEPA analysis would eventually require the development of two Biological Opinions ("BiOp"), one by NOAA referred to in the litigation as National Marine Fisheries Service, and the second by the United States Fish and Wildlife Service ("USFWS"), along with a USFWS Fish and Wildlife Coordination Act Report ("FWCAR"), an Environmental Impact Statement ("EIS") and a Record of Decision ("ROD") completed by the Action Agencies.

6.     In 2016, the Tribe was optimistic that the NEPA process could lead to a more equitable and holistic approach to the operation and management of the Federal Columbia River Power System ("FCRPS"), a process that would require the Action Agencies to consider how to operate and manage the system in a manner that would meet not only the Action Agencies' Endangered Species Act ("ESA") 16 U.S.C. §§ 1531 *et seq* mandates, but also their obligations under the Pacific Northwest Electric Power

---

[5] Bonneville Power Administration ("BPA") is an Action Agency; however, the Ninth Circuit Court of Appeals has original jurisdiction over petitions challenging BPA's final actions. The Spokane Tribe is challenging BPA's final action in the development and approval of the 2020 CRSO ROD in a petition filed on December 24, 2020. Three separate petitions, including the Tribe's, were consolidated on January 13, 2021. No. 20-73761, 20-73762, & 20-73775. Dkt. Entry 7.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    5

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Planning and Conservation Act ("Northwest Power Act" or "NWPA"), 16 U.S.C. §§ 839 *et seq*, and their federal Indian trust responsibility. Unfortunately, the NEPA process ordered in 2016 culminated in the significantly flawed Columbia River System Operations Environmental Impact Statement Record of Decision ("2020 CRSO ROD") issued on September 28, 2020.

7.    This Complaint-in-intervention seeks review of the USFWS 2020 BiOp for the Columbia River System Operations and Maintenance of the 14 Federal Dams and Reservoirs, issued on July 24, 2020 ("USFWS BiOp"), NOAA's BiOp for the continued operation and maintenance of the Columbia River System issued on July 24, 2020 ("NOAA BiOp"), the USFWS's May 2020 Fish and Wildlife Coordination Act Report ("2020 FWCAR") for the CRSO, the Final EIS for the Columbia River System Operations issued by the Action Agencies, and the 2020 CRSO ROD for violations of the ESA, the Northwest Power Act, NEPA, and the Administrative Procedures Act, 5 U.S.C. §§ 551, *et seq*.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action under 5 U.S.C. §§ 701-706; 28 U.S.C. § 1331, § 2201, and § 2202, the ESA, 16 U.S.C. § 1540(g), and the Northwest Power Act, 16 U.S.C. § 839f(e)(5).[6] As required by the ESA, 16 U.S.C. § 1540(g) the Tribe provided its sixty-days' notice of its intent to sue the Corps and BOR on October 26, 2020.[7]

---

[6] "Suits challenging any other actions under this chapter shall be filed in the appropriate court."

[7] Exhibit 2.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

9.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e).

## PARTIES

10.     Intervenor-Plaintiff, the Spokane Tribe of Indians ("Tribe") is a federally recognized Indian Tribe.  The Tribe's Reservation was established on August 18, 1877 after the Tribe was forced from parts of its homeland by the United States government. *See Northern Pac. Ry. Co. v. Wismer*, 246 U.S. 283, 288 (1918).  The Tribe's Reservations' boundaries are the East Bank of Tshimikain Creek, the South Bank of the Spokane River, the West Bank of the Columbia River and the Northern Border is the 48th parallel. 1880 WL 32483 (Exec.Ord.).  The Tribe's ancestral lands as found by the Indian Claims Commission and affirmed by the United States Court of Claims include the entirety of the Spokane River as it flows through what is now Washington State and portions of the Columbia River. *Spokane Tribe of Indians v. United States*, 163 Ct.Cl. 58, 1963 WL 8583, 5 (1963).  The Tribe has unquantified water rights with a priority date of August 18, 1877 within the Spokane and Columbia Rivers, which also include a right to water of a quality that can sustain fish and other aquatic life.  *See United States v. Anderson*, 591 F.Supp. 1, 5 (E.D. Wa 1982), *aff'd in part, rev'd in part by United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984).  Finally, the Spokane Tribe retains ownership of the original beds and banks of its Reservations' boundary waters (Spokane River, Columbia River and Tshimikain Creek). *See* Opinion on the Boundaries of and Status of Title to Certain Lands within the Colville and Spokane Indian Reservations, 84 Interior Dec. 72, 78, 1977 WL 28859, at 5 (Feb. 2, 1977).

11.     In addition to the fishing and hunting rights the Tribe retains within its Reservation, the Tribe was granted "paramount use" rights for a portion of Lake

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

7

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Roosevelt for fishing, hunting, and boating when the construction of Grand Coulee Dam inundated a portion of the Tribe's Reservation creating what is now called Lake Roosevelt. 16 U.S.C. § 835d. Lake Roosevelt encompasses parts of the Spokane River and the Columbia River.

12.    The Spokane Tribal Department of Natural Resources ("DNR") operates several mitigation programs and a hatchery that are directly funded by the BPA. Additionally, in an effort to protect the Tribe's membership and guests from pollution and negative water quality impacts in the waters of the Reservation, the Tribe directed DNR to seek treatment in the same manner as a state status ("TAS") under the Clean Water Act ("CWA"), 33 U.S.C. § 1377(e), and the implementing regulations 40 C.F.R. § 131.8. The Tribe obtained TAS in 2002. Obtaining, TAS by the Tribe was designed to improve the quality of the Tribe's waters for resident fish, cultural and subsistence use, but also to help prepare the Tribe's water for the eventual return of anadromous fish once passage and reintroduction is achieved at Chief Joseph and Grand Coulee Dams.

13.    In 2019, the United States recognized some of the inequities surrounding the construction of Grand Coulee Dam with the passage of the SPOKANE TRIBE OF THE SPOKANE RESERVATION EQUITABLE COMPENSATION ACT, PL. 116-100, 133 Stat. 3256, which will finally provide the Tribe with a portion of the revenue generated by the power produced at Grand Coulee Dam.

14.    In 2021, the Tribe's membership is 2943 and growing. The Tribe's membership lives within the Reservation and throughout the region. Many members exercise their fishing rights within the portion of the Spokane and Columbia Rivers that are contained within the Reservation and Lake Roosevelt's "paramount use" area, but

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    8

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

also exercise cultural practices, recreate and fish throughout their ancestral lands, including all portions of the Spokane and Columbia Rivers. The Tribe's membership utilizes the surface and ground waters of the Reservation, including the Spokane River and Columbia River, for ceremonial and subsistence purposes. The Tribe operates several campgrounds on the banks of the Rivers, and operates a Marina and Resort at the confluence of the Spokane and Columbia Rivers.

15.     Defendant, NOAA, referred to as the National Marine Fisheries Service ("NMFS") in this litigation is an agency of the United States Department of Commerce responsible for administering the provisions of the ESA in regard to threatened and endangered marine species, including the species of threatened and endangered salmon and steelhead that inhabit the Columbia River Basin and the endangered population of Southern Resident Killer Whales ("SRKW") that inhabit the coastal and offshore waters of the Pacific Northwest.

16.     Defendant, United States Fish and Wildlife Service ("USFWS") is an agency within the United States Department of Interior and is responsible for administering the provisions of the ESA in regards to bull trout, Kootenai River white sturgeon, and the critical habitat for bull trout and Kootenai River white sturgeon. The USFWS is also charged with duties under the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. Section 661 *et seq.*

17.     Defendant, United States Army Corps of Engineers is an agency of the United States and the Department of Defense that constructs and operates federal engineering projects throughout the United States. The Corps has primary management

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    9

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

authority over the operation and maintenance of several dams and, reservoirs and associated facilities on the Columbia and Snake Rivers.

18.    Defendant United States Bureau of Reclamation is an agency of the United States Department of Interior that constructs and operates federal water projects throughout the United States, including Grand Coulee Dam. BOR has primary management authority over several projects on the Columbia and Snake Rivers.

## LEGAL FOUNDATION

### Northwest Power Act

19.    Prior to the listings of salmon and steelhead in the Columbia and Snake Rivers under Endangered Species Act, which now dominates the Northwest Region's discussion on how salmon recovery should occur and how the environmental impacts of the FCRPS should be handled, the Northwest Power Act was the primary statutory foundation looked to for fixing these intractable problems. Congress passed the Northwest Power Act which:

> [C]reated the Northwest Power and Conservation Council ["Council"], an interstate compact agency, and directs the Council to prepare programs to protect and enhance the fish and wildlife of the Columbia River basin while also assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. The Act also instructs the Bonneville Power Administration, the federal agency that operates the dams on the Columbia River, to use its authority in a manner consistent with the programs developed by the Council.

*N.W. Envtl. Def. Ctr., et al. v. Bonneville Power Admin.*, 477 F.3d 668, 672 (9th Cir. 2007).

20.    The NWPA created a framework where the Council was charged with developing two guiding documents: the Fish and Wildlife Program ("Program") and the Power Plan ("Plan"). The Program and Plan are developed through a public and iterative

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

10

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

process prescribed by the Act. Both are guides to the Action Agencies and other federal

regulators of the FCRPS to ensure the purposes of the Northwest Power Act are achieved.

21.    The NWPA specifically directs the following of all of the Defendants in

this case:

> 16 U.S.C. § 839b(h)(11)(A) The Administrator and **other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall**—
>
> (i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;
>
> (ii) exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.
>
> (B) The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.

16 U.S.C. § 839b(h)(11) (emphasis added).

22.    Here, the Action Agencies are managing and operating the reservoirs and

dams of the Columbia River System ("CRS"), and the USFWS and NOAA are acting in

their capacity as federal regulators by issuing the BiOps and the USFWS's May 2020

Fish and Wildlife Coordination Act Report ("2020 FWCAR") for the CRSO. These are

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

11

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

regulatory duties that Section 11(A) attach. *See Nat'l Wildlife Fed'n v. F.E.R.C.,* 801 F.2d 1505, 1514-15 (9th Cir. 1986). Additionally, Section 11(B) requires consultation with and between the Action Agencies, regulators, States and Tribes to ensure the sovereigns are coordinating their collective actions.

23.     Congress clearly saw consultation and consistency as the path to resolving the intractable issues of salmon recovery and mitigation for the impacts of the FCRPS: "The purposes of this chapter, together with the provisions of other laws applicable to the Federal Columbia River Power System, are all intended to be construed in a consistent manner. Such purposes are also intended to be construed in a manner consistent with applicable environmental laws." 16 U.S.C. § 839.

**Endangered Species Act**

24.     Under the ESA Section 7 (a)(2) "[e]ach federal agency shall … insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987). The substantive duty imposed by § 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h); *Conner v. Burford,* 848 F.2d 1441, 1452 Fn. 26 (9th Cir. 1988).

25.     The ESA's substantive protections are implemented in part through the consultation process, which Congress designed explicitly "to ensure compliance with the

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

12

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

[ESA's] substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). To fulfill these procedural duties, federal agencies must consult with the appropriate federal fish and wildlife agency (NOAA in the case of anadromous fish) and, if appropriate, obtain a biological opinion evaluating the effects of any federal agency action on listed species and their critical habitat. *Id*. If NOAA and/or USFWS conclude that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NOAA and/USFWS must propose reasonable and prudent alternatives ("RPAs"). If available, RPAs are designed so that they will mitigate the proposed action to avoid jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1071 (9th Cir. 1995).

26.    Compliance with the procedural requirements of the ESA – making the determination of the effects of the actions through the consultation process – is integral to compliance with the substantive requirements of the ESA. Under this statutory framework, federal actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency insures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.14, 402.13; *Pac Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 138 F. Supp.2d 1228 (N.D. Cal. 2001).

27.    Even after the procedural requirements of consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize listed species lies with the action agency. And an action agency's reliance on an inadequate,

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                13

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy is arbitrary

and capricious. *See, e.g. Stop H-3 Ass'n. v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984).

28.     In addition, ESA's Section 7(a)(1) requires federal agencies to "utilize

their authorities in furtherance of the purposes of this chapter by carrying out programs

for the conservation of endangered species and threatened species listed" under the Act.

16 U.S.C. § 1536(a)(1). Like the duty to avoid jeopardy, this conservation duty is

discharged, in part, in consultation with NOAA/USFWS. *Id*. A program of

"conservation" is one that brings the species to the point of recovery and delisting. Id. §

1532(3).

29.     ESA section 7(d) prohibits federal agencies, after the initiation of

consultation under ESA section 7(a)(2), from making any irreversible or irretrievable

commitment of resources if doing so would foreclose the implementation of reasonable

and prudent alternatives. 16 U.S.C. § 1536(d); *Natural Resource Defense Council v.

Houston*, 146 F.3d 1118, 1128 (9th Cir. 1998). This prohibition is not an exception to the

requirements of section 7(a)(2); it remains in effect until the procedural requirements of

section 7(a)(2) are satisfied, 50 C.F.R. § 402.09; and it ensures that section 7(a)(2)'s

substantive mandate is met. *See, e.g.*, *Pacific Rivers Council v. Thomas,* 30 F.3d 1050

(9th Cir. 1994). Harm to a protected resource itself is considered a violation of Section

7(d). *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992).

30.     Finally, Section 9 of the ESA prohibits all activities that cause a "take" of

an endangered species. 16 U.S.C. § 1538(a)(1)(B), (C). "Take" is defined by the ESA to

encompass killing, injuring, harming, or harassing a listed species. 16 U.S.C. § 1532(19).

The regulations further define "harm" as: "Harm in the definition of "take" in the Act

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                                    14

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

means an act which actually kills or injures fish or wildlife. Such an act may include

significant habitat modification or degradation which actually kills or injures fish or

wildlife by significantly impairing essential behavioral patterns, including, breeding,

spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

31.     Federal actions that have completed a legally valid section 7(a)(2)

consultation and have a biological opinion generally obtain an incidental take statement

("ITS"). 50 C.F.R. § 402.14(i). The ITS authorizes the agency, if in compliance with the

terms and conditions of the ITS, to "take" listed species without facing Section 9 liability.

50 C.F.R. § 402.14(i)(5). However, if a biological opinion is legally flawed, the ITS

cannot shield the action agency from liability.

**National Environmental Policy Act**

32.     NEPA requires federal agencies to prepare Environmental Impact

Statements ("EIS") in connection with all "major Federal actions significantly affecting

the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must detail "the

environmental impact of the proposed action" and "alternatives to the proposed action."

Id. § 4332(2)(C)(i), (iii).

33.     NEPA further directs that the federal agencies: "study, develop, and

describe appropriate alternatives to recommended courses of action in any proposal

which involves unresolved conflicts concerning alternative uses of available resources"

*Id*. § 4332(2)(E).  Importantly here given that the Columbia River and several of its

tributaries are shared with Canada, NEPA directs the federal agencies to: "recognize the

worldwide and long-range character of environmental problems and, where consistent

with the foreign policy of the United States, lend appropriate support to initiatives,

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                          15

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." *Id*. at 4332(2)(F).

34.     NEPA ensures that agency decisionmakers and the public at large are informed of the environmental impact of proposed federal action. Though NEPA does not impose substantive environmental obligations on federal agencies, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989), it does force federal agencies to "take a hard look at environmental consequences" and "provide for broad dissemination of relevant environmental information" *Id*. at 350. That is, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id*.

35.     One part of that process is the requirement that an agency prepare an environmental impact statement ("EIS") any time it proposes a "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The "heart" of the EIS is its presentation of the "environmental impacts of the proposal and the alternatives in comparative form," which "sharply defin[es] the issues and provid[es] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

36.     NEPA at its core requires that all reasonable alternatives be considered for major federal actions, even if those alternatives are outside the agency's authorities. *National Wildlife Federation, et al v. National Marine Fisheries Service*, *et al*., 184 F. Supp. 3d at 943-44. The EIS must give all reasonable alternatives the "hard look" which allows the public and the government agencies the ability to make fully informed decisions around the costs and benefits of the decisions made by the agencies. *Id* at 948.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

16

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

37.     Finally, in an EIS, "[m]itigation must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Carmel-By-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997). The Ninth Circuit invalidated an EIS where the agency "did not even consider mitigating measures for [water bodies] actually affected," despite the agency's belief that mitigation measures elsewhere in the watershed "could 'compensate' for the harms." *Neighbors of Cuddy Mt. v. U.S. Forest Serv.,* 137 F.3d 1372, 1381 (9th Cir. 1998). In a different case, the Ninth Circuit found that an EIS did not have a reasonably complete discussion of possible mitigation measures where the agency discussed and adopted mitigation measures in one area that was likely affected, but neglected other areas that would suffer similar impacts, the court noted, mitigation "simply was not considered." *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. Forsgren,* 309 F.3d 1181, 1191 (9th Cir. 2002).

## Trust Responsibility

38.     "The trust relationship between the United States and the Indian people imposes a fiduciary duty on the government when it conducts "any Federal government action which relates to Indian Tribes."" *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 294 (D. Mont. 2019) (*quoting Nw. Sea Farms, Inc. v. U.S. Army Corps of Engineers*, 931 F. Supp. 1515, 1519–20 (W.D. Wash. 1996)). The federal government is the trustee of Indian Tribes' rights. *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995). This trust responsibility extends "to the federal government as a whole." *Id*. Additionally, any agency action that can impact tribal rights and interests is subject to the "United States' fiduciary responsibilities toward the Indian tribes." *Nance v. Environmental Protection*

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

17

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

*Agency*, 645 F.2d 701, 711 (9th Cir. 1981). Furthermore, the Indian law canon of statutory construction, derived from the trust relationship, requires that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). "The trust relationship and its application to all federal agencies that may deal with Indians necessarily requires the application of a similar canon of construction to the interpretation of federal regulations." *HRI, Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000).[8] One commentator stated this principal succinctly with this statement, "the agency is bound by the trust responsibility to use its discretion within the statutory regime to protect tribal interests unless doing so conflicts with the actual statutory language."[9]

**Administrative Procedures Act**

39.     The NWPA, ESA, and NEPA do not provide a separate standard of review and claims under these Acts are reviewed under the standards of the Administrative

---

[8] The Tenth Circuit has held "that the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997). The Ninth Circuit chose to apply Chevron deference over the canon favoring native tribes, *Haynes v. United States*, 891 F.2d 235, 239 (9th Cir. 1989), although it more recently acknowledged the circuit split and declined to make an explicit finding on "the interplay between the Chevron and Blackfeet Tribe presumptions." *Navajo Nation v. Dep't of Health & Human Servs. Sec'y*, 325 F.3d 1133, 1136 FN 4 (9th Cir. 2003); *see also Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1162 (9th Cir. 2020)

[9] The Indian Trust Responsibility: Protecting Tribal Lands and Resources Through Claims of Injunctive Relief Against Federal Agencies, Mary Christina Wood, 39 TULSA L. REV 355, 362 (Winter 2003)( *citing Nw. Sea Farms v. U.S. Army Corps of Eng'rs,* 931 F. Supp. 1515 (W.D. Wash. 1996) (upholding the Corps' refusal of a permit for a fish farm because it could interfere with treaty fisheries. The Court stated, "[it] this fiduciary duty, rather than any express regulatory provision, which mandates that the Corps take treaty rights into consideration." *Id. at* 1520).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    18

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq*. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).  Pursuant to the APA, "agency action must be upheld on review unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id*.  Claims that BiOps are in violation of the ESA or other laws, RODs and EISs, and violations of the NWPA are reviewed under the APA.

