ELLEN F. ROSENBLUM #753239
Attorney General
NINA R. ENGLANDER #106119
Assistant Attorney General
DEANNA J. CHANG #192202
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-5000
nina.englander@doj.state.or.us
deanna.j.chang@doj.state.or.us

Attorneys for Intervenor-Plaintiff State of Oregon

THE HONORABLE MICHAEL H. SIMON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, et al., | Case No. 3:01-CV-00640-SI |
| Plaintiffs, | OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF |
| and | |
| STATE OF OREGON, | |
| Intervenor-Plaintiff, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | |
| Defendants, | |
| and | |
| NORTHWEST RIVERPARTNERS, et al., | |
| Intervenor-Defendants. | |

Page 1 -   OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
             DECLARATORY AND INJUNCTIVE RELIEF
          33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.    INTRODUCTION

1.    Pursuant to Fed. R. Civ. P. 15(d) and LR 15.1(b) and (c), Plaintiff-Intervenor the State of Oregon ("Oregon"), hereby supplements its Amended Fourth Supplemental Complaint-in-Intervention (ECF No. 1973) filed December 1, 2014, to address new circumstances and subsequent actions by Defendants National Marine Fisheries Service ("NMFS"), the Bureau of Reclamation ("BOR") and the U.S. Army Corps of Engineers ("the Corps").

2.    Oregon brings this action to challenge:

a.    The Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Columbia River System issued by NMFS on July 24, 2020 ("2020 BiOp") in response to this Court's Order of Remand, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Svc.,* No. 01-640-SI, (D. Or. July 6, 2016) (ECF 2089) ("Order of Remand") (as modified by ECF No. 2288 (Apr. 17, 2018)) (extending the date for the BiOp to March 26, 2021);

b.    The Columbia River System Operations Final Environmental Impact Statement issued by the Corps, BOR (collectively, "the Action Agencies") and Bonneville Power Administration ("BPA")[1] in July 2020 ("EIS") in response to the Order of Remand;

c.    The Columbia River System Operations Environmental Impact Statement Record of Decision ("2020 ROD") issued by the Corps, BOR, and BPA in September 2020, adopting and incorporating the EIS and 2020 BiOp.

---

[1] BPA is not named as a defendant in this supplemental complaint because jurisdiction to review final action by BPA lies in the Ninth Circuit. *See Confederated Tribes of Umatilla Indian Res. v. Bonn. Power Admin.*, 342 F.3d 924, 928 (9th Cir. 2003) (citing 16 U.S.C. § 839f(e)).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

3.      For the reasons set forth below:

a.      The 2020 BiOp, 2020 ROD and acts and omissions of the Corps, BOR, and NMFS violate the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq*., and the APA, 5 U.S.C. §§ 551 *et seq*.

b.      The EIS, 2020 ROD and acts and omissions of the Corps and BOR violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*

4.      The 2020 BiOp relies on and applies new final rules governing cooperation between federal agencies and NMFS for federal agency actions that may affect listed species or critical habitat, "Revision of Regulations for Interagency Cooperation," 84 Fed. Reg. 44,976 (Aug. 27, 2019) ("ESA Rules").  The ESA Rules are unlawful as applied in the 2020 BiOp.

## II.      PARTIES

5.      Oregon is a sovereign state of the United States of America.  Oregon has a unique sovereign interest in the survival and recovery of listed salmon and steelhead in the Columbia River Basin.  Oregon also has a unique sovereign interest in the beneficial attributes of the CRS, including power production, navigation, flood control, and irrigation.  In view of those interests, Oregon has a clearly cognizable interest in the lawful operation of the CRS.

6.      Defendant NMFS is part of the National Oceanic and Atmospheric Administration, an agency of the U.S. Department of Commerce responsible for administering the provisions of the ESA with regard to threatened and endangered marine species, including the species of threatened and endangered salmon and steelhead that inhabit the Columbia River basin and the endangered population of Southern Resident Killer Whales that inhabits the coastal and offshore waters of the Pacific Northwest.

7.      Defendant the Corps is an agency of the U.S. Army and the Department of the Defense that constructs and operates federal engineering projects throughout the United States, primarily in rivers, coasts, and wetlands.  The Corps has primary management authority over the

Page 3 -   OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
            DECLARATORY AND INJUNCTIVE RELIEF
            33212149

                                    Department of Justice
                                    100 SW Market Street
                                    Portland, OR 97201
                              (971) 673-1880 / Fax: (971) 673-5000

operation and maintenance of several dams, reservoirs, and associated facilities on the Columbia and Snake rivers that are at issue in this case.

8.      Defendant BOR is an agency of the U.S. Department of the Interior that constructs and operates federal water projects throughout the United States.  BOR has primary management authority over several projects on the Snake and Columbia Rivers that are at issue in this action.

### III.      JURISDICTION AND VENUE

9.      This court has jurisdiction over this action under 5 U.S.C. §§ 701-706 (APA); 28 U.S.C. § 1331 (federal question), § 2201 (declaratory judgment), and § 2202 (injunctive relief); the ESA, 16 U.S.C. § 1540(g); and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*. As required by the ESA, 16 U.S.C. § 1540(g), Oregon provided 60 days' notice of intent to sue the Corps and BOR.

10.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e).

### IV.      LEGAL FRAMEWORK

**A.      Endangered Species Act**

*STATUTORY FRAMEWORK*

11.      Congress enacted the ESA in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); see 16 U.S.C. § 1531(a).  The ESA accordingly enshrines a national policy of "institutionalized caution" in recognition of the "overriding need *to devote whatever effort and resources [are] necessary* to avoid further diminution of national and worldwide wildlife resources." *Hill*, 437 U.S. at 177, 194 (internal quotation omitted, emphasis in original).  The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

12.      The fundamental purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered ... and threatened species depend may be conserved, [and] to

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

provide a program for the conservation of such [endangered and threatened] species[.]" 16 U.S.C. § 1531(b).  Furthermore, the ESA declares "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered … and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c).  The ESA defines "conserve" broadly as "to use and the use of all methods and procedures which are necessary to bring any endangered … or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"—i.e., to the point of full recovery.  *Id.* § 1532(3).  The ESA achieves its overriding statutory purposes through multiple vital programs.

13.     Section 9 of the ESA, 16 U.S.C. § 1538, prohibits the "take" (e.g., killing, injuring, harassing, or harming) of listed endangered fish and wildlife species, and section 4(d) separately authorizes extension of that prohibition to listed threatened species, *see id.* § 1533(d).

14.     Section 7 of the ESA, 16 U.S.C. § 1536, requires all federal agencies to "insure" that any action they propose to authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered … or threatened species or result in the destruction or adverse modification of" any designated critical habitat.  16 U.S.C. § 1536(a)(2).  If a proposed federal agency action "may affect" any listed species or critical habitat, the federal action agency must initiate consultation with the relevant Service.  *Id.* §§ 1536(b)(3), (c)(1).  The Service must then prepare a biological opinion to determine whether the action is likely to jeopardize any listed species or destroy or adversely modify any designated critical habitat and, if so, to provide "reasonable and prudent alternatives" to the agency action that would avoid jeopardy or adverse modification.  16 U.S.C. § 1536(b)(3)(A).  The biological opinion also must identify "reasonable and prudent measures that the [Services] consider [] necessary or appropriate to minimize such impact," and the "terms and conditions" that the agency must comply with in implementing those measures.  *Id.* § 1536(b)(4).

15.     In formulating its biological opinion and determining whether an action will jeopardize a species or destroy or adversely modify its critical habitat, NMFS must use the best

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

scientific and commercial data available.  16 U.S.C. § 1536(a)(2).  It also must evaluate the effects of the action, together with any cumulative effects and the environmental baseline, on the listed species.  50 C.F.R. §§ 402.14(g)(3)-(4); *see generally* 50 C.F.R. § 402.02.

16.     Further, ESA § 7(a)(1) requires action agencies to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of [ESA-listed] endangered species and threatened species."  16 U.S.C. § 1536(a)(1).

*NEW ESA REGULATIONS*

17.     In 2019, the Trump Administration amended the ESA Section 7 regulations.  *See* 84 Fed. Reg. 44,976 (Aug. 27, 2019) ("Final Rules").  The Final Rules have been challenged by several states—including Oregon—and organizations as contrary to the ESA, arbitrary, and capricious.  *See California et al. v. Bernhardt et al.*, No. 19-cv-06013-JST (N.D. Cal*); Center for Biological Diversity et al. v. Bernhardt et al.*, No. 19-cv-05206-JST (N.D. Cal.); *Animal Legal Def. Fund v. Bernhardt et al.*, No. 19-cv-06812-JST (N.D. Cal.).

18.     As relevant to this action, the Final Rules: (i) changed the definition of "effects of the action" by limiting both the type and extent of effects of a proposed federal agency action that must be analyzed in the section 7 consultation process; (ii) defined "environmental baseline" to include "ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify," thereby exempting such ongoing actions from analysis as effects of a proposed agency action; (iii) weakened the requirement for action agencies to ensure that mitigation is actually implemented, enforceable, and will reduce adverse effects of proposed agency actions; (iv) redefined "destruction or adverse modification" of critical habitat triggering section 7 consultation to require the critical habitat to be appreciably diminished in conservation value "as a whole"; and (v) eliminated from the definition of "destruction or adverse modification" any actions that alter "physical or biological features essential to the conservation of a species."

Page 6 -   OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF
          33212149

**B.      NEPA**

19.      NEPA's fundamental purpose is to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  Regulations promulgated by the Council on Environmental Quality (CEQ) implement NEPA.[2]  *See* 40 C.F.R. §§ 1500-1508 (2019); 21 C.F.R., Part 25.  Regulations for the Corps incorporate the CEQ requirements by reference.  33 C.F.R. § 325, App. B.  Regulations for the Department of Interior, and hence BOR, incorporate and supplement the CEQ requirements.  *See* 43 C.F.R. § 46.20.

20.      Pursuant to the duties in NEPA and its implementing regulations, if a proposed major federal action may significantly affect the quality of the human environment then federal agencies are required to evaluate and disclose in an Environmental Impact Statement ("EIS") the direct, indirect, and cumulative effects of the proposed action, identify and consider alternatives to the proposed action, and describe mitigation measures to avoid or lessen adverse environmental impacts.  42 U.S.C. § 4321; 40 C.F.R. § 1500 (2019).

21.      Congress enacted NEPA as a broad national commitment to protecting and promoting environmental quality.  Congress enforces that commitment through "action-forcing" procedures requiring federal agencies to take a "hard look" at environmental consequences of their proposed actions in the EIS.  42 U.S.C. § 4332.

22.      The two pillars of NEPA and its requirement of an EIS are that agencies (1) carefully and fully evaluate the environmental impacts of proposed actions before undertaking them, and (2) objectively and completely advise the public and decision-makers of the potential

---

[2] CEQ recently amended the NEPA regulations.  *See* 85 Fed. Reg. 43,304 (July 16, 2020) ("revised NEPA regulations").  The EIS, however, was prepared under the prior regulations, and the prior regulations govern its review.  Several lawsuits have been filed challenging the revised NEPA regulations on their face, including an action on behalf of 21 states—including Oregon— and several territories, counties and cities.  *See California et al. v. CEQ et al.*, 3:20-cv-06057-RS (N.D. Cal.).  If Defendants raise the revised NEPA regulations in their defense of this case, Oregon reserves its right to amend this Fifth Supplemental Complaint-in-Intervention to allege that the revised NEPA regulations are unlawful as applied.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

impacts of those actions, and of alternatives to them.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1501.4, 1502.5 (2019).

23.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS must detail "the environmental impact of the proposed action" and "alternatives to the proposed action."  *Id.* § 4332(2)(C)(i), (iii).  NEPA further provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).  The discussion must include an analysis and comparison of the environmental impacts of the proposed action to the impacts of alternatives to the proposed action.  40 C.F.R. §§ 1502.14, 1502.16, 1508.25 (2019).  Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a) (2019).  An alternative need not be within an agency's existing legal authority or a complete solution to the agency's goals to warrant consideration and analysis.  When properly conducted, the alternatives section is "the heart" of the EIS because it presents the environmental impacts of the proposal and the alternatives to the proposal in comparative form; "thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14 (2019).

24.    Agencies also must "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24 (2019).  An agency's failure to include and analyze information that is important, significant, up-to-date, available, or essential renders an EIS inadequate.  40 C.F.R. § 1500.1 (2019) ("The information must be of high quality.").  Following completion of an EIS, NEPA and its implementing regulations also impose a continuing duty on agencies to prepare a supplemental environmental impact statement whenever "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are

Page 8 -    OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
                DECLARATORY AND INJUNCTIVE RELIEF
        33212149

                                Department of Justice
                                100 SW Market Street
                                Portland, OR 97201
                            (971) 673-1880 / Fax: (971) 673-5000

significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(c)(1)(i), (ii) (2019).

