David J. Cummings, OSB #922695
djc@nezperce.org
Geoffrey M. Whiting, OSB #954547
gwhiting@gmwnezperce.com
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, ID  83540
(208) 843-7355 | Phone
(208) 843-7377 | Fax

*Attorneys for the Nez Perce Tribe*

THE HONORABLE MICHAEL H. SIMON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, et al.,

Plaintiffs,

and

STATE OF OREGON,

Intervenor-Plaintiff,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

Defendants.

Civ. No. 3:01-cv-00640-SI

NEZ PERCE TRIBE'S
MEMORANDUM IN SUPPORT
OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION

TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………..1

BACKGROUND………………………………………………………………………2

STANDARD OF REVIEW……………………………………………………………7

ARGUMENT…………………………………………………………………………..7

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
      CLAIMS AGAINST THE 2020 BIOP AND 2020 ROD…………………………8

   A. THE 2020 BIOP'S JEOPARDY ANALYSIS AND STANDARD ARE
      UNLAWFUL………………………………………………………….......................8

      1.  The 2020 BiOp retreats to a jeopardy analysis and standard that are contrary
          to the repeated decisions of this case…………………………………………….8

      2.  The 2020 BiOp contradicts NMFS II, NMFS III, and NMFS V by offering no
          meaningful analysis of recovery risks at all……………………………….…12

      3.  The 2020 BiOp contradicts NMFS V by failing to apply climate change
          effects within an aggregated jeopardy analysis……………………….….…14

   B. THE 2020 BIOP AGAIN IRRATIONALLY RELIES ON HABITAT
      IMPROVEMENT TO DO DOUBLE DUTY IN BOTH AVOIDING JEOPARDY
      FROM CRS DAM OPERATIONS AND MITIGATING THE EFFECTS OF
      CLIMATE CHANGE……………………………………………………………16

   C. THE 2020 BIOP DOES NOT RATIONALLY EXPLAIN HOW THE EXISTING
      LEVEL OF HABITAT RESTORATION, NOW PROPOSED FOR 15 YEARS
      AND MEASURED BY HABITAT ACTIVITY TYPE FOR MPGS WITHOUT
      IDENTIFIED ACTIONS AND WITH ADMITTED UNCERTAINTY, MEETS
      THE ESTABLISHED APA AND ESA REQUIREMENTS OF THIS CASE….22

II.   PLAINTIFFS' REQUESTED PRELIMINARY RELIEF IS NECESSARY TO
      REDUCE IRREPARABLE HARM TO THE LISTED SPECIES………………31

CONCLUSION………………………………………………………………………..34

i

TABLE OF AUTHORITIES

CASES

Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.,
  175 F.3d 1156 (9th Cir. 1999) ……………………………......................10, 11

Idaho Dept. of Fish & Game v. National Marine Fisheries Service,
  850 F. Supp. 886 (D. Or. 1994)………………………………………………11, 31

National Wildlife Federation v. National Marine Fisheries Service,
  254 F. Supp. 2d 1196 (D. Or. 2003)…………………………………………………3

National Wildlife Federation v. National Marine Fisheries Service,
  2005 WL 1278878 (D. Or. 2005), aff'd, 524 F.3d 917……………………................3

National Wildlife Federation v. National Marine Fisheries Service,
  524 F.3d 917 (9th Cir. 2008)………… ………………………………….........passim

National Wildlife Federation v. National Marine Fisheries Service,
  839 F. Supp. 2d 1117 (D. Or. 2011)…………………………………………………3

National Wildlife Federation v. National Marine Fisheries Service,
  184 F. Supp. 3d 861 (D. Or. 2016)… ……………………………….........passim

Pacific Coast Fed'n of Fisherman's Ass'ns v. NMFS,
  265 F.3d 1028 (9th Cir. 2001)………………………………………….……10

Sierra Club v. Marsh,
  816 F.2d 1376 (9th Cir. 1987)……………………………………..……..……2

TVA v. Hill,
  437 U.S. 153 (1978)……….………………………………………...……….2

REGULATIONS

50 C.F.R. § 402.02……………………………………………………….........9, 10

50 C.F.R. § 402.14……………………………………………………….........9, 10

# INTRODUCTION

*Ki hiwes nunim howtin waqiswiitine oykala hiwes ke kuus wetes hiwcetetu pel'leyheype.
Oykala ke hipimtetu pike weteskinix̄ ka pen'nex̄sep waqiswit hiwsiix̄ nunim mickuynekt.
Kus wecen hiwes toosx̄ nunim kuus ka hiwciix̄ lepitipx̄ tukewtelikin eetqo kuuspelu etke
kuuspeme hiwsiix̄.  Kalo'.*

[According to our spiritual way of life, everything is based on nature.
Anything that grows or lives is part of our spiritual life.
The most important element we have in our way of life is water.
The next most important element is the fish because the fish comes from water.]

*Isluumc*, Horace Axtell (1924 - 2015), Nez Perce elder, September 2008.

The Nez Perce Tribe (Tribe) respectfully submits this memorandum in support of

the motions for preliminary injunction of National Wildlife Federation, et al. (NWF) and

the State of Oregon (Oregon) (Plaintiffs, when referenced together) against the U.S.

Army Corps of Engineers (the Corps).

The case requires a restatement of interests and positions. The Tribe is deeply

committed to rebuilding Columbia and Snake River salmon runs to healthy, harvestable

levels and fairly sharing the conservation burden. Of the Snake River species, sockeye

are listed as endangered under the Endangered Species Act (ESA), and spring/summer

Chinook, fall Chinook, and steelhead are listed as threatened.  The dams on the lower

Snake River and the mainstem Columbia have had enormous impacts on salmon and

steelhead, and, in turn, on the Nez Perce Tribe and its people.  The Tribe's Reservation,

and many of the Tribe's treaty-reserved fishing places, in addition to those on the

mainstem Columbia, lie above the eight dams on the lower Snake and Columbia rivers.

The Tribe continues to participate in this case for the fundamental reason that the federal agencies' dam operations remain harmful to the continued existence of salmon and steelhead, and NOAA Fisheries (NOAA) continues to produce Columbia River System (CRS) ESA biological opinions (BiOps) in which the demands of river users come first and the survival and recovery needs of endangered and threatened salmon and steelhead come last.  This is unlawful. Both Congress and the U.S. Supreme Court have made clear that the required priority when federal agencies interact with ESA-listed species is that the needs of the species come first.  <u>TVA v. Hill</u>, 437 U.S. 153, 180 (1978).  And NOAA's BiOps continue to place the risks of uncertainty on the listed species – precisely the reverse of what the law requires.  The ESA requires federal agencies to "give the benefit of the doubt" to ESA-listed species.  <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1386 (9th Cir. 1987) (citations omitted).

## BACKGROUND

For the Nez Perce Tribe – for the Nez Perce *people* – the situation that returns to this Court is a disgrace.  Both in the ESA-compliance issues that return – and reveal a cynical strategy by the prior Administration to evade or defy the repeated law of this case – and in the real world river conditions salmon and steelhead now face in the Columbia Basin.  But to be precise: the real world *reservoir conditions* the salmon and steelhead face.  The Snake River is not a natural river – it is a segmented series of slow-moving, warming reservoirs.  So is the mainstem Columbia River.  This is 2021.  The climate-warming world the fish now inhabit has been easily conceivable for at least 15 years.

