Irion A. Sanger, OSB No. 003750
John Maxwell Greene, OSB No. 182714
Sanger Greene, PC
4031 SE Hawthorne Blvd.
Portland, OR 97214
Telephone: 503-756-7533
Fax: 503-334-2235
irion@sanger-law.com
max@sanger-law.com

Counsel for Intervenor-Defendant Public
Power Council

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **NATIONAL WILDLIFE FEDERATION**, et al., | Case No. 3:01-cv-640-SI |
| Plaintiffs, | **OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION** |
| and | |
| **STATE OF OREGON**, et al., | |
| v. | |
| **NATIONAL MARINE FISHERIES SERVICE**, agency of the United States Department of Commerce, et al., | |
| Defendants | |
| and | |
| **PUBLIC POWER COUNCIL**, et al., | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.   **Public Power** ........................................................................................................ 3

        1.   Public Power in the Northwest .................................................................. 3

        2.   The Public Power Council .......................................................................... 4

        3.   Reliability, Affordability, and Climate Change Mitigation ..................... 5

        4.   BPA and the Northwest Power Act ........................................................... 8

        5.   PPC and Fish Recovery .............................................................................. 9

    B.   **Procedural History** ............................................................................................ 10

        1.   The 2020 Biological Opinion ................................................................... 10

        2.   The 2021 Motions for Preliminary Injunction ...................................... 10

        3.   The Memorandum of Understanding ...................................................... 10

        4.   Developments in 2025 .............................................................................. 11

STANDARD OF REVIEW ............................................................................................... 11

APPLICABLE LAW ........................................................................................................ 12

    A.   **The Endangered Species Act** .......................................................................... 12

    B.   **The Administrative Procedure Act** ................................................................ 13

ARGUMENT .................................................................................................................... 14

    A.   **A Preliminary Injunction Is Not Warranted** .............................................. 14

        1.   Plaintiffs Cannot Establish a Reasonable Likelihood of Success Because NMFS Correctly Applied the 2019 ESA Rules in the 2020 BiOp ................................. 15

        2.   NMFS Appropriately Considered Climate Change in the 2020 BiOp ........ 22

        3.   The 2020 BiOp Is Not Unlawfully Vague or Unclear .................................. 25

        4.   The Balance of the Equities and the Public Interest Do Not Support a Preliminary Injunction ............................................................................................................ 26

        5.   Directing the Parties to Confer Would Be More Appropriate than Issuing an Injunction ................................................................................................................... 28

    B.   **The Requested Preliminary Injunction Is Not Appropriately Tailored** .................. 28

        1.   The Record Does Not Support Plaintiffs' Requested Spill .......................... 29

        2.   The Record Does Not Support Plaintiffs' Requested MOPs ....................... 32

        3.   If the Court Grants an Injunction, It Should Direct the Parties to Identify Significantly Narrower Terms ...................................................................................................... 34

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Atl. Salmon Fed. v. Merimil Limited Partnership*,
    Case No. 1:21-cv-00257-JDL, 2022 WL 558358 (D. Me. Feb. 24, 2022) ................ 30, 31

*Cal. Energy Comm'n v. Bonneville Power Admin.*,
    909 F.2d 1298 (9th Cir.1990) ........................................................................ 10

*Cal. Wilderness Coalition v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ....................................................................... 22

*Center for Biol. Diversity v. Env'l Prot. Agency*,
    141 F.4th 153 (D.C. Cir. 2025) ...................................................................... 24

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) .................................................... 12, 13, 22, 30

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ................................................................. 13, 32

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ......................................................................... 13

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ...................................................................................... 30

*Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*,
    850 F.Supp. 886 (D. Or. 1994) ........................................................................ 5

*Northwest Env't Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ........................................................................... 4

*NWF v. NMFS*,
    184 F.Supp.3d 861 (D. Or. 2016) ("*NMFS V*") ....................................... passim

*NWF v. NMFS*,
    2005 WL 1278878 (D. Or. May 26, 2005) ("*NMFS II*") ........................... 18, 19

*NWF v. NMFS*,
    524 F.3d 917 (9th Cir. 2008) ("*NMFS III*") ..................................... 15, 18, 20

*NWF v. NMFS*,
    886 F.3d 803 (9th Cir. 2018) ("*NMFS VII*") ............................................... 14

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
No. 24-7807, 2025 WL 3467536 (9th Cir. Dec. 3, 2025)......................................... 12, 29

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1978)................................................................................................... 30

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................................................................................................... 12

**Statutes**

16 U.S.C. § 1536............................................................................................................ 14, 15

16 U.S.C. § 832................................................................................................................... 5

16 U.S.C. § 832c............................................................................................................... 8, 9

16 U.S.C. § 832d.................................................................................................................. 8

16 U.S.C. § 837a.................................................................................................................. 9

16 U.S.C. § 839c.................................................................................................................. 5

16 U.S.C. § 839e................................................................................................................ 10

16 U.S.C. §§ 837-837h......................................................................................................... 8

16 U.S.C. §§ 838-838k......................................................................................................... 8

5 U.S.C. § 706.................................................................................................................... 15

ORS 469A.400..................................................................................................................... 6

ORS 469A.410..................................................................................................................... 6

RCW 19.405.010................................................................................................................. 6

**Regulations**

50 C.F.R. § 402......................................................................................................... passim

84 Fed. Reg. 44976 (Aug. 27, 2019)................................................................................. 17, 22

## INTRODUCTION

Intervenor-Defendant Public Power Council ("PPC") respectfully submits this Opposition ("Opposition") to the Motions for Preliminary Injunction ("Motions") filed by Plaintiffs National Wildlife Federation *et al.* ("NWF") and Intervenor-Plaintiff State of Oregon ("Oregon").  ECF 2526 & 2530.  NWF and Oregon seek the same injunctive relief on substantially similar legal grounds, but the law does not support their requested relief and that relief is too broad.

While PPC opposes the Motions under the legal regime applicable to requests for injunctive relief based on the Endangered Species Act ("ESA"), it is important that the Court understand *why*.  PPC shares the region's deep commitment to protecting and restoring Columbia River salmon and steelhead, and strongly supports reasonable efforts to restore threatened fish populations.  Whether the lens is practical, ethical, or legal, extinction is not an option.  PPC's members pay $818 million annually through power rates to fund one of the world's largest and most sophisticated fish restoration efforts through the rates they pay to the Bonneville Power Administration ("BPA").

However, Columbia River salmon and steelhead face many challenges, including ocean conditions, habitat loss, predation, and non-Tribal fishing.  Plaintiffs request the Court focus on operation of the Federal Columbia River Power System ("FCRPS") of hydroelectric dams.  While PPC agrees operation of the FCRPS can harm fish species and some mitigation is appropriate, the 2020 Biological Opinion ("2020 BiOp") is sufficient to ensure that the federal action does not jeopardize Columbia River salmon and steelhead.  On the other hand, the FCRPS provides over 11,000 megawatts ("MW") of reliable, low-cost, carbon-free power during a time when electricity demand is rising, rates are climbing, new generation is difficult to build, and the FCRPS is essential to regional and global climate efforts.  Simms Decl. at 9-11.  PPC's members lean on the FCRPS to provide power to the residents and businesses, schools, daycares, farms, factories, hospitals,

streetlights, and traffic lights of the Northwest. Plaintiffs' requested relief would unnecessarily undermine the reliable, low-cost, carbon-free power on which Northwest communities rely.

PPC's Opposition focuses on three issues with Plaintiffs' requested relief. First, Plaintiffs identify no real legal defects in the 2020 BiOp and have no reasonable likelihood of success on the merits. As Plaintiffs acknowledge, the 2020 BiOp applied ESA rules adopted in 2019 that modified certain elements of the prior ESA rules. Plaintiffs do little to explain why they believe the 2020 BiOp fails under these rules, largely relying instead on caselaw that applied the prior, superseded rules. Plaintiffs' limited argumentation based on the 2019 rules is unconvincing – it runs counter to caselaw from the District of Columbia Circuit – and their Motions cannot reasonably be construed as a robust as-applied attack on the rules.

Second, the balance of the equities and the public interest cut against issuance of an injunction. While a recent Ninth Circuit case held that "the only equities that matter" in ESA cases are those relating to listed species, Plaintiffs argue the equities of the case and, because a preliminary injunction is an equitable remedy, the Court should at least be aware of and consider the equitable and policy implications raised in this case. Analogous cases weighing harm to threatened species against the benefits of zero-carbon electricity generation in the face of resource adequacy concerns and clean-energy policies designed to mitigate climate change have landed in favor of clean energy – including maintaining robust hydroelectric dam operations. This balancing of the equities is strongest where the link between requested injunctive relief and benefits to threatened species is attenuated or otherwise not clearly established.

Third, Plaintiffs' requested relief is not tailored to mitigate the harm to threatened species from the FCRPS dams. Take Plaintiffs' proposed spill regime. Plaintiffs essentially argue that, because spill is beneficial to threatened salmon and steelhead species, more spill must be more

beneficial. But there is nothing in the record that demonstrates, for example, that 24-hour spill is necessary or even helpful for listed species. Plaintiffs have failed to meet their burden to support their requested relief. If the Court decides to issue an injunction, at a minimum, it should direct the parties to confer on terms of an injunction tailored to the evidence. When weighing competing measures that could provide similar levels of relief to threatened fish species, the Court should ensure that an injunction employs the measures least likely to threaten the reliability of the regional electricity grid, impose hundreds of millions of dollars in added annual costs to Northwest citizens, and set back Oregon and Washington in their climate and clean-energy policy goals.

PPC respectfully requests that the Court deny the Motions or, if the Court grants an injunction, direct the parties to tailor it.

## BACKGROUND

This case has stretched on now for decades. PPC will not attempt a full recitation of the case's legal history. Instead, this section of the Opposition reviews factual, legal, and practical background elements that inform PPC's position and explain how critical this case is to public power in the Northwest.

### A. Public Power

#### 1. *Public Power in the Northwest*

Public power in the Northwest has been the backbone of the region's power supply and transmission network for over a century. Declaration of Scott Simms at 3 (hereinafter "Decl. Simms"). The first public power utility in the region was formed in Tacoma in 1893, when the citizens voted to purchase Tacoma Light & Water Company. Decl. Simms at 4. On the heels of this success, the state passed Initiative 1 in the 1930 election authorizing the establishment of public utility districts in the state. Decl. Simms at 4. That same year, Oregon voters approved an

amendment to the state constitution authorizing the creation of people's utility districts.  Decl. Simms at 4.

Shortly thereafter, in 1937, Congress created BPA to improve power generation and transmission in the Northwest, with a specific directive to BPA to serve public power.  *See generally* 16 U.S.C. § 839; *see also Northwest Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 672 (9th Cir. 2007).  Today, BPA markets power from more than 30 facilities throughout the Columbia River Basin and is responsible for roughly one-third of the power consumed in the Northwest, supplying more than 120 public and cooperative utilities.  Decl. Simms at 4.

### 2. *The Public Power Council*

PPC is a nonprofit corporation organized under Washington law.  Decl. Simms at 3.  PPC represents the interests of approximately 100 consumer-owned utilities (municipal utilities, public and peoples' utility districts, and cooperatively owned utilities, all of which fall under the broader umbrella term "consumer-owned utilities").  *Id*.  For purposes of the discussion in this brief, the terms "public power" and "consumer-owned utilities" are used interchangeably.  The governing boards of PPC's member utilities consist of elected officials, and these utilities are ultimately responsive to their communities.  Unlike investor-owned utilities, which earn a return on their capital investments that generates profit for shareholders, consumer-owned utilities are legally required to pass their costs directly through to their customer-constituents – there are no investors and no profits.  PPC's member utilities provide power to approximately 1.5 million households, business, industrial, and commercial consumers, and irrigators, and consumer-owned utilities serve approximately 54% of Washington electric consumers and 25% of Oregon electric consumers.  *Id*.

PPC's member utilities are preference customers of BPA. The Northwest Power Act, 16 U.S.C. § 839 *et seq.*, incorporates the statutory preference provision of the Bonneville Project Act, 16 U.S.C. § 832 *et seq.*, which requires BPA to give priority to consumer-owned utilities in the sale of power. These statutes are discussed further below. PPC's member utilities hold long-term power sales contracts with BPA, which markets power from the FCRPS. These contracts require BPA to supply the power statutory-preference customers need, a requirement that is founded in the Northwest Power Act. 16 U.S.C. § 839c(b).

PPC works to ensure access to reliable, low-cost, and environmentally-sound power supplies for its members. Decl. Simms at 5-6. It interacts with BPA and other regional and national groups on subjects including BPA rate proceedings, power marketing policies, public preference issues, power supply planning, conservation, legislative concerns, and fish and wildlife issues. Decl. Simms at 3-4. One of its main objectives is to preserve and enhance the benefits of the FCRPS for consumer-owned utilities and the people they serve. Decl. Simms at 15-17.

PPC has long fought to maintain reasonable rates for its members, to support continued and enhanced electric reliability in the region, and to ensure BPA and all PPC members adhere to all ESA requirements. Decl. Simms at 5-6. PPC has worked for many years to ensure the region's power needs are met alongside adherence with the ESA. *See, e.g.*, *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 850 F.Supp. 886, 900 (D. Or. 1994). This work has included consistent support for fish recovery funding. Decl. Simms at 7-8. PPC's renewed involvement in this case represents another effort to support recovery for threatened and endangered fish species while maintaining affordable, reliable, zero-carbon power for its members and their customers.

   3.  *Reliability, Affordability, and Climate Change Mitigation*

Hydropower is public power's key resource in the Northwest, supplying more than 11,000 megawatts of electricity through the FCRPS and providing both low-cost, reliable power to meet base customer loads and essential balancing support for variable renewable resources. Decl. Simms at 9. State clean energy laws underscore hydropower's importance: Washington's Clean Energy Transformation Act highlights the state's "wealth of carbon-free hydropower," and Oregon's House Bill 2021 identifies hydropower as a necessary non-emitting resource for meeting emissions targets. *See* RCW 19.405.010(2), ORS 469A.400(7); ORS 469A.410(c). The Oregon Department of Energy affirmed in its 2025 Oregon Energy Strategy that hydropower remains central to the state's electricity system, a point reinforced by rankings showing Oregon and Washington lagging behind other states in new clean-energy development. Decl. Simms at 10. Indeed, the analysis presented in the Oregon Energy Strategy reflects an assumption that the FCRPS continues *status-quo* operations – not the regime requested by Plaintiffs (including Oregon). Decl. Simms at 9. Meanwhile, as they continue relying on the FCRPS and development of new resources remains slow, Oregon and Washington electricity rates have climbed significantly. Decl. Simms at 8-9.

As Oregon and Washington move toward 100 percent clean energy and the region retires traditional thermal resources, there is a projected resource shortfall of up to nine gigawatts by 2030, driven by slow development of new generation and rising electricity demand, including growth from data centers. Decl. Simms at 9-10. Hydropower's support for resource adequacy and grid reliability is therefore indispensable, particularly as utilities add more wind and solar generation.

Constraining the FCRPS as Plaintiffs request could seriously threaten the reliability of the region's electricity grid while driving significant costs for the people that rely on public power.

According to a study conducted in 2022 to analyze the impacts of the preliminary injunctions Plaintiffs requested in 2021, during critical summer months the requested FCRPS operations would result in the loss of about 1,400 MW of capacity (equivalent to three large natural gas plants or one nuclear power plant) and a loss of about 550 MW in the winter.  Decl. Simms at 14.  With constraints in the regional wholesale power market and the slow pace of clean-energy buildout, a loss this size could threaten the regional power grid's ability to operate.  Decl. Simms at 10-12. Even if the power grid could operate, it would likely need to rely on a power market that – during high-demand hours – tends to be driven by emissions-intensive power.  Declaration of Joshua Rasmussen at 7-8 ("Decl. Rasmussen").  The spill regime Plaintiffs proposed in 2021 would have driven an additional 2 million metric tons of greenhouse gas emissions per year.  Decl. Simms at 14.

Since 2022, the circumstances that drove those results have become more dire.  PPC commissioned an updated analysis of the power impacts of Plaintiffs' requested injunction, and the results are starker from a reliability perspective.  Comparing the injunction terms to actual spill levels from 2022-2025, Plaintiffs' requested operations are projected to remove up to 1,674 MW in June (compared to a loss of 1,400 under the 2021 requested injunction).  Decl. Rasmussen at 21.  The region is already facing a potential 9,000 MW shortfall as new resources struggle to come online; factoring in another 1,600 MW deficit makes the region more likely to experience blackouts or price spikes.  Decl. Simms at 10-11.  Even setting aside price spikes, due to the need to purchase replacement power to offset reduced FCRPS operations, the FCRPS operations Plaintiffs now request would cost over $150 million per year.  Decl. Rasmussen at 3-4.  Those increased costs will be directly passed through to public power customers.  Meanwhile, the

emissions impacts of Plaintiffs' requested relief are still significant, driving a projected increase of nearly a million metric tons per year.  Decl. Rasmussen at 4-5.

### 4.  BPA and the Northwest Power Act

A key player in navigating these complex dynamics is BPA, which is governed by four federal statutes.  Following the original 1937 statute that established BPA – the "Project Act" – Congress subsequently enacted the Pacific Northwest Consumer Power Preference Act of 1964, 16 U.S.C. §§ 837-837h ("Preference Act"), the Pacific Northwest Federal Transmission System Act of 1974, 16 U.S.C. §§ 838-838k, and the Northwest Power Act.

These statutes impose a mandatory duty on BPA to sell power to Northwest public power utilities, the majority of which are PPC's members.  The Project Act establishes a preference for the sale of FCRPS power to public power entities, 16 U.S.C. § 832c, and requires BPA to contract with public power entities for wholesale FCRPS power.  16 U.S.C. § 832d.  The Project Act establishes these mandates "to insure that the facilities for the generation of electric energy at the Bonneville project shall be operated for the benefit of the general public, and particularly of domestic and rural consumers[.]"  16 U.S.C. § 832c(a).  The Preference Act protects this policy by restricting the sale of FCRPS power outside the region.  16 U.S.C. § 837a.  The Northwest Power Act mandates that BPA "shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region" to the extent that power exceeds the resources those utilities already have available to them.  16 U.S.C. § 839c(b).

The Northwest Power Act includes many provisions designed to balance its joint purposes "to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply"

and "to protect, mitigate and enhance the fish and wildlife[.]"  16 U.S.C. § 839(2) & 839(6). Another purpose of the Northwest Power Act is "to encourage, through the unique opportunity provided by the Federal Columbia River Power System ... the development of renewable resources within the Pacific Northwest[,]" highlighting the importance of the FCRPS to enabling Oregon and Washington clean energy policies.  16 U.S.C. § 839(1)(B).  Overall, while it imposes requirements designed to protect threatened fish species, the Northwest Power Act also ties the FCRPS to clean-energy development and strengthens the statutory right of public-power entities to access power from the FCRPS.

### 5. *PPC and Fish Recovery*

The Northwest Power Act also sets up infrastructure designed to drive recovery of the region's threatened fish species, which PPC has consistently supported.  Decl. Simms at 4-9. While PPC's members support and pay for effective fish recovery efforts, they are the ones footing the bill for those efforts so they also have a substantial interest in ensuring that fish and wildlife measures are science-based, directly connected to FCRPS operations, and cost-effective to the extent permitted by the ESA, while also staying consistent with species recovery.  Decl. Simms at 7-8, 13-14.

BPA's total fish and wildlife expense category, supported by public power revenues, stands at an average of about $818 million a year over the past 10 years.  Decl. Simms at 7.  BPA is required to charge wholesale rates sufficient to cover its costs.  16 U.S.C. § 839e(a)(1).  Further, the Northwest Power Act requires BPA "to establish rates that will produce sufficient revenues to ensure BPA's fiscal independence[.]" *Cal. Energy Comm'n v. Bonneville Power Admin.,* 909 F.2d 1298, 1303 (9th Cir.1990).  Any additional costs or reductions in revenue will be passed on as higher electricity rates to PPC's members.  PPC has supported increases in spending levels for

BPA's Fish and Wildlife program in the past, and will continue to do so in the future, so long as those increases are reasonable.  Decl.  Simms at 7-8.

### B.  Procedural History

#### 1.  The 2020 Biological Opinion

The National Marine Fisheries Service ("NMFS") issued the 1,500-page 2020 BiOp on July 24, 2020, determining that the proposed federal action – including a suite of operational and other measures designed to promote the recovery of threatened salmon and steelhead – would not place those species in jeopardy.  NMFS explained that, in reaching this conclusion, it had applied recently adopted rules implementing the ESA.  2020 BiOp at 46.  In accordance with those 2019 rules, NMFS engaged in a detailed review of the expected effects of the federal action on listed species, determining in each case that the federal action would not place the species in jeopardy.

#### 2.  The 2021 Motions for Preliminary Injunction

Dissatisfied with the 2020 BiOp, Plaintiffs filed Motions for Preliminary Injunctions on July 16, 2021, roughly a year after it was issued.  ECF 2373 ("NWF 2021 Motion") & 2382 (OR 2021 Motion").  Oregon requested relief comprising spill and MOPs, which NWF also supported.  OR 2021 Motion at 1-2; NWF 2021 Motion at 1-2.  Oregon said in its Motion that an "amplified extinction risk is real and urgent, requiring both a comprehensive long-term solution and immediate additional stop-gap actions to help mitigate the current situation before it is too late."  OR 2021 Motion at 47-48.  In October 2021, however, the parties filed a Joint Motion to Stay Litigation, which the Court granted on October 26, 2021 and later extended.  ECF 2415.

#### 3.  The Memorandum of Understanding

On December 14, 2023, a subset of parties to the litigation – including the Federal Defendants but not including PPC – filed a Joint Motion to Stay Litigation Through 2028 on the

ground that those parties had negotiated a Memorandum of Understanding ("MOU") outlining both a plan they called "the Columbia Basin Restoration Initiative ('CBRI')" and a set of "United States Government Commitments in Support of the Columbia Basin Restoration Initiative ('USG Commitments')."  ECF 2450 at 2.  Appendix B to the MOU outlined the FCRPS operations that these parties had agreed to.  The restrictions in Appendix B were significantly less onerous than those Oregon had indicated were "require[d] … to help mitigate the current situation before it is too late."  ECF 2382 at 47-48.  Indeed, as NWF explains, some aspects of the MOU that they agreed to represented "improvements [that] fell short of what state and tribal fisheries experts identified as necessary, even on a temporary interim basis" while "[o]ther aspects of the negotiated interim operations would harm salmon relative to the 2020 ROD[.]"  NWF Motion at 11.

### 4.  Developments in 2025

On June 24, 2025, the Federal Defendants withdrew from the MOU.  ECF 2480, Exh. A. Accordingly, on September 11, 2025, a group of Plaintiffs and Plaintiff-aligned parties filed a Joint Motion to Lift Stay, ECF 2493, and Motion to Set Schedule and Motion for Overlength Briefs, ECF 2494, followed by the Motions at issue here.

## STANDARD OF REVIEW

In considering whether to grant a preliminary injunction, a court will assess four factors: 1) the moving party's likelihood of succeeding on the merits of the underlying claim; 2) whether the moving party will suffer irreparable harm; 3) whether the balance of the equities supports the moving or the non-moving party; and 4) whether the public interest supports issuance of an injunction.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).  In the Endangered Species Act context, Congress has divested the courts of some of the equitable powers that underlie the standard preliminary injunction test.  *See Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075,

1090 (9th Cir. 2015).  In a case issued earlier this month, the Ninth Circuit explained that, within

the Ninth Circuit, "courts have no discretion to balance equities or the public interest when

considering …  any injunction, preliminary or permanent, sought in any ESA case."  *San Luis*

*Obispo Coastkeeper v. Cnty. of San Luis Obispo*, No. 24-7807, 2025 WL 3467536, at *7 (9th Cir.

Dec. 3, 2025).[1]

Courts consistently hold that the moving party bears the burden of making the required

showing to support injunctive relief.  *Cottonwood Env't L. Ctr.*, 789 F.3d at 1088.  Because

Plaintiffs seek an order that the Federal Defendants take specific actions with respect to operation

of the FCRPS, their request is for a mandatory injunction, which is "particularly disfavored" and

should be denied "unless the facts and law clearly favor the moving party[.]"  *Garcia v. Google,*

*Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (internal quotation marks and citations omitted).

A preliminary injunction must be tailored to remedy the specific harm alleged and achieve

the statute's purposes.  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180,

1195 (9th Cir. 2024). The injunction's scope must be no broader and no narrower than necessary

to remedy the specific harm.  *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195.

## APPLICABLE LAW

### A.  The Endangered Species Act

Plaintiffs rest the substance of their claims on the ESA.  Section 7(a)(2) of the ESA requires

federal agencies to "insure that any action authorized, funded, or carried out by such agency ... is

---

[1]     PPC notes that, as of the time of this Opposition, the time for a Petition for Rehearing in
*San Luis Obispo Coastkeeper* has not yet run.  *See* FRAP 40(d)(1).  PPC believes that,
absent this case, there would be a stronger argument for this Court to consider the balance
of the equities and the public interest in determining whether or not to grant a preliminary
injunction.  Accordingly, PPC reserves the right to address those additional arguments
should the *San Luis Obispo Coastkeeper* opinion not prove to be final and binding.

not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). To accomplish this outcome, Section 7 provides that agencies must undergo a consultation process for determining the biological impacts of a proposed action. 16 U.S.C. § 1536(a)-(c). This requirement is further delineated in United States Fish and Wildlife Service and NMFS regulations. 50 C.F.R. § 402. "[I]f a proposed federal action may jeopardize listed species or adversely modify critical habitat, the 'acting agency' must consult with the 'consulting agency.'" *NWF v. NMFS*, 886 F.3d 803, 813 (9th Cir. 2018) (citing 50 C.F.R. §§ 402.13, 402.14) (*NMFS VII)*.

The direct result of the consulting process is a BiOp in which the consulting agency explains whether the proposed action will affect a listed species. 16 U.S.C. § 1536(b)(3)(A). The test for whether an action jeopardizes a listed species is whether the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The consulting agency determines the "environmental baseline" and the "effects of the action" – both defined terms under the regulations – and adds them together to formulate an "opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. §§ 402.02, 402.14(g)(4). If the proposed action is likely to jeopardize a listed species or adversely modify its critical habitat, the BiOp generally must set forth a reasonable and prudent alternative ("RPA") to the action that is not likely to jeopardize the species. 16 U.S.C. § 1536(b)(3)(A).

**B.  The Administrative Procedure Act**

The ESA does not establish a cause of action relevant to the Motions, so Plaintiffs seek relief under the Administrative Procedure Act ("APA").  The APA authorizes the Court to declare unlawful and set aside an agency action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  A court reviews the decision of an expert agency on technical matters through a highly deferential lens.  *NWF v. NMFS*, 184 F.Supp.3d 861, 878-79, 898-99 (D. Or. 2016) ("*NMFS V*") (upholding NMFS's treatment of smolt-to-adult returns).  While the Court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it[,]" it may not "substitute [its] judgment for that of the agency" when reviewing an agency action.  *NWF v. NMFS*, 524 F.3d 917, 927 (9th Cir. 2008) ("*NMFS III*").

## ARGUMENT

### A.  A Preliminary Injunction Is Not Warranted

The Court should deny Plaintiffs' requests for a preliminary injunction because Plaintiffs are unlikely to succeed on the merits – the 2020 BiOp is appropriate under the ESA and its implementing regulations.  Moreover, although the Ninth Circuit just removed this Court's power to balance the equities and consider the public interest in ESA cases, the Court should understand how these considerations cut against Plaintiffs' requested relief, which would threaten the reliability of the electric grid, cost public power customers hundreds of millions of dollars per year, and result in millions of tons of greenhouse gas emissions.

To support a preliminary injunction, the Court must find that Plaintiffs are likely to succeed on the merits of their claims.  Plaintiffs make essentially three arguments:  1) NMFS inappropriately included operation of the FCRPS in the environmental baseline, thus removing it from the "effects of the action" to support its finding of no jeopardy [Oregon Motion at 18-22, 27-

32; NWF Motion at 14-23]; 2) NMFS did not adequately assess the impacts of climate change in reaching its finding of no jeopardy [NWF Motion 29-35]; and 3) NMFS's reasoning is insufficiently clear [Oregon Motion 22-27; NWF Motion 35-42].  Plaintiffs do not meet their burden of demonstrating that the 2020 BiOp was arbitrary and capricious or contrary to law.

The balance of the equities and the public interest also would not support issuance of a preliminary injunction.  The fish populations at issue here are stable, while the power system that underlies the way of life for people throughout the region is itself increasingly in jeopardy.  This is not just a matter of cost, but of the reliability of the regional power grid.  Moreover, continued robust operation of the FCRPS will generate funding that is a bedrock of fish recovery efforts and carbon-free power that is the cornerstone of the region's strategy to avert the worst impacts of climate change.  Plaintiffs' requested relief will not achieve outcomes they seek under the ESA but will harm the people of the region in tangible ways.

1. *Plaintiffs Cannot Establish a Reasonable Likelihood of Success Because NMFS Correctly Applied the 2019 ESA Rules in the 2020 BiOp*

Plaintiffs are unlikely to succeed on the merits of their claims because the 2020 BiOp is appropriate under the ESA and the 2019 regulations implementing it ("2019 Rules"), and Plaintiffs' arguments incorrectly focus on case law implementing and interpreting the pre-2019 regulations superseded by the 2019 Rules.  Plaintiffs have not met their burden of persuasion, and the 2019 Rules support the legality of the 2020 BiOp.

a. Plaintiffs' Arguments Are Inappropriately Grounded in Decisions Applying pre-2019 Rules

Plaintiffs have not met their burden to demonstrate that the 2020 BiOp is arbitrary and capricious or contrary to law because the 2020 BiOp applies the 2019 Rules – which Plaintiffs acknowledge resulted in a significant change in the substantive requirements for Biological Opinions – but Plaintiffs ground their argument in case law applying the more restrictive pre-2019

Rules. Relying on caselaw that applies these outdated rules amounts to an attempt to bootstrap in a legal standard that was later superseded by the 2019 Rules.

There is no disagreement that the 2019 Rules apply to this Court's review of the 2020 BiOp. As discussed above, the process and standards underlying the 2020 BiOp are set forth in rules promulgated at 50 C.F.R. Part 402. Those rules were substantially revised in 2019. 84 Fed. Reg. 44976 (Aug. 27, 2019). PPC agrees with Oregon's basic characterization of certain key changes:

> the [2019] Rules: (1) changed the definition of "effects of the action" by limiting both the type and extent of effects of a proposed federal agency action that must be analyzed in the Section 7 consultation process; and (2) redefined 'environmental baseline' to include "ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify," thereby exempting ongoing actions from analysis as effects of an agency action.

Oregon Motion at 16. Further, the preamble to the proposed 2019 Rules explained that NMFS did not "interpret Section 7(a)(2) and the regulations thereunder to require that each proposed action improve or increase the likelihood of survival and recovery of the species, or improve the conservation value of critical habitat … even where a species already faces severe threats prior to the action." Oregon Motion at 16-17. As Oregon pointed out, the proposed 2019 Rules announced an intention to depart from some of the past reasoning in this case, in particular *NMFS III*. Oregon Motion at 16-17 (quoting 83 Fed. Reg. 35178, 35182 (July 25, 2018)). In adopting the 2019 Rules, NMFS was free to reject *NMFS III* because the case relied in significant part on the ESA regulations that were in place at the time of the decision. *See NMFS III*, *passim*. The same is true of *NWF v. NMFS*, 2005 WL 1278878 (D. Or. May 26, 2005) ("*NMFS II*") and *NMFS V*, on which Plaintiffs rely in arguing that the 2020 BiOp is legally deficient. *See NMFS II* at *12; *NMFS V* at 888. Because these decisions were based in relevant part on regulations that have since been superseded, it is the 2019 Rules – not *NMFS II*, *III*, or *V* – that the Court must focus on here.

Nevertheless, Plaintiffs rely on *NMFS II*, *III*, and *V* for the bulk of their argument that they will succeed on the merits. For example, NWF cites *NMFS II* to argue that "the 2020 BiOp's jeopardy analysis improperly focuses on the effects of the Proposed Action compared to the effects of past dam operations" but that "[t]he Court has previously rejected this kind of comparative jeopardy analysis as contrary to the ESA." NWF Motion at 13 (citing *NMFS II*, 2005 WL 1278878 at *9–14). The portion of *NMFS II* that directly discusses comparative jeopardy analysis begins on page *12 and relies in significant part on a discussion of language in 50 C.F.R. 402.02 – a provision that was changed in the 2019 Rules. The Federal Defendants in *NMFS II* had interpreted the pre-2019 version of 50 C.F.R. 402.02 to permit consideration of "an impaired environmental baseline", in part because otherwise even beneficial agency actions could be prevented by jeopardy findings. *NMFS II* at *12. The Court described this interpretation as an attempt by the agency to "compare the proposed action to the share of the proposed action it chose to re-categorize as part of the environmental baseline[,]" observed that this "st[ood] in sharp contrast to the … approach … used in prior BiOps," and rejected the Federal Defendants' "interpretation of § 402.02 … because the 2004 BiOp's comparative approach represents a significant departure from … previous interpretations of 402.02[.]" *NMFS II* at *14. The 2019 Rules, in contrast, explicitly allow consideration of a portion of the proposed action as part of the environmental baseline, as Oregon acknowledges. Oregon Motion at 16.

Later, NWF points to *NMFS III* to support the following argument: "NMFS does not clearly acknowledge that the 2020 BiOp limits the effects of the Proposed Action to the differential between prior and current operations, perhaps because courts have already rejected that approach." NWF Motion at 17 (citing *NMFS III* at 933). Again, the analysis in *NMFS III* leading up to this conclusion relied in part on 50 C.F.R. 402.02. Again, the court rejected an effort by Federal

Defendants to interpret 50 C.F.R. 402.02 to allow NMFS to "satisfy the ESA by comparing the effects of proposed FCRPS operations on listed species to the risk posed by baseline conditions." *NMFS III* at 930. Again, the court's analysis was founded on 50 C.F.R. 402.02. *NMFS III* at 930-33 (citing 50 C.F.R. 402.02 five times). Plaintiffs have conceded that the version of 50 C.F.R. 402.02 in the 2019 Rules "limit[s] both the type and extent of effects of a proposed federal agency action that must be analyzed in the Section 7 consultation process … [and] exempt[s] ongoing actions from analysis as effects of an agency action[,]" in contrast to the rules applied in *NMFS III*. Oregon Motion at 16.

Similarly, Oregon relies on *NMFS V* to argue that "[w]here, as here, the population is already severely degraded, a standard that reaches a no-jeopardy conclusion with only minimal *improvement* to the species does not satisfy the ESA." Oregon Motion at 19 (emphasis in original) (citing *NMFS V* at 888). But, yet again, the cited provision of *NMFS V* relies on 50 C.F.R. 402.02. *NMFS V* at 888. In this case, the court in *NMFS V* cited 50 C.F.R. 402.02 in support of its observation that "[t]he relevant regulation requires that [the agency] consider whether the RPA actions are expected to reduce appreciably the likelihood of recovery of the listed species in the wild." *Id*. The court's language echoes the definition of "jeopardize the continued existence of", which "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. 402.02. While this definition did not change in the 2019 Rules, the agency's responsibility to apply the definition in the consultation process did. Prior to the 2019 Rules, the agency was required to "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse

modification of critical habitat."  50 C.F.R. 402.14(g)(4) (pre-2019).  Under the 2019 Rules, the agency must instead *"[a]dd the effects of the action and cumulative effects to the environmental baseline* and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether *the action* is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. 402.14(g)(4) (post-2019) (emphasis added).  The revised rules import the modified definition of environmental baseline discussed above, and the court's reliance on 50 C.F.R. 402.02 must be reconsidered in light of the 2019 Rules.

### b.  The 2020 BiOp Correctly Follows the 2019 Rules

The 2020 BiOp is neither arbitrary and capricious nor contrary to law because it correctly applies the 2019 Rules.  While Plaintiffs primarily rely on outdated caselaw to argue that they are likely to succeed on the merits, they also argue that the 2020 BiOp does not correctly apply the 2019 Rules' definition of environmental baseline.  Plaintiffs are mistaken.

Plaintiffs' core argument is that the 2020 BiOp incorrectly applies the 2019 Rules' definition of environmental baseline by including discretionary FCRPS operations in the environmental baseline.  Oregon begins by highlighting that the 2019 Rules added language expanding the environmental baseline by excluding only "the consequences to the listed species … caused by the proposed action" and explicitly including "consequences to listed species … from ongoing agency activities that are not within the agency's discretion to modify[.]"  Oregon Motion at 27 (quoting 84 Fed. Reg. 44976, 45016).  Oregon then argues that "NMFS' approach in the 2020 BiOp of considering only the changes in operations of the CRS relative to all prior and ongoing operations runs afoul of even that cramped definition because it fails to assess the discretionary elements of ongoing agency action."  Oregon Motion at 28.  Both Oregon and NWF attempt to paint the 2020 BiOp as inconsistent with the 2019 Rules because they say it includes in

the "environmental baseline" FCRPS operations that are "discretionary."  Oregon Motion at 29-30, NWF Motion at 20-23.  Oregon says that the 2020 BiOp fails to explain "why it should be permitted to characterize *any* aspect of [FCRPS] operations as nondiscretionary," observing that "the Ninth Circuit has already held that [FCRPS] operations are mostly, if not entirely discretionary."  Oregon Motion at 28 (citing *NMFS III* at 928).  Using similar language but going a step further, NWF says that "[t]he 2020 BiOp fails to explain why it can treat *any* aspect of ongoing dam operations as nondiscretionary[,]" pointing to an "explicit holding that the overall operation of the [FCRPS] is discretionary" from the Ninth Circuit.  NWF Motion at 21-22 (citing *NMFS III* at 928-29).  This line of argument has two main problems.

First, Plaintiffs invert the standard of review.  Under the standards for issuance of a preliminary injunction and the APA, the burden is on Plaintiffs to show that the 2020 BiOp is wrong, not on the 2020 BiOp to prophylactically defend against every possible critique.  *Cottonwood Env't L. Ctr.*, 789 F.3d at 1088 (preliminary injunction); *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090-92 (9th Cir. 2011) (APA).  Plaintiffs' efforts to shift the burden onto NMFS run counter to law.

Second, Plaintiffs fail to show that the 2020 BiOp unlawfully included discretionary FCRPS operations in the environmental baseline.  The 2019 Rules generally do not allow inclusion of discretionary agency actions in the environmental baseline.  50 C.F.R. 402.02; 84 Fed. Reg. 44976, 45016.  They do, however, allow inclusion of effects stemming from the *existence* of the FCRPS, which is non-discretionary.  The 2020 BiOp follows the 2019 Rules and indicates repeatedly that only "[t]he consequences to listed species … from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR 402.02)."  2020 BiOp at 125, 320, 452, 556, 663-64, 778, 890,

984, 1048, 1116-17, 1185, 1245-46, 1297, 1342. Each of those recitations of the rule is followed by a detailed determination of the environmental baseline for each listed fish species. The 2020 BiOp frequently discusses impacts to listed species from the "existence and operation" of the dams. *See*, *e.g.*, 2020 BiOp at 322, Figure 2.3-3. However, none of the impacts are attributable solely to the discretionary operation of the FCRPS, nor does the 2020 BiOp suggest that the impacts under discussion are attributable to discretionary operational choices. Instead, when discussing impacts from the existence and operation of the FCRPS, the 2020 BiOp generally offers the opposite conclusion. *See*, *e.g.*, 2020 BiOp at 399 ("some of the mortality and delay in travel times is attributable to the existence of the eight mainstem dams as opposed to operational or configurational choices").

Plaintiffs' argument is difficult to rebut because neither offers a single citation to the BiOp to explain which discretionary operations they believe the Federal Defendants unlawfully included in the environmental baseline. Rather than trying to demonstrate that NMFS included particular, identifiable discretionary operations in the environmental baseline, Plaintiffs suggest that all FCRPS operations are discretionary so any operations that are included in the environmental baseline are unlawful. Oregon Motion at 28, NWF Motion at 21-22. That conclusion is irrelevant, given that the impacts attributed to the environmental baseline stem from the existence of the FCRPS dams rather than discretionary dam operations.

Indeed, remaining focused on the "existence and operation" – as opposed to discretionary operational choices – Oregon effectively agrees with PPC's conclusion above and acknowledges that "the 2019 Rules' definition of environmental baseline … effectively excludes the existence and ongoing operation of the CRS … from environmental review under the ESA." Oregon Motion at 27. Oregon then goes on to observe that "[u]nder this approach, the environmental baseline

includes nearly three decades of illegal operations of the CRS that, by NMFS' own prior admission, jeopardize listed species." Oregon Motion at 27. This language seems to imply that this outcome is legally problematic in some undefined way. However, the District of Columbia Circuit has considered whether it is appropriate to include legally deficient past agency actions in the environmental baseline and determined that it is.

The Court considered the propriety of an ESA analysis of proposed Renewable Fuel Standard rules, where the analysis included in the environmental baseline harm attributable to past rules that courts had determined were unlawful. As the Court explained:

> EPA has generally failed to comply with its ESA obligations in previous RFS Program rulemakings. … But the fact that the Set Rule represents EPA's first full attempt to comply with its obligations under the ESA does not mean the agency must here account for the RFS Program's cumulative effects on endangered species since the program's outset. The Environmental Petitioners identify no authority for that proposition, and the ESA's implementing regulations foreclose it. The regulations define an "environmental baseline" as "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat *caused by the proposed action*. 50 C.F.R. 402.02(d) (emphasis added). … That definition requires EPA to include the cumulative impact of previous rules promulgated under the RFS Program in its environmental baseline.

*Center for Biol. Diversity v. Env'l Prot. Agency*, 141 F.4th 153, 178-79 (D.C. Cir. 2025). The Court concluded "EPA's use of a baseline that excludes only the effects of the Set Rule, and not the full impact of the Program since its inception, was reasonable and not contrary to law." 141 F.4th at 179. The same is true of the 2020 BiOp – excluding only the effects of the federal action and not the full impact of the FCRPS since its inception is reasonable and not contrary to law.

### 2. NMFS Appropriately Considered Climate Change in the 2020 BiOp

Plaintiffs argue that the 2020 BiOp does not adequately account for the effects of climate change in the analysis leading to its no jeopardy conclusion. Specifically, Plaintiffs argue that the 2020 BiOp does not adequately consider whether the federal action will jeopardize listed species

in a future with climate change, and that the 2020 BiOp wrongfully suggests the federal action will mitigate the effects of climate change. *See* NWF Motion at 29-35. Plaintiffs are mistaken on both counts – the 2020 BiOp does consider climate impacts in reaching a no-jeopardy conclusion, and continued operation of the FCRPS under the 2020 BiOp will mitigate climate impacts.

The 2020 BiOp uses a sophisticated and appropriate analytical approach to assess possible impacts of the federal action on listed species under scenarios that reflect different possible climate futures. As one would expect, the listed species generally fare worse under more extreme climate conditions. The 2020 BiOp concludes that, in these worse climate scenarios, it is not the federal action that poses a jeopardy to the species, but climate change and its effects. For example, warming ocean conditions may drive the species to extinction. In this case, the 2020 BiOp is correct that it is just that – ocean warming – and not the federal action that threatens listed salmon and steelhead. 2020 BiOp at 263-279. Plaintiffs do not disagree with the 2020 BiOp that, for example, "[c]limate change, especially future conditions that could substantially reduce survival during the marine life history stage, poses a substantial threat to SR spring/summer Chinook salmon, and likely to other salmon populations[.]" 2020 BiOp at 279; *see also*, *e.g.*, Oregon Motion at 10 ("Environmental factors such as poor ocean conditions, drought, reduced snowpack, reduced river flow, and elevated water temperatures are also important factors that are increasing in frequency, magnitude, and duration with climate change."). They only seem to disagree with the 2020 BiOp's conclusion that "[t]hese conditions are not caused by, nor will they be exacerbated by, the continued operation and maintenance of the CRS as proposed in the biological assessment (BPA et al. 2020)." 2020 BiOp at 279. However, if Plaintiffs disagree with the actual conclusions the 2020 BiOp reached regarding climate change, they do not explain how or why they disagree.

Additionally, the 2020 BiOp concludes at multiple points that the federal action will mitigate the effects of climate change. *See*, *e.g.*, 2020 BiOp at 428. NWF disagrees but does not present any rationale for why they believe there is no mitigation effect, nor do they provide any contrary evidence. *See* NWF Motion at 33 (arguing "the 2020 BiOp improperly substitutes for a real-world jeopardy determination the alternative, arbitrary, and illegal conclusion that the Proposed Action will 'mitigate' the effects of climate change to some unspecified extent").

Instead, Plaintiffs argue that the 2020 BiOp "assigns all of the harm from ongoing CRS operations to the environmental baseline rather than the Proposed Action as described above[,]" which, in turn, "underlies the illogical conclusion that the Proposed Action will 'mitigate' the effects of climate change instead of profoundly exacerbate them." NWF Motion at 34. This is a mischaracterization of the 2020 BiOp's discussion of climate mitigation. The BiOp includes robust discussions of climate mitigation that are reasonable and grounded in scientific literature. *E.g.*, 2020 BiOp at 424.

Plaintiffs say the 2020 BiOp's attribution of harm to ocean warming is "irrelevant", but that is wrong. NWF Motion at 34. The 2020 BiOp correctly indicates that the effects of climate change are not the effects of the federal action, and the 2019 Rules require a determination of "whether *the action* is likely to jeopardize the continued existence of listed species" – not whether climate change is likely to jeopardize the species. 50 C.F.R. 402.14(g)(4) (emphasis added).

Moreover, the Court must review the 2020 BiOp's treatment of climate change, a technical matter, with the deference due to NMFS as an expert agency. *NMFS V* at 878-79, 898-99. Through this lens, even if the Court were not satisfied that the 2020 BiOp is objectively correct, it should still defer to the expert agency. The 2020 BiOp includes 1,500 pages dominated by technical analysis, with well over 500 references to climate change. Plaintiffs' argument is not really that

the 2020 BiOp fails to address Plaintiffs' concerns; rather, they disagree with its conclusions.  This is insufficient to overcome the deference to which NMFS is entitled.

Finally, the 2020 BiOp would have a substantial mitigating effect on climate change, because Plaintiffs' requested relief would lead to an increase in greenhouse gas emissions of nearly a million metric tons per year.  Decl. Rasmussen at 4-5.  For context, the most recent year of greenhouse gas emissions from natural gas in Oregon, Washington, and Idaho combined totaled 46.5 million metric tons.  Decl. Rasmussen at 25.  This emissions increase is not trivial.

### 3.  *The 2020 BiOp Is Not Unlawfully Vague or Unclear*

Plaintiffs argue that the 2020 BiOp is too vague or unclear for three main reasons.  First, they say it relies on future mitigation measures whose results are uncertain.  NWF Motion at 36-38.  Second, they say its no-jeopardy conclusion does not follow from the data and analysis presented in the body of the document.  Oregon Motion at 22-26; NWF Motion at 38-42.  Third, they argue they cannot tell what the federal action is in the first place, let alone trace the action to the no-jeopardy conclusion.  Oregon Motion at 22-26.  None of these arguments has merit.

Plaintiffs' requested mitigation measures are similar in nature to those in the 2020 BiOp, but only different in degree.  If Plaintiffs are correct that mitigation benefits are uncertain, then they undermine their own request for injunctive relief.  Plaintiffs say the following mitigation measures are insufficient to support a no-jeopardy conclusion:  spill operations at the eight mainstem dams; a range of spring and summer minimum operating pools ("MOPs") at the dams; fish passage infrastructure repair and maintenance; and conservation measures such as predation reduction.  2020 BiOp, Tables 1.3-1, 1.3-2, 1.3-3, and 1.3-4, 1396-1420.  To remedy this failure, Plaintiffs propose the following mitigation measures:  spill operations at the eight mainstem dams; a range of spring and summer MOPs at the dams; fish passage infrastructure repair and

maintenance; and conservation measures such as predation reduction. Oregon Motion at 1-2; NWF Motion at 1-2. The only difference is in the extent of the mitigation measures. Whether the 2020 BiOp's proposed measures or Plaintiffs' are more consistent with a no-jeopardy conclusion is a matter of technical disagreement on which NMFS is entitled to deference, not actually a question of overly vague or inadequate analysis on NMFS's part. *NMFS V* at 878-79, 898-99. Plaintiffs have not demonstrated the measures in the 2020 BiOp are insufficient or the measures they propose will make a meaningful difference.

Second, Plaintiffs argue there is not a logical path from the federal action – including the mitigation measures in the 2020 BiOp – to a no-jeopardy conclusion. NWF Motion at 38-39. However, the 2020 BiOp and Plaintiffs identify the same potential concerns and the same mitigation measures to prevent jeopardy, only to a different degree. If the 2020 BiOp's analytical path is inadequate, by Plaintiffs' reasoning their own analytical path is also invalid.

Third, Plaintiffs say that the 2020 BiOp "make[s] a no-jeopardy finding without even knowing what the federal actions will be" because "[t]he proposed operations are so vague and undefined that it is impossible for the Defendants to have a rational basis to even identify the actual action[.]" Oregon Motion at 23. This is wrong. The 2020 BiOp's "Proposed Federal Action" runs for 45 pages and includes seven operational subcategories, 10 conservation subcategories, as well as terms for monitoring, research, reporting, adaptive management, and regional coordination. 2020 BiOp at 46-91. Section 1.3.1.2 of the 2020 BiOp describes "Operations for Conservation of Fish and Wildlife", it includes both a narrative description and tables outlining spill operations (Tables 1.3-1 and 1.3-2), and it also discusses an adaptive management framework to change the operations as needed to achieve conservation goals. 2020 BiOp at 51-58.

4. *The Balance of the Equities and the Public Interest Do Not Support a Preliminary Injunction*

The FCRPS's role as the cornerstone of the reliability and affordability of the Northwest's power grid and the Northwest's climate and clean energy policy would be a strong factor weighing against an injunction, if the Court were permitted to consider it. Regardless, to make an equitable decision the Court must be aware of the depth and breadth of the harm Plaintiffs' requested relief would impose on the region.

As a preliminary matter, it is appropriate for PPC to address the balance of equities and the public interest to ensure that the Court has a full view of the context for its decision and the potential impacts of an injunction. The Ninth Circuit held earlier this month that courts within the Circuit "have no discretion to balance equities or the public interest when considering … any injunction, preliminary or permanent, sought in any ESA case." *San Luis Obispo Coastkeeper*, 2025 WL 3467536, at *7. PPC therefore does not request at this time that the Court employ the test for preliminary injunctions in contexts other than the ESA. However, a preliminary injunction is still a creature of equity. *Cottonwood*, 789 F.3d at 1090; *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193-94 (1978). Based on "several hundred years of history … [t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case[,]" bearing in mind "[t]he qualities of mercy and practicality[.]" *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Thus, the Court should be aware of the practical effects that will flow from its decision. Indeed, Plaintiffs themselves include a discussion of the equities at issue here. Oregon Motion at 36; NWF Motion at 52-55. It would prejudice PPC not to respond to Plaintiffs.

Other Courts have assessed the equities in similar circumstances and found in favor of clean energy, a reliable electricity grid, reasonable costs for electricity consumers, and reducing greenhouse gas emissions. Like the Ninth Circuit, the First Circuit has held that "the third and

fourth prongs" of the traditional preliminary injunction test "tip heavily in favor of protected species." *Atl. Salmon Fed. v. Merimil Limited Partnership*, Case No. 1:21-cv-00257-JDL, 2022 WL 558358 at *9 (D. Me. Feb. 24, 2022) (quoting *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 27 (1st Cir. 2010)); *see also Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997) (citing *Nat'l Wildlife Fed. v. Burlington Northern R.R.*, 23 F.3d 1508, 1510 (9th Cir. 1994)). Working within this framework, the court in *Atlantic Salmon* considered claims of harm to threatened fish species and Defendants' concerns regarding the loss of electricity and climate impacts from restricting operations of the dams at issue in that case, and it rejected Plaintiffs' request for injunctive relief. *Atl. Salmon* at *9-*10. Here, Plaintiffs' proposed injunction would yield a 1,600 MW capacity deficit in a region that is already strained from a grid-reliability standpoint, cost public power customers $150 million per year, and drive greenhouse gas emissions. The equities favor PPC.

     *5.  Directing the Parties to Confer Would Be More Appropriate than Issuing an Injunction*

     Plaintiffs have not met their burden to demonstrate a preliminary injunction is legally or factually justifiable. Under similar circumstances in the past, the Court has directed the parties to confer. *NWF v. NMFS*, 2017 WL 1829588 at *10 (D. Or. Apr. 3, 2017) (ECF No. 2190) ("*NMFS IV*"). If the Court agrees with PPC that no injunction is appropriate, but nevertheless wishes to take some action, directing conferral would be an appropriate next step. The parties here broadly share aligned interests – in particular, identifying a path for the listed fish species to recover, upholding Tribal Nations' treaty rights, and maintaining a reliable, affordable, and clean electricity system in the Northwest. A negotiated solution may be possible.

## B.  The Requested Preliminary Injunction Is Not Appropriately Tailored

     Plaintiffs' Motions request relief that is unsupported by their evidence, so even if the Court sees fit to grant injunctive relief, that relief must be significantly more tailored than Plaintiffs'

requested relief to address the harms they allege. Plaintiffs have not demonstrated the amount of spill or the level of MOPs they request will bring incremental benefits to listed fish species beyond the regime set forth in the 2020 BiOp. A preliminary injunction must be tailored to remedy the specific harm demonstrated by the moving party, and the scope of the injunction must be no broader and no narrower than necessary to remedy that specific harm. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195. Here, Plaintiffs have not demonstrated their requested levels of spill or MOPs are no broader than necessary to remedy the harm they assert and meaningfully reduce the likelihood of jeopardy to listed fish species. Rather than attempt to craft a tailored injunction on this record, the Court may be better off directing the parties to confer and develop appropriate terms for an injunction, if one is to issue. *See NWF v. NMFS*, 2017 WL 1829588 at *11 (D. Or. Apr. 3, 2017) (ECF No. 2190) ("*NMFS VI*").

    *1.   The Record Does Not Support Plaintiffs' Requested Spill*

    The evidence Plaintiffs rely on to support their requested mandatory injunction dictating spill at the FCRPS dams does not demonstrate the level of spill they request will meaningfully reduce the likelihood of jeopardy to listed fish species. Plaintiffs suggest increased spill will benefit listed fish survival primarily by decreasing powerhouse encounters. Oregon Motion at 40-44. However, at its best, Plaintiffs' evidence only supports that *some level* of spill will bring about *some level* of increased survival, not that the level of spill they request will do so. In contrast, the Declaration of Dr. Andrew Deines ("Decl. Deines") submitted in support of this Opposition examines each category of intended results and demonstrates Plaintiffs have not proved – and cannot prove – the spill Plaintiffs request will yield results that provide incremental survival benefits above and beyond the regime outlined in the 2020 BiOp. The relief Plaintiffs request is significantly broader than necessary to remedy the harms they assert.

As a starting point, Plaintiffs acknowledge the 2020 BiOp recognizes that spill can yield survival benefits for listed fish species and, accordingly, mandates spill.  Focusing on spring spill, Oregon notes "Federal Defendants have already embraced the efficacy of spill by rolling forward the flexible spill operations into 2021 and providing the maximum amount of water that can be spilled without exceeding state TDG standards for 16 hours per day during the spring spill period." Oregon Motion at 40.  However, Plaintiffs request more, arguing "these spill operations should be expanded to 24 hours per day to provide additional benefits to fish" and requesting "the Court order Federal Defendants to spill the maximum amount of water that can be spilled without exceeding state TDG standards for 24 hours per day during the spring spill period at Lower Granite, Lower Monumental, Ice Harbor, McNary, John Day and Bonneville[.]"  Oregon Motion at 40.  Similarly, Plaintiffs request "[a]t Little Goose, Federal Defendants would spill to 125% of Gas cap for 24 hours until the adult criteria are reached, and at The Dalles, the Federal Defendants would conduct 40% spill up to 125% Gas cap for 24 hours per day."  Oregon Motion at 40.

Plaintiffs' first explanation of the rationale for this request is that the requested spill would provide survival benefits by reducing powerhouse encounters, but the evidence they cite in support of this proposition does not make that case.  Plaintiffs explain "[m]odeling estimates that this additional spill could decrease dam powerhouse encounters for Snake River spring-summer Chinook and steelhead by about 54% and 59%, respectively, and improve SARs [smolt-adult returns] by about 27% and 30%, respectively, for out-migrating fish compared to modeled results for the Selected Alternative[,]" citing the Declaration of Edward Bowles at paragraph 84.  Oregon Motion at 40.  Dr. Deines, however, points out that the modeling Mr. Bowles relies on does not accurately reflect Plaintiffs' request and includes "an extrapolation beyond any observed spill … highlighting that the proposed relief is really an experiment in fish passage."  Decl. Deines at 20-

21. Plaintiffs perhaps recognize that uncertainty in using the word "could" – "additional spill *could* decrease dam powerhouse encounters" – rather than a stronger formulation such as "is likely to".

Dr. Deines identifies two additional fault points in Mr. Bowles's logical chain. First, the data on which Mr. Bowles relies show a trend of diminishing returns as spill increases. Decl. Deines at 25. This trend suggests that shifting from the 2020 BiOp to Plaintiffs' request will likely have *de minimis* impacts in terms of reduced powerhouse encounters, if it has any at all. Second, Mr. Bowles does not base his conclusions on the actual metrics that define the relationship between spill and powerhouse encounters – volume of anticipated spills and flows in thousands of cubic feet per second (kcfs) – so it is impossible to trace Plaintiffs' requested relief to any quantifiable outcome. Decl. Deines at 12. The same is true for Plaintiffs' requested relief with respect to fall-winter spill – Plaintiffs acknowledge the BiOp recognizes benefits from spill and calls for spill, but they fail to provide evidence showing that their proposed level of spill will yield meaningful benefits for listed fish species above and beyond the BiOp. *Compare* Oregon Motion at 40-43 *with* Decl. Deines at 14-23.

Plaintiffs also indicate in passing that their requested spill regime may decrease travel time and decrease water temperature, thus yielding survival benefits for listed species, but these arguments are not developed, and the Court should disregard them. As to the potential benefits of spill for travel time, Plaintiffs say "[s]pill helps to *mitigate for* slower fish travel time" but "it does not help reduce travel time through the main body of mainstem reservoirs." Oregon Motion at 38 (emphasis added). And as to the relationship between spill and temperature, Plaintiffs say "the Federal Defendants must take immediate action to reduce water temperature impacts to listed fish … includ[ing] increasing spill" but otherwise do not attempt to draw any connection at all. Oregon

Motion at 39. Plaintiffs spend more time and effort attempting to tie their requested MOPs to travel time and temperature, so these will be discussed in the following section.

### 2. The Record Does Not Support Plaintiffs' Requested MOPs

The evidence Plaintiffs rely on to support mandatory MOPs does not demonstrate that the specific MOPs they request will meaningfully reduce the likelihood of jeopardy to listed fish species. Plaintiffs suggest their MOPs will bring about two direct results that benefit listed fish survival: 1) decreasing travel time; and 2) decreasing water temperature. Oregon Motion at 45; NWF Motion at 50. With respect to travel time, Plaintiffs' evidence is speculative and does not actually demonstrate that the requested MOPs will decrease travel time. With respect to temperature, Plaintiffs' evidence is again speculative and includes no quantification of temperature benefits expected as a result of the requested MOPs. Dr. Deines examines Plaintiffs' explanation of these intended results and demonstrates Plaintiffs have not proved their request will provide incremental survival benefits above and beyond the regime outlined in the 2020 BiOp. The relief Plaintiffs request is again significantly broader than necessary to remedy the harms they assert.

Without adequate supporting evidence, Plaintiffs request the following MOPs:

[F]or Federal Defendants to operate the McNary, Dalles, and Bonneville reservoirs at near MOP with a 1.5-foot operating range from March 1 through August 31, beginning in 2026. … For John Day … that Federal Defendants be required (1) to operate at MIP with a 1.5-foot operating range from March 1 through June 15, and at 1 foot above MIP with a 1.5-foot operating range from June 16 through August 31, beginning in 2026, and (2) to prepare a plan identifying and proposing solutions to actions necessary for the John Day reservoir to operate at MOP with a 1.5-foot operating range from March 1 through August 31.

Oregon Motion at 45. Plaintiffs argue "[o]perating three (and eventually all four) LCR reservoirs at MOP with a 1.5-foot operating range will improve … fish travel time and survival, and help to ameliorate temperature risks." Oregon Motion at 45. Plaintiffs attempt to quantify the benefits to travel time of their requested MOPs, but, as Dr. Deines explains, their analysis extrapolates from

a data set that is too narrow (focusing primarily on the John Day Dam and extrapolating to other dams) when it attempts quantification at all. Plaintiffs do not even attempt to quantify the temperature benefits of their requested MOPs.

As to reduced travel time, Plaintiffs do not adequately explain how their requested relief brings real, incremental travel-time benefits. Despite proposing relief that represents a drastic change from current operations, they acknowledge that "manipulating reservoir elevation cannot fully compensate for the lost slope of the free-flowing river [but] can be used to improve conditions and water travel time *to some extent*." Oregon Motion at 38 (emphasis added). Later, they provide a predictive attempt to quantify those benefits. They cite Mr. Bowles, who predicts "[r]eductions in yearling Chinook travel time associated with MOP elevations rang[ing] from 0.5 to 2 days (depending on flow) when compared to full pool and 0.2 to 0.9 days when compared to MIP" and "[s]imilar gains are predicted for steelhead (0.4 to 1.6 days when comparing MOP to full pool and 0.2 to 0.7 when comparing MOP to MIP)." Oregon Motion at 46. Plaintiffs conclude "[t]hese analyses indicate that important additional fish protections can be gained for juvenile outmigrants during the spring if lower Columbia River reservoirs are operating at MOP with a 1.5-foot operating range during that timeframe." Oregon Motion at 46. But Dr. Deines explains that Plaintiffs' analysis: 1) fails to quantify certain key values at all; 2) relies exclusively on the John Day and Lower Granite dams and does not include data from the other Lower Columbia dams; and 3) ultimately represents "an experiment in fish passage." Decl. Deines at 23-26.

As to reduced temperature, Plaintiffs provide barely any analysis. They say briefly "reducing reservoir elevations" will "reduce … reservoir heating[.]" Oregon Motion at 39. Their Motion does not discuss any attempt to quantify this relationship. Nor does Mr. Bowles. Indeed, Dr. Deines points out that Plaintiffs simply do not "assess the amount of temperature improvement

that would derive from the incremental changes in spill and elevation represented by Plaintiff's recommended relief, and by extension, how those temperature changes may support Snake River Chinook ESU and steelhead DPS." Decl. Deines at 32. Plaintiffs' discussion of temperature benefits bears no relationship to the evidence they have produced and should be disregarded.

In sum, Plaintiffs' requested Preliminary Injunction is not narrowly tailored because they have tied their requested relief to benefits broadly attributable to reduced powerhouse encounters resulting from increased spill, reduced travel time resulting from a limited range of reservoir depth, and reduced temperature resulting from lower reservoir depth, but they have not produced evidence to demonstrate *their* requested relief will produce these results in any meaningful way.

### 3. If the Court Grants an Injunction, It Should Direct the Parties to Identify Significantly Narrower Terms

The Court does not have sufficient evidence to produce an injunction that is no broader and no narrower than necessary to remedy the specific harm. Accordingly, if the Court sees fit to issue an injunction at all (which it should not), it should direct the parties to convene and identify terms that comport with science, as supported by the evidence in the record.[2] The Court has done this in the past, at least as recently as *NMFS VI*, where the Court allowed the parties "to consider an appropriate protocol and methodology for spill at each dam, incorporating the most beneficial spill patterns" and "set periodic status conferences to ensure that the parties are making sufficient progress toward a spill implementation plan and proposed injunction order." *NMFS VI* at *11. That same approach would be reasonable here.

---

[2]    While PPC acknowledges that the Motions seek an injunction directing the Federal Defendants take certain actions, a requirement that the parties confer could yield a negotiated resolution that directs other parties to take actions to benefit the fish as well. For example, Oregon could agree to limit non-tribal fishing practices that have a deleterious effect on listed species. *See*, *e.g.*, Deposition of E. Bowles at 78.

The parties have a shared set of interests that may allow them to identify appropriate terms for operating the FCRPS.  To the best of PPC's knowledge, all parties to this case earnestly desire the survival of the listed fish species and the protection of Tribal treaty rights.  Similarly, the parties broadly share an interest in supporting a reliable and affordable electric grid that rests on a foundation of clean electricity generation.  Finally, PPC understands that the parties agree removal of the FCRPS is not an available remedy in this case.  Based on this shared foundation, the parties should be able to agree on how to balance these interests.  However, after 25 years of litigation, the parties may need direction from the Court to confer.  While PPC's preference is that the Court direct conferral in an order denying Plaintiffs' requested injunction, if the Court sees fit to issue an injunction, PPC respectfully requests it direct the parties to identify more reasonable terms than those proposed by the Plaintiffs.

## CONCLUSION

PPC respectfully requests the Court deny the Motions for Preliminary Injunction or direct the parties to confer and arrive at a reasonable approach to operation of the FCRPS, because Plaintiffs' requested relief is not supported by law and would not yield meaningful benefits for listed fish species but would create reliability risks for the West's electricity grid, drive significant costs for public power customers, and result in increased greenhouse gas emissions that cause the very climate change impacts that are threatening the continued viability of these important species.

Respectfully submitted this 15th day of December 2025,

*s/ Irion A. Sanger*
Irion A. Sanger, OSB No. 003750
John Maxwell Greene, OSB No. 182714
Sanger Greene, PC
4031 SE Hawthorne Blvd.
Portland, OR 97214
Telephone: (503)756-7533
Fax: (503)334-2235
irion@sanger-law.com
max@sanger-law.com

Of Attorneys for Intervenor-Defendant Public Power Council

CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2025, I electronically filed the foregoing OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION with the Clerk of the Court for the United States District Court – District of Oregon via the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

*s/ John Maxwell Greene*
John Maxwell Greene
Sanger Greene, PC
4031 SE Hawthorne Blvd.
Portland, OR 97214
Telephone: (401) 339-2990
Fax: (503) 334-2235
max@sanger-law.com

Of Attorneys for Intervenor-Defendant Public Power Council