**Lindsay Thane, OSB #171474**
Email:  lthane@schwabe.com
**Aukjen Ingraham, OSB # 023338**
Email: aingraham@schwabe.com
**Lawson E. Fite, OSB #055573**
Email:  lfite@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Facsimile: 503-796-2900
*Attorneys for Intervenor-Defendant Inland Ports and Navigation Group*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, *et al.*,<br><br>    Plaintiffs,<br><br>  and<br><br>STATE OF OREGON, *et al.*,<br><br>    Intervenor-Plaintiffs,<br><br>  v.<br><br>NATIONAL MARINE FISHERIES SERVICE *et al.*,<br><br>    Defendants,<br><br>and<br><br>PUBLIC POWER COUNCIL, *et al.*,<br><br>    Intervenor-Defendants. | Case No. 3:01-cv-00640-SI<br><br>**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS** |

# TABLE OF CONTENTS

Introduction..................................................................................................................1

Factual Developments Relevant to the Motion for Preliminary Injunction.......................3

Standard of Review.........................................................................................................4

Argument .......................................................................................................................7

    I.      Plaintiffs Fail to Show "Serious Questions" on Their Challenge to the 2020 BiOp...............................................................................................7

            A.     The 2020 BiOp Conducted a Lawful Jeopardy Analysis................8

                  1.     Jeopardy Under Section 7(a)(2) Requires an Affirmative Agency Action; Plaintiffs' Theory Improperly Treats Inaction or Preexisting Conditions as a Section 7 Violation.....................................................................................8

                  2.     The 2020 BiOp Ensures There is No Appreciable Reduction in the Likelihood of Survival or Recovery of the Species; Plaintiffs Misconstrue the Legal Standard...........10

                  3.     Role of Recovery: Section 7 Does Not Require a "Contingency Plan" or a Guaranteed Trend Toward Recovery.....................................................................................12

            B.     The 2020 BiOp's Environmental Baseline Is Lawful....................14

                    1.     The 2020 BiOp Correctly Follows the 2019 ESA Consultation Rule Defining "Environmental Baseline." ...15

                    2.     Consistent with Past Precedent in This Case, the 2020 BiOp Properly Describes and Considers the Environmental Baseline.................................................................................18

    II.     The Requested Measures are Not Needed to Avoid Irreparable Harm. ....21

            A.     The Listed Species Have Increasing Abundance Trends; Plaintiffs' Extinction Analysis is Flawed. .....................................................22

            B.     Plaintiffs' Requested Relief Does Not Provide Benefits to Fish Survival Relative to Current Operations Under the 2020 BiOp. ...26

    III.    Plaintiffs Ignore Threats to Navigation Safety on the Columbia and Snake Rivers.........................................................................................................28

            A.     The Corps Should Retain Discretion for Adaptive Management. .28

            B.     Navigation-Safe Spill Should be Available on 45-Minute Notice.31

**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

C.     Spill Must be Modeled before Implementation to Ensure Navigation Safety.........................................................................31

Conclusion ........................................................................................................32

**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...........................................6, 7

*American Rivers v. FERC*, 895 F.3d 32 (D.C. Cir. 2018) .....................................................20, 21

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) ...................................................................................................................14

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................6

*Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869 (9th Cir. 2025) ...................................................................................................................12

*Cooling Water Intake Structure Coalition v. E.P.A.,* 905 F.3d 49 (2d Cir. 2018)................20, 21

*Cottonwood Env'tl L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ....................5, 22

*Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* No. 6:15-cv-02358-JR, 2016 WL 9226390 (D. Or. Apr. 6, 2016) ...............................................................6

*Ctr. for Biological Diversity v. United States Forest Serv.*, No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025)....................................................................................12

*Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085 (E.D. Wash. 2006) ........................................11

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) ..................................................................................................... *passim*

*Friends of Animals v. Haaland*, 102 F.4.th 1024, 1055 (9th Cir. 2024)......................................11

*Humane Soc'y of the United States v. Bryson*, No. 3:12-CV-00642-SI, 2012 WL 1952329 (D. Or. May 30, 2012) .................................................................................7, 22

*Klamath Siskiyou Wildlands Ctr. v. United States Fish & Wildlife Serv.*, No. 1:21-CV-00058-CL, 2022 WL 856035 (D. Or. Mar. 23, 2022).......................................................7

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...............................................................6

*Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ............................4

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)..................................................................................6

Page iii -   **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F.Supp.3d 861 (D. Or. 2016) .................................................................................................. 8, 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1278878 (D. Or. May 26, 2005) ............................................................................................ 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ........... *passim*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018) ............... 8, 29

*Nw. Envt'l. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) .......................................................... 7, 22

*Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766 (9th Cir. 1985) ....................................... 4

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439 (9th Cir. 2011) .............................. 12

*Salmon Spawning & Recovery All. v. Nat'l Oceanic & Atmospheric Administration's Nat'l Marine Fisheries Serv.*, 342 Fed. App'x. 336 (9th Cir. 2009) ................................................................................................... 11

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ........................................... 6

*Willamette Riverkeeper v. Nat'l Marine Fisheries Serv.*, 763 F. Supp. 3d 1203 (D. Or. 2025) ................................................................................................ 12, 17

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................... 5, 7

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................... 6

16 U.S.C. § 1536 ...................................................................................... 11

Endangered Species Act ......................................................................... *passim*

Northwest Power Act, 16 U.S.C. § 839 ............................................................. 17

**Other Authorities**

50 C.F.R. § 402.02 ................................................................................ 11, 16

50 C.F.R. § 402.14(1)(h)(1) ......................................................................... 11

Page iv -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

## Introduction

Plaintiffs' Motions fail because there is no threat of irreparable harm. At a minimum, Plaintiffs must show that their requested relief is necessary to avoid harm. They have not done so. Given that this basic requirement has not been met, this Court should deny Plaintiffs' demand for the extraordinary remedy of an injunction that will significantly affect safe navigation on the Columbia River.

The Inland Ports and Navigation Group ("IPNG") opposes Plaintiffs' Motions for Preliminary Injunction. Neither the State of Oregon nor the National Wildlife Federation (collectively, "Plaintiffs") have made the showing that the extraordinary remedy of a preliminary injunction is justified. Specifically, they have failed to show serious questions on the lawfulness of the 2020 Biological Opinion ("2020 BiOp"), and have failed to show that their requested relief is necessary to forestall irreparable harm in the period when this case will be fully litigated. Injunctive relief should never be allowed to imperil the safety of navigation and cause severe harm to irrigators and farmers in the Columbia Basin and Lower Snake River regions.

The science does not support Plaintiffs' requested relief. The measures incorporated into the 2020 BiOp are already avoiding irreparable harm to listed salmon and steelhead species. The science shows that Plaintiffs' requested measures will have negligible benefits to fish populations. This Court cannot order Plaintiffs' requested injunction even under the more generous standard for injunctions under the Endangered Species Act ("ESA") because Plaintiffs' request does not further the species' interests in a meaningful way.

IPNG has a considerable interest in navigation safety and continued economic opportunities for inland ports and industries that rely on the Columbia Snake River System ("CRS"). IPNG is an organization made up of public ports in Washington, Idaho, and Oregon,

Page 1 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

farmers, and members of the towboat, cruise ship, grain, and forest products industries. IPNG represents the interests of navigation and commerce on the CRS. Throughout this litigation, IPNG has supported efforts by the action agencies and state and tribal governments to protect listed salmon and steelhead species, while preserving the federally authorized channel and locks for navigation from the mouth of the Columbia River to Lewiston, Idaho.

Plaintiffs' requested relief will have severe negative impacts on IPNG's members because it will change how spill operations and reservoir forebay elevation operations are handled. It will also hamper the Army Corps of Engineers' (the "Corps") ability to react to navigable safety situations that require flexibility.  The requested relief will cause unsafe navigation conditions for IPNG's members due to: (1) un-modeled changes to spill and reservoir forebay elevation operations; (2) an elimination of the navigation-safe components built in to the Corps' recent fish operations plans related to spill; and (3) extended operations at minimum operating pool ("MOP") without affording the Corps the flexibility to operate with sufficient buffer to provide safe navigation conditions. Additionally, the requested decreases in reservoir elevation  will stifle the ability to move the over $25 billion in commodities that is transported on the CRS annually, which hurts farmers, rural economies, and the countries who rely on the exports for food.

Plaintiffs have not shown that any injunctive relief is justified. But to the extent the Court finds any relief is appropriate, Plaintiffs also fail to acknowledge the serious concerns related to navigating the CRS with no sound scientific analysis to demonstrate that operations under the 2020 BiOp cause irreparable harm to the listed species. Plaintiffs' requested relief should be denied and any plan moving forward must take into account safe river navigation and the ability for commodities to continue to move to market.

Page 2 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

**Factual Developments Relevant to the Motion for Preliminary Injunction**

Because Plaintiffs' claims at issue in the motions challenge the 2020 BiOp, the Court does not sit as a fact-finder in the merits inquiry. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). In such cases, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Facts have developed since 2020, however, which bear on the irreparable harm analysis. These facts are developed in the submissions from Plaintiffs, certain government studies, and in the declaration of IPNG's expert witness, Ian Courter, a fisheries biologist who has worked for decades on salmonid issues for governments, non-profits, and private sector clients.

ESA-listed salmon and steelhead counts are growing, not shrinking. A 2025 publication by the National Marine Fisheries Service ("NMFS") found the majority of ESA-listed stocks of salmon and steelhead had increasing abundance trends over the past 25 years. Decl. of Ian Courter ¶ 10. Similarly, in 2022, NMFS's five-year status review found that recent declines in Snake River spring Chinook were concerning, but "each population remains well above the abundance levels of when they were listed." *Id.* (internal citation omitted). Ocean conditions, freshwater habitat restoration, hatchery supplementation, fishery management changes, and hydro system operational refinements have all contributed to the improvement. *Id.*

Columbia Basin salmon and steelhead are competing for food and habitat which has had an effect on their numbers. This phenomenon is known as density dependence and means that as population abundance increases, survival decreases due to intraspecific competition for limited resources. Courter Decl. ¶ 12. In other words, there is not enough habitat/food for the number of

Page 3 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

fish in a given area. *Id.* For example, studies in 2020 and 2025 that focused on Snake River spring/summer Chinook salmon reported that freshwater carrying capacity is the most important parameter affecting extinction risk of Snake River spring/summer Chinook. *Id.* These studies demonstrate that limited freshwater habitat availability is the primary reason present-day species numbers remain low relative to historic abundance estimates. *Id.* Because of this research, resources have been focused on a regional recovery strategy emphasizing habitat restoration efforts. For example, the 2025 study referenced above compared abundance trends of listed and non-listed salmon and steelhead stocks from 1995 to 2020 and their analysis found that "[a] majority of the protected DPSs [distinct population segments] had increasing abundance trends over this time period, and protected populations had higher median trends than non-protected populations of the same species." *Id.* at ¶ 14. Instead of acknowledging the progress made, Plaintiffs appear to be anchoring any consideration of population abundance numbers around historic population estimates, which masks the positive progress in recent data.

## Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such relief, a movant must establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent the grant of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id*. at 20. In ESA cases, although the balance of harms and public interest factors are presumed to weigh in favor of the species, these factors do not weigh in favor of a preliminary injunction unless it can be shown that an injunction is necessary to forestall irreparable harm. *Cottonwood*

Page 4 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

*Env'tl L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090–91 (9th Cir. 2015). And even in ESA cases, courts do not presume irreparable harm and a movant must still make an affirmative showing. *Id.*

Injunctive relief is a "drastic remedy" and should only be awarded upon a "clear showing" that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This is particularly true where the requested relief alters, rather than preserves, the status quo and requires a party to take an affirmative step. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* No. 6:15-cv-02358-JR, 2016 WL 9226390 at *1 (D. Or. Apr. 6, 2016).

In evaluating these four factors, the Ninth Circuit utilizes a "serious questions" version of the "sliding scale" test such that as to the first factor, a plaintiff must raise only "serious questions" on the merits—"a lesser showing than likelihood of success." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

The first factor, likelihood of success, requires more than speculation; under the sliding-scale approach, a plaintiff must at least raise "serious questions going to the merits" to justify preliminary relief. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). A challenge to a biological opinion is reviewed deferentially under the Administrative Procedure Act ("APA"), under which agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Bennett v. Spear*, 520 U.S. 154, 173 (1997). The APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

"Serious questions" are those that cannot be resolved one way or the other at the

Page 5 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

preliminary injunction hearing because they require more deliberative investigation. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1192. They need not promise a certainty of success, but they must present at least a fair chance of success on the merits of the ESA claim. *Id*. Where the record reflects a genuine scientific or factual dispute over whether the challenged action is likely to violate the ESA, courts may conclude that serious questions exist at the preliminary stage. *Id*. at 1192–93. Conversely, where the administrative record substantially supports the agency's ESA analysis and Plaintiffs do not raise substantial issues on their consultation or take theories, courts have denied preliminary relief for failure to show serious questions. *Klamath Siskiyou Wildlands Ctr. v. United States Fish & Wildlife Serv.*, No. 1:21-CV-00058-CL, 2022 WL 856035, at *8-9 (D. Or. Mar. 23, 2022).

The irreparable harm factor requires a movant demonstrate that such harm is likely in the absence of the injunction. *Cottrell*, 632 F.3d at 1135. The mere "possibility" of harm is not enough. *Winter*, 555 U.S. at 22. Where alleged harms are speculative, remote, or contingent on future events, the irreparable harm factor is not satisfied and an injunction must be denied. *See Winter*, 555 U.S. at 22–26. Courts therefore look for a "definitive threat of future harm to protected species, not mere speculation." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193; *Nw. Envt'l. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00437-HZ, 2019 WL 2372591 at *11 (D. Or. June 5, 2019) (Plaintiffs must show "that the species is likely to suffer irreparable harm *before* the Court can resolve the merits of Plaintiffs' claims" (emphasis added)); *Humane Soc'y of the United States v. Bryson*, No. 3:12-CV-00642-SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012) ("The purpose of a preliminary injunction is to prevent harm that would impair this court's ability to grant effective relief after resolving the merits of the case.").

If, after applying these demanding standards, a court concludes that some provisional

Page 6 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

relief is warranted, it must still ensure that any preliminary injunction is narrowly drawn to remedy only the specific irreparable harm. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F.Supp.3d 861, 948 (D. Or. 2016) ("*NMFS V*"). The scope of an injunction is to be no broader than necessary to redress the specific irreparable harm alleged. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195. There must be a "sufficient causal connection" between the alleged irreparable harm and the activity to be enjoined, as well as a showing that "the requested injunction would forestall" the irreparable harm. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) ("*NMFS VII*") (internal quotation omitted); *see also Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1197 (despite plaintiffs having shown a reasonably certain threat of harm, the requested preliminary injunctive relief was narrowed because limiting wolf trapping and snaring beyond the range of listed grizzly bears was "geographically overbroad" and improperly extended to state research trapping).

## Argument

**I.     Plaintiffs Fail to Show "Serious Questions" on Their Challenge to the 2020 BiOp.**

Plaintiffs' core contention is that the 2020 BiOp's no-jeopardy finding is arbitrary and capricious. That is not correct. The 2020 BiOp fully complies with the ESA and its implementing regulations. It uses a legally defensible environmental baseline, evaluates the total effects of the proposed action when added to that baseline, and gives a rational, science-based explanation for its conclusions that the proposed action would incrementally benefit listed species.

Plaintiffs' challenges to the 2020 BiOp's analytical framework are unfounded. They misstate the jeopardy standard by treating Section 7(a)(2) as a mandate to maximize benefits rather than to avoid appreciable deterioration, and they demand affirmative improvement in

Page 7 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

species status even though the statute requires only that agency action not appreciably reduce the likelihood of survival and recovery. Plaintiffs further mischaracterize the 2020 BiOp's use of the environmental baseline and the 2019 consultation rule, insisting that all CRS operations must be treated as discretionary "ongoing action," contrary to controlling case law distinguishing discretionary from non-discretionary operations. Oregon's separate attack on the absence of Adaptive Management Implementation Plan ("AMIP")-like "contingency triggers" similarly fails because neither Section 7 nor its implementing regulations require a stand-alone contingency plan where a BiOp employs adaptive management, an Incidental Take Statement with appropriate reinitiation triggers, and a reasoned no-jeopardy determination.

Each of these arguments reflects a policy disagreement with the 2020 BiOp and at its core—with the structure of the ESA—rather than a legal defect. None of the arguments raises a serious question whether the agencies acted arbitrarily or capriciously in their analysis and determinations in the 2020 BiOp. The scientific disputes that Plaintiffs attempt to raise do not rise to the level of "serious questions" because they are policy disputes, not disputes about the correct adherence to the ESA in conducting the 2020 BiOp.

## A.     The 2020 BiOp Conducted a Lawful Jeopardy Analysis.

### 1.     Jeopardy Under Section 7(a)(2) Requires an Affirmative Agency Action; Plaintiffs' Theory Improperly Treats Inaction or Preexisting Conditions as a Section 7 Violation.

In a prior stage of this litigation, the Ninth Circuit Court of Appeals held that an agency action "can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) ("*NMFS III*"). The statute uses "jeopardize" which is a verb, not a noun, to describe the effect of an *action* on the species, rather than naming "jeopardy" as a state

Page 8 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

of being. *Id.* Here, the 2020 BiOp determined that the proposed action will *lessen* jeopardy risk, and incrementally *improve* the species' prospects of survival and recovery—conclusions that are borne out by data since 2020 and by Plaintiffs' own submissions.

Plaintiffs' theory inverts the jeopardy standard by asserting that the 2020 BiOp is unlawful because it "permits functional extinction" by allowing only "minimal improvement." ECF 2530 at 27–29. NWF similarly quibbles with the alleged "comparative assessment" in the 2020 BiOp by stating that it "reduces the effects of the Proposed Action to a featherweight or even an incremental improvement," which admits it will not be a deterioration in the species' condition, but will in fact provide some positive benefit, which is more than the ESA requires. ECF 2526 at 28. But even accepting Plaintiffs' characterization of the action as producing "minimal" improvement, that is a far cry from "appreciably reducing" the likelihood of the species' survival and recovery.

As Plaintiffs would have it, if a species is in a sufficiently poor state (which they refer to as a state of "jeopardy"), then there is a duty to put maximum effort toward the species (regardless of efficacy). That is not the law. Where a species is in poor condition, "[a]n agency may still take action . . . that lessens the degree of jeopardy." *NMFS III*, 524 F.3d at 930. The proposed action evaluated in the 2020 BiOp is such an action as it lessens the overall level of threat to the affected species. The agencies are not imposing any additional *harm* that Section 7 prohibits. *See id.*

Oregon's brief repeatedly condemns "status quo" conditions while treating the 2020 BiOp's no-jeopardy finding as if Section 7 imposes strict liability for ongoing ecological stressors that the action agencies do not affirmatively cause. ECF 2530 at 26–29. This is not the ESA standard and is in conflict with prior precedent in this case that held the dams are an

Page 9 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

105422\126072\49374076.v10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

"existing human activity" in the environmental baseline. It is the *operation* of the dams—not their existence—that must be evaluated to determine whether the agencies' proposed actions will jeopardize listed species. *NMFS III*, 524 F.3d at 930–31.

> **2.    The 2020 BiOp Ensures There is No Appreciable Reduction in the Likelihood of Survival or Recovery of the Species; Plaintiffs Misconstrue the Legal Standard.**

Oregon asserts that the 2020 BiOp's no-jeopardy conclusion is unlawful because the action produces, at most, "minimal improvement" that Oregon finds unsatisfactory. ECF 2530 at 27-29; ECF 2526 at 33-34. That is not the legal standard. Section 7 requires an agency to ensure that the action does not "reduce appreciably" the likelihood of survival or recovery of the species "by *reducing* the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added). Agencies must use the best scientific and commercial data available to make this determination. 16 U.S.C. § 1536. The BiOp must include a summary of the information on which the opinion is based, a detailed discussion of the environmental baseline, the effects of the action on listed species or habitat, and the agency's opinion on whether the action is likely to jeopardize the species or adversely modify its habitat. 50 C.F.R. § 402.14(1)(h)(1).

The 2020 BiOp applies precisely that definition and explicitly notes that Section 7 does not require each consulted-on action to "improve or increase the likelihood of survival and recovery." ACE001056265. Section 7(a)(2) does not mandate each action ensure recovery. *Friends of Animals v. Haaland*, 102 F.4.th 1024, 1055 (9th Cir. 2024) (ESA does not require net improvement ). The Ninth Circuit has endorsed that framework both before and after the 2019 rulemaking. See *Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1095 (E.D. Wash. 2006) (Discussing the above standard and stating: "This grant of authority has been characterized as a 'do-no-harm obligation' on agencies when their own actions could cause harm to an endangered

Page 10 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

species"); *Salmon Spawning & Recovery All. v. Nat'l Oceanic & Atmospheric Administration's Nat'l Marine Fisheries Serv.,* 342 Fed. App'x. 336, 338-39 (9th Cir. 2009) (holding that a no-jeopardy determination is lawful where the agency reasonably concludes the action will not appreciably reduce the species' likelihood of survival or recovery; rejecting Plaintiffs' argument that Section 7 requires affirmative improvement or evidence that the action "boosts" recovery prospects); *Willamette Riverkeeper v. Nat'l Marine Fisheries Serv.,* 763 F. Supp. 3d 1203, 1225 (D. Or. 2025) ("Under ESA Section 7(a)(2), a BiOp must evaluate 'how the [proposed] agency action affects the species or its critical habitat,' . . . and the consulting agency must make a jeopardy finding only if a species' likelihood of survival and recovery in the wild are 'appreciably' diminished by the [action]." (internal quotation omitted)).

Recent Ninth Circuit decisions confirm that a no-jeopardy BiOp can be reasonable even when some individuals or local reproduction are adversely affected, so long as the species' overall likelihood of survival and recovery is not appreciably reduced. See *Ctr. for Biological Diversity v. United States Forest Serv.*, No. 23-2882, 2025 WL 586358, at *4 (9th Cir. Feb. 24, 2025) (upholding Fish & Wildlife Services' ("FWS") no-jeopardy conclusion where short-term non-lethal effects could depress reproduction for grizzly bears "for 1–2 reproductive cycles" was reasonable, relying on *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 443 (9th Cir. 2011), which upheld a no jeopardy determination for the bull trout even where FWS concluded "the rate of recovery of the core area population may slow slightly"); see also *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 881 (9th Cir. 2025) (no-jeopardy reasonable where record showed action would not appreciably diminish species-level

Page 11 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

prospects).[1]

The ESA and case law directly rebut Oregon's premise that a no-jeopardy conclusion is unlawful absent demonstrable improvement. *See* ECF 2530 at 27–28. The ESA requires an agency to prevent appreciable reduction of the species; it does not require guaranteed recovery through every Section 7 consultation.

The 2020 BiOp asks, for each species, whether the proposed operations would appreciably reduce the likelihood of survival or recovery compared to the status-quo trajectory. ACE001056842-ACE001056845. Contrary to Oregon's claim, Federal Defendants did not "abandon" recovery metrics, Federal Defendants utilized quantitative metrics directly linked to recovery: median abundance projections and quasi-extinction thresholds ("QET") over a 24-year horizon. ECF 2530 at 11; *Id.*

Recovery is a landscape-scale effort; Section 7 aims to ensure that federal actions at a local and regional scale will not set back that collective endeavor. Here, the Federal Defendants reasonably found that the proposed action, including CRS operations with specific mitigation measures, will not appreciably delay or derail progress toward recovery.

### 3. Role of Recovery: Section 7 Does Not Require a "Contingency Plan" or a Guaranteed Trend Toward Recovery.

Oregon asserts the 2020 BiOp is arbitrary because it lacks the 2009 AMIP-style

---

[1] These holdings are not in conflict with this Court's decision in *NMFS V*, 184 F. Supp. 3d at 885–895. In *NMFS V*, the court was specifically analyzing the 2014 BiOp's "trending toward recovery" analysis and the quantitative analysis undertaken by NOAA Fisheries to determine whether that met the ESA standard of not appreciably reducing the likelihood of survival and recovery. In that case, the court faulted the Federal Defendants for being unable to demonstrate how an increasing population and the reasonable and prudent alternatives would impact recovery and not reduce appreciably the likelihood of recovery. Here, the 2020 BiOp uses modeling to project abundances and explains the likelihood of recovery.

Page 12 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

abundance "triggers" and a pre-baked contingency plan. ECF 2530 at 33–35. The 2020 BiOp

explains, that (i) the old AMIP triggers were outdated and keyed to data through 2007–2008; (ii)

many "contingency" measures are already incorporated into the proposed action (e.g.,

substantially higher spill, refined transport, hatchery reform); and (iii) several other measures lie

outside the Action Agencies' authority. ACE001056310. The 2020 BiOp further documents an

adaptive-management process tied to monitoring and collaboration with federal and state

agencies and tribal sovereigns to ensure expected benefits are realized and operations can be

modified as new information emerges. *Id*.

That record both acknowledges Oregon's concern and explains the Federal Defendants'

choice: adaptive management plus reinitiation obligations are the appropriate tools, not ossified

abundance triggers from a prior regime. See ECF 2530 at 34. Administrative law requires a

"rational connection" between facts and choice; it is not a particular policy instrument. *Arizona*

*Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001). The

2020 BiOp's explanation suffices.

The case cited by Oregon, *Oregon Wild v. U.S. Forest Service*, to illustrate that the 2020

BiOp impermissibly "swerves" from "longstanding practice" is a puzzling choice. ECF 2530 at

34. The court's concern in *Oregon Wild* was an apparent, unexplained shift from earlier

consultations until the record showed that the agency had in fact reached the same bottom-line

view in prior consultation and consideration of the potential affects had been discussed several

times in the intervening years. Thus the challenged opinion was not "a sharp shift" but was rather

a "continuation" of the evolving conclusions of the agency over the course of over a decade.

*Oregon Wild* , 193 F. Supp. 3d at 1165–66.

Here, similarly, there is no unexplained "swerve" from prior agency practice: The 2020

Page 13 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

BiOp's approach was not an unexplained departure from prior analyses, but a legally and scientifically justified evolution. By 2020, Federal Defendants had replaced earlier BiOps with a new, comprehensive consultation, rendering the AMIP obsolete. The 2020 BiOp integrated adaptive management and reinitiation triggers directly into its Reasonable and Prudent Measures and Incidental Take Statement without a separate AMIP document. No further justification was required because the agency's new course rested on new governing standards and a different evidentiary record, not on repudiation of its prior factual premises. Moreover, Oregon's argument ignores the fact that a BiOp is prepared for the proposed action, not the species as a whole. The BiOp must respond to changes and mitigation measures embodied in the proposed action.

To the extent Oregon argues that the absence of a contingency plan itself violates Section 7, that argument lacks a legal basis in the ESA or its consultation rule. Section 7 requires a lawful effects analysis and, if necessary, reasonable and prudent alternatives—it does not require a contingency plan. Plaintiffs' present no case law to back up this claim and none exists. The 2020 BiOp contains an appropriate Incidental Take Statement and reinitiation triggers, although Oregon does not challenge these in attempting to impose new requirements found nowhere in the ESA.

### B.     The 2020 BiOp's Environmental Baseline Is Lawful.

The 2020 BiOp correctly accounted for the environmental baseline of the CRS operations. Plaintiffs' arguments to the contrary are misguided. *See* ECF 2530 at 35–40; ECF 2526 at 22–31. In issuing the no-jeopardy 2020 BiOp, the Federal Defendants followed the law and regulations by distinguishing ongoing baseline conditions from the effects of the proposed action. The 2020 BiOp's treatment of the baseline is both legally sound and consistent with

Page 14 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

precedent, and Plaintiffs' attempts to fault this approach reflect a misreading of the ESA and its implementing regulations.

### 1. The 2020 BiOp Correctly Follows the 2019 ESA Consultation Rule Defining "Environmental Baseline."

Plaintiffs first argue that the 2020 BiOp "relies on an illegal comparative framework" by assigning ongoing dam impacts to the "environmental baseline" and measuring the proposed action's effects against that baseline. ECF 2526 at 35–43. According to Plaintiffs, the 2020 BiOp has attempted to "insulate" the dams' harm from ESA scrutiny by hiding it in the baseline, but that mischaracterizes both the 2020 BiOp and the law. NWF relies on *NMFS III* to claim that "the overall operation of the CRS is discretionary," so therefore nothing belongs in the baseline. ECF 2526 at 22. But *NMFS III* rejected a reference-operation device that excluded degraded baseline conditions from the jeopardy calculus; it did not hold that all facets of multi-purpose river projects are discretionary for Section 7 purposes. *NMFS III*, 524 F.3d at 923–33. In *NMFS III*, moreover the court "acknowledge[d] that the existence of the dams must be included in the environmental baseline . . . ." *Id.* at 930. Because certain aspects of the operation of the dams are discretionary, the court continued, any proposed action "must be evaluated in the conte[x]t of this baseline in order to properly determine whether the proposed actions will jeopardize the listed fishes." *Id.*

In 2019, the Services clarified that "impacts to listed species or designated critical habitat from Federal agency activities or existing Federal agency facilities that are not within the agency's discretion to modify are part of the environmental baseline." 50 C.F.R. § 402.02 (2019). 50 C.F.R. § 402.03 is a backstop that prevents Section 7 consultation—and thereby reviewing courts—from requiring that the baseline apply to all proposed actions and instead,

**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

specifies that consultation "covers only discretionary agency actions and does not attach to actions . . . that an agency is required by statute to undertake . . . ." *National Ass'n of Home Builders*, 551 U.S. at 669. A court in this District has clarified that "the relevant inquiry under ESA Section 7(a)(2) is not whether the species and its habitat continue to suffer adverse effects from other actions, such as dams, development, or climate change, but rather whether, *against that backdrop*, the proposed agency action under review 'place[s] the existence of the species in jeopardy.'" *Willamette Riverkeeper,* 763 F. Supp. 3d at 1225 (emphasis added) (reviewing NMFS' discussion of downgraded habitat based on historical information from past environmental baselines as part of the environmental baseline for the biological opinion analyzing the Willamette Valley Project Dams and water quality on winter steelhead and their habitat satisfied the ESA).

Plaintiffs' assertion that in *NMFS III* the Ninth Circuit held the "overall operation of the CRS is discretionary" overstates the holding. ECF 2526 at 30. In *NMFS III*, the court rejected NMFS's 2004 attempt to utilize "a hypothetical 'reference operation' in its jeopardy analysis to exclude from the proposed actions' impacts the effects of related operations NMFS deems "nondiscretionary." 524 F.3d at 928–29. The court did not hold that every minute aspect of CRS operations is discretionary. *Id.* It acknowledged that the *goals* (e.g. flood control) may be mandatory, but the *means* involve agency choice. *Id.* The court further "acknowledge[d] that the existence of the dams must be included in the environmental baseline," though "the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act, 16 U.S.C. § 839." *NMFS III*, 524 F.3d at 930–31.

Plaintiffs cite language from *NMFS III* criticizing a comparative method that masked action-caused risk by benchmarking to an already degraded baseline. ECF 2526 at 22–23. NWF

Page 16 -   **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

105422\126072\49374076.v10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

overstates the case, as it decries the use of *any* comparisons, even though the comparisons at issue are real-world historic examples from this existing project. *Id.* This is very different from the "hypothetical reference operation" invalidated by the Ninth Circuit in *NMFS III,* where the 2004 BiOp created a fabricated reference operation that did not actually exist, and that artificially excluded many real CRS impacts. *NMFS III*, 524 F.3d at 928–31. The flaw was not baseline use or comparing proposed practices with past data (as is occurring here, even by Plaintiffs' own admission), it was the creation of a counterfactual scenario that obscured the deteriorating effect of the proposed action. *Id.* at 930–31. That defect is absent here. The 2020 BiOp does not compare the action to any fabricated regime; it evaluates the effects of the proposed action additively against the actual environmental baseline, as the 2019 ESA Consultation Rule requires. The 2020 BiOp identifies the proposed action as continued CRS operations with refined spill, flow, transport, habitat, hatchery, and predator-management measures, and evaluates their effects under actual current conditions. ACE001056344 (baseline discussion); ACE001056264; ACE001056314 (action description and effects methodology).

The 2020 BiOp faithfully applies the 2019 ESA Consultation Rule's definition of "environmental baseline " and is consistent with past precedent, including *NMFS III.* ACE001056265. Far from hiding discretionary harm in the baseline, the 2020 BiOp analyzed the effects of the CRS's ongoing operations as part of the proposed action where those operations were subject to the agencies' control. Nothing in the record supports Plaintiffs' claim that the 2020 BiOp assigns all dam-caused mortality to the baseline; the 2020 BiOp contains detailed analyses of hydropower turbine mortality, predation, and passage effects, then evaluates the incremental effect of the proposed operations and mitigation measures. ACE001056313– ACE001056314, ACE001056540–ACE001056542, ACE001056671–ACE001056672; ECF

Page 17 - **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

2530 at 36.

The 2020 BiOp also appropriately accounts for the environmental baseline in its consideration of the "effects of the action", including "basinwide water management activities to meet authorized project purposes." *E.g.* ACE001056408–ACE001056409. Since the 2020 BiOp does not fail to account for the non-discretionary operations as part of the baseline, Plaintiffs' complaint seems to be that the 2020 BiOp discusses current operations and the effects of those operations at all. (See ECF 2526 at 26; ECF 2530 at 36) (stating that the 2020 BiOp contradicts *NMFS III*, but the motion does not appear to support its conclusory statement with argument on this point). There is nothing unlawful about including a discussion of the historical management in the 2020 BiOp. The 2020 BiOp also appropriately accounts for the environmental baseline "in its consideration of effects of the action", including "basinwide water management activities to meet authorized project purposes." ACE001056408-ACE001056409.

The Plaintiffs' argument rests on a false premise that the 2020 BiOp swept discretionary operations under the rug by including them in the baseline. In reality, the 2020 BiOp appropriately segregated only those impacts that the action agencies have no power to alter as the baseline. The 2020 BiOp's thorough explanation of the environmental baseline, including providing context relative to past operations, is not an attempt to categorize all effects as "nondiscretionary."

### 2.    Consistent with Past Precedent in This Case, the 2020 BiOp Properly Describes and Considers the Environmental Baseline.

Plaintiffs' strained reading of the 2020 BiOp inaccurately attempts to paint it as the same as the 2004 BiOp. ECF 2526 at 27–28; ECF 2530 at 37–38. In contrast to the 2004 BiOp, the 2020 BiOp carefully explains ongoing operations and describes the effects of the proposed action

Page 18 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

as part of the baseline conditions, and then evaluates the effects of the proposed operational changes against that baseline. For example, the 2020 BiOp explains that "continued reduced flows" in the lower Snake and Columbia during May–July are part of the background operational regime and demonstrates the degree to which conditions would change. ACE001056411–13 ("The effects of CRS operations will include continued reduced flows in the lower Snake and Columbia Rivers during the months of May through July. The proposed changes in reservoir operations will affect monthly average outflows minimally (0 to 2 percent) at McNary Dam, relative to current conditions."); and ("The proposed change in flow would be too small to affect river temperature during the adult migration period, which would be the attribute of highest concern. The associated effects on Snake River spring/summer Chinook smolts or adults should not change from recent conditions by a meaningful amount."). These statements, and similar statements throughout the 2020 BiOp, assist in orienting the reader to contextualize the proposed operation. These statements are in fact a "comprehensive approach to jeopardy" because they are not offered simply for minimizing the current effects by comparing them against the current operations. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1278878, at *14 (D. Or. May 26, 2005) ("*NMFS II*"). Rather, the 2020 BiOp thoroughly analyzes the current operations as part of the environmental baseline and discusses the proposed operations, all of which inform the effects analysis and the jeopardy determinations. The 2020 BiOp's analysis of baseline operations and proposed operations reflects this "comprehensive approach to jeopardy," *id.*, and Plaintiffs' effort to depict it as a repeat of 2004 misstates both the record and the governing law.

Plaintiffs ignore binding Ninth Circuit precedent and rely on out-of-circuit cases like *Cooling Water Intake Structure Coalition v. E.P.A.,* 905 F.3d 49, 81 (2d Cir. 2018) and

Page 19 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

*American Rivers v. FERC*, 895 F.3d 32, 46-47 (D.C. Cir. 2018)*,* but those decisions predate the 2019 rule and involved agencies that failed to describe or analyze the actual, ongoing operational baseline, creating uncertainty about whether the effects analysis captured what was already occurring versus what the agency was newly authorizing. That is the opposite of what NMFS did here.

In *American Rivers,* the D.C. Circuit faulted FERC because it did not analyze the project as it currently operates when projecting future effects, 895 F.3d at 46–47, whereas the 2020 BiOp is explicit about the hydrosystem's present operational regime and its precise effects on flow, temperature, migration timing, and life-stage survival. ACE001056411-ACE001056413. *Cooling Water Intake* also does not help Plaintiffs. There, the Second Circuit reviewed EPA's Clean Water Act rule for cooling water intake structures and, in the ESA context, focused on whether the agencies had adequately considered the effects of the federal rulemaking decision itself on listed species in light of the continued operation of covered facilities. 905 F.3d at 80–82. The court did not hold that all ongoing facility operations must be treated as part of the "federal action," nor did it collapse long-standing, non-federal operations into the action effects; instead, it required the agencies to assess how the new federal regulatory decision would influence entrainment and impingement risks at those facilities going forward. *Id*. That is fully consistent with the 2020 BiOp's approach: CRS operations that are already in place and not presently subject to new discretion are treated as part of the environmental baseline, while only the specific discretionary changes in operations are analyzed as "effects of the action." Plaintiffs' attempt to stretch *Cooling Water Intake* into a rule that every ongoing project is an "ongoing action" simply ignores the limited nature of the Second Circuit's holding and the different statutory and factual context of a generally applicable EPA rule at issue in that case.

Page 20 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

105422\126072\49374076.v10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

Taken as a whole, Plaintiffs' ESA claims rest on legal theories that the Ninth Circuit has squarely rejected. Section 7(a)(2) imposes a duty to consult only for affirmative, discretionary actions and requires the agency to ensure that such actions do not appreciably reduce a species' likelihood of survival and recovery. The 2020 BiOp applied those principles: it properly distinguished between discretionary and non-discretionary operations under the 2019 consultation rule, analyzed the additive effects of the proposed action against an accurately defined baseline, and found that the action would not appreciably diminish any species' survival and recovery prospects. That is what Section 7(a)(2) requires. Plaintiffs' contrary arguments ignore controlling precedent and attempt to revive theories that would convert the ESA into a mandate to correct baseline conditions, which is not required under the ESA. Because the 2020 BiOp's no-jeopardy finding rests on a lawful framework, a robust scientific record, and reasoned explanation, Plaintiffs cannot show that they have raised serious questions on the merits of their ESA claims.

## II.    The Requested Measures are Not Needed to Avoid Irreparable Harm.

Plaintiffs are required to make an affirmative showing that there will be irreparable harm absent the requested preliminary injunction. *Cottonwood Environmental Law Center*, 789 F.3d at 1090-91. They have not done so. Moreover, the Plaintiffs fail to demonstrate the necessity of a preliminary injunction and how their perceived harm will impair the court's ability to grant effective relief after resolving the case. *Humane Soc'y of the United States*, 2012 WL 1952329, at *5; *Nw. Envt'l. Def. Ctr.*, 2019 WL 2372591 at *11.

Plaintiffs' arguments rely on technically unsound and conceptually misguided analyses of the status of the listed species and projections of the future of the populations. Courter Decl. ¶

Page 21 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

15. In fact, Plaintiffs acknowledge "there also may be a hint of mild improvement associated with higher spill levels in . . . the CRSO ROD Preferred Alternative." ECF 2530 at 16–17 (citing the Declaration of Edward Bowles ¶ 32). Yet, Plaintiffs in the next breath claim that the flawed QET analyses they conducted is cause for emergency action. *Id.* Plaintiffs do not explain these contradictory statements because there can be no valid explanation. Nor can such statements and flawed analyses support a finding that there will be irreparable harm. Courts must look for a "definitive threat of future harm to protected species, not mere speculation." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193 (citing *Burlington N. R.R.*, 23 F.3d 1508, 1512). Plaintiffs do not meet this bar.

### A.    The Listed Species Have Increasing Abundance Trends; Plaintiffs' Extinction Analysis is Flawed.

Plaintiffs' arguments that there will be irreparable harm to the listed species relies on the declaration of Edward Bowles and the modeling that he discusses therein. ECF 2526 at 50; ECF 2530 at 40–41. Plaintiffs' analysis that the listed species declines are dire and likely to worsen reference an analysis of observed and predicted future abundance of Snake River spring/summer Chinook and steelhead that is flawed both conceptually and technically. Courter Decl. ¶ 15; *see* ECF 2530 at 27 ("the already dire condition of the species.").

Conceptually, Oregon Department of Fish and Wildlife ("ODFW") misapplies the concept of quasi-extinction. *Id.* ¶ 16. Quasi-extinction is typically applied within a theoretical modeling framework where population abundance is simulated over numerous generations and extinction risk is assessed based on frequency of QET occurrence. *Id.* When performing a retrospective analysis using observed abundance data, like ODFW did, such as observing fish counts from a weir or spawning surveys, it is unnecessary and not scientifically appropriate to

Page 22 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

apply QET to assess possible extinction because the fate of the population is known. *Id.* ¶ 17. For example, Camas Creek spring-summer Chinook is a very small major population group with median abundance levels below 50 spawners, yet the population is not extirpated. *Id.* In this case, a trend analysis would be more appropriate. *Id.*

Trend analyses are used to perform a retrospective analysis because they use observed data when assessing abundance. *Id.* ¶ 18. The concept is simple: an increasing trend is interpreted favorably, while a decreasing trend suggests a higher risk of continued decline. *Id.* Explanatory variables, like marine conditions, can also be incorporated to examine the influence of factors known to affect abundance. *Id.* Including these variables can explain the underlying mechanisms driving the trend and provides context for interpreting results. *Id.*

If the goal is to forecast possible future outcomes, which appeared to be the objective of ODFW's analysis, a population dynamics approach—such as a life-cycle model or Integrated Population Model—is a more appropriate method of analysis. *Id.* ¶ 20. These types of models typically account for observed or approximated variation in survival and reproduction, such as the relationship between spawners and juvenile recruitment. *Id.* These approaches can also incorporate survival indicators, such as ocean temperature or predator abundance. *Id.* Life-stage survival parameters and functional relationships are then used to project future abundance given assumptions about environmental conditions and management decisions. *Id.* ODFW's application of the QET concept to look retrospectively at abundance data and then forecast possible future outcomes using QET, as opposed to conducting a trend analysis or conducting a population dynamics model, is conceptually flawed and does not provide a meaningful basis for species management decisions. *Id.*

Notwithstanding the conceptual misalignment between the analysis in Exhibit 1 of Mr.

**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

Bowles's Declaration and QET, it also had technical flaws. *Id.* ¶ 21. The models generated a moving average, whereas QET (≤50 spawners for four consecutive years) is supposed to be applied to absolute abundance. *Id.* Autoregressive Integrated Moving Average ("ARIMA") models do not forecast large abundance fluctuations due to averaging, thereby trigging the QET more frequently when equilibrium abundance is low. *Id.* Furthermore, ARIMA models, particularly the ones presented in Exhibit 1 of Mr. Bowles's Declaration, are not well-suited for modeling population dynamics. *Id.* ¶ 22. They do not account for the influence of population age structures and spawner abundance on recruitment. *Id.* ARIMAs simply predict future average abundance from abundance in the prior years. *Id.* The models used also did not account for long-term oscillations that are a well-known population dynamics process that occurs with salmonids. *Id.* This is why NMFS used a time-varying trend analysis when assessing viability in their most recent Status Review. *Id.*

Finally, ODFW's analysis did not include measures of uncertainty and other statistical output that would be necessary for a statistician to review results. *Id.* ¶ 23. No model output table is provided; therefore, there is no way to assess the specifics of the model structure. *Id.* Predictions of future abundance should also include measures of uncertainty, such as 95% confidence intervals. *Id.* There is no way for anyone to assess how confident we can be in Plaintiffs' results without this additional information. *Id.* Based on the predicted values plotted in the Exhibit 1 of Mr. Bowles' Declaration, the ARIMA models likely had very low predictive power. *Id.* The flaws in Plaintiffs' modeling, combined with the lack of confidence that the irreparable harm to listed species that they claim is "dire" is not a "definitive threat of future harm to protected species" it is "mere speculation", which cannot be the basis for injunctive relief. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193.

**INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

Plaintiffs' opinion that extinction risk is imminent and the requested relief is necessary to reduce irreparable harm is in conflict with the fact that Oregon, Washington, and Idaho continue to sanction commercial and recreational fisheries known to impact listed stocks. Courter Decl. ¶ 24. Nor do Plaintiffs even attempt to try to explain this glaring inconsistency underlying their irreparable harm argument.

A recent report by Washington Department of Fish and Wildlife ("WDFW") on mark-selective fishing in the Columbia River stated:

> Reducing the total number of allowable mortalities for Columbia River non-treaty fisheries may provide some conservation benefit in the form of increased escapement (i.e., more ESA-listed fish returning to the spawning grounds). However, Washington state policies, and co-management agreements may allow for unused impacts to be utilized by other fisheries rather than allowing those impacts to go unused.

*Id.* (citing WDFW, Selective Fishing on the Columbia River (Dec. 1, 2022) https://wdfw.wa.gov/sites/default/files/publications/02353/wdfw02353.pdf). An ODFW website intended to address Frequently Asked Questions about Columbia River commercial fishing states:

> **The question of whether commercial fisheries should continue on the Columbia River is primarily a social, rather than a biological, issue.** Commercial and recreational fisheries are both managed to ensure that the incidental mortality of wild fish resulting from their handling in fisheries falls within limits established to ensure their survival and recovery.

*Id.* (citing ODFW, Columbia River Fisheries – Frequently Asked Questions, https://www.dfw.state.or.us/fish/oscrp/crm/faq.asp (last visited Dec. 5, 2025) (emphasis added)).

If Upper Columbia and Snake River stocks were in imminent crisis as Plaintiffs assert, it seems unfathomable that the States of Oregon and Washington would tolerate fishery-related mortality as they continue to do to this day.

Page 25 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

**B.    Plaintiffs' Requested Relief Does Not Provide Benefits to Fish Survival Relative to Current Operations Under the 2020 BiOp.**

Plaintiffs argue additional spill and reduced reservoir elevations are needed to avoid irreparable harm to listed fish populations. When quantifying effects of spill and MOP, the scientific analysis shows that these measures are likely to offer only small incremental benefits— far too small to meaningfully alter population trajectories or extinction risk for any of the major population groups in the Upper Columbia or Snake River basins. Courter Decl. ¶ 26. Under the 2020 BiOP spill operations, the majority of fish are already expected to pass via spillways at each CRS dam. *Id.* In deposition, Mr. Bowles acknowledged that the 2020 BiOp improves conditions for the species and that Oregon merely wants more to be done. Decl. of Lawson Fite ¶ 3 (citing Depo. of Edward Bowles  237:2–7, 15–25).

Although Plaintiffs' characterizations of population trends and extinction risk are inaccurate, no one disputes that spilling more water and operating reservoirs at MOP will likely reduce Fish Travel Time ("FTT") through the CRS. Courter Decl. ¶ 26. There is, however, a problem with the Plaintiffs' assumed magnitude of effect. *Id.* In reality, additional spill would only slightly improve spillway passage, and FTT reductions would be minimal. *Id.* Mr. Bowles acknowledged these facts in his deposition. Fite Decl. ¶ 3 (citing Bowles Depo. 238:5–239:8).

In analyzing the effect of spilling, prior to the 2020 BiOp, fish had slightly more than a 50% chance of using a spillway to pass each dam. *Id.* ¶ 27. After implementing the 2020 BiOp, spillway passage proportion increased to approximately 80-90%. *Id.* In practical terms, the median number of spillway passages from 2021–2024 ranged from 6.8 to 7.4 spillway dam passage of a possible 8 spillway dam passages. *Id.* Similarly, operating reservoirs at MOP throughout the CRS will only slightly reduce FTT. *Id.* ¶ 28.

Page 26 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

Perhaps more importantly for purposes of determining irreparable harm, Plaintiffs fail to analyze or discuss the success of the 2020 BiOp spill operations. The dire picture painted by Plaintiffs as the need for additional surface spill simply is not supported in the data. The Plaintiffs' requested relief to increase spill to gas cap levels and reduce reservoir elevations to MOP is expected to have negligible effects on FTT through the CRS. *Id.* ¶ 29. Current operations already provide high spillway passage proportions and reservoir operating levels minimally affect water transit time in the spring. *Id.* Therefore, the combined effect of the spill and reservoir operations in the Plaintiffs' Proposed Order would reduce median FTT from Lower Granite Dam to Bonneville Dam by less than 1 day for spring-summer Chinook, and less than 2 days for subyearling fall Chinook and summer steelhead. *Id.*

Finally, one of the Plaintiffs' stated purposes for the proposed MOP operations is to reduce river temperatures. ECF 2530 at 33–37 (citing Bowles Decl. ¶¶ 12, 41). Plaintiffs fail to provide any temperature predictions so there is no proof of the validity of this statement. Courter Decl. ¶ 31. Given the lack of scientific analysis, Plaintiffs' hypothesis is unfounded speculation. In contrast, the EPA used a temperature model and predicted changes in temperature for June-October of 2011-2016 at Columbia and Snake River dams under a variety of flow scenarios. *Id.* ¶ 32. The results of that model reveal that a comparison of current conditions to a free-flowing scenario—where lower Snake River and mid/lower Columbia River reservoirs were removed—was predicted to yield mixed results in the months of June and July when adult Sockeye Salmon are present. *Id.* ¶ 33. In the lower Snake River, average monthly water temperatures actually *increased* in June by 0.03-0.23 ºC under the free flowing scenario and decreased in July by 0.49-0.69 ºC. *Id.* In the mid/lower Columbia River, average monthly temperatures were predicted to decrease by 0.50-0.60 ºC in June and 0.31-0.53 ºC in July. *Id.* Based on interpretation of actual

Page 27 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

105422\126072\49374076.v10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

data, the resulting changes from Plaintiffs' requested MOP procedures would only have a fraction of this effect, and even the EPA modeled effect is an incredibly small effect. Plaintiffs' analysis of harm to the listed species is scientifically unfounded and fails to demonstrate irreparable harm to the species. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193.

## III.     Plaintiffs Ignore Threats to Navigation Safety on the Columbia and Snake Rivers.

Plaintiffs are not entitled to a preliminary injunction because they have not raised "serious questions" nor demonstrated in the absence of an injunction, there will be irreparable harm. But, if relief is afforded, it must be narrowly tailored and maintain a sufficient causal connection between the operations enjoined and the asserted injury. *See NMFS VII*, 886 F.3d at 819; *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195. That tailoring must account for navigation safety because unmodeled operations and the loss of adaptive management tools can create dangerous back eddies, cross currents, and inadequate depths for commercial tows. Decl. of Josh Nichols ¶¶ 14–19, 24–28. The very real risks of back eddies, cross currents and inadequate depths can and must be addressed through targeted measures that preserve the Corps' adaptive management discretion under the Fish Operations Plan ("FOP"), allow spill to be curtailed when it creates dangerous conditions, and retain navigation safe spill on short notice. *Id.* ¶¶ 21–27. It must also account for a continued ability of barges to transport good to the uppermost extent of the CRS to avoid stifling the economy that relies on transportation via the CRS. Decl. of Neil Maunu ¶¶ 6–8, 14. Any injunction that fails to protect navigational and transport interests would be overbroad.

### A.     The Corps Should Retain Discretion for Adaptive Management.

The current FOP includes adaptive management tools that allow short term adjustments in spill and MOP elevations to address navigation safety concerns. Nichols Decl. ¶¶ 25, 27. Since

Page 28 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

2018, the FOPs have allowed navigation-safe spill. *Id.* ¶ 25. This allows a barge captain to call

ahead to a dam, understand real-time river and spill conditions, and request an adjusted spill

pattern that reduces strong eddy effects and cross currents. *Id.* ¶ 23. Navigation-safe spill can

take the form of reducing spill volume, briefly curtailing spill, or opening additional spill gates to

create a more even, flat discharge to decrease the risk of an eddy effect. *Id.* ¶ 23. These actions

materially lower the risk of a strong eddy and prevent a barge from potentially being pushed into

a lock guide wall. *Id.* ¶¶ 21–23. Those adaptive management tools are critical because recent

unmodeled spill patterns have already created strong eddies and cross currents at several

projects, resulting in multiple near-miss incidents for commercial tows. *Id.* ¶¶ 14–19. The 2025

FOP also provides for navigation safety by allowing for in-season adjustments, which may

expand forebay operating range (Expanded MOP) or raised minimum forebay elevation (Raised

MOP). *Id.* ¶ 27.

Plaintiffs' Proposed Order would replace these flexible, safety-oriented tools with

prescriptive spill and reservoir settings that operate year-after-year, project-by-project, at fixed

levels untethered to specific navigation or fish passage conditions. ECF 2530-2 at 3–6

(specifying 125% gas cap spill). Part II of the Proposed Order is also ambiguous regarding

reservoir forebay elevation operations because it does not specify whether the stated operating

range lies solely above MOP or also permits fluctuation below MOP by that range. Nichols Decl.

¶ 26. It is unworkable to impose any new reservoir forebay elevation operations without

clarifying language like that in the 2025 FOP, which defines MOP as the "operating range above

the minimum forebay elevation at the lower Snake River projects (i.e., 'MOP' is a 1.5-foot

operating range)." *Id.* The MOP provisions would also prevent tug and barge operators from

being able to fully load their tows, which will financially harm their businesses not just in

Page 29 -    **INLAND PORTS AND NAVIGATION GROUP'S
RESPONSE TO OREGON'S AND NATIONAL
WILDLIFE FEDERATION'S PRELIMINARY
INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

relation to the movement of grain, but with regard to moving other commodities as well. Maunu Decl. ¶ 8. These companies will be forced to evaluate the economics of moving loads from these load-limited locations that are less profitable due to the state of river operations and they will be forced to shift their business to moving loads at other docks in other regions. *Id.* The 2025 FOP further protects navigation through in-season adjustments to MOP, allowing the Corps to expand the forebay operating range (Expanded MOP) or raise the minimum forebay elevation (Raised MOP) when necessary to avoid dips below minimum tailwater elevations or inadequate navigation depths during low-flow and spill conditions. Nichols Decl. at ¶ 27. The Proposed Order omits this operational flexibility and is written such that the Corps could appear to violate the order by making similar adjustments even when required for safe navigation. ECF 2530-2 at 7–9.

By mandating rigid spill percentages and inflexible reservoir forebay elevation operations, the Proposed Order would unduly constrain the Corps' ability to respond to evolving river conditions and navigating hazards. An injunction fashioned in this manner improperly intrudes on the agencies' administrative province and goes beyond what is necessary to address the particular harm Plaintiffs assert because "injunctive relief must be tailored to remedy the specific harm alleged" and its scope must be "no broader and no narrower than necessary." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195 (internal quotation omitted).

Accordingly, if the Court concludes an injunction is warranted, which Plaintiffs have not demonstrated, any injunction must preserve and expressly incorporate the FOP's adaptive-management framework, including navigation-safe spill and short-term adjustments in spill and MOP elevations to address navigation safety concerns to be narrowly tailored. *See* Nichols Decl. ¶¶ 21–23, 25, 27, Maunu Decl. ¶ 9.

Page 30 -    **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

### B.     Navigation-Safe Spill Should be Available on 45-Minute Notice.

Since 2018, the FOPs have included navigation-safe spill as a short term tool to address navigation safety concerns when spill patterns create strong eddies or cross currents. Nichols Decl. ¶ 25. Navigation-safe spill allows operators, on short notice, to adjust spill so that vessels can safely transit locks when spill patterns create navigation safety concerns. *Id.* To be effective, this tool must be available quickly, on the order of 45 minutes, so that spill can be modified before a tow commits to a lock approach or hazardous reach. *Id.*

The Proposed Order, however, does not explicitly preserve navigation-safe spill. Nichols Decl. ¶ 25. It only generally allows annual adjustments "to the injunction spill operation for reasons set forth in the FOP," without clearly requiring that the Corps retain authority to make adjustments on short notice. ECF 2530-2 at 6; Nichols Decl. ¶ 25. Any order would not be narrowly tailored unless it included language similar to the 2025 FOP at pages 15 and 16, which provides that short term adjustments in spill or MOP elevations "may be required at any of the fish passage projects to address navigation safety concerns," including "changes in spill patterns, reductions in spill, short term spill curtailment, or operating above MOP." Nichols Decl. ¶ 25. These provisions ensure that when particular spill patterns generate dangerous back eddies or cross currents, spill can be curtailed or reconfigured on a short-term basis that is consistent with a 45 minute response window, to attempt to provide safe navigation. *Id.*

### C.     Spill Must be Modeled before Implementation to Ensure Navigation Safety.

The spill provisions in the Proposed Order would introduce unmodeled operating conditions that create unpredictable river conditions for commercial navigation and increase the risk of serious marine incidents. Nichols Decl. ¶ 24; ECF 2530-2 at 3–6. Unmodeled operational changes put captains and crews, cargo, project infrastructure, and the river system at risk because

Page 31 -     **INLAND PORTS AND NAVIGATION GROUP'S RESPONSE TO OREGON'S AND NATIONAL WILDLIFE FEDERATION'S PRELIMINARY INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10

a damaged or breached vessel can disrupt river operations and harm the environment well

beyond the incident itself. Nichols Decl. ¶ 24. Given the gravity of these potential consequences,

it is too great a risk to forgo preventative diligence in the form of advance modeling and built-in

safety flexibility. *Id.*

### Conclusion

For the foregoing reasons, IPNG requests that the Court deny the Plaintiffs' motions for

preliminary injunction. If the Court determines that preliminary injunctive relief is warranted,

IPNG requests that the court narrowly tailor the relief consistent with IPNG's requests herein.

Dated this 15th day of December, 2025.

Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

By:    *s/ Lindsay Thane*
Aukjen Ingraham, OSB #023338
Lindsay Thane, OSB #171474
Lawson E. Fite, OSB #055573
*Of Attorneys for Inland Ports and*
*Navigation Group*

Page 32 -    **INLAND PORTS AND NAVIGATION GROUP'S
RESPONSE TO OREGON'S AND NATIONAL
WILDLIFE FEDERATION'S PRELIMINARY
INJUNCTION MOTIONS**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Fax: 503-796-2900

105422\126072\49374076.v10