### ACTION AGENCIES DEVELOPMENT OF THE CRSO FEIS AND ROD

40.     On May 4, 2016 in *National Wildlife Federation, et al v. National Marine Fisheries Service*, *et al*., 01-cv-00640-SI, Dkt. 2065, 184 F. Supp. 3d 861 (D. Or. 2016)("2016 Order"), the Court found that the Bureau of Reclamation ("BOR") and the Army Corps of Engineers ("Corps") violated NEPA and the ESA in their adoption and implementation of the 2014 NOAA Fisheries Biological Opinion ("BiOp") and associated Reasonable and Prudent Alternatives ("RPAs") prepared for their operation and maintenance of the Federal Columbia River Power System ("FCRPS").  The Court further found that the NOAA Fisheries BiOp relied upon by the Agencies was arbitrary and capricious and therefore violated the APA and the ESA.

41.     The Court clearly stated its hopes for the NEPA ruling:

> One of the benefits of a NEPA analysis, which requires that all reasonable alternatives be analyzed, is that it allows innovative solutions to be considered and may finally be able to break through any bureaucratic logjam that maintains the status quo. The agencies, public, and public officials will be able evaluate the costs and benefits of various alternatives. The FCRPS remains a system that "cries out" for a new approach. A NEPA process may elucidate an approach that will finally move the listed species out of peril.

*Id* at Dkt. 2065 at 145. After reviewing the Court's 2016 Order, the Spokane Tribe was encouraged and planned to participate in the NEPA process to ensure that FCRPS's

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

19

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

impacts to its rights, economic and natural and cultural resources were protected and considered in the final environmental impact statement ("FEIS") and record of decision ("ROD").

42.     Accordingly, the Tribe submitted extensive scoping comments on February 7, 2017, as the preparation of the CRSO EIS kicked off. Following this the Tribe participated as a cooperating agency in the development of the CRSO EIS pursuant to a Memorandum of Understanding ("Cooperating Agency MOU") entered between the Tribe and the Action Agencies in August of 2017.  The Tribe sought to assist the Action Agencies with the production of the CRSO EIS to provide the expertise of the Tribe's staff and to share the perspective of the Tribe from its unique location within the Columbia River System. Additionally, the Tribe hoped that its participation would help in the development of a final EIS and eventual ROD that would meet the mandates of the NWPA, NEPA, ESA, and the federal government's trust responsibility.

43.     Importantly during the development of the CRSO EIS, the Tribe sought to ensure that the Action Agencies properly took "into account at each relevant stage" of their "decisionmaking processes to the fullest extent practicable" the Northwest Power and Conservation Council's ("Council") Fish and Wildlife Program ("Program") as required by the Northwest Power Act. 16 U.S.C. § 839b(h)(11). Further, the Tribe wanted to ensure that the Action Agencies exercised their responsibilities consistent with the NWPA and other applicable laws, "to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, **affected by such projects or facilities** in a manner that provides equitable treatment for such fish and wildlife with the

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                          20

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

other purposes for which the system and facilities are managed and operated." §

839b(h)(11)(i)(emphasis added).

44.     In the Tribe's view the Council's Program should have been the starting

point for the Action Agencies when they attempted to find a "new approach" to their

operation and maintenance of the FCRPS. And again, in the Tribe's opinion this "new

approach" must include healthy and harvestable populations of salmon and steelhead

throughout their historic range as a key indicator of its success.

**Fish and Wildlife Program's Approach**

45.     The Region began to formally recognize the importance of reestablishing

anadromous fish above Chief Joseph and Grand Coulee Dams in the Council's 2000

Program adopted pursuant to 16 U.S.C. Section 839b(h). The 2000 Program included:

"Take action to reintroduce anadromous fish into blocked areas, where feasible." (Page

17).[10] In that Program, "blocked area" was clearly defined as "Areas in the Columbia

River Basin where hydroelectric projects have created permanent barriers to anadromous

fish runs. These include the areas above Chief Joseph and Grand Coulee dams, the Hells

Canyon Complex and other smaller locations." (Page A-1).  This measure and call for

action were elaborated upon in the 2003 Mainstem Amendments that clearly articulated a

measure to: "Evaluate the feasibility of reintroducing anadromous fish into blocked areas,

including above Chief Joseph and Grand Coulee dams." (Page 17).[11] This was further

---

[10] *Available at* https://www.nwcouncil.org/sites/default/files/FullReport_0.pdf (Last
visited February 4 2021).

[11]  *Available at* https://www.nwcouncil.org/sites/default/files/2003_11_0.pdf (Last visited
February 4, 2021).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                          21

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

clarified in the adopted Upper Columbia Sub-Basin Plan that is officially part of the Program which directed, "Develop an anadromous fish re-introduction feasibility analysis by 2006 for Chief Joseph and by 2015 for Grand Coulee." (Upper Columbia Subbasin Plan at 34-15).[12]

46.    Then again in the 2009 Program the Council included, "Reintroduction of anadromous fish in blocked areas: The Council recognizes and will monitor current efforts to reintroduce Pacific salmon and steelhead into blocked areas of the Columbia River Basin. Reintroduction of anadromous fish into blocked areas has the potential to increase the diversity, complexity, capacity, and productivity of salmonid habitat. The Council will continue to evaluate the feasibility of salmon and steelhead reintroduction, consistent with the objectives in the appropriate subbasin plans." (2009 Program at 56).[13]

47.    Unfortunately, the previous Programs' measures did not result in the action the fish and wildlife managers planned for on this issue. Accordingly, in the 2014 Fish and Wildlife Program, the Region articulated a clear directive to begin a Phased Approach to anadromous fish reintroduction above Chief Joseph and Grand Coulee Dams. It stated the following:

> **Reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams to mainstem reaches and tributaries in the United States Phased approach.** Pursue a science-based, phased approach to investigating the reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams including juvenile and adult passage at the dams. The phases shall include:
>
> **Phase 1 (to be completed no later than the end of 2016):**

---

[12]  Available at https://www.nwcouncil.org/sites/default/files/34_uprcol_MP.pdf (Last Visited February 4, 2021)

[13] *Available at* https://www.nwcouncil.org/sites/default/files/2009_09_1.pdf (Last visited February 4 2021).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    22

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Evaluate information from passage studies at other blockages and from previous assessments of passage at Grand Coulee and Chief Joseph dams.

Investigate habitat availability, suitability and salmon survival potential in habitats above Grand Coulee. This might include selective releases of salmon and steelhead. Investigate the scientific feasibility and possible cost of upstream and downstream passage options for salmon and steelhead. Before funding new investigations, provide the Council with a report for consideration of subsequent work to advance the fish passage planning process.

As part of Phase 1, the Council will engage in discussions with tribal, state, and federal agencies and others regarding the purpose, scope and progress of reintroduction efforts above Chief Joseph and Grand Coulee dams.

**Phase 2:**

Based on the results in the first phase, the Council in collaboration with the other relevant entities will decide how to proceed. Phase 2 activities may include one or more of the following:

design and test salmon and steelhead reintroduction strategies and Interim fish passage facilities at Chief Joseph and Grand Coulee Dams

investigate alternative approaches to passage

identify additional studies necessary to advance the fish passage planning process

reintroduction pilot projects

monitoring, evaluation, and adaptive management of the Phase 2 activities

**Phase 3:**

Based on the results of Phase 2, the Council in collaboration with the other relevant entities will decide whether and how to proceed to implement and fund reintroduction measures as a permanent part of the program, including construction and operation of passage facilities.

Monitor, evaluate, and adaptively manage the reintroduction efforts.

**Transboundary reintroduction.** The United States should pursue a joint program with Canada, with shared costs, to investigate and, if warranted, implement the reintroduction of anadromous fish on the mainstem Columbia River to Canadian spawning grounds. This joint program would proceed on an incremental basis, comparable to the phased approach described above.

**Reintroductions above Grand Coulee to mainstem reaches and tributaries in the United States.** Bonneville and the relevant federal action agencies, working in collaboration with state and federal fish and wildlife agencies and tribes, shall investigate and, if warranted, implement

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

23

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

passage and reintroduction of anadromous fish into suitable habitats within the United States. This shall include:

> Funding research associated with critical uncertainties at Chief Joseph and Grand Coulee dams required to inform Phase 1
> Funding work required for Phases 2 and 3 based on Council recommendations

(2014 Program at 84-85) (*hereinafter* "Phased Approach" or "Council's Phased Approach").[14]

48.    Approval of the 2014 Program was challenged in the Ninth Circuit Court of Appeals and the approval was upheld as satisfying the requirements of the Northwest Power Act. The Court mentioned the Phased Approach measure as a specific example as to why the Program fulfilled the mandate of the Northwest Power Act.[15]

49.    After the adoption of the 2014 Program, the Tribe's DNR worked with other Tribes, federal and state government agencies, and NGOs to ensure the 2014 Program's measure to carry out the Phased Approach to the "Reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams to the mainstem reaches and tributaries in the United States"[16] is implemented.

50.    The results of the work done thus far on Phase One were compiled, summarized, and then presented to the Northwest Power and Conservation Council in the

---

[14] *Available at* https://www.nwcouncil.org/sites/default/files/2014-12_1.pdf (Last visited February 4, 2021).

[15] "For example, the reintroduction of anadromous fish above the Grand Coulee Dam, as recommended by the Spokane Tribe, was included in the Program but not in the BiOps." *NRIC v. NPCC, et al*, 15-71482, unpublished opinion (9th Circuit 2017).

[16] *Available at* https://www.nwcouncil.org/sites/default/files/2014-12_1.pdf (Last visited December 7, 2020).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                              24

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

"Fish Passage and Reintroduction Phase One Report" ("UCUT Report")[17] prepared by the Upper Columbia United Tribes. The UCUT Report was then presented by the Council for review and submission to the Independent Scientific Advisory Board ("ISAB") the review was published on November 1, 2019.[18]

51.     In response to the initial drafts of the UCUT report, and the completion of several of the measures listed within Phase One, the Spokane Tribal Council, governing body of the Tribe,  adopted a resolution on September 12, 2018 directing the Spokane Tribal Department of Natural Resources ("DNR") to pursue reintroduction of anadromous fish to the Tribe's waters by all means necessary.[19] The Spokane Tribe owns and has regulatory authority over the water bodies within its jurisdiction, which includes the bed and banks of the Columbia and Spokane Rivers, along with Tshimikain Creek.

52.     Three major milestones in this effort to restore healthy, harvestable and sustainable populations of anadromous fish above Chief Joseph and Grand Coulee Dams occurred in 2019.[20] First, the Tribe in an educational exercise, released on April 16, 2017, the 752 yearling Chinook implanted with PIT and floy tags.  This release took place above Little Falls Dam roughly 1-one mile upstream from the Spokane River within

---

[17] *Available at* https://secureservercdn.net/104.238.71.140/b63.d34.myftpupload.com/wp-content/uploads/2019/05/Fish-Passage-and-Reintroduction-Phase-1-Report.pdf (Last visited January 27, 2021).

[18] *Available at* https://www.nwcouncil.org/sites/default/files/ISAB%202019-3%20ReviewUCUTReintroductionReport1Nov.pdf (Last visited January 27, 2021).
[19] Exhibit 3.

[20] The following information contained in ¶¶51-54 is *available at* https://spokanetribalfisheries.com/wp-content/uploads/2021/02/STICulturalReleases01252021.pdf (Last visited February 4, 2021).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    25

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Tshimikain Creek (the Tribe's eastern boundary water).  Of those Chinook released, 83 unique fish were detected downstream of Chief Joseph Dam. These fish were detected one or more times at juvenile and adult passage facilities, in the estuary trawl, and several tags were recovered from avian colonies. Amazingly some of these fish passed three dams (Little Falls, Grand Coulee and Chief Joseph) that currently have <u>NO</u> juvenile passage facilities and made their way to the ocean. Much to the Tribe's amazement on June 30, 2019 one of those Chinook returned and was detected at Bonneville Dam and made the journey all the way to the Chief Joseph hatchery (located near the base of Chief Joseph Dam). Sadly, due to the Action Agencies' protocols imposed upon the Colville hatchery this Tshimikain Creek origin Chinook could not be held alive to be returned to its waters, but was nonetheless returned deceased to the Tribe for ceremonial purposes.

53.     In 2020, three additional adult Chinook from the 2017 juvenile release returned to the Basin.  The first arrived to Bonneville Dam on June 4, 2020.  Twenty-one days later on June 25th it passed over Wells Dam and was not detected again.  On June 16th the second Chinook from the 2017 release was detected at the Bonneville fish ladder; the one and only time it was detected.  The third sibling returned to the Columbia and passed Bonneville on July 4th.  On July 12th it was detected in the fish ladder of John Day Dam.  On July 14th one of these fish was harvested in the Dalles pool by a Tribal fisher.  On July 16th, a Tribal Member fish processor in Rufus Oregon contacted the Spokane Tribe's Fisheries Department to inform them that one of the Chinook released had been harvested.  She graciously provided it to the Tribe's staff so that it could be preserved alongside its sister who returned in 2019.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    26

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

54.    The second milestone occurred when the Tribe transported 50 live Chinook salmon from the Wells Dam, following an agreed upon disease risk protocol with the State of Washington, to Tshimikain Creek and released them on August 15, 2019 for ceremonial purposes. This act returned anadromous fish to Tshimikain Creek for the first time in over 100 years and allowed Tribal elders and youth take part in a harvest of those fish.  Additionally, the Colville Tribe released live Chinook salmon to its waters above Chief Joseph Dam and to the waters of the San poil River and the Mainstem Columbia River at Kettle Falls, all above Grand Coulee Dam. These are small steps to some, but given how much resistance some of the federal agencies and others have quietly mounted against this effort, it is a success the Tribes and the Region will build upon.[21]

55.    Finally, in the summer of 2020 the Tribe released 100 summer/fall Chinook into their waters.  By October 22, 2020, fifteen definitive Chinook redds were identified in Tshimikain Creek. The presence of so much spawning activity is encouraging.  These results are surprising since these Chinook were "naïve," not being from this watershed.  These educational releases taken with the UCUT Report, indicate to the Tribe that the reestablishment of salmon and steelhead to the previously occupied habitats above Grand Coulee Dam is a viable management and operations option for the current FCRPS.

---

[21] It is worth noting that the smolt-to-adult-returns (SARs) percentage to Bonneville Dam for the 752 fish released by the Tribe in 2017 was .0053, which is higher than the releases noted for other areas and hatchery operations in NOAA's BiOp, at page 1368, Table 2.16-1.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

56.    Separate, but related to the Fish and Wildlife Program's Phased Approach and general mitigation related concerns in the areas above Grand Coulee Dam, the Northwest Power and Conservation Council in January 2020 adopted the following measures as an addendum to the 2014 Program:

**Mitigation in Blocked Areas**
**Implementer: Bonneville**

Implement a broad suite of actions to mitigate for the complete loss of anadromous fish and the losses to other fish and wildlife species in the Lake Roosevelt and Spokane River areas above Grand Coulee and Chief Joseph dams, as well as ongoing operational impacts. Increase significantly the level of mitigation for these losses without compromising the substantive protection and mitigation activities elsewhere in the basin.

This part of the basin has suffered the loss of anadromous fish and other fish and wildlife species directly due to hydropower development at a scale at least comparable to, and in most cases greater than, other areas in the basin. These losses have been severely under-addressed and under-mitigated through the Northwest Power Act, especially when compared with other areas and other entities in the basin.

Bonneville should begin a comprehensive effort over the next five years to intensify, expand, and then sustain the mitigation effort for this part of the basin. In developing this comprehensive effort, Bonneville should work with the Spokane Tribe of Indians and the tribe's list of mitigation measures recommended to the Council. Bonneville and the Spokane Tribe of Indians should consult with the Confederated Tribes of the Colville Reservation and Washington Department of Fish and Wildlife and coordinate with their ongoing work in the Lake Roosevelt area. The Council expects annual reports from Bonneville and the Spokane Tribe of Indians detailing progress made in this mitigation effort.

**Implementer: Bonneville and others**

Continue to make progress on the program's phased approach to evaluate the possibility of reintroducing anadromous fish above Grand Coulee and Chief Joseph dams.

Continuing to assess the feasibility of reintroducing anadromous fish is one measure in the suite of mitigation measures recommended by the Spokane Tribe of Indians (see previous measure). Continuing to make

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                28

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

progress on this measure received substantial support in the amendment process from many governmental and non-governmental entities.[22]

**Action Agencies Decision to Ignore the Fish and Wildlife Program in Alternatives or Mitigation**

57.    Even with the significant actions described above, that were supported by the Program as a backdrop, the Action Agencies during the CRSO EIS development process dismissed numerous requests to include reintroduction measures in the alternatives or as mitigation actions within the EIS. This dismissal was done even though the above-described actions are clearly consistent with the Northwest Power Act.

58.    This lack of consistency is most evident in the Action Agencies' dismissal of any consideration of the reintroduction of salmon and steelhead above Chief Joseph and Grand Coulee Dams within the FEIS, either in an alternative or as mitigation even though it was contained as a measure in the 2014 Fish and Wildlife Program and reaffirmed in the 2020 Addendum. Additionally, there are numerous measures outlined by the Council in the 2014 Fish and Wildlife Program and 2020 Addendum that the Action Agencies simply failed to consider, chose to ignore, or actively chose to defy, such as the 2003 Mainstem Amendment's fall refill targets for Lake Roosevelt.

59.    On February 5, 2020, the Tribe's frustration reached a breaking point and the Tribe terminated the Cooperating Agency MOU with the Action Agencies.[23] The

---

[22] 2014 Fish and Wildlife Program 2020 Addendum, page 38, *available at* https://www.nwcouncil.org/sites/default/files/2020-9.pdf (January 28, 2021). The Tribe notes that the cited sections of the 2020 Addendum were approved by the Northwest Power and Conservation Council in January 2020. *Available at* https://www.nwcouncil.org/reports/2020-1 (January 28, 2021).

[23] Exhibit 4.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                29

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Tribe no longer wanted to be associated with an inadequate CRSO EIS that failed to meet the requirements of NEPA, the NWPA or the ESA.

60.    On February 28, 2020, the Action Agencies released their draft CRSO EIS for a 45-day public comment period.  The Tribe submitted comments along with many others. However, due to the onset of the Covid-19 pandemic numerous entities and individuals requested an extension of the comment period, which the Action Agencies denied. In accordance with the Trump Administration's October 19, 2018 Presidential Memorandum[24] the entire CRSO EIS process was truncated by one year.  The Action Agencies approved the ROD on September 28, 2020.

61.    The Tribe will first discuss the significant defects with the USFWS 2020 FWCAR and 2020 BiOp, and the NOAA 2020 BiOp that were required in the development of the CRSO FEIS and CRSO ROD. This is followed by a description of the significant shortcomings of the FEIS and ROD.

### USFWS's 2020 BiOp and 2020 FWCAR

**NWPA Violations**

62.    The preparation of the EIS and the September 28, 2020 CRSO ROD required that USFWS, in its capacity as an "other Federal" agency responsible for "regulating federal … hydroelectric facilities located on the Columbia River or its tributaries" to follow the mandate of Section 839b(h)(11)(A) of the Northwest Power Act in it carrying out its duties under the Fish and Wildlife Coordination Act of 1934, 16

---

[24] https://www.whitehouse.gov/presidential-actions/presidential-memorandum-promoting-reliable-supply-delivery-water-west/ Section 6 (Last visited December 9, 2020).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    30

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

U.S.C. Section 661 *et seq*. ("FWCA") and Section 7 of the Endangered Species Act. The

USFWS 2020 FWCAR and 2020 BiOp are final agency actions reviewable by the Court.

63.    USFWS failed to acknowledge and/or adhere to the mandates of Section

839b(h)(11)(A) of the Northwest Power Act in exercising its responsibilities under either

the ESA or the FWCA when preparing the 2020 FWCAR or the USFWS 2020 BiOp.

**Endangered Species Act Violations**

64.    "Lurking, and apparently thriving, under the quiet, shallow shoreline

waters of Lake Roosevelt in Northeastern Washington is an aggressive, invasive predator

that has the potential to upset billions of dollars of investment to rebuild native fish

populations including redband trout, kokanee, white sturgeon, burbot, and possibly

salmon and steelhead." John Harrison, *The Pike Problem*, (September 2018), *available at*

https://www.nwcouncil.org/fish-and-wildlife/topics/pike-problem#5_whopays (Last

visited January 28, 2021). The aggressive non-native invasive predator referenced in the

previous quote is the Northern Pike (*Esox lucius*). Not to be confused with the Columbia

River native predator the Northern Pikeminnow (*Ptychocheilus oregonensis*).

65.    USFWS concluded the following in regards to northern pike: "<u>Mainstem

Upper Columbia River CHU 22</u>[25]: Proposed operations have the potential to increase

suitable habitat for non-native predatory species including smallmouth bass and northern

---

[25] "The Mainstem Upper Columbia River CHU 22 includes the mainstem Columbia River from Chief Joseph Dam downstream to John Day Dam and all inundated/backwater portions of tributaries (USFWS 2010b). This CHU was identified essential for bull trout to conserve migratory corridors for fluvial bull trout in adjacent Core Areas (USFWS 2010b). The entirety of the Mainstem Upper Columbia River CHU 22 falls within the Action Area." USFWS BiOp, p. 139.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                          31

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

pike. Expansion of northern pike in Lake Roosevelt, Lake Rufus Woods and in the Columbia River downstream is expected to continue. Increased spill operations that entrains pike and flow management that creates shallow, warm water spawning areas suitable for northern pike are expected to continue into the future." USFWS BiOp at 276.

66.     Even with this finding presented, the USFWS BiOp fails to address the take and adverse modification Northern Pike present to the bull trout's continued existence and the modification Northern Pike will cause to their critical habitat.  USFWS simply ignore their own conclusion that Northern Pike will be allowed to further spread and flourish in response to the proposed operations over the next 15-years. Finally, even with this significant threat identified the USFWS BiOp, it concluded that the Action Agencies proposed action is not likely to jeopardize the continued existence of bull trout, or adversely modify the bull trout's critical habitat. USFWS BiOp p. 299.

67.     Furthermore, the USFWS issued the Incidental Take Statement ("ITS") that fails to account for the Bull Trout "take" caused by the Northern Pike, and fails to require mandatory conditions on the Action Agencies to address the Northern Pike problem, even though the Action Agencies proposed actions will assist in the Northern Pike's continued spread through the Bull Trout's critical habitat over the next 15-years.

## NOAA 2020 BiOp

### NWPA Violations

68.     The preparation of the EIS and the September 28, 2020 CRSO ROD required that NOAA, in its capacity as an "other Federal" agency responsible for "regulating federal … hydroelectric facilities located on the Columbia River or its

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                          32

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

tributaries" follow the mandate of Section 839b(h)(11)(A) of the Northwest Power Act in it carrying out its duties under Section 7 of the Endangered Species Act.

69.    NOAA failed to acknowledge and/or adhere to the mandates of Section 839b(h)(11)(A) of the Northwest Power Act in exercising their responsibilities under the ESA when developing the 2020 BiOp. NOAA did not acknowledge the need for it to exercise its regulatory responsibilities in a manner consistent with the purposes of the Northwest Power Act or take into account the Fish and Wildlife Program in its "decision making processes" while developing the 2020 BiOp.

**Endangered Species Act Violations**

70.    NOAA failed to acknowledge or even consider the impacts Northern Pike will have on listed species, in particular Upper Columbia River Spring Chinook (*Oncorhynchus tshawytscha*) and Steelhead (*O. mykiss*). Specifically, the NOAA BiOp ignores the adverse modification to the listed species critical habitat that will result from continued failure to control the spread of Northern Pike throughout the project area over the next 15-years. To be clear, even though the USFWS BiOp identified Northern Pike as a problem that will be exacerbated by the Action Agencies proposed action (*supra* at ¶ 64), NOAA failed to even mention Northern Pike in its entire 1500-page BiOp.

71.    Additionally, NOAA relied on an outdated thirteen-year-old ineffective Upper Columbia River Spring Chinook Salmon and Steelhead Recovery Plan as justification for numerous conclusions, including the complete failure to consider the role of reintroducing the species into the areas above Chief Joseph Dam, and the reintroductions potential significant benefit to the continued existence of Upper Columbia River Spring Chinook and Steelhead.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                              33

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

72.     Interior Columbia Technical Recovery Team ("ICTRT"), in a 2007 Memorandum,[26] discussed the role of the large extirpated habitat areas in recovery: "The repopulation of either the Spokane or the Kettle/Colville/San poil MPG would substantially reduce the overall risk faced by the Upper Columbia spring chinook ESU. This judgment was based on the combination of likely contribution to overall ESU abundance and productivity, diversity and spatial structure (Table E-1), given the small number and extent, potential for catastrophic loss, and low diversity of the single extant MPG."  Similarly, in relation to Upper Columbia Steelhead the ICTRT stated: "Repopulation of either the Spokane or the Kettle/Colville/San poil MPG would substantially reduce the risk of the Upper Columbia steelhead ESU. This judgment was based on the combination of likely contribution to overall ESU abundance and productivity, diversity and spatial structure."

73.     NOAA's 2020 BiOp did not even consider the blocked habitats potential benefit to the Upper Columbia River Spring Chinook or Upper Columbia River Steelhead over the next 15-year period, it concluded that: "These [MPGs] were extirpated by the completion of Grand Coulee and Chief Joseph Dams, and reintroduction of these extirpated MPGs is not required for recovery as defined in the ESA recovery plan (UCSRB 2007)."[27] The Upper Columbia River Spring Chinook "on the scale of at-risk, [

---

[26] The Memorandum is available at:  https://ucut.org/wp-content/uploads/2019/05/ICTRT-2007-Role-of-Extirpated-Areas-in-Recovery-1.pdf

[27] NOAA BiOp at 645.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                    34

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

] are among the most at-risk populations we have in the Columbia River Basin."[28]

Additionally, the status quo has led to the Upper Columbia River Spring Chinook having

Smolt to Adult Return ("SAR") that is currently less than 1%. *Id*. The Northwest Power

and Conservation Council's SAR goal is 4-6 percent, clearly relying a 13-year-old

recovery plan is not cutting it.

74.    NOAA's failure to consider the habitats above Chief Joseph and Grand

Coulee Dams ignores potential benefits these previously occupied habitats present

because they generally are much colder habitats and modeling indicates will likely

provide a cold-water refuge far into the future even with the impacts of climate change.

75.    Finally, NOAA's 2020 BiOp concludes that the Action Agencies proposed

action is not likely to affect the Southern Resident Killer Whales (*Orcinus orca*)

("SRKW"), in particular the proposed action's impact on prey availability, one of the key

limiting factors facing the SRKW.  "Chinook salmon were again the dominant prey.

Southern Residents from the K and L pods occur off the Columbia River in March

(Hanson et al. 2013), emphasizing the importance of fish from Mid/Upper Columbia

River and LCR spring-run Chinook salmon populations in the diet during later winter and

early spring (Hanson et al., in review)." NOAA BiOp at 1371.

76.    Even with the identification of prey availability as a key limiting factor to

the SRKW's continued survival NOAA failed to consider the impact of the Action

---

[28] John Harrison, <u>Modelling Shows Upper Columbia Spring Chinook Remain Among
Most "At-Risk",</u> October 19, 2020, quoting Dan Rawding, Columbia River Salmon
Recovery Coordinator for the Washington Department of Fish and Wildlife, *available at*
https://www.nwcouncil.org/news/modelling-shows-upper-columbia-spring-chinook-
remain-among-most-risk (Last visited January 28, 2021).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

35

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Agencies' decision to continue to operate and manage Chief Joseph and Grand Coulee

Dams without fish passage facilities over the next 15-years.[29]  Furthermore, with Chinook

salmon being the prey of choice of the SRKW's, NOAA identified prey quality (size) as

an impact to the SRKW's survival. However, NOAA failed to indicate how the continued

management of Chief Joseph Dam and Grand Coulee Dam without fish passage facilities

impacts Chinook size and quality.  The Chinook that returned to areas above Chief

Joseph and Grand Coulee Dams were typically the largest Chinook returning to the

Columbia (Exhibit 1).[30] Unfortunately, NOAA failed to consider and identify this

---

[29] Washington State's Orca Task Force ("Task Force") has set the following goal to prevent the SRKWs extinction:  "Hydropower operations: Improve survival and distribution of Chinook populations. **Recommendation 7**: Prepare an implementation strategy to reestablish salmon runs above existing dams, increasing prey availability for Southern Resident orcas."  In describing the implementation of this recommendation the Task Force stated the following: "In 2019, the governor and Legislature should provide funding through WDFW and regional salmon recovery organizations to coordinate with tribes, local governments, National Oceanic and Atmospheric Administration and other key partners to assess and prioritize appropriate locations based on potential benefits, costs, management, operations and other key information necessary to reestablish salmon runs as soon as possible above the dams and in the watersheds agreed to by the parties. Provide policy support for Chinook reintroduction upstream of dams such as Chief Joseph and Grand Coulee Dams for both the near-term trap-and-haul efforts (cultural releases implemented by the Upper Columbia tribes). In addition, provide policy support for the long-term phased approach in the Northwest Power and Conservation Council's Fish and Wildlife Program and support the U.S. entity's regional recommendation concerning the Columbia River Treaty. Prioritize projects that can produce downstream adult Chinook and areas with suitable habitat or areas targeted for habitat restoration in the near term." *Available at* https://www.governor.wa.gov/sites/default/files/OrcaTaskForce_FinalReportandRecomm endations_11.07.19.pdf (Last visited January 29, 2021).

[30]  It is worth noting that the oldest SRKW in the L Pod (born 1928) would have spent its early years feeding on Chinook from the Upper Columbia that were destined to return to the Spokane Tribe's Reservation and on into the Columbia River spawning and rearing habitats in Canada.

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

continued management and operational choice by the Action Agencies as an impact to prey availability and quality.

**THE CRSO FEIS AND CRSO ROD VIOLATE NEPA, ESA, APA and NWPA**

77.     The 2020 CRSO ROD and 2020 CRSO FEIS are arbitrary, capricious, and contrary to law for at least, but not limited to the following reasons.

**Northwest Power Act**

78.     The Action Agencies refused to consider the reintroduction of salmon and steelhead to the habitats above Chief Joseph and Grand Coulee Dams within an alternative or as mitigation within the FEIS.  Although they make passing statements throughout the ROD and EIS for their decision, the following is the most complete:

> Reintroduction of salmon above Grand Coulee Dam and installation of fish passage at Grand Coulee and Chief Joseph Dams. Reintroduction is an important and complex, large-scale concept. Its consideration, evaluation, and implementation should involve multiple tribal, federal, state, and other entities. A coordinated approach among water users, tribes, states, multiple federal agencies, and others would be necessary. To allow so many differing interests to coordinate on such a complex topic, which may include international considerations, a decision-making framework and a series of regional workshops would be necessary just to approach the first step of defining reintroduction objectives. **Given the incompatibility of such a wildlife management decision-making framework with an analysis of the operation of the CRS, it is not feasible to proceed with a detailed consideration of reintroduction in this EIS.** Moreover, to meaningfully analyze reintroduction as a measure, the details of the proposal would need to be understood well enough to include in hydrologic, water quality, and fish models. That information is not presently available, and development of those details was not possible in the timeframe of this NEPA process. Nevertheless, the agencies and

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                37

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

interested regional [31] sovereigns are developing a framework to address critical information gaps.[32]

79.    First, the Action Agencies reasoning does not comport with the Northwest Power Act's direction to exercise their responsibilities consistent with the purposes of the Act and provide for "equitable treatment" for the fish and wildlife affected by the hydroelectric power projects they operate and manage. 16 U.S.C. § 839b(h)(11)(A)(i). Meaning they must strike an "equitable" balance between the other purposes for which the facilities were built and the need to protect, mitigate and enhance the fish and wildlife that are impacted. Ignoring the impacts of continuing to manage and operate these two dams without fish passage facilities clearly indicates that the Action Agencies simply failed to consider this requirement of the NWPA. One cannot equitably balance impacts if the impacts are simply ignored.

80.    Second, the Action Agencies have a separate duty under the NWPA to take "into account at each relevant stage of the decisionmaking processes to the fullest extent practicable, the Program adopted by the Council." 16 U.S.C. § 839b(h)(11)(A)(ii). Again, in reading the above passage, it seems the Action Agencies completely failed to recognize the 2014 Fish and Wildlife Program's Phased Approach and the 2020 Addendum's direction to continue to make progress on the Phased Approach. The above reasoning by the Agencies appears to ignore that both the 2014 and 2020 Programs

---

[31] The Tribe takes the position that it will be present in any and every forum that could or will discuss the reintroduction of salmon and steelhead to its waters and accordingly it sent a letter outlining its concerns with this Action Agencies' directed and funded forum after it learned the concepts was under consideration. Exhibit 5.

[32]FEIS, Section 2.5.10, page 2-79, *available at* https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/14958 (January 29, 2021) (Emphasis added).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

adopted and approved by the Northwest Power and Conservation Council went through the statutorily prescribed process that includes substantial public and regional input and is subject to judicial review. 16 U.S.C. § 839b(h).  However, it is clear from the above reasoning, the Action Agencies' view more process is needed simply because the Agencies' do not want to accept the Program's measures as a directive from the Council which in the end is direction from the Columbia River Region. Nor do they seem to want to acknowledge the progress and work that has been completed over the seven years since the 2014 Phased Approach was adopted by the Council that directly addresses some of the Agencies' laundry list of "information gaps."

81.    The Action Agencies not only ignored the and summarily dismissed the Council's Phased Approach they dismissed numerous other measures in the Council's Program. Such as providing greater mitigation in the areas above Grand Coulee Dam. Instead, the Actions Agencies ROD moves forward with a plan to ignore the 2003 Mainstem Amendments in regards to operational changes to elevations of Lake Roosevelt in the fall. 2020 ROD at 51. This new operation chosen by the Action Agencies ignores the Council's target elevation of 1,283 feet by the end of September and moves it to the end of October for hydropower purposes and unilaterally decides that 100 acres of spawning gravel mitigation solves any potential negative impacts to fish populations. This operation has been referred to as "Fall Flex."

82.    This particular operation was a contentious issue addressed in the development of the Fish and Wildlife Program's 2020 Addendum process. The situation is best described in the Findings on Recommendations and Responses to Comments for the 2020 Addendum to the 2014 Fish and Wildlife Program ("Findings"). The

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                          39

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

discussions and correspondence around "Fall Flex" are accurately described in the

Findings:

> The Spokane Tribe of Indians recommended that the existing program language regarding operations at Grand Coulee Dam remain in the program and be implemented. In an exchange of comments on the recommendations, Bonneville and the Spokane Tribe of Indians and the Confederated Tribes of the Colville Reservation differed over whether conditions were ripe for the program to call for a more flexible approach to fall operations at Grand Coulee Dam, permitting the operators to manage Lake Roosevelt to a minimum elevation of 1,283 feet by the end of October rather than the end of September. After discussions, Bonneville, the Spokane Tribe of Indians and the Colville Tribes asked the Council not to address this issue in the Addendum, effectively retaining the language on Grand Coulee Dam operations in the 2014 Program. **Any proposal to shift the fall operation needs further evaluation, information generation, and discussions between the project operators and the fish managers before proceeding.[33]**

Instead, the Action Agencies included the elevation change in the ROD with very specific

mitigation that is not anchored to the above-described path. Instead, the Agencies

developed their mitigation plan, without substantive discussions with Tribe, as stated in

the ROD that once again ignores the Program.

83.    The Actions Agencies' FEIS and ROD are imbued with a lack of the

adherence to the mandatory duties of the Northwest Power Act.  They appear to want to

ignore that Congress clearly adopted the Act and its processes for determining

appropriate mitigation, protection and enhancement actions related to the operation and

maintenance of the facilities considered in the FEIS and ROD. It seems that the Fish and

Wildlife Program and the Northwest Power Act should have been the starting place for

their considerations in the EIS not an afterthought or one that could be worked around.

---

[33] *Available at*
https://www.nwcouncil.org/sites/default/files/2020%20Addendum%20Part%20II%20Findings%20Responses%20final%20March%202020.pdf  at Page 52  (Emphasis added).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                40

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

Congress clearly expected the Program to be central to these types of actions or it would not have given the Council the authorities described in 16 U.S.C. § 839(b)(i)-(j) or 16 U.S.C. § 839b(c)(8)-(13).

**NEPA**

84.    As already discussed thoroughly above the Action Agencies decision to fail to consider salmon and steelhead reintroduction and fish passage above Chief Joseph and Grand Coulee Dams either in an alternative or as mitigation violates the Northwest Power Act, it separately violates NEPA and its implementing regulations.

85.    Given that the following has been stated: "It is doubtful the Action Agencies could demonstrate that breaching, bypassing, or removing one or more of the Snake River dams is not "reasonable" under NEPA." 184 F. Supp. 3d at 943. Similarly, the consideration of operating and managing Chief Joseph and Grand Coulee Dams with steelhead and salmon passage is also not an unreasonable alternative to consider under NEPA. Particularly given that anadromous fish passage around high head dams is being pursued and effectively implemented throughout the Northwest.

86.    Additionally, the consideration of reintroduction was broadly recommended in the USFWS FWCAR, "Create and implement effective reintroduction plans for native species above federal projects with little to no access." FWCAR at 54. Regardless, the Action Agencies once again ignored and offered a similar excuse as described above:

> Co-lead agencies lack the authority to oversee or implement reintroduction
> except as necessary to comply with ESA and other applicable laws.
> Reintroduction is an important and complex, large-scale concept. Its
> consideration, evaluation, and implementation should involve multiple
> tribal, federal, state, and other entities. A coordinated approach among
> water users, tribes, states, multiple federal agencies, and others would be

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

41

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

necessary. To allow, so many differing interests to coordinate on such a complex topic, a decision-making framework and a series of regional workshops would be necessary just to approach the first step of defining reintroduction objectives. (CRSO FEIS Appendix U at 7).

87.     EISs "shall include discussions of …[m]eans to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(h)[34]. Mitigation includes "[r]ectifying the impact by repairing, rehabilitating, or restoring the affected environment" and "[c]ompensating for the impact by replacing or providing substitute resources and environments." 40 C.F.R. §§ 1508.20(c), (e).

88.     The CRSO FEIS failed to consider managing and operating Chief Joseph and Grand Coulee Dams with fish passage facilities as a mitigation measure. Even though it is likely the most effective mitigation for the harm caused by the continued operation and maintenance of these facilities.

89.     Mitigation for the impacts of the operations and maintenance described in the FEIS and ROD are also inadequate for the numerous expected impacts in Lake Roosevelt.

     **a.     Dissolved Oxygen Impacts**: The proposed mitigation fails to address the dissolved oxygen impairments that occur in the Spokane Arm of Lake Roosevelt during

---

[34] This Complaint cites to the prior regulations, which were in effect during most of CRSO process. The new regulations are also already subject to four lawsuits. See Compl. for Declaratory and Injunctive Relief, *California v. Council on Env't Quality*, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); Compl., *Env't Just. Health All. v. Council on Env't Quality*, No. 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Compl., *Wild Va. v. Council on Env't Quality*, No. 3:20-cv-00045 (W.D. Va. July 29, 2020); Compl. for Declaratory and Injunctive Relief, *Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 3:20-cv-05199 (N.D. Cal. July 29, 2020). Without express statutory authority to the contrary, rules do not apply retroactively. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

42

certain time periods.  The ROD and FEIS described actions will intensify impacts to this portion of Lake Roosevelt that is subject to the Tribe's EPA approved water quality standards. This issue of dissolved oxygen impairments within the Spokane Arm was raised during the development of the Spokane River DO TMDL. At that time EPA squarely blamed this impairment on the current management and operation of Grand Coulee Dam:

> Scenario #4 predicts that SOD is the most important factor affecting DO in the Spokane Arm (Figure 78). When SOD is reduced by 50%, DO levels in the deeper portions of the Arm increase to above 3 mg/L, and anoxic conditions are eliminated. While conditions are improved, they still do not achieve the 8 mg/l riverine standard. The elevated SOD in the Spokane Arm is a legacy of the accumulation of oxygen-demanding pollutants in sediment. Sediment accumulation is, in turn, **caused by the hydrologic regime created by Grand Coulee dam.** These results indicates that improving SOD is critical to improving water quality, and that assumptions about SOD will have a significant impact on the estimation of "natural conditions" within the Arm.[35]

Unfortunately, the Action Agencies failed to provide any mitigation for this continued and likely exacerbated impact.

      **b.**    **Landslides:** Erosion and landslides occur throughout the Tribe's reservation and will continue due to the actions decided upon on in the CRSO FEIS and CRSO ROD. Unfortunately, no additional mitigation is proposed by the Action Agencies.

      **c.**    **Spokane Arm Wildlife Impacts Caused by Ice Formation.** The Tribe's wildlife resources are impacted by the formation of ice within the Spokane Arm that historically did not occur.  Numerous deer, moose and elk are lost on the ice each year. The ice formation is a direct impact caused by the operations at Grand Coulee Dam.

---

[35] EPA Approval of Spokane River DO TMDL, at 37, *available at* https://www.spokaneriver.net/wp-content/uploads/2010/05/May_2010_Spokane_TMDL_Approval.pdf (emphasis added).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

43

Unfortunately, no mitigation for these impacts is proposed by the Action Agencies within the CRSO FEIS or ROD.

     **d.**    **Increased Entrainment.** The operations and maintenance actions arrived at by the Action Agencies in the FEIS and ROD will also increase entrainment of native fish species and mitigation hatchery rainbow trout. Again, the FEIS and ROD proposed no additional mitigation for these increased and continuing impacts.

     90.    The Agencies' failure to properly evaluate the impacts on the Tribe's rights and resources is indicative of their complete failure to take the "hard look" at the issues and interests and aspirations described in Executive Order 12898, Executive Order 13007 and Secretarial Order 3175.

     91.    Finally, Section 839b(h)(11)(B) of the Northwest Power Act requires that the Action Agencies and the federal agencies responsible for regulating the federal hydroelectric facilities consult with each other and with "State fish and wildlife agencies appropriate Indian tribes." This Northwest Power Act consultation requirement did not occur prior to approval of the FEIS or CRSO ROD.

     92.    The above-paragraphs described many, but not all of the arbitrary, capricious, and legal failings of the CRSO FEIS and the CRSO ROD.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NOAA VIOLATIONS OF THE ESA, NWPA, AND APA

     93.    Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

     94.    NOAA violated the requirements of ESA Section 7 and its implementing regulations, and arbitrarily, capriciously, without any rational basis, and in disregard of

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

44

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

the best available scientific information concluded in the 2020 BiOp that the actions proposed by the Corps and BOR are not likely to jeopardize any listed species of salmon or steelhead or destroy or adversely modify their critical habitat, and that these same actions are not likely to adversely affect the SRKW. Additionally, NOAA failed to follow the mandates of the Northwest Power Act when regulating, under the authority of the ESA, the Federal hydroelectric facilities located on the Columbia River or its tributaries.

95.     The defects in the 2020 BiOp include, but are not limited to, those described and referred to above. In addition, to the extent NOAA relies in the 2020 BiOp on the recently revised ESA consultation regulations, those regulations are arbitrary and contrary to law as applied in this case. NOAA's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, and are reviewable under the APA, 5 U.S.C. §§ 701–706.

## SECOND CLAIM FOR RELIEF
## USFWS VIOLATIONS OF THE ESA, NWPA, AND APA

96.     Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

97.     USFWS violated the requirements of ESA Section 7 and its implementing regulations, and arbitrarily, capriciously, without any rational basis, and in disregard of the best available scientific information concluded in the 2020 BiOp that the actions proposed by the Corps and BOR are not likely to jeopardize bull trout or destroy or adversely modify their critical habitat. Additionally, USFWS failed to follow the mandates of the Northwest Power Act when regulating, under the authority of the ESA

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                          45

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

and the FWCA, the Federal hydroelectric facilities located on the Columbia River or its tributaries.

98.    The defects in the USFWS 2020 BiOp include, but are not limited to, those described and referred to above. In addition, to the extent USFWS relies in the 2020 BiOp on the recently revised ESA consultation regulations, those regulations are arbitrary and contrary to law as applied in this case. USFWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, and are reviewable under the APA, 5 U.S.C. §§ 701–706.

## THIRD CLAIM FOR RELIEF
## BOR AND CORPS VIOLATIONS OF ESA AND APA

99.    Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

100.    The Corps and BOR have an independent and continuing legal duty to comply with the substantive requirements of ESA Section 7(a)(2) to avoid jeopardy and adverse modification of critical habitat without regard to whether they have received a biological opinion for their actions. The Corps and BOR may not meet their duty to comply with Section 7 by relying on an invalid opinion. *Stop H-3 Ass'n v. Dole*, 740 F.2d at 1460; *Res. Ltd. v. Robertson*, 35 F.3d at 1304. For at least each of the reasons described above, the Corps' and BOR's reliance on the 2020 BiOps in their 2020 ROD is arbitrary, capricious, an abuse of discretion, and in violation of ESA Section 7(a)(2).

101.    The Corps' and BOR's actions and omissions also are arbitrary, capricious, and in violation of the ESA and its implementing regulations for at least the following additional reasons:

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                46                Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

A.     The Corps and BOR have not obtained a valid, complete Section 7(a)(2) consultations for operation of their projects and have not evaluated, proposed, or implemented further protective measures for ESA-listed species in order to avoid jeopardy and destruction and adverse modification of critical habitat.

B.     The ESA requires the Corps and BOR to operate their projects in a manner that avoids harm to listed species pending compliance with the procedural requirements of Section 7(a)(2). The Corps and the Bureau have not developed any valid analysis or rationale of their own to establish that their actions comply with the requirements of ESA Section 7(a)(2). 16 U.S.C. § 1536(a)(2); *see also Greenpeace v. NMFS*, 106 F. Supp. 2d 1066 (W.D. Wash. 2000) (enjoining implementation of fishing management plans in specific areas pending completion of BiOp).

C.     In addition to these violations of ESA Section 7(a)(2), BOR and the Corps are violating the supplemental protections afforded by ESA Section 7(d), 16 U.S.C. § 1536(d), by taking actions that may foreclose implementation of measures required to avoid jeopardy, and the requirements of ESA Section 7(a)(1), id. § 1536(a)(1), by failing to utilize their authorities for the conservation of threatened and endangered species. 155. Because the Corps and BOR have not obtained a valid, complete consultation, or taken any other appropriate steps to ensure that their operations will not harm ESA-listed species, the Corps and BOR are operating their projects in violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, and Sections 7(a)(1) and 7(d) of the ESA, id. § 1536(a)(1) & (d).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                                47

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

102.    In addition, to the extent the Corps and BOR rely on the recently revised ESA consultation regulations to conclude that their actions comply with the ESA, those regulations are arbitrary and contrary to law as applied in this case.

103.    The Corps' and BOR's project operations and 2020 ROD are arbitrary, capricious, and abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the ESA, 16 U.S.C. § 1540(g)(1), and the APA, 5 U.S.C. §§ 701–706.

## FOURTH
## BOR AND CORPS VIOLATIONS OF NWPA AND APA

104.    Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

105.    BOR and the Corps violated the Northwest Power Act by failing to exercise their responsibilities in a manner consistent with the purposes of the Northwest Power Act to adequately protect, mitigate, and enhance fisheries and wildlife impacted by their facilities "in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated." 16 U.S.C. § 839b(h)(11)(A)(i).

106.    BOR and Corps violated the mandatory requirements of the Northwest Power Act when they failed to take "into account at each relevant stage of the decisionmaking processes to the fullest extent practicable" the 2014 Fish and Wildlife Program and the 2020 Addendum in the development and approval of the CRSO ROD and the CRSO FEIS. 16 U.S.C. § 839b(h)(11)(A)(ii).

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                48

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

**FIFTH**
**BOR AND CORPS VIOLATIONS OF NEPA**

107.    Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

108.    NEPA requires federal agencies to prepare an EIS in connection with all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The CRSO FEIS fails to comply with the requirements of NEPA, its implementing regulations, and the relevant case law for reasons including, but not limited to, those described in the foregoing paragraphs of this complaint-in-intervention.

109.    By their actions and inactions as alleged above, the Corps and BOR are currently violating the NEPA and its implementing regulations. The Corps' and BOR's actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

**SIXTH**
**BOR, CORPS, NOAA, AND USFWS VIOLATED THE NORTHWEST POWER ACT CONSULTATION MANDATE**

110.    Plaintiff-Intervenor incorporates by reference each and every allegation set forth above.

111.    BOR, Corps, NOAA and USFWS all failed to follow the consultation mandate described in Section 839b(h)(11)(B) of the Northwest Power Act during the development of the CRSO EIS, CRSO ROD, FWCAR, and BiOps.

112.    This violation is reviewable under the APA, 5 U.S.C. §§ 701–706.

**PRAYER FOR RELIEF**

WHEREFORE, the Spokane Tribe of Indians respectfully requests that the Court:

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

1.      Adjudge and declare that NOAA has violated ESA Section 7 and its implementing regulations by making no-jeopardy/no-adverse modification findings, and findings concurring in a not likely to adversely affect determination, in the 2020 BiOp that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

2.      Adjudge and declare that NOAA has violated the Northwest Power Act, by failing to adhere to the requirements of Section 839b(h)(A) of the Act in the development of the 2020 BiOp;

3.      Adjudge and declare that USFWS, NOAA, BOR and the Corps have violated the Northwest Power Act by failing to adhere to the requirements of Section 839b(h)(11)(B);

4.      Vacate and set aside the 2020 NOAA BiOp and the accompanying incidental take statement and permits and enjoin NOAA to notify the Action Agencies of these actions;

5.      Adjudge and declare that USFWS has violated ESA Section 7 and its implementing regulations by making no-jeopardy/no-adverse modification findings, and findings concurring in a not likely to adversely affect determination, in the 2020 USFWS BiOp that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

6.      Adjudge and declare that USFWS has violated the Northwest Power Act, by failing to adhere to the requirements of Section 839b(h)(11)(A) of the Act in the development of the 2020 USFWS BiOp and the 2020 USFWS FWCAR;

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    50

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

7.      Vacate and set aside the 2020 USFWS FWCAR, 2020 USFWS BiOp and the accompanying incidental take statement and permits and enjoin USFWS to notify the Action Agencies of these actions;

8.      Adjudge and declare that BOR and the Corps have violated ESA Section 7(a)(2) and its implementing regulations by continuing to operate their projects in the Columbia and Snake River Basins without valid biological opinions, by failing to ensure that these projects avoid jeopardy, by making irretrievable and irreversible commitments of resources before the conclusion of a valid consultation, and by failing to utilize their authorities to conserve threatened and endangered species, all in violation of the requirements of ESA Section 7, 16 U.S.C. § 1536, and that their actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law;

9.      Adjudge and declare that BOR and the Corps have violated ESA Section 7(a)(2) and its implementing regulations by continuing to operate their Columbia and Snake River projects without initiating and completing formal consultation with NOAA on the effects of these projects and their operations on endangered Southern Resident killer whales and without ensuring that those operations will not jeopardize the survival and recovery of this species;

10.     Order the Corps and BOR to consult with NOAA pursuant to Section 7(a)(2) of the ESA on the effects of their project operations and maintenance on Southern Resident Killer Whales and ensure, based on that consultation, that any actions will not jeopardize the survival and recovery of this endangered species;

Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI                    51

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

11.     Adjudge and declare that the Corps and BOR have violated NEPA by failing to prepare an environmental impact statement that complies with the requirements of NEPA, its implementing regulations, and Executive Orders and Secretarial Orders;

12.     Adjudge and declare that the Corp, BOR, NOAA and USFWS violated the APA by failing to adhere to the requirements of the federal government's trust responsibility;

13.     Vacate the 2020 ROD and remand the CRSO FEIS to the Corps and BOR;

14.     Grant the Spokane Tribe such preliminary and permanent injunctive relief as it may from time-to-time request and as may be necessary to protect the environment and ESA-listed species until the Court decides the merits of this case or the agency complies with the law;

15.     Award the Spokane Tribe its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

16.     Grant the Spokane Tribe such further and additional relief as the Court may deem just and proper.


Respectfully submitted this 25th day of February 2021.

By: /s/Ted C. Knight
Ted C. Knight, WSBA #39683
Special Legal Counsel
Spokane Tribe of Indians
PO Box 100
Wellpinit, WA 99040
Phone (509) 953-1908
tedk@spokanetribe.com


Spokane Tribe of Indians'
COMPLAINT-IN-INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 01-cv-00640-SI

Ted C. Knight, Special Legal Counsel
Spokane Tribe of Indians
PO Box 100, Wellpinit, WA 99040
(509) 953-1908

52

# EXHIBIT 1



Summer chinook: 54" 70+ lb: Little Falls Dam, 1933

Summer chinook harvested at Little Falls Dam in 1933 by a Spokane Tribal member. The fish was approximately 4.5 ft long and weighed about 70 lb. [Photograph courtesy of Christine LeBret.]

EXHIBIT 1

# EXHIBIT 2

EXHIBIT 2



**Spokane Tribe of Indians**
OFFICE OF THE SPOKANE TRIBAL ATTORNEY
P.O. BOX 100, Wellpinit, WA 99040
(509) 458-6521 / fax (509) 458-6596

October 26, 2020                    *By Via USPS Priority Mail*

Lieutenant General Scott A. Spellman
55th Chief of Engineers & Commanding
General
U.S. Army Corps of Engineers
441 G Street NW
Washington, D.C. 20314-1000

Brigadier General D. Peter Helmlinger, P.E.
Commander, Northwestern Division
U.S. Army Corps of Engineers
1201 NE Lloyd Blvd, Suite 400
Portland, OR 97232-1257

Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

Barry Thom
Regional Administrator
NOAA
West Coast Regional Office
1201 NE Lloyd Blvd., Suite 1100
Portland, OR 97232

David L. Bernhardt
Secretary
Department of the Interior
1849 C Street NW
Washington, D.C. 20240

Brenda Burman
Commissioner
Bureau of Reclamation
1849 C Street NW
Washington, D.C. 20240

Robyn Thorson
Regional Director
U.S. Fish and Wildlife Service
911NE 11th Avenue
Portland, OR 97232-4181

RE: Sixty-Day Notice of Intent to Sue for Violations of the Endangered Species
Act Regarding Impacts of the Federal Columbia River Power System on
Threatened and Endangered Salmon and Steelhead

Dear Sirs and Madams:

This letter provides notice of the Spokane Tribe of Indians' ("Tribe") intent to sue the
Army Corps of Engineers ("ACOE") and the Bureau of Reclamation ("BOR")[1] for
violations of Section 7 and Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C.
§§ 1536, 1538. These violations arise from ACOE's and BOR's failure to comply with

---

[1] A separate notice has been provided to the Bonneville Power Administration.

1

EXHIBIT 2                    1

EXHIBIT 2

the substantive and procedural requirements imposed by ESA Section 7, 16 U.S.C. §
1536, as well as the prohibition on "take" of listed species in ESA Section 9, 16 U.S.C. §
1538, in their coordination, operation, maintenance, and configuration, along with other
federal agencies, of federal dams, reservoirs, and related facilities and actions in the
Columbia River basin. This notice is provided pursuant to § 11(g) of the ESA, 16 U.S.C.
§ 1540(g). This notice challenges the ACOE's and BOR's Joint Record of Decision
("2020 ROD") to implement their parts of the Preferred Alternative identified in the
CRSO EIS (DOE/EIS-0529, July 2020), which constitutes the proposed action reviewed
in the 2020 NOAA and USFWS CRS Biological Opinions.[2]

**Legal Framework**

Under the ESA Section 7 (a)(2) "[e]ach federal agency shall … insure that any action
authorized, funded, or carried out by such agency … is not likely to jeopardize the
continued existence of any endangered species or threatened species or result in the
destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. §
1536(a)(2)(emphasis added). The obligation to "insure" against a likelihood of jeopardy
or adverse modification requires the agencies to give the benefit of the doubt to
endangered species and to place the burden of risk and uncertainty on the proposed
action. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987). The substantive
duty imposed by § 7(a)(2) is constant, relieved only by an exemption from the
Endangered Species Committee. 16 U.S.C. § 1536(h); *Conner v. Burford*, 848 F.2d 1441,
1452 Fn. 26 (9th Cir. 1988).

The ESA's substantive protections are implemented in part through the consultation
process, which Congress designed explicitly "to ensure compliance with the [ESA's]
substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). As the
Ninth Circuit stated, "[i]f a project is allowed to proceed without substantial compliance
with these procedural requirements, there can be no assurance that a violation of the
ESA's substantive provisions will not result." *Id.* To fulfill these procedural duties,
federal agencies must consult with the appropriate federal fish and wildlife agency
(NOAA in the case of anadromous fish) and, if appropriate, obtain a biological opinion
evaluating the effects of any federal agency action on listed species and their critical
habitat. *Id.* If NOAA and/or USFWS conclude that a proposed action is likely to
jeopardize a listed salmon species or result in adverse modification of its critical habitat,
NOAA and/USFWS must propose reasonable and prudent alternatives ("RPAs"). If
available, RPAs are designed so that they will mitigate the proposed action to avoid
jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); *Idaho
Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071 (9th Cir. 1995).

Compliance with the procedural requirements of the ESA – making the determination of
the effects of the actions through the consultation process – is integral to compliance with

---

[2] Columbia River System Operations Environmental Impact Statement Record of
Decision ("CRSO ROD"), issued September 28, 2020, *available at*
https://www.nwd.usace.army.mil/Portals/25/docs/CRSO/CRSO_EIS_RecordOfDeci
sion.pdf

EXHIBIT 2

the substantive requirements of the ESA. Under this statutory framework, federal actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency insures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.14, 402.13; *Pac Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 138 F. Supp.2d 1228 (N.D. Cal. 2001)(enjoining delivery of Klamath project water to irrigators until a valid consultation was complete); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F.Supp.2d 1066 (W.D. 2000)(enjoining ocean-bottom fishing until § 7(a)(2) consultation was complete); *Conner v. Burford*, 848 F.2d at 1441, 1453-55 (enjoining oil and gas lease sales and related surface-disturbing activity until comprehensive biological opinion assessing the effects of all phases of the oil and gas activities was complete); *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992)("individual sales cannot go forward until consultation process is complete on the underlying plans which BLM uses to drive their development.").

Even after the procedural requirements of consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize listed species lies with the action agency. <u>And Action Agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy is arbitrary and capricious</u>. *See, e.g. Stop H-3 Ass'n. v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984). Thus, the substantive duty not to jeopardize listed species (or adversely modify critical habitat) remains in effect regardless of the status of the consultation. While this substantive duty is most readily fulfilled by implementing a federal action that properly has been determined not to cause jeopardy, or by implementing a valid RPA that results from a properly completed consultation, an action agency is "technically free" to choose another alternative course of action if it can independently ensure that the alternative will avoid jeopardy. *See Bennett v. Spear*, 520 U.S. 154, 170 (1997).

In addition, ESA's Section 7(a)(1) requires federal agencies to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed" under the Act. 16 U.S.C. § 1536(a)(1). Like the duty to avoid jeopardy, this conservation duty is discharged, in part, in consultation with NOAA/USFWS. *Id.* A program of "conservation" is one that brings the species to the point of recovery and delisting. *Id.* § 1532(3).

Separately, ESA section 7(d) prohibits federal agencies, after the initiation of consultation under ESA section 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d); *Natural Resource Defense Council v. Houston*, 146 F.3d 1118, 1128 (9th Cir. 1998)(section 7(d) violated where BOR executed water service contracts prior to completion of formal consultation); Marsh, 816 F.2d at 1389 (construction of highway outside species habitat barred by section 7(d) pending completion of consultation). This prohibition is not an exception to the requirements of section 7(a)(2); it remains in effect until the procedural requirements of section 7(a)(2) are satisfied, 50 C.F.R. § 402.09; and it ensures that section 7(a)(2)'s substantive mandate is met. *See, e.g., Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994); *Greenpeace v. National Marine Fisheries Service*, 80 F. Supp.2d 1137 (W.D. Wash.

3

EXHIBIT 2                                                                    3

# EXHIBIT 2

2000). Harm to a protected a protected resource itself is considered a violation of Section 7(d). *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d at 295.

Finally, section 9 of the ESA prohibits all activities that cause a "take" of an endangered species. 16 U.S.C. § 1538(a)(1)(B), (C). "Take" is defined by the ESA to encompass killing, injuring, harming, or harassing a listed species. 16 U.S.C. § 1532(19). The regulations further define "harm" as: "Harm in the definition of "take" in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

Federal actions that have completed a legally valid section 7(a)(2) consultation and have a biological opinion generally obtain and incidental take statement ("ITS"). 50 C.F.R. § 402.14(i). The ITS authorizes the agency, if in compliance with the terms and conditions of the ITS, to "take" listed species without facing section 9 liability. 50 C.F.R. § 402.14(i)(5). However, if a biological opinion is legally flawed, the ITS cannot shield the action agency from liability.

**2020 Columbia River System Biological Opinions and 2020 ROD**

The 2020 ROD relies on the 2020 Columbia River System Biological Opinions ("BiOps") prepared by NOAA and the U.S. Fish and Wildlife Service ("USFWS") to conclude that the actions ACOE and BOR will take over the next fifteen-year period in implementing their part of the preferred alternative described in the CRSO 2020 ROD and EIS will not jeopardize any of the listed species of salmon and steelhead, destroy or adversely modify any designated critical habitat, or be likely to negatively affect the endangered Southern Resident Killer Whales ("SRKW"). The 2020 BiOps and ROD contain numerous legal flaws and errors in at least, but not limited to, the following ways, and are arbitrary and capricious and violate the ESA:

- Ignore the harm/take that will result from continued failure to control the spread of Northern Pike (*Esox lucius*) throughout the project area on the listed species, in particular the Upper Columbia River Spring Chinook (*Oncorhynchus tshawytscha*) and Steelhead (*O. mykiss*);
- Ignore the recent data for Upper Columbia River Spring Chinook and Upper Columbia River Steelhead presented via the 2020 Five Year Status Review of these populations;
- Rely on a thirteen year old ineffective Upper Columbia River Spring Chinook Salmon and Steelhead Recovery Plan as justification for numerous conclusions: including the continued reliance on unproven tributary habitat actions, completely failing to consider the role of reintroducing the species into the areas above Chief Joseph Dam, and ignoring reintroductions' potential to significantly benefit the continued existence of Upper Columbia River Spring Chinook and Steelhead;
- Ignore the significant habitat opportunities for Upper Columbia River Spring Chinook and Steelhead that are forgone by the Action Agencies decision to

4

EXHIBIT 2                4

EXHIBIT 2

manage and configure both Chief Joseph and Grand Coulee Dams without anadromous passage, such as truck and haul facilities or juvenile passage facilities utilized throughout the Columbia River System and the Northwest Region generally;

- Ignore the Action Agencies' failure to eradicate and/or meaningfully control Northern Pike that are allowed to flourish, likely expand in range, and abundance due to the proposed action that will continue to result in unaccounted for take of Bull Trout (*Salvelinus confluentus*) and further damage and degrade Bull Trout habitat;
- Ignore the Action Agencies failure to eradicate and/or meaningfully control Northern Pike that are allowed to flourish and will likely expand in range and abundance due to the proposed action that will further negatively impact Columbia River Redband Trout (*O. mykiss gairdneri*) populations, and will negatively impact the downstream gene flow that benefits the genetic diversity of UCR Steelhead below Chief Joseph Dam;
- Ignore the impacts of climate change and other habitat limitations below Chief Joseph Dam over the next 15-year period, and how managing and configuring Chief Joseph Dam and Grand Coulee Dam with fish passage facilities to allow for UCR Spring Chinook and Steelhead access to the habitat upstream of these facilities "would substantially reduce the overall risk faced by the Upper Columbia spring chinook [and steelhead] ESU"[3];
- The Northwest Power Act, 16 U.S.C. Section 839b(h)(11)(A) requires the federal agencies responsible for managing, operating, or **regulating** Federal or non-federal facilities exercise those regulatory responsibilities consistent with the purposes of the Northwest Power Act and exercise those regulatory responsibilities "taking into account at each relevant stage of the decision making processes to the fullest extent practicable, the [Northwest Power and Conservation Council's Fish and Wildlife Program]. . .." Both NOAA and the USFWS failed to follow these statutory mandates while fulfilling their regulatory responsibilities when regulating the federal management and operation of the federal hydroelectric facilities, and the proposed actions considered in the agencies' BiOps;
- NOAA failed to analyze the Action Agencies decision to manage and configure Chief Joseph and Grand Coulee Dams without adult and juvenile salmon passage facilities that could be utilized by Chinook and other salmon populations, and how that negatively impacts the long-term prey availability for the SRKW;
- The BiOps and ROD relied on a comparative jeopardy standard that is arbitrary and capricious and contrary to the requirements of the ESA; and
- NOAA and USFWS failed to meaningfully consult with the Tribe during the development of the BiOps.

---

[3] Interior Columbia Technical Recovery Team, Memorandum. *Role of large extirpated areas in recovery*, January 8, 2007, pages 16 and 19.

5

EXHIBIT 2                                                5

EXHIBIT 2

## ACOE's and BOR's Violations of the ESA

**The ACOE and the BOR have failed to ensure that their actions are not likely to jeopardize the continued existence of listed species or destroy or adversely modify the listed species critical habitat.**

The ACOE and the BOR have a duty to ensure their actions "authorized, funded, or carried out" by them are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. *See* 16 U.S.C. § 1536(a)(2). For the reasons stated above, but not limited to, the 2020 BiOps issued by USFWS and NOAA incorrectly apply ESA Section 7(a)(2) and its implementing regulations to determine that the proposed action, the CRSO ROD, will avoid jeopardy of listed species. The ACOE and the BOR have an independent duty to ensure their actions avoid jeopardy. This is especially true here because the Action Agencies (ACOE, BOR, & BPA) were intimately involved in the development and drafting of the analyses and data employed by NOAA and the USFWS in the 2020 BiOps, and can reasonably be expected to know that the Opinions are arbitrary and capricious and contrary to law. *See, e.g. Res. Ltd. v. Robertson*, 35 F3d 1300, 1304-05 (9th Cir. 1993). The ACOE and the BOR through their continuing actions adopting and acting pursuant to the CRSO ROD and BiOps are knowingly violating ESA Section 7(a)(2).

**The ACOE and the BOR have failed to comply with ESA Section 7(a)(1).**

The ACOE and BOR have additional requirements under Section 7(a)(1) to develop a plan for recovery of listed species, in consultation with NOAA and USFWS. *See Sierra Club v. Glickman*, 156 F.3d 606 (5th Cir. 1998). In neither the 2020 BiOps, nor any other document have the ACOE or the BOR identified steps they will take to recover the listed species impacted by their actions to the point where the listed species can be removed from ESA protection.

**The ACOE and the BOR[4] are making irretrievable and irreversible commitments of resources, in violation of ESA Section 7(d).**

ESA Section 7(d) prevents federal agencies from making irretrievable and irreversible commitments of resources "which [have] the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives." 50 C.F.R. § 402.09. Section 7(d) imposes the additional restriction on the ACOE and the BOR because the initiation of consultation process has not been lawfully completed with the issuance of valid BiOps as discussed above.

**ACOE and BOR are "taking" listed species without a valid ITS in violation of ESA Section 9.**

---

[4] Such as those described in the *Grand Coulee G1-G18 Generating Units Modernization Overhaul Final Environmental Assessment,* August 2018.

6

EXHIBIT 2                                    6

# EXHIBIT 2

In their operation of the Columbia River System, and in particular the ACOE's and the BOR's implementation of the preferred alternative within the CRSO EIS as described in the CRSO ROD, are taking or causing the take of endangered and threatened salmon, steelhead and bull trout. This take occurs in numerous ways for example, but not limited to, when the endangered and threatened species interact with the hydroelectric facilities directly, are taken by non-native and invasive species that have been allowed to survive and flourish due to management decisions of the Action Agencies, and the listed species have lost access to substantial quantities of available habitat due to the management decisions of the Action Agencies.

The 2020 BiOps are arbitrary, capricious, and contrary to law. Accordingly, the ITS contained in the BiOps are invalid, and any take caused by the ACOE and BOR is in violation of ESA Section 9.

## Conclusion

If the ACOE and BOR do not cure the violations described above immediately, upon expiration of the sixty-(60) days the Tribe intends to file suit against them pursuant to the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g), and other applicable laws. In the meantime, the Tribe remains available to discuss resolution of these issues. Please feel free to contact the undersigned regarding any such discussions.

Sincerely,

Ted Knight
Special Legal Counsel
Office of the Spokane Tribal Attorney
P.O. Box 100
Wellpinit, WA 99040
tedk@spokanetribe.com
(509) 953-1908

Cc:     Carol Evans, Chairwoman, Spokane Tribe of Indians
        B.J. Kieffer, Director, Spokane Tribe of Indians, Department of Natural
        Resources

7

EXHIBIT 2                                    7

# EXHIBIT 3

# EXHIBIT 3

1

R E S O L U T I O N
Spokane Tribal Resolution 2018-422

**RESOLUTION DIRECTING THE SPOKANE TRIBAL NATURAL RESOURCES DEPARTMENT TO IMPLEMENT SALMON AND STEELHEAD REINTRODUCTION TO THE SPOKANE TRIBE'S WATERS**

**WHEREAS**, the Spokane Tribal Business Council is the duly constituted governing body of the Spokane Tribe of Indians by the authority of the Constitution of the Spokane Tribe; and

**WHEREAS**, under the Constitution of the Tribe, the Spokane Tribal Business Council is charged with the duty of protecting the health, security and general welfare of the Spokane Tribe and all Reservation residents; and

**WHEREAS**, the Spokane Tribe desires to protect and enhance the Tribe's resources, including its water and fish resources for the Tribe's future use and benefit; and

**WHEREAS**, construction of Grand Coulee Dam not only flooded portions of the Tribe's land, it blocked the Tribe's primary food source, the once abundant salmon, steelhead, and lamprey that thrived and fed the Tribe and Tribes throughout the Upper Columbia River Basin; and

**WHEREAS**, construction of Grand Coulee Dam temporarily blocked over 40% of the available habitat in the Columbia River Basin for a variety of anadromous fish species; and

**WHEREAS**, the temporary loss of anadromous fish returning to this habitat has been felt most acutely in the areas above Grand Coulee Dam, this temporary loss has impacted the entire Region; and

**WHEREAS**, the wider impacts include the reduction of prey availability for the Southern Resident Killer Whales, loss of fishing opportunities for tribal and commercial fisherman throughout the Columbia River terminal fishery and losses to the ocean fishery; and

**WHEREAS**, even Tribal elders on Vancouver Island have discussed the noticeable loss of large Chinook passing through their ocean fishing areas several years after the construction of Grand Coulee Dam; and

**WHEREAS**, in an effort to enhance the Spokane Tribe's resources, the Tribe actively participates in the development of the Northwest Power and Conservation Council's ("NPCC") Fish and Wildlife Program; and

**WHEREAS**, pursuant to Northwest Power Act, the NPCC has a duty to develop a Fish and Wildlife Program ("Program") that protects, mitigates and enhances fish and wildlife that are impacted by the Federal Columbia River Power System ("FCRPS"); and

**WHEREAS**, Grand Coulee Dam is recognized by the Region as the lynchpin of the FCRPS; and

**WHEREAS**, among other mitigation efforts the Tribe consistently sought to ensure that the NPCC included provisions in the Program that require the Region to study and if feasible implement anadromous reintroduction upstream of Grand Coulee Dam; and

**WHEREAS**, in addition to salmon reintroduction and passage, the Tribe focused on including provisions that could lead to greater mitigation efforts upstream of Grand Coulee Dam, and a recognition of the substantial unmitigated fish and wildlife impacts that have occurred and continue to occur upstream of Grand Coulee Dam; and

**WHEREAS**, the Tribe and others in the Region successfully included within the Intermountain Subbasin Plan, which is statutorily part of the Program, an overall goal of reintroducing anadromous fish into blocked areas where feasible, and the specific development of reintroduction feasibility studies for Chief Joseph Dam by 2006 and Grand Coulee Dam by 2015; and

**WHEREAS**, the Bonneville Power Administration ("BPA") the entity that is statutorily required to finance the mitigation measures included in the Fish and Wildlife Program with electricity ratepayer funds has consistently failed to provide such funding for the anadromous reintroduction measures outlined in the Intermountain Subbasin Plan; and

1

EXHIBIT 3                                          2

**WHEREAS,** the Bureau of Reclamation (BOR), the entity that owns and operates Grand Coulee Dam, has directed the vast majority of mitigation funding to regions downstream of the dam, with very few funds being distributed to the area directly impacted by their dam; and

**WHEREAS,** on January 26, 2012 the Spokane Tribal Business Council met with the Tribe's Department of Natural Resources Director and staff along with the Tribe's attorneys and directed them to pursue anadromous fish reintroduction back to the Tribe's waters by advocating for that objective in all current and future processes in the Region that could further the objective; and

**WHEREAS,** the Tribe along with the other Columbia Basin Tribes successfully advocated for the inclusion of anadromous fish passage provisions in the December 2013 Regional Recommendation on the future of the Columbia River Treaty; and

**WHEREAS,** during the development of the 2014 Fish and Wildlife Program the Tribe along with others advocated for amendments to the Program that would highlight and prioritize anadromous reintroduction above Chief Joseph and Grand Coulee Dams; and

**WHEREAS,** the Northwest Power and Conservation Council adopted the 2014 Fish and Wildlife Program that included measures that outlined a phased approach to the reintroduction of anadromous fish above Chief Joseph and Grand Coulee Dams; and

**WHEREAS,** when compared to prior Fish and Wildlife Programs, the 2014 Fish and Wildlife Program contains provisions that could lead to the full implementation of the Northwest Power Acts mitigation, protection and enhancement mandates that thus far were missing or not fully appreciated in any previous Programs; and

**WHEREAS,** due to these changes in the Program the Tribe was compelled to come to the Northwest Power and Conservation Council's defense and intervened in case brought by NRIC in 2014 challenging the Program (*NRIC v. NPCC, et al.,* Ninth Circuit Court of Appeals, *15-71482*).

**WHEREAS,** NRIC's challenge to the 2014 Fish and Wildlife Program failed and the Court's 2017 opinion called out the inclusion of the anadromous fish reintroduction measures above Grand Coulee Dam as one indicator that the NPCC had met its statutory requirements in developing the 2014 Fish and Wildlife Program; and

**WHEREAS,** Phase 1 of the Program's measure for reintroduction was to be completed by the end of 2016; and

**WHEREAS,** due to BPA's failure to appropriately or timely fund the initial components of Phase 1 led to the delay of significant portions of that work; and

**WHEREAS,** after the unnecessary delays caused by BPA, significant components of Phase 1 are now complete; and

**WHEREAS,** the Tribe has regulatory jurisdiction over the waters within its Reservation which include portions of Chamokane Creek and the Spokane and Columbia Rivers, along with numerous smaller tributaries; and

**WHEREAS,** the Tribe retains ownership of the beds and banks of the Tribe's water bodies including the original beds and banks of the Spokane and Columbia Rivers where they serve as boundaries of the Tribe's Reservation; and

**WHEREAS,** the Tribe has the responsibility to ensure that it exercises its sovereign authority over its land and waters in a manner that protects and enhances these resources for the current and future generations of the Tribe and the Region; and

**WHEREAS,** the Tribe has reviewed and considered the studies and information gathered during Phase 1 of the Program's measure and information developed in other forums and processes;[i] and

**WHEREAS,** based on the review and advice of the Tribe's Department of Natural Resources staff, reintroduction of anadromous fish will pose little to no significant risk to our current resources; and

**WHEREAS,** in review of the information developed the Tribe has determined that anadromous reintroduction above Chief Joseph Dam and Grand Coulee Dam is feasible and may require no changes to the those facilities; and

**WHEREAS,** even though operators of those facilities may currently choose to operate and manage them without proper mitigation or anadromous passage facilities, the Tribe recognizes that it can begin reintroducing anadromous fish to its waters now and develop additional plans to expand these activities immediately; and

**WHEREAS,** beyond the overarching goal of returning anadromous fish to the Tribe to begin to heal the injuries to the Tribe, its culture and its resources wrought by the construction and operation of Grand Coulee Dam, the Tribe determines that managing its resources to include anadromous reintroduction will provide needed habitat for anadromous fish which can assist alleviating current density dependence issues throughout the Columbia River watershed and can provide consistent cold water habitat into the foreseeable future for anadromous fish facing the pressures of global warming; and

**NOW, THEREFORE, BE IT HEREBY RESOLVED,** that the Tribe's Department of Natural Resources is granted permission to reintroduce anadromous fish to the Tribe's waters and manage the Tribe's resources to facilitate the successful reintroduction of anadromous fish to the Tribe's waters;

**AND BE IT FURTHER RESOLVED,** that this Resolution grants permission to allow the release of juvenile anadromous fish in the Tribe's waters for scientific, educational, and ceremonial purposes, the release of adult anadromous fish into the Tribe's waters for scientific, educational, and ceremonial purposes, and specifically allows for the use of redband trout, that currently exhibit smoltification, for scientific and educational purposes to support the reestablishment of steelhead above Grand Coulee Dam, this is by no means a complete list of actions and serves only to provide examples of the activities permitted pursuant to this Resolution;

**AND BE IT FINALLY RESOLVED,** that Tribe's Department of Natural Resources with the support of the Tribe's attorneys is directed to continue to actively participate in all regional processes that may further support the Tribe's objective of anadromous fish reintroduction back to the Tribe's waters.

### Certification

The foregoing was duly enacted by the Spokane Tribal Business Council on the 12th day of September, 2018, by the vote of 5 for, 0 against, 0 abstain, and 0 absent under authority contained in Article VIII of the Constitution of the Spokane Indians ratified by the Spokane Tribe on November 22, 1980.

*Carol Evans*
**Carol Evans, Chairwoman**
**Spokane Tribal Business Council**

|      | YES | NO | Abstain | Absent |
|------|-----|----|---------|--------|
| CE   | X   |    |         |        |
| GA   | X   |    |         |        |
| TP   | X   |    |         |        |
| DK   | X   |    |         |        |
| GF   | X   |    |         |        |

[i] **Habitat Assessments:**

Bussanich. R, L. Bellingham, and G. Kehm. 2017. Tributary Assessment of Potential Sockeye, Chinook, and Steelhead Spawning Habitat in the Upper Columbia River, Canada, for Prioritizing Salmon Reintroduction. Prepared by Okanagan Nation Alliance Fisheries Department, Westbank, BC. 63pp; plus Appendices.

Giorgi, C. and A. Kain. 2018. Lake Roosevelt Sockeye Salmon Rearing Capacity. Spokane Tribal Fisheries, Wellpinit, WA. March 2018.

Giorgi, C. 2018. Identification of Potential Habitats for Blocked Area Reintroduction. Prepared for: Bureau of Reclamation, Agreement No. R16AP00169. June 2018.

Golder Associates. 2016. Chinook Salmon Spawning Habitat Availability in the Lower Columbia River. Report No. 1538622-001-R-Rev0. Prepared for Canadian Columbia River Inter-Tribal Fisheries Commission, Cranbrook, BC. April 2016.

EXHIBIT 3                                                                                      4

Golder Associates. 2017. Chinook Salmon Spawning Habitat Availability in the Lower Columbia River, Year 2. Report No. 1659612-001-R-Rev0. Prepared for Canadian Columbia River Inter-Tribal Fisheries Commission, Cranbrook, BC. March 2017.

Hanrahan, T. P., Dauble, D. D., and D. R. Geist. 2004. An estimate of chinook salmon (*Oncorhynchus tshawytscha*) spawning habitat and redd capacity upstream of a migration barrier in the upper Columbia River. Canadian Journal of Fisheries and Aquatic Science. 61: 23-33.

ICF. 2017. Anadromous Reintroduction Potential for the Sanpoil River and Select Upper Columbia Tributaries on the Colville Reservation using the Ecosystem Diagnosis and Treatment model. September. ICF 00392.17 Seattle, WA. Prepared for Confederated Tribes of the Colville Reservation, Spokane, WA.

ICF. 2018. Anadromous Reintroduction Potential for the Spokane River and Select Lake Roosevelt Tributaries Using the Ecosystem Diagnosis and Treatment Model. Final version. April. ICF 00281.17 Seattle, WA. Prepared for Spokane Tribe of Indians, Wellpinit, WA.

Welsh, S. 2016. Untitled. Internal analysis and presentation on salmon habitat upstream of Chief Joseph Dam. Bonneville Power Administration, Portland, OR. April 2016.

**Risk and Donor Stock Assessments:**

Hardiman, J.M., Breyta, R.B., Haskell, C.A., Ostberg, C.O., Hatten, J.R., and Connolly, P.J., 2017, Risk assessment for the reintroduction of anadromous salmonids upstream of Chief Joseph and Grand Coulee Dams, northeastern Washington: U.S. Geological Survey Open-File Report 2017–1113, 87 p., https://doi.org/10.3133/ofr20171113.

Warnock, W.G., Stroud, D.H.P, and J.E. Merz. 2016. Donor stock selection of Chinook Salmon for reintroduction to the Transboundary Reach of the Columbia River. Report prepared for the Canadian Columbia River Inter-Tribal Fisheries Commission. 153 pp.

**Fish Passage:**

NPCC (Northwest Power and Conservation Council). 2016. Staff Paper: Review of Fish Passage Technologies at High-Head Dams. Document No. 2016-14. Northwest Power and Conservation Council, Portland, OR. December 2016.

USACE (U.S. Army Corps of Engineers). 2002. Chief Joseph Dam Preliminary Investigation of Fish Passage Alternatives. U.S. Army Corps of Engineers, Seattle District, Hydraulic Engineering Section. September 2002.

**Miscellaneous:**

Flores, L., Mojica, J., Fletcher, A., Casey, P., Christin, Z., Armistead, C., Batker, D. 2017. The Value of Natural Capital in the Columbia River Basin: A Comprehensive Analysis. Earth Economics, Tacoma, WA. Prepared for Upper Columbia United Tribes (UCUT), Columbia River Inter-Tribal Fish Commission (CRITFC), Pacific Rivers, WaterWatch of Oregon, Save our Wild Salmon.

# EXHIBIT 4

**R E S O L U T I O N**
Spokane Tribal Resolution 2020-123

**APPROVING THE TERMINATION OF THE MOU BETWEEN ARMY CORPS OF ENGINEERS, BONNEVILLE POWER ADMINISTRATION, AND THE BUREAU OF RECLAMATION WITH THE SPOKANE TRIBE OF INDIANS AS A COOPERATING AGENCY IN THE COLUMBIA RIVER SYSTEM OPERATIONS ENVIRONMENTAL IMPACT STATEMENT PROCESS**

**WHEREAS,** the Spokane Tribal Business Council ("Tribal Council") is the governing body of the Spokane Tribe of Indians by authority of the Constitution of the Spokane Tribe; and

**WHEREAS,** under the constitution of the Tribe, the Tribal Council is charged with the duty of protecting the health, security and general welfare of the Tribe and all Reservation residents; and

**WHEREAS,** under the Constitution of the Tribe, the Tribal Council is required to negotiate with and represent the Tribe before Federal, State, and local governments and their departments and agencies; and

**WHEREAS,** on May 4, 2016 Judge Simon in the case *NWF, et al v. NMFS, et al.* (which is known as the FCRPS BIOP litigation) ordered the Action Agencies to develop an Environmental Impact Statement ("EIS") for the Federal Hydropower System on the Columbia River; and

**WHEREAS,** the Tribal Council determined that participation in the development of the EIS was necessary to protect the Tribe and its interests, most importantly its interest in seeing that the return of salmon, both Endangered Species Act protected salmon and non-listed salmon, into the areas above Grand Coulee Dam is given the required "hard look" by the Action Agencies; and

**WHEREAS,** the Tribal Council determined that participation within the development of the EIS was at the time best way to ensure that the Action Agencies properly carry out their responsibilities under applicable law and the May 4, 2016 and subsequent cord orders in the FCRPS BIOP litigation and approved the Tribe's participation by Resolution 2017-482; and

**WHEREAS,** the Tribal Council has been advised that the Agencies have refused to take the Tribe's concerns and interests into account and have failed to include the Tribe's recommendations into the DRAFT CRSO EIS; and

**WHEREAS,** the Tribe's Department of Natural Resources recommends that the Tribe terminate the MOU; and

**NOW THEREFORE, BE IT HEREBY RESOLVED,** that the Spokane Tribal Business Council approves termination of the MOU with ACOE, BPA and BOR, and authorizes the Tribal Chairwoman, or the Tribal Chairwoman's designee, to sign the termination letter.

**Certification**

The foregoing was duly enacted by the Spokane Tribal Business Council on the 5th day of February, 2020, by the vote of 5 for, 0 against, 0 abstain, and 0 absent under authority contained in Article VIII of the Constitution of the Spokane Indians ratified by the Spokane Tribe on November 22, 1980.

**Chairwoman Carol Evans**
**Spokane Tribal Business Council**

|    | Yes | No | Abstain | Absent |
|----|-----|----|---------|--------|
| CE | X   |    |         |        |
| GA | X   |    |         |        |
| DK | X   |    |         |        |
| GF | X   |    |         |        |
| TP | X   |    |         |        |

EXHIBIT 4                              Page 1

RESOLUTION #2020-123

# SPOKANE TRIBAL COUNCIL RESOLUTION

Council use only:

DATE: 2/5/2020  CHAIR: _Carol Evan_  MOTION: _AJ_  SEC: _____

VOTE: _5_ FOR  _0_ AGAINST  _0_ ABSTAIN  _0_ ABSENT

**INFORMATION:** **APPROVING THE TERMINATION OF THE MOU BETWEEN ARMY CORPS OF ENGINEERS, BONNEVILLE POWER ADMINISTRATION, AND THE BUREAU OF RECLAMATION WITH THE SPOKANE TRIBE OF INDIANS AS A COOPERATING AGENCY IN THE COLUMBIA RIVER SYSTEM OPERATIONS ENVIRONMENTAL IMPACT STATEMENT PROCESS**

| VOTING RECORD | Yes | No | Abstain | Absent |
|---|---|---|---|---|
| CE | | | | |
| GA | | | | |
| DK | | | | |
| GF | | | | |
| TP | | | | |

Submitted by: TKnight/BJK  BJK

ED review/initial: _____

Received by: BB

Date Received: 2/5/2020

COMMENTS: _____

TRIBAL BUSINESS COUNCIL INSTRUCTION TO RECORDS MANAGER:

1. _____

2. _____

3. _____

Records Manager Initials: _____
Date Completed:

EXHIBIT 4                    Page 2



# Spokane Tribe of Indians
### P.O. Box 100 •Wellpinit, WA 99040 • (509) 458-6500

February 5, 2020

Brigadier General D. Peter Helmlinger
Northwestern Division Commander
Army Corps of Engineers
P.O. Box 2870, Portland, OR
97208-2870

Lorri Gray
Pacific Northwest Regional Director
Bureau of Reclamation
1150 North Curtis Road, Suite 100
Boise, Idaho 83706-1234

Elliot Mainzer
Administrator
Bonneville Power Administration
905 NE 11th Ave.
Portland, OR 97232

**RE: Spokane Tribe's Termination of CRSO Memorandum of Understanding**

Dear Commander Helminger, Director Gray and Administrator Mainzer:

This letter serves as the Spokane Tribe's ("Tribe") notice of termination of the Memorandum of Understanding ("MOU") between the Army Corps of Engineers ("Corps"), Bonneville Power Administration ("BPA") and the Bureau of Reclamation ("BOR") and the Tribe, as a Cooperating Agency in the Columbia River Systems Operations Environmental Impact Statement ("EIS") Process as required by section 8(d) of the MOU.

The Tribe met with the Corps, BOR and BPA on December 6, 2019 in Spokane to discuss the EIS's development. At that meeting the Tribe's staff and Council present expressed frustrations that the Tribe's staff input into the process was not being considered or it was being summarily dismissed. During that meeting the federal agency representatives present expressed a strong desire that Draft EIS be released to the public

EXHIBIT 4                                    Page 3

1

with all Cooperating Agencies' support and that was what they would strive to obtain. Unfortunately, since December 6th meeting, the additional staff meetings between the agencies and the Tribe's staff have not resulted in the Tribe's satisfaction with the process or the parts of the EIS reviewed thus far.

The Tribe recognizes that the Corps, BOR and BPA have the ultimate responsibility to issue the final EIS. However, the Tribe's staff diligently performed its obligations pursuant to the MOU, and from its viewpoint the Tribe's input into the process has either been ignored or diminished. We can no longer afford to have our staff's time used to develop a document that does not meaningfully take our impacts or hopes for how the CRSO will be operated for the next 25 years seriously. If you have any questions regarding the Tribe's termination of the MOU, please contact the Tribe's Director of Natural Resources, B.J. Kieffer at (509)626-4426.

Sincerely,

Carol Evans
Chairwoman
Spokane Tribe of Indians

Cc:    B.J. Kieffer, Director, Spokane Tribe of Indians Department of Natural
              Resources
       Ted Knight, Special Legal Counsel, Spokane Tribe of Indians
       Corey Carmack, BOR, Tribal Liaison
       Sonja Kokos, BOR, NEPA Policy Lead

EXHIBIT 4                                    Page 4
2

# EXHIBIT 5



# Spokane Tribe of Indians
### P.O. Box 100 • Wellpinit, WA 99040 • (509) 458-6500

October 10, 2019

Elliot Mainzer
Administrator
Bonneville Power Administration
905 NE 11th Ave.
Portland, OR 97232

Lorri Gray
Pacific Northwest Regional Director
Bureau of Reclamation
1150 North Curtis Road, Suite 100
Boise, Idaho 83706-1234

Brigadier General D. Peter Helmlinger
Northwestern Division Commander
Army Corps of Engineers
P.O. Box 2870, Portland, OR
97208-2870

Barry Thom, Regional Administrator
NOAA Fisheries
West Coast Region
1201 Northeast Lloyd Boulevard, Suite
1100
Portland, OR 97232

Bryan Mercier, Regional Director
Northwest Regional Office
Bureau of Indian Affairs
911 NE 11th Avenue,
Portland, OR
97232-4169

**RE: Fish Management in Blocked Areas Initiative**

Dear Administrator Mainzer, Director Gray, Commander Helminger, Regional Director
Mercier, and Regional Administrator Thom:

On behalf of the Spokane Tribe of Indians please accept our initial thoughts and
comments on the federal agencies decision to pursue the creation of an additional forum
to discuss the reestablishment of anadromous fish above Chief Joseph and Grand Coulee
Dams. At a recent meeting amongst the 15 Columbia Basin Tribes and the Department
of Interior, Principal Deputy Assistant Secretary, Indian Affairs, John Tahsuda, III
announced the creation of the "Fish Management in Blocked Areas Initiative" ("Forum")
by the federal agencies responsible for operation of the FCRPS, along with others in the
federal family. The federal representatives present at the meeting stated that the purpose
of this new forum is to centralize the discussion around the reintroduction and passage of
anadromous fish above Chief Joseph and Grand Coulee Dams. Those at the meeting
stated that they looked forward to the Columbia Basin Tribe's input on the this new

1

EXHIBIT 5
Page 1 of 18

initiative through future meetings with the Columbia Basin Tribes this fall. Accordingly, this letter provides you with the Spokane Tribe's initial thoughts on the Forum's potential shape and function.

<u>Background</u>

**Historical and Social Context**

The temporary destruction of the Spokane Tribe's way of life on the River began with the over harvest of anadromous fish throughout the Columbia River after the arrival of settlers, and quite literally arrived at the Tribe's door with the completion in 1911 of Little Falls Dam (built within the Tribes' Reservation on the Spokane River). This small dam blocked the migration of salmon and importantly the prized June Hogs, steelhead and lamprey into the cold spring fed waters of Tshimikain Creek, the Little Spokane River, Hangman Creek and the stretch of the mainstem Spokane River from Little Falls to what is currently downtown Spokane, along with many small tributaries in between. Then the construction of Grand Coulee Dam by the United States completely ripped the Spokane Tribe of Indians away from a food source, much of its lands and resources and its way of life that had sustained us from beyond memory.  Up until then the Spokane and Columbia Rivers were the Tribe's grocery store and with the creation of Grand Coulee Dam the store was empty and we had to adjust to survive.

For the Spokane Tribe returning and restoring anadromous fish to our current Reservation and ancestral homelands is among our highest priorities. From the Tribe's perspective, the restoration effort on the Columbia will only succeed when there are healthy, harvestable and sustainable populations of anadromous fish above Chief Joseph and Grand Coulee Dams. For the Tribe it is simple, the area above Chief Joseph and Grand Coulee Dams includes 40% of the anadromous habitat in the Columbia River Basin and until anadromous fish are reestablished in these previously occupied habitats the restoration effort in the Columbia will continue to fall woefully short of its goals.

I note that although the Tribe cannot speak for those that are not members of the Tribe, we have heard loud and clear that many non-members in the Upper Columbia Region and beyond share this goal because they recognize the social, economic, and ecological value of returning the anadromous fish to a Region that has been deprived of this once plentiful resource.[1]

_____

[1] It is important for the federal family to acknowledge that reestablishment of anadromous fish above Chief Joseph and Grand Coulee Dams is a goal/directive from the Region garnered through a rigorous iterative process of public review and input pursuant to the Northwest Power Act which culminates in Council Members (appointed by their State's Governors) voting for their respective States whether to approve the Program.  At the meeting on August 28, 2019, the Federal agency representatives present clearly misunderstood this issue as a "tribal" only issue/goal. This is simply not the case. The Region's citizens, politicians, and ratepayers from all backgrounds support this effort. For example, the City of Spokane reaffirmed their support for reestablishing salmon above Grand Coulee on September 23, 2019. (**Attachment 1**); *See also U.S. Entity Regional Recommendation for the Future of the Columbia River Treaty after 2024* at 4-5; *Southern Resident Orca Task Force Report and recommendations November 16, 2018* at 47-48, available at

2

EXHIBIT 5
Page 2 of 18

**Legal Context**

The Region began to formally recognize the importance of reestablishing anadromous fish above Chief Joseph and Grand Coulee Dams in the 2000 Northwest Power and Conservation Council's ("Council") Fish and Wildlife Program ("Program") adopted pursuant to 16 U.S.C. Section 839b(h). The 2000 Program included: "Take action to reintroduce anadromous fish into blocked areas, where feasible." (Page 17). In that Program, "blocked area" was clearly defined as "Areas in the Columbia River Basin where hydroelectric projects have created permanent barriers to anadromous fish runs. These include the areas above Chief Joseph and Grand Coulee dams, the Hells Canyon Complex and other smaller locations." (Page A-1). This measure and call for action was elaborated upon in the 2003 Mainstem Amendments that clearly articulated a measure to: "Evaluate the feasibility of reintroducing anadromous fish into blocked areas, including above Chief Joseph and Grand Coulee dams." This was further elaborated upon in the adopted Upper Columbia sub-basin Plan that is officially part of the Program stating, "Develop an anadromous fish re-introduction feasibility analysis by 2006 for Chief Joseph and by 2015 for Grand Coulee." (Upper Columbia Subbasin Plan at 34-15).

Then again in the 2009 Program the Council included, "Reintroduction of anadromous fish in blocked areas: The Council recognizes and will monitor current efforts to reintroduce Pacific salmon and steelhead into blocked areas of the Columbia River Basin. Reintroduction of anadromous fish into blocked areas has the potential to increase the diversity, complexity, capacity, and productivity of salmonid habitat. The Council will continue to evaluate the feasibility of salmon and steelhead reintroduction, consistent with the objectives in the appropriate subbasin plans." (2009 Program at 56).

Unfortunately, the previous Programs' measures did not result in the action the fish and wildlife managers planned for on this issue. Accordingly, in the 2014 Fish and Wildlife Program, the Region articulated a clear directive to begin a Phased Approach to anadromous fish reintroduction above Chief Joseph and Grand Coulee Dams. It stated the following:

> **Reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams to mainstem reaches and tributaries in the United States Phased approach.** Pursue a science-based, phased approach to investigating the reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams including juvenile and adult passage at the dams. The phases shall include:
> **Phase 1 (to be completed no later than the end of 2016):**
> Evaluate information from passage studies at other blockages and from previous assessments of passage at Grand Coulee and Chief Joseph dams

---

https://www.governor.wa.gov/sites/default/files/OrcaTaskForce_reportandrecommendations_11.16.18.pdf (last visited August 30, 2019).

Investigate habitat availability, suitability and salmon survival potential in habitats above Grand Coulee. This might include selective releases of salmon and steelhead. Investigate the scientific feasibility and possible cost of upstream and downstream passage options for salmon and steelhead. Before funding new investigations, provide the Council with a report for consideration of subsequent work to advance the fish passage planning process.

As part of Phase 1, the Council will engage in discussions with tribal, state, and federal agencies and others regarding the purpose, scope and progress of reintroduction efforts above Chief Joseph and Grand Coulee dams.

**Phase 2:**

Based on the results in the first phase, the Council in collaboration with the other relevant entities will decide how to proceed. Phase 2 activities may include one or more of the following:

design and test salmon and steelhead reintroduction strategies and Interim fish passage facilities at Chief Joseph and Grand Coulee Dams

investigate alternative approaches to passage

identify additional studies necessary to advance the fish passage planning process

reintroduction pilot projects

monitoring, evaluation, and adaptive management of the Phase 2 activities

**Phase 3:**

Based on the results of Phase 2, the Council in collaboration with the other relevant entities will decide whether and how to proceed to implement and fund reintroduction measures as a permanent part of the program, including construction and operation of passage facilities.

Monitor, evaluate, and adaptively manage the reintroduction efforts.

**Transboundary reintroduction.** The United States should pursue a joint program with Canada, with shared costs, to investigate and, if warranted, implement the reintroduction of anadromous fish on the mainstem Columbia River to Canadian spawning grounds. This joint program would proceed on an incremental basis, comparable to the phased approach described above.

**Reintroductions above Grand Coulee to mainstem reaches and tributaries in the United States.** Bonneville and the relevant federal action agencies, working in collaboration with state and federal fish and wildlife agencies and tribes, shall investigate and, if warranted, implement passage and reintroduction of anadromous fish into suitable habitats within the United States. This shall include:

Funding research associated with critical uncertainties at Chief Joseph and Grand Coulee dams required to inform Phase 1

4

EXHIBIT 5
Page 4 of 18

> Funding work required for Phases 2 and 3 based on Council
> recommendations

(2014 Program at 84-85).

Approval of the 2014 Program was challenged in the Ninth Circuit Court of Appeals and the approval was upheld as satisfying the requirements of the Northwest Power Act. The Court mentioned the Phased Approach measure as a specific example as to why the Program fulfilled the mandate of the Northwest Power Act.[2]

The 2014 Program is the foundation and main guide for how the Region will address the reestablishment of anadromous fish above Chief Joseph and Grand Coulee Dams currently.  The Council's "Phased Approach" is being informed by a parallel tracked Tribal initiative led by the Colville, Spokane and Coeur D' Alene Tribes along with assistance from WDFW and USGS. Recently, the results of the work done thus far in Phase One were compiled, summarized, and then presented to the Northwest Power and Conservation Council for review and submission to the ISAB in the "Fish Passage and Reintroduction Phase One Report" ("UCUT Report") prepared by the Upper Columbia United Tribes.

The Tribe repeats this truncated version of the history of the effort to reestablish healthy, harvestable and sustainable populations of anadromous fish above Chief Joseph and Grand Coulee Dams through the Council's Fish and Wildlife Program for two purposes. One, to educate the federal agency staff that seemed unfamiliar at the meeting on August 28, 2019 with some of the context and history of this issue. Two, to remind the federal agencies that will be involved in this new forum of the following statutory requirements:

> (A) The Administrator and other Federal agencies responsible for
> managing, operating, or regulating Federal or non-Federal hydroelectric
> facilities located on the Columbia River or its tributaries shall--
> (i) exercise such responsibilities consistent with the purposes of this
> chapter and other applicable laws, to adequately protect, mitigate, and
> enhance fish and wildlife, including related spawning grounds and habitat,
> affected by such projects or facilities in a manner that provides equitable
> treatment for such fish and wildlife with the other purposes for which such
> system and facilities are managed and operated;
> **(ii) exercise such responsibilities, taking into account at each relevant
> stage of decision making processes to the fullest extent practicable, the
> program adopted by the Council under this subsection**. If, and to the
> extent that, such other Federal agencies as a result of such consideration
> impose upon any non-Federal electric power project measures to protect,
> mitigate, and enhance fish and wildlife which are not attributable to the

---

[2] "For example, the reintroduction of anadromous fish above the Grand Coulee Dam, as recommended by the Spokane Tribe, was included in the Program but not in the BiOps." *NRIC v. NPCC, et al*, 15-71482, unpublished opinion (9th Circuit 2017).

development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.

(B) The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.

16 U.S.C.A. § 839b(h)(11) (emphasis added).  Clearly, whatever new Forum is organized it must honor and adhere to the federal agencies' statutory obligations under the Northwest Power Act and the starting place for any Forum must be the Fish and Wildlife Program and its regionally adopted and supported measures.

### Progress from 2014 to the present

In response to the initial drafts of the UCUT report, and the completion of many of the measures listed within Phase One, the Spokane Tribal Council adopted a resolution on September 12, 2018 directing the Tribe's Natural Resources Department to pursue reintroduction of anadromous fish to the Tribe's waters by all means necessary.[3] I note that the Spokane Tribe owns and has regulatory authority over the water bodies within its jurisdiction, which includes the bed and banks of the Columbia and Spokane Rivers, along with Tshimikain Creek, which create the boundaries of our current Reservation.

Two major milestones in this effort to restore healthy, harvestable and sustainable populations of anadromous fish above Chief Joseph and Grand Coulee Dams occurred this year. First, the Tribe in an educational exercise, released 750 pit tagged juvenile Chinook salmon within the Reservation in April of 2017.  This release took place above Little Falls Dam roughly 1-one mile upstream from the Spokane River within Tshimikain Creek.  We had 81 detection from the juvenile bypass systems down stream, amazingly these fish passed three dams (Little Falls, Grand Coulee and Chief Joseph) that currently have NO juvenile passage facilities and made their way to the ocean. Much to our amazement on June 30, 2019 our staff found that one of those fish was detected at Bonneville Dam and made the journey all the way to the Chief Joseph hatchery. Sadly due BPA's protocols imposed upon the Colville hatchery this Tshimikain Creek origin fish could not be held alive to be returned to its waters, but was nonetheless returned deceased to the Tribe for ceremonial purposes. The second mile stone occurred when the Tribe transported 50 live Chinook salmon from the Wells Dam, after following an agreed upon disease risk protocol with the State of Washington, to Tshimikain Creek and released them on August 15, 2019 for ceremonial purposes. This act returned anadromous fish to Tshimikain Creek for the first time in over 100 years. Additionally, the Colville Tribe released live Chinook salmon to its waters above Chief Joseph Dam and to the waters of the San Poil River and the Mainstem Columbia River at Kettle Falls, all above Grand Coulee Dam. These are small steps to some, but given how much resistance some

---

[3]Attached Spokane Tribal Council Resolution. **(Attachment 2).**

of the federal agencies and others have quietly mounted against this effort, it is a success the Tribes and the Region will build upon.

**Fish Management in Blocked Area Initiative**

To be blunt, the Tribe is not at all interested in this new Forum if the federal agencies are simply looking to reinvent the wheel or deflect from BPA's immediate responsibility to fund some of the projects related to this effort. This effort which at its core is a form of basic mitigation that must be provided pursuant to and required by the Northwest Power Act for the impacts caused by the construction and continued operation of Chief Joseph and Grand Coulee Dams. Additionally, the Tribe is also not interested in revisiting the policy level decisions that have already been decided by the Northwest Power and Conservation Council, the body statutorily tasked with duty to develop the plan to mitigate for the impacts of the FCRPS, or the State of Washington's policy level recommendations that support the implementation of reintroduction above Chief Joseph and Grand Coulee Dams to increase the Chinook populations as a reasonable measure to pursue in the effort to save the Southern Resident Killer Whales.  Nor can the Forum undermine the difficult work completed thus far by the MAFAC Columbia Basin Partnership Task Force.

The BPA recently raised the issue of the need for a Forum in its comments on recommendations for the updated Fish and Wildlife Program. In those comments it stated the following: "Discussion about passage and reintroduction of anadromous fish in blocked areas, for example, would benefit from an organized forum where the entities concerned can work through considerations not only relating to the Program, but also the necessary congressional authorizations, international implications, private entity responsibilities and other relevant matters." BPA Comments, February 8, 2019. This sounds reasonable, however, it could also be interpreted as another delay tactic. The Tribe provided extensive comments on this and will not repeat those points here.[4]

In short, several of the actions required to move the reintroduction effort forward are relatively small scale and require absolutely no changes to either the facilities at Grand Coulee or Chief Joseph Dams, their current operations, or have any international implications.  For example, scaling up the release of tagged juvenile Chinook above the dams will provide important input on their movement and migration, along with the continued scaling up of releases of live non-listed Chinook and other anadromous fish will provide important cultural benefits to the Tribes and the Region. The increased release of adults can provide important information on fish behavior in the habitats above Grand Coulee Dam. Absolutely, none of these activities require Congressional authorization and can be funded by BPA at little cost. Again, the Tribe has no interest in participating in a Forum that will fret over activities that are all ready occurring and will be expanded.

---

[4] The Spokane Tribe's Department of Natural Resources, March 8, 2019, letter to Chair Anders. (**Attachment 3**).

7

EXHIBIT 5
Page 7 of 18

**With the above addressed, the Spokane Tribe can support the creation of the new Forum so long as it embodies these principles:**

1. The Forum must be value added to the current Fish and Wildlife Program and other Regional processes, and cannot duplicate or triplicate the work that has already been completed.

2. The Forum must accept the decisions already made by the Region and not be used as an avenue for a federal take over of this effort to second guess the Region's sovereigns and citizens.

3. The Forum must clearly acknowledge the Northwest Power Act's existing framework in the Region.

4. The Forum must only include entities and individuals with experience in the subject matter and have a real interest in it. The Forum cannot be a place for proxy wars where individuals and entities participate only because they have concerns about reestablishment of anadromous fish in general or in some other area in the Basin or Country.

5. Given that the Spokane, Colville, and Coeur D'Alene Tribes' Reservations and ancestral homelands include the dams and habitats that are part of this reestablishment of anadromous fish, representatives appointed from these three Tribes must have a key leadership role in the Forum.

   In conclusion I want to thank you on behalf of the Spokane Tribe of Indians for your consideration of our initial thoughts on the creation of an additional Forum to discuss the reintroduction of anadromous fish above Chief Joseph and Grand Coulee Dams. If you have any questions regarding this letter, please direct them to B.J. Kieffer, Director of the Spokane Tribe of Indians' Natural Resources Department at (509) 626-4426.

Sincerely,

*Carol Evans*

Carol Evans
Chair
Spokane Tribe of Indians

Cc:  B.J. Kieffer, Director, Department of Natural Resources, Spokane Tribe of Indians
  Jill Smail, Chief United States Negotiator for the Columbia River Treaty,
   Department of State
  Northwest Power and Conservation Council

8

EXHIBIT 5
Page 8 of 18

Agenda Sheet                                                                                      Page 1 of 1

| **SPOKANE** Agenda Sheet for City Council Meeting of* | | ❷Date Rec'd (Clerk use only) | 9/20/2019 |
|---|---|---|---|
| ❷ 09/23/2019 | | ❷Clerk's File # | RES 2019-0081 |
| Briefing date: 09/23/2019 | | ❷Renews # | |
| ❷ Status: | | | |
| **Submitting Dept\*:** | CITY COUNCIL | ❷Cross Ref # | |
| **Contact Name & Phone\*:** | BEN STUCKART          625-6258 | ❷Project # | |
| ❷**Contact E-Mail\*** | BSTUCKART@SPOKANECITY.ORG | ❷Bid # | |
| ❷Add'l Docs Attached? ☑ | Resolutions | ❷Requisition # | |

❷ **Agenda Item Name:** Begin with Dept #

0320 - RESOLUTION SUPPORTING FISH REINTRODUCTION ABO

❷ **Agenda Wording\*:** (137    character max) ☐ Additional attached?

A resolution reaffirming the City of Spokane's support for anadromous fish reintroduction above Grand Coulee Dam.

❷ **Summary (Background)\*:** (6    character max.) ☐ Additional attached?

Resolution 2014-0070 (2014) supported the Northwest Power and Conservation Council's Fish and Wildlife Program's measures for reintroduction of salmon, steelhead and lamprey above Grand Coulee Dam, and other regional processes for reintroduction of anadromous fish into their historical habitats within the City of Spokane.

This resolution supports measures to measures to achieve salmon and steelhead

| ❷**Fiscal Impact** | Grant related? Yes ○ No ● | **Budget Account** | ☐ Additional attached? |
|---|---|---|---|
| | Public Works? Yes ○ No ● | | |

| Neutral ∨ | $ | | # | |
|---|---|---|---|---|
| Select ∨ | $ | | # | |
| Select ∨ | $ | | # | |
| Select ∨ | $ | | # | |

| ❷ **Approvals** | | ❷ **Council Notifications** (Date) ☐ None | |
|---|---|---|---|
| Dept Head | MCCLATCHEY, BRIAN | Study Session | |
| Division Director | | Other | PIES, 9/23/2019 |
| Finance | | ❷ **Distribution List** (Emails preferred) ☐ Additional? | |
| Legal | DALTON, PAT | | |
| For the Mayor | | | |
| ❷ **Additional Approvals** | | ADOPTED BY SPOKANE CITY COUNCIL · | |
| Purchasing | | 9/23/2019 | |
| Select Dept 1 ∨ | | | |
| Select Dept 2 ∨ | | | |
| Select Dept 3 ∨ | | CITY CLERK | |

Save    Cancel

**Council Action Log (Name/Action/Date):**

EXHIBIT 5
Page 9 of 18

**RESOLUTION NO. 2019-0081**

A resolution reaffirming the City of Spokane's support for anadromous fish reintroduction above Grand Coulee Dam.

**WHEREAS,** on July 7, 2014 the City Council passed Resolution 2014-0070 which announced the City Council's support for the Northwest Power and Conservation Council's ("NPCC") Fish and Wildlife Program's ("Program") inclusion of measures to address anadromous fish (salmon, steelhead and lamprey) reintroduction above Grand Coulee Dam, and other regional processes that could result in anadromous fish reintroduction into their historical habitats that lie within the City of Spokane and throughout the Upper Columbia Region; and

**WHEREAS,** in 2014 the NPCC included a measure in the Program that outlined a phased approach to investigate the reintroduction of salmon and steelhead to the habitats above Grand Coulee Dam; and

**WHEREAS,** following the adoption of the 2014 Program, the Region's Tribes collectively and individually, along with several federal entities and the Washington Department of Fish and Wildlife made substantial progress in this effort; and

**WHEREAS,** the recently released Upper Columbia United Tribes' "Fish Passage and Reintroduction Phase 1 Report: Investigations Upstream of Chief Joseph and Grand Coulee Dams" concluded that reestablishing salmon and steelhead into the Upper Columbia is feasible and can be implemented without impacting power generation, flood control protections or irrigation within our Region; and

**WHEREAS,** the NPCC is currently conducting its five year review of the Program as required by the Northwest Power Act and it has recently released a Draft 2020 Addendum to the 2014 Program; and

**WHEREAS,** the Draft 2020 Addendum includes additional support for the reintroduction of salmon and steelhead into the habitats above Chief Joseph and Grand Coulee Dams, including the Spokane River; and

**WHEREAS,** the Draft 2020 Addendum further includes direction to the Bonneville Power Administration to significantly expand the mitigation measures that address the impacts to the Upper Columbia River ecosystem caused by the construction and operation of Grand Coulee Dam; and

**WHEREAS,** the Draft 2020 Addendum includes measures that will continue support for the phased approach to salmon and steelhead reintroduction into the habitats above Chief Joseph and Grand Coulee Dams.

**NOW, THEREFORE, BE IT RESOLVED** that the City of Spokane supports the NPCC's Draft 2020 Addendum's measures to achieve salmon and steelhead reintroduction above Grand Coulee Dam and the expansion of mitigation efforts in the Upper Columbia River.

EXHIBIT 5
Page 10 of 18

**ADOPTED BY THE CITY COUNCIL ON** _September 23, 2019_

_____
City Clerk

Approved as to form:

_____
Assistant City Attorney



EXHIBIT 5
Page 11 of 18

RESOLUTION
Spokane Tribal Resolution 2018-422

**RESOLUTION DIRECTING THE SPOKANE TRIBAL NATURAL RESOURCES DEPARTMENT TO IMPLEMENT SALMON AND STEELHEAD REINTRODUCTION TO THE SPOKANE TRIBE'S WATERS**

**WHEREAS,** the Spokane Tribal Business Council is the duly constituted governing body of the Spokane Tribe of Indians by the authority of the Constitution of the Spokane Tribe; and

**WHEREAS,** under the Constitution of the Tribe, the Spokane Tribal Business Council is charged with the duty of protecting the health, security and general welfare of the Spokane Tribe and all Reservation residents; and

**WHEREAS,** the Spokane Tribe desires to protect and enhance the Tribe's resources, including its water and fish resources for the Tribe's future use and benefit; and

**WHEREAS,** construction of Grand Coulee Dam not only flooded portions of the Tribe's land, it blocked the Tribe's primary food source, the once abundant salmon, steelhead, and lamprey that thrived and fed the Tribe and Tribes throughout the Upper Columbia River Basin; and

**WHEREAS,** construction of Grand Coulee Dam temporarily blocked over 40% of the available habitat in the Columbia River Basin for a variety of anadromous fish species; and

**WHEREAS,** the temporary loss of anadromous fish returning to this habitat has been felt most acutely in the areas above Grand Coulee Dam, this temporary loss has impacted the entire Region; and

**WHEREAS,** the wider impacts include the reduction of prey availability for the Southern Resident Killer Whales, loss of fishing opportunities for tribal and commercial fisherman throughout the Columbia River terminal fishery and losses to the ocean fishery; and

**WHEREAS,** even Tribal elders on Vancouver Island have discussed the noticeable loss of large Chinook passing through their ocean fishing areas several years after the construction of Grand Coulee Dam; and

**WHEREAS,** in an effort to enhance the Spokane Tribe's resources, the Tribe actively participates in the development of the Northwest Power and Conservation Council's ("NPCC") Fish and Wildlife Program; and

**WHEREAS,** pursuant to Northwest Power Act, the NPCC has a duty to develop a Fish and Wildlife Program ("Program") that protects, mitigates and enhances fish and wildlife that are impacted by the Federal Columbia River Power System ("FCRPS"); and

**WHEREAS,** Grand Coulee Dam is recognized by the Region as the lynchpin of the FCRPS; and

**WHEREAS,** among other mitigation efforts the Tribe consistently sought to ensure that the NPCC included provisions in the Program that require the Region to study and if feasible implement anadromous reintroduction upstream of Grand Coulee Dam; and

**WHEREAS,** in addition to salmon reintroduction and passage, the Tribe focused on including provisions that could lead to greater mitigation efforts upstream of Grand Coulee Dam, and a recognition of the substantial unmitigated fish and wildlife impacts that have occurred and continue to occur upstream of Grand Coulee Dam; and

**WHEREAS,** the Tribe and others in the Region successfully included within the Intermountain Subbasin Plan, which is statutorily part of the Program, an overall goal of reintroducing anadromous fish into blocked areas where feasible, and the specific development of reintroduction feasibility studies for Chief Joseph Dam by 2006 and Grand Coulee Dam by 2015; and

**WHEREAS,** the Bonneville Power Administration ("BPA") the entity that is statutorily required to finance the mitigation measures included in the Fish and Wildlife Program with electricity ratepayer funds has consistently failed to provide such funding for the anadromous reintroduction measures outlined in the Intermountain Subbasin Plan; and

EXHIBIT 5
Page 12 of 18

1

**WHEREAS,** the Bureau of Reclamation (BOR), the entity that owns and operates Grand Coulee Dam, has directed the vast majority of mitigation funding to regions downstream of the dam, with very few funds being distributed to the area directly impacted by their dam; and

**WHEREAS,** on January 26, 2012 the Spokane Tribal Business Council met with the Tribe's Department of Natural Resources Director and staff along with the Tribe's attorneys and directed them to pursue anadromous fish reintroduction back to the Tribe's waters by advocating for that objective in all current and future processes in the Region that could further the objective; and

**WHEREAS,** the Tribe along with the other Columbia Basin Tribes successfully advocated for the inclusion of anadromous fish passage provisions in the December 2013 Regional Recommendation on the future of the Columbia River Treaty; and

**WHEREAS,** during the development of the 2014 Fish and Wildlife Program the Tribe along with others advocated for amendments to the Program that would highlight and prioritize anadromous reintroduction above Chief Joseph and Grand Coulee Dams; and

**WHEREAS,** the Northwest Power and Conservation Council adopted the 2014 Fish and Wildlife Program that included measures that outlined a phased approach to the reintroduction of anadromous fish above Chief Joseph and Grand Coulee Dams; and

**WHEREAS,** when compared to prior Fish and Wildlife Programs, the 2014 Fish and Wildlife Program contains provisions that could lead to the full implementation of the Northwest Power Acts mitigation, protection and enhancement mandates that thus far were missing or not fully appreciated in any previous Programs; and

**WHEREAS,** due to these changes in the Program the Tribe was compelled to come to the Northwest Power and Conservation Council's defense and intervened in case brought by NRIC in 2014 challenging the Program (*NRIC v. NPCC, et al.,* Ninth Circuit Court of Appeals, *15-71482*).

**WHEREAS,** NRIC's challenge to the 2014 Fish and Wildlife Program failed and the Court's 2017 opinion called out the inclusion of the anadromous fish reintroduction measures above Grand Coulee Dam as one indicator that the NPCC had met its statutory requirements in developing the 2014 Fish and Wildlife Program; and

**WHEREAS,** Phase 1 of the Program's measure for reintroduction was to be completed by the end of 2016; and

**WHEREAS,** due to BPA's failure to appropriately or timely fund the initial components of Phase 1 led to the delay of significant portions of that work; and

**WHEREAS,** after the unnecessary delays caused by BPA, significant components of Phase 1 are now complete; and

**WHEREAS,** the Tribe has regulatory jurisdiction over the waters within its Reservation which include portions of Chamokane Creek and the Spokane and Columbia Rivers, along with numerous smaller tributaries; and

**WHEREAS,** the Tribe retains ownership of the beds and banks of the Tribe's water bodies including the original beds and banks of the Spokane and Columbia Rivers where they serve as boundaries of the Tribe's Reservation: and

**WHEREAS,** the Tribe has the responsibility to ensure that it exercises its sovereign authority over its land and waters in a manner that protects and enhances these resources for the current and future generations of the Tribe and the Region; and

**WHEREAS,** the Tribe has reviewed and considered the studies and information gathered during Phase 1 of the Program's measure and information developed in other forums and processes:[i] and

**WHEREAS,** based on the review and advice of the Tribe's Department of Natural Resources staff, reintroduction of anadromous fish will pose little to no significant risk to our current resources; and

**WHEREAS,** in review of the information developed the Tribe has determined that anadromous reintroduction above Chief Joseph Dam and Grand Coulee Dam is feasible and may require no changes to the those facilities; and

EXHIBIT 5

Page 13 of 18

2

**WHEREAS,** even though operators of those facilities may currently choose to operate and manage them without proper mitigation or anadromous passage facilities, the Tribe recognizes that it can begin reintroducing anadromous fish to its waters now and develop additional plans to expand these activities immediately; and

**WHEREAS,** beyond the overarching goal of returning anadromous fish to the Tribe to begin to heal the injuries to the Tribe, its culture and its resources wrought by the construction and operation of Grand Coulee Dam, the Tribe determines that managing its resources to include anadromous reintroduction will provide needed habitat for anadromous fish which can assist alleviating current density dependence issues throughout the Columbia River watershed and can provide consistent cold water habitat into the foreseeable future for anadromous fish facing the pressures of global warming; and

**NOW, THEREFORE, BE IT HEREBY RESOLVED,** that the Tribe's Department of Natural Resources is granted permission to reintroduce anadromous fish to the Tribe's waters and manage the Tribe's resources to facilitate the successful reintroduction of anadromous fish to the Tribe's waters;

**AND BE IT FURTHER RESOLVED,** that this Resolution grants permission to allow the release of juvenile anadromous fish in the Tribe's waters for scientific, educational, and ceremonial purposes, the release of adult anadromous fish into the Tribe's waters for scientific, educational, and ceremonial purposes, and specifically allows for the use of redband trout, that currently exhibit smoltification, for scientific and educational purposes to support the reestablishment of steelhead above Grand Coulee Dam, this is by no means a complete list of actions and serves only to provide examples of the activities permitted pursuant to this Resolution;

**AND BE IT FINALLY RESOVLED,** that Tribe's Department of Natural Resources with the support of the Tribe's attorneys is directed to continue to actively participate in all regional processes that may further support the Tribe's objective of anadromous fish reintroduction back to the Tribe's waters.

### Certification

The foregoing was duly enacted by the Spokane Tribal Business Council on the 12th day of September, 2018, by the vote of 5 for, 0 against, 0 abstain, and 0 absent under authority contained in Article VIII of the Constitution of the Spokane Indians ratified by the Spokane Tribe on November 22, 1980.

_Carol Evans_

**Carol Evans, Chairwoman**
**Spokane Tribal Business Council**

|    | YES | NO | Abstain | Absent |
|----|-----|----|---------|--------|
| CE | X   |    |         |        |
| GA | X   |    |         |        |
| TP | X   |    |         |        |
| DK | X   |    |         |        |
| GF | X   |    |         |        |

---

[i] **Habitat Assessments:**

Bussanich. R, L. Bellingham, and G. Kehm. 2017. Tributary Assessment of Potential Sockeye, Chinook, and Steelhead Spawning Habitat in the Upper Columbia River, Canada, for Prioritizing Salmon Reintroduction. Prepared by Okanagan Nation Alliance Fisheries Department, Westbank, BC. 63pp; plus Appendices.

Giorgi, C. and A. Kain. 2018. Lake Roosevelt Sockeye Salmon Rearing Capacity. Spokane Tribal Fisheries, Wellpinit, WA. March 2018.

Giorgi, C. 2018. Identification of Potential Habitats for Blocked Area Reintroduction. Prepared for: Bureau of Reclamation, Agreement No. R16AP00169. June 2018.

Golder Associates. 2016. Chinook Salmon Spawning Habitat Availability in the Lower Columbia River. Report No. 1538622-001-R-Rev0. Prepared for Canadian Columbia River Inter-Tribal Fisheries Commission, Cranbrook, BC. April 2016.

EXHIBIT 5
Page 14 of 18

3

Golder Associates. 2017. Chinook Salmon Spawning Habitat Availability in the Lower Columbia River, Year 2. Report No. 1659612-001-R-Rev0. Prepared for Canadian Columbia River Inter-Tribal Fisheries Commission, Cranbrook, BC. March 2017.

Hanrahan, T. P., Dauble, D. D., and D. R. Geist. 2004. An estimate of chinook salmon (*Oncorhynchus tshawytscha*) spawning habitat and redd capacity upstream of a migration barrier in the upper Columbia River. Canadian Journal of Fisheries and Aquatic Science. 61: 23-33.

ICF. 2017. Anadromous Reintroduction Potential for the Sanpoil River and Select Upper Columbia Tributaries on the Colville Reservation using the Ecosystem Diagnosis and Treatment model. September. ICF 00392.17 Seattle, WA. Prepared for Confederated Tribes of the Colville Reservation, Spokane, WA.

ICF. 2018. Anadromous Reintroduction Potential for the Spokane River and Select Lake Roosevelt Tributaries Using the Ecosystem Diagnosis and Treatment Model. Final version. April. ICF 00281.17 Seattle, WA. Prepared for Spokane Tribe of Indians, Wellpinit, WA.

Welsh, S. 2016. Untitled. Internal analysis and presentation on salmon habitat upstream of Chief Joseph Dam. Bonneville Power Administration, Portland, OR. April 2016.

**Risk and Donor Stock Assessments:**

Hardiman, J.M., Breyta, R.B., Haskell, C.A., Ostberg, C.O., Hatten, J.R., and Connolly, P.J., 2017, Risk assessment for the reintroduction of anadromous salmonids upstream of Chief Joseph and Grand Coulee Dams, northeastern Washington: U.S. Geological Survey Open-File Report 2017–1113, 87 p., https://doi.org/10.3133/ofr20171113.

Warnock, W.G., Stroud, D.H.P, and J.E. Merz. 2016. Donor stock selection of Chinook Salmon for reintroduction to the Transboundary Reach of the Columbia River. Report prepared for the Canadian Columbia River Inter-Tribal Fisheries Commission. 153 pp.

**Fish Passage:**

NPCC (Northwest Power and Conservation Council). 2016. Staff Paper: Review of Fish Passage Technologies at High-Head Dams. Document No. 2016-14. Northwest Power and Conservation Council, Portland, OR. December 2016.

USACE (U.S. Army Corps of Engineers). 2002. Chief Joseph Dam Preliminary Investigation of Fish Passage Alternatives. U.S. Army Corps of Engineers, Seattle District, Hydraulic Engineering Section. September 2002.

**Miscellaneous:**

Flores, L., Mojica, J., Fletcher, A., Casey, P., Christin, Z., Armistead, C., Batker, D. 2017. The Value of Natural Capital in the Columbia River Basin: A Comprehensive Analysis. Earth Economics, Tacoma, WA. Prepared for Upper Columbia United Tribes (UCUT), Columbia River Inter-Tribal Fish Commission (CRITFC), Pacific Rivers, WaterWatch of Oregon, Save our Wild Salmon.

EXHIBIT 5
Page 15 of 18

4



# Spokane Tribal Natural Resources
P.O. Box 480 ● Wellpinit, WA 99040 ● (509) 626 - 4400 ● fax 258 - 9600

March 8, 2019

Council Chair Jennifer Anders
Northwest Power and Conservation Council
851 SW 6th Avenue, Suite 1100
Portland, OR 97204-1348

**RE: Spokane Tribe of Indians response to BPA's February 8, 2019 Comments**

Dear Chair Anders,

Please accept this letter from the Spokane Tribe of Indians' Department of Natural Resources ("Tribe") in response to the comments submitted by the Bonneville Power Administration ("BPA") on February 8, 2019 to the Northwest Power and Conservation Council ("Council") on the fish and wildlife program amendments submitted by the Region's Tribes, States, fish and wildlife managers, and others. BPA's characterizations and description of the Spokane Tribe's and others amendments require clarification and correction.

**<u>Salmon Reintroduction Above Chief Joseph and Grand Coulee Dams</u>**

BPA's comments that relate to the Council's measure to investigate salmon reintroduction above Chief Joseph and Grand Coulee Dams are misleading and reiterate the same excuses BPA attempted to utilize in 2013 and 2014 in their attempt to derail this valid measure. The Tribe will address their comments in turn.

BPA states that: "We helped fund the Phase 1 habitat study and we look forward to analyzing the results and discussing next steps…." From the start, BPA provided minimal support for the habitat study, less than $100,000. (Less in fact than one Pikeminnow fisherperson's take for 2016.) In reality, the majority of the Phase One work has been funded through reprogrammed funds and the Bureau of Reclamation directly. Additionally, the habitat work completed to date, pursuant to the funds provided by BPA and BOR, was presented to them almost one year ago and reviewed by the ISRP in August of 2018.[1] Given that BPA has previously performed a habitat analysis in 2014 for the areas above Chief Joseph and Grand Coulee Dams[2] we expect any additional "analyzing" by BPA to be done fairly quickly.

After this statement BPA goes onto make several "points" that appear to be more like attempts to again derail this measure in the Program or make it seem more complicated than it is.

> Considerations of anadromous fish passage and reintroduction above Grand Coulee and Chief Joseph dams **(1)** affect two countries, **(2)** four states, a dozen tribes, and at least five Executive Branch departments. **(3)** Long-term solutions will take years to develop and require congressional approval. The scope of the issues raised suggests that the Program may not have the necessary breadth to accommodate the range of considerations necessary for the region to address these issues. **(4)** Therefore, Bonneville and its federal partners would like to work with the region to identify a forum appropriate for considering the sensitive cultural, political, economic, and legal issues raised by the passage and reintroduction amendment recommendations.

It is important to unpack this entire statement to identify the half-truths that are present.

---

[1] Attachment 1.
[2] Through a FOIA request entities in the Region discovered that BPA had performed a review of the habitats above Chief Joseph and Grand Coulee Dams soon after the 2014 Fish and Wildlife Program's adoption, but failed to share the results with the Region in a transparent manner. *See* FOIA #BPA-2015-00301-F.

EXHIBIT 5
Page 16 of 18

**(1)** Reintroduction above Chief Joseph Dam impacts one Country, the United States. Reintroduction above Grand Coulee Dam certainly could lead to reintroduction of salmon into Canada, but that is no more of an issue than the release of sturgeon or kokanee into Lake Roosevelt. These native species and others such as bull trout certainly do not recognize the U.S./Canada border. Additionally, the Council in the 2014 Program's measure clearly identified the geographic area of the Council's Program, and appropriately addressed this concern.

**(2)** Reintroduction above Grand Coulee and Chief Joseph Dams only affects **two** states, Washington and Oregon. Both of which expressed support for this measure in their amendments submitted to the Council, and Washington has expressed support for this measure in its SRKW Task Force proposal.

**(3)** BPA states that "long-term" solutions will take years and require congressional approval. This might be correct, but what is certain is that BPA's refusal to appropriately fund this effort will continue to cause delay in the development of the potential solutions. The 2014 Program called for Phase One to be completed by 2016, this did not happen due to the lack of funding and stonewalling by the BPA. Additionally, many potential solutions do not implicate the need for congressional approval and fall well within the current authorities of all entities involved. However, so long as the completion of the Council's Phase One is delayed a set of smart solutions that the Region will support will continue to remain nebulous.

**(4)** Finally in this statement BPA makes clear that it and its unidentified "federal partners" would like to create another process to conduct the work the Council already provides to the Region. It seems this request for a "new forum" stems from BPA's desire to avoid the structure of the NW Power Act, and support BPA's desire to usurp the States' and F&W managers' designated roles contained in the NW Power Act on how rate payer funds should be spent on mitigation and restoration. Additionally, creating a "new forum" will likely create more delay and more cost by adding more unnecessary process. (The Action Agencies have already, to date, refused to address reintroduction in the CRSO process so it is unclear why they would want to address it in yet another separate forum. **Attachment 2**).

Furthermore, the UCUT in 2015 proposed a structured forum/process for the Phase One measure and it was soundly rejected as unnecessary and BPA refused to participate or fund it. (**Attachment 3**). Fast forward four plus years, and it seems unnecessary to create another forum at the additional cost to rate payers when the NW Power Act and the Council have shown to provide a structure and provide a forum that can serve this function. The Council is fully capable of handling this measure just like it does for other measures such as lamprey and other reintroductions in the Columbia River and its tributaries impacted by the FCRPS.

**(5)** The final two bullets in BPA's comments on this measure will be addressed during the final parts of the Council's Phase One.  The current Program states the following:

> **As part of Phase 1, the Council will engage in discussions with tribal, state, and federal agencies and others regarding the purpose, scope and progress of reintroduction efforts above Chief Joseph and Grand Coulee dams.**
> **Phase 2:**
> **Based on the results in the first phase, the Council in collaboration with the other relevant entities will decide how to proceed.**

(2014 Fish and Wildlife Program, p. 85). The Council and the Region are able to handle this measure as Congress intended via the NW Power Act, the only missing part is the appropriate level participation and support from BPA.

## Grand Coulee Fall Operations

Of all the comments submitted by BPA their new proposed amendment contained in these comments is the most frustrating for the Tribe.  Procedurally if BPA desired to provide amendments to the Program it should have submitted those amendments in December 2018 not through its comments submitted in February 2019.

For background, around August 2016 the Tribe was contacted by BOR regarding an emergency request to delay refill in Grand Coulee until October 31st of that year. The Spokane Tribe of Indians and the Confederated Tribes of the Colville Reservation agreed to this one-off request after discussing the potential impacts that could result from this operation. The Tribe received a meeting request from BOR and BPA in December 2016 to have further discussion about the potential for a proposed change to ongoing fall operations extending the drawdown period and not refilling to 1283' each year until the end of October. That discussion was held via conference call in April 2017 at which time BPA and BOR submitted documents to the Tribe basing the need for the delayed refill on lower river flows and navigation issues. The Tribe submitted a request to both BPA and BOR for a written explanation and

EXHIBIT 5
Page 17 of 18

justification of the need for the operation change. At the time, the Tribe needed more information to evaluate the request and informed BOR and BPA of this need.  After considering the request the Tribe informed BPA and BOR that the delayed refill could have unknown impacts and inquired if they were willing to fund the studies needed to analyze those potential impacts.  These requests were left unresolved and ignored.

The Tribe became concerned when the Action Agencies started to include this fall operations proposal in the CRSO process with the Tribe's questions left unresolved.  In January of this year the Tribe addressed its concerns again about the proposed changes to fall operations at Grand Coulee Dam in a government-to-government meeting with the Action Agencies. At that meeting, the Tribe was told that the Agencies would respond to the Tribe's request and provide more information about it.  Unfortunately, after one follow-up call the Tribe's questions were again left unresolved. Much to our surprise BPA submitted its comments on February 8 which contain a new proposed amendment to the program and this statement: **"Bonneville believes the Council should adopt a more flexible approach to these fall operations, as described in Attachment A, which would save ratepayers money at no cost to fish."**

The Tribe strongly opposes the inclusion of BPA's untimely-submitted amendment to the updated Fish and Wildlife Program at this time.  First, it was submitted outside the ordinary process as required by the NW Power Act. Second, it is not supported by the information in Attachment A of BPA's comments. Finally, it is inappropriate for BPA, one of the Action Agencies responsible for the CRSO EIS, to advocate for a potential alternative operation prior to the completion of the CRSO EIS. Accordingly, if the Council wishes to pursue BPA's untimely-submitted amendment below is a list of studies that must be conducted prior to its consideration. Given the potential ramifications of the fall operation change, it must be fully evaluated by the Region's fish and wildlife managers prior to adoption into the Program.

**At a minimum the Tribe would need to assess the potential impact of the delayed drawdown on the fall spawning and migration of Kokanee Salmon and Redband Trout. We would propose a three year project to look at the impacts on migration corridors to fish moving to/from the tributaries, increased likeliness of predation, changes to water quality, and the potential for any physical changes to the environment (increased slides, tributary re-routed, etc.).**

In conclusion, the Tribe encourages the Council to disregard BPA's untimely-submitted amendment to the Program and take a hard look at their comments prior to acting on any of them to ensure their factual accuracy and their historical context. The Tribe looks forward to working with the Council over the coming months in the development of the updates to the 2014 Fish and Wildlife Program.  If you have any questions regarding this letter or the Tribe's comments or amendments please do not hesitate to contact me at 509-626-4427.

Sincerely,

B.J. Kieffer
Director
Department of Natural Resources
Spokane Tribe of Indians

EXHIBIT 5
Page 18 of 18