## C.    The Administrative Procedure Act

25.    Neither the ESA nor NEPA provide a separate standard of review, so claims under these Acts are reviewed under the standards of the Administrative Procedures Act ("APA"). *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 879 (D. Or. 2016). Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)). "A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 879 (internal quotation marks omitted).

26.    An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

27.    Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 879. Under the APA, "[t]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 899 (citations and internal quotation marks omitted). In addition, "an agency must provide sufficient information so that a reviewing court can educate itself in order to properly perform its reviewing function— determining whether the agency's conclusions are rationally supported and whether the agency's

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

actions were complete, reasoned, and adequately explained." *Id.* at 909-10 (citations and internal quotation marks omitted). The agency's analysis must be complete, reasoned and adequately explained. *See id.* at 917 (citation and internal quotation marks omitted).

## V.    STATUS OF THE SPECIES

28.    The historical annual run of wild salmon and steelhead into the Columbia River is estimated at 7.5 million to over 10 million. By the early 1990s, the abundance of the Snake River and upper Columbia River salmon and steelhead populations declined to the lowest levels ever recorded and are now at a small fraction of their historical abundance.

29.    Currently, a total of thirteen salmon and steelhead Evolutionarily Significant Units ("ESU") and Distinct Population Segments ("DPS") that are adversely affected by the FCRPS are listed as threatened or endangered, thereby receiving the protections of the ESA.

30.    As discussed below, *see infra* ¶ 31, several ESUs/DPSs have recently seen unprecedented declines in their abundance levels. These declines are so significant that they tripped the "Significant Decline Trigger" of the Adaptive Management Implementation Plan ("AMIP") as defined in the 2014 BiOp. The Significant Decline Trigger is a crisis safety net, which was never expected to be triggered. Moreover, the AMIP required only a process to identify response actions, not the implementation of any actions to protect the species, and no additional actions were taken when these Significant Decline Triggers were tripped. The 2020 BiOp has removed these Significant Decline Triggers entirely.

31.    Every five years, NMFS is required to review the status of species that are listed as threatened or endangered. 16 U.S.C. § 1533(c)(2). NMFS determines the species' status using benchmarks including population abundance, productivity (population growth), and population spatial structure and diversity. The precarious status of the 13 listed species adversely impacted by CRS operations is reflected in NMFS's 2015 5-year status review ("2015 status review"):

Page 10 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
           DECLARATORY AND INJUNCTIVE RELIEF
           33212149

a.  <u>Snake River Spring/Summer Chinook ESU</u>: 31 of 32 currently recognized
populations have a high risk of extinction, are functionally extirpated or are
extirpated.  *See* 2020 BiOp at 104-05, Table 2.2-2.  The population status for one
population is "maintained."  *Id.*  This ESU remains at high overall risk of
extinction, and its viability rating has not changed since the previous five-year
status review.  2020 BiOp at 106.

b.  <u>Snake River Basin Steelhead DPS</u>: 23 of 25 populations have a high risk of
extinction, moderate risk of extinction, "maintained or high risk of extinction,"
maintained risk of extinction, or are extirpated. *See* 2020 BiOp at 299, Table 2.3-
2. "The best scientific and commercial data available with respect to adult
abundance" of this DPS "indicates a substantial downward trend in abundance of
natural-origin spawners at the DPS-level from 2014 to 2019."  2020 BiOp at 306.

c.  <u>Snake River Sockeye Salmon ESU</u>: four of five populations are extirpated.  *See*
2020 BiOp at 433, Table 2.4-1.  This ESU is at high risk of extinction.  *See* 2020
BiOp at 436. "The best scientific and commercial data available with respect to
adult abundance indicate a substantial downward trend in the returns of hatchery-
origin and natural-origin adults to the Sawtooth Valley since 2014."  2020 BiOp
at 440.  Since 2015, the annual number of natural-origin sockeye salmon returns
have ranged from 11 to 33 fish. *See* 2020 BiOp at 437, Table 2.4-2 (28 fish in
2015; 33 fish in 2016; 11 fish in 2017; 13 fish in 2018; 14 fish in 2019).

d.  <u>Snake River Fall Chinook Salmon ESU</u>: one of the two populations is extirpated
and the other population is listed.  "The best available scientific and commercial
data with respect to adult abundance of lower SR fall Chinook salmon indicates a
substantial downward trend in the abundance of natural-origin spawners at the
ESU level from 2013 to 2019."  2020 BiOp at 544.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

e.    <u>Upper Columbia River Spring-run Chinook Salmon ESU</u>: three of three populations have a high risk of extinction.  *See* 2020 BiOp at 649, Table 2.6-2. "The best scientific and commercial data available with respect to adult abundance of [this ESU] indicates a substantial downward trend in the abundance of natural-origin spawners at the ESU level from 2015 to 2019."  2020 BiOp at 651.

f.    <u>Upper Columbia River Steelhead DPS</u>: four of four populations have a high risk of extinction.  *See* 2020 BiOp at 763, Table 2.7-2.  "The best scientific and commercial data available with respect to adult abundance of natural-origin UCR steelhead indicates a substantial downward trend in the abundance of natural-origin spawners at the DPS level from 2014 to 2019."  2020 BiOp at 765.

g.    <u>Middle Columbia River Steelhead DPS</u>: seven of 20 populations have a high risk of extinction or are extirpated, one population has a moderate risk of extinction, and seven populations have a maintained status.  *See* 2020 BiOp at 870-71, Table 2.7-2.  "The best scientific and commercial data available with respect to adult abundance of MCR steelhead indicates a substantial downward trend in the abundance of natural-origin spawners at the DPS level from 2014 to 2019."  2020 BiOp at 875.

h.    <u>Columbia River Chum Salmon ESU</u>: 15 of 17 populations have a very high risk of extinction, and one population has a moderate risk of extinction.  *See* 2020 BiOp at 976, Table 2.9-1.  "NMFS' most recent status review found that the CR chum ESU was relatively unchanged in status from previous reviews (NMFS 2016i).  While improvements in the status of some populations were observed, most remained at high to very high extinction risk, with very low abundances, and the ESU overall remained at moderate to high extinction risk.  Most populations

Page 12 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF
33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

will require very large improvements to reach their recovery goals (NWFSC 2015, NMFS 2016i)." 2020 BiOp at 975.

i.   Lower Columbia River Chinook Salmon ESU: "twenty-seven populations are at very high risk of extinction, two populations are at high risk of extinction, one population is at moderate risk of extinction, and two populations are at very low risk of extinction (NMFS 2016i)." 2020 BiOp at 1033; *see also id.* at 1035, Table 2.10-1. "NMFS' most recent status review (NMFS 2016i) found that overall, there had been little change in status from the previous review." 2020 BiOp at 1035.

j.   Lower Columbia River Steelhead DPS: "NMFS concluded in the most recent status review that the LCR steelhead DPS remained at moderate risk of extinction (NWFSC 2015, NMFS 2016i). Of the 23 populations, 16 were considered to be at high or very high risk of extinction, six had a moderate overall risk of extinction, and one had a low risk of extinction. None of the populations were considered fully viable. All four strata in the DPS fell short of their recovery goals, and most populations required substantial improvements to reach their recovery goals (NWFSC 2015)." 2020 BiOp at 1107; *see id.* at 1107-08, Table 2.11-1.

k.   Lower Columbia River Coho Salmon ESU: 21 of the 24 populations have a very high risk of extinction, one population has a high risk of extinction, and the final population has a moderate risk of extinction. *See* 2020 BiOp at 1176, Table 2.12-1. "[A]t the time of the most recent status review, none of the MPGs had met their recovery goals, and most populations still required substantial improvements to reach their recovery goals (Table 2.12-1). Abundances were still relatively low, and most populations remained at moderate or high risk of extinction." 2020 BiOp at 1176.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

l.  <u>Upper Willamette River Chinook Salmon DPS</u>: "At the time of the most recent status review (NMFS 2016e), NMFS found that while a few populations had experienced slight improvements in status, others had declined, and overall there had likely been a decline in the status of the ESU.  The Clackamas and McKenzie River populations, previously viewed as strongholds within the ESU, had experienced declines in abundance."  2020 BiOp at 1238.  The most recent status review further "noted that the Calapooia River population may have been functionally extinct, and that the Molalla River population remained at critically low abundance.  The South Santiam River population had also declined in abundance since the previous status review.  Abundance in the North Santiam River population had risen since the previous review, but still ranged only in the high hundreds of fish.  Improvement in the status of the Middle Fork Willamette River population related solely to the return of natural adults to Fall Creek; however, the capacity of the Fall Creek basin alone would be insufficient to achieve the recovery goals for the Middle Fork Willamette River population (NWFSC 2015)."  *Id.*

m.  <u>Upper Willamette River Steelhead ESU</u>: "[A]ll four populations remain extant and produce low to moderate numbers of natural-origin steelhead each year."  2020 BiOp at 1286.  "In its most recent status review for UWR steelhead (NMFS 2016e), NMFS noted that overall, the declines in abundance noted during the previous review (Ford et al. 2011) had continued through the period 2010 to 2015, and that populations in this DPS had experienced long-term declines in spawner abundance.  Although the declines noted were relatively moderate, the most recent review noted that continued declines would be a cause for concern (NWFSC 2015).  The most recent review noted considerable uncertainty in many of the abundance estimates for this DPS (with the possible exception of tributary

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

dam counts)." 2020 BiOp at 1288. "Overall, NMFS concluded in the most recent status review that none of the populations in the DPS were meeting their recovery goals and that all were most likely in the moderate risk category (NWFSC 2015, NMFS 2016e)." *Id.* at 1289.

## VI.    PROCEDURAL BACKGROUND

32.    The present action commenced as a challenge to the 2000 BiOp, in which NMFS determined the effects of the proposed action—continued operations of the Federal Columbia River Power System ("FCRPS")[3]—would jeopardize eight listed salmon ESUs and steelhead DPSs and adversely modify their critical habitat. *NWF v. NMFS*, 254 F. Supp. 2d 1196, 1201 (D. Or. 2003)(ECF No. 396). NMFS relied upon a Reasonable and Prudent Alternative (RPA) to the proposed action to reach a no-jeopardy conclusion. The Court held that the 2000 BiOp was arbitrary and capricious because it (a) relied on mitigation activities not subject to consultation as required under the ESA, and (b) relied on mitigation activities that were not shown to be reasonably certain to occur. Judge Redden remanded the 2000 BiOp to NMFS to fix the legal errors identified by the Court.

33.    In the 2004 BiOp, the agencies took a novel approach to avoid a jeopardy and adverse modification determination. The 2004 BiOp found no jeopardy and no adverse modification of critical habitat. This determination was a result of a new interpretation by NMFS of the ESA and its implementing regulations that allowed NMFS to consider the dams to be part of the environmental baseline, thus ignoring many of the adverse effects of the dam operations. Additionally, NMFS's new interpretation allowed hatchery fish to be considered wild fish in determining whether ESA protection was required. Both this Court and the Ninth

---

[3] In earlier Biological Opinions, the CRS was referred to as the Federal Columbia River Power System ("FCRPS"). This Complaint retains the FCRPS acronym when referring to previous biological opinions and RODs but uses CRS to refer to the 2020 BiOp and ROD.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Circuit determined the 2004 BiOp was arbitrary and capricious.  Judge Redden remanded the
2004 BiOp to NMFS to fix the legal errors identified by the Court.

34.    In 2008, NMFS issued yet another BiOp.  The 2008 BiOp reversed course from
the 2004 BiOp and acknowledged that operations of the FCRPS did result in jeopardy and
adverse modification of critical habitat of endangered species, and therefore relied on an RPA to
reach its no-jeopardy conclusion.  NMFS used a new framework in analyzing the impact of the
FCRPS operations that focused on whether the listed species were on a "trend toward recovery"
and whether the critical habitat "retains the ability to become functional."  2008 BiOp at 1-12.
To avoid jeopardy, the Agencies included tributary and estuary habitat, hydropower, and
hatchery measures in the 2008 consultation and BiOp.

35.    In December 2010, NMFS issued the 2010 Supplemental BiOp, which
incorporated an Adaptive Management Implementation Plan ("AMIP") into the 2008 BiOp.  The
2010 BiOp again acknowledged that FCRPS operations jeopardized endangered species and
would result in adverse modification of critical habitat.

36.    The 2008 and 2010 Supplemental BiOps were challenged and remanded back to
NMFS.  Specifically, the BiOps' reliance on habitat mitigation measures that were not
reasonably certain to occur, and NMFS's conclusion that the reasonable and prudent alternatives
would avoid jeopardy were arbitrary and capricious.  This Court, in invalidating both the 2008
and 2010 Supplemental BiOps, ordered that:

> No later than January 1, 2014, [NMFS] shall produce a new
> biological opinion that reevaluates the efficacy of the RPAs in
> avoiding jeopardy, identifies reasonably specific mitigation plans
> for the life of the biological opinion, *and considers whether more*
> *aggressive action, such as dam removal and/or additional flow*
> *augmentation and reservoir modifications are necessary to avoid*
> *jeopardy.*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1130 (D. Or. 2011)
(emphasis added).

Page 16 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF

37.     The Court retained jurisdiction over the matter given the "Federal Defendants' history of abruptly changing course, abandoning previous BiOps, and failing to follow through with their commitments to hydropower modifications proven to increase survival (such as spill)" and "to ensure that Federal Defendants develop and implement the mitigation measures required to avoid jeopardy." *Id.*

38.     In 2014, NMFS issued yet another BiOp.  Like the BiOps prepared in 2000, 2008, and 2010, NMFS found that operations of the CRSO jeopardized endangered species and adversely modified critical habitat of those endangered species but could be avoided by implementation of a suite of 73 RPAs.

39.     Yet again, this BiOp was challenged, and yet again, this BiOp was found to be arbitrary and capricious.  In a lengthy opinion in 2016, this Court described previous litigation as follows:

> Judge Redden, both formally in opinions and informally in letters to the parties, urged the relevant consulting and action agencies to consider breaching one or more of the four dams on the Lower Snake River.  For more than 20 years, however, the federal agencies have ignored these admonishments and have continued to focus essentially on the same approach to saving the listed species – hydro-mitigation efforts that minimize the effect on hydropower generation operations with predominant focus on habitat restoration.  These efforts have already cost billions of dollars, yet they are failing.  Many populations of the listed species continue to be in a perilous state.

184 F. Supp. 3d 861, 876 (D. Or. 2016) (footnote omitted).

40.     This Court found the 2014 BiOp similarly lacking:

> The 2014 BiOp continues down the same well-worn and legally insufficient path taken during the last 20 years. It impermissibly relies on supposedly precise, numerical survival improvement assumptions from habitat mitigation efforts that, in fact, have uncertain benefits and are not reasonably certain to occur. It also fails adequately to consider the effects of climate change and relies on a recovery standard that ignores the dangerously low abundance levels of many of the populations of the listed species.

> *Id.*

Page 17 - OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

41.    The Court observed and concluded that "[t]he Federal Columbia River Power System remains a system that 'cries out' for a new approach and for new thinking if wild Pacific salmon and steelhead, which have been in these waters since well before the arrival of homo sapiens, are to have any reasonable chance of surviving their encounter with modern man." *Id.* at 876.  The Court ordered that, in addition to developing a new BiOp, the federal agencies must prepare a comprehensive EIS to comply with their duties under NEPA, with the hope that preparation of an EIS "may finally break the decades-long cycle of court-invalidated biological opinions that identify essentially the same narrow approach to the critical task of saving these dangerously imperiled species.  The federal consulting and action agencies must do what Congress has directed them to do." *Id.* at 871-72.

42.    This Court remanded the 2014 BiOp, and subsequently ordered NMFS to complete a new BiOp, and the Corps and BOR to prepare an EIS and issue new RODs no later than September 24, 2021.  Order on Remand, July 6, 2017 (ECF No. 2089).  This schedule was based, in large part, on arguments raised by the federal defendants that five years was the bare minimum amount of time to complete the necessary work.

43.    In January 2017, Plaintiffs moved for an injunction to increase voluntary spring spill at the lower Snake and lower Columbia River dams to the maximum level allowed by state water quality standards.  The Court granted the motion but delayed implementation until the spring of 2018 to allow the regional scientists time to develop more specific plans for implementing this increased spring spill.  *NWF v. NMFS*, No. 3:01-cv-0640-SI, 2017 WL 1829588 (D. Or. April 3, 2017).  The Ninth Circuit affirmed the District Court's order. *NWF v. NMFS*, 886 F.3d 803 (9th Cir. 2018).

44.    In December 2018, Oregon, Washington, the Nez Perce Tribe, the Corps, BOR, and BPA negotiated a "Flexible Spill Agreement" to govern voluntary spring spill operations during the remainder of the remand (spring of 2019, 2020, and 2021), or until NMFS issued a new BiOp concurrent with an EIS and the Action Agencies adopted new RODs.  *NWF v. NMFS*,

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Status Report re: 2019-2021 Spill Operations Agreement (Dec. 18, 2018) (ECF No. 2298) (and Exhibit thereto).  The Flexible Spill Agreement expressly recognized that "no [p]arty makes any concessions regarding the legal validity [or] scientific validity . . . of the spill operations contemplated in this Agreement."  Agreement § X.B. (ECF No. 2298-1).

45.    The signatories to the Flexible Spill Agreement, as well as the remaining parties to this case, agreed not to pursue further litigation in this case for the three year-term of the Flexible Spill Agreement so long as the Action Agencies implemented the Flexible Spill Agreement.

46.    NMFS issued a Biological Opinion on March 29, 2019 ("2019 BiOp").  The 2019 BiOp contained and perpetuated the legal errors identified above with the previous decades of biological opinions.  Consistent with the commitments and caveats in the Flexible Spill Agreement, however, there was no litigation over the 2019 BiOp.

47.    In July 2020, the Action Agencies released the Final EIS and NMFS released the 2020 BiOp.  The federal agencies released the EIS over a year earlier than they had previous stated was possible in order to comply with an October 19, 2018, Executive Order from President Trump directing the federal agencies to complete the EIS by September 30, 2020.  *See* 2020 BiOp at 95 & 95 n.16.  The Action Agencies issued the joint ROD on September 28, 2020.

## VII.    THE 2020 ROD & 2020 BIOP VIOLATE THE ESA & APA

48.    The Corps operates several projects in the Columbia and Snake River basins that affect listed salmon and steelhead.  BOR also operates projects on these rivers and is the primary agency responsible for federal water storage and diversion facilities in the Upper Snake basin.  In the 2020 ROD, the Corps and BOR agree with NMFS' determination in the 2020 BiOp that the CRS operations that the Action Agencies will implement over the next fifteen years will not jeopardize any listed species of salmon or steelhead, destroy or adversely modify any of their designated critical habitat, or be likely to adversely affect endangered Southern Resident Killer

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Whales.  As described below, the 2020 BiOp repeats, incorporates, exacerbates and adds to the legal errors of prior unlawful BiOps, particularly the 2004 BiOp and the 2008/2010/2014 BiOps.

49.    The Corps' and BOR's reliance on the 2020 BiOp fails to meet their independent and continuing legal duty to comply with the substantive requirements of ESA section 7(a)(2) to avoid jeopardy and adverse modification of critical habitat, nor is their reliance in accordance with their conservation duty pursuant to ESA section 7(a)(1).

50.    To the extent that NMFS attempts to justify its unlawful analyses in the 2020 BiOp by relying on the revisions to the ESA regulations or "clarifications" provided in those regulations, those regulatory changes and "clarifications" are illegal and contrary to law as applied in the 2020 BiOp.  In the alternative, even if the Court does not invalidate these regulations as applied in the 2020 BiOp, the 2020 BiOp is arbitrary and capricious to the extent that the analysis does not comply with the revised regulations and/or applies them inconsistently.

A.    **The jeopardy analysis unlawfully manipulates the Environmental Baseline and employs a comparative—rather than additive—approach that has been rejected by the Courts.**

51.    Like the 2004 BiOp, the 2020 BiOp employs the previously litigated and unlawful approach of categorizing "nondiscretionary" dam operations as part of the environmental baseline and comparing, rather than aggregating, the effects of the proposed action to the environmental baseline.   The environmental baseline in the 2020 BiOp includes the effects of the decades of harm to listed species resulting from the Action Agencies' unlawful operation of the Columbia River System for over twenty years.  The 2020 BiOp then divorces the harms in the environmental baseline from the analysis on the basis that the terms "jeopardize the continued existence of" and "destruction or adverse modification" relate solely to the effects of the proposed action, and not the environmental baseline.  The 2020 BiOp erroneously concludes that there is no jeopardy or adverse modification so long as the effects of the proposed action are comparatively the same or not much worse than the effects of the decades of illegal operations that have brought the listed species to the brink of extinction.

Page 20 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

52.     By placing more than twenty years of illegal dam operations into the environmental baseline and then divorcing those harms to fish from the analysis, NMFS sets an exceedingly low, and unlawful, bar for jeopardy.  Rather than addressing poor fish performance under previous BiOps' illegal dam operations—or explaining why the survival improvements predicted under those BiOps have not come to fruition—NMFS subsumes that period in the environmental baseline and compares that baseline to the proposed action.  This unlawful approach allows NMFS to conclude that proposed action will not cause jeopardy or adversely modify critical habitat because the proposed action will not be appreciably *worse* for fish than the past twenty years of illegal operations.

53.     The 2020 BiOp's flawed analysis is compounded by NMFS's application of the new, unlawful regulatory definitions.  First, the 2020 BiOp applies the new regulatory definition of the environmental baseline, which states that "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline."  50 CFR § 402.2; *see also, e.g.*, 2020 BiOp at 125.  Second, the 2020 BiOp applies the new regulatory definition of "effects of the action," which states that the "effects of the action" are only those consequences to the listed species or critical habitat that would not occur but for the proposed action and are reasonably certain to occur.  By applying these unlawful definitions, the 2020 BiOp attempts to wipe the slate clean by dismissing from the analysis the effects of the prior decades of illegal and harmful actions that caused the decline of ESA-listed species (which are relegated to the environmental baseline).  The 2020 BiOp allows the species to continue to have elevated risks of extinction and low probability of survival and recovery by failing to incorporate degraded baseline conditions into the jeopardy and critical habitat analyses, minimizing the cumulative adverse effects of the proposed action, and allowing NMFS to conduct the ESA analysis in a vacuum.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**B.      The Jeopardy and Critical Habitat analyses ignore the status of the species, fail to analyze likelihood of recovery and allow the species to continue on the path to extinction.**

54.      The 2020 BiOp's jeopardy and critical habitat analyses violate the ESA and expressly contravene controlling precedent in this case; the analyses fail to properly consider and account for the degraded status of the species and the impact of prolonged low population abundances on the species' likelihood of survival and recovery, and the conservation value of critical habitat.  The 2020 BiOp relies on and/or cites to the new ESA rules, including the discussion of the term "appreciably diminish" in the preamble of the new ESA rules and the new definition of "destruction or adverse modification" of critical habitat—which strikes the reference to direct or indirect alterations to the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features. These new ESA regulations are unlawful and their application in the 2020 BiOp is arbitrary, capricious, and contrary to law.

55.      The Court held that the "trending toward recovery" standard in the 2014 BiOp violated the ESA because, among other reasons, it: (a) failed "to account for whether a population is already at a precariously low level of abundance"; (b) did "not consider the individual abundance levels of the various endangered or threatened populations or what growth trends would be necessary in each population to ensure that the likelihood of recovery of the population or the listed species is not appreciably diminished"; (c) improperly equated "an increasing population" with "a no jeopardy finding"; (d) provided no rational connection between the conclusion that an incrementally larger population was sufficient to ensure no decreased risk of reaching recovery.

56.      The 2020 BiOp does not remedy these deficiencies.  The 2020 BiOp's analysis is unlawful for at least the following reasons:

   a.      It does not consider the individual abundance levels of the various endangered or threatened populations or what population growth trends are necessary to ensure

Page 22 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF
33212149

that the likelihood of survival or recovery of the population or the species is not appreciably diminished.

b.      It includes no viability component or any other measure of progress towards recovery. Without determining the point at which recovery is placed at risk, federal defendants cannot ensure that the likelihood of recovery is not appreciably diminished.

c.      It fails to assess risk in connection with any time frame for achieving recovery and thereby allows species to linger at the brink of extinction, without separately considering how prolonged periods of low abundance increase extinction risk and adversely affect the potential for survival and recovery.

d.      As discussed further below, it misapplies the ICTRT's approach and disregards population viability criteria developed by NMFS without rational explanation or scientific basis. *See infra* ¶¶ 59-61.

57.     The 2020 BiOp sets an even lower bar than the one set by the unlawful "trending toward recovery" standard. Instead of considering population viability requirements and the species' minimum requirements for survival and recovery, the 2020 BiOp assesses only whether the proposed action will be *appreciably worse* for listed species than the environmental baseline. NMFS fails to consider, much less determine, the point at which survival and recovery are placed at risk and therefore it cannot demonstrate that the likelihood of achieving both will not be appreciably reduced. Remarkably, despite the degraded population status of all 13 ESUs/DPSs, the 2020 BiOp finds that none of the listed populations of Columbia and Snake river salmon and steelhead—not even the Snake River Sockeye, which have had annual returns of 11 to 33 natural-origin fish since 2015—are jeopardized by a proposed action that makes only minor adjustments to status quo CRS operations. Thus, the 2020 BiOp concludes that no population requires any improvement in status over baseline conditions for CRS operations to avoid jeopardy to listed species.

Page 23 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
            DECLARATORY AND INJUNCTIVE RELIEF
        33212149

                            Department of Justice
                            100 SW Market Street
                            Portland, OR 97201
                        (971) 673-1880 / Fax: (971) 673-5000

58.     The 2020 BiOp arbitrarily concludes that the proposed action will avoid jeopardy and adverse modification to critical habitat without addressing or accounting for the available scientific information which shows that the species are not likely to survive or recover and instead will continue to have elevated risk of extinction under the proposed action.

**C.    The 2020 BiOp misapplies the Interior Columbia Technical Recovery Team (ICTRT) analysis and employs an analysis that effectively requires an entire generation to collapse and species to become functionally extinct before there can be a jeopardy finding.**

59.     The 2020 BiOp bears no logical or analytical connection to any scientifically-based recovery criteria and employs a jeopardy analysis that effectively requires an entire life generation to collapse and a species to become functionally extinct before there can be a finding that the proposed action is likely to jeopardize the listed species.

60.     NMFS misapplies the Interior Columbia Technical Recovery Team (ICTRT)[4] approach in its jeopardy analysis.  The ICTRT conducted a scientifically based population viability analysis, in which the likelihood of survival is calculated as a function of abundance and productivity[5], with varying combinations yielding the same probability of survival.  (*Interior Columbia Basin Technical Recovery Team (ICTRT) 2007.  Viability criteria for application to Interior Columbia Basin Salmonid ESUs*.  Review Draft, March 2007).  The components of the ICTRT's approach are described in the following subparagraphs:

a.      The ICTRT defines survival as remaining above a "quasi-extinction threshold" (QET), which for this purpose is set at 50 spawning adults per year for a four-year

---

[4] This group is composed of scientists appointed by NOAA to assess and describe the minimum requirements for survival and recovery of ESA-listed salmon and steelhead in the interior Columbia River Basin.  These scientists were selected based on their recognized and demonstrated expertise, and include non-representative participation from federal, state, tribal and academic scientists.

[5] Productivity, or recruits per spawner, is the number of returning adult progeny produced from each spawner.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

period.  As part of this analysis, the ICTRT constructs a suite of "viability curves," each of which delineates a constant probability of extinction risk.  The "viability curves" explicitly incorporate the variability around abundance and productivity, and take into consideration minimum abundance thresholds, as defined by the ICTRT.  These thresholds are based on conservation biology science and are calculated using an index of historical stream habitat capacity.  The ICTRT incorporates minimum abundance thresholds into its analysis as targets below which average abundance should not fall at any productivity level.  Once these viability curves have been generated, actual (empirical) population values of productivity and abundance, including measures of variation, are plotted to determine the current status of the population relative to the specific extinction risk curves.

b.      To meet minimum abundance and productivity viability criteria, a population— with consideration of its variance—must be in the region of likely survival on or above the extinction risk curve with the probability of the population falling below a selected threshold for four consecutive years over the course of 100 years is 5% or less.  For populations whose current abundance and productivity fall below the relevant viability curve, and thus pose an unacceptably high risk of extinction (i.e., greater than 5%), the ICTRT calculates the percentage increase in abundance and productivity necessary to move the population above the viability curve and into the region of likely survival.  The necessary increase in productivity represents the current "survival gap."  (*Interior Columbia Basin Technical Recovery Team (ICTRT) 2007; Required survival rate changes to meet Technical Recovery Team abundance and productivity viability criteria for Interior Columbia River Basin salmon and steelhead populations.*  November 2007).

Page 25 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF
33212149

  c.  The ICTRT accounts for the need to "roll-up" the status of individual populations to the ESU/DPS level. This roll-up is a critical stage in the analysis since it is the entire ESU/DPS, rather than individual populations, that is found to be in or out of jeopardy. The roll-up is further required in order to satisfy diversity and spatial distribution population viability criteria, particular patterns of populations across the ESUs/DPSs. And finally, a formal roll-up allows uncertainty to be characterized appropriately at the ESU/DPS level as error is propagated from the population-level.

  61.  Unlike the ICTRT approach, NMFS's jeopardy analysis does not assess population status in relation to minimum requirements for survival and recovery. The 2020 BiOp uses life-cycle modeling to project geometric mean abundances and Quasi-Extinction Threshold ("QET") probabilities for various populations but does not analyze or rationally explain what these projections mean for the species' likelihood of survival or recovery. The 2020 BiOp's 24-year (as opposed to the ICTRT's 100-year) time frame for assessing extinction risk, is too short to provide reasonable assurance that the likelihood of survival is not being appreciably reduced. In addition, the BiOp predominantly relies on evaluating hydrosystem survival impacts on total abundance which is not an objective, measurable criteria for evaluating likelihood of survival and recovery.

  62.  NMFS's jeopardy analysis fails to consider that jeopardy needs to be considered at the level of the ESU/DPS. By neglecting a sufficient roll-up of status from the individual population level to the ESU/DPS level, NMFS failed to adequately consider the diversity and spatial distribution population viability criteria, the importance of particular patterns of populations across the ESUs/DPSs, and account for compounding error at the ESU/DPS level.

  63.  The analysis in the 2020 BiOp does not satisfy even the exceedingly low, and unlawful, standard discussed above (i.e., that the proposed action will not cause jeopardy or adversely modify critical habitat so long as the proposed action will not be appreciably worse for

Page 26 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
    DECLARATORY AND INJUNCTIVE RELIEF
    33212149

fish than the past twenty years of illegal operations). *See supra* ¶¶ 51-52, 57.  The 2020 BiOp

provides that QET—which focuses on extinction level—must be below the 30 or 50 fish level

for four consecutive years to constitute jeopardy.  Thus, this analysis requires that species

become functionally extinct before there can be a finding that the proposed action is likely to

jeopardize the listed species.  The 2020 BiOp does not explain how a jeopardy analysis that

allows for functional extinction is also one that avoids an appreciable reduction in the species'

likelihood of survival and recovery.  Extinction, of course, is far too late for a species to survive

or achieve recovery.  This analysis does not satisfy even the illegal standard of "no further

decline" set in the 2020 BiOp.

      64.    NMFS ultimately does not rely on any quantitative analysis to reach its no-

jeopardy conclusion, but instead relies on population-level metrics not tethered to the proposed

action to speculate qualitatively about effects of the proposed action at the level of ESU/DPS.

NMFS provides no rational explanation of how its qualitative analysis provides an appropriate

basis for a no-jeopardy finding.  The 2020 BiOp does not consider and use the best currently

available scientific information throughout their ROD and the 2020 BiOp, including, but not

limited to, not using available and credible quantitative information and analyses regarding the

listed species.

**D.    No rational connection between the facts found and the conclusions of No Jeopardy
      or Adverse Modification.**

      65.    The 2020 BiOp's analysis of the species' likelihood of survival and recovery

consists of merely listing the effects of the proposed action, stating that some elements of the

proposed action will harm fish while others will benefit fish, and then summarily concluding that

the proposed action is not likely to jeopardize any listed species.  The ROD and 2020 BiOp do

not articulate a rational connection between the stated factors and the conclusion of no jeopardy

or adverse modification.  There is no explanation of how, and to what extent, the harmful effects

Page 27 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
           DECLARATORY AND INJUNCTIVE RELIEF
           33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

to fish are offset or mitigated by the asserted beneficial effects nor is there any analysis of how the harmful and beneficial effects factor into the species' likelihood of survival and recovery.

66. The analysis of critical habitat is similarly flawed. The 2020 BiOp acknowledges that critical habitat is not fully functioning, lists principal factors impairing the functioning of critical habitat, and notes that—while some actions have been taken to improve the functioning of critical habitat—more improvements will be necessary before many areas function at a level that supports recovery. The 2020 BiOp concludes that the proposed action does not destroy or adversely modify critical habitat, however, because the proposed action will not make conditions worse by "a meaningful amount." *See, e.g.*, BiOp at 293. The 2020 BiOp's critical habitat analysis does not consider recovery nor ensure that the proposed action is not likely to destroy or adversely modify critical habitat.

67. Several of the measures incorporated into the proposed action are likely to have both adverse and beneficial impacts for fish, but the 2020 BiOp does not meaningfully analyze individual measures nor the overall impact of the individual measures on fish survival and recovery. For example:

a. Under the proposed action, ponding will occur behind John Day Dam for the purported purpose of reducing avian predation. This measure, however, will also adversely impact flow and, consequently, increase both fish travel time and water temperature during the peak of spring juvenile salmon and steelhead out-migrations. The 2020 BiOp does not analyze nor even consider these associated negative effects on fish.

b. The 2020 BiOp does not use the best available science and arbitrarily assumes benefits to the species from higher-capacity turbines, which it dubs "fish-friendly" turbines. The 2020 BiOp does not account for the fact that higher-capacity turbines draw more water, thereby increasing powerhouse capacity. As more water is routed through the powerhouse, more fish are drawn away from safer

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

spillway and surface passage routes, particularly at times when flows are near the Total Dissolved Gas caps. The higher-capacity turbines therefore increase the number of powerhouse encounters fish experience. Powerhouse encounters are known to be deleterious to fish survival. Even setting aside the potential increased delayed mortality associated with increased powerhouse encounters, the overall direct mortality level associated with these high capacity turbines on migrating juvenile salmonids will ultimately be the product of both the direct mortality of the experience—i.e., the percentage of fish that these turbines kill—*and* the number of fish exposed to the experience. Even assuming that these high capacity turbines kill slightly fewer fish, they will entrain more fish to them which corresponds to an overall increase in direct mortality. To date, the most credible assessments available indicate that these turbines are at best neutral in fish benefits and are at worst detrimental to fish survival. The 2020 BiOp arbitrarily assumes benefits of these turbines without analyzing or considering the tradeoffs that may precipitate an overall detriment to survival and recovery of fish species.

68. The 2020 BiOp rolls back protective measures for fish and critical habitat without sufficient—or any—analysis of the corresponding negative effects on fish survival and recovery. For example, the 2014 BiOp allowed the Action Agencies to cease nighttime flows in the Snake River starting no earlier than December 1 with abundance-based criteria that must be met prior to implementation; the 2020 BiOp extends this zero-flow operation period by 45 days and adopts an earlier fixed start date of October 15. This operational change allows the Action Agencies to stop flows during periods when listed adult and juvenile fish are actively migrating. Further examples of roll backs in the 2020 BiOp include relaxing the standard for minimum operation pool ("MOP") ranges for navigation purposes at the expense of water transit time improvements, and reducing spill levels from August 15 to August 31 to neutralize power revenue losses associated with spilling to 125% for a portion of the day. The ROD and 2020 BiOp allow these

Page 29 - OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

operational changes to occur despite the fact that there has been no analysis of their adverse effects on fish survival and a monitoring plan has not been developed, let alone put in place, to assess the magnitude of deleterious impacts.

**E.    Climate change analysis overlooks relevant factors and important aspects of the problem.**

69.    As highlighted by the summer of 2015's devastating impact on water temperature and fish survival, the adverse impacts of climate change on the listed species and critical habitat are already a present-day reality.  Yet, the 2020 BiOp includes no new meaningful actions to mitigate the adverse impacts the fish have already experienced, nor any actions to mitigate for future adverse effects of climate change on listed species.  Instead, the 2020 BiOp erroneously conducts the climate change analysis in a vacuum, without giving appropriate consideration to the adverse effects of the action within the context of climate change impacts.  The analysis ignores that, in light of climate impacts on listed species and their critical habitat, the adverse effects of the proposed action will be compounded and therefore additional actions are required to ensure that the proposed action does not cause jeopardy or adverse modification; no such actions are included in any meaningful way in the 2020 BiOp or ROD.

70.    The 2020 BiOp acknowledges that climate change will affect anadromous fish in all stages of life and poses a substantial threat to the species' likelihood of survival and recovery. Nonetheless, they conclude that there is no jeopardy or adverse modification because projected abundances may decline slightly less under the proposed action than they would under the status quo operation (which this Court found to violate the ESA).  *See, e.g.*, 2020 BiOp at 750 ("If these predictions are realized, they would represent a near-term improvement in productivity and abundance … and, over time, would somewhat reduce the severity of expected declines in abundance and productivity caused by a warming climate and deteriorating ocean conditions.").

71.    The analysis must consider, and account for, adverse impacts from climate change on listed salmonids and critical habitat in order to meet the statutory mandate to "insure" that the

Page 30 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

proposed action is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat. NMFS is not free to exclude from the analysis or arbitrarily minimize climate impacts that it deems to be outside their control.

72.    Climate change exacerbates many of the adverse effects of the action, including, among other things, thermal impacts/exposure from reservoirs, elevated water temperature in fish ladders, and the effects of curtailment of flow to benefit power production. The ROD and 2020 BiOp do not appropriately analyze, consider, or account for the many ways in which climate change worsens and intensifies the adverse effects of the CRS on listed species and critical habitat.

73.    The ROD and 2020 BiOp's climate change analyses do not give the benefit of the doubt to species. The analyses arbitrarily assume benefits to species and habitat resiliency from future habitat improvements; those putative improvements and benefits are speculative and not reasonably certain to occur. For example, the cumulative adverse impacts to tributary, mainstem and estuary habitats resulting from the ongoing and expected impacts of other federal and non-federal actions are likely to continue to largely offset or negate the benefits to the species and habitat resiliency that are assumed in the climate change analysis. The ROD and 2020 BiOp do not propose or analyze new actions or measures that are needed to address and counter climate change impacts to species and critical habitat.

**F.    The Proposed Action analyzed in the BiOp is vague, uncertain and largely undefined, yet the 2020 BiOp provides ESA coverage for a 15-year period.**

74.    The ROD and 2020 BiOp are replete with uncertainty; the proposed action analyzed in the 2020 BiOp and the selected alternative in the ROD are themselves undefined and uncertain, as are the benefits that the ROD and 2020 BiOp assume will accrue to the species and critical habitat are highly uncertain. In light of these significant uncertainties, NMFS' conclusion of no jeopardy or adverse modification is arbitrary and capricious, as is the Action

Page 31 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
         DECLARATORY AND INJUNCTIVE RELIEF
         33212149

Agencies' agreement with that determination in the ROD.  The ROD and 2020 BiOp do not resolve these uncertainties in favor of the listed species.  The ROD and 2020 BiOp fail to provide sufficient information to allow the Court to properly perform its reviewing function.

75.    The proposed action purportedly analyzed in the 2020 BiOp is the operation, maintenance, and associated non-operational conservation measures for the 14 CRS dams for a period of 15 years.  The 2020 BiOp and ROD conclude that the proposed action is not likely to jeopardize the listed species or destroy or adversely modify critical habitat for the full 15-year term of the BiOp.  This conclusion is arbitrary and capricious because the proposed action is so vague and undefined that it is impossible for the federal agencies to have a rational basis to assume what the actual action is—let alone ensure—that it is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat of such species.  In addition, the 2020 BiOp asserts that there is uncertainty about the existence and precise extent of "latent mortality" and that the 15-year proposed action will help to clarify their understanding of this issue, without acknowledging that the assumptions about latent mortality used in the 2020 BiOp and relied on in the ROD lack a rational basis, and that any uncertainty regarding these effects must be resolved in favor of protecting the species.

76.    To the extent that the proposed action does identify any specific measures, those measures represent only minor modifications from the RPA that did not avoid jeopardy in the 2000, 2004 and 2008/2010/2014 BiOps.  NMFS's reliance on the same or similar measures to conclude no jeopardy or adverse modification in the 2020 BiOp is erroneous.

77.    The beneficial effects that the BiOp assumes will accrue are much too attenuated and uncertain to meet with the new regulatory definitions of "effects of the action" and "activities that are reasonably certain to occur," to the extent that the Court finds those definitions lawful. For example:

Page 32 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
            DECLARATORY AND INJUNCTIVE RELIEF
        33212149

                            Department of Justice
                            100 SW Market Street
                            Portland, OR 97201
                        (971) 673-1880 / Fax: (971) 673-5000

a.    Undefined voluntary spill operation for 14 years of the 15-year term of the BiOp.

   i.    Voluntary spill for fish passage—a key component of the operation of the CRS dams—is only defined in the first year (2021).  After the 2021 spill season, no spill operation is specified; instead, the Action Agencies express an intent to engage in some nebulous "adaptive management" process to determine a yet to be defined voluntary spill operation.  The 2020 BiOp cannot rationally conclude that an unidentified, non-specific voluntary spill operation—without any stated duration, periodicity, floor or magnitude for spill operations—is not likely to jeopardize listed species or adversely modify critical habitat for the remaining 14 years of the BiOp term.

   ii.   The 2020 BiOp cannot rationally conclude that an undefined voluntary spill operation will benefit listed species and their critical habitat. Nonetheless, the BiOp arbitrarily assumes the putative fish benefits of the 2021 spill operation—which itself is a rollback from the Flexible Spill Agreement operation—over the full 15-year term of the BiOp.  These benefits are not reasonably certain to occur because actions taken under the proposed amorphous adaptive management strategy may have differing or negative effects on species.  The BiOp's reliance on an undefined spill operation to conclude "no jeopardy" and no adverse modification of critical habitat for fifteen ESU/DPS and "not likely to adversely affect" and not likely to adversely affect critical habitat for SRKW and Southern DPS of Green Sturgeon is arbitrary and capricious.

b.    There are significant discrepancies between the EIS, Preferred Alternative ("PA"), Biological Assessment ("BA"), the proposed action in the 2020 BiOp, and the Selected Alternative in the ROD regarding several measures—for

Page 33 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

example, the frequency and duration of zero flow conditions at the four Snake River projects. These discrepancies, in combination with the amorphous adaptive management strategy, create additional and significant uncertainty about what operation will be imposed by the Action Agencies, which operation has been analyzed, and the resulting impacts on listed fish and critical habitat.

c.   The 2020 BiOp's no jeopardy or adverse modification determination relies on tributary and estuary habitat mitigation programs; predator management programs; research, monitoring, and evaluation ("RME") programs; and reporting expectations that are not reasonably certain to occur nor reasonably certain to provide and sustain assumed benefits. The 2020 BiOp relies on overly optimistic assumptions about the level of cumulative survival improvements that will result from these programs. For example:

i.   The BiOp arbitrarily assumes that past actions and programs have begun to result in measurable benefits to the species and critical habitat, and that future actions are reasonably likely to occur and that the putative benefits of such actions will be sufficient to offset negative impacts from both the proposed action as well as future adverse climate change effects on the species and critical habitats.

ii.   The 2020 BiOp arbitrarily assumes a perpetual, compounding of benefits from existing mitigation actions. The BiOp overlooks relevant factors and important aspects of the problem. Previously funded actions/projects may terminate or sunset (e.g., an instream water lease ends and is not renewed), or change (e.g., a landownership change results in a protected riparian area being returned active pasture). Unless additional actions are added to the portfolio to compensate for those changes, they will undoubtedly result in a decrease in the potential benefits. In practice, flat-funded, reduced,

Page 34 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and/or terminated mitigation contracts have significantly limited the efficacy of proposed habitat improvements.  Continued flat funding of planned measures, at or below the level of inflation, undermines the certainty that assumed habitat actions will be implemented, and if they are, whether the RME necessary to effectively evaluate success and demonstrate species-habitat improvements will be available.  The BiOp's assumptions about future habitat mitigation programs, predator management programs and RME overlook important ongoing and future constraints and limitations.

iii.    Even if—despite an existing track record of reduced project funding—all these habitat restoration activities were to actually occur, responses to these habitat restorations will inevitably require a substantial amount of time to occur and detect (i.e., if benefits accrue it may be at a very slow rate), can vary dramatically in space and among species, and can be highly uncertain (e.g., a seemingly positive outcome may be misleading).  Given the perilous state of the listed species now, time spent waiting for habitat restoration to translate into fish benefits and then trying to determine whether a positive outcome has occurred constrains resources necessary to implement more effective and immediate actions.

iv.    Tributary habitat restoration actions, even if implemented at the scope and magnitude assumed in the BiOp, can affect only those salmonid life stages that occur in the tributary (i.e., spawning and rearing).  The benefits of habitat restoration actions in individual tributaries cannot offset negative impacts from the dams in the mainstem Columbia and Snake rivers, which all listed salmonids use as critical habitat as well as a migration corridor during a key life stage.  Moreover, habitat restoration cannot improve life

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

cycle survival for essential populations that originate in near-pristine wilderness watershed (e.g., Middle Fork Salmon River). These populations were the productivity engines for the species before the Snake River dams were completed. Now they perform one third to one half as well as unlisted John Day populations—which originate below the Snake River dams and therefore pass fewer dams on their migrations to and from the ocean— yet aggregated Middle Fork Salmon River spawning and rearing habitat is more intact and capable of supporting productivity goals than corresponding aggregated habitats in the John Day River Basin. Although improving tributary habitat can potentially improve egg-smolt survival and capacity in the specific tributary where that habitat action takes place, it is constrained by density-dependent population dynamics and cannot compensate for lost productivity caused by dams for any population or species, much less for those that currently have pristine tributary habitat.

v.    For populations and species that currently have degraded tributary habitat, the benefits of habitat restoration—even if implemented at the scope and magnitude assumed in the BiOp—are unlikely to offset impacts from the proposed actions, especially given the predictable impacts of climate change and ongoing cumulative anthropogenic habitat degradation. NMFS has repeatedly stated that continued degradation of habitat associated with land use and development is one of the biggest detriments to the survival and resiliency of listed populations and the critical habitat on which they rely. Yet it is not clear if, and to what extent, NMFS considered continued habitat degradation in its analysis.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

78.    There is additional uncertainty because the 2020 BiOp is a "no jeopardy" BiOp, unlike the 2000, and 2008/2010/2014 BiOps which concluded that the proposed action was likely to jeopardize listed species and adversely modify or destroy critical habitat and therefore relied on RPAs to try to avoid jeopardy and adverse modification.  The 2020 BiOp incorporates the measures proposed as RPAs as part of the proposed action and scales back the research, monitoring and evaluation ("RME") necessary to evaluate the effectiveness of the mitigation actions.  The types of robust RME that are necessary to meaningfully evaluate the mitigation measures have been moved to merely "conservation recommendations" in the 2020 BiOp; they are, therefore, completely discretionary. The "non-discretionary" RME that is included in the Incidental Take Statement ("ITS") as a Reasonable and Prudent Measure is vague and insufficiently robust to meaningfully evaluate the effectiveness of the measures that are relied upon to avoid take and ensure that the proposed action is not likely to cause jeopardy or adverse modification.  The discretionary conservation measures contain key pieces that are central to ensuring that the assumed benefits will accrue.  The 2020 BiOp does not rationally analyze or explain the choice to make the RME discretionary or the effects of that choice.  Nor does the 2020 BiOp provide any assurance that measures will be implemented. The failure to make these measures non-discretionary is arbitrary, capricious, and contrary to law.

79.    The 2020 BiOp places significant reliance on adaptive management to ensure that the proposed hydropower system operations will not jeopardize listed salmon and steelhead. Adaptive management actions are frequently implemented without a rational basis or broad support from the regional sovereigns' scientific technical representatives assigned to the Action Agencies' in-season management forums and without the ability to evaluate the impact of the modification.  NMFS's reliance on adaptive management as a substitute for binding and effective actions is arbitrary and capricious, discounts the best available science, and contrary to law, in at least the following ways:

Page 37 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
            DECLARATORY AND INJUNCTIVE RELIEF
        33212149

a.     NMFS's reliance on adaptive management in its jeopardy analysis fails to adhere to any recognized concepts of that approach.  Rather than provide a means of structured development and testing of clearly identified alternatives, the adaptive management provisions are a means of excusing imprecision, uncertainty, and the lack of clearly identified actions and alternatives.  By failing to adhere to the basic principles of adaptive management, the 2020 BiOp fails to employ the best science available.

b.     NMFS's plan to resort to adaptive management is in many instances presented as the primary means to ensure that the likelihood of survival and recovery of listed species is not appreciably impaired.  The 2020 BiOp's promise that adequately protective solutions will be found at some unspecified point in the future does not satisfy the ESA's mandate that NMFS ensure now, in this biological opinion, that the proposed operations will not jeopardize listed species and fails to give the benefit of the doubt to the species.

c.     NMFS's reliance on adaptive management to satisfy its obligations under the ESA is arbitrary and capricious, fails to employ the best science available and repeats past failures from previous BiOps.  For example, Northwest Power and Conservation Council's 1984 Fish & Wildlife Program relied heavily on an "all-H" adaptive management approach.  Yet this strategy could not prevent the ESA listing of 13 ESUs in the Columbia basin.  Since then, conservation science has revealed that for adaptive management to work for these species, it must employ specific and aggressive actions that produce detectable results.  The 2020 BiOp instead adheres to an adaptive management framework that relies on undefined actions whose impacts NMFS either cannot or will not measure and is backed by vague promises to find new actions if and when NMFS discovers the current efforts have failed.  This adaptive management framework constitutes an

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

irrational and unlawful course of "wait and see," far from the mandate of the ESA and the reasoned decision-making required by the APA.

d.    NMFS's failed approach to adaptive management from previous BiOps and the lack of any meaningful response to the 2015 fish disaster provide helpful context for evaluating the glaring deficiencies in the 2020 BiOp.  The 2014 BiOp incorporated the adaptive management implementation plan (AMIP).  The AMIP was developed in response to concerns expressed by Judge Redden after reviewing the 2008 BiOp.  The AMIP was not triggered when species failed to perform as expected in the 2014 BiOp, but rather when two abundance monitors—the "Early Warning Indicator," and the "Significant Decline Trigger"—demonstrated catastrophic decline in species' abundance.  The "Significant Decline Trigger" was intended as a crisis safety net, which NMFS never expected to be triggered.  Recently, several ESUs have seen unprecedented declines in their abundance levels that are so significant that they tripped the "Significant Decline Trigger."  The AMIP failed in concept and implementation.  Yet, instead of remedying the AMIP's deficiencies and providing a robust adaptive management plan based on scientifically-sound trend metrics and related qualitative analyses, NMFS simply abandons the AMIP in the 2020 BiOp without explanation.

## G.    Flow and transportation

80.    The 2020 BiOp fails to provide adequate flow to support juvenile and adult system-wide survivals of listed salmon and steelhead.  The 2020 BiOp degrades minimum operation pool implementation by institutionalizing adaptive management protocols that temporarily increase the pool elevation operating ranges and widen operating flexibility at the expense of Water Transit Time in the Snake River.  The flow program should return to minimum operating pool levels that offer 1-foot operating flexibility, establish weekly targets for flow

Page 39 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF
          33212149

volume and water velocity at least equivalent to flow objectives—while recognizing that achieving targets is dependent on annual runoff conditions— and ensure frequent forecasting to ensure reservoirs are operated to maximize fish survival at all times. Finally, NMFS should include a presumptive path to operate Lower Columbia River mainstem reservoirs at minimum operating pool from April 10 to August 31, while ensuring power, irrigation and navigation benefits are maintained and impacts to other resources are mitigated.

81.    From 2007 through 2018, the start date for transportation was no earlier than May 1 with in-season adaptive management flexibility determined through regional coordination at the Technical Management Team. The 2020 BiOp abandons that coordinated and collaborative effort and directs the Corps to initiate juvenile transportation at Lower Granite Dam no later than May 1. In doing so, NMFS arbitrarily discounts that the best available information demonstrates that there is little benefit (and in some cases potential detriments) to listed species from transportation of smolts prior to May 1. This change is arbitrary and capricious.

82.    There is little to no evidence that transportation of smolts from the Snake River Basin provides survival benefits to those listed populations. To the contrary, monitoring shows that the approach can be deleterious to Snake River ESUs/DPSs. Despite nearly two decades of using transportation as the primary mitigation/recovery strategy, every extant Snake River ESU/DPS is listed under the ESA as either Threatened or Endangered. The 2020 BiOp acknowledges that "transportation is not a panacea," that there is considerable uncertainty surrounding the efficacy of transportation, and that there is a well-documented negative relationship between reach survival and the efficacy of transportation, i.e., as reach survival increases—owing to improved in-river conditions from increased spill—any marginal benefit of transportation decreases to a point at which the life-cycle survival of in-river migrants exceeds that of transported fish. Despite these concessions, NMFS incongruously continues to propose implementing an expanded transportation strategy regardless of past performance or prohibitive levels of uncertainty.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

83.     In seeking to rationalize an operation that would increase the overall proportion of juvenile salmonids transported, NMFS has provided a justification that is arbitrary and capricious in that it: (1) overstates the benefit of transportation compared to in-river migration in the spring by drawing inappropriate comparisons among groups of fish experiencing different outmigration conditions (e.g., bypassed and transported versus bypassed returned to river fish), (2) discounts the well-documented deleterious effects of juvenile transportation on the success of migrating adults (e.g., delayed return, increased straying) and (3) despite acknowledging the strong negative relationship between increases in reach survival and the relative efficacy of transportation, continues to pursue the transportation strategy as if the negative relationship did not exist.  Yet, in the 2020 BiOp, NMFS adopts an approach that would expand transportation in a misguided effort to "spread the risk" by providing for an earlier start date for transportation in year one and allowing virtually unconstrained latitude through a broad and undefined adaptive management to manipulate the scope of transportation.

**H.     The 2020 BiOp's conclusion that the Proposed Action is not likely to adversely affect SRKWs and their designated critical habitat is arbitrary and capricious.**

84.     The 2020 BiOp's conclusion that the proposed action is not likely to adversely affect SRKW and their designated critical habitat is legally flawed for several reasons including, but not limited to, the reasons identified in the following paragraphs.

85.     The 2020 BiOp's "not likely to adversely affect" determination is based on the premise that "increased prey availability through CRS-funded hatchery production" will offset negative effects on SRKW prey base caused by the proposed hydrosystem operations and maintenance.  *See* 2020 BiOp at 1367.  However, the proposed action has no additional hatchery production over existing levels; the Action Agencies therefore cannot reasonably rely on an increase to the prey base from hatchery production to conclude that the proposed action is not likely to adversely affect the SRKW.  Under existing hatchery releases, SRKW are on the brink of extinction.  The 2020 BiOp provides for status quo hatchery operations and, as explained

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

above, employs a jeopardy analysis that requires an entire generation to collapse and a species to become functionally extinct before there can be a finding that the proposed action is likely to jeopardize the listed species. *See supra* ¶¶ 61-64.  The 2020 BiOp fails to explain why status quo hatchery production, combined with operations that allow for functional extinction of the species, will avoid adversely affecting the SRKW.

86.    The 2020 BiOp does not consider relevant factors and ignores important aspects of the problems facing SRKW.  The 2020 BiOp discounts impacts of the proposed action on certain Chinook Salmon runs and consequently SRKW because, NMFS argues, there is little spatial and temporal overlap among those prey items and the SRKW.  This analysis does not consider the disproportionate energetic importance of prey items during critical periods when overlap does occur.  For example, Columbia River spring Chinook may have a lower degree of spatial and temporal overlap than some other prey items, yet these salmon likely constitute an energetically important component of the SRKW diet during pivotal life stages—for example, late winter and early spring during gestation—when the impact of the proposed action on that prey item may be severely detrimental to SRKW, potentially across generations.

87.    The 2020 BiOp's analysis of the proposed action's impact on the SRKW is not based on the best scientific and commercial data available, does not draw a rational conclusion between the evidence presented and the conclusions drawn, and fails to consider relevant factors.

I.    **Incidental Take Statement**

88.    NMFS has determined that CRS operations and implementation of the proposed action by the Corps and BOR will take ESA-listed salmon and steelhead.  *See* 2020 BiOp at 1377.  NMFS provides the Corps and BOR with an ITS authorizing them to lawfully take a large percentage of each ESU/DPS affected by the hydrosystem.  In the absence of a valid ITS or exemption under the Act, this take is prohibited.  This provision does not protect BOR and the Corps from liability under Section 9 because the 2020 BiOp is arbitrary, capricious, and contrary to law.  The ITS contained therein is consequently also invalid.  Because the Corps and BOR

Page 42 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
           DECLARATORY AND INJUNCTIVE RELIEF
       33212149

may not lawfully take listed species in the absence of a valid take statement, they are in violation of § 9, 16 U.S.C. § 1538(a)(1)(B),(G).

## VIII.    THE CORPS' AND BOR'S VIOLATIONS OF NEPA

89.    The purpose of NEPA generally, and in this case specifically, is to force the consideration and rigorous evaluation of the environmental impacts of agency actions.  The NEPA process ordered by this Court was intended "to force the consideration of environmental impacts in the decision-making process," the end result being to "finally be able to break through any bureaucratic logjam that maintains the status quo."  *NWF v. NMFS*, 184 F. Supp. 3d 861, 947-48 (D. Or. 2016).

### A.    The Action Agencies' formulation of the Purpose and Need Statement for the Proposed Action is arbitrary and capricious.

90.    The underlying purpose and need for the environmental analysis performed under NEPA is set forth in the Purpose and Need Statement developed by the action agency.  *See* 40 CFR § 1502.13 (2019).  Importantly, the Purpose and Need Statement drives and limits the choice of alternatives.  Here, the Action Agencies framed "[t]he ongoing action that requires evaluation under NEPA" as "the long-term coordinated operation and management of the CRS projects for the multiple purposes" of "flood risk management (FRM), navigation, hydropower production, irrigation, fish and wildlife conservation, recreation, and municipal and industrial (M&I) water supply."  EIS at 1-2, 1-4.

91.    The Action Agencies explain that "[a]n underlying need to which the co-lead agencies are responding, is to review and update the management of the CRS, including evaluating measures to avoid, offset, or minimize impacts to resources affected by managing the CRS in the context of new information and changed conditions in the Columbia River Basin since the SOR EIS was released."  EIS at 1-4.  The Purpose and Need Statement then lists eight "resources purposes"—including power supply, water supply for irrigation, and recreation.  The

Page 43 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF
33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Action Agencies explain that the purpose of the NEPA review is to identify a "flexible approach" to meeting these eight resource purposes.

92. These eight resource purposes are focused on meeting the currently authorized statutory uses of the CRS dams, especially those with economic effects on status quo river users; only one of the eight resource purposes is focused exclusively on conservation of fish and wildlife resources, including threatened and endangered species. This contravenes the purpose of the Court-ordered NEPA process: that the Action Agencies identify and consider opportunities for the CRSO to avoid or minimize environmental harm, including actions to protect the rapidly vanishing Columbia and Snake River salmon and steelhead populations that have been at the center of this controversy for nearly three decades.

93. This framing of the purpose and need for the proposed action contravenes the point of NEPA; namely that federal agencies to take a "hard look" at *environmental consequences* of their proposed actions in the EIS, *see* 42 U.S.C. § 4332. The fundamental purpose of an EIS is to "promote efforts which will prevent or eliminate damage to the *environment* and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (emphasis added). "Economic and social effects" are only considered when they are "interrelated" with "natural or physical environmental effects." 40 C.F.R. § 1508.14 (2019). Economic and social effects do not alone trigger NEPA. Yet the asserted effects on economic interests drive the focus of the analysis in the CRSO EIS and guide the choice among a limited set of alternatives. Contrary to the requirements of NEPA, the inadequate and incomplete discussion of environmental impacts takes a back seat to the analysis of whether modified operations will meet the economic resource purposes of the CRSO EIS.

94. The limited scope of the EIS is arbitrary and capricious and not in accordance with law in that many of the alternatives analyzed are wholly unrelated to operating the system in a manner that addresses the legal obligation of the Action Agencies to operate the CRS in a manner that promotes the survival and recovery of ESA-listed species, and avoids the adverse

Page 44 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
        DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

destruction of their habitat—the very purpose for which the Court ordered the Action Agencies to prepare an EIS.  By framing the purpose and need for the proposed action as the evaluation of measures to avoid, offset, or minimize impacts to a list of resources purposes dominated by economic factors, the purpose and need statement defines its objectives in unreasonably narrow terms.  The scope of the Action Agencies' evaluation of the CRSO for all its authorized purposes comes at the expense of a thorough, searching, hard-look at reasonable alternatives for CRSO operations that avoid jeopardy to listed species and adverse modification of critical habitat.

95.     Although an agency may discuss an alternative in light of its statutory missions (or even economic considerations), the Action Agencies' decision to tie the purpose and need statement to the fulfillment of current statutory authorizations is arbitrary and capricious in this case and not in accordance with law.  The Action Agencies effectively precluded the potential selection of a reasonable alternative that maximizes benefits to the anadromous fish by having its purpose and need statement focus on carrying out its existing statutory authorizations, in violation of NEPA and contrary to this Court's order.  *See* 40 CFR 1502.14(c) (2019); *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 876 ("One of the benefits of a comprehensive environmental impact statement, which requires that all reasonable alternatives be analyzed and evaluated, is that it may be able to break through any logjam that simply maintains the precarious status quo. A comprehensive environmental impact statement may allow, even encourage, new and innovative solutions to be developed, discussed, and considered.").  The EIS fails entirely to consider an important aspect of the problem: operating the CRS in a manner that will avoid extinction of ESA-listed-fish species and promote their survival and recovery.

**B.    The range of alternatives and evaluation of alternatives violate NEPA and the APA.**

96.     The CRSO EIS violates NEPA because the range of alternatives evaluated is unnecessarily restrictive and includes multiple inconsistent objectives within each alternative. Early in the Draft EIS process, the Action Agencies identified a suite of structural and operational measures, some of which would likely benefit anadromous fish survival and some of

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

which would likely decrease anadromous fish survival.  The Action Agency then selected and reassembled a subset of these measures into four "multiple objective" alternatives ("MOs") without conducting or presenting any quantitative or qualitative modeling or other meaningful analyses of the individual measures.

97.     The EIS defines the "no-action" alternative as the continued implementation of the RPAs from the unlawful 2014 BiOp.  *See* CRSO EIS at 2-6 to 2-37.  The EIS does not acknowledge or explain that the Court found this suite of actions illegal.  Nonetheless, the EIS uses this illegal operation as the baseline against which it compares the net effects of each of the "multiple objective alternatives" it considers.  These "multiple objective alternatives" include:

- Multiple Objective 1 ("MO1"), a suite of measures that differ from the no action alternative by including a block spill operation for salmon and steelhead;

- Multiple Objective 2 ("MO2"), a suite of measures that prioritizes maximizing power generation at the expense of salmon and steelhead survival;

- Multiple Objective 3 ("MO3"), a suite of measures that include breach of the four federal dams on the lower Snake River as well as other measures, some of which would degrade salmon and steelhead survival thereby constraining the ecological benefits gained from the multiple objective; and,

- Multiple Objective 4 ("MO4"), a suite of measures that include increased spring and summer spill at the lower Snake and lower Columbia River dams along with other measures, some of which would harm migrating salmon and steelhead.

*See generally* CRSO EIS, Chpts. 2 & 3.

98.     The federal agencies' evaluation of alternatives must allow for "informed decision-making and informed public participation."  *Calif. v. Block*, 690 F.2d 753, 767 (9th Cir.1982).  The EIS prepared by the Action Agencies fails to meet this legal requirement.

99.     Each multiple objective alternative is comprised of complex combinations of individual measures with different objectives and differing impacts on the human environment.  Many of those objectives and impacts are oppositional, thereby obfuscating the positive and negative impacts of the individual measures on the environment.  The decision to group measures into multiple objectives makes it impossible to discern the environmental impacts of

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

key measures in comparative form.  The decision to analyze the net environmental impacts of a suite of measures—as opposed to the environmental impacts of individual measures—serves to mask the nature, magnitude, and duration of the effects of individual measures on anadromous fish survival and precludes a direct comparison of the consequences of key individual measures. Under this approach, it is not possible to separate the true impact of a measure being considered from the potentially moderating effect of another measure.  Therefore, the Action Agencies' decision to only consider and compare the overall effects of each multiple objective alternative prevents informed decision-making and informed public participation.

100.     In Judge Simon's Opinion ordering the Action Agencies to comply with NEPA, the Court repeatedly emphasized that the goal of the EIS is to force the consideration of environmental impacts in the decision-making process.  For example, the Court emphasized that "the option of breaching, bypassing, or even removing a dam may be considered more financially prudent and environmentally effective than spending hundreds of millions of dollars more on uncertain habitat restoration and other alternative actions." *NWF v. NMFS*, 184 F. Supp. 3d 861, 875-76 (D. Or. 2016).

101.     The EIS violates NEPA because it fails to analyze a reasonable alternative, namely: an anadromous-fish focused alternative without additional measures that detract from its environmental benefits.  *See NWF v. NMFS*, 184 F. Supp. 3d at 947-48 ("One of the benefits of a NEPA analysis, which requires that *all* reasonable alternatives be analyzed, is that it allows innovative solutions to be considered and may finally be able to break through any bureaucratic logjam that maintains the status quo." (Emphasis added)).  Oregon identified one potential anadromous-fish focused alternative in its comments on the Draft EIS, but the Action Agencies declined to evaluate it.  The range of alternatives the Action Agencies present in the EIS violates NEPA, and an agency's failure to consider a reasonable alternative is fatal to the sufficiency of an EIS.  *See* 40 C.F.R. § 1502.14 (2019); *Idaho Conservation League*, 956 F.2d at 1519.

Page 47 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
           DECLARATORY AND INJUNCTIVE RELIEF
       33212149

                          Department of Justice
                          100 SW Market Street
                          Portland, OR 97201
                      (971) 673-1880 / Fax: (971) 673-5000

102.    Although MO3 is putatively built around breach of the four federal dams on the Lower Snake River, the Action Agencies included individual measures in MO3 that obscure the actual beneficial environmental impacts—including impacts to anadromous fish species and water quality—of "the option of breaching, bypassing, or even removing a dam," as the Court urged. The EIS' failure to consider or meaningfully evaluate an alternative that maximizes benefits to anadromous fish, without measures that dilute its environmental effects, violates NEPA. The purposes of NEPA to inform the public and decisionmakers of environmentally preferable alternatives to the proposed action was subverted.

103.    Action Agencies provide no justification for why an anadromous-fish-focused alternative consistent with this Court's order is either infeasible or impracticable. The range of alternatives presented in the EIS is insufficient to permit a reasoned choice given relevant facts and the Court order. The anadromous-fish-focused alternative is significantly different from the alternatives considered in the EIS and that alternative does not have similar environmental consequences to those considered.

**C.    The EIS fails to ensure professional integrity of the discussion and analyses.**

104.    NEPA requires that the Action Agencies use "high quality" information and accurate scientific analysis to ensure "professional integrity, including scientific integrity, of the discussions and analyses" within an EIS. 40 C.F.R. §§ 1500.1(b), 1502.24 (2019). The EIS is replete with examples of errors and deficient or misleading analysis which compromise the scientific integrity of the analysis and lead to inaccurate conclusions. Examples include:

    a.    Power analysis:

        i.    The EIS attempts to analyze the overall reliability of the regional power system, including the potential for future coal plant retirements; those issues are significantly broader in scope than the EIS and require a more robust regional analysis in appropriate venues (e.g., Northwest Power and Conservation Council and the Northwest Power Pool) to fully evaluate potential reliability impacts.

Page 48 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF
          33212149

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

      ii.      The EIS' identification of estimated costs for potential power replacement resources does not accurately reflect the rapid changes in technology costs. The EIS' estimated costs are likely significantly higher than actual costs will be. Reliable forecasts from the National Renewable Energy Laboratory show that the projected future capital costs of solar power could be approximately 60% lower than the low estimate used in the EIS.

      iii.     The EIS' overestimation of replacement costs is compounded by the fact that the evaluation of MO3 assumes breaching all four Lower Snake River Dams will occur in 2022, which by the Action Agencies' own description is not feasible. This assumption creates an impossible timeline and artificially elevates the costs to replace power from the four Lower Snake River Dams. The price of clean energy technology is expected to continue to decline, but the EIS arbitrarily bases its evaluation on the estimated costs in 2022. Evaluating replacement resources over a more reasonable and realistic timeframe would likely result in lower, and more accurate, costs by incorporating the projections of future lower costs of low-carbon energy resources.

      iv.     The EIS failed to consider methods of portfolio optimization to identify a combination of complementary power resources to replace a reduction in output from the CRSO. Such an analysis should include portfolios consisting of combinations of targeted energy efficiency investments, demand response measures, storage, and renewable generation technologies. Therefore, even the most economical assessments in the EIS likely represent a misleading overestimate.

  b.     Water quality analysis:

      i.       The water quality analysis in the EIS focused solely on daily maximum temperatures, which do not adequately inform environmental consequences. The water quality analysis should have considered: (1) the full range of daily water temperature fluctuations across alternatives; (2) the water temperature benefits likely to occur under MO3, particularly as they relate to the enhanced ability for summer cold water releases from Dworshak Reservoir and restoration of ecological functions; (3) water temperature benefits under MO3 could result from less solar heat accumulation; (4) water temperature impairments resulting from increased reservoir forebay elevations, increased reservoir surface areas, and decreased water travel times; (5) opportunities to use cooler water from reservoir depth to reduce fish ladder water temperatures; and (6) mitigation efforts that could be employed during drought or low water years to prevent fish kills.

      ii.     In evaluating MO3, the EIS fails to provide clear, accurate conclusions regarding impacts to water temperature associated with reduced water travel time and faster flow rates.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

c.    Climate change analysis:

    i.    The EIS misrepresents the impacts of climate change on anadromous species (which have evolved to need cold water habitats) and does not identify measures to avoid and mitigate the impacts. The EIS notes that future conditions will include reduced snowpack, increased water temperatures and reduced summer discharges; it fails, however, to integrate these impacts into the analysis of the affected environment and environmental consequences, and does not consider the impacts to fish from extreme temperature exceedances and/or prolonged exposure to less-extreme temperature exceedances.

    ii.    The EIS acknowledges that water temperatures have already reached "lethal limits" for some listed species. Thus, even minor increases in thermal exposure put some populations above lethal limits. The EIS fails to consider that any alternative that does not include measures to mitigate excessive water temperatures will have lethal or sub-lethal effects on anadromous salmonids.

    iii.    The EIS does not contain a plan for mitigation of thermal emergencies such as the extremely high water temperatures that resulted in fish kills during the summer of 2015. Such thermal emergencies are predicted to become more common in the future due to increasing climate change impacts.

    iv.    The EIS's analysis of the socioeconomic impacts of climate change is faulty in that it focuses on power reliability and replacement costs under MO3 and MO4, but fails to provide an equal analysis of the impacts of climate change on salmonid survival and the resulting impact on cultural and socioeconomic resources.

d.    Socioeconomic analysis:

    i.    The EIS did not include a socioeconomic analysis of recreational fisheries, and includes an inequitable economic analysis of commercial and tribal fisheries that greatly undervalues them. Given the significant contributions of commercial, recreational and tribal fisheries to regional economies, a fishery-specific economic analysis should be given equal weight with other commodity-specific analyses in the EIS.

    ii.    The Action Agencies failed to employ widely accepted professional economic standards that would produce a thorough, objective, and transparent evaluation of alternatives.

    iii.    There are severe, systemic gaps in the socioeconomic analyses of the EIS that inaccurately represent regional effects of alternatives with respect to recreational, commercial and tribal fisheries in a manner that prevents reasoned decision-making. Specifically, the EIS fails to: (1) Make use of all the relevant and reliable socioeconomic information; (2) Make a

substantive and objective effort to evaluate all the socioeconomic issues relevant to the actions considered; (3) Account fully for the socioeconomic importance of ecosystems; (4) Consider equally both monetized and non-monetized effects; (5) Provide full transparency to the decision-making process, to enable the public and decisionmakers to understand the social and economic factors that contributed to the preferred alternative.

e.      Scientific analysis:

i.      High quality scientific information was often caveated or discounted in favor of less reliable information.  For example, the EIS used two quantitative modeling approaches to predict survival benefits or decrements across alternatives: (1), the Northwest Fisheries Science Center's (NWFSC) Comprehensive Passage (COMPASS) and Life-cycle models and, (2), the Comparative Survival Study's (CSS) Cohort and Life-cycle models (CRSO-84, CSS Annual Report 2017).  Despite the fact that both approaches have been scrutinized extensively under peer review, the discussion and summarization of the results of the two models are presented in a biased manner including, but not limited to: (1) Model results between models (e.g., NWFSC and CSS) are not given fair and equitable weight when drawing conclusions; (2) CSS model results are presented with misleading and unnecessary qualifier statements while output from NWFSC models are represented as fact with no qualification and little meaningful discussion of assumptions; (3) Fish modeling results are presented in a biased manner, use unnecessarily charged language, and are generally not presented in a fair and transparent manner particularly when modeling results differ between models.

ii.     The EIS relies on a "TDG Tool," to quantify exposure to total dissolved gas and its relationship to mortality.  This model has not been peer-reviewed, model parameters are often based solely on studies conducted decades ago, and the model is highly dependent on uncertain parameter assumptions.  Nonetheless, the EIS relies on the estimates produced by this model to inform decisions, while failing to consider in any meaningful way empirical field observations of TDG impacts to fish migrating through the area collected over two decades.

iii.    The EIS arbitrarily and incorrectly fails to acknowledge that only Congress is and would be responsible for decisions associated with the continuation of the Lower Snake River Compensation Plan hatcheries and the important benefits these hatcheries provide for non-Indian and tribal fisheries and rural economies.  The EIS arbitrarily and incorrectly asserts that implementation of MO3 will mean immediate discontinuation of the Lower Snake River Compensation Plan hatchery releases when the impacts of the Lower Snake River dams—accumulating over a period of nearly sixty years—will continue to occur for a significant period of time after the dams are breached; the Action Agencies then rely on these flawed premises to argue that a reduction in the number of hatchery fish with the implementation of MO3 will create a survival decrement for naturally produced Snake River salmonids.  There are multiple flaws in this argument, making it misleading and incomplete.

Page 51 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
            DECLARATORY AND INJUNCTIVE RELIEF
            33212149

E.      **The EIS fails to identify and adequately analyze mitigation.**

105.    NEPA requires the Action Agencies to analyze and discuss possible mitigation measures, 40 C.F.R. § § 1502.14(f), 1502.16(h) (2019), since "[w]ithout such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside of the jurisdiction of the lead agency or the cooperating agencies …." Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981), Question 19b.

106.    The Action Agencies failed to engage in a "reasonably complete discussion of possible mitigation measures," especially with respect to mitigation necessary to address harm to listed species, as required by NEPA. *Id*. The EIS merely lists potential mitigation without information, discussion or analysis of the effectiveness of mitigation measures. Where, as here, proposed mitigation measures are unenforceable and lack monitoring commitments or sufficient resources to assure performance, the Action Agencies have no reasonable basis to conclude that such measures will effectively reduce adverse environmental impacts of the CRSO.

107.    Specific areas where the need for mitigation is apparent include:

a.      Potential for lowered reservoir elevations that may impact intakes of surface water diversions and wells;

b.      Impacts on water rights issued but under development;

c.      Identification of best management practices that could be implemented to mitigate sediment discharges to reduce the short-term impacts associated with dam-breaching;

d.      Identification of ways to mitigate the costs to the power sector associated with dam-breaching;

e.      Identification of cost mitigation efforts for BPA customers, including equitable allocation of costs across the region, to achieve non-power objectives of the EIS.

Page 52 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
           DECLARATORY AND INJUNCTIVE RELIEF
           33212149

                        Department of Justice
                        100 SW Market Street
                        Portland, OR 97201
                 (971) 673-1880 / Fax: (971) 673-5000

108.    Oregon's Department of Fish and Wildlife, a cooperating agency in NEPA process, repeatedly recommended a list of 36 mitigation measures to avoid, minimize, rectify, reduce, or compensate for environmental impacts to anadromous fish from the proposed CRSO structural and operational measures.  None of those mitigation recommendations appear as new mitigation measures in the EIS.  The lack of such mitigation measures demonstrates that the Action Agencies failed to fairly evaluate the environmental consequences of the proposed action and alternatives.

**F.    The Preferred Alternative[6] suffers from critical defects, erroneous justifications, and arbitrary conclusions.**

109.    The EIS fails to accurately analyze the likely environmental impacts of the Preferred Alternative and lacks the transparent and coherent analysis required by NEPA and the APA.

110.    The Action Agencies do not select any of the four MOs as the preferred alternative because they conclude that none of the MOs meet the economic resource purposes set forth in the EIS.  Instead, they select a combination of individual measures from the multiple objective alternatives as the Preferred Alternative without any analysis to determine why this grouping of measures is preferred.  The primary difference between the preferred alternative and MO3 is the elimination of dam removal and its replacement with spring spill operations from the 2019 Flexible Spill Agreement (albeit with additional measures detrimental to fish)—at least for the spring of 2021.  The Action Agencies thereby violated NEPA in at least the following ways:

    a.    As described above, *see supra* ¶¶ 99, 102, the EIS fails to analyze the environmental effects of these individual measures and, instead, evaluated only the net effect of the all the individual measures when combined into a multi-objective alternative.  It is arbitrary and capricious to conclude that the Selected

---

[6] The Preferred Alternative identified in the EIS was selected as the Selected Alternative in the ROD.  This Complaint refers to Selected Alternative and Preferred Alternative interchangeably.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Alternative falls within the range of alternatives analyzed in the EIS because the EIS fails to analyze the environmental effects of the individual measures in the Selected Alternative, nor the net effect of this combination of measures on the environment.

b.   Instead of using the NEPA process to consider "innovative solutions …to break through the bureaucratic logjam," *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 87, the Action Agencies instead reverse engineered a Preferred Alternative that is, effectively, what the Action Agencies had already agreed to do in the Flexible Spill Agreement with some rollbacks to fish protections.  The Preferred Alternative was not evaluated by the technical review teams prior to its selection; it was assembled after-the-fact without the benefit of a comprehensive review.

111.    The Selected Alternative does not meet the Purpose and Need for the proposed action.  The Purpose and Need Statement includes language from the Opinion and Order issued by this Court in 2016 requiring that the EIS "evaluate how to insure that the prospective management of the System is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of designated critical habitat, including evaluating mitigation measures to address impacts to listed species." However, both modeling approaches predict that the Selected Alternative will fall short of the rate of adult returns likely necessary for recovery or to avoid generational decreases in abundance.  Moreover, the structural measures identified in the Selected Alternative will have an overall adverse impact on salmonid survival as compared to the No Action Alternative, and only one of the seventeen operational measures in the Selected Alternative is likely to benefit survival of salmonids as compared to the No Action Alternative.

112.    There is a fundamental disconnect between the putative time period of analysis in the EIS (25 years) and the length of the defined operation in the Preferred Alternative (one year). Beyond the first year, operations will be determined based on undefined adaptive management

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

"opportunities." The EIS provides no description of what these opportunities might be and no adaptive management scenarios are identified or analyzed in the EIS. Thus, it is unclear what assumptions the Action Agencies made in evaluating the environmental effects of the Preferred Alternative over 25 years.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### NMFS VIOLATIONS OF THE ESA AND APA

113.    The State of Oregon incorporates by reference all preceding paragraphs.

114.    NMFS has violated the requirements of ESA Section 7 and its implementing regulations by arbitrarily, capriciously and without any rational basis concluding in the 2020 BiOp that the proposed action of the Corps, BPA and BOR is not likely to jeopardize any listed species or destroy or adversely modify their critical habitat and not likely to adversely affect SRKW, and by issuing a biological opinion that is otherwise not in accordance with law. The defects in the 2020 BiOp are set forth above and incorporated herein. In addition, to the extent that NMFS relies in the 2020 BiOp on the recently revised ESA consultation regulations, those regulations are arbitrary and contrary to law as applied in this case. The conclusions of the 2020 BiOp, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and are reviewable under the APA, 5 U.S.C. §§ 701-706.

### SECOND CLAIM FOR RELIEF

### CORPS AND BOR VIOLATIONS OF SECTION 7 OF THE ESA AND APA

115.    The State of Oregon incorporates by reference all preceding paragraphs.

116.    The Corps and BOR have an independent and continuing legal duty to comply with the substantive requirements of ESA section 7(a)(2) to avoid jeopardy and adverse modification of critical habitat without regard to whether they have received a biological opinion for their actions. Indeed, the Corps and BOR may not meet their duty to comply with § 7 by relying on an invalid opinion. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993),

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*as amended on denial of reh'g* (July 5, 1994); *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984). For the reasons described above, the Corps' and BOR's reliance on the 2020 BiOp in the 2020 ROD and through their other actions is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and is reviewable under the APA, 5 U.S.C. §§ 701-706.

117.    In addition to their reliance on the invalid 2020 BiOp, which incorporates each and every one of the legal violations committed by NMFS as described above, the Corps and BOR's actions and omissions are arbitrary and capricious and in violation of the ESA for at least the following additional reasons:

a.    The Corps and BOR have not obtained a valid, complete § 7(a)(2) consultation for operation of their projects and have not evaluated, proposed or implemented further protective measures for ESA-listed salmon and steelhead in order to avoid jeopardy and destruction and adverse modification of critical habitat;

b.    The ESA requires the Corps and BOR to operate their projects in a manner that avoids harm to listed species pending compliance with the procedural requirements of § 7(a)(2). The Corps and BOR have not developed any analysis of their own to establish that their actions comply with the requirements of ESA § 7(a)(2). *See* 16 U.S.C. § 1536(a)(2); *see also Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1242 (N.D. Cal. 2001);

c.    BOR and the Corps are violating ESA § 7(d), 16 U.S.C. § 1536(d), by taking actions that may foreclose implementation of measures required to avoid jeopardy, and the requirements of ESA Section 7(a)(1), *id.* § 1536(a)(1), by failing to utilize their authorities for the conservation of threatened and endangered species.

118.    Because the Corps and BOR have not obtained a valid, complete consultation, or taken any other appropriate steps to ensure that their operations will not harm or conserve ESA-listed species, the Corps' and BOR's are operating their projects in violation of § 7(a)(1) and (2) of the ESA, 16 U.S.C. § 1536(a)(1),(2), and its implementing regulations and § 7(d) of the ESA, 16 U.S.C. § 1536(d).

119.    In addition, to the extent the Corps and BOR rely on the recently revised ESA consultation regulations to conclude that their actions comply with the ESA, those regulations are arbitrary and contrary to law as applied in this case.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

120.    BOR and the Corps' project operations and 2020 ROD are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the ESA, 16 U.S.C. § 1540(g)(1) and the APA, 5 U.S.C. §§ 701-706.

### THIRD CLAIM FOR RELIEF

### THE CORP AND BOR VIOLATIONS OF NEPA AND APA

121.    The State of Oregon incorporates by reference all preceding paragraphs.

122.    NEPA requires federal agencies to prepare an EIS in connection with all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The CRSO EIS fails to comply with the requirements of NEPA, its implementing regulations, and the relevant case law for reasons including, but not limited to, those described in the foregoing paragraphs of this supplemental complaint.

123.    By their actions and inactions as alleged above, the Corps and BOR are currently violating the NEPA and its implementing regulations. The Corps' and BOR's actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

### FOURTH CLAIM FOR RELIEF

### THE CORP AND BOR VIOLATIONS OF SECTION 9 OF THE ESA

124.    The State of Oregon incorporates by reference all preceding paragraphs.

125.    By their actions and inactions alleged above, and as admitted by NMFS in the 2020 BiOp, the Corps and BOR are currently taking, and unless enjoined will continue to take, ESA-listed salmon and steelhead. The ITS issued as part of the invalid 2020 BiOp does not exempt the Corps and BOR from liability for this take.

126.    By their actions and inactions alleged above, the Corps and BOR are violating Section 9 of the ESA, 16 U.S.C. §§ 1538(a)(1)(B) & (G), 1538(g), and the salmon 4(d) rule, 50 C.F.R. § 223.203(a).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## X.    PRAYER FOR RELIEF

WHEREFORE, the State of Oregon respectfully requests that the court:

1.    Adjudge and declare that NMFS has violated ESA Section 7 and its implementing regulations in the 2020 BiOp by making a no-jeopardy/no-adverse modification finding, and findings concurring in a not likely to adversely affect determination, that are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and by issuing an incidental take statement that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

2.    Vacate and set aside the 2020 BiOp and the accompanying incidental take statement and permits and enjoin NMFS to notify BOR and the Corps of these actions;

3.    Adjudge and declare that BOR and the Corps have violated ESA Section 7(a)(1), 7(a)(2), 7(d) and implementing regulations by: continuing to operate their projects in the Columbia and Snake River basins without a valid biological opinion; failing to ensure that these projects avoid jeopardy and adverse modification or destruction of critical habitat; failing to utilize their authorities to conserve threatened and endangered species; and making irretrievable and irreversible commitments of resources before the conclusion of a valid consultation;

4.    Adjudge and declare that BOR and the Corps have violated ESA Section 7(a)(2) and its implementing regulations by continuing to operate their Columbia and Snake River projects without initiating and completing formal consultation with NMFS on the effects of these projects and their operations on endangered Southern Resident killer whales and without ensuring that those operations will not jeopardize the survival and recovery of this species;

5.    Order BOR and the Corps to consult with NMFS pursuant to Section 7(a)(2) of the ESA on the effects of their project operations on Southern Resident killer whales and ensure, based on that consultation, that any actions will not jeopardize the survival and recovery of this endangered species;

Page 58 -  OREGON'S FIFTH SUPPLEMENTAL COMPLAINT-IN-INTERVENTION FOR
          DECLARATORY AND INJUNCTIVE RELIEF
          33212149

6.      Adjudge and declare that the Corps and BOR have violated ESA Section 9, 16 U.S.C. §§ 1538(a)(1)(B), (a)(1)(G), & (g), and the ESA implementing regulations by taking endangered salmon and steelhead without a valid incidental take statement;

7.      Adjudge and declare that the ESA Rules are unlawful as applied in the 2020 BiOp;

8.      Adjudge and declare that BOR and the Corps have violated NEPA by failing to prepare an environmental impact statement that complies with the requirements of NEPA and its implementing regulations;

9.      Vacate the 2020 ROD and remand the CRSO EIS to the Corps and BOR;

10.     Grant such preliminary and permanent injunctive relief as Oregon may request and as may be necessary to protect the ESA-listed species until the court decides the merits of this case or the agency complies with the law;

11.     Award costs associated with this litigation; and

12.     Grant such further and additional relief as the Court may deem just and proper.

DATED March  3, 2021.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

     s/ Nina R. Englander
NINA R. ENGLANDER #106119
Assistant Attorney General
DEANNA J. CHANG #192202
Senior Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
nina.englander@doj.state.or.us
deanna.j.chang@doj.state.or.us
Of Attorneys for State of Oregon

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000