This was a moment to prepare for, with ESA-prioritized action plans and contingency plans, and most recently – under this Court's 2016 Order – with a National Environmental Policy Act (NEPA)-driven development of innovative alternatives. None of that occurred. Federal Defendants have failed the listed species, and their duties under the ESA and NEPA, in every sense.

The Court in its 2016 Opinion and Order (<u>NMFS V</u>[1]) found and described ESA and NEPA flaws in the 2014 BiOp that were clear and correctable. They were in essence: 1) an unlawful jeopardy standard and analysis, particularly including inadequate recovery risk analysis; 2) uncertain habitat mitigation actions; 3) inadequate climate change considerations; and 4) the absence of NEPA compliance for a Record of Decision (ROD)-adopted BiOp.

The Court established a generous *five-year* remand schedule for Federal Defendants to correct those flaws and comply with integrated ESA and NEPA requirements. NEPA was to play a potentially "logjam-breaking" role – in the words of the Court – for the first time in the history of the case. Five years later we are here again,

---

[1] The Tribe follows the <u>NWF v. NMFS</u> prior-case name approach used by the Court in its 2016 ruling. <u>NWF v. NMFS</u>, 184 F. Supp. 3d 861, 868 n.4 (D. Or. 2016). The 2020 BiOp is the latest NOAA BiOp issued since 1992. NOAA issued BiOps in 2000, 2004, 2008, a supplemental in 2010, and 2014; each was challenged and overturned by the Court as unlawful. <u>NWF v. NMFS</u>, 254 F. Supp. 2d 1196 (D. Or. 2003) (<u>NMFS I</u>) (2000 BiOp); <u>NWF v. NMFS</u>, 2005 WL 1278878 (D. Or. May 26, 2005) (<u>NMFS II</u>) (2004 BiOp), <u>aff'd by NWF v. NMFS</u>, 524 F.3d 917, 924 (9th Cir. 2007) (<u>NMFS III</u>) (2004 BiOp); <u>NWF v. NMFS</u>, 839 F. Supp. 2d 1117 (D. Or. 2011) (<u>NMFS IV</u>) (2008/2010 BiOp). The Court's 2016 Opinion and Order overturning the 2014 BiOp is referred to as <u>NMFS V</u>.

and at every turn Federal Defendants chose to avoid, ignore, or defy every flaw found in NMFS V, and to worsen the situation with a cynical return to standards and methods rejected by Judge Redden in NMFS II and the Ninth Circuit in NMFS III.  The recurring misuse of the repeated remands in this case – especially the waste and loss of precious time – has been taken to a new level: disgrace.

Some of this situation is surely connected to the reality that the regional agencies served most of the last five years under the political direction of an Executive Branch of remarkable ecological hostility and disdain.  But we are here again and the new Administration has not yet publicly acknowledged that the Trump Administration's CRS ESA and NEPA products – that they will now have to defend – were a cynical undercutting of the very ecological and environmental justice principles the new Administration hopes to stand for.

The 2020 CRS BiOp's (2020 BiOp[2]) jeopardy analysis and standard are a pointed rejection of the prior decisions of this case since at least NMFS II and NMFS III.  The "trending toward recovery" standard rejected in NMFS V was in a sense merely a phrase: it had ambivalent value prior to implementation.  But the "trending" growth metrics it then used were – as used – statistically meaningless at best.  They failed to employ abundance data that could have made them meaningful, but would – surely the point of not employing them – almost certainly have revealed that survival and recovery risks

---

[2] The 2020 CRS BiOp is located at NMFS00362178, and is Appendix V part 2 of the CRS Final Environmental Impact Statement, available at https://www.nwd.usace.army.mil/CRSO/Final-EIS/#top (last visited July 16, 2021).

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION                                    4

under the 2014 BiOp were incompatible with a Reasonable and Prudent Alternative (RPA) no-jeopardy conclusion.

Under this Court's NMFS V ruling, the 2014 BiOp's flaws were in theory correctable. The 2020 BiOp corrects nothing. It retreats to a jeopardy analysis and standard rejected 16 years ago: that a BiOp may compare, rather than add, a proposed action to a degraded, harmful environmental baseline – no matter how degraded – and simply conclude that the compared proposed action will be no worse. In habitat mitigation, the 2020 BiOp corrects nothing: it continues to rely on unspecified and uncertain habitat actions to justify assumed survival benefits, and again irrationally relies on habitat improvement to do double-duty in both avoiding jeopardy from CRS operations and mitigating for the effects of climate change. And climate change risks continue to be, even if finally recognized, marginalized and unaggregated – "[t]hese climate change consequences are not caused by the proposed action . . . ." BiOp at 289; see Section I(A)(3) below. The unfortunate punch line is that the 2020 BiOp extends the ESA-coverage duration from all prior (unlawful) CRS BiOps to *15 years.*

It is important to understand that the 2020 BiOp's proposed action is the Preferred Alternative of the 2020 CRS Final Environmental Impact Statement (FEIS) – the outcome of the NEPA process ordered by the Court in NMFS V. The Nez Perce Tribe's disappointment in that NEPA process and its results would be hard to overstate. From the start, the Court's NMFS V direction that NEPA compliance be used as an opportunity to develop innovative fish-protective alternatives to a BiOp proposed action – "breaking the

logjam" – was manipulated by the action agencies. They instead began with a NEPA "purpose and need" that barely recognized an ESA-compliance context, and constructed a EIS process instead broadly aimed at the multiple existing CRS purposes and authorities, ensuring that fish-protective considerations, much less innovations, would be diluted and marginalized.

For Columbia Basin tribes, it was ultimately astounding to see that approximately *20 pages* of a 7,000 page FEIS were provided to the analysis of the effects of the CRS on the tribal resources of *the 19 Indian tribes whose reservations and homelands compose the literal geography of the CRS* and who have borne the direct impacts of CRS dam operations for over 80 years. No analysis of effects on tribal treaty rights. Dismissive consideration of Indian Trust Assets. "Tribal Perspective Reports" solicited and obtained from 11 tribes and attached in an appendix, but then only summarized and ignored analytically. Cultural Resources marginalized through minimized reservoir "action areas."[3] Environmental Justice concerns marginalized for the Columbia Basin tribes whose reservations and homelands compose the exact geography of the CRS, while conveniently maximized for "power users" across a for-that-purpose-expanded *seven-state action area of the regional West*.

---

[3] Insult added to injury, the agencies frequently assert their concern that the removal of dams or the drawdown of reservoirs would adversely impact tribal cultural resources through new exposure, when those resources were drowned by the dams and their reservoirs in the first place.

The icing on this indigestible NEPA cake was that the Preferred Alternative was not fully analyzed along with the other four developed alternatives during the "environmental consequences" phase of the EIS (and therefore together with tribal and other governmental cooperating agencies).  Instead, it was disclosed in the fall of 2019, after the four EIS alternatives had been evaluated, as in essence a "none of the above" alternative.  It was to be based on the 2018 Flexible Spill Agreement that had been entered into as an *interim measure*, for the 2019-2021 spill seasons, by Oregon, Washington, the Nez Perce Tribe, the Action Agencies, and BPA, in order to allow the agencies to complete NEPA compliance without renewed ESA litigation – and to propose *something better* through NEPA.  The Tribe had specifically conveyed during 2018 Spill Agreement discussions that given the status and trends of the listed species, the flexible spill operations of the Agreement could be interim only, and would not be acceptable for a longer period of time (such as the 10-year time frame often examined in a CRS BiOp).

The Trump Administration in the meantime had directed that the CRS FEIS, BiOp, and RODs be completed by September 2020 (about one year ahead of this Court's ordered schedule), plainly as a political contingency ahead of the 2020 Presidential Election.  The 2020 BiOp, thus based on the Preferred Alternative, does not even identify spill operations beyond 2021 and leaves operations for the *15 year duration* of the BiOp undefined and uncertain, deferring to an "adaptive management" construct that does not even preclude *reductions* in spill.

It should come as no surprise the Nez Perce Tribe now views this entire process – emanating from the hopeful direction of <u>NMFS V</u> in 2016 – as the loss of precious years of time for the salmon.

## STANDARD OF REVIEW

Plaintiffs NWF and Oregon have accurately stated the standard of review for an ESA-context preliminary injunction.

## ARGUMENT

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS AGAINST THE 2020 BIOP AND 2020 ROD**

A. **THE 2020 BIOP'S JEOPARDY ANALYSIS AND STANDARD ARE UNLAWFUL**

The Nez Perce Tribe supports Plaintiffs' arguments regarding the flaws in the jeopardy analysis and standard of the 2020 CRS BiOp.  The Tribe here intends to briefly offer its perspective.[4]

1. **The 2020 BiOp retreats to a jeopardy analysis and standard that are contrary to the repeated decisions of this case**

It seems clear that at some point in the remand Federal Defendants chose, strategically, to go back and pick a fight with the decisions of this case in <u>NMFS II</u> and <u>NMFS III</u>, and thereby with this Court's ruling in <u>NMFS V</u>.[5]

---

[4]  As with Plaintiffs, the Tribe does not comment at this stage of the case on all of the claims in Plaintiffs' Complaints.

[5]  The Tribe supports the arguments made by Oregon and NWF regarding the Trump Administration's ESA regulation revisions of 2019. As Plaintiffs recognize as well, however, the fundamental jeopardy analysis/standard flaws in the 2020 BiOp are neither allowed nor facilitated by the Trump Administration revisions. The Tribe here

Regardless how the 2020 BiOp tries to label its jeopardy analysis, as a matter of its repeated analytical method the BiOp compares the proposed action – rather than combining or aggregating it – with the degraded, harmful environmental baseline the species experience, and then concludes that the proposed action will be no worse.  See, e.g., BiOp at 46 (overall method), 290 (SR Spring/Summer Chinook).  This comparative approach contradicts the repeated decisions of this case, and the explanations of those decisions are worth recalling.

The Ninth Circuit in NMFS III court affirmed Judge Redden's NMFS II rejection of a comparative jeopardy analysis and stated:

> The district court also properly concluded that the 2004 BiOp impermissibly *failed to incorporate degraded baseline conditions* into its jeopardy analysis. The 2004 BiOp initially evaluated the effects of the proposed action as compared to the reference operation, rather than focusing its analysis on whether the action effects, *when added to the underlying baseline conditions*, would tip the species into jeopardy. Like the district court, we cannot approve NMFS's insistence that it may conduct the bulk of its jeopardy analysis in a vacuum.

---

simply notes that neither the revision to the definition of "effects of the action," nor the distinctly defined "environmental baseline," both in 50 CFR 402.02, nor the additive-analysis descriptions in 50 CFR 402.14(g), allow for a 2020 BiOp jeopardy analysis that violates the decisions of this case in NMFS II and NMFS III by: 1) comparing rather than aggregating a proposed action with a degraded, harmful environmental baseline; and 2) concluding that the compared rather than aggregated proposed action is "not appreciably worse" for the listed species. Nor does any revised inclusion of nondiscretionary actions or activities in the environmental baseline justify the flaws of the 2020 BiOp, since the law of this case since NMFS III is that the *operations* of the CRS dams – beneath broad statutory mandates –are *discretionary* for the action agencies. NMFS III at 928-89. Whether the Trump Administration revisions in their "preamble" or in certain comment responses (plainly) intended a challenge to the decisions of this case in NMFS II and NMFS III merely begs the questions the agencies, or at least the Trump Administration, must have intended to put before this Court now with the 2020 BiOp.

. . .

> Our approach does not require NMFS to include the entire environmental baseline in the ''agency action'' subject to review. It simply requires that NMFS appropriately consider the effects of its actions ''within the context of other existing human activities that impact the listed species.'' *ALCOA,* 175 F.3d at 1162 n. 6 (citing 50 C.F.R. § 402.02's definition of the environmental baseline). This approach is consistent with our instruction (which NMFS does not challenge) that ''[t]he proper baseline analysis is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts.*'' *Pac. Coast Fed'n,* 426 F.3d at 1093 (emphasis added).

NMFS III at 929-30 (first two emphases added).

This Court in <u>NMFS V</u> discussed the decisions of this case rejecting conclusions of no-jeopardy based on finding a proposed action to be "not appreciably worse" than environmental baseline conditions:

> The Ninth Circuit has emphasized the ''highly precarious status'' of the species at issue in this litigation. *NMFS III*, 524 F.3d at 933 (noting that due to the ''highly precarious status'' of the listed populations, ''considering recovery impacts could change the jeopardy analysis''). The court cautioned that the ESA prohibits an agency action from allowing a species to have a ''slow slide into oblivion'' and that agency action may not ''tip a species from a state of precarious survival into a state of likely extinction.'' *Id.* at 930. Here, the listed fish remain in a highly precarious state . . . . In upholding the jeopardy standard applied in NOAA Fisheries' 1995 BiOp, the Ninth Circuit noted:

>> In addition, NMFS correctly viewed incremental improvements as insufficient to avoid jeopardy in light of the already vulnerable status of the listed species. We agree with NMFS that the regulatory definition of jeopardy, *i.e.,* an appreciable reduction in the likelihood of both survival and recovery, 50 C.F.R. § 402.02, does not mean that an action agency can "stay the course" just because doing so has been shown slightly less harmful to the listed species than previous operations. Here, the species already stands on the brink of extinction, and the incremental improvements pale in comparison to the requirements for survival and recovery.

Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin., 175 F.3d 1156, 1162 n.6 (9th Cir. 1999).

Similarly, in rejecting the argument that some improvement in survival necessarily equates to a no jeopardy conclusion when considering NOAA Fisheries' 1993 BiOp, Judge Malcom F. Marsh noted:

> For example, if 100 listed species are expected to survive downstream juvenile migration in 1993, and 99 survived in 1990, [Defendant-Intervenor]'s argument would mandate a ''no jeopardy'' finding—even though a 100 survival level may still be considered so low as to constitute a continued threat to the species' existence.

*IDFG*, 850 F. Supp. at 899.

NMFS V at 890-91.

As a matter on required ESA analytical method, this is not complicated. The repeated decisions of this case, after decades of the listed salmon and steelhead merely hanging on to survival, do not allow for a 2020 BiOp that finds its proposed action that will be no worse for the species that the degraded, harmful environmental baseline in which they exist. And it adds insult to injury to the species to reach that conclusion by comparing the proposed action with an environmental baseline largely composed of prior agency actions that have *never even been part of a lawful BiOp,* given the repeated BiOp rejections of this Court and the Ninth Circuit. For the Tribe, a newly disturbing aspect of the 2020 BiOp's harm-deflecting comparative method is with respect to climate change risks: where the BiOp appears at last to recognize that lethal climate-warming impacts are here and are escalating, but analytically dismisses climate change as "not caused by" the

proposed action, and as a harm that the proposed action will not worsen.  (See Section A.3 below.)

### 2.  The 2020 BiOp contradicts <u>NMFS II</u>, <u>NMFS III</u>, and <u>NMFS V</u> by offering no meaningful analysis of recovery risks at all

The 2020 BiOp's approach to the required recovery prong of a BiOp jeopardy analysis again reveals a decision to retreat and pick a fight with <u>NMFS II</u> and <u>NMFS III</u>, and thereby ignore this Court's findings and ruling in <u>NMFS V</u>.

The "trending toward recovery" standard of the 2008/10/14 BiOps was a phrase with ambivalent value prior to implementation.  Its flaw was not necessarily wording: it was that the "trending" growth metrics then used – as used – were statistically meaningless at best and a deception at worst.  They failed to employ abundance data that could have made them meaningful, but would almost certainly have revealed that survival and recovery risks under the 2014 BiOp were incompatible with an RPA no-jeopardy conclusion.

As the Court found in <u>NMFS V</u>, the 2014 BiOp's incomplete recovery analysis was contrary to the prior decisions of this case.  In <u>NMFS III</u>, the Ninth Circuit had stated:

> The question before us is not whether, on the merits, recovery risks in fact require a jeopardy finding here, but whether, as part of the consultation process, *NMFS must conduct a full analysis of those risks* and their impacts on the listed species' continued existence.  Although recovery impacts alone may not *often* prompt a jeopardy finding, NMFS's analytical omission here may not be dismissed as harmless: the highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis.

524 F.3d at 933 (former emphasis added) (footnote omitted).

This Court in <u>NMFS V</u> explained:

> The ''trending toward recovery'' standard fails to consider the concerns expressed by courts and NOAA Fisheries relating to the dangers of sustained low abundance levels. The standard also does not include any consideration of the actual abundance numbers of the fish, but merely ascertains whether the existing population is growing at any detectable rate. Without a ''full analysis'' of the risks to recovery from whatever amount the population is growing, including proper consideration of the ''highly precarious status'' of the species and the dangers of sustained low abundance, NOAA Fisheries' conclusion that any population that is ''trending toward recovery'' necessarily is not appreciably reducing the species' likelihood of recovery is arbitrary and capricious. The additional cases relied on by Defendants that hold that an action need not boost the chances of recovery are inapposite. The problem with the ''trending toward recovery'' standard is *not that it fails to ensure that the chances of recovery are increased, but that it does not include any metric or goal that considers whether the incremental improvements to the currently low abundance levels are sufficient to avoid creating a ''new risk of harm'' by decreasing the chances of recovery of the listed species.*

<u>NMFS V</u> at 892 (emphasis added).

The 2020 BiOp, rather than correcting the abundance-data failings of the 2014 BiOp, retreats all the way to a posture similar to the 2004 BiOp. Rather than admitting a simple refusal to distinctly consider recovery risks, however, the 2020 BiOp offers the poster-child of conclusory statements in describing its approach:

> This opinion includes both a jeopardy analysis and an adverse modification analysis. The jeopardy analysis relies upon the regulatory definition of "to jeopardize the continued existence of" a listed species, which is "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species" (50 CFR 402.02). *Therefore, the jeopardy analysis considers both survival and recovery of the species.*

2020 BiOp at 93 (emphasis added).

No <u>NMFS III</u> "full analysis" is even pretended; no <u>NMFS V</u> abundance data is employed to consider whether the proposed action will "decrease the chances of recovery of the listed species." No reasoning or "rational connections" are offered: only a statement that "therefore, the jeopardy analysis considers" the recovery of the species. As we near 30 years of the ESA-listing of these species, the 2020 BiOp's refusal to provide a "full analysis" of the recovery risks posed by the proposed action, when properly added to or aggregated with the degraded, harmful environmental baseline, deserves the judicial response it plainly dares: rejection as contrary to the repeated decisions of this case and a gross misuse of the five-year remand provided to the agencies in this case.

3.   **The 2020 BiOp contradicts <u>NMFS V</u> by failing to apply climate change effects within an aggregated jeopardy analysis**

The Nez Perce Tribe is intensely concerned about the current and escalating impacts of climate warming on salmon and steelhead throughout their life cycles, including impacts on freshwater habitat and freshwater life-stages. The Tribe's concerns are informed by leading scientific opinion indicating that climate change will be among the most fundamental influences on the future survival and recovery of salmon and steelhead.

The 2020 BiOp includes climate change as a subsection of the "Rangewide Status" sections for each species, following "Status of the Species" and "Status of Critical Habitat" subsections, with descriptions of "Climate Change Implications." <u>E.g.</u>, 2020 BiOp at 118 (SR Spring/Summer Chinook). What occurs in each instance, and then is

never meaningfully applied through an additive or aggregated jeopardy analysis, is

legally inadequate under the APA and this Court's ruling in NMFS V. The BiOp's

jeopardy conclusions for each listed species, with respect to climate change risks, is

neither rationally connected to facts found nor an aggregated component of the jeopardy

analysis and conclusion.

In NMFS V, this Court summarized defects in climate change consideration in the

2014 BiOp:

> NOAA Fisheries failed properly to evaluate the degree to which climate change
> will cause added harm and reduce the effectiveness of the RPA's mitigation
> measures, the estimated climate impacts after 2018 but within a reasonable time
> period for a meaningful jeopardy analysis, and whether the benefits expected from
> the RPA actions are sufficient in light of that expected added harm and decrease
> in effectiveness of RPA actions. NOAA Fisheries also failed to consider the
> potentially catastrophic impact of climate change. Without these analyses,
> NOAA Fisheries could not rationally conclude that the RPA actions, while
> consistent with the types of actions recommended by ISAB, are sufficient in
> scope and breadth to avoid jeopardy *in light of the harm from the FCRPS with the
> added impacts of climate change*.

NMFS V at 923 (emphasis added).

The 2020 BiOp, among other flaws with respect to climate change, plainly

employs a comparative analytical approach – not additive or aggregated – that violates

the decisions of this case in NMFS II, III, and V:

> Based on the [climate change] modeling, *we expect abundances over the next 24
> years to decrease and extinction risk to increase*, even when taking into account
> the benefits of the proposed non-operational conservation measures and the most
> optimistic hypotheses related to reduced latent mortality. *These climate change
> consequences are not caused by the proposed action*, and elements of the
> proposed action (flexible spring spill operations, tributary and estuary habitat
> restoration and research, monitoring, and evaluation programs) should help to
> improve the resiliency of SR spring/summer Chinook salmon populations to

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION                                                    15

expected climate change effects. *In simple terms, even if the adult abundance declines as predicted under climate change, which will make recovery of this ESU more challenging, it will have declined less as a result of the proposed action* because in many ways the proposed action is expected to improve the functioning of VSP parameters and thus positively contribute to the survival and recovery of the species.

2020 BiOp at 289.

This is legally inadequate. The 2020 BiOp does not correct the defects of the 2014 BiOp with respect to climate change risks. It is simply more assertive, as with other aspects of the status of the species and with the environmental baseline, with respect to what are at this point plainly intentional defects in analysis: "*[t]hese climate change consequences are not caused by the proposed action…[ population abundance] will have declined less as a result of the proposed action.*" This comparative dismissal of harm is contrary the decisions of this case, in which the required analytical question is "not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts.*'' NMFS III at 930 (quotation and citation omitted) (emphasis in original).

**B. THE 2020 BIOP AGAIN IRRATIONALLY RELIES ON HABITAT IMPROVEMENT TO DO DOUBLE DUTY IN BOTH AVOIDING JEOPARDY FROM CRS DAM OPERATIONS AND MITIGATING THE EFFECTS OF CLIMATE CHANGE.**

The 2020 BiOp again relies on habitat improvement (this time merely identifying types of habitat activities) to do double duty in both avoiding jeopardy from CRS dam operations and mitigating for the effects of climate change. See, e.g., BiOp at 289

("[E]lements of the proposed action (flexible spring spill operations, tributary and estuary habitat restoration and research, monitoring, and evaluation programs) should help to improve the resiliency of SR [Snake River] spring/summer Chinook salmon populations to expected climate change effects.")  Yet nowhere does the BiOp rationally explain, much less analyze, its reliance on habitat restoration to be responsive to both the present needs of imperiled salmon and to the effects of climate change.

Instead, NOAA merely notes that "certain types of actions are also likely to increase climate change resilience" (BiOp at 217) and summarizes general "types" of habitat improvement actions that may be more – or less – effective in ameliorating climate warming effects.  BiOp Appendix A at 17-18 (Table A-1.1).[6]  The BiOp directs the reader to Appendix A for "additional discussion."  BiOp at 217.  However, when one turns to the Appendix A, there is no rational explanation for the BiOp's reliance on habitat measures to serve double duty. Instead, the additional discussion consists of four sentences.  BiOp Appendix A at 17.

NOAA first plucks a sentence out of an article that, in passing, compared the extent of past degradation of habitat through land use and water abstraction on salmon habitat to the predicted degradation of habitat from climate change alone and noted this comparison presents "substantial opportunities to improve salmon habitats more than enough to compensate for expected climate change . . . ." Id. (citing Beechie et al. 2013 (NMFS00282779-80)).  This article does not relate these "substantial opportunities" to

_____

[6] NOAA's 2020 BiOp Appendices are found at NMFS00360410.

the level of habitat effort occurring then, nor does NOAA relate these substantial opportunities to the habitat effort it is relying upon in this BiOp – and it is important to understand that the level of habitat effort is far short of that envisioned by recovery plans and occurs at a level limited by BPA's fish and wildlife program funding which has been reduced, particularly with respect to the Snake River Basin.  Declaration of David B. Johnson, at ¶44.  Notably, this article (published before the issuance of the 2014 BiOp), concludes that a simple logic framework should be deployed that consists of distinct, discrete steps for evaluating and adapting habitat restoration plans and actions in the face of climate warming: (1) understanding the current recovery needs, (2) evaluating whether climate change effects will likely alter those needs, (3) determining whether restoration actions can ameliorate climate change effects, and (4) determining whether restoration actions can increase ecosystem resilience.  See Beechie et al. 2013 (also published online in 2012) at 957 (NMFS00282797).

The 2020 BiOp, in a similar but even more misleading vein, states in the next two sentences that an article "demonstrated through modeling that a combination of riparian restoration and channel narrowing could reduce stream temperatures and increase the abundance of Chinook salmon parr in the Upper Grande Ronde River and Catherine Creek in northeast Oregon" and then asserts that the authors "concluded that restoration of such streams could more than compensate for an expected increase in summer stream temperature through 2080."  Appendix A at 17 (citing Justice et al. 2017 (NMFS00308991)).  The BiOp conveniently omits what the authors themselves described

as two "unrealistic assumptions" in their modeling: "[o]ur model unrealistically assumes that—for the full riparian restoration scenario—the entire stream network could be restored to its natural potential," and "[o]ur model also unrealistically assumes that riparian restoration across the stream network occurs immediately, starting on day one of the model simulation period" when "[i]n reality . . . the amount of riparian habitat restored being dictated by annual differences in funding and landowner permissions." See Justice et al. 2017 at 224 (NMFS00308991).

In fact, this article's conclusion emphasizes the urgent need for a more aggressive habitat restoration approach, stating that:

> [s]ignificant portions of these watersheds—particularly in lower elevation reaches—continued to exceed stressful temperature limits for salmon growth and survival even after full riparian restoration, suggesting that alternative restoration strategies (*e.g.*, increasing floodplain connectivity, streamflow restoration, and enhancement and protection of cold-water refuges) should also be implemented in order to maximize thermal benefits to threatened salmon populations.
>
> 　　　　. . .
>
> Given that a more realistic restoration scenario (*e.g.*, high priority areas only) would result in more modest temperature improvements [from specific riparian vegetation and channel width], combined with the rapid projected rise in water temperatures due to climate change, we emphasize the urgent need for a targeted and aggressive restoration strategy which includes riparian restoration as a key component.

Id. at 225 (NMFS00308992).

Finally, the 2020 BiOp cites a 2019 article that looked at methods of increasing climate resilience for Pacific salmon and steelhead and describes that the article "concluded that reducing any anthropogenic stressor could improve response to climate

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION                                                    19

change by improving the overall status of an ESU or distinct population segment (DPS)
(in terms of abundance, productivity, spatial structure, and diversity) and thereby making
the ESU or DPS more resilient and less vulnerable to stochastic extinction." Appendix A
at 17 (citing Crozier, et al. 2019 (NMFS00291887)). The article itself – which does not
use the word "any" – prefaced the foregoing by noting that these salmon species are
listed or are imperiled "almost entirely as a result of anthropogenic stressors." See
Crozier, et al. 2019 at 32 (NMFS00291887). The article emphasizes the troubling
intersection of climate warming with the precarious status of salmon:

> Climate change presents an array of specific threats that can act
> synergistically with other threats, dramatically increasing the impacts of
> each. In particular, the loss of population spatial structures, as well as
> habitat heterogeneity and connectivity, removes the means by which
> salmon have historically persisted through frequent disturbances and
> climate extremes. . . . Thus, due to past adaptation or recent stressors,
> *adaptive capacity* may already be at its lowest levels precisely where
> salmon need it most.

Id. (footnotes omitted; emphasis in original).

And the article clearly goes far beyond simply observing that any action that reduces
anthropogenic factors may be responsive to climate resilience; for example, with respect
to habitat restoration it differentiates among these actions:

> Habitat restoration is especially important in allowing salmon to express
> their intrinsic life history diversity. Salmon are highly adapted to
> disturbance regimes, but they need access to a wide variety of physical
> and thermal conditions within a watershed if they are to respond to
> increasing climate variability, such as frequent flooding or persistent
> droughts. Three main themes have emerged from recent literature. First,
> reconnection of habitats blocked by artificial barriers, either longitudinally
> or laterally (floodplains), can be highly effective in expanding the
> effective climate space of a watershed. Reconnected habitats restore

natural processes and provide refuges from extremes in both temperature and flow.  Second, amelioration of temperature or flow constraints can actively reduce climate stress, for example, through hypolimnetic releases from reservoirs, reconnection to historical sources of cool water, riparian restoration, and other techniques.  Finally, identifying and improving access to food-rich environments can improve tolerance of climate stress by reducing bioenergetic constraints and mortality risks that are often lower for larger fish.

Id. (footnotes omitted).

Notably, this 2019 article observes that "[g]uidelines to identify habitat restoration actions that will have a climate benefit have been developed" (Id.) (citing Beechie, 2013[7] )) and notes that this framework is being used to realign priorities in some watersheds (citing an article on the Nooksack River in the Puget Sound) but acknowledges that this has "not become the norm."  Id.  And, in terms of the scale of actions that increase climate resiliency, this article describes that "removal of dams has become much more frequent in recent years" and that "[s]almon responded rapidly when multiple dams were removed in the Rogue, Sandy and Elwha River basins . . . . Id. at 33 (NMFS00291888) (footnotes omitted).

Thus, the BiOp fails to rationally explain, much less analyze, its reliance on habitat restoration to both be responsive to the present needs of imperiled salmon and to the effects of climate change.

_____

[7] As noted above, this article concludes that a simple logic framework should be deployed that consists of distinct, discrete steps for evaluating and adapting habitat restoration plans and actions in the face of climate warming.

**C. THE 2020 BIOP DOES NOT RATIONALLY EXPLAIN HOW THE EXISTING LEVEL OF HABITAT RESTORATION, NOW PROPOSED FOR 15 YEARS AND MEASURED BY HABITAT ACTIVITY TYPE FOR MPGS WITHOUT IDENTIFIED ACTIONS AND WITH ADMITTED UNCERTAINTY, MEETS THE ESTABLISHED APA AND ESA REQUIREMENTS OF THIS CASE.**

NOAA's 2020 BiOp continues to place a predominant focus on tributary habitat restoration for mitigating the effect of CRS dam operations, as did NOAA's prior (overturned) 2008 and 2014 BiOps.

For many important populations of ESA-listed Snake River spring-summer Chinook whose natal streams are in, or mostly in, designated wilderness areas or are otherwise in relatively pristine conditions (e.g., the Frank Church-River of No Return Wilderness overlaying the Salmon River in Idaho, the Wenaha-Tucannon Wilderness and the Eagle Cap Wilderness Areas overlaying the Wenaha and Minam Rivers in northeast Oregon) habitat is in good-to-excellent condition and highly functioning; thus, the Action Agencies did not propose and NOAA's 2020 BiOp does not identify tributary habitat improvement actions for the Middle Fork Salmon River major population groups.

Outside of these significant areas where habitat is relatively pristine, the parties and the Court have acknowledged there is significant benefit to the listed salmon and steelhead from habitat improvement, such that the flaws in the 2008 and 2014 BiOps regarding habitat improvement projects were "not that NOAA Fisheries relied on habitat mitigation efforts to avoid jeopardy, but that some of the habitat projects relied on are not reasonably certain to occur and that NOAA Fisheries relied on habitat mitigation projects achieving the exact amount of extremely uncertain survival benefits required to avoid

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION                                                              22

jeopardy." <u>NMFS V</u> at 914.  As this Court concluded in <u>NMFS V</u>, the ESA "tips the scale toward listed species and requires that the risk that mitigation will not be achieved be placed on the project." <u>Id.</u>

In <u>NMFS V</u>, this Court set forth the familiar rule that "[a]n agency must provide sufficient information so that a reviewing court can educate itself in order to properly perform its reviewing function—'determining whether the agency's conclusions are rationally supported' and whether the 'agency's actions were complete, reasoned, and adequately explained.'" <u>Id.</u> at 909-10 (citations omitted).  This Court held that in the 2014 BiOp, NOAA "failed adequately to explain how much survival benefit was needed from tributary habitat actions to avoid jeopardy and whether NOAA Fisheries included any 'cushion' in the survival benefit needed." <u>Id.</u> at 910.  This Court went on to find that there was not an excess in survival improvement and that all of the survival improvements estimated to occur from the tributary habitat projects (and all other RPAs) was relied on to avoid jeopardy, such that there was not a sufficient margin of error in the expected benefits accruing from tributary habitat mitigation.  <u>Id.</u>  This Court found that because the 2014 BiOp did "not provide room for error that the specific, numeric survival benefits associated with tributary habitat improvements might not all accrue precisely as estimated . . . this is an improper allocation of risk onto the listed species." <u>Id.</u>  This Court thus found that,

> [r]equiring habitat improvement projects to achieve some amount of
> survival benefit beyond the minimum survival benefit required to avoid
> jeopardy complies with Congress's directive to afford endangered species
> the highest of priorities, while not imposing upon NOAA Fisheries or the

Action Agencies a requirement of certainty that is unreasonable or unattainable.

Id. at 914.

Noting that while all parties agree there is significant scientific uncertainty in allocating estimated survival benefits, the ESA does "require that the risk of such an uncertain calculation achieving 100 percent of its expected benefits should not fall onto the listed species." Id. at 910 (citation omitted).

This Court in NMFS V ordered the Action Agencies to "continue to fund and implement the 2014 BiOp" until what was then contemplated to be a 2018 BiOp was prepared and filed, thus ensuring some protection for the listed species remained in effect. Id. at 949.

Following NMFS V, the Action Agencies proposed no additional funding, additional resources, or additional level of effort to implement tributary habitat improvements to provide any additional protection to the listed species and ensure the risks were not borne by the listed species.

The Action Agencies, in their 2020 proposed action in the Biological Assessment (BA) propose no additional funding, additional resources or additional level of habitat restoration effort – and NOAA's 2020 BiOp does not alter this.

The 2020 BiOp observes that the Action Agencies have proposed tributary habitat restoration as part of the proposed action and refers the reader to the Action Agencies' 2020 BA and its Appendix D for more details (BiOp at 75). In the BA, the Action Agencies state that, for the next 15 years –2021- 2036 – "[t]he effort will be at a similar

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION                                         24

level to that described in the 2018 proposed action . . . ." BA[8] at 2-97. Neither the BA nor

the BiOp which relies upon it reveal the reduction in Fish and Wildlife Program funding

relative to tributary habitat that has occurred, particularly with respect to the Snake Basin.

See Declaration of David B. Johnson, at ¶44. The Action Agencies simultaneously

abandon any identification of specific habitat restoration actions and fish survival

benefits (as occurred in the 2010 and 2014 BiOps), and instead provide only the vaguest

of information about types of habitat restoration activities they now characterize as

"habitat metrics": flow protected (cfs); flow enhanced (acre-feet); entrainment screening

(# screens); habitat access (miles); stream complexity (miles); riparian habitat improved

(acres). BA at 2-98, 2-99 (Tables 2-18 and 2-19). The BA states that a "more detailed

description of the Action Agencies proposed tributary habitat actions can be found in

Appendix D" (Id. at 2-94); however, Appendix D to the BA simply reiterates that "[t]he

effort will be implemented at a level similar" to the level previously occurring and

reproduces the tables from the BA that identify types of habitat restoration activities. Id.

at D-12 to D-15. As vague as these metrics are, the Action Agencies admit that they too

involve significant uncertainty:

> These metrics become more uncertain farther into the future. For
> example, the Action Agencies can predict with relative certainty the
> actions to implement in the first 5 years of this Proposed Action.
> However, some planned actions may not come to fruition, some actions
> may change as they proceed through the design and permitting process,
> and some new opportunities for actions may arise. Forecasting farther into
> the future becomes uncertain. While the Action Agencies can assert that

---

[8] The 2020 BA and its appendices are found at ACE001059479; for convenience,
this memo cites to page numbers in the BA.

> metrics identified at the MPG level (or their equivalent) can be
> implemented during the Proposed Action, they cannot identify which
> actions in which locations will occur.

Id. at D-23.

The BA admits that "accurate forecasting of implementation metrics will be difficult to determine beyond a 5-year time horizon" and notes that "[a]t 5-year intervals, the Action Agencies therefore will provide an estimate of specific actions and metrics" and anticipates these metrics will be subject to adjustment stating that this approach "will provide valuable insight for the THSC [tributary habitat steering committee also called a tributary technical team[9]] in adjusting reporting and performance metrics in periods two and three [the 10-year period starting in 2026]." Id. at D-23-24.

The 2020 BiOp begins its discussion of the proposed action by reproducing the table for 2021-2036 from the Action Agencies' BA that characterizes as metrics the types of habitat restoration activities mentioned above: flow protected; flow enhanced; entrainment screening; habitat access; stream complexity; riparian habitat improved. BiOp at 208 (Table 2.2-17).  In a footnote, NOAA notes these metrics are satisfied whether they are completed "or in process, by the end of 2036."  Id. (Table 2.2-17, n. 1).

The 2020 BiOp then refers the reader to its Appendix A for an overview of how NOAA "analyzed the effects of tributary habitat improvement actions for this opinion."

---

[9] See BA Clarification Letter, April 1, 2020 (NMFS00360391).  This BA clarification letter does not provide any additional information on the tributary habitat actions themselves.

Id. at 209.  In a footnote in Appendix A, NOAA reveals that its analysis of habitat

improvement actions goes hand-in-hand with its latest approach to analyzing jeopardy:

> In the 2008 biological opinion and its 2010 and 2014 supplements, we characterized the benefits of tributary habitat improvement actions at the population level primarily in terms of their effect on freshwater survival, either life-stage-specific or total egg-to-smolt survival.  We also assumed, based on best available information, that these improvements would carry on to direct improvements in recruits per spawner (R/S) and therefore contribute to achieving metrics, such as R/S > 1, that were used as one part of the analysis in those biological opinions.  In the [unchallenged] 2019 biological opinion and this current opinion, we characterize the effects of tributary habitat improvement actions at the population level primarily in terms of changes in population abundance, productivity, spatial structure, and diversity.  We then qualitatively relate these population-level changes to effects to the species or designated critical habitat.  This approach is consistent with our section 7 regulations, which direct NMFS to formulate the agency's biological opinion as to whether a proposed action is likely to: 1) reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing its numbers, reproduction, or distribution; or 2) appreciably diminish the value of designated or proposed critical habitat for the conservation of the species (50 CFR 402.02).  The approach is also consistent with our longstanding use of "viable salmonid population" (VSP) parameters (McElhany et al. 2000) to evaluate Pacific salmon and steelhead population viability.  The four VSP parameters (abundance, productivity, spatial structure, and diversity) encompass the species' "reproduction, numbers, or distribution," and are commonly used to evaluate long-term risk of extinction and population status relative to Endangered Species Act (ESA) recovery goals.  All of these population parameters could affect survival and also mitigate extinction risk by making populations more resilient, and this is why we use these factors to assess the status of populations, which in turn informs the evaluation of species status.

Appendix A at n.2.

What this means — and what this allows — is that the 2020 BiOp embarks on

what is essentially a comparative exercise that never comes back around to offering a

reasoned explanation for how the mitigation actions relied upon and, most importantly,

addressed the threats to the species in a way that satisfies the jeopardy standard under the

ESA or the standard of review under the APA.[10]  That is, this allows NOAA to follow a

formula in which it first assesses whether there is "potential for improvement in habitat

productivity" in populations in the MPG; concludes that there is; offers the general

---

[10] This Court set forth the well-established standard for reliance on mitigation actions in <u>NMFS V</u> at 901-02:

> The 2008 BiOp was remanded because it was "based on unidentified habitat mitigation measures that are not reasonably certain to occur." *NMFS IV*, 839 F. Supp 2d at 1125.  As explained by Judge Redden in remanding the 2008 BiOp in this case:

> Mitigation measures may be relied upon only where they involve "specific and binding plans" and "a clear, definite commitment of resources to implement those measures."  [*NMFS III*, 524 F.3d at 935–36] (finding agency's "sincere general commitment to future improvements" inadequate to support no jeopardy conclusion).  Mitigation measures supporting a biological opinion's no jeopardy conclusion must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Ctr. for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987)).

And, this Court also set forth the well-established standard under the APA, and applied it in <u>NMFS V</u> at 909-10:

> An agency must provide sufficient information so that a reviewing court can educate itself in order to properly perform its reviewing function— "determining whether the agency's conclusions are rationally supported" and whether the "agency's actions were complete, reasoned, and adequately explained."  *Nw. Coal. for Alts. to Pesticides (NCAP) v. U.S. E.P.A.*, 544 F.3d 1043, 1052 n. 7 (9th Cir. 2008) (quoting *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1373 (D.C. Cir. 1985) (Wright, J., dissenting)). NOAA Fisheries failed adequately to explain how much survival benefit was needed from tributary habitat actions to avoid jeopardy. . . .

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION                                                    28

statement that "[a]ctions implemented to ameliorate limiting factors for any population [in the MPG] would provide localized habitat benefits and potential improvements in abundance and productivity for the targeted population"; observes that[w]here such actions are implemented consistent with the strategic approach outlined in the proposed action (i.e., consistent with ESA recovery plan population priorities and best available science [e.g., watershed assessments] and modelling information that informs questions related to what kind of actions will be most beneficial where, in what sequence, and at what scale), these benefits would be enhanced"; references existing partnerships and states that the "Action Agencies commitment to work with NMFS to continue to enhance strategic implementation of the program, provides confidence that appropriate actions will be implemented in appropriate locations." See, e.g., BiOp at 212-13.  NOAA's formula also includes noting that it used life-cycle modelling to "help assess the extent of benefits," though the limitations of these models and their assumptions quickly become evident.  See, e.g., BiOp at 213 (model only assesses benefits from certain types of actions, modelers made assumptions about the locations where the Action Agencies' efforts would be focused, modelers made assumptions that habitat access projects were assumed to open habitat of similar type and quality to that currently available, and complexity actions were applied to improve quality of habitat currently in moderate or good condition). Id. And, perhaps most troubling of all, this life-cycle modeling information does not identify the starting point. While the actual habitat actions being relied upon to be implemented in 2021-2026 (much less in 2027-2036) remain elusive

after examining the BA, the BiOp, and their appendices, NOAA nevertheless concludes, both in its summary of effects (BiOp at 217) and its integration and synthesis (*Id.* at 286), that "[i]mplementation of the tributary habitat actions analyzed in this opinion, if implemented as described in the proposed action, will provide additional near-term and long-term benefits to the targeted populations by improving tributary habitat in the manner and timeframes outlined in Table 2.2-18 [a table that identifies types of actions – for example, "improved habitat access" – and gives a general assessment of their timing – for example, removing "impassable culverts/ dams" have "consistently shown rapid colonization by fishes"] Id.

In other places, the BiOp is the definition of arbitrary and capricious; it's "assessment" of the South Fork Salmon River MPG, for example, consists of the statement that "The Action Agencies have not proposed tributary habitat improvement actions for implementation in this MPG as part of the proposed action."  BiOp at 209.

At a time when the status of many populations of ESA-listed Snake River spring-summer Chinook are at the Quasi-Extinction Threshold, NOAA's 2020 BiOp fails to provide a rational explanation for how the existing level of habitat restoration effort proposed for the next 15 years, now to be measured by habitat activity type for an MPG, without identified actions, and with admitted uncertainty, satisfies the APA much less addresses the threats to the species in a way that satisfies the jeopardy standard.  NMFS V at 901-02, 909-10.  NOAA's 2020 BiOp brings to mind Judge Marsh's opinion in Idaho Dep't of Fish and Game v. NMFS: "*Instead of looking for what can be done to*

*protect the species from jeopardy, NMFS and the action agencies have narrowly focused their attention on what the establishment is capable of handling with minimal disruption*." NMFS V at 869-870 (excerpting quote from Judge Marsh).

## II.    PLAINTIFFS' PRELIMINARY RELIEF IS NECESSARY TO REDUCE IRREPARABLE HARM TO ESA-LISTED SALMON AND STEELHEAD.

The preliminary injunctive relief Oregon and NWF seek will reduce irreparable harm to ESA-listed species that would otherwise occur under the illegal 2020 BiOp and 2020 ROD, as described in the attached Declaration of David B. Johnson, Director of the Nez Perce Tribe's Department of Fisheries Resource Management.

Mr. Johnson's 33-year career working in the Tribe's fisheries department overlaps with the entirety of the ESA listings in the Snake River Basin, and he has served as the Tribe's lead technical representative in each of the prior CRS BiOp remands. Id. at. ¶4. Mr. Johnson has submitted declarations in this case opposing the curtailment of spill by the Action Agencies in 2004, and more recently, in support of additional spill in 2017. Id. at ¶1. Mr. Johnson participated in the negotiation of the 2018 Flexible Spill Agreement as an interim operation to allow for completion of the Court-ordered NEPA process and the development of a better alternative. Id. at ¶4. Mr. Johnson has experienced the reduction in Fish and Wildlife Program funding – particularly in the Snake River Basin, that is not revealed in the 2020 BiOp. Id. at ¶44. Following the issuance of the 2020 ROD, Mr. Johnson has been involved in efforts to implement CRS operations to benefit the fish (including efforts to reinstate operations beneficial to fish that were in place in prior BiOps). Id. at ¶43.

The Tribe has always viewed the status and needs of the fish as the starting point for any inquiry related to FCRPS actions and compliance with the law. <u>Id.</u> at ¶9. Snake River salmon and steelhead populations have been listed under the ESA (troubling enough it its own right) for 30 years (more troubling), remain imperiled (more troubling still) and, are – right now – experiencing an existential crisis.[11]

The Tribe recently conducted an assessment of the status of Snake River spring/summer Chinook populations relative to the Quasi-Extinction Threshold (QET) of 50 natural origin spawners or less on the spawning grounds for four consecutive years. <u>Id.</u> at ¶12-26.

Alarmingly, this assessment found that 42% of the extant Snake River Basin spring/summer Chinook populations *currently* have natural origin spawner abundances at or below the QET of 50 spawners or less on the spawning grounds for four consecutive years, and that 77% of these populations would be at or below 50 natural origin spawners by 2025. <u>Id.</u> at ¶22. These populations encompass a broad geographic area within the Snake River Basin. <u>Id.</u> at ¶23 (map).

As Mr. Johnson explains, breaching the four lower Snake River dams would benefit the survival and recovery of Snake River salmon and steelhead more than any other action, and is urgently needed. <u>Id.</u> at ¶30. Plaintiffs' requested injunctive relief will not provide the benefits of breaching the lower Snake River dams, but it will reduce

---

[11] Of course, it is not necessary to demonstrate an extinction-level threat to species to prevail on an injunction under the ESA. <u>NWF v. NMFS</u>, 2017 WL 1829588 at *6.

NEZ PERCE TRIBE'S MEMO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION                                                                32

in the short term the irreparable harm the species will otherwise experience.  Mr.

Johnson's declaration describes the reasons the Tribe supports the requested additional

spill to reduce powerhouse encounters of juvenile and adult listed fish and to reduce

forebay delay and associated fish travel time (including the PITPH modelling application

the Tribe developed to provide relative comparisons of spill operations based on CSS

methods) (Id. at ¶35-40), and supports the reinstatement or establishment of minimum

operating pool ("MOP") operations to reduce fish travel time through the CRS reservoirs.

Id. at ¶41-42.

## CONCLUSION

The Nez Perce Tribe respectfully urges the Court to grant Plaintiffs NWF and the

State of Oregon's motions for preliminary injunction.

Dated: July 16, 2021.

Respectfully submitted,

 *s/ David J. Cummings*
 *s/ Geoffrey M. Whiting*
David J. Cummings (OSB #922695)
Geoffrey M. Whiting (OSB#954544)
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, ID 83540
(208) 843-7355 | Phone
(208) 843-7377 | Fax
djc@nezperce.org
gwhiting@gmwnezperce.com

*Attorneys for the Nez Perce Tribe*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5-2, and F.R. Civ. P. 5(d), I certify that on July 16, 2021, the foregoing document will be electronically filed with the Court's electronic court filing system, which will generate automatic service upon all parties enrolled to receive such notice.


 s/ Anjee Toothaker
Anjee Toothaker