ADAM R.F. GUSTAFSON, Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
MICHAEL R. EITEL, Acting Assistant Section Chief
JOHN H. MARTIN, Senior Trial Attorney
ROMNEY PHILPOTT, Senior Trial Attorney
Wildlife and Marine Resources Section
Natural Resources Section
999 18th Street, Suite 600 North Terrace
Denver, Colorado 80202
Tel: (303) 319-5359 Martin; (202) 532-5077(Philpott)
Fax: (303) 844-1350
Email: John.H.Martin@usdoj.gov; Romney.Philpott@usdoj.gov

*Additional counsel on signature page*
*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **NATIONAL WILDLIFE FEDERATION**, et al., | Case No. 3:01-cv-640-SI |
| Plaintiffs, | **FEDERAL DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTIONS FOR PRELIMINARY INJUNCTIVE RELIEF [ECF 2526, 2530]** |
| and | |
| **STATE OF OREGON**, et al., | |
| Intervenor-Plaintiffs, | |
| v. | |
| **NATIONAL MARINE FISHERIES SERVICE**, et al., | |
| Defendants, | |
| and | |
| **PUBLIC POWER COUNCIL**, et al., | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

    I.     The Endangered Species Act ..................................................................... 4

    II.    The Columbia River System ...................................................................... 5

    III.   Litigation and Consultation History ........................................................... 7

    IV.   2020 ESA Consultation .............................................................................. 7

    V.    2020 Record Of Decision ........................................................................... 8

    VI.   Current Litigation ....................................................................................... 9

    VII.  Proposed 2026 Operations ....................................................................... 10

Standards of Review .......................................................................................... 11

    I.     APA Review ............................................................................................. 11

    II.    Preliminary Injunction ............................................................................. 12

Argument ............................................................................................................ 13

    I.     The Court lacks Authority to Enter Plaintiffs' Injunction. ...................... 13

          A.    Plaintiffs identify no precedent for courts in equity granting proposed systemic, mandatory, preliminary relief that replaces operations of Federal projects with those chosen by Plaintiffs or the courts ........................................ 15

          B.    Plaintiffs' Injunction would violate the law, rendering the Injunction unavailable. ................................................................................. 20

    II.    Plaintiffs' ESA Claims Against the Action Agencies Fail Because the Agencies Provided Independent Analysis In Addition to the 2020 Biological Opinion. ................................................. 23

    III.   Plaintiffs Fail to Show Irreparable Harm is Imminent Or

Likely to Occur. ............................................................................................... 25

    A.    Plaintiffs have not shown irreparable harm to themselves is likely. ................. 25

    B.    The status of the species has improved and is no basis for the Injunction. ....... 28

    C.    Elevated water temperatures provide no basis for an Injunction. ..................... 33

    D.    Plaintiffs' assertions of irreparable harm are not focused on any
        cognizable personal interests. ........................................................................... 35

    E.    Plaintiffs fail to prove irreparable injury is imminent. ....................................... 36

IV.   Plaintiffs' Injunction Will Not Benefit Listed Species, Is Infeasible, and
     Overbroad. .............................................................................................................. 38

    A.    Plaintiffs' Injunction will have less benefit and more adverse
        consequences for ESA-listed species than Defendants' existing and
        planned system operations. ................................................................................ 39

        1.    Plaintiffs' Injunction will have worse overall consequences for
            ESA-listed species than Defendants' continued operations. ..................... 39

        2.    The higher and more frequent spill Plaintiffs seek will harm salmonids. ... 42

        3.    Lowering reservoir elevations will harm salmonids. ................................. 44

        4.    Reducing fish transportl acks a rational basis and will decrease
            in-river survival and adult returns. .............................................................. 45

    B.    Plaintiffs' non-operational measures are overbroad and beyond
        agency authority. ................................................................................................ 46

V.    Plaintiffs Are Unlikely to Succeed on the Merits of their Claims Because NMFS'S
     2020 Jeopardy Analysis Is Lawful. ......................................................................... 48

    A.    NMFS's 2020 jeopardy analysis is lawful. ....................................................... 48

        1.    NMFS appropriately assessed the status of the species and
            environmental baseline. ............................................................................... 49

2.  NMFS appropriately assessed the effects of CRS operations. ................... 51

3.  NMFS appropriately assessed whether CRS Operations are likely
    to jeopardize ESA-listed species. ................................................. 55

B.  Plaintiffs' arguments lack merit. ......................................................... 59

1.  The ESA's plain text directs NMFS to isolate the "Effects of the Action"
    when addressing the Section 7(a)(2) substantive jeopardy prohibition. .... 61

2.  Plaintiffs also err in concluding that, factually, NMFS failed to rationally
    address how the "action" affects ESA-listed species. ............................... 64

    a.  NMFS properly included past CRS operations in the
        environmental baseline. ...................................................... 64

    b.  NMFS properly addressed the full effects of ongoing CRS
        operations when performing its broader jeopardy analysis. .............. 68

    c.  NMFS properly considered "recovery" when determining if the
        proposed action is likely to jeopardize ESA-listed species. .............. 72

3.  NMFS appropriately considered and incorporated climate change
    information into its analysis. ..................................................... 78

4.  The proposed action was adequately defined to sustain NMFS's
    jeopardy analysis. ..................................................................... 82

VI.  The Balance of the Equities and Public Interest Do Not Support a Preliminary
     Injunction ............................................................................... 89

A.  The Court must consider the interests of ESA-listed bull trout. ....................... 90

B.  The Court must consider the interests of federally protected birds. .................. 94

C.  The Court must consider the interests of human health and safety................... 95

D.  The Court should consider financial implications. ............................................ 96

Conclusion ............................................................................................... 97

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982)........................................................................................................ 28

*All. for the Wild Rockies v. Anderson,*
    780 F. Supp. 3d 1075 (D. Mont. 2025) ....................................................................... 10

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ..................................................................................... 13

*All. for the Wild Rockies v. Krueger,*
    35 F. Supp. 3d 1259 (D. Mont. 2014) .................................................................... 13, 89

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.,*
    175 F.3d 1156 (9th Cir. 1999) ................................................................................ 66, 77

*American Freedom Defense Initiative v. King County,*
    796 F.3d 1165 (9th Cir. 2015) ..................................................................................... 12

*American Rivers v. FERC,*
    895 F.3d 32 (D.C. Cir. 2018) ...................................................................................... 71

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,*
    480 U.S. 531 (1987).............................................................................................. 26, 88

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) ...................................................................................... 49

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
    462 U.S. 87 (1983)................................................................................................ 11, 12

*Bennett v. Spear,*
    520 U.S. 154 (1997)...................................................................................... 13, 85, 88

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.,*
    419 U.S. 281 (1974).............................................................................................. 12, 59

*Buckingham Corp. v. Karp,*
    762 F.2d 257 (2d Cir. 1985) ........................................................................................ 39

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) ....................................................................................... 94

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*,
No. 01-cv-238, 2001 WL 881268 (E.D. Cal. Feb. 8, 2001)................................................ 94, 95

*Calence, LLC v. Dimension Data Holdings, PLC*,
222 F. App'x 563 (9th Cir. 2007)................................................................................ 19

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)...................................................................................... 26

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................................................................................... 37

*Columbia Snake River Irrigators Ass'n v. NWF*,
230 F. App'x 659 (9th Cir. 2007)............................................................................ 66, 67

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015)................................................................................ 27, 36

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
141 F.4th 153 (D.C. Cir. 2025) ................................................................. 50, 64, 65, 66

*Ctr. for Biological Diversity v. Rumsfeld*,
198 F.Supp.2d 1139 (D. Ariz. 2002) ......................................................................... 86

*Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
No. 6:15-cv-2358-AA, 2016 WL 9226390 (D. Or. Apr. 6, 2016)............................... 2, 39

*Ctr. for Env't Sci. Accuracy & Reliability v. Cowin*,
No. 1:15-cv-884-LJO, 2015 WL 3797693 (E.D. Cal. June 18, 2015)............................ 2

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) ................................................................................ 26, 29

*Dahl v. HEM Pharmaceuticals Corp.*,
7 F.3d 1399 (9th Cir. 1993).................................................................................... 12

*De Beers Consol. Mines v. United States*,
325 U.S. 212 (1945).................................................................................................. 16

*Defs. of Wildlife v. U.S. Dep't of Navy*,
733 F.3d 1106 (11th Cir. 2013) .............................................................................. 69, 71

*Dow AgroSciences LLC v. NMFS*,
707 F.3d 462 (4th Cir. 2013)................................................................................... 42

*Fed. Power Comm'n v. Idaho Power Co.*,
   344 U.S. 17 (1952) ........................................................................................ 16

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
   98 F.4th 1180 (9th Cir. 2024) ....................................................................... 13

*Ford Motor Co. v. NLRB*,
   305 U.S. 364 (1939) ...................................................................................... 20

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) .................................................................... 12, 13

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
   378 F.3d 1059 (9th Cir. 2004) ................................................................. 60, 86

*Gill v. Whitford*,
   585 U.S. 48 (2018) .................................................................................... 26, 36

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ...................................................................................... 28

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ...................................................................................... 15

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ....................................................................... 28

*Hernandez v. City of El Monte*,
   138 F.3d 393 (9th Cir. 1998) ......................................................................... 49

*Humane Soc'y of the U.S. v. Bryson*,
   No. 3:12–cv–00642–SI, 2012 WL 1952329 (D. Or. May 30, 2012) ........................ 26, 27, 37

*I.N.S. v. Pangilinan*,
   486 U.S. 875 (1988) ...................................................................................... 20

*Ibson v. United Healthcare Servs.*,
   877 F.3d 384 (8th Cir. 2017) ......................................................................... 20

*Idaho Dep't of Fish & Game v. NMFS*,
   850 F. Supp. 886 (D. Or. 1994) ..................................................................... 77

*In re Clean Water Act Rulemaking*,
   60 F.4th 583 (9th Cir. 2023) ......................................................................... 15

*In re Consol. Salmonid Cases,*
   791 F.Supp.2d 802 (E.D. Cal. 2011) ................................................................. 56

*In re Flash Memory Antitrust Litig.,*
   No. 07-cv-86-SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .......................... 18

*In re Operation of Mo. River Sys. Litig.,*
   421 F.3d 618 (8th Cir. 2005) ............................................................................. 69

*Jayne v. Sherman,*
   706 F.3d 994 (9th Cir. 2013) ............................................................................. 86

*Kartman v. State Farm Mut. Auto. Ins. Co.,*
   634 F.3d 883 (7th Cir. 2011) ............................................................................. 12

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) .......................................................................................... 28

*Lands Council v. McNair,*
   537 F.3d 981 (9th Cir. 2008) ........................................................................ 11, 49

*Lane Cnty. Audubon Soc'y v. Jamison,*
   958 F.2d 290 (9th Cir. 1992) ............................................................................. 86

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) ............................................................................. 26

*Lewis v. Casey,*
   518 U.S. 343 (1996) .......................................................................................... 26

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ............................................................................. 17, 60, 62

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009) ........................................................................ 12, 26

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) .......................................................................................... 12

*Miller v. Albright,*
   523 U.S. 420 (1998) .......................................................................................... 23

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ..................................................................................... 28, 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................... 11

*Mt. Graham Red Squirrel v. Espy,*
    986 F.2d 1568 (9th Cir. 1993) ......................................................................... 11

*Nat. Res. Def. Council v. Haaland,*
    102 F.4th 1045 (9th Cir. 2024) ........................................................................ 83

*Newsom v. Norris,*
    888 F.2d 371 (6th Cir. 1989) ........................................................................... 19

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................... 88

*NLRB v. Enter. Ass'n,*
    429 U.S. 507 (1977) ......................................................................................... 16

*Nw. Env't Advocs. v. United States Fish & Wildlife Serv.,*
    No. 3:18-CV-01420-AR, 2023 WL 7181694 (D. Or. Sept. 15, 2023) ............ 75

*Nw. Env't Def. Ctr. v. United States,*
    558 F.Supp.3d 1056 (D. Or. 2021) ................................................................. 22

*NWF v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994) ........................................................................... 29

*NWF v. NMFS,*
    886 F.3d 803 (9th Cir. 2018) ....................................................... 13, 15, 26, 27

*NWF v. NMFS,*
    524 F.3d 917 (9th Cir. 2008) ................................................................... passim

*NWF v. NMFS,*
    422 F.3d 782 (9th Cir. 2005) ..................................................................... 15, 27

*NWF v. NMFS,*
    No. 3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017) ............ 24, 25, 27

*NWF v. NMFS,*
    184 F. Supp. 3d 861 (D. Or. 2016) ........................................................ passim

*NWF v. NMFS,*
    No. CV 01-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005) ............ 27, 71, 72

*Oceana, Inc. v. Pritzker*,
  75 F. Supp. 3d 469 (D.D.C. 2014) .................................................................. passim

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
  693 F.3d 1084 (9th Cir. 2012) ............................................................................ 59

*Pac. Dawn LLC v. Pritzker*,
  831 F.3d 1166 (9th Cir. 2016) ............................................................................ 16

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ....................................................................... 23, 24

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ..................................................................... 28, 38

*People of State of N.Y. by Vacco v. Operation Rescue Nat.*,
  80 F.3d 64 (2d Cir. 1996) ................................................................................... 18

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ............................................................................ 25

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................................................ 16

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ............................................................................ 11

*S. Yuba River Citizens League v. NMFS*,
  No. 2:13-CV-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ................. 26, 38, 47

*S. Yuba River Citizens League v. NMFS*,
  723 F. Supp. 2d 1247 (E.D. Cal. 2010) .............................................................. 71

*Salazar v. Buono*,
  559 U.S. 700 (2010) ............................................................................................ 15

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .............................................................................. 20

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ................................................................... 42, 60, 79

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
  No. 24-7807, 2025 WL 3467536 (9th Cir. Dec. 3, 2025) ....................... 13, 43, 89, 90

*Sierra Pac. Indus. v. Lyng*,
    866 F.2d 1099 (9th Cir. 1989) ........................................................................ 20

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ...................................................................................... 62

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ........................................................................ 12

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ........................................................................... 2, 13, 88

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ........................................................................ 13, 52, 62

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 26

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................................ 15, 26, 36

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) ........................................................ 79, 80, 81, 83

*United States v. Gementera*,
    379 F.3d 596 (9th Cir.2004) .......................................................................... 10

*United States v. Oregon*,
    No. 68-513-SI (D. Or. filed Sept. 13, 1968) .................................................... 36

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) ...................................................................................... 20

*United States v. Wahchumwah*,
    710 F.3d. 862 (9th Cir. 2013) ........................................................................ 10

*United States v. Washington*,
    853 F.3d 946 (9th Cir. 2017) ........................................................................ 22

*United States v. Zenon*,
    711 F.2d 476 (1st Cir. 1983) ......................................................................... 19

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    592 U.S. 261 (2021) ...................................................................................... 85

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) ................................................................ 16

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................ 88

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ................................................ 56

*Willamette Riverkeeper v. NMFS*,
    763 F. Supp. 3d 1203 (D. Or. 2025) ...................................... 81

*William Keeton Enters., Inc. v. A All Am. Strip-O-Rama, Inc.*,
    74 F.3d 178 (9th Cir. 1996) .................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................... passim

*Xerces Soc'y for Invertebrate Conservation & Ctr. for Biological Diversity v. Watson*,
    No. 3:22-CV-00790-HZ, 2025 WL 1736922 (D. Or. June 23, 2025) ...................................... 19

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) .............................................. 10

**Statutes**

5 U.S.C. § 705 ................................................................................ 13

5 U.S.C. § 706 ......................................................................... 13, 49

5 U.S.C. § 706(2)(A) ...................................................................... 11

16 U.S.C. § 703(a) ........................................................................ 93

16 U.S.C. § 1536(a)(2) ............................................................. passim

16 U.S.C. § 1536(b) ...................................................................... 89

16 U.S.C. § 1536(b)(3) ................................................................. 74

16 U.S.C. § 1536(b)(3)(A) ....................................................... passim

16 U.S.C. § 1536(b)(4) ................................................................. 57

Wash. Admin. Code § 173-201A-200(1)(f)(ii)(B) (2024) ........................ 21

**Rules**

Fed. R. Civ. P. 65........................................................................................................ 49

Fed. R. Civ. P. 65(d)(1)(C)......................................................................................... 18

**Regulations**

50 C.F.R. § 402 ......................................................................................................... 83

50 C.F.R. § 402.02 ................................................................................................ passim

50 C.F.R. § 402.02(d)................................................................................................. 52

50 C.F.R. § 402.03 .................................................................................................... 52

50 C.F.R. § 402.04 .................................................................................................... 74

50 C.F.R. § 402.13 ...................................................................................................... 4

50 C.F.R. § 402.14(a)................................................................................................... 4

50 C.F.R. § 402.14(c)(2) ............................................................................................ 24

50 C.F.R. § 402.14(g)(2)................................................................................... 5, 50, 74

50 C.F.R. § 402.14(g)(3)......................................................................................... 5, 52

50 C.F.R. § 402.14(g)(4)....................................................................................... 57, 69

50 C.F.R § 402.14(h)................................................................................................... 5

**Federal Register**

83 Fed. Reg. 35178 (July 25, 2018)...................................................................... 56, 57

84 Fed. Reg. 44976 (Aug. 27, 2019)..................................................................... passim

85 Fed. Reg. 63834 (Oct. 8, 2020)................................................................ 3, 9, 24, 35

**Other Authorities**

1 Joseph Story, *Commentaries on Equity Jurisprudence* § 64 (12th ed. 1877) ............................ 17

11 A Wright & Miller, Fed. Prac. & Proc. Civ. § 2941 (3d ed. 2025)............................................. 17

11 A C. Wright, A. Miller, & M. Kane Fed. Prac. & Proc. § 2948.1 (2d ed. 1995)...................... 26

**CITATION FORMAT**

1.      The citation format for the agencies' administrative records uses the bates number stamped on the records as set forth in Plaintiffs' motions. *See* ECF 2526, 2530.

2.      For citations to docket entries (ECF XXX), we cite the ECF-generated page number.

3.      Citations to declarations filed in support of this motion use a naming convention that provides the last name of the declarant and the numbered paragraph referenced, wherein Smith ¶ 1 refers to the first paragraph of Dr. Smith's declaration.

4      Citations to deposition transcripts use a naming convention that provides the page number(s) and line number(s) of both the question and answer and may include a longer reference to provide additional context Defendants feel may be helpful. For example, Bowles 12:2-6 refers to page 12, lines 2 through 6 of Mr. Bowles' deposition transcript. Excerpts of cited transcripts are attached to this brief as exhibits.

5. Citations to previous orders in this litigation adopt the naming conventions set forth in Plaintiffs' motions. *See* ECF 2526 at 13 n.2; *see generally* ECF 2530.

## INTRODUCTION

Plaintiffs National Wildlife Federation and their co-plaintiffs and the State of Oregon request a mandatory preliminary injunction seizing effective control of operation of the Columbia River System ("CRS"). Plaintiffs ask the Court to affirmatively mandate year-round spill operations at eight of the dam and reservoir projects within the CRS and also specify the reservoir levels behind those eight projects. But they don't stop at dam operations: they also ask the Court to order Defendants to take (or fund) a laundry-list of other affirmative actions that they believe the agencies should take. All this, even though Plaintiffs identify no authority—or even claims in their complaints—under which such mandatory, affirmative actions could be compelled. ECF 2530-2. Nor do Plaintiffs even seriously address the merits of their claims against the Corps—the primary agency they seek to enjoin—or even address planned operations in 2026 and their effects. They instead rushed to Court and now expect this Court to enjoin the Corps and the other Federal agencies simply because Plaintiffs disagree with decision documents issued five years ago.[1] To justify this Injunction they argue the merits of their claim against the National Marine Fisheries Service, the consulting agency here. They raise formalist issues with its Biological Opinion, but not any claims the agency ignored any available scientific information or overlooked particular short-term impacts, and thus fail to connect their claim to the emergency relief they seek. Plaintiffs' attacks on the BiOp lack merit and NMFS' analysis and conclusions were lawful.

Their sweeping scheme to wrest control of the CRS operations laid out in Plaintiffs' Injunction, one based on scant analysis or evidence, is untethered from the principles of equity

---

[1] The only expert evidence Plaintiffs' rely on to request sweeping relief over the operation of dams affecting huge swaths of the Pacific Northwest is the declaration of Mr. Bowles, a former administrative-level employee for the State of Oregon. ECF 2531. Plaintiffs do not rely on, and cannot seek refuge behind, the *later-filed* evidence of amicus parties, like the Nez Perce Tribe and the State of Washington. Plaintiffs were required to meet their burden in the opening motion—not through shifting evidence presented by other non-parties as the motions proceed. The Court therefore should disregard the amicus evidence.

jurisprudence, judicial review of administrative agency action, the limited purpose of a preliminary injunction, and current science.

By way of example, Plaintiffs ask that the Court order: (1) the U.S. Army Corps of Engineers to reorder infrastructure projects to prioritize Plaintiffs' unilaterally-selected projects; (2) Defendants—to take likely unlawful predator management actions involving *Oregon-owned and managed* infrastructure—including the killing of migratory birds protected under international treaties; (3) Defendants to approve and fund other activities completely unrelated to CRS operations; and (4) the Corps to dredge a segment of the Lower Snake River—without any prior environmental assessment of the potential impacts. ECF 2530-2. Plaintiffs' Injunction also would compel Bonneville Power Administration, the National Marine Fisheries Service, and the U.S. Fish and Wildlife Services to act, requiring them to seek funding for, and implement, infrastructure repair and maintenance, predation reduction and management, and steelhead kelt reconditioning, and plan development for hatchery programs, dredging, and installation of a weir to modify the river itself.

This is not an injunction to preserve the status quo—the purpose of a preliminary injunction. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). Instead, *more than four years after* challenging the decision documents, ECF 2325, 2396, Plaintiffs ask the Court to replace Defendants' reasoned and science-based operational decisions with their own preferred (and detrimental) management of the CRS while they pursue a political goal—dam breach. Under any circumstance, a mandatory injunction is highly disfavored and is subject to heightened standards. *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 6:15-cv-2358-AA, 2016 WL 9226390, at *4 (D. Or. Apr. 6, 2016) (heightened standards applied where plaintiffs sought "wholesale changes to the operations of three dams and to the management of the Upper Deschutes River basin"). In this circumstance, it is a bridge too far.

In short, Plaintiffs' ambition to de-federalize Federal dams and dam operations has thrust two options upon the Court: (1) uphold Defendants' reasoned operational decisions and allow the Action Agencies (the Corps, Reclamation, and Bonneville) the necessary discretion to operate so as to protect ESA-listed species, secure the region's water and energy needs, and safeguard human health and safety; or (2) hand over control of the entire CRS to Plaintiffs and the Court. The latter would compromise the Federal agencies' ability to ensure the safe and efficient operation of the CRS dams—for both the people of the Northwest and the fish and wildlife resources affected by these large public works projects. Because Plaintiffs' proposed injunction far outstrips the Court's equitable powers, and because Plaintiffs have not shown a risk of immediate, irreparable harm, the Court should deny Plaintiffs' motions for extraordinary mandatory injunctive relief.

## BACKGROUND

Pursuant to Congressional mandate, the Corps, Reclamation, and Bonneville share overlapping responsibilities over fish and wildlife conservation, hydropower production, and water management for Columbia River projects. "The co-lead agencies share a mandate to exercise their responsibilities for management and operation of the [Columbia River System], consistent with the purposes of the Northwest Power Act and other applicable laws." Joint Record of Decision for CRS Operations, 85 Fed. Reg. 63834, 63859 (Oct. 8, 2020), ACE000068151–8244 ("2020 ROD"). The Corps and Reclamation operate and maintain the dams in a coordinated manner for multiple public purposes specifically authorized by Congress in numerous laws, with Bonneville responsible for the transmission and marketing of CRS-generated hydropower. ACE000068151. Here, Plaintiffs ask the Court to enter an Injunction that would mandate how the Action Agencies operate the eight lower Columbia and lower Snake River dams, including year-round fish passage spill operations,[2] until the Court reaches a

---

[2] Spill refers to water released from a dam over the spillway instead of being directed through the turbines. *See* Smith ¶ 4; Renholds ¶ 7.

decision on the merits. ECFs 2526, 2530. Below, we address the relevant activities at these dams, litigation and consultation history, the 2020 consultation process, present litigation posture, and the Action Agencies' proposed (but not yet finalized) 2026 operations.[3]

## I.    THE ENDANGERED SPECIES ACT

Under ESA Section 7(a)(2), each federal agency proposing an "action authorized, funded, or carried out by such agency" must, in consultation with NMFS or FWS (together the "Consulting Agencies"), insure that the action is not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2).[4] If an action agency determines that the action "may affect" listed species or critical habitat, then it must pursue either "informal" or "formal" consultation with the consulting agencies. 50 C.F.R. §§ 402.13, 402.14(a).

In formal consultation, NMFS issues a BiOp explaining how the proposed action will affect listed species and determining whether the proposed action is likely to jeopardize its continued existence, and, if so, to propose reasonable and prudent alternatives. 16 U.S.C. § 1536(b)(3)(A). To "[j]eopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. To prepare its BiOp, NMFS evaluates the current status of a species and critical habitat, the environmental baseline, and the effects of the action and cumulative effects on the listed species and critical habitat in the action area. *Id.* § 402.14(g)(2), (g)(3). The BiOp must include a "summary of the information on which the

---

[3] Defendants' proposed draft Fish Operations Plan for 2026 ("Draft 2026 FOP") is attached hereto as Exhibit B to the Declaration of Daniel Feil, filed concurrently herewith. The Draft 2026 FOP identifies, for example, the dates and operations for each period of spill, e.g., spring, summer, and fall/winter, at each separate CRS dam, among many other operational issues.

[4] ESA Section 7(a)(2) also requires federal agencies to insure that any such action "is not likely to . . . result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical." 16 U.S.C. § 1536(a)(2). Plaintiffs do not raise this provision in their present motions, and therefore it is not addressed further herein.

opinion is based," a "detailed discussion of the environmental baseline of the listed species and critical habitat," a "detailed discussion of the effects of the action on listed species or critical habitat," and NMFS's jeopardy or no-jeopardy opinion. *Id.* § 402.14(h). The jeopardy analysis considers whether the effects of the action and cumulative effects, when added to the environmental baseline and in light of the status of the species and critical habitat, results in an appreciable reduction in the likelihood of the species' survival and recovery. *Id.* § 402.02.

## II.    THE COLUMBIA RIVER SYSTEM

The CRS consists of fourteen multi-purpose dams and related facilities that contribute to the vitality of the Pacific Northwest, eight of which are the subject of the Injunction (although the Injunction would affect other CRS projects).[5] ECF 2530-2. Congress explicitly directed the Corps and Reclamation to construct and operate these dams and reservoirs for a multitude of purposes: flood risk management throughout the Columbia River basin; generation of renewable energy for millions of residents; conservation of fish and wildlife resources; irrigation of nearly 1.4 millions of acres of land; commercial navigation to bring products to market; recreation; municipal and industrial water supply; and other purposes. *See generally* ECF 1989 at 6–9; CRS Operations Executive Summary Environmental Impact Statement, ACE001055181–232 ("EIS Executive Summary").

Most juvenile salmon and steelhead migrate downstream on the Snake and Columbia Rivers in the spring and early summer. Swieca ¶ 9; Faulkner ¶ 18; Feil ¶ 13. Multiple passage routes are available and utilized by juvenile migrants at the lower Columbia and lower Snake

---

[5] References in this brief to the CRS collectively refer to the eight dams in the lower Columbia and lower Snake River that Plaintiffs target with their Injunction. However, it is more accurate to define the CRS as the fourteen Federal projects that are operated as a coordinated system within the interior Columbia River Basin in the states of Idaho, Montana, Oregon, and Washington. The fourteen CRS projects ("project" is used to collectively refer to a dam and its associated reservoir) are Libby, Hungry Horse, Albeni Falls, Grand Coulee, Chief Joseph, Dworshak, Lower Granite, Little Goose, Lower Monumental, Ice Harbor, McNary, John Day, The Dalles, and Bonneville.

River dams, including: juvenile salmon bypass systems, where fish are diverted before reaching the turbines and either collected for transport or returned to the tailrace; spill bays (using conventional spill); surface passage routes (spillway weirs, corner collector, sluiceways); or turbines. Feil ¶¶ 9–16. Spill is provided using conventional spill and surface passage routes to facilitate juvenile and adult fish passage at the dams. *Id.* ¶ 15. As part of efforts to improve fish passage, the Corps has implemented operations that include voluntary spill, e.g., sending a certain volume of water through spillways (including those with spillway weirs), even during times when it would be possible to direct the water through the turbines. *Id*. ¶¶ 10–15. In setting spill levels and spill patterns, the agencies consider all relevant factors in order to "enhance juvenile fish passage and increase the survival of juvenile fish passing these dams," "maintain adequate tailrace hydraulic conditions for safe egress," and "minimize[] passage delay and fallback of adult fish over spillways." *Id.* ¶ 15.

For operations in recent years, fish passage spill consists of spilling a certain flowrate, *i.e.*, a specific amount of spill in thousand cubic feet per second (kcfs) for a specific number of hours (*e.g.*, 100 kcfs day/100 kcfs night); a fixed percentage of the hourly flow of the total project outflow for a number of hours (*e.g.*, 30% day/30% night); or up to a specific total dissolved gas ("TDG") level. Feil ¶¶ 19–20. The different spill regimes are reflective of the unique conditions at each dam—through years of testing, evaluation, and collaboration with NMFS and regional experts, the Action Agencies coordinate on the specific spill operation (*e.g.*, spill level or percent of river flow, and spill patterns) that best facilitates juvenile and adult passage at each individual dam. Feil ¶¶ 10–15, 18, 20; *see* Draft 2026 FOP at 21–26 (proposed spill at each dam).

Three annual documents guide operations and maintenance activities and serve as instructions to agency staff operating the dam and reservoir projects and related facilities: (1) the Water Management Plan; (2) Fish Passage Plan; and (3) Fish Operation Plan. Feil ¶¶ 4, 42. The

operations outlined in the Draft 2026 FOP are specific operational adjustments formulated within the adaptive framework adopted in the 2020 ROD. *Id.* ¶ 42; Draft 2026 FOP at 1. As described in the 2020 ROD and consistent with longstanding custom, the Action Agencies plan to coordinate with Federal agencies and regional sovereigns before finalizing the Draft 2026 FOP. Feil ¶ 36.

## III.    LITIGATION AND CONSULTATION HISTORY

This litigation's long history is well known to the Court. In 2016, the Court found that Defendants had violated the ESA and the National Environmental Policy Act ("NEPA") by issuing and adopting the 2014 BiOp and by failing to prepare a comprehensive and current EIS addressing the CRS. *NWF v. NMFS*, 184 F. Supp. 3d 861 (D. Or. 2016) ("*NMFS V*"). Accordingly, the Court, inter alia, ordered NMFS to complete a new BiOp and ordered the Corps and Reclamation to prepare an EIS under NEPA. *Id.* at 950; ECF 2065 at 149. Around this same time, the Action Agencies resolved separate litigation over their ESA consultation obligations on bull trout critical habitat, leading to formal consultation and issuance of a BiOp by FWS. *See* Final EIS, App. V, Part 3, Biological Opinion for the Operations and Maintenance of the 15 Federal Dams and Reservoir, ACE001057825–58268 ("FWS BiOp").

The Action Agencies, in close cooperation with NMFS and FWS, thus embarked on a four-year NEPA process. The agencies undertook expansive efforts to invite public comments, considered multiple alternatives to CRS operations, and extensively analyzed the effects of these alternatives using multiple hydrological and biological models, culminating in issuance of a final EIS in July 2020. Final EIS, ACE001055181–66824.

## IV.    2020 ESA CONSULTATION

While this activity was ongoing, in early 2020, the Action Agencies requested formal consultation on the operation and maintenance of the fourteen CRS projects with both NMFS and FWS. *See* Final EIS, App. V, Part 2, Biological Opinion for Continued Operation and Maintenance of the Columbia River System, ACE001056214–7824 ("2020 BiOp"); FWS BiOp,

ACE001057827. In the 2020 formal consultation, NMFS considered the effects of the Action

Agencies' proposed action (adopted in the 2020 ROD) on eight species of salmon, five species of

steelhead, and the Southern Distinct Population Segment of Pacific Eulachon and their

designated critical habitat. *See* 2020 BiOp, ACE001056214–7824.

      NMFS did not utilize the prior CRS-specific jeopardy standards and analysis frameworks

the Court rejected in 2016. *Id.* at ACE001056264. Instead, NMFS returned to its usual ESA

consultation practice of applying the statutory language and long-standing interpretations of

Section 7(a)(2) contained in the ESA interagency consultation regulations at 50 C.F.R. Part 402.

*Id*. In the 2020 BiOp, NMFS used those standards and interpretations of the ESA to determine

whether the proposed action was likely to jeopardize the continued existence of listed species. *Id*.

      The jeopardy analysis in the 2020 BiOp relied on the regulatory definition of "to

jeopardize the continued existence of" a listed species, which is "to engage in an action that

reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

the survival and recovery of a listed species in the wild by reducing the reproduction, numbers,

or distribution of that species." 50 C.F.R § 402.02. Based on this standard, NMFS concluded that

the proposed action was not likely to jeopardize the continued existence of ESA-listed species.

2020 BiOp, ACE00105218–19.[6]

## V.   2020 RECORD OF DECISION

      In October 2020, the Action Agencies issued the 2020 ROD. 2020 ROD,

ACE000068151–8244. The 2020 ROD formally adopted the operations for the fourteen federally

managed dams described and consulted upon for the 2020 BiOp and identified a Selected

Alternative for implementation. This Selected Alternative adopted a flexible spill program that

included 16 hours per day of spill up to the "gas cap" and 8 hours per day of "performance

---

[6] Although not directly at issue in these motions, NMFS also concluded that the proposed action was not likely to destroy or adversely modify designated critical habitat, which means "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R § 402.02; 2020 BiOp, ACE001056218–19**.**

standard" spill; includes measures for lamprey and resident fish protection; provides flexibility

for water management and water supply operations; and enhances past commitments to benefit

ESA-listed fish species. *Id.* at ACE000068169–70. The Selected Alternative also provides an

adaptive management framework to allow the Action Agencies to implement the proposed action

to meet the multiple purposes of the CRS in response to changes in natural conditions and new

information. *Id.*; *see also* Final EIS, App. R, ACE001066340. In this way, the Selected

Alternative "provide[s] the most balanced way to fulfill all of the CRS projects' congressionally

authorized purposes, meets a majority of the CRS[] EIS objectives, minimizes and avoids

adverse impacts to the environment, benefits tribal interests and treaty resources, and provides

additional improvements for ESA-listed species." 2020 ROD, ACE000068169.

## VI.    CURRENT LITIGATION

Plaintiffs filed supplemental complaints in 2021 challenging the 2020 BiOp, 2020 ROD,

and Final EIS. ECFs 2325, 2396. In February 2024, this Court granted a stay of litigation through

December 2028, ECF 2465, based on a Memorandum of Understanding between the parties, in

which Defendants committed to spill operations and interim CRS operations (located in

Appendix B of the Resilient Columbia Basin Agreement) that would remain in place for up to ten

years, so long as the Memorandum of Understanding remained in effect, ECF 2450-1 at 5.

Plaintiffs agreed to these negotiated interim operations, including higher spring spill levels,

limited spill in fall and winter, and an earlier end to summer spill for up to ten years. *Id.* at 84–

92.

In June 2025, pursuant to a Presidential Memorandum, the U.S. Government withdrew

from the Memorandum of Understanding.[7] The Court granted Plaintiffs' motion to lift the stay of

---

[7] *Presidential Memoranda: Stopping Radical Environmentalism to Generate Power for the Columbia River Basin*, The White House (June 12, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/stopping-radical-environmentalism-to-generate-power-for-the-columbia-river-basin/.

litigation in September 2025, ECF 2495, and, in October 2025, Plaintiffs filed the instant

motions seeking mandatory injunctive relief, ECF 2526 (NWF), 2530 (Oregon).[8]

## VII.    PROPOSED 2026 OPERATIONS

Under the Action Agencies' 2020 ROD and Services' 2020 BiOps, Defendants and

Bonneville plan each year's upcoming annual operations following an adaptive management

approach for certain discretionary activities "to allow the action to respond to new and evolving

information." Swieca ¶ 28. Modifications are only implemented if the effects to listed species are

"similar to the manner and magnitude of effects considered in the" operative BiOps. *Id.* ¶ 29.

Potential adaptive management measures are informed by species status monitoring results, *id.* ¶

30, and discussed in a regional forum where federal, state, and tribal sovereigns can all

collaborate, *id.* ¶ 28. As is their usual practice, the Action Agencies plan to coordinate with

regional sovereigns through the Regional Implementation Oversight Group before finalizing the

Draft 2026 FOP and prior to implementing new operations. Feil ¶ 36.

The Draft 2026 FOP describes the Action Agencies' proposed operations in 2026 for fish

passage at the four lower Columbia and Snake River dams, including spring surface spill

operations (March through early April), spring and summer spill operations (early April through

August), fall/winter surface spill operations (September through mid-November) and project-

specific spill operations. *See* Draft 2026 FOP at 1, 18 (fall/winter), 19–20 (spring), 21 (summer),

and 21–27 (project-specific). The Draft 2026 FOP provides annual detailed direction on

---

[8] Washington, the Nez Perce Tribe, and the Yakama Nation, as *amici curiae*, subsequently filed memoranda in support of Plaintiffs' preliminary injunction motions. ECF 2533, 2536, 2537. *Amici* raise new arguments that are not addressed in Plaintiffs' motions, including expert declarations. The Court should decline to consider this material. *See United States v. Wahchumwah*, 710 F.3d. 862, 868 n.2 (9th Cir. 2013) ("Generally, arguments not raised in a party's opening brief are deemed waived, and the court will not consider arguments raised only in amicus briefs." (citation modified)); *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009); *see also All. for the Wild Rockies v. Anderson*, 780 F. Supp. 3d 1075, 1076 (D. Mont. 2025) ("An amicus brief is meant to assist the court and not merely extend the length of the litigant's brief." (citation omitted)).

implementation of the proposed action consistent with the 2020 BiOp's analysis and new data gathered and analyzed since the 2020 BiOp. Feil ¶¶ 31, 35, 37, 40, 49. It is the culmination of "lessons learned"—including lessons from the high-spill regimes implemented since this Court's 2018 injunction—and employs the best and most recent scientific information available. *Id.* ¶ 35.

## STANDARDS OF REVIEW

### I.    APA REVIEW

Claims under the ESA are reviewed under the well-established standards of the Administrative Procedure Act ("APA"). *NMFS V*, 184 F. Supp. 3d at 879 (citations omitted). Under the APA, an agency action must be upheld on review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067-70 (9th Cir. 2010) (per curiam). A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). These standards also govern preliminary injunctions like the one at issue here. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (court is bound at the preliminary injunction stage by the APA's deferential standard and scope of review).

Courts are at their "most deferential" "where, as here, the challenged decision implicates substantial agency expertise," *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993), such as when the agency is "making predictions, within its area of special expertise, at the frontiers of science," *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 93, 96, 103, 105–06 (1983); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375–77 (1989). Even if a decision has "less than ideal clarity," a court must uphold it so long as "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

## II.    PRELIMINARY INJUNCTION

An injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20.

The standards are heightened where, as here, a plaintiff seeks a mandatory injunction that "goes well beyond simply maintaining the status quo pendente lite." *Stanley v. Univ. of S. Cal*., 13 F.3d 1313, 1320 (9th Cir. 1994) (citation modified); *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are those that "order [] a responsible party to take action" (citation omitted)). Such an injunction imposes "significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 892 (7th Cir. 2011). As such, "[m]andatory injunctions are particularly disfavored," *American Freedom Defense Initiative v. King County*, 796 F.3d 1165, 1173 (9th Cir. 2015), and requests for this relief are subject to "heightened scrutiny," *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993). They "are not granted unless extreme or very serious damage will result," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and should be denied "'unless the facts and law clearly favor the moving party.'" *Garcia*, 786 F.3d at 740 (citation omitted). "In plain terms, mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (citation omitted).

In cases arising under the ESA, the Supreme Court has recognized that "the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) (*"TVA"*). But this test does not apply to Plaintiffs' claims

against NMFS's 2020 BiOp, which arise under the APA, 5 U.S.C. § 706, not the ESA citizen suit. *Bennett v. Spear*, 520 U.S. 154, 179 (1997). The APA does not remove a court's equitable discretion when granting injunctive relief. 5 U.S.C. § 705 (a reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings")*. Therefore, the Court must apply the *Winter* four-part test and should decline to apply any other approach to the preliminary injunction standard. *See Starbucks Corp.*, 602 U.S. 339 (2024).[9]

Even setting aside APA review, courts in ESA cases only "presume[]" that "the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *NWF v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018) ("*NMFS VII*"). They do not circumvent the inquiry entirely. *See San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, No. 24-7807, 2025 WL 3467536, at *2–3 (9th Cir. Dec. 3, 2025) (holding that "a court must consider competing equities and the public interest as to [] other species"); *see also All. for the Wild Rockies v. Krueger*, 35 F. Supp. 3d 1259, 1266–67 (D. Mont. 2014) ("The law is clear that threatened and endangered species are the beneficiaries . . . , rather than plaintiffs professing to act on their behalf.").

## ARGUMENT

This Court lacks jurisdiction to rule on Plaintiffs' motions and therefore should dismiss Plaintiffs' complaints, rendering moot their request for injunctive relief. *See* Federal Defendants'

---

[9] The Court also should also not apply the Ninth Circuit's "serious questions" approach to the preliminary injunction standard, as requested by Plaintiffs. *See* ECF 2530 at 18 (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011); ECF 2526 at 12 (citing *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024)). This relaxed standard is invalid under the Supreme Court's recent direction in *Starbucks Corp.*, 602 U.S. at 346 (overruling Sixth Circuit's alternative test for preliminary injunctive relief and holding that "absent a clear command from Congress, courts must adhere to [*Winter's*] traditional four-factor test" as the "default rule"). Neither the APA nor the ESA expressly modify the four-factor test.

Motion to Dismiss for Lack of Jurisdiction, filed concurrently herewith. Even if that not the case, the Court should deny Plaintiffs' motions for preliminary injunctive relief for many additional reasons. First, the Court lacks authority to enter Plaintiffs' Injunction because the proposed relief far outstrips the Court's equitable powers and would require new (and unlawful) operations. Second, Plaintiffs fail to tie their Injunction to legal claims the Action Agencies—as opposed to NMFS—violated the law. Third, Plaintiffs have not–and cannot–show that irreparable harm is likely to occur to them before this case can be decided on the merits. Fourth, the Injunction will not benefit listed species as claimed, is infeasible, and is overbroad. Fifth, Plaintiffs are unlikely to succeed on the merits of their claims against NMFS because NMFS properly applied the law and performed a robust, expert, and reasoned analysis of the CRS's effects on ESA-listed species. Last, the balance of the equities and public interest weigh strongly against Plaintiffs' Injunction.

## I.     THE COURT LACKS AUTHORITY TO ENTER PLAINTIFFS' INJUNCTION.

Plaintiffs' Injunction inappropriately forces the Court to confront an extraordinary request to seize control over the CRS and Federal resources before the Court decides the merits of this case. Plaintiffs seek judicial control over coordinated system operations, to the extent of asking the Court to dictate day-to-day, even hourly, operations of federal dams across the Pacific Northwest. They also ask the Court to create new substantive rights for non-parties, like compelling the United States to fund the Nez Perce Tribe's kelt management program, approving and funding a new hatchery program for sockeye, and developing infrastructure to benefit the State of Washington's hatchery. *See* ECF 2530-2. While these operational and non-operational measures *might* advance Plaintiffs' parochial prerogatives, they conflict with Congress' direction to the federal agencies and do not comply with the ESA or other applicable laws. Preliminary injunctions are equitable remedies, and the essence of equity jurisdiction is "to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321,

329 (1944); *see also Salazar v. Buono*, 559 U.S. 700, 718 (2010) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established.").

In past iterations of this case, the Court granted mandatory injunctive relief that modifies CRS operations, overriding the plans adopted by Defendants. *NWF v. NMFS*, 422 F.3d 782 (9th Cir. 2005) (per curiam); *NMFS VII*, 886 F.3d 803. Recent Supreme Court precedent, however, clarifies the limits on the Court's authority to grant equitable relief. *See Trump v. CASA*, *Inc.*, 606 U.S. 831, 841 (2025) (holding a court's equitable powers to grant nationwide injunctive relief are cabined by the Judiciary Act of 1789, which "is what authorizes the federal courts to issue equitable remedies" and "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception" (internal citations and quotes omitted)). Under this precedent, Plaintiffs must show that their requested relief is of the kind traditionally accorded by courts of equity. *See, e.g.*, *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593 (9th Cir. 2023) (noting plaintiffs' obligation). They have not made this showing, nor could they. The proposed relief far outstrips the Court's equitable powers and, at most, would replace the current Federal operations with new operations that Plaintiffs concede would violate the law. By failing to seek relief that falls squarely within the Court's equitable powers, Plaintiffs provide no basis for the Court to entertain their proposed injunction.

A. *Plaintiffs identify no precedent for courts in equity granting the proposed systemic, mandatory, preliminary relief that replaces operations of Federal projects with those chosen by Plaintiffs or the courts.*

Plaintiffs' Injunction oversteps traditional bounds of equity in multiple and unjustified ways. Plaintiffs request that the Court issue—as preliminary relief—mandatory requirements governing overall operational control of the CRS. However, it is well-established that intermediate or preliminary relief must follow substantive law and be of the "same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220

(1945). Plaintiffs' Injunction would not pass muster as a permanent injunction and is thus unavailable as preliminary relief.

First, Plaintiffs' mandatory injunction is squarely foreclosed by the fundamental principle that the Court is not empowered to substitute its judgment for that of Defendants'. The Court's authority to review and set aside agency action "is not power to exercise an essentially administrative function."[10] *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 21 (1952). In fact, the opposite is true: "It is a familiar rule that a court may exercise its equity powers . . . to compel courts, boards, or officers to act in a matter with respect to which they may have jurisdiction or authority, although the court will not assume to control or guide the exercise of their authority." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937); *see also Raines v. Byrd*, 521 U.S. 811, 828-29 (1997) (Established law "contemplates a more restricted role for Article III courts [in exercising judicial review] . . . not some amorphous general supervision of the operations of government." (citation modified)).

Plaintiffs' Injunction exceeds these limits. They seek an Injunction to supplant Defendants' operations for water management, including fish passage, throughout the CRS, among many other related decisions and processes for managing their operational flexibility. ECF 2530-2 at 2–10. Plaintiffs' Injunction would override Defendants' decision-making, notwithstanding the agencies' technical expertise or authorized funding, and will significantly increase the risk of severe negative impacts to both fish and human health and safety. *See, e.g.*, Marshall ¶¶ 8–56; Feil ¶¶ 18–53; Faulkner ¶ 57. The proposed changes to CRS operations

---

[10] This principle is established in a long line of cases. *See, e.g.*, *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) ("[T]he court is not empowered to substitute its judgment for that of the agency."); *see also NLRB v. Enter. Ass'n*, 429 U.S. 507, 522 n.9 (1977) ("When an administrative agency has made an error of law, the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." (citation modified); *Fed. Power Comm'n*, 344 U.S. at 20 ("[T]he function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration.").

threaten the stability of the regional power and transmission system by significantly reducing the flexibility required for operations to maintain reliability, risking the health, safety, and economic stability of communities throughout the region. Dibble ¶¶ 31, 32, 33, 39, 40; Stevenson ¶¶ 18–34; McManus ¶¶ 16–19.

Likewise, the Injunction's non-operational measures would create new legal rights and obligations, forcing the United States to engage in new processes, seek and expend funds, issue contracts, and perform other measures. ECF 2530-2 at 11–14. These measures appear designed to enrich participants in this case—like providing the State of Washington and the Nez Perce Tribe with financial and other benefits they otherwise are not due. This, too, exceeds the Court's equitable authorities. A court in equity simply cannot create new rights, as "[e]quity *follows* the law." 1 Joseph Story, Commentaries on Equity Jurisprudence § 64 (12th ed. 1877) (emphasis added). Thus, even if Plaintiffs could demonstrate they are entitled to extraordinary injunctive relief, fundamental principles of administrative law and separation of powers preclude the Court from mandating that Defendants adhere, on pain of contempt, to Plaintiffs' preferred scheme for CRS operations, infrastructure projects, and predation and habitat actions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("Unlike the political branches, the courts would by design exercise neither Force nor Will, but merely judgment." (citation modified)).

Federal Rule of Civil Procedure 65 confirms that Plaintiffs' Injunction exceeds the bounds of the Court's equitable authorities. This rule codified existing law on the longstanding constraints on the Court's equitable authority, *see* 11A Wright & Miller's, Fed. Prac. & Proc. § 2941 (3d ed. 2025), including the requirement that every injunction "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C); *William Keeton Enters., Inc. v. A All Am. Strip-O-Rama, Inc.*, 74 F.3d 178, 182 (9th Cir. 1996) (per curiam). This rule contemplates that injunctions are limited, discrete, and present manageable constraints on specific parties. *Cf. People of State of*

*N.Y. by Vacco v. Operation Rescue Nat.,* 80 F.3d 64, 70 (2d Cir. 1996) (Rule 65(d) codifies the principle that a court's equitable powers "cannot lawfully enjoin the world at large").

What Plaintiffs propose is the opposite of what the rule allows. The Injunction would seemingly obligate NMFS and FWS to undertake activities well beyond their responsibilities in administering ESA Section 7 and other statutes, even though they have no direct control or discretionary authority over management of the CRS. Other examples of this overbreadth are detailed *infra* Sections IV.B, VI.A, and VI.B, especially as regards the Corps and Bonneville. Likewise, the Injunction is unclear as to the role or responsibility of Reclamation, though it certainly has its own distinct roles in the overlapping federal operational and regulatory schemes at play here.

Plaintiffs also seek to control dam operations that are governed by documents developed collaboratively by these and other agencies, States, Tribes, and many others over decades, including the: 2020 ROD (ACE000068151), Final EIS (ACE001055181), FWS's 2020 BiOp (ACE001057825), NMFS's 2020 BiOp (ACE001056214), the annual Water Management Plan (available at https://public.crohms.org/tmt/documents/wmp/ (last visited Dec. 15, 2025)), and the annual Fish Passage Plan (available at https://public.crohms.org/tmt/documents/fpp/ (last visited Dec. 15. 2025)), as well as documents that are not even yet finalized, such as the Draft 2026 FOP. These operational documents cannot be supplanted by the Injunction addressed simply to all Defendants (and based only on evidence from a single former employee of the State of Oregon that glosses over these issues). ECF 2531, Decl. of Edward Bowles.[11] Plaintiffs are

---

[11] Plaintiffs cannot rely on amicus declarations to support their case. Plaintiffs bear the burden of establishing that preliminary injunctive relief is required. *Winter*, 555 U.S. at 20. As with any matter where the movant bears the burden of proof, Plaintiffs were required to meet their burden in their opening submission, "in order to afford Defendants a full and fair opportunity to respond." *In re Flash Memory Antitrust Litig.*, No. 07-cv-86-SBA, 2010 WL 2332081, at *15 (N.D. Cal. June 9, 2010) (declining to reply to "evidence [that] should have been proffered with Plaintiffs' moving papers"). Here, Plaintiffs relied only on one witness. ECF 2531, Decl. of Edward Bowles. Plaintiffs cannot shore up a deficient motion by later incorporating declarations filed well after they presented their case. *Calence, LLC v. Dimension Data Holdings, PLC*, 222

consequently forced to incorporate into their Injunction both the operational documents and expertise of the Federal agencies. This includes Bonneville, an agency that is not a party to this case but has intertwined legal responsibility over the CRS. *E.g.*, ECF 2530-2 at 6 (referencing a Fish Operations Plan). Structuring Plaintiffs' Injunction in this way conflicts with Rule 65 and its longstanding restraints on the Court's equitable authorities.

Even incorporating the Actions Agencies' Fish Operations Plan by reference, Plaintiffs' Injunction is still unworkable and invites endless questions regarding Defendants' discretion to draft annual plans, adjust operations to meet Congressionally mandated needs, and respond to emergency situations. The Injunction's requirements are subject to ambiguous exceptions and conditions that may or may not allow Defendants to exercise their usual independent professional and technical judgment, to act on the judgment or recommendations of other entities, or to reconcile ambiguities between the Injunction and other applicable guidance. Indeed, the Order would place Defendants in the untenable and impermissible position of inadvertently violating its terms or other legal obligations. In this way, the Injunction's intent to strip Defendants of some, but not all, discretionary control of the CRS violates Rule 65.

Nor should Defendants be directed to "write the injunction themselves" because "that is a job for the court." *United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983); *see also Xerces Soc'y for Invertebrate Conservation & Ctr. for Biological Diversity v. Watson*, No. 3:22-CV-00790-HZ, 2025 WL 1736922, at *6 (D. Or. June 23, 2025) (rejecting injunction seeking notification and disclosure requirements as not tailored to remedying deficiencies in agency analysis); *Newsom v. Norris*, 888 F.2d 371, 382 (6th Cir. 1989) (vacating requirement to prepare a remedial plan where "those issues were not joined by the complaint nor developed by the proof"). By violating well-established limits embodied in Rule 65, Plaintiffs seek relief that goes

---

F. App'x 563, 566 (9th Cir. 2007) (upholding district court's refusal to consider arguments raised for the first time on reply when considering a motion for preliminary injunction).

well beyond the scope of the Court's equitable authority and provide no basis for the Court to entertain their proposed injunction.

    B. *Plaintiffs' Injunction would violate the law, rendering the Injunction unavailable.*

Plaintiffs' Injunction also exceeds the Court's equitable authorities because it would result in new ESA and Clean Water Act violations. *See I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) ("[I]t is well established that courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (citation modified)); *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989) (when fashioning equitable relief, "the court must act within the bounds of the statute and without intruding upon the administrative province" (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939))); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 2014) (a court may not issue an injunction if doing so would cause an agency to violate other statutory requirements, including ESA Section 7).

The *Pangilinan* decision illustrates application of this rule. There, the Ninth Circuit ordered naturalization of plaintiffs as an equitable remedy despite the expiration of their eligibility for naturalization under applicable statutes. Reversing, the Supreme Court explained that courts lacked the equitable authority to order a remedy in contravention of the statutory requirements for naturalization. *Pangilinan*, 486 U.S. at 882–83; *see also Ibson v. United Healthcare Servs.*, 877 F.3d 384, 389 (8th Cir. 2017) (reversing award of benefits to ineligible party). This case is consistent with *Pangilinan*.

First, Plaintiffs ask the Court itself to direct an operation of the CRS that Plaintiffs unilaterally developed *outside* the ESA's consultation requirements. Plaintiffs further concede their Injunction will not comply with ESA Section 7's substantive mandate. ECF 2526 at 12 (claiming their Injunction is inadequate to comply with ESA Section 7); ECF 2530 at 13 (same). Plaintiffs thus ask the Court to entertain a new violation—to order Defendants to implement an

operation that was not subject to any procedural ESA consultation or covered by the current BiOp or its Incidental Take Statement.[12] In short, there is no statutory mechanism for courts to mandate Federal agencies to implement operations outside the ESA's consultation framework.[13] This problem is illustrated most clearly with the discussion *infra* Section VI.A, about Plaintiffs' failure to consider the impacts of the Injunction on ESA-listed bull trout.

Second, the Injunction would violate other state and federal law. In implementing the Clean Water Act, Oregon and Washington have both enacted water quality standards governing total dissolved gas ("TDG") to protect aquatic life. *See generally* Turner Decl.; Draft 2026 FOP at 2–8. Although both states have issued adjustments allowing elevated levels of TDG during spring spill and other time periods, Defendants may not utilize the Washington adjustment unless doing so is in accordance with ESA consultation documents. *See* Wash. Admin. Code § 173-201A-200(1)(f)(ii)(B) (2024).[14] If the Court grants the Injunction, it will be ordering operations that have not undergone consultation, thus rendering unavailable the States' allowances for the Corps to exceed the water quality standard deemed protective of aquatic life—110% TDG. By asking the Court to order spill operations that fall outside the boundaries of ESA consultation, Plaintiffs request the Court to order Defendants to violate State law and the Clean Water Act. It is inequitable to put a Hobson's choice before Defendants where either choice violates the law, and this predicament supports denial of Plaintiffs' Injunction.

---

[12] Nor do Plaintiffs come close to providing analysis of the effects of their proposed action similar to that provided by Defendants for their 2020 ROD and by NMFS in its 2020 BiOp. They instead rely on one former State employee presenting testimony in an advocacy setting, not as an expert wildlife agency entrusted by Congress with implementing the provisions of the ESA.

[13] Because Plaintiffs' principal complaint is with the 2020 BiOp, they should have litigated the merits of that claim in order to secure a timely remedy requiring a new BiOp—not use the possibility of NMFS's legal errors to leverage disruptive relief against the Action Agencies simply because they relied on the BiOp.

[14] Plaintiffs' proposed spill operations in fall-winter, spring, and summer, as well as their proposed lower forebay operations, will cause more frequent exceedances of the increased TDG levels allowed under the two States' adjustments to their generally applicable standards. *See* generally Turner ¶¶ 9–20; *see also infra* Sections IV.A.2 & VI.A.

NWF nonetheless argues that the Court may issue a detailed remedial order. ECF 2526 at 56, 60. The case law they cite predates the Supreme Court's clarification in *Trump v. Casa*. It is also distinguishable. In *Northwest Environmental Defense Center v. United States*, the Court issued an interim injunction to address an absence of fish passage and water quality measures. 558 F.Supp.3d 1056 (D. Or. 2021). The terms of the interim injunction in that case do not cause the same problems described above because there, the "bulk of Plaintiffs' requested remedies [were] simply [Reasonable and Prudent Alternatives ("RPA")] measures that the Corps ha[d] failed to carry out, ha[d] already undergone environmental consultation, and were deemed necessary by NMFS to avoid jeopardy to the listed salmonids under the ESA." *Id.* at 1066. The provenance of the measures in a NMFS BiOp issued after consultation with the Corps also indicates that such RPA measures could be implemented "in a manner consistent with the intended purpose of the action, . . . consistent with the scope of the Federal agency's legal authority and jurisdiction, [and were] economically and technologically feasible." 50 C.F.R. § 402.02 (definition of "Reasonable and prudent alternatives"); 16 U.S.C. § 1536(b)(3)(A). In contrast, the Injunction comes with no assurance that its terms are similarly appropriate and demonstrably lawful.

NWF's cite to *United States v. Washington*, 853 F.3d 946, 979 (9th Cir. 2017), is inapposite. There, the State defendant objected to a detailed mandatory injunction by raising federalism concerns that lacked merit under the Supremacy Clause. No such issue is pertinent here. Nor is there any similarity between the affirmative suit by the United States in that case, and the separation of powers concerns and other limits to a court's role in judicial review and equitable authority presented here.

In short, Plaintiffs are asking the Court to swap an *alleged* violation (the agencies' operation) for an *admitted* violation of the ESA (the Injunction). For all the reasons explained above, the Court is not authorized to exert in its sole discretion such standardless control of the

CRS. This is so *even if* the Court finds that Plaintiffs are likely to succeed on the merits (which it should not). Courts have "many remedial tools at their disposal" beyond the issuance of injunctive relief. *See Winter*, 555 U.S. at 33. As such, Plaintiffs err in arguing the Court can, or should, step into the shoes of Federal agencies and—"under the guise of [its] remedial authority"—direct operations in ways that otherwise violate the law. *Miller v. Albright*, 523 U.S. 420, 456 (1998) (Scalia, J., concurring). The Court should deny Plaintiffs' Injunction because it exceeds the Court's equitable authority and fails to meet multiple objective prerequisites to such dramatic and intrusive relief.

## II.    PLAINTIFFS' ESA CLAIMS AGAINST THE ACTION AGENCIES FAIL BECAUSE THE AGENCIES PROVIDED INDEPENDENT ANALYSIS IN ADDITION TO THE 2020 BIOP.

The flaws in Plaintiffs' motions are further demonstrated by the disconnect between their merits arguments and relief sought. Plaintiffs rely on their APA claim against NMFS, alleging flaws in the 2020 BiOp, to demonstrate they have a likelihood of success on the merits. But they seek preliminary injunctive relief directed largely against the Corps and Defendants other than NMFS. This strategy runs afoul of the requirement for a close nexus between claims, harms, and injunctive relief, proven with "exactitude." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). The preliminary injunction should "grant relief of the same character as that which may be granted finally." *Pac. Radiation Oncology*, 810 F.3d at 636. The remedy for Plaintiffs' APA claim against NMFS would be an order requiring preparation of a new BiOp in compliance with the ESA and NEPA. *NMFS V*, 184 F. Supp. 3d at 949–50. That APA claim does not support an injunction against the Corps or other Action Agencies.

Plaintiffs argue for relief against the Action Agencies because "the 2020 ROD relies on the 2020 BiOp to establish compliance with the ESA." *See* ECF 2526 at 21 (citing *NWF v. NMFS* ("*NMFS VI*"), No. 3:01-CV-0640-SI, 2017 WL 1829588, at *5 (D. Or. Apr. 3, 2017),

*aff'd* 886 F.3d 803 (9th Cir. 2018)); *id.* at 50. NWF devotes one sentence to this assertion, citing only this Court's 2017 decision. ECF 2526 at 21. Oregon offers *no* argument to support an ESA citizen suit claim. Their problem is that the Court's 2017 decision does not prove they have a likelihood of success now on their ESA claim against the Action Agencies.

The Court's 2017 decision found the Action Agencies in violation of the ESA because "in reaching their 2014 Records of Decision, the Corps and [Reclamation] did not conduct any independent analysis but solely relied on the now-invalidated 2014 BiOp." *NMFS VI*, 2017 WL 1829588, at *5. The cases are different because the 2020 ROD does not rely exclusively on the 2020 BiOp. Here, in contrast to 2014, the 2020 ROD provides an independent analysis of the agencies' compliance with Section 7(a)(2). 2020 ROD, ACE000068214–23. The Action Agencies also presented an in-depth analysis of effects to salmon and steelhead in the EIS, further supporting their independent analysis, in addition to relying on the BiOp(s).[15] *See* Final EIS, ACE001055181–66824; *see also* Biological Assessment of Effects of the Operations and Maintenance of the Federal Columbia River System on ESA-Listed Species, Final EIS, App. V, Part 1, ACE001059479–660477 ("Biological Assessment"). Plaintiffs do not explain why that detailed explanation is contrary to law. They ignore the 2020 ROD and EIS, and present no more than *ipse dixit* that the Action Agencies have independently violated ESA Section 7(a)(2). They have not shown a likelihood of success in their claims against the Action Agencies.

There is a second problem for Plaintiffs. Unlike the procedural posture in *NMFS V*, the Court here has not invalidated the 2020 BiOp. The Court's 2017 decision ordered "interim injunctive measures" only after its decision "invalidating" the 2014 BiOp and holding that the Action Agencies had themselves violated the ESA. *NMFS VI*, 2017 WL 1829588 at *2, 5; *see*

---

[15] The EIS is over 11,000 pages long. Detailing its every consideration of the possible consequences of the agency action here on salmon and steelhead, amongst the other relevant factors, is excessive to rebut Plaintiffs' sole point. Action Agencies may utilize their NEPA analyses, such as in this EIS, to demonstrate their ESA compliance. *See, e.g.*, 50 C.F.R. § 402.14(c)(2) (allowing reliance on NEPA analyses in ESA consultation).

*also NMFS V*, 184 F.Supp.3d at 949–50. The present procedural posture is materially different now because the 2020 BiOp remains valid. A preliminary finding by the Court that Plaintiffs are likely to eventually succeed on their APA claims against the BiOp would not render Action Agency reliance on it today contrary to law. The Action Agencies may rely on the 2020 BiOp unless Plaintiffs prove that reliance, especially when combined with their own independent analysis, to be arbitrary and capricious. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1415–16 (9th Cir. 1990) (explaining judicial review of reliance on BiOp). Plaintiffs have not made that argument, and no preliminary injunction against the Action Agencies may issue.

## III.     PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM IS IMMINENT OR LIKELY TO OCCUR.

Plaintiffs also have not—and cannot—show that irreparable harm to them is likely to occur in the time it would take the Court to decide this case on the merits.

### A.  *Plaintiffs have not shown that irreparable harm to themselves is likely.*

The Court should not issue a preliminary injunction for the fundamental reason that Plaintiffs have not shown that *they* face irreparable harm that is likely to occur before this Court can resolve the merits of their claims. "Federal courts do not exercise general legal oversight" of the Executive Branch, nor do they "possess a roving commission" to find and invalidate unlawful executive policies. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Rather, equitable remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018)); *Lewis v. Casey*, 518 U.S. 343, 358–59 n.6 (1996) (finding that judicial remedy is limited to "remediation of the inadequacy that caused [a plaintiffs'] injury," not "systemwide relief" or "all administrative deficiencies"); *CASA*, 606 U.S. at 851. In accord, to justify preliminary injunctive relief, Plaintiffs "must show that *they themselves* are likely to suffer irreparable harm absent an injunction." *NMFS VII*, 886 F.3d at 822 (emphasis added);

*Winter*, 555 U.S. at 22 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)) (noting the "applicant must demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered'").

The harm also must be individualized and substantiated with evidence. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–76 (9th Cir. 1988); *Leiva-Perez v. Holder*, 640 F.3d 962, 968–69 (9th Cir. 2011). Plaintiffs must show "extreme or very serious damage" because harm that is irreparable is "permanent or at least of long duration." *Marlyn Nutraceuticals*, 571 F.3d at 879; *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987). This burden is much higher than establishing Article III standing. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm.").

And Plaintiffs must show—with evidence—that the irreparable harm is "likely" to occur (and is attributable to Defendants) before the Court can decide the merits of the case. *Winter*, 555 U.S. at 22. The only relevant inquiry is thus whether the Court should act "to prevent harm that would impair th[e] court's ability to grant effective relief after resolving the merits of the case." *Humane Soc'y of the U.S. v. Bryson*, No. 3:12–cv–00642–SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012); *S. Yuba River Citizens League v. NMFS*, No. 2:13-CV-00042-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013) (denying injunction for failure to "quantify any impact occurring . . . during the interim period that the relief is to be provided").

In the face of this exacting burden of proof, Plaintiffs do not rely on a "likelihood" of irreparable harm to their interests. They make no showing of likely irreparable harm at all, let alone that Defendants' activities in the next year are likely to inflict permanent or lasting damage on any plaintiff over the period of months until this Court could resolve the merits of the case. NWF, for example, identifies no substantive right of theirs that will be injured, much less

irreparably harmed, during this case. They hold no contract, property right, or other such interest affected by the CRS operations. While NWF Plaintiffs may show an emotional, recreational, or financial interest in salmon and steelhead, they have not shown that Defendants are likely to irreparably harm those interests in 2026 during the limited period while the Court resolves the case. NWF's brief addresses only the harms they allege two Snake River salmon and steelhead species are generally suffering from the collective causes and stressors. ECF 2526 at 43–45. NWF's brief fails to describe, let alone prove, that their activities or pastimes are likely to be severely affected by the 2026 CRS operations.[16] Nor do they demonstrate that system operations over the next year or period of months are likely to impact any specific locations where their interests might be severely affected. Indeed, the Court may conclude that Plaintiffs have Article III "standing to seek injunctive relief" but still cannot show that they have "suffered an irreparable injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010). This is just such a case.

---

[16] Nor do prior grants of injunctions in this case resolve the current question in Plaintiffs' favor. This Court's 2005 grant of an injunction was based on "irreparable harm results to listed species," not harm to Plaintiffs, and thus conducts the wrong analysis. *NWF v. NMFS* ("*NMFS II*"), No. CV 01-640-RE, 2005 WL 1278878, at *4 (D. Or. May 26, 2005), *affirmed*, 524 F.3d 917. The affirmance of this injunction by the Ninth Circuit is likewise no longer controlling or persuasive because it found an injunction was necessary to remedy the ESA violation. *NWF*, 422 F.3d at 796. The Ninth Circuit has since disclaimed any such presumption of irreparable harm. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). And this Court's 2017 grant of an injunction likewise focused on irreparable harm to ESA-listed species and did not explain how "harm to the listed species will affect the Spill Plaintiffs." *NMFS VI*, 2017 WL 1829588, at *5 n.7. The Ninth Circuit found the requisite personal harm in a supporting declaration. *NMFS VII*, 886 F.3d at 822. But such evidence is missing from this round of litigation because neither of NWF's standing declarants prove they are likely to suffer any permanent or serious harm in the immediate future while the Court resolves the merits. As argued elsewhere herein, these declarants essentially rely on the presumption that they are harmed because the ESA-listed species at issue are not yet sufficiently abundant to have achieved recovery and delisting. Such assertions fall short of the necessary proof that any active change in status is likely to occur in the short term with sufficiently severe and permanent impact to Plaintiffs' asserted interests.

The State of Oregon also has presented no evidence of imminent irreparable harm to its own interests. ECF 2530 at 40–44. Oregon does not have standing as *parens patriae* to sue the Federal Government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (en banc); *see also Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023). Oregon therefore "must assert [its] own legal rights" and may not invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). While Oregon claims an interest in salmon and steelhead and other wildlife species generally, Oregon proffers *no* evidence that Defendants are likely to irreparably harm the State's cognizable interests in the limited time it will take for the Court to resolve the merits. Indeed, Oregon's sole declarant (Edward Bowles) made clear that when he was addressing irreparable harm in his declaration, he was referring to irreparable harm to "the fish," and not Oregon itself. Bowles 32:20–33:1. Neither he nor the State of Oregon provides evidence as to how any specific State interest is facing likely imminent and irreparable harm.

Without evidence identifying and quantifying the irreparable harm *to them*, Plaintiffs cannot meet their burden of proof that an injunction is warranted. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc*., 736 F.3d 1239, 1251 (9th Cir. 2013) ("[T]hose seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm."); *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[T]hose seeking injunctive relief, not those opposing that relief, are responsible for showing irreparable injury."). The Court should deny the motions on this ground alone.

B.  *The status of the species has improved and is no basis for the Injunction.*

Even if Plaintiffs were allowed to demonstrate irreparable harm based on alleged injury to a specific ESA-listed salmon or steelhead species (rather than to themselves), they have not made and cannot make that showing either. Unable to provide evidence of likely imminent irreparable harm, Plaintiffs instead suggest that *any* harm (or even risk of harm) to salmon and

steelhead on an ongoing basis constitutes irreparable harm, positing that any declines in abundance increase the risk of loss of the population groups that comprise each species. ECF 2526 at 44–45; ECF 2530 at 41–43. This goes too far because Plaintiffs do not articulate why such loss is likely for any specific population groups (or species) due to CRS operations in the next year.

For example, Oregon posits that "a single year of poor environmental conditions increases extinction risk." ECF 2530 at 41–42. However, their evidence articulates only "a cause for alarm." Bowles ¶ 32. This proof is inadequate to meet their obligation to prove "a definitive threat of future harm to protected species, not mere speculation." *NWF v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994). And this evidence fails to prove "the relevant harm—that is, the environmental harm likely caused by the" challenged action "in the absence of preliminary relief." *Winter*, 555 U.S. at 37 (Breyer, J., concurring); *id.* at 20.

Plaintiffs also disregard how actual CRS operations have evolved, wrongly asserting that CRS operations are essentially the same as in 2014 and thus pose the same imminent risk of population losses they claim existed a decade ago. ECF 2526 at 52–53; ECF 2530 at 40–41. For example, spring spill has increased dramatically since 2014, and fish passage spring spill is now about double the rate compared to spill rates implemented prior to 2018 under the 2008 BiOp, with a decreasing proportion of fish passing through a powerhouse. Feil ¶ 19; Swieca ¶¶ 31–33; Smith ¶¶ 6, 29 (noting steady increase in spill). Plaintiffs' recycled argument based on decade-old data is facially insufficient to prove likely irreparable harm in the next year from Defendants' implementation of the 2020 ROD in 2026. *Ctr. for Food Safety*, 636 F.3d at 1173 (examples of past harms irrelevant unless probative of future injury).

Likewise, Plaintiffs assert that the current status and population trends of Snake River salmon and steelhead establish irreparable harm because declines occurring since 2014 will continue unabated. This assertion is belied by more recent evidence that provides a more

nuanced view of the current status of these species and factors affecting abundance trends and forecasts, such as challenging climatic conditions. *See, e.g.*, Swieca ¶¶ 9–23. Plaintiffs avoid discussing the best available *recent* data on abundance and population trends by focusing on analyses conducted circa 2020 and thereby fail to address data from subsequent years that show increasing abundance. ECF 2530 at 40–41; ECF 2526 at 45.

As a matter of fact, abundance has generally increased for most stocks following the synchronously low return period of 2017–2019, with two stocks recently experiencing returns within the top three highest abundances since ESA-listing. Swieca ¶¶ 9–21, 29–34. Recent evidence for Snake River salmon and steelhead disprove Plaintiffs' assertions that negative trends prior to 2020 have continued.[17] *Id*. Plaintiffs (and their experts) instead resort to other metrics, such as those set in an outdated Adaptive Management Implementation Plan from 2009 ("AMIP"), ECF 2530 at 43; ECF 2526 at 14–15, misapply those standards to current data on species abundance, and misstate that conditions are worse than they really are.[18] Swieca ¶¶ 24–26; *see also* Bowles 36:5–37:9 (admitting that under most recent data, with one exception, no AMIP triggers were even met).

Species can and do rebound from low population abundances, *see e.g.*, Swieca ¶¶ 14, 23, and Plaintiff-aligned experts have conceded as much, *see, e.g.*, Hesse 47:18 ("So, certainly, I could look at the mid '90s time series and say that a number of those populations were below [Quasi-Extinction Threshold ("QET")] (50) for four consecutive years and that those populations

---

[17] Snake River fall Chinook have dramatically increased in abundance and the trend since 2014 is not clearly decreasing. Swieca ¶¶ 10-11. Snake River spring/summer Chinook have "a modest positive trend in abundance from 2019–2024," with increases in abundance in 2020 or 2022, and an improved rating for some populations. *Id*. ¶¶ 14–15. Snake River Basin steelhead have "a largely increasing trend in abundance (2020–2024)." *Id*. ¶¶ 16–19. Snake River sockeye abundance has increased the last three years suggesting a trend of generally increasing abundance. *Id*. ¶¶ 22–23.

[18] Plaintiffs also ignore that the 2020 ROD includes as part of the proposed action many of the contingency measures that had been recommended in the earlier AMIP, thereby rendering the AMIP outdated for its purpose as a store of possible additional remedial actions. Swieca ¶ 27.

increased to levels above [QET(50)].").[19] That populations can and do rebound from dropping below QET 50 should not be surprising given that from a strictly modeling perspective, the statistical characteristics of "quasi-extinction" are not the same as actual extinction dynamics. *See* Faulkner ¶ 24. The role of an individual population in recovery scenarios can also vary. *See e.g.*, *ESA Recovery Plan: Snake River Spring/Summer Chinook Salmon and Snake River Basin Steelhead*, NMFS00324629 ("ESA Recovery Plan") ("[A] variety of recovery scenarios may lead to a viable ESU/DPS. These various recovery scenarios may reflect different combinations of viable populations and policy choices regarding acceptable risk levels."). Plaintiffs' insinuation that having a population below QET 50 means the entire ESU or DPS (or even that single population) is always in imminent danger of extinction (or extirpation) is incorrect.

Regardless, even if dropping below QET 50 for a population did preclude its rebound (which is not the case), the risk of exceeding the QET threshold of 50 spawners for eight populations of Snake River Chinook salmon is actually *higher* under the Injunction than the Draft 2026 FOP. Faulkner ¶¶ 27-32, 57. Thus, granting Plaintiffs' Injunction is only likely to worsen the status quo compared to the 2020 ROD.

Oregon also argues that a single year of elevated water temperatures proves its claims of irreparable harm, ECF 2530 at 41–42, but it offers no evidence that the record-breaking heat waves in 2015 and 2021 are likely to re-occur in 2026 or even 2027. Such a forecast is insufficient to prove the necessity of imposing Plaintiffs' allegedly prophylactic measures now just in case, because an injunction is not intended to guard against possible future harm "no

---

[19] Quasi-extinction risk is an estimate of the probability or risk of a population falling below a quasi-extinction threshold ("QET"), or an abundance level for four consecutive years which may be too small to effectively reproduce due to the difficulty of spawning adults locating each other. Although QET values of population levels of both 30 and 50 spawners were presented in the 2020 BiOp, only QET values of 50 spawners ("QET 50") were used because these estimates are more conservative. 2020 BiOp, ACE001056316; *see also* Faulkner ¶ 24 (describing how NMFS uses QET as a proxy in assessing the risk of extinction under different scenarios, not as an absolute prediction of likelihood of true extinction).

matter how small the risk." *Monsanto*, 561 U.S. at 161. Oregon's point (ECF 2530 at 42) that climate change is associated with more frequent and severe downturns in environmental conditions does not prove that such conditions will occur in the next year or two. That theory instead demonstrates Plaintiffs are truly interested in commandeering CRS operations to buffer against the possible adverse consequences of climate change, rather than the consequences of CRS operations in 2026.

Plaintiffs predict the abundance of several Snake River Chinook and steelhead populations will fall below QET 50 natural spawners in one or more of the next several years. ECF 2530 at 41 (citing Bowles ¶¶ 27–32). This modeling is not credible. Plaintiffs offered the same prediction in 2021 based on the same modeling approach to forecast significant reductions in abundance. This modeling proved incorrect and demonstrates that this particular modeling exercise produces poor evidence and is not sufficiently reliable to support the Injunction. For instance, at his deposition, Mr. Bowles admitted that in 2021, he concurred with the Nez Perce Tribe's analysis that 77% of the Snake River spring/summer Chinook would likely be at or below QET in 2025; however, he admitted that the 2021 estimate ended up being exceedingly inaccurate, in that he now concurs with the Tribe's current analysis that *only 11%* of the Snake River spring/summer Chinook populations are in abundance levels at or below QET 50. Bowles 98:3–99:5. Oregon Department of Fish and Wildlife's ("ODFW") 2021 QET predictions also failed the test of time: in 2021, ODFW's projection was that by 2025, 39% of the Snake River spring/summer Chinook populations would be predicted to reach QET thresholds—but, as Mr. Bowles admitted, ODFW now estimates that *only 13%* of those populations are currently at QET. *Id.* 103:25–104:9. Despite these discrepancies, Mr. Bowles testified that he didn't "know how to mechanistically improve" ODFW's methodology. *Id.* 112:7–113:2. This consistent overpredictions of downward trends in the 2021 QET analyses—and the fact that no improvements to the analyses have been implemented—undercuts any argument of imminent

risk made by Plaintiffs based on their 2025 use of the same methodologies. *See also* Hesse 91:8–25 (noting approach was "probably highly imprecise in terms of predicting the future").

Plaintiffs also offer 2019 Comparative Survival Study ("CSS") modeling they claim shows that operations under the 2020 BiOp will result in continued low smolt-to-adult returns[20] and declining populations. ECF 2526 at 52 (citing Bowles ¶¶ 51-53). This modeling analysis is not especially relevant now. The 2019 CSS modeling has not accurately tracked with actual observed results to date and appears to be significantly less accurate than NOAA Science Center's Life Cycle Modeling for the years in question. Feil ¶¶ 23–24, 35; Faulkner ¶ 53.

More probative are the new results of the NOAA Science Center's Life Cycle Model analysis of the 2020 ROD compared to Plaintiffs' Injunction.[21] These results show that the 2020 ROD and the Draft 2026 FOP are both likely to result in *equivalent or higher* numbers of spawners than the Injunction, with better results across other important metrics such as lower extinction probabilities. Faulkner ¶¶ 27, 57. These results alone provide a strong reason to deny the Injunction.

C. *Elevated water temperatures provide no basis for an Injunction.*

Plaintiffs also fail to prove that their Injunction will actually address the temperature issues they raise or will be more effective than current CRS operations at mitigating elevated temperatures or other stressors. Defendants' technical analyses of the Injunction predict that Plaintiffs' proposal to lower reservoir elevations to minimum operating pools would not meaningfully change water temperature downstream of dams and may actually *increase* temperatures at critical times. Turner ¶¶ 36–37. Likewise, Plaintiffs' proposed spill operations may also lead to warmer water temperatures in spring and summer by impeding in-season

---

[20] Smolt-to-adult returns measure the percentage of juvenile fish (smolts) migrating to the ocean that survive to return as spawning adults. 2020 BiOp, ACE001056363.
[21] NMFS's analysis labels the operations provided in the 2020 ROD as the "2020 PA," i.e. Proposed Action.

adaptive management decisions designed to lower water temperatures, such as decisions to increase powerhouse flow and decrease warmer surface water spill. *Id*. at ¶¶ 38–41.

Oregon also errs factually in asserting that CRS projects are a primary or significant reason that water temperatures in the Snake or Columbia rivers exceed state water quality criteria. It ignores that: (1) water temperature is warmer upstream of the CRS's four lower Snake River projects; (2) temperature exceedances of the state criteria of 20° C (68° F) are widespread upstream of these projects; (3) temperature exceedances above state water quality criteria existed pre-dam construction; and (4) outflow temperature from each project is dependent on the inflow temperature. *Id.* ¶¶ 21–29. As a result of CRS operations to improve water temperature at the projects (particularly the Dworshak Dam temperature operation), the Snake River upstream of the lower Snake River dams exceeds the applicable water quality criterion for temperature more often in July than in the four downstream tailraces. *Id*. ¶¶ 28–29. This fact illustrates that the Dworshak Dam operation provides a maximum cooling of 3.8° C on the Snake River, mitigating the maximum estimated warming caused by the lower Snake River dams of 3.2° C. *Id*. ¶¶ 26, 30. Plaintiffs conveniently ignore that CRS operations mitigated the impact of the June 2021 heat wave and maintained cooler temperatures below or near the water quality criterion through the lower Snake River projects, with temperatures cooler than the Snake River upstream of the projects. *Id*. ¶¶ 29, 31.

Oregon also blames the Action Agencies for elevated temperatures in fish ladders, asserting that this factor causes adult migration delays. ECF 2530 at 41, 47. However, when cooler water is available, the Corps already takes all feasible measures to reduce water temperatures and temperature differentials in fish ladders. Turner ¶ 32; 2020 ROD, ACE000068218. As explained above, water temperatures in the river mainstems are largely a function of incoming water temperatures upstream of CRS projects. Plaintiffs ignore that Defendants already have in place a robust technical process to respond to temperature issues, as

well as processes to develop and implement longer-term improvements to minimize CRS water quality impacts. Turner ¶¶ 33–35, 39. Such improvements remain ongoing. *Id*.

In sum, Plaintiffs fail to prove that any imminent harm attributable to CRS operations is likely to occur in the short-term. And Defendants' detailed and comprehensive modeling, as well as analysis of the discrete changes to CRS operations, all show that the Defendants' operations of the CRS will likely be better for ESA-listed salmon and steelhead than Plaintiffs' poorly supported demands. *See, e.g.*, Faulkner ¶¶ 27-32, 57 (explaining model results showing lower mean spawner abundance and higher risk of falling below QET for all populations under Injunction compared to the Draft 2026 FOP or 2020 ROD scenarios); *see infra* Section IV.A. This is not a close case, and certainly not the "extreme or very serious damage" Plaintiffs need to prove to justify a mandatory injunction. *Marlyn Nutraceuticals*, 571 F.3d at 879.

D.  *Plaintiffs' assertions of irreparable harm are not focused on any cognizable personal interests.*

Plaintiffs' focus on salmon and steelhead abundance illustrates another problem with their theory of irreparable harm: it is not true that any harm to salmon and steelhead amounts to an irreparable injury to Plaintiffs. Oregon routinely authorizes and conducts activities that take and kill salmonids.[22] *See generally United States v. Oregon*, No. 68-513-SI (D. Or. filed Sept. 13, 1968). NWF Plaintiffs also regularly take and kill salmonids for commercial or recreational purposes. ECF 2528 (explaining abiding interest in sportfishing for salmon). As a result, they cannot show that *any* impacts to the abundance of ESA-listed salmon and steelhead, no matter how small, irreparably harms them. Put differently, Plaintiffs have no personal relationship with individual salmonids, such that one less salmonid irreparably harms them. *Winter*, 555 U.S. at

---

[22] For the current agreement that covers the Columbia River fisheries, including non-treaty fisheries authorized by the State of Oregon, see https://www.fisheries.noaa.gov/west-coast/sustainable-fisheries/2018-2027-united-states-v-oregon-management-agreement (last visited Dec. 15. 2025).

22–23 (plaintiffs must show each element of the injunction is necessary to avoid irreparable harm to their viewing activities).

Plaintiffs' only response is that the underlying status of the ESA-listed stocks establishes irreparable harm. But this argument improperly equates the status of the stocks with harm to Plaintiffs. A court granting equitable relief "may administer complete relief *between the parties*." *CASA*, 606 U.S. at 851 (emphasis in original) (quotation omitted). In this context, the proper "remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. Without specifically defining the injury—and irreparable harm—to Plaintiffs, the Court can neither determine what relief to provide nor ensure that such relief is narrowly tailored to redress *Plaintiffs'* established injuries or harms.

Plaintiffs' argument also props up an unlawful presumption of irreparable harm in ESA cases. They contend ESA-listed species are in "perilous" condition and that immediate action is needed. By definition, the same can be said for every species listed as threatened or endangered under the ESA. But being listed as an endangered or threatened species, standing alone, cannot by itself establish irreparable harm. *Cottonwood Env't L. Ctr.*, 789 F.3d at 1091 (no presumption of irreparable harm in ESA cases). Plaintiffs also fail to prove a reasonably certain nexus between the status of ESA-listed fish next year and the discretionary operations Plaintiffs seek to enjoin in 2026. The status of ESA-listed fish is based on the cumulative impacts of all past and present factors affecting the species, not solely 2026 CRS operations. An injunction, by contrast, is forward-looking and considers the effects of the actions sought to be enjoined. *Winter*, 555 U.S. at 37 (Breyer, J., concurring); *id.* at 41. Plaintiffs' generalized concerns are insufficient.

E.  *Plaintiffs fail to prove irreparable injury is imminent.*

Finally, Plaintiffs admit that harms to, and the status of, ESA-listed stocks can be remediated and rehabilitated. ECF 2530 at 44–45; ECF 2526 at 12, 16. This admission belies any notion that all potential short-term adverse effects present irremediable harm to ESA-listed

species. "The possibility that . . . other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006); *Humane Soc'y of U.S.*, 2012 WL 1952329, at *5 ("The purpose of a preliminary injunction is to prevent harm that would impair this court's ability to grant effective relief after resolving the merits of the case."). The salmon and steelhead species at issue suffer high mortality throughout their life cycle from myriad causes, including at the hands of Plaintiffs. These losses do not necessarily cause irreparable damage to any ESA-listed salmon or steelhead. Thus, while Plaintiffs point to harms generally to the species, they identify no near-term action by Defendants that will have irreparable consequences for ESA-listed salmon or steelhead. Indeed, Plaintiffs present no evidence of how 2026 CRS operations will irreparably harm ESA-listed salmon and steelhead in the next year, or until this case is resolved on the merits. ECF 2526 at 52; ECF 2530 at 41–42 (presenting evidence on past actions and harms and therefore not from the actions sought to be enjoined in 2026).

Plaintiffs present no evidence on the legally relevant showing of irreparable harm to *them*, not the environment, while the case is resolved. By failing to do so, they preclude the Court from engaging in the proper inquiry or tailoring the injunction to their alleged harms, as it is required to do. *Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1160 (injunctive relief "must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." (citation modified)). Plaintiffs instead argue that no tailoring is required because an injunction only needs to benefit these species. ECF 2530 at 56; ECF 2526 at 56. This sleight of hand reaffirms that Plaintiffs are seeking relief based on the status of the species, not irreparable harm to them. For this reason alone, the Court should deny the motion.

## IV.    PLAINTIFFS' INJUNCTION WILL NOT BENEFIT LISTED SPECIES, IS INFEASIBLE, AND OVERBROAD.

Plaintiffs have not made, and cannot make, the requisite showing to justify a preliminary injunction. "Plaintiffs must show that each item of injunctive relief they seek is necessary to avoid irreparable harm to the listed species during the interim period." *S. Yuba River*, 2013 WL 4094777, at *8. In *Winter*, for example, only two of several originally disputed mitigation measures were at issue, and the Supreme Court explained that plaintiffs were obligated to prove those measures were necessary to avoid irreparable harm to their interests in viewing marine mammals. 555 U.S. at 22–23; *id.* at 37 (Breyer, J., concurring).

Defendants' expert analyses of the Injunction show that it is unlikely to provide any greater benefits than if the Court were to deny their motion and allow Defendants to implement the 2020 ROD. Plaintiffs also fail to acknowledge the serious consequences of getting it wrong; for instance, by confronting their own claims that salmon and steelhead face dire risks from even a single stochastic event or a single year of unfavorable climatic conditions. Plaintiffs' proposals for aggressive and immediate changes to CRS operations are neither scientifically justified nor in the best interest of any ESA-listed species. Instead, sound management of the CRS for salmonids calls for carefully adjusting management operations and using existing adaptive management protocols to evaluate the effects of operations and adjust as warranted. This is exactly what Defendants' existing management scheme does in a prudent fashion, including coordinating with regional sovereigns and technical experts.

The deficiencies in Plaintiffs' Injunction, detailed below, also prove that they have failed to show irreparable harm. Irreparable harm is lacking where the injunction measures avoid no harm (or affirmatively cause it). The "linchpin of [] interim relief is that threatened irreparable harm will be prevented by that injunction." *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985); *see also Ctr. for Biological Diversity*, 2016 WL 9226390, at *4 (evidence must

"clearly support the finding that plaintiffs['] requested relief would significantly improve conditions for the [listed species]"). The 2020 ROD incorporates all feasible and reasonable conservation measures and already provides optimal operations and other beneficial measures currently available. The additional spill Plaintiffs request would not provide tangible benefits to ESA-listed species and/or critical habitat.

A. *Plaintiffs' Injunction will have less benefit and more adverse consequences for ESA-Listed species than Defendants' existing and planned system operations.*

1. *Plaintiffs' Injunction will have worse overall consequences for ESA-listed species than Defendants' continued operations.*

Fisheries experts from both Services, the Corps, and Bonneville reviewed Plaintiffs' Injunction. They universally conclude that the Injunction would deliver less meaningful benefit to ESA-listed salmonids *and* bull trout than the Action Agencies' operations under the 2020 ROD. These conclusions weigh heavily against granting Plaintiffs' Injunction and should tip the scales against any preliminary relief. Further, Plaintiffs' demands for increased spill, changes to reservoir management, and changes to the juvenile transportation program suffer critical uncertainties and could provide no benefit—or even harm—to salmon and steelhead.

NMFS fisheries biologists and other scientists have a deep understanding of the factors that affect the passage and survival of juvenile and adult salmon and steelhead migrating through reservoirs and dams in the Snake and Columbia rivers. NMFS scientists evaluated the operational scenario in the Injunction using quantitative models specifically designed for that task: the Comprehensive Passage Model (COMPASS) and Life Cycle Model. [23] Faulkner ¶¶ 4, 10, 17; Swieca ¶ 39. Generally, modeling results indicate that the Injunction would be less

---

[23] In fact, actual values of in-river survival and smolt-to-adult returns are currently tracking much more closely with NOAA Science Center Life Cycle Model projections than CSS modeling. Feil ¶ 24.

beneficial to salmon and steelhead than would implementation of the 2020 ROD and Defendants' Draft 2026 FOP.[24] Faulkner ¶¶ 27, 57; Swieca ¶ 39.

Accounting for differences in juvenile transportation and increased negative effects of Plaintiffs' proposed spill on adult survival, the Injunction would be *worse* for salmon. Faulkner ¶¶ 31–53, 57; Feil ¶¶ 33–35, 37–39 (discussing adult fish passage delays with high spill levels), Feil ¶¶ 42–51 (impacts of lowering reservoir pool elevations). To be sure, the Injunction might be expected to result in slightly shorter travel times, fewer powerhouse encounters, and marginally higher in-river survival rates for out-migrating juveniles than Defendants' planned operations. Faulkner ¶ 16. But Plaintiffs fail to grapple with the tradeoffs, net benefits, and lack of evidence for the assumptions and hypotheses undergirding their Injunction. *Id.* ¶¶ 31–53, 57.

Experts from NMFS and the Corps have a series of concerns and critiques of the evidence Plaintiffs advance in support of their Injunction, based on more recent data and studies from recent years of higher spill at CRS dams. *Id.* For example, experts are concerned that "recent data do not support the contention that [smolt-to-adult returns] will be substantially higher under very high spill levels." Faulkner ¶¶ 53, 57. Another important consideration is total survival of outmigrating juveniles through the Snake and Columbia rivers. Feil ¶ 20 (noting, for example, that "in-river juvenile survival through the CRS in recent years, notably since 2020 with increased spill up to 125% TDG levels, has not shown a marked corresponding increase with increased spill"); *see also* Feil ¶¶ 18–24. One NMFS expert summarizes his conclusions as follows:

> no evidence has yet emerged that spill levels since 2020 have been associated with a marked increase in smolt survival, compared to the decade before, when spill levels were more moderate. Indeed, for both yearling Chinook salmon and steelhead, mean estimated survival was lower in the 2020-2025 period than in 2007-2019. Moreover, for both species, the two lowest survival estimates in the 2020-2025 period occurred in the two highest spill years of 2024 and 2025.

---

[24] NMFS's analysis calls these latter two scenarios, respectively the "2020 CRS Proposed Action" and "Draft 2026 FOP." Faulkner ¶ 10.

Smith ¶ 7; *see also id.* ¶¶ 11–34.

Essentially, Defendants' data and analyses support that "spill levels well below the 125% TDG cap level provided more benefit to migrating juveniles, and as spill rate increases, juvenile survival declines." Feil ¶ 20. Defendants' experts present compelling data from the most recent CSS study showing that the progressive decline in powerhouse encounter rates (due to ever higher spill rates) "are not translating into higher [smolt-to-adult returns]," and that there is "no statistical differences [in smolt-to-adult returns] . . . observed since 1998 for either Chinook Salmon or Steelhead . . . even though [the powerhouse encounter rate] has been reduced" almost 80%, i.e., that fish powerhouse encounter probabilities have reduced from 3.8 to 0.8. Feil ¶ 23; *id.* ¶ 21.

Critically, Mr. Bowles—on whose expert opinion both Plaintiffs primarily rely—admitted at his deposition that it was *mere speculation* that additional spill (as requested in the Injunction) would improve adult returns. When addressing certain recent "upticks" in adult returns, Mr. Bowles stated outright that he could only *speculate* that increased spill (resulting from the recent agreements addressed above) could have resulted in a "slight improvement" in adult returns. Bowles 85:22–86:7. Indeed, he corroborated the speculative nature of his opinion multiple times, noting that if "my speculation that improved spill to 125 percent TDG" contributed to higher abundance rates, that would be "good to know and can help inform how we move forward." *Id.* 86:14–18; *id.* 106:19–25 ("I speculated . . . that a little bit of this uptick [in abundance] could be, hopefully, a component of the additional spill levels that we provided which reduced powerhouse encounters. But that's speculation. But we're hoping, if that's true, we can leverage that for some more benefits moving forward."); *see also id.* 86:14-18. Accordingly, Plaintiffs rely on admittedly speculative predictions to support their request for higher spill amounts.

Moreover, if the Federal agencies must use the best available data in ESA analyses or risk arbitrary or unlawful decisions, but Plaintiffs face no such obligation in justifying their

Injunction, there is impermissible bias towards Plaintiffs. *See Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 473 (4th Cir. 2013) (explaining that, where agency's data is "either outdated or inaccurate," agency should, at the very least, explain why it nonetheless relied on the data on which it did); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (agency may not ignore available studies). The data available *now* does not support Plaintiffs' speculative demand for higher rates of spill to lower powerhouse encounters. Rather, "projections from CSS modeling appear to have substantially overestimated the potential survival benefits associated with increasing levels of spill." Feil ¶ 24; Swieca ¶ 34. The best available scientific information weighs against the Injunction.

Further, Plaintiffs flatly ignore that the Injunction will likely worsen conditions for ESA-listed bull trout. For largely the same reasons that high spill at the dams is not invariably always beneficial to salmon and steelhead, that same increased spill poses the same and other adverse consequences for bull trout. Kuttel ¶ 45. These issues are further described below. *See infra* Section VI.A. In sum, the Injunction is likely to increase mortality and other adverse effects to bull trout to an extent not contemplated in FWS's existing BiOp. *Id*. Although Plaintiffs completely ignore this ESA-listed species, it would be error for this Court to do the same. *San Luis Obispo Coastkeeper*, 2025 WL 3467536, at *8 ("The court must balance the equities and consider the public interest as to the other listed species."). These expert critiques of the overall consequences for salmon and steelhead and bull trout strongly support denial of the Injunction.

2. *The higher and more frequent spill Plaintiffs seek will harm salmonids.*

As discussed above, the available evidence indicates that higher spill will not necessarily benefit, and may even harm, salmon and steelhead. Despite consistent increasing spill since 2017, trends in juvenile survival have progressively declined, and there has been no statistically significant improvements in smolt-to-adult return rates. *See infra* Section IV.A.1; *see generally* Smith Decl.; Faulkner Decl. That evidence undermines Plaintiffs' basic hypothesis that

decreasing powerhouse encounters by increasing spill will result in higher smolt-to-adult returns. But Plaintiffs also avoid discussion of the several reasons high levels of spill degrades migration conditions for both juvenile and adult salmon and steelhead. High spill can impede returning adult access to fish ladders, increase fallback, impede juvenile egress from tailraces, and increase predation. *See generally* Feil Decl.; Swieca Decl.

Plaintiffs' proposed spring spill operations are expected to produce large circulating tailrace eddies below powerhouses that can delay or impede adult upstream passage, particularly at the four lower Snake River dams and particularly in low flow conditions. Renholds ¶¶ 28–29, 33–34; Feil ¶¶ 33–34, 37. These tailrace eddies can cause water to flow upstream near fish ladder entrances rather than downstream, interfering with the ability of adult salmon and steelhead to locate attraction flows from fishway entrances. High levels of spill can also increase fallback of adult fish over spillways that can be associated with reduced abundance. Feil ¶¶ 37–38. Continuous high levels of spill have, in the past, caused adult migration delays for multiple days. *Id*. Under the Injunction, longer migration times can affect reproductive fitness and are more likely to occur. *Id*. ¶¶ 33–34, 37–38; Faulkner ¶ 32; Kuttel ¶ 22. In contrast, Defendants have sought to avoid the collateral consequences of continuous high spill by regularly pausing high spill; therefore, spill operations described in the Draft 2026 FOP provide more favorable conditions for returning adults to pass upstream with less passage delay during daytime hours. Feil ¶ 35. In this way, proposed 2026 operations are also likely to benefit juvenile passage by alleviating degraded tailrace conditions that increase the potential for injury and can increase exposure to predation. Renholds ¶¶ 22–27.

The high spill requested by Plaintiffs up to the 125% TDG gas cap that is conditionally periodically allowed under state water quality standards will also increase the prevalence of gas bubble trauma in non-salmonid resident fishes. Turner ¶¶ 4–8 (explaining applicable water quality standards for TDG); *id*. ¶¶ 9–20 (explaining how Plaintiffs' fall-winter and spring spill

operations will cause exceedances of TDG criteria); Renholds ¶¶ 18–21; *See generally* Plumb
Decl. (monitoring and effects of gas bubble trauma); Feil ¶ 40; Kuttel ¶¶ 33–35, 41. These
problems will be exacerbated by Plaintiffs' request for lower minimum operating pool elevations
because lower water levels increase TDG at certain dams. Turner ¶ 16.

Degraded water quality conditions with continuously elevated TDG at or near 125%
causes gas bubble trauma. Because that condition impacts resident native fish in particular, it has
potentially adverse consequences for ESA-listed bull trout, including reducing the species' prey
base and degrading foraging habitat. *See generally* Kuttel ¶¶ 39–45. Gas bubble trauma can be
widespread in a river system even while TDG remains below the 125% (and at time, lower) state
standards, with unintended and unknown consequences for fish species, especially if TDG
remains elevated for extended periods of time and in long river segments. *See, e.g.*, Renholds ¶¶
19–21; Turner ¶¶ 10, 12, 15–16, 18. Plaintiffs' Injunction will more than double the percentage
of days exceeding 120% TDG during the spring compared to Defendants' Draft 2026 FOP and
poses a likelihood of real harm to aquatic life. Turner ¶¶ 19–20.

### 3. Lowering reservoir elevations will harm salmon and steelhead.

Plaintiffs' Injunction would strictly limit reservoir forebay elevations. The Court should
deny this request as well because, *inter alia*, such operations will significantly degrade the
operation of fish passage systems and could have a negative impact on both adult and juvenile
fish passage. Plaintiffs' proposed minimum operating pool elevation operations would decrease
water depth and force some dams to operate outside of normal operating ranges (i.e., below
minimum tailwater) and outside fish passage criteria in fish ladders. Feil ¶¶ 42–49; Renholds
¶¶ 17, 26; Marshall ¶¶ 19–24. The Corps anticipates resulting delays in adult passage because
these conditions will negatively affect adults entering and leaving the fish ladders. Feil ¶¶ 42–49.
Plaintiffs' proposed minimum operating pool operations would also significantly degrade the

operation of many surface fish passage routes, rendering them less effective at attracting juvenile salmon. *Id.* ¶ 48.

Nor is it likely that Plaintiffs' proposed minimum operating pool operations would benefit water temperature. Turner ¶¶ 36–41. As an initial matter, Plaintiffs point to no actual analysis demonstrating, let alone quantifying, water temperature decreases that they believe would result from their proposed minimum operating pool operations. *See, e.g.*, Bowles 218:19–21; 219:12–22. By contrast, the Corps undertook extensive modeling, and its analysis demonstrated that Plaintiffs' Injunction would not meaningfully change temperature or have a beneficial effect downstream of dams. Turner ¶¶ 36–41. Moreover, in years with conditions that concern Plaintiffs (low flow and high air temperatures), the Injunction would increase water temperature during the sockeye run at John Day, The Dalles, and Bonneville dams. *Id*. Plaintiffs also fail to consider that their separate proposed surface spill operations can cause warmer tailrace temperatures downstream of a dam; generally speaking, increased surface spill can result in warmer tailwater temperatures, as it generally involves passing the surface of the reservoir, which can have higher temperatures than water lower in the reservoir. *Id.* ¶ 46.

The Injunction also is likely to have only minimal impact on water travel time. *Id.* ¶ 36. And these minimal reductions may not translate to shorter fish travel times because Plaintiffs fail to consider the complex hydraulics that could increase actual fish travel time, including eddy formation in the tailrace and decreased effectiveness of attraction flow to surface outlets. *Id*. Plaintiffs' injunction seeking to lower reservoir elevations also would likely increase avian predation of salmonids by creating new nesting habitat for piscivorous birds and by increasing exposure to predation. Marshall ¶ 25; Feil ¶¶ 49–50.

    4.   *Reducing fish transport lacks a rational basis and will decrease juvenile survival and adult returns.*

Plaintiffs also seek to enjoin juvenile fish transportation from Lower Monumental Dam. This request should be denied because Plaintiffs offer no evidence that stopping these operations will benefit fish. Data shows that transporting juvenile steelhead has historically returned more adult steelhead to the Snake River basin. Feil ¶¶ 27–32; Smith ¶¶ 54–63. Plaintiffs also ignore data that when these brief spill reductions do occur, they coincide with substantial increases in adults entering fish ladders, thus enabling increased adult return passage as well. Feil ¶¶ 29, 34. Plaintiffs provide no empirical evidence to support the inference that continuing spill for the very limited periods when spill would otherwise be reduced for transport would exceed the benefit provided by (1) transporting juvenile fish from Lower Monumental Dam and (2) increasing effectiveness of adult passage. To the contrary, the estimated smolt-to-adult returns of transported Chinook salmon and steelhead *exceeded* that of migrating in-river fish at Lower Granite Dam and, on average, ranged from 32% to 94% higher—this difference was statistically significant for all but wild Chinook salmon. *See* Smith ¶ 50; Faulkner ¶ 30. This issue underscores that the lower rate of transportation that Plaintiffs advocate will result in *lower* smolt-to-adult returns and higher extinction probabilities for all populations compared to Defendants' planned operations. Faulkner ¶ 57; Smith ¶¶ 40–52 (explaining that transported fish have higher smolt-to-adult returns than spilled fish).

### B.  *Plaintiffs' Non-Operational Measures are Overbroad and Beyond Agency Authority.*

The Court should deny Plaintiffs' many requests that Defendants undertake a series of other non-operational measures, planning exercises, and maintenance. These elements of the Injunction will not serve to alleviate imminent harm until the Court decides the merits of the case. It is not appropriate to order preliminary injunctive relief that has no likelihood of beneficially affecting salmonid species during the interim period the relief is to be provided due to planning, funding, or legal hurdles. *S. Yuba River*, 2013 WL 4094777, at *7–8 (finding "planning steps or studies" untethered to avoidance of immediate irreparable harm). Nor is it

permissible to order Defendants to take steps in anticipation of relief Plaintiffs hope to secure in a later permanent injunction.

It is not possible to undertake the infrastructure activity in Plaintiffs' Injunction in the presumed one or two-year period of interim relief afforded by a preliminary injunction. Feil ¶¶ 54–58. Likewise, the so-called "emergency" non-operational conservation measures are largely beyond Defendants' authority, or are focused on agencies or entities other than Defendants who have actual authority or control over such activities. *Id.* ¶¶ 59–74; McDowell ¶¶ 36–38. The Corps lacks authority, either statutory or land management, to implement several Injunction measures, including the authority to relocate, or fund a relocation of, a cormorant colony from Oregon's Astoria-Megler Bridge to East Sand Island, and as such the Court cannot Order such relief. Feil ¶¶ 64–66. Similarly, FWS is the designated land manager of Blalock Islands under a cooperative agreement, and an Injunction ordering the Corps to eliminate terns and reduce gulls at Blalock Islands in the John Day Project reservoir would conflict with the grant of rights to FWS to manage those islands as part of the Umatilla National Wildlife Refuge. *Id.* ¶¶ 62.

Other of the non-operational actions sought by Plaintiffs, such as dredging of the Tucannon River, are ill-conceived, unlikely to deliver the claimed benefits, and require further feasibility assessments and planning. Swieca ¶¶ 40–43; Kuttel ¶¶ 46–52; Hanson ¶¶ 8–18. Some projects, such as planning for a lower elevation of the John Day dam reservoir pool, are unwarranted because they would increase the risk of fish injury and stilling basin erosion. Renholds ¶¶ 6, 9, 15, 36. Similarly, Plaintiffs' demand for holding ponds at Dworshak Hatchery would expose sockeye to infectious hematopoietic necrosis virus and could contribute to higher rates of mortality in this listed species. *See* Hanson ¶¶ 9–11. Plaintiffs' failure to address the feasibility and efficacy of their proposed measures indicate that they are unwarranted as preliminary relief and not appropriately tailored to any harm arising in 2026. They are also a

vivid illustration of Plaintiffs' overreach in requesting this Court to commandeer limitless federal resources, regardless of any fiscal or accountability process. None of these compelled projects can be implemented in 2026 or in a similar period and should be denied on that basis.

In short, multiple qualified experts have explained how the Injunction will have an array of significant adverse effects for salmonids that can likely be avoided by continuing project operations under the 2020 ROD. This analysis warrants deference and strongly weighs against any Injunction.

## V. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS BECAUSE NMFS'S 2020 JEOPARDY ANALYSIS IS LAWFUL.

To justify their extraordinary request for preliminary relief, Plaintiffs pluck one set of claims from their supplemental complaints. They argue that NMFS's jeopardy analysis in the 2020 BiOp fails to comply with the ESA and is arbitrary and capricious under the APA. ECF 2526 at 26; ECF 2530 at 22-23. To prevail, Plaintiffs must show that, based on the administrative record, their merits claims are "likely" to succeed. *Winter*, 555 U.S. at 20. This factor "is a threshold inquiry and is the most important." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). Plaintiffs fail to show they are likely to succeed on the merits because NMFS's expert analysis and conclusions adhered to the best available science and followed applicable law.[25]

### A. *NMFS's 2020 jeopardy analysis is lawful.*

After the Court's 2016 remand order, NMFS appropriately returned to the ESA's statutory text and the agency's longstanding regulations to perform its jeopardy analysis, instead of continuing to use novel CRS-specific standards like those developed in its 2008 BiOp. *See*

---

[25] Even at the preliminary injunction stage, the Court's review of the merits is governed by the APA. *Lands Council*, 537 F.3d at 987 (court is bound at the preliminary injunction stage by the APA's deferential standard and scope of review). The APA, in turn, restricts review to the administrative record. 5 U.S.C. § 706. The agencies filed their records on July 8, 2021, ECF 2371-72, and the Court therefore has the complete record for claims against NMFS's 2020 Biological Opinion.

Consultation on Remand for Operation of the Federal Columbia River Power System, 11 Bureau of Reclamation Projects in the Columbia Basin and ESA Section 10(a)(I)(A) Permit for Juvenile Fish Transportation Program, NMFS00317510–8438 ("2008 BiOp"); *id.* at NMFS00317560 (applying a "forward looking" inquiry that asked "whether the species can be expected to survive with an adequate potential for recovery (e.g. trending toward recovery)"); *see also* Consultation on Remand for Operation of the Columbia River Power System and 19 Bureau of Reclamation Projects in the Columbia Basin, NMFS00337794–8403 ("2014 BiOp") (assessing how proposed actions improve the species' recovery prospects). Thus, in the 2020 BiOp, NMFS asked the simple question posed by the statutory text: how does the "agency action"—here, CRS operations—"affect[] the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); 2020 BiOp, ACE001056264. As each species is "uniquely exposed to the effects of the action," NMFS's "analysis of the action area, environmental baseline, effects of the action, and cumulative effects focuses on the facts and evidence most relevant to the species under review, such that [its] jeopardy . . . analyses and conclusions for one species are independent from other species." 2020 BiOp, ACE001056313. However, NMFS applied the same analytical approach to each listed entity. *See id.* As Plaintiffs' arguments primarily address NMFS's analysis of Snake River spring/summer Chinook salmon (hereafter, "SR sp/su Chinook"), *see, e.g.*, ECF 2526 at 24; ECF 2530 at 28, we focus on this species to examine the steps NMFS used to perform its jeopardy analysis.

1. *NMFS appropriately assessed the status of the species and environmental baseline.*

To conduct its jeopardy inquiry, consistent with the statute and regulations, NMFS first examined the status of the ESA-listed species, as well as the "environmental baseline." 50 C.F.R. § 402.14(g)(2). The environmental baseline is "the condition of the listed species . . . in the action area, without the consequences to the listed species . . . caused by the proposed action."[26]

---

[26] In 2019, NMFS and FWS published revisions to their ESA regulations altering, in relevant part, the definition of "environmental baseline." 84 Fed. Reg. 44976 (Aug. 27, 2019). This rule

50 C.F.R. § 402.02. Together, the status of the species and the baseline inquiries identify the prevailing condition of the ESA-listed species, against which NMFS performs the rest of its jeopardy analysis. 84 Fed. Reg. 44976, 44978 (Aug. 27, 2019) ("environmental baseline" is a "separate consideration from the effects of the action" and "should be used to compare the condition of the species . . . in the action area with and without the effects of the proposed action"); *Ctr. for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 179 (D.C. Cir. 2025) ("*CBD*") (affirming NMFS's use of baseline excluding effects of proposed action but including past and present impacts of all prior Federal actions).

To evaluate species status, NMFS assessed populations within each evolutionarily significant unit based on four characteristics of a "viable salmonid population": abundance, productivity, spatial structure, and diversity. 2020 BiOp, ACE001056313. At appropriate levels, these factors maintain a population's capacity to adapt to various environmental conditions and encompass the species' "reproduction, numbers, or distribution," as described in NMFS's regulations. *Id.* at ACE001056313, ACE001056325; 50 C.F.R. § 402.02 (actions appreciably reduce the likelihood of survival and recovery "by reducing the reproduction, numbers, or distribution of that species"). This methodology "informs . . . the species' likelihood of both survival and recovery" and allows NMFS to characterize overall extinction risk. 2020 BiOp at ACE001056318, ACE001056322. For species with multiple populations, NMFS characterized the status of the entire species using delisting criteria for major population groups, derived from recovery plans and other sources. *Id.* at ACE001056314, ACE001056325. For example, to characterize the status of SR sp/su Chinook, NMFS examined the available data and concluded that population-level estimates of natural-origin and total (including hatchery) spawners

---

merely clarified that "[t]he consequences to listed species . . . from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline" and are not considered "effects of the action." *Id.* at 44993; 50 C.F.R. § 402.02. Therefore, the final rule "[did] not lower or raise the bar on section 7 consultations" or "alter what is required or analyzed during a consultation." 84 Fed. Reg. at 45015.

exhibited downward trends for most populations and major population groups, and that most populations remained below minimum abundance thresholds. 2020 BiOp, ACE1056329–30. As CRS operations, habitat, and hatchery practices had been "relatively constant or improving" for a decade, NMFS attributed these declines primarily to degraded marine conditions and ocean productivity. *Id.* at ACE001056330.

To assess the environmental baseline, NMFS considered the "past and present impacts of all Federal, state, or private actions and other human activities in the action area" as well as "ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify[,]" such as the presence of dam structures. *Id.* at ACE001056344; 50 C.F.R. § 402.02. For SR sp/su Chinook, for example, this analysis included impacts from "tributary and estuary habitat degradation, hydropower systems, harvest, hatcheries, predation, toxic contaminants, climate change, and fluctuating ocean cycles," all of which NMFS concluded adversely affected the species' abundance, productivity, spatial structure, and diversity. 2020 BiOp, ACE001056408. However, NMFS also found that recent improvements in passage conditions in mainstem CRS dams (including transportation of juveniles and the installation of surface passage routes), estuary and tributary habitat improvement actions, and hatchery practices have positively impacted adult and juvenile survival compared to prior years. *Id.* at ACE001056408, ACE001056362 (juvenile survival rates "represent[ed] a substantial improvement in migration conditions and survival rates . . . which has the potential to increase the overall productivity of the populations and the abundance of returning adults").

### 2. NMFS appropriately assessed the effects of CRS operations.

After establishing status and baseline conditions, NMFS then identified—and isolated—the effects of the action on ESA-listed species. 50 C.F.R. § 402.14(g)(3); *id.* § 402.02(d) (defining "effects of the action").[27] This inquiry is central to NMFS's jeopardy analysis. Under

---

[27] In 2019, NMFS and FWS published revisions to ESA regulations altering, in relevant part, the definition of "effects of the action." 84 Fed. Reg. at 44976. This revision merely articulated and

ESA Section 7(a)(2), Federal agencies must ensure any discretionary "action" they authorize, fund, or carry out is not likely to "jeopardize the continued existence" of an ESA-listed species. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.03; *TVA*, 437 U.S. at 173. And the Consulting Agency—here, NMFS—must similarly "detail[] how the agency action affects the species" in the BiOp. 16 U.S.C. § 1536(b)(3)(A). In this way, the Section 7(a)(2) mandate is not concerned with whether the status of the species, baseline conditions, cumulative effects, climate change, or some other factor jeopardizes the species—rather, its singular concern is whether the *proposed action* at issue affirmatively causes jeopardy in light of these other factors.

In accordance with this statutory mandate, NMFS examined how CRS operations over a fifteen-year period are likely to affect ESA-listed species. 2020 BiOp, ACE001056266 (defining the proposed action as "operational measures (e.g., flood risk management [], navigation, fish passage, and hydropower generation) and non-operational measures (e.g., support for conservation hatchery programs, predator management, habitat improvement actions, and [research, monitoring, and evaluation] programs)"); *id.* at ACE001056266–310 (detailing operational and non-operational measures). For each species, NMFS assessed the anticipated consequences of spill and seasonal flow operations, water quality, project maintenance, fish transportation, estuary and tributary habitat improvement actions, predator management, and research, monitoring, and evaluation activities. *See, e.g.*, *id.* at ACE001056408–98 (assessing effects of proposed action on SR sp/su Chinook). To predict the effects of CRS operations on juvenile fish survival and migration, NMFS utilized several different models and studies.

---

provided additional explanation of the Services' existing practices and analyses, "retaining the scope of the assessment required to ensure a complete analysis of the effects of the proposed Federal action." 84 Fed. Reg. at 45015. Therefore, the final rule "[did] not lower or raise the bar on section 7 consultations" or "alter what is required or analyzed during a consultation." *Id.* at 45015.

NMFS started with predictions from Comprehensive Passage (COMPASS model),[28] which accurately represents river conditions and dam operations and produces predictions of juvenile fish passage and survival through the CRS, and predictions from life cycle models (LCM), which predict survival from the egg stage back to the spawning adult stage and include COMPASS as a sub-model. 2020 BiOp, ACE1056314. For instance, for SR sp/su Chinook, COMPASS and Life Cycle modeling predicted effects of CRS operations on adult and juvenile survival rates and travel times. *Id.* at ACE001056417–24. In terms of survival, Life Cycle results forecast that adult survival rates from 2020 through 2045 were "expected to continue to average about . . . 83 percent from Bonneville to Lower Granite Dam" under CRS operations. *Id.* at ACE001056417, ACE001056423. COMPASS results also predicted that for juveniles, increased spill levels at each of the eight mainstem dams would slightly increase direct dam passage survival and overall survival, resulting in an average survival rate of around 50 percent between Lower Granite Reservoir and Bonneville Dam tailrace. *Id.* at ACE001056420, ACE001056423. Although turbine unit operations are less effective at passing fish than spillway, and could slightly decrease adult and juvenile survival, survival rates between Bonneville and Lower Granite Dam (for adults) and vice versa (for juveniles) "should not be measurably reduced." *Id.* at ACE001056420, ACE001056422. In terms of travel time, Life Cycle results indicated that higher spring spill operations would likely increase adult travel times and fallback rates for returning adults at mainstem dams, but that these impacts could be mitigated by implementing reduced spill levels on a regular basis and other adaptive management responses. *Id.* at ACE1056417–18. For juveniles, travel times could increase slightly due to increased minimum operating ranges and reduced flow rate at certain dams; however, "the proposed action as a

---

[28] COMPASS modeling was specifically developed for Snake River spring/summer Chinook salmon, Snake River steelhead, Upper Columbia River spring-run Chinook, and Upper Columbia River steelhead. 2020 BiOp at 96. However, model results can be used as a surrogate to assess effects on other listed species with similar life-histories (e.g., Middle Columbia River steelhead, Lower Columbia River Chinook salmon, etc.). *Id.*

whole with an increase in spill [would] result in a reduction in total average [juvenile] travel times." *Id.* at ACE001056421.

Next, for certain species with adequate available data, NMFS used 24-year life-cycle models to assess the likely future effects of proposed CRS operations, habitat restoration, hatchery production, and pinniped predation on average abundance and risk of reaching quasi-extinction threshold of 50 spawners ("QET 50"). 2020 BiOp, ACE001056316; *see, e.g.*, *id.* at ACE001056442 (for SR sp/su Chinook); *id.* at ACE001056842 (for Snake River fall Chinook); *id.* at ACE001056960 (for Upper Columbia River spring-run Chinook). Life-cycle models incorporated COMPASS results and also include the impacts of tributary habitat actions, pinniped predation, and ocean survival. *Id.* at ACE001056316. In this way, abundance estimates reflect both positive impacts of the proposed action (such as fish passage improvements and predator management actions) and its negative impacts (continuing negative effects of hydropower projects, land use practices, and increased predation). *Id.* at ACE001056442. For example, life-cycle modeling for SR sp/su Chinook indicated that while each major population group would continue to have some smaller populations, each group would also continue to have at least one population with 250-300 or more spawners and, correspondingly, a relatively low risk (0-20 percent) of falling below the QET 50 threshold. *Id.* at ACE001056459. NMFS also considered the Action Agencies' COMPASS analysis, which concluded that flexible spring spill would exert beneficial impacts on in-river juvenile survival and travel time, and only minimal impacts on smolt-to-adult returns between Lower Granite and Bonneville dams. *Id.* at ACE001056460.

Additionally, NMFS compared its life-cycle results to a Comparative Survival Study ("CSS") model.[29] 2020 BiOp, ACE001056316. This model proposes that some fish that pass

---

[29] The CSS model is more generalized than COMPASS and uses correlations rather than route-specific passage and survival rates to predict juvenile survival and smolt-to-adult returns. 2020 BiOp, ACE001056315 n.18.

through juvenile bypass systems suffer some effect that results in a lower chance of returning as an adult. *Id.* at ACE001056443. As flexible spring spill operations would likely increase the proportion of juvenile fish that pass dams via spillways and decrease the proportion that pass via powerhouses (e.g., turbines or screened juvenile bypass systems), the model predicts that the proposed action would reduce latent mortality and thereby increase productivity of SR sp/su Chinook by 35 percent.[30] *Id.* at ACE001056316, ACE001056423. With this additional 35 percent survival, NMFS concluded that under the proposed action, projected abundance across all populations of SR sp/su Chinook would increase substantially, while the median probability of falling below QET 50 would decrease. *Id.* at ACE1056460.

For SR sp/su Chinook, NMFS also ran life-cycle models under different future emission scenarios to predict the effects of the proposed action in the context of climate change. *Id.* at ACE001056316–17; ACE001056461–98. Based on this modeling, NMFS concluded that median population abundance could "decline substantially in the next two to three decades" and that climate change effects could reduce survival during the marine life history stage. *Id.* at ACE001056494, ACE001056498. However, NMFS also concluded that improvements from flexible spring spill and non-operational conservation measures, such as habitat restoration and predator management programs, "should . . . contribute to resilience in the freshwater life history stages." *Id.*

    *3. NMFS appropriately assessed whether CRS operations are likely to jeopardize ESA-listed species.*

Having evaluated the effects of the proposed action, NMFS then addressed the ultimate question posed by the ESA: whether the action is likely to jeopardize any ESA-listed species.[31]

---

[30] The CSS model also predicted that the proposed action would increase productivity by 28 percent for Snake River Basin steelhead. 2020 BiOp, ACE001056618.

[31] Consistent with ESA regulations, NMFS also assessed "cumulative effects," which include "effects of future state or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02; 2020 BiOp, ACE001056501. With respect to SR sp/su Chinook, NMFS considered

In making this determination, the agencies must ensure the proposed action will not affirmatively cause the species significant harm, to the degree of reducing appreciably its "likelihood of both [] survival and recovery . . . in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523 (9th Cir. 2010) ("There could be some impact, but not an appreciable impact, in each of several subdivided periods of operation that, in cumulation, have an undeniably appreciable impact."); *cf. In re Consol. Salmonid Cases*, 791 F. Supp. 2d 802, 872–73 (E.D. Cal. 2011) (inquiry under destruction or adverse modification of critical habitat is whether the record demonstrates agency action "will have a significant (i.e., appreciable or considerable) impact on the critical habitat" of listed species); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 483 (D.D.C. 2014) (construing the regulatory standard, which tracks the ESA by prohibiting only those actions that cause reductions to survival and recovery that are "meaningful from a biological perspective") (citation omitted).

NMFS has long interpreted the phrase "reduce appreciably" to capture "biological[ly] significan[t]" effects that are "consequential" in "nature and magnitude," "based on the totality of the circumstances and the best available scientific information." 83 Fed. Reg. 35178, 35182 (July 25, 2018). That a particular activity may adversely affect a species or "take" members of the species does not automatically give rise to jeopardy. 16 U.S.C. § 1536(b)(4). Mere "reductions in the reproduction, numbers, or distribution of a species that are inconsequential at the species level . . . would not be considered to rise to the level of 'reduce appreciably' . . . within the meaning of the regulations." 83 Fed. Reg. at 35182. Rather, ESA Section 7(a)(2) prohibits only those actions that cause the species "some new risk of harm," for instance, actions that "will tip a species from a state of precarious survival into a state of likely

---

both non-Federal habitat and hydropower actions that were expected to "significantly improve conditions for the salmon and steelhead," as well as human activities that are generally expected to continue to have an adverse effect on populations, such as land development, water withdrawal, and harvest. *Id.* Harvest alone should continue to average around 12 percent, including 10 percent mortality of wild-released fish. *Id.* at ACE001056507.

extinction." *NWF v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008) ("*NMFS III*"). This is true even where a species may be facing significant threats prior to the proposed action. *See Oceana*, 75 F. Supp. 3d at 486 ("NMFS, as an expert agency charged with administering the ESA, may reasonably conclude that a given agency action, although likely to reduce the likelihood of a species' survival and recovery to some degree, would not be likely to jeopardize the continued existence of the species."); 83 Fed. Reg. at 35182 (noting there is no existing "status of being 'in jeopardy,' 'in peril,' or 'jeopardized' by baseline conditions, such that any additional adverse impacts must be found to meet the regulatory standards for 'jeopardize the continued existence of'" a listed species).

Consistent with the statute and regulations, NMFS added the effects of the proposed action to the baseline and cumulative effects, and concluded that the proposed action is not likely to jeopardize any ESA-listed species. *See* 50 C.F.R. § 402.14(g)(4). For instance, for SR sp/su Chinook, NMFS found that CRS operations were likely to improve dam passage survival, population productivity, and tributary and estuary habitat, and would maintain current conditions regarding altered flows, altered water quality, and reduced predation. 2020 BiOp, ACE001056509. As the proposed action carries forward and enhances beneficial operations (such as surface passage routes, 24-hour spill, improved spill patterns, juvenile transportation, and improvements to juvenile bypass systems), NMFS reasoned that freshwater survival and population productivity would continue to improve, and that spatial structure and diversity could improve over time. *Id.* at ACE001056502–03. Flexible spring spill operations, potentially reduced latent mortality, earlier juvenile transport, and habitat restoration actions under the proposed action were also found to improve juvenile survival. *Id.* at ACE001056503–06, ACE001056509–10. Improvements in tributary and estuary habitat, in particular, are likely to continue to positively benefit all populations, *id.* at ACE001056505–06, and predator management programs "will maintain current (reduced) levels of predation," contributing to

improved productivity and abundance, *id.* at ACE001056505–07. While the proposed action's spring spill levels may expose fish to higher total dissolved gas levels and increase adult fall back, these factors are unlikely to result in any substantial negative impacts to juvenile or adult survival. *Id.* at ACE001056503–04.

Although climate change is a substantial threat to SR sp/su Chinook, life-cycle modeling indicated that even under the most severe future climate emission scenarios, the proposed action is expected to improve the species' abundance, productivity, diversity, and spatial structure, and may contribute to its survival and recovery over time. *Id.* at ACE001056508. Specifically, non-operational conservation measures of the proposed action, such as tributary and estuary habitat restoration and predator management programs, are "expected to reduce both the scope and severity of those impacts" by "increas[ing] the resiliency of the populations to climate change and provid[ing] time for additional recovery actions to be implemented." *Id.* at ACE001056510. Indeed, if CSS predictions are realized, the proposed action would result in a "substantial near-term improvement in productivity and abundance for SR spring/summer Chinook salmon . . . and, over time, would reduce the severity of expected declines in abundance and productivity caused by a warming climate and deteriorating ocean conditions." *Id.* at ACE001056504. After considering these factors, and based on the best available science, NMFS reasoned that adult and juvenile survival would endure under the proposed action due to flexible spill operations and projected benefits of non-operational conservation measures. On this basis, NMFS reasonably concluded the proposed action "will not cause reductions in reproduction, numbers, or distribution that would reasonably be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of SR sp/su Chinook." *Id.* at ACE001056510.

While NMFS's analysis is scientifically rigorous and complex, its analytical approach is ultimately straightforward and consistent with the ESA's statutory mandate. Pursuant to the

directives of Section 7(a)(2), NMFS considered how the proposed action would affect listed species and then, in the context of other factors, whether the proposed action will jeopardize the species' continued existence in the wild. And its conclusions are sound. While SR sp/su Chinook face threats from multiple sources, NMFS rationally determined, based on the best available science, that CRS operations are not going to affirmatively cause harm rising to the level of jeopardy. Although these operations as a whole may not clearly enhance the species' recovery, NMFS concluded they will not cause extinction or *preclude* recovery—the crux of the ESA's jeopardy inquiry.[32] *See Oceana*, 75 F. Supp. 3d at 485 (affirming jeopardy analysis where NMFS "identified the reasons underlying its conclusion that the likelihood of loggerheads' recovery would not be appreciably reduced by [the proposed action], and . . . articulated a rational connection between these reasons and that conclusion"). Because NMFS's jeopardy analysis complies with the ESA and is analytically sound, it withstands APA review and the Court should uphold it. *Bowman Transp.*, 419 U.S. at 285–86 ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (noting APA review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision" (citation omitted)).

B.  *Plaintiffs' arguments lack merit.*

Plaintiffs ignore the analytical rigor of NMFS's 2020 BiOp, arguing that it should be tossed aside in favor of their Injunction. Plaintiffs' claims suffer from at least three fatal flaws.

First, unable to attack NMFS's jeopardy analysis head-on, Plaintiffs are forced to recycle past judicial opinions on outdated analytical approaches that NMFS did not use in its 2020 BiOp. *See, e.g.*, ECF 2526 at 26–27, 33–34; ECF 2530 at 27–29, 38–39 (collectively citing cases regarding NMFS's 2000, 2004, 2008, and 2014 BiOps and analyses). But at the same time,

---

[32] Interestingly, Plaintiffs effectively admit as much here, conceding that recovery is not precluded by the action. ECF 2530 at 44–45; ECF 2526 at 12, 16.

Plaintiffs concede that NMFS's 2020 BiOp did not carry forward these past analytical approaches. ECF 2530 at 11 (noting NMFS "cast aside previous analytical frameworks" and "abandon[ed] the recovery analysis"), 39–40 (conceding that "NMFS deviates markedly from the approach taken in the 2000, 2008, and 2014 BiOps"). Of course, as it did here, NMFS may decide to dispatch novel standards and adhere to the textual mandates of the ESA. *See Loper Bright*, 603 U.S. at 395 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." (citation modified)); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004) (noting "the ESA does not prescribe how the jeopardy prong is to be determined"); *Oceana*, 75 F. Supp. 3d at 487 ("The statute does not define how the [jeopardy] concept is to be measured, and the agency therefore has discretion to make this determination on the basis of its own expertise."). For this reason, NMFS's jeopardy analysis cannot be found unlawful for failing to address critiques raised over fundamentally different standards and analyses. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 992 ("In general, a court reviewing agency action under the APA must limit its review to the administrative record.").

Second, and likely for this reason, Plaintiffs offer an unlawful and distorted approach to the jeopardy analysis that flatly disregards the statutory language. Despite the ESA's clear mandate requiring NMFS to examine "how *the agency action* affects the species," 16 U.S.C. § 1536 (b)(3)(A) (emphasis added), Plaintiffs try to argue that the ESA actually *prohibits* NMFS from "isolating" the effects of the action in its jeopardy analysis. ECF 2526 at 31-36; ECF 2530 at 35-40. Under Plaintiffs' approach, NMFS should focus the jeopardy inquiry not on the effects

of the proposed action, but rather on *other* sources affecting the species—for instance, the pre-action condition of the species, environmental baseline, or climate change. This argument is contradicted by the statutory text and case law. *See NMFS III*, 524 F.3d at 930 (noting the ESA prohibits agency actions that "caus[e] . . . some new risk of harm").

Third, Plaintiffs fundamentally mischaracterize—or misunderstand—NMFS's analysis. They argue NMFS simply compares current operations to past operations, when in fact, NMFS properly assessed both new and continuing effects of the proposed action consistent with the ESA and its regulations. Further, Plaintiffs cut short and misrepresent NMFS's consideration of climate change and the 2020 ROD's adaptive management framework. None of Plaintiffs' critiques seriously contend with the contents of NMFS's rigorous, scientific, and comprehensive analysis in the 2020 BiOp. Thus, while Plaintiffs may be adept at parroting past and inapplicable case law and leveling accusations, they cannot substantiate their challenges to NMFS's jeopardy analysis. Their arguments fail, legally and factually, demonstrated further herein.

1.   *The ESA's plain text directs NMFS to isolate the "Effects of the Action" when addressing the Section 7(a)(2) substantive jeopardy prohibition.*

Plaintiffs' overarching challenge to the 2020 BiOp presents an attack on the ESA itself. They allege that the 2020 BiOp "isolates effects from their real-world impacts to listed species" by "first reduc[ing] the effects of the Proposed Action and then strip[ping] away the context that has brought the species to its diminished state." ECF 2526 at 31. Yet, stripped of Plaintiffs' hyperbole, that analysis of what consequences an action will cause, as distinct from other causal factors, is precisely what the ESA requires. When construing the ESA, the Court must employ traditional tools of statutory construction to determine the "best reading" of the statute. *Loper Bright*, 603 U.S. at 402–03. When performing this inquiry, the Supreme Court confirmed that courts should look to longstanding agency regulations and interpretations as guidance. While an agency's interpretation "cannot bind a court," the Court may still consider the agency's subject

matter expertise, as "[s]uch expertise has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'" *Id.* at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

There is no ambiguity in the ESA on the nature of the Section 7(a)(2) mandate at issue in this case—that it focuses squarely on isolating the effects of the agency action at issue. The plain language of Section 7(a)(2) ties the jeopardy mandate to the agency action itself. 16 U.S.C. § 1536(a)(2) (requiring agencies to ensure that "any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any [listed] species . . . ."). This establishes a simple cause-and-effect relationship between (1) the action and (2) consequences to ESA-listed species. Congress made this point express later in the statute, instructing the Consulting Agencies to determine "how the *agency action* affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A) (emphasis added), not how the environmental baseline, abundance levels, climate change, or any of the other formulations advanced by Plaintiffs affect the species. *See, e.g.*, ECF 2526 at 23–26, 29; ECF 2530 at 27–31 (conflating agency action with baseline); ECF 2526 at 31–36; ECF 2530 at 18–22 (conflating agency action with pre-action condition of the species); ECF 2526 at 32–33, 37–43 (conflating agency action with climate change effects).

Case law confirms the statute focuses on a cause-and-effect relationship between the action and the species. *TVA*, 437 U.S. at 188 n.34 ("Section 7 . . . compels agencies not only to consider the effect of their projects on endangered species, but to take such actions as are necessary to insure that species are not *extirpated* as a result of federal activities." (emphasis added)); *NMFS III*, 524 F.3d at 930 ("To 'jeopardize'—the action ESA prohibits—means to 'expose to loss or injury' or to 'imperil.' Either of these implies causation, and thus some new risk of harm."); *Oceana*, 75 F. Supp. 3d at 491 (rejecting plaintiffs' isolating harms argument and noting that "Section 7 consultation must determine whether the *specific agency action* under

review actually causes some additional harm to the species, beyond that which the species may suffer due to other factors" (emphasis added)).

Finally, NMFS's longstanding ESA regulations likewise confirm that the statutory mandate is focused on how the action affects ESA-listed species. 50 C.F.R. § 402.02 (establishing the relevant inquiry in 1986 that the jeopardy standard requires assessment on whether the "action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species"). As the agencies have since clarified, there is no "existing status of being 'in jeopardy,' 'in peril,' or 'jeopardized' by baseline conditions, such that any additional adverse impacts must be found to meet the regulatory standards" for a jeopardy finding. 84 Fed. Reg. at 44987.

Plaintiffs fail to cogently wrestle with this statutory scheme, and they present no interpretative basis to conclude the ESA requires the jeopardy mandate be focused on anything other than the "action" itself. *See, e.g.*, ECF 2526 at 30–31 (failing to explain why the jeopardy inquiry should be focused on the environmental baseline, "earlier harms, the species' reduced status, and the ongoing effects of climate change"). As discussed, this framing conflicts with the statute itself, which focuses the jeopardy inquiry squarely on the action and its effects. To be sure, this does not mean that NMFS may ignore baseline conditions, climate change, or any other factor affecting the status of the species. *Id.* at 21 (alleging, wrongly, NMFS "isolate[d] the effects of the proposed action from the full range of harms"). But the record shows that NMFS considered whether the effects of the action, viewed against the baseline and status of the species, were likely to jeopardize the species. Because Plaintiffs' entire challenge is premised on the notion that NMFS must apply the jeopardy question expansively, they cannot show a likelihood of success on their ESA claims.

2.  *Plaintiffs also err in concluding that, factually, NMFS failed to rationally address how the "Action" affects ESA-listed species.*

a.  NMFS properly included past CRS operations in the environmental baseline.

Contrary to Plaintiffs' argument, ECF 2530 at 37; ECF 2526 at 30, NMFS properly characterized the effects of the action by placing the effects of prior CRS operations in the environmental baseline. This is exactly what the ESA, its regulations, and case law require. To assess the baseline, NMFS considers the "past and present impacts of all *Federal*, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early [S]ection 7 consultation, and the impact of state or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02 (emphasis added); 2020 BiOp, ACE001056344. The environmental baseline is separate from the effects of future CRS operations and thus includes all past actions—including past CRS operations. The D.C. Circuit's recent decision in *CBD* is instructive on this point.

In *CBD*, the D.C. Circuit considered whether consultation over the Environmental Protection Agency's ("EPA") rule setting national renewable fuel standards (the "Set Rule") violated the ESA for failing to account for the renewable fuel standards ("RFS") program's cumulative impacts on endangered species. 141 F.4th 153. The petitioner alleged that EPA set the wrong environmental baseline against which to measure the effects of the Set Rule on endangered species because it failed to "compar[e] the effects of the Set Rule to a hypothetical circumstance in which the entire RFS Program, from 2007 onward, never existed." *Id.* at 178 (citation omitted). Instead, the petitioner requested EPA assess all past effects of the RFS Program because the agency "had full statutory discretion to set volumes for corn and soy[beans] at zero." *Id.* In essence, this approach to measuring the environmental baseline "would have forced EPA to reckon with the cumulative environmental effects of all previous rules

promulgated since the RFS Program's inception for which EPA did not comply with its ESA obligations." *Id.*

The D.C. Circuit soundly rejected the petitioner's reconstruction of the environmental baseline. *Id.* at 178–79. Returning to the regulatory definition, the court noted that the baseline measures "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat *caused by the proposed action*" and "includes 'the past and present impacts of all Federal . . . actions.'" *Id.* at 178 (quoting and adding emphasis to 50 C.F.R. § 402.02(d)). Because the Set Rule at issue only established fuel volumes for 2023 through 2025, the EPA properly considered "the cumulative impact of previous rules promulgated under the RFS Program in its environmental baseline," which "exclude[ed] only the effects of the Set Rule, and not the full impact of the Program since its inception." *CBD*, 141 F.4th at 178–79.

NMFS's analysis here tracks the proper inquiry identified by the court in *CBD*. In the 2020 BiOp, NMFS appropriately differentiated between the environmental baseline and the effects of the action by placing the effects of prior CRS operations where they belong—in the baseline. In characterizing baseline conditions, NMFS addressed the present impacts of the construction and operation of CRS projects, including effects of prior CRS operations on mainstem habitat, seasonal flows, water quality, sediment transport, juvenile and adult salmonid migration, and juvenile transportation. 2020 BiOp, ACE001056344–67. This necessarily included the effects of prior CRS operations that have *benefited* fish passage, such as improvements in passage conditions and habitat improvement programs. *Id.* at ACE001056408. Consistent with ESA regulations, NMFS also considered the expected impacts of all proposed Federal projects in the action area that had already undergone consultation, such as operation and maintenance of Reclamation's upper Snake River projects. *Id.* at ACE001056407. This approach squarely aligns with NMFS's analysis in *CBD*, the ESA, its regulations, and Ninth Circuit case

law. 50 C.F.R. § 402.02 (defining environmental baseline); *Columbia Snake River Irrigators Ass'n v. NWF*, 230 F. App'x 659, 661 (9th Cir. 2007) (noting "present effects of past federal actions . . . must be included in the environmental baseline"); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1162 (9th Cir. 1999) (finding that NMFS properly included the past and present impacts of incidental harvesting in the environmental baseline to assess future CRS operations).

Contrary to Plaintiffs' claims, this does not mean that NMFS "ignore[d]" the effects of prior CRS operations "absent prior lawful consultation." ECF 2530 at 36. Rather, NMFS properly described the present impacts of past CRS operations in its baseline analysis to provide the context against which to assess the effects of the proposed action. *See, e.g.*, 2020 BiOp, ACE001056345–48 (detailing how development of the hydrosystem and prior water management activities have altered seasonal flows); *see also id.* at ACE001056407 (noting anticipated effects of other Federal projects were "incorporated into the data used to model flow effects in the mainstem Snake and Columbia rivers"). As in *CBD*, just because prior consultations on CRS operations have been found unlawful, this does not mean NMFS "must here account for the [CRS's] cumulative effects on [listed] species since the [system's] outset" as effects of the proposed action. 141 F.4th at 178. NMFS properly accounted for these effects in the environmental baseline.

Plaintiffs ignore these distinctions and therefore do not undermine NMFS's actual analysis. Just like the petitioners in *CBD*, Plaintiffs instead argue that NMFS must "analyze the full effect of the Corps' discretionary decision to continue operation of the CRS dams and reservoirs," ECF 2526 at 23, by assigning "the effects of decades of harm . . . from nearly 30 years of (illegal) operation of the CRS" to the effects of the action, ECF 2530 at 36; ECF 2526 at 31 (arguing, without citation, that NMFS improperly failed to account for effects of "two decades of disregard for the ESA"). This approach conflates the action with the baseline,

requiring NMFS to determine whether both the proposed action *and* the environmental baseline are likely to jeopardize the continued existence of listed species, not the effects of the proposed agency action when added to the baseline.

A common consultation scenario illustrates the absurdity of Plaintiffs' requested approach. Oregon permits harvest of the same species of salmon and steelhead it claims will be jeopardized by CRS operations. However, in its own consultations on the effects of State-managed fisheries, it does not argue that NMFS must consider the effects of all prior State harvest as part of the effects of prospective fisheries actions in its jeopardy determination. And for good reason; it would conflict with the law. Indeed, in *Columbia Snake River Irrigators Ass'n*, 230 F. App'x 659, the Ninth Circuit held that NMFS properly considered "tribal treaty fishing rights as present effects of past federal actions that must be included in the environmental baseline" in assessing effects of prior CRS operations on salmon and steelhead. *Id.* at 661. So too, here: NMFS properly assigned the effects of prior CRS operations to the environmental baseline, not to the effects of the action.

Oregon's argument that the *existence* of the dams should not be part of the environmental baseline fails for the same reasons. ECF 2530 at 35 (noting that the 2019 Rules "effectively exclude[] from consideration any effects caused by ongoing agency activities that the Services deem nondiscretionary"). The regulatory definition of baseline clarifies that the "impacts to listed species or designated critical habitat from Federal agency activities or existing Federal agency facilities that are *not* within the agency's discretion to modify are part of the environmental baseline." 50 C.F.R. § 402.02; 84 Fed. Reg. at 45016. In *NMFS III*, the Court therefore held that dams are part of the environmental baseline. 524 F.3d at 930 ("[W]e acknowledge that the existence of the dams must be included in the environmental baseline . . . ."). The effects of the dams themselves (i.e., the physical structures) were properly considered in the environmental baseline as nondiscretionary impacts of the existing facilities. *See, e.g.*, 2020 BiOp,

ACE001056498–99 (differentiating "the *existence* of the dams, which is in the environmental

baseline," from effects *caused* by the proposed operations).

> b. NMFS properly addressed the full effects of ongoing CRS operations when
>
> performing its broader jeopardy analysis.

NMFS properly considered continuing effects of ongoing CRS operations as effects of

the proposed action, in accordance with the ESA and its regulations. 84 Fed. Reg. at 44978

(clarifying "effects of all of the discretionary operations . . . on the species and designated critical

habitat [are] part of the effects of the action, even those operations that the Federal agency

proposes to keep the same"). First, NMFS summarized the proposed action as the "operation,

maintenance, and management of the 14 Federal dam and reservoir projects in the CRS that are

managed as a coordinated system for multiple congressionally authorized public purposes" over

a fifteen-year period. 2020 BiOp, ACE001056265–66. This encompassed operational measures,

such as flexible spill operations to manage flood risk, navigation, fish passage, and hydropower

generation, as well as non-operational measures, including conservation and safety-net hatchery

programs, predator management, habitat improvement actions, and research, monitoring, and

evaluation programs. *Id.* at ACE001056266. The proposed action also included continued

discretionary operations, such as system-wide water management operations involving upstream

water storage projects, continued flow augmentation in the lower Snake and Columbia rivers

between May and July, and continued maintenance of dam facilities. *Id.*

To analyze the effects of proposed CRS operations on listed species, NMFS considered

and described "all consequences to listed species . . . that are caused by the proposed action,

including the consequences of other activities that are caused by the proposed action." 2020

BiOp, ACE001056408; 50 C.F.R. § 402.02 (defining "effects of the action"). In the effects of the

action section, NMFS clarified which effects of CRS operations described in the environmental

baseline section are expected to continue *as an effect of the proposed action. See, e.g.*, 2020

BiOp, ACE001056412 (discussing how continuing system-wide management operations involving upstream water storage are likely to impact lower Snake River and lower Columbia River flows); *id.* at ACE001056414, ACE1056399 (discussing how continued CRS operations will affect water quality parameters in the mainstem migration corridor); *id.* at ACE001056415 (discussing how continued CRS operations are likely to affect TDG levels and sediment transport); *id.* at ACE001056417 (discussing how scheduled maintenance activities are expected to continue to affect SR sp/su adult and juvenile migration); *id.* (discussing how continued CRS operations are likely to affect adult survival rates). For instance, NMFS observed that "the seasonal alterations of the hydrograph caused by CRS operations . . . described in the Environmental Baseline section will *continue* to affect the lower Snake and lower Columbia mainstem migration and rearing corridor, estuary, and plume," and that "[t]he effects of CRS operations will include *continued* reduced flows in the lower Snake and Columbia Rivers during the months of May through July." *Id.* at ACE001056412 (emphasis added).

Plaintiffs erroneously presume that just because NMFS did not copy and paste descriptions of ongoing operations in the effects of the action section of the 2020 BiOp, it did not consider or analyze the ongoing discretionary operations as such. Not so. NMFS may incorporate by reference other parts of its biological opinion, so long as it identifies which effects will continue under the proposed action and considers them in its jeopardy analysis. 16 U.S.C. § 1536(b)(3)(A) (only procedural obligation in the ESA is to provide a "summary of the information on which the opinion is based," not to meet Plaintiffs' preferred structure); *see also* 50 C.F.R. § 402.14(g)(4); *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1120 n.6 (11th Cir. 2013) ("There is 'no requirement that every detail of the agency's decision be stated expressly in the [biological opinion]' as long as the 'rationale is present in the administrative record underlying the document.'" (quoting *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005))). Moreover, the 2020 BiOp is limited to review of the proposed action

as it is described and defined in the Action Agencies' biological assessment, which details at length all continuing components of the proposed action. *See* Biological Assessment, ACE001059481 (describing continuing elements of the proposed action).

NMFS also identified which operations will *change* as a result of the proposed action, and how these changes are expected to impact future river flow conditions. *See* 2020 BiOp, ACE001056409–11 (detailing spring and summer spill operations, and identifying which spill levels are consistent with recent performance spill levels); *id.* at ACE001056412–13 ("The proposed changes in reservoir operations will affect monthly average outflows minimally (0 to 2 percent) at McNary Dam, relative to current conditions[.]"); *id.* at ACE001056413 ("Flow changes downstream of Grand Coulee will be within 2 percent of current conditions."); *id.* ("Flows at the lower Snake and other lower Columbia River projects will not change substantially."); *id.* at ACE001056418 (detailing reduced summer spill at all mainstem dams, increased operating range at Lower Granite, Little Goose, Lower Monumental, and Ice Harbor dams, and increased forebay operating range at John Day Dam); *id.* at ACE001056509 (Proposed Action "will have little overall effect on the seasonal hydrograph" as "compared to recent conditions.").

Critically, NMFS did not stop there. While Plaintiffs argue that NMFS simply compared past and current operations without considering survival or recovery risks, *see* ECF 2526 at 23–26; ECF 2530 at 35–38, NMFS in fact analyzed in detail how these continuing and altered operations will impact salmon and steelhead species' migration, survival, and recovery. For example, for SR sp/su Chinook, NMFS modeled the likely effects of the proposed action (including flexible spring spill and habitat restoration actions) on population abundance and QET risk. 2020 BiOp, ACE001056442. Therefore, projected estimates of population abundances and QET risk incorporated *both new and continuing* effects of the proposed action. *See, e.g.*, *id.* at ACE001056442, ACE001056460 (estimates accounting for altered and continuing factors

affecting recruit-per-spawner estimates, including existing and new CRS improvements, reductions in juvenile transportation, pikeminnow and avian predator management actions, and continuing negative effects of existing projects). To take yet another example, in examining the effect of continued maintenance activities, NMFS found that scheduled actions were "expected to continue to negatively affect only small numbers of adult and juvenile" salmon, and that unscheduled actions would likely "continue to result in increased TDG exposure, passage delay, and occasional mortalities." *Id.* at ACE001056417. Thus, NMFS's jeopardy analysis properly accounted for the entirety of CRS operations, both continuing and altered. Plaintiffs' superficial qualms with the BiOp's formatting do not give rise to a likelihood of success on the merits. *Defs. of Wildlife*, 733 F.3d at 1120 n.6.

Nor do Plaintiffs' citations to this Court's earlier, inapposite opinions rescue their arguments. In *NMFS II*, the Court held that NMFS's jeopardy analysis in the 2004 BiOp failed to properly evaluate the proposed action "in its entirety" by choosing to recategorize part of the proposed action as part of the environmental baseline. 2005 WL 1278878, at *13. Affirming, in *NMFS III*, the Ninth Circuit held that the "reference operation" approach utilized in the 2004 BiOp "attributed . . . a much smaller portion of the fishes' perilous condition to the proposed action under review." 524 F.3d at 926. Here, in contrast to *NMFS II*, NMFS did not utilize a hypothetical "reference operation" approach to recategorize certain parts of ongoing operations as nondiscretionary and part of the environmental baseline. Instead, it clarified that discretionary ongoing operations were properly considered as part of the effects of the proposed action, and then considered the impacts to survival and recovery resulting from the consequences caused by the action as a whole. That NMFS also considered how survival rates or travel times might change from the "No Action" Alternative in the Action Agencies' Draft EIS in no way undermines the integrity of NMFS's analysis. 2020 BiOp, ACE001056459, ACE001056504; Final EIS, ACE001055220.

Plaintiffs' citations to out-of-circuit and nonbinding case law are similarly unpersuasive. In *American Rivers v. FERC*, 895 F.3d 32 (D.C. Cir. 2018), and *South Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247 (E.D. Cal. 2010), the D.C. Circuit and Eastern District of California each rejected BiOps in which the Consulting Agencies in part attributed ongoing discretionary project impacts to the environmental baseline, thereby excluding such impacts from the jeopardy analysis. Here, NMFS did not "compare" incremental changes between prior and current operations; it considered *all* effects of proposed operations, whether those effects were the same or different than prior operations. 2020 BiOp, ACE001056408–500. Nor did it pull out discretionary parts of ongoing operations to examine limited effects of the proposed action. Instead, it properly evaluated the effects of past CRS operations in the environmental baseline section, clarified which CRS operations were ongoing as effects of the action and which operations would be changing as a result of the proposed action, and then compared survival and recovery outcomes with and without the proposed action. 2020 BiOp at ACE001056344–408, ACE001056409–98. This is precisely the "comprehensive approach to jeopardy analysis [this Court has held] will meet the [ESA's] statutory mandate." *NMFS II*, 2005 WL 1278878, at *14.

      c.   NMFS properly considered "recovery" when determining if the proposed action is likely to jeopardize ESA-listed species.

Plaintiffs' further argument that the 2020 BiOp falls short due to "an absence of clear analysis on the listed species' likelihood of eventual recovery," ECF 2526 at 34; ECF 2530 at 28, misconstrues NMFS's analysis of recovery risks. Plaintiffs also fail to identify any data that NMFS ignored. Instead they demand a specific mode of quantitative analysis that has no basis in statute or regulation, and is thus not mandatory. In the jeopardy context, survival and recovery is a "joint analysis." *NMFS III*, 524 F.3d at 932 (noting survival and recovery are "intertwined needs that must both be considered in a jeopardy analysis"); 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of" as "reduce appreciably the likelihood of both the survival

and recovery"). As injury to recovery prospects may, "in exceptional circumstances," warrant a jeopardy finding, "[i]n order to recognize such effects, and to apply the proper joint survival and recovery concept, NMFS must analyze effects on recovery as well as effects on survival." *NMFS III*, 524 F.3d at 932. This requires a rational "analysis of the listed species' prospects for recovery," including an assessment of "the relevant species' chances to survive proposed operations with an adequate potential for recovery." *Id.* at 932–33. However, the ESA does not require "an improvement in the likelihood of recovery or the attainment of an improved status, which is addressed through section 4 recovery plans." 2020 BiOp, ACE001056265.

NMFS's analysis directly tracks this joint inquiry. NMFS conducted qualitative and quantitative analyses that enabled it to understand the effects of the proposed action on species' survival and recovery, as measured by key viable salmonid parameters (abundance, productivity, spatial structure, and diversity). For example, for SR sp/su Chinook, NMFS first considered the species' degraded status based on current population abundances and minimum abundance thresholds, as informed by ESA recovery plan metrics and delisting criteria. *See id.* at ACE001056323–24 (detailing recovery plan target status for individual populations within each major population group); *id.* at ACE001056326–28 (population-level risks for viable salmonid population parameters), *id.* at ACE001056331–33 (current abundances). Then, considering this status, NMFS performed COMPASS and life-cycle modeling to quantitatively estimate population abundance and productivity under the proposed action. *Id.* at ACE001056423–24 (discussing COMPASS estimates of juvenile survival and travel time); *id.* at ACE001056442–61 (life-cycle model results); *id.* at ACE001056462–98 (climate change sensitivity analysis). Because these modeling tools included metrics that were informative of both survival and recovery (e.g., abundance and QET 50 risk), they allowed NMFS to gauge the status and performance of the species under different operational hypotheses and under future climate conditions. *See, e.g.*, *id.* at ACE001056442.

Finally, NMFS considered these data points in the context of the action as a whole—including habitat improvement actions, predator management, and the potential for significantly improved abundance and productivity—and made a qualitative determination based on weighing these several lines of evidence that the proposed action would not appreciably reduce the species' likelihood of survival and recovery. *See, e.g.*, *id.* at ACE001056502 (noting factors limiting the viability of SR sp/su Chinook populations); *id.* at ACE001056503–07 (discussing how flexible spring spill operations, juvenile transportation, habitat improvement actions, and predator management actions would likely result in an increase in SR sp/su Chinook viable salmonid population parameters, and how such actions may "achieve recovery goals"); *id.* at ACE001056508 (discussing how proposed CRS operations could enhance SR sp/su Chinook resiliency to climate change impacts on abundance and extinction risk); *id.* at ACE001056509(discussing how flexible spring spill operations, fish passage mechanisms, and adaptive management of juvenile transport would improve abundance).

Based on these quantitative and qualitative assessments, NMFS reasonably concluded that the proposed action, while not moving SR sp/su Chinook *towards* recovery, would also not appreciably *reduce or preclude* its likelihood of recovery. *Id.* at ACE001056509–10 (noting that although certain factors like climate change may make recovery of the ESU "more challenging," the proposed action is "likely to improve many factors identified in the recovery plan for this ESU" and "provide time for additional recovery actions to be implemented"); 50 C.F.R. § 402.04. NMFS gave weight to its finding that the action could reasonably be expected "to improve the functioning of [viable salmonid population] parameters" through improvement in critical factors for recovery such as habitat improvement, population productivity, and flexible spring spill. 2020 BiOp, ACE00105608–09. This analysis squarely aligns with the ESA and its regulations. NMFS is charged with examining the effects of the proposed action on the species' *current* survival and recovery, as measured by its status, the environmental baseline, and other

factors affecting its present condition. 16 U.S.C. § 1536(a)(2), (b)(3) (focusing on "effects of the action"); 50 C.F.R. § 402.14(g)(2). It follows that, if the proposed action is not expected to measurably reduce a species' current "reproduction, numbers or distribution," the action also would not "appreciably reduce" its likelihood of maintaining survival and preserving a path to recovery. 50 C.F.R. § 402.04.

Even Plaintiffs appear to agree, fundamentally, with this analysis. Plaintiffs accept that "[e]ven where the 2020 BiOp acknowledges that aspects of the proposed action will likely adversely affect listed species," it may still "find[] that the overall effects of the Proposed Action will at least not appreciably worsen the current condition of the species." ECF 2526 at 32-33; *see also id.* at 33 (acknowledging that the jeopardy inquiry focuses on whether operations maintaining adult survival rates "[are] likely to appreciably reduce the species' ability to survive and eventually recover in the context of the status of the species and other threats"). Indeed, the crux of the jeopardy analysis is whether the proposed action would "tip [the] species from a state of precarious survival into a state of likely extinction" or cause such "injury to recovery prospects" that its continued existence is jeopardized. *NMFS III*, 524 F.3d at 930, 932. After considering the SR sp/su Chinook's overall status and analyzing the effects of the proposed action in relation to the species' likelihood of survival and recovery, NMFS reasonably concluded that the answer to this inquiry, here, is "no." *See Oceana*, 75 F. Supp. 3d at 491 (upholding jeopardy determination that "rest[ed] in large part on the qualitative assessment of population indicators and the estimated extent of [proposed action impacts], considered in light of . . . the impact of other sources of harm"); *NMFS III*, 524 F.3d at 932–33 ("NMFS must analyze effects on recovery as well as effects on survival."); *see also Nw. Env't Advocs. v. U.S. Fish & Wildlife Serv.*, No. 3:18-CV-01420-AR, 2023 WL 7181694, at *21 (D. Or. Sep. 15, 2023), *report and recommendation adopted*, No. 3:18-CV-01420-AR, 2023 WL 8190727 (D. Or. Nov. 27, 2023) (upholding no-jeopardy determination where FWS "rested its conclusion on

permissible considerations about the effects of the proposed action at scale" and "articulated a rational connection between the facts found and its decision that the proposed action would not appreciably impair bull trout recovery").

Despite their apparent agreement with the central jeopardy inquiry, Plaintiffs instead would have NMFS evaluate how the action affects the species' *recovery* under some hypothetical future scenario, and then "articulate a rough recovery endpoint" to avoid jeopardy. ECF 2526 at 35. In essence, Plaintiffs would require NMFS to quantitatively define "recovery," establish specific timeframes for attaining it, and assess how the proposed action affects reaching those recovery thresholds. *See id.* ("[A]ssessing recovery requires some conception of the goal line."). Plaintiffs claim that this analysis would not "require NMFS to speculate about a time in the future when recovery will no longer be possible," ECF 2526 at 35, but actually, it would do just that: NMFS would be forced to adopt inflexible recovery metrics and scenarios, evaluate the percent probability of achieving them, and then confirm—regardless of the scope or magnitude of the adverse effects of the action—that the probabilities are not only sufficiently low enough to ensure that recovery prospects not be appreciably reduced, but that they will be sufficiently *increased* to Plaintiffs' liking.

This is not what Section 7(a) of the ESA requires. Nothing in regulation or statute requires NMFS to articulate a recovery "endpoint" or precisely "calculate the level of improvement necessary to achieve a five percent or less risk of extinction during the next 24 years." ECF 2530 at 29, 35. The central focus of the jeopardy inquiry is not *how much improvement is needed* to ensure a species' recovery; it is whether the effects of the proposed action will appreciably reduce the species' likelihood of recovery as measured against the species' current status (e.g., current "reproduction, numbers, or distribution"). 50 C.F.R. § 402.02; *see Oceana*, 75 F. Supp. 3d at 490 ("Although NMFS has not applied a specific quantitative formula to account for all of these factors, the agency's logic is both discernible and

rational: it weighed the impact of [the proposed action], as well as take caused by other sources, against the four positive attributes that characterize the [listed species], and it concluded that the population's continued existence would not be jeopardized by these impacts.").

Again, Plaintiffs' outdated arguments heavily rely on critiques of the 2014 BiOp, which employed a different methodology for measuring jeopardy. In prior BiOps, NMFS in part looked at whether populations were "trending toward recovery." *See, e.g.*, 2008 BiOp, NMFS00317539, NMFS00317558; 2014 BiOp, NMFS00337838–847. Under this standard, the Court concluded that if NMFS designed its jeopardy analysis around recovery metrics, it should be able to characterize what that recovery looks like. *NMFS V*, 184 F. Supp. 3d at 891–92; *see* ECF 2526 at 35–36 (citing this Court's critiques of QET modeling and NMFS's failure to identify a "rough recovery endpoint" in the 2014 BiOp under a trending toward recovery analysis). For this reason, Plaintiffs' citation to *NMFS V* is inapt. ECF 2526 at 34. There, this Court held that NMFS's "trending toward recovery" approach "d[id] not consider the individual abundance levels of the various populations or what growth trends would be necessary" to avoid jeopardy. *NMFS V*, 184 F. Supp. 3d at 891. But in the 2020 BiOp, NMFS did not utilize these prior standards and returned to the clear inquiry posed by the ESA and regulations: whether, given the species' current status, conditions, and threats, the proposed action will reduce current "reproduction, numbers, or distribution" in a way that pushes the species toward extinction or precludes its recovery. In this way, NMFS's jeopardy analysis does not treat "some improvement in survival" as *per se* adequate to avoid jeopardy, nor does it compare projected harms to "previous operations." *Id.* (quoting *Idaho Dep't of Fish & Game v. NMFS*, 850 F. Supp. 886, 899 (D. Or. 1994), and *Aluminum Co. of Am.*, 175 F.3d at 1162 n.6). NMFS properly considered impacts to recovery in the context of the proposed action as a whole. This is all ESA Section 7(a) requires. *NMFS III*, 524 F.3d at 932.

3. *NMFS appropriately considered and incorporated climate change information into its analysis.*

Plaintiffs' arguments challenging NMFS's climate change analysis also fall flat. Confusingly, Plaintiffs claim that the 2020 BiOp simultaneously "rel[ies] on predictions from an analysis that *excludes* climate change projections" and "includes a quantitative analysis of Proposed Action effects including climate change." ECF 2526 at 37, 38. Plaintiffs are incorrect on both counts. As to the first, NMFS properly considered the effects of climate change in its jeopardy analysis. As to the second, climate change is not an "effect" of the proposed action.

First, NMFS extensively analyzed the impacts of climate change throughout its jeopardy analysis. For instance, in assessing species' status and the environmental baseline, NMFS recognized that climate change was a significant limiting factor. *See, e.g.*, 2020 BiOp, ACE001056329, ACE001056338 (detailing adverse impacts on fish physiology, migration, water quality, timing and availability of food resources, and changes in estuarine and ocean productivity); *id.* at ACE001056341–44 (detailing impacts of climate change on temperature and freshwater, estuary, and marine habitats); *id.* at ACE001056349, ACE001056353 (noting increased water temperature and diminished sediment transport impacts population productivity). While SR sp/su Chinook were found especially vulnerable to climate change, especially during adult and juvenile freshwater stages, *id.* at ACE001056339, they were also ranked high in adaptive capacity for their ability to cope with its effects. *Id.* at ACE001056340 (noting increased production of juvenile smolt and adjusted timing of migration patterns).

NMFS also performed life-cycle modeling to assess the effects of the proposed action on SR sp/su Chinook under different climate scenarios. 2020 BiOp, ACE001056316–17, ACE001056461–63. NMFS then compared projected abundance under these scenarios to a "stationary climate" scenario, which assumed no imminent trend in worsening environmental conditions. *Id.* at ACE001056461. Despite this detailed analysis, Plaintiffs allege that NMFS

"exclude[d]" climate change projections from its jeopardy analysis by "relying" on this stationary climate model. ECF 2526 at 39. To the contrary, NMFS performed climate sensitivity modeling under "environmental conditions projected by global climate models . . . *for comparison with* a stationary climate." 2020 BiOp, ACE001056461 (emphasis added). And, "to improve clarity," only projections based on the "more conservative scenario"—i.e., a future assuming a progressively worsening climate with fewer mitigation policies—"[were] discussed." *Id.* at ACE001056317, ACE001056463; *see, e.g.*, *id.* at ACE001056465–66 (detailing life-cycle model projections of abundance and QET risk under the proposed action and most severe climate scenario, along with "median values for projected abundance under recent, historical climate conditions . . . for comparison").

Based on these metrics, NMFS concluded that although abundances "could decline substantially in the next two to three decades," *id.* at ACE001056494, ACE001056508, SR sp/su Chinook were also "relative[ly] resilien[t]" to climate change effects in the freshwater stages, and declines through the migration corridor and immediate impacts on freshwater productivity would be "relatively small." *Id.* at ACE001056495–96. Instead, NMFS found rising sea surface temperatures to be the "dominant driver" of reduced abundance and productivity. *Id.* at ACE001056496. NMFS also determined that elements of the proposed action, such as flexible spring spill operations and habitat restoration programs, "should help to improve the resiliency of SR [sp/su] Chinook salmon populations to expected climate change effects." *Id.* at ACE001056477, ACE001056508. NMFS concluded that, even if climate change effects "will make recovery of this ESU more challenging, it will have declined less as a result of the proposed action because in many ways the proposed action is expected to improve the functioning of [viable salmonid population parameters] and thus positively contribute to the survival and recovery of the species." *Id.* at ACE001056508; *see also* Appendix A at 16; Section

A.2.2.4. Thus, far from ignoring climate change forecasts, NMFS directly integrated them into its assessment of the effects of the proposed action on the species. 2020 BiOp, ACE1056508.

Contrary to Plaintiffs' claim, this analysis does not "substitut[e] a 'mitigate-to-some-extent' finding for a jeopardy determination." ECF 2526 at 41. Rather, it properly incorporates and assesses *all* the effects of the proposed action, including those effects NMFS predicts may help improve species' climate resilience, and therefore, survival and recovery. *See Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 739 (9th Cir. 2017) (NMFS is "entitled to rely on [a] climate-based population assessment model" in performing jeopardy analysis); *Locke*, 776 F.3d at 997 ("[T]he agency has substantial discretion to choose between available scientific models, provided that it explains its choice."). On this basis, NMFS reasonably concluded that even under a variety of climate change scenarios, the proposed action would not appreciably reduce the species' likelihood of survival or recovery. 2020 BiOp at ACE001056510.

Second, climate change "conditions are not caused by, nor will they be exacerbated by, the continued operation and maintenance of the CRS." *Id.* at ACE001056498. Plaintiffs argue that the proposed action exacerbates climate change because it contributes similar "changes in river conditions that harm salmon, such as seasonally increased water temperatures and changed river flows." ECF 2526 at 41. But, as described *supra*, NMFS appropriately considered those same changes as effects of the proposed action. 2020 BiOp at ACE001056345–52; ACE001056408–98. As before, Plaintiffs would have NMFS apply the jeopardy standard to something other than the effects of the proposed action—here, climate change—in contravention of the direct command of Section 7(a)(2). The question is not whether climate change will appreciably reduce the species' likelihood of survival and recovery—it is whether the *effects of the action* will. *Oceana*, 75 F. Supp. 3d at 491.

Indeed, if NMFS were to apply the jeopardy inquiry to climate change effects, it is difficult to imagine a scenario in which even a no-action alternative (i.e., no proposed action at

all) would pass ESA muster. It is only when climate change effects are added to the modeling analysis that projected abundances significantly diminish, suggesting that it is not the proposed action but rather climate change that will have the greatest impact on the species under future conditions. For this reason, NMFS's conclusion that worsening ocean conditions are the "dominant driver" of future declines in survival is not "irrelevant," ECF 2526 at 42; it demonstrates that the effects associated with maintenance and operation of the CRS, i.e., the effects of the proposed action, are *not* the dominant driver. *See Turtle Island*, 878 F.3d at 753 (Callahan, J., dissenting) (suggesting NMFS's no-jeopardy finding was reasonable where there was "no significant difference in the risk of extinction between the default, climate-based trends and the forecast considering the direct effects of the proposed action," such that "risk of extinction [was] virtually the same whether or not the [proposed action occurred]").

Plaintiffs chide NMFS for only performing a quantitative analysis of climate change effects on SR sp/su Chinook. ECF 2526 at 37. But such data for other species was unavailable, 2020 BiOp, ACE001056316 n.20, so NMFS relied on a qualitative species-by-species assessment of climate vulnerability for other species. *See, e.g.*, *id.* at ACE001056645–47 (assessing climate change effects on SR steelhead). The ESA does not prescribe the method NMFS must use to perform this analysis, and Plaintiffs do not explain how else NMFS should have evaluated available climate change-related data in assessing jeopardy. *See Turtle Island*, 878 F.3d at 740 (upholding no-jeopardy analysis based on "indeterminate" data where "NMFS considered a variety of ways in which climate change may affect" species); *Oceana*, 75 F. Supp. 3d at 492 (upholding NMFS's "general, qualitative, and relatively speculative" climate change analysis where plaintiffs failed to cite "overlooked scientific evidence"). NMFS properly considered the effects of the proposed action on each species in light of climate change predictions to determine "what jeopardy might result from the agency's proposed actions in the present and future human and natural contexts." *NMFS III*, 524 F.3d at 930; *Willamette*

*Riverkeeper v. NMFS*, 763 F. Supp. 3d 1203, 1237–38 (D. Or. 2025) (jeopardy analysis requires "evaluat[ing] the consequences . . . of projected worsening conditions" and "assess[ing] whether [species] can sustain impacts from the [proposed action] on top of climate change effects").

  *4. The proposed action was adequately defined to sustain NMFS's jeopardy analysis.*

  NMFS reasonably relied on the proposed action to sustain its jeopardy analysis because elements of the proposed action—including its spill operations, non-operational conservation measures, and adaptive management and contingency framework—were sufficiently defined and their benefits reasonably certain to occur. Plaintiffs' arguments challenging the certainty of CRS operations and mitigation measures are unavailing.

  First, NMFS adequately characterized proposed spill operations as part of its jeopardy analysis. In the proposed action, the Action Agencies committed to adopting flexible spill operations intended to improve juvenile passage and survival rates and adult returns, provide Federal power system benefits, and ensure operational feasibility. 2020 BiOp, ACE001056264; Final EIS, App. R, ACE001066364, ACE001066383. To adapt future operations from a common reference point, the Action Agencies developed a base operation for the first year of implementation (2021), which would then "serve as the basis for deriving future performance targets for power and fish" to inform future operations and annual Fish Operations Plans as part of the adaptive management framework. Final EIS, App. R, ACE001066381, ACE001066389. These proposed 2021 operations are not "vague and undefined," ECF 2630 at 31—they are spelled out in detail in the Final EIS and 2020 BiOp. *See* Final EIS, App. R, ACE001066381–82; 2020 BiOp, ACE001056275 (proposed spring spill levels), *id.* at ACE001056277 (proposed summer spill levels), *id.* at ACE001056278 (minimum operating pool ranges).

  Plaintiffs argue NMFS's jeopardy analysis is unreasonable because it relies on a "single year of defined spill operations" and "without even knowing what the [future] federal actions will be." ECF 2530 at 31; *see* ECF 2526 at 45. However, the adaptive management framework is

not a blank check that allows the Action Agencies to control spill at will, nor does it "place the risk of uncertainty" on the listed species. ECF 2530 at 31 (citing *NMFS V*, 184 F. Supp. 3d at 906). Rather, future operations are guided by proposed 2021 operations and constrained by "the understanding that . . . in 2020 and 2021, these fish benefits [from 2019 operations] are improved further" such that they "would continue to be as good as or better than in 2020." Final EIS, App. R, ACE001066383 & n.3. This adaptive management framework imposes defined operational sideboards consistent with the analysis in the 2020 ROD and ESA consultations, while giving the Action Agencies the necessary discretion to deviate from planned operations and respond promptly to meet biological, energy, and health and safety needs. The annual cycle of preparing an operations plan for each upcoming year after considering available data and results for prior years, as well as projections of the anticipated effects of the next year, is a reasonable way to assess the steady accumulation of new data on the effects of spill operations on salmon and steelhead.

Moreover, NMFS properly accounted for unanticipated effects of future spill operations; if spill operations post-2021 affected listed species in a manner or to an extent not previously considered in the 2020 BiOp, this would constitute a reinitiation trigger. 2020 BiOp, ACE001057640; 50 C.F.R. § 402 (requiring reinitiation of formal consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion"). On this basis, it was reasonable for NMFS to evaluate the fifteen-year effects of the flexible spill operations initially proposed in making its jeopardy determination. *See Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1069 (9th Cir. 2024) ("Where the agency action is ongoing, the time period covered by the resource agency's analysis must be long enough for [the resource agency] to make a meaningful determination as to whether

the ongoing [agency action] reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of the listed species." (citation modified)); *Turtle Island*, 878 F.3d at 739. The agencies assessed the consequences of continuing the action for 15 years based on the specified 2020 operations, but allowed the Action Agencies to deviate from those specific parameters so long as anticipated benefits and relevant metrics are projected to be equivalent.

Second, NMFS's jeopardy analysis reasonably relied on the projected benefits of non-operational conservation measures. 2020 BiOp, ACE001056425, ACE001056427, ACE001056498–500 (detailing effects of tributary and estuary habitat improvements to achieve major population group-level metrics). As part of the proposed action, the Action Agencies committed to specific quantifiable metrics for tributary habitat improvement (including protected and enhanced flow, entrainment screening, habitat access, stream complexity, and riparian habitat area) for major population groups across several listed species. *See, e.g.*, Biological Assessment, ACE001059608–14 (detailing commitments to projected estimates of habitat metrics); *id.* at ACE001059610, ACE001059614 (discussing implementation process, science-based adaptive management, and consultation of experts); *id.* at ACE001059611–14 (discussing conducting and utilizing research, monitoring, and evaluation methods to "determin[e] if habitat actions are meeting their physical and/or biological objectives . . . as well as revealing the benefit of actions on larger scales" (ACE00105612)); *see generally* Final EIS, App. D, ACE001064571–5135 (further detailing the tributary habitat improvement program). In its jeopardy analysis, not only did NMFS analyze the effects of tributary habitat improvement actions, *see* 2020 BiOp, App. A, it explicitly "considered certainty of implementation and effects," "the strategic framework within which the Action Agencies were committing to implement the program," and "the adequacy of the [research, monitoring, and evaluation] and adaptive management framework," *id.* at ACE001056428 (for SR sp/su Chinook).

Additionally, the Action Agencies proposed continued implementation of the Columbia Estuary Ecosystem Restoration Program, which supported the completion of 64 projects and reconnected 8,500 acres of floodplains and 390 miles of restored channel networks between 2007 and 2020. Biological Assessment, ACE001059614. Under this program, the Action Agencies committed to reconnecting an average of 300 acres of estuary habitat to the tidal regime annually—a goal they had met every year between 2008 and 2019—subject to a five-year rolling review to "evaluate the acreage restored to date" and "increase in restored acreage that is most likely to be accomplished in the following 5 years . . . to determine an annual acreage goal." *Id.* at ACE001059617; *see also id.* at ACE001059616–17 (detailing commitments to restoration metrics); *id.* at ACE001059617–18 (conducting and utilizing research, monitoring, and evaluation methods and science-based adaptive management); *id.* at ACE001059619 (incorporating climate change impacts). In the 2020 BiOp, NMFS considered "all of these program elements in place (rolling 5-year reviews of project availability, landscape planning, the . . . process for reviewing site designs, the monitoring program, and attention to climate change considerations and adaptive management)," as well as the Action Agencies' long record of meeting estuary restoration commitments. 2020 BiOp at ACE001056426–27 (for SR sp/su Chinook). On this basis, NMFS reasonably "expect[ed] that the Action Agencies' proposed implementation of the estuary program will continue to partially mitigate the effects of mainstem flow management" and that "benefits [would] increase as habitat quality matures, contributing to increased abundance, productivity, and life-history diversity of all SR spring/summer salmon populations . . . ." *Id.*

Just because the Action Agencies did not know precisely how these metrics would be achieved does not mean that these aspects of the proposed action were illusory, nor does it diminish NMFS's analysis of their projected benefits to listed salmon and steelhead in the future. These habitat actions were not "indeterminate," "broadly described metrics" whose "timing and

exact nature . . . remain[] elusive." ECF 2526 at 44–45. Although specific projects and sites were yet to be determined, the Action Agencies had ongoing programs with dedicated budgets to implement them, selection criteria, research, monitoring, and evaluation processes, reporting requirements, and a long history of working with regional partners on restoration actions. *See* 2020 BiOp at ACE001056294 (committing Action Agencies to habitat improvement actions for three major population groups of SR sp/su Chinook, among others; five-year implementation plans outlining specific restoration actions in collaboration with NMFS; annual reporting requirements; and implementation of a tributary habitat research, monitoring, and evaluation program in collaboration with regional partners); *id.* at ACE001056295–96 (implementation reporting); *id.* at ACE001056309 (committing Action Agencies to annually report to NMFS on acres of estuary floodplain improved and miles of estuary riparian area improved); *id.* at ACE001056375 (showing cumulative metrics between 2007 and 2019); *id.* at ACE001056330 (noting that "overall availability and quality of tributary and estuary habitat . . . have been relatively constant or improving over the past 10 years").

And ESA consultation ensures these habitat improvement measures will endure as a continued operation of the proposed action. *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 271 (2021) (holding a BiOp "leads to 'direct and appreciable legal consequences' because it alters 'the legal regime to which the action agency is subject, authorizing it' to take action affecting an endangered species 'if (but only if) it complies with the prescribed conditions.'" (quoting *Bennett*, 520 U.S. at 178)). This makes continuation of the habitat programs, with sustained level of work, "reasonably certain to occur." 50 C.F.R. § 402.02 (defining effects of the action as consequences that are "reasonably certain to occur"); *see Jayne v. Sherman*, 706 F.3d 994, 1005 (9th Cir. 2013) (per curiam) (holding FWS reasonably relied on Forest Service's commitments to protect listed species in no-jeopardy determination where "FWS cited specific actions taken by the [Forest Service] consistent with its commitment [to

protect habitat]," "the [Forest Service] had a record over the past decade of protecting that same habitat," and there was "nothing in the record to cast doubt on these commitments").

In turn, the beneficial effects of the habitat programs are also reasonably certain to occur based on past performance and assessment, and given that this is a mature program. Thus, these conservation measures are not "uncertain," ECF 2526 at 44, but rather involve "specific and binding plans" and "a clear, definite commitment of resources to implement" them. *NMFS V*, 184 F. Supp. 3d at 873 (quoting *NMFS III*, 524 F.3d at 935–36); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002). NMFS's reliance on the projected benefits of flexible spill operations and habitat restoration actions in making its jeopardy determination was reasonable. *See Jayne*, 706 F.3d at 1005 ("[Forest Service] has made a firm commitment to protect the grizzly bear in other areas, and it is reasonable to assume they would follow the same course in the [action area]."); *Gifford Pinchot Task Force*, 378 F.3d at 1068 (holding FWS reasonably relied on "projections and assumptions" of a forest management plan in making no-jeopardy determination, where its continuing "compliance with the [plan] [formed] the FWS's primary justification for its ultimate jeopardy analysis"); *see also Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992) (discussing Bureau of Land Management's reliance on timber management plans in making jeopardy determinations for timber sales, even though such plans "do not designate specific timber-sale boundaries, or require that any particular area be harvested. . . . Rather, they decide land-use allocation and set the 'annual allowable harvest' for each district").

Third, NMFS's reliance on the adaptive management principles and contingency actions of the proposed action was reasonable. Contrary to Plaintiffs' argument, the proposed action need not rely on the 2009 Adaptive Management Implementation Plan to support a legally valid BiOp. ECF 2530 at 33–34; FCRPS Adaptive Management Implementation Plan, ACE000126373 ("2009 AMIP"). As noted in the 2020 BiOp, and as Oregon itself acknowledges, the abundance

and trend triggers in this plan had become outdated and were no longer useful. 2020 BiOp at ACE001056310. Under the 2009 AMIP, the primary rapid response actions contemplated increased spill and/or modified transportation operations to attempt to exceed the dam passage performance standards. ACE000126404–06 (detailing hydrosystem actions such as "targeted spill and changes in fish transportation operations based on recent survival data" as rapid response actions to significant decline trigger); ACE000126384–85 (discussing significant decline triggers and rapid response actions), ACE000126398–400 (detailing contingency triggers). These actions were subsequently incorporated into the proposed action, which included spill far in excess of that envisioned by the 2009 AMIP (including off-season surface spill) as well as refined transportation operations. *See* Biological Assessment, ACE001059630–36 (detailing off-season surface spill for downstream passage of adult steelhead and bull trout); ACE001059565–66 (detailing juvenile fish transportation operations). Moreover, several other rapid response actions in the AMIP, such as reducing harvest and certain predator control actions, were outside the Action Agencies' authority to implement. 2020 BiOp, ACE001056310.

Oregon also critiques the Action Agencies for "opt[ing] not to adopt any contingency plan whatsoever," ECF 2530 at 34, but it ignores the contingency actions that would continue to be implemented under the proposed action (e.g., higher spills due to the flexible spill operation, juvenile transportation, and hatchery reform). 2020 BiOp, ACE001056310. Further, "[a]ctions such as spill, bypass, and transport operations . . . will be adaptively managed annually based on results of biological studies and monitoring information" in collaboration with regional partners "to ensure expected benefits to [salmonids] are being met." *Id.* Despite Oregon's hasty dismissal of the adaptive management framework, ongoing coordination through the regional forum workgroups allows for in-season changes and longer-term adaptive management, and constitutes an appropriate contingency plan to identify, manage, and respond to unanticipated declines.

Additionally, there is no legal obligation for an agency to include a contingency plan; rather, the ESA imposes an obligation on agencies to ensure its jeopardy analysis is based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This is precisely what NMFS did here, and no further legal procedures require it to add more plans to the action, contingency or otherwise. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (courts should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good"). Because the proposed action was sufficiently defined, and projected benefits reasonably certain to accrue, NMFS's no-jeopardy determination was reasonable and easily withstands APA review.

## VI.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT A PRELIMINARY INJUNCTION.

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co.*, 480 U.S. at 542. These factors—balance of harms and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). While courts have modified the inquiry in ESA cases, the traditional four factors—including balance of harms and public interest—apply in this case. The crux of Plaintiffs' motion seeks preliminary relief for NMFS's alleged violation of the ESA when issuing the 2020 BiOp. This claim arises under the APA. *Bennett*, 520 U.S. at 179. The APA, in turn, does not restrict the Court's equitable discretion in any way, let alone support a modified injunction test. *See Starbucks*, 602 U.S. at 346. Plaintiffs also opened the door to considering public interest and equities beyond ESA compliance, rendering the balancing inquiry appropriate. ECF 2526 at 61–62 ("The broader public interest is also served by an injunction."). However this inquiry is framed, the Court must consider and balance ESA interests, including the effect of the injunction on the ESA's operation

and all ESA-listed species, not just aspects or species Plaintiffs prefer. *San Luis Obispo Coastkeeper*, 2025 WL 3467536, at *3; *Krueger*, 35 F. Supp. 3d at 1270 (declining to "merely assume that the Plaintiffs are acting in the species' best interest, especially when confronted with the type of comprehensive contradictory evidence that the Defendants have presented here").

Against these standards, the balance of harms weighs decidedly against granting Plaintiffs' Injunction. Under ESA Section 7(a)(2), new actions adversely affecting listed species should not occur before ESA consultation and expert review by the Services. 16 U.S.C. § 1536(a)(2), (b). The fact the Injunction circumvents the ESA and would have adverse consequences for the ESA-listed bull trout, as well as avian species protected by the Migratory Bird Act is a sufficiently weighty reason to deny it. That conclusion is buttressed by the additional factor that the forced expenditures and forgone revenues attributable to the Injunction will directly impact Defendants' (and Bonneville's) ability to comply with their plentiful statutory obligations as well as their ability to manage CRS operations into the future. The Court should carefully consider and weigh the equities inherent in a decision on grant or denial of the Injunction, including effects to ESA-listed bull trout, federally protected birds, human health and safety, and financial implications, all of which are detailed below.

A. *The Court must consider the interests of ESA-listed bull trout.*

The Court should deny Plaintiffs' Injunction for the simple reason that it would force the CRS out of compliance with the FWS's 2020 BiOp on bull trout. Numerous populations of ESA-threatened bull trout, including smaller sized populations, are present near at least six of the dams at issue. Kuttel ¶¶ 7–14. The best available science suggests that Plaintiffs' Injunction will likely *worsen* conditions for bull trout in ways that require further ESA consultation. *Id.* ¶¶ 39-45; *id.* ¶ 54 ("The proposed [injunction] measures that will increase the duration and frequency of high spill operations are expected to increase harm to bull trout through elevated risks of entrainment or fallback, passage barriers and reduce the diversity and quality of forage and

foraging habitats."). And yet, Plaintiffs entirely disregard the species. It would be error for this Court to do the same. *San Luis Obispo Coastkeeper*, 2025 WL 3467536, at *8 ("The court must balance the equities and consider the public interest as to the other listed species.").

Plaintiffs' request to increase spill operations, and to continue them for extended and unbroken periods, will limit or eliminate the periods without high spill when bull trout pass upstream and that may also reduce in-river concentrations of TDG. Kuttel ¶¶ 35, 39–40, 44. Longer periods of high spill will increase the frequency and duration of upstream passage impediments, such as hydraulic eddies or vortices, and also likely mean more entrainment (involuntary downstream passage) of bull trout. *Id*. Such effects are likely to increase mortality and various sublethal adverse effects to bull trout in ways not considered in FWS's 2020 BiOp, such as higher risks of delayed migration, missed spawning, and lost reproduction. *Id.* ¶¶ 22, 39.

Increased high spill will also increase the incidence of gas bubble trauma, which poses direct and indirect threats to bull trout. *Id.* ¶¶ 33–35, 37–39, 41; Plumb ¶¶ 16–23 (explaining that higher spill at dams has increased TDG and the prevalence of gas bubble trauma in non-salmonid resident fish within the lower Snake and lower Columbia rivers); Feil ¶¶ 40–41; Turner ¶¶ 4–5. While bull trout may be able to "depth compensate" for elevated TDG, they will still experience indirect impacts, including behavioral effects like avoidance and disorientation. *See* Kuttel ¶¶ 33, 34, 37, 38. Moreover, the effects of long-term exposure of TDG on bull trout are uncertain. *Id.* ¶ 42. More significantly, gas bubble trauma due to elevated TDG would reduce prey availability and diversity in native resident fish populations, impairing bull trout fitness and the function of foraging habitats. *Id.* ¶ 42. Concerns are particularly heightened for proposed spring, late fall and late winter spill. *Id.* ¶¶ 40, 44.

Additionally, the Injunction may increase fallback for bull trout. Kuttel ¶ 41. PIT tag data from the spring spill season in 2019 through 2025 shows that individual bull trout experienced fallback, forcing them to reascend adult ladders multiple times. *Id.* ¶ 24. Because fallback rates

appear higher during periods of higher spill, *id.* ¶ 30, fallback will only increase with the high consistent spill Plaintiffs seek. *Id.* ¶ 41. Impacts are anticipated during spring spill, but also during proposed operations in late fall and late winter, when bull trout are utilizing the river for overwintering, forage, and recovery from spawning. *Id.* ¶ 44. Specifically, fallback and injury from entrainment are expected to rise under the proposed fall and winter operations. *Id.* ¶ 45. Overall, these issues will result in additional levels of predation, behavioral changes, injury, and even mortality that FWS experts had not previously considered. *Id.* ¶ 41.

Plaintiffs also ask this Court to require the Action Agencies to perform a litany of non-operational measures, including installing a second weir at the Tucannon River and dredging at the mouth of the Tucannon River and Lower Monumental reservoir. ECF 2530-2 at 13–14. These Injunction requirements face two daunting problems: (1) Plaintiffs present a timeline that is impossible to meet, and (2) they completely omit any consideration of ESA-listed bull trout in their management actions. The Injunction would require design documents by December 31, 2026, even though no site has yet been selected. ECF 2530-2 at 14. This deadline is arbitrary and infeasible; significant planning must occur before any timelines might reasonably be projected, and only after analyzing potential effects to bull trout. Kuttel ¶ 48. And despite potential impacts to bull trout and its critical habitat, *see id.* ¶¶ 48–49, Plaintiff-aligned experts concede they did not consider bull trout in any respect in proposing such measures, *see* Hurst 112:15–18, 97:25–98:22 (confirming she was not aware of bull trout's presence in the Tucannon River, or the presence of other sensitive species such as lamprey).

Indeed, the best scientific data available shows that dredging in the Tucannon River and Lower Monumental reservoir will harm bull trout. Kuttel ¶ 49. Plaintiffs would require the proposed project to occur within the in-water work window of November through February—when data shows that bull trout are more likely to be in the work area. *Id.* ¶ 50. Exposure to

sediment from dredging is likely to modify fish behavior, reduce availability and impact behavior of prey, and even cause injury and mortality. *Id.* ¶¶ 49–50.

Plaintiffs ignore other issues with this proposal that indicate the project should not proceed in the short term, or at all. Although Plaintiff-aligned experts suggest that the proposed dredging will create a cool water refuge and reduce predation, Hurst ¶¶ 25–26, this assertion is not based on any modeling or studies, but rather a "concept." Hurst 86:15–20, 90:25–92:6. And even this "concept" is rooted in inaccuracy, as water temperature data between the Tucannon River and the proposed dredging area do not show a marked difference. Kuttel ¶ 53. Plaintiff-aligned experts further understand the Injunction to provide for a "scoping and development period followed by in-water work," Hurst 93:9–15, with dredging completed during the 2026/2027 work window, ECF 2530-2 at 13–14. But it has taken years to collect the necessary data for other projects. Kuttel ¶ 49. This is not a project the Court should compel.

These well-considered concerns about the effects of the Injunction on bull trout, as well as the impacts on salmon and steelhead described above, outweigh Plaintiffs' speculation that the Injunction will, as a whole, benefit salmon and steelhead. *See* Bowles 106:19-23 ("I speculated . . . that a little bit of this uptick [in abundance] could be, hopefully, a component of the additional spill levels that we provided which reduced powerhouse encounters. But that's speculation."); *see* Hesse 158:16–159:9 (discussing data underlying his opinion on high spill and potential concerns for its use, but noting "it's what we have"). But available evidence shows that consistent higher spill can instead harm listed species. *See, e.g.*, Turner ¶ 13 (gas cap operations result in more exceedances of water quality standards); Marshall ¶ 50 (low tailwater elevations combined with high spring spill will cause tailrace eddies that can injure or delay); Feil ¶¶ 19–20, 24 (high spill negatively affects smolt to adult returns); *id.* ¶¶ 33–34 (high spill produces tailrace eddies that delay passage); *id.* ¶ 39 (high spill causes passage delays); *see also* Renholds

¶¶ 17–23, n.10–11 (same, with videos of tailrace eddies). Again, Plaintiffs disregard a critical consideration of their Injunction, an omission that compels denial.

B. *The Court must consider the interests of federally protected birds.*

Plaintiffs also neglect to consider how their Injunction would impact regulatory compliance obligations regarding take of several federally protected avian species. While not listed under the ESA, many of these species are subject to other federal protections. *See* McDowell ¶¶ 17, 19, 25. In balancing interests, this Court should consider the impacts of Plaintiffs' immediate and aggressive avian-control measures against the speculative benefits such measures may deliver for salmon and steelhead.

Plaintiffs' Injunction would require measures to take or kill migratory birds that are protected under the Migratory Bird Treaty Act. Plaintiffs ask this Court to order Defendants "to ensure that there are no nesting Caspian terns . . . on the Blalock Islands" (within a federal wildlife refuge controlled by FWS) and to relocate a double-crested cormorant colony on Astoria-Megler Bridge (under Oregon's jurisdiction) through any means, including lethal removal. ECF 2530-2 at 11. Plaintiffs' proposed actions are prohibited by the Migratory Bird Treaty Act without a permit, 16 U.S.C. § 703(a), McDowell ¶¶ 9, 32, and removal would increase the risk to already-declining populations. *See id.* ¶ 17 (double-crested cormorant population decline); *id.* ¶ 25 (Caspian tern's 71% population decline between 2009 and 2024); *id.* ¶¶ 26–27, 29 (noting displaced terns have not successfully relocated and numbers continue to decline). Plaintiffs' zero-nesting goal also will cause mortalities and nest failures for the declining Caspian tern and other avian species that will, at the very least, require further analysis. *Id.* ¶ 40. Plaintiffs' proposed actions would also adversely impact nesting gull colonies around Blalock Islands, which are also protected under the Migratory Bird Treaty Act. *Id.* ¶¶ 31, 37, 42 (discussing permit requirements). Obtaining the necessary requirements to engage in such measures under the Injunction's proposed timeframe is infeasible and is subject to FWS's

regulatory authority under the Migratory Bird Treaty Act and/or National Wildlife refuge authorities. Moreover, these measures would require Defendants to divert extensive resources away from critical management work they are already doing. *Id.* ¶¶ 37, 41–43. These resources are not for Plaintiffs to deploy as they wish. *See, e.g.*, Hesse 197:9–98:4; Bowles 190:9–91:5, 223:21–23.

The Injunction would also require inter-agency coordination in Oregon to address avian bird populations at the Astoria-Megler Bridge. When asked if the Corps "has any authority or jurisdiction" to relocate cormorants, Bowles simply stated he believes "that if the Corps took leadership on this, it could help get it done." Bowles 224:17–22. This element of the Injunction is impermissible because the Oregon Department of Transportation—not a Defendant—operates and manages the bridge. McDowell ¶ 10; Bowles 223:18–224:22. Oregon does not recognize the responsibility it would have over the management actions it requests, nor does it address whether it has sought relevant permitting, making its request for judicial intervention premature. Weighing the aforementioned harms of these actions against the likelihood that they will simply shift predation to other areas of the CRS, the Court should deny the Injunction.

C. *The Court must consider the interests of human health and safety.*

Plaintiffs' Injunction would also threaten the reliability of the power and transmission system for the Pacific Northwest. *See* Stevenson ¶¶ 13, 18, 35; Dibble ¶¶ 23, 28, 31, & Table 1. Plaintiffs' proposal to decrease power transfers across the system risks system instability during weather events and equipment failures, which could lead to blackouts. Stevenson ¶¶ 22–34. Such blackouts seriously threaten public health and safety by destabilizing electricity that supports the use of air conditioning, heating, and life-saving and sustaining equipment such as ventilators. *Cf. Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993–94 (9th Cir. 2012) (per curiam) (denying vacatur because risk of blackouts is a severe and disruptive consequence); *and see Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, No. 01-cv-238, 2001 WL 881268, at *4 (E.D.

Cal. Feb. 8, 2001) ("The parties do not dispute that such blackouts pose a dire threat to public health and safety."). This contingency has, unfortunately, played out several times over the years. Stevenson ¶¶ 10, 12.

CRS projects also provide critical support in maintaining the reliability of the transmission system and serving local loads. *Id.* ¶¶ 17, 32; *see also* McManus ¶¶ 18, 19. But constant high spill and reduced reservoir elevations decrease the amount of power that CRS dams can supply, including during summer months when power demand is high. Dibble ¶ 32; *see also* Stevenson ¶ 25. Plaintiffs' proposed mechanism for handling emergencies does not correspond to projected risks, Dibble ¶ 18, nor would the Injunction give Bonneville the ability to carry geographically diverse reserves to mitigate the risk of system disturbances or the impact of potential emergencies. *See id.* ¶¶ 45–46; *see also* McManus ¶¶ 8–10, 14; Stevenson ¶ 18. As a result, the Injunction will more frequently overburden the transmission system, especially during extreme weather events. Stevenson ¶¶ 35–36; McManus ¶¶ 20–21; Dibble ¶¶ 20, 30. The Injunction would also restrict reservoir storage, which will increase the risk of flooding in Portland, Oregon, and Vancouver, Washington, Marshall ¶¶ 37–40, and could impact municipal water supplies and availability of drinking water. *Id.* ¶ 41. The Court should consider and weigh the speculative benefits of the Injunction against these unnecessary risks and costs to human health and safety.

D.  *The Court should consider financial implications.*

Plaintiffs further request the Court order Defendants to secure funding from Bonneville to fund a kelt reconditioning program, which is inappropriate because Bonneville is not a party and this court does not have jurisdiction over Bonneville. Plaintiffs' request for "Federal Defendants" to "work with the Nez Perce Tribe to develop and finalize" a hatchery plan, ECF 2530-2 at 13, is premised on their incorrect allegation that Bonneville has "reduc[ed] the capacity to optimize collection of kelts." Bowles ¶ 137 (misstating the amount of annual funding that Bonneville has

committed to provide for these efforts); *see also* Hesse ¶ 71 (citing a *draft* statement of work to declare that Bonneville's funding was "limited" despite known benefits); Bowles 188:1–91:5 (describing the need for federal "resources" in kelt recovery program). But Plaintiffs' emphasis on funding is misplaced because high spill levels—not funding amount—are the primary factor limiting kelt collection and rehabilitation. *See* Sweet ¶ 16. Moreover, the average annual budget that Bonneville is set to provide the Nez Perce Tribe for the kelt program has increased to account for added costs associated with operating a new reconditioning facility starting in 2026. *Id.* ¶¶ 11–12, 14. In addition, the kelt program has access to further funding through its inclusion in a new Bonneville project that consolidates all Bonneville-funded activities at Nez Perce Tribe-operated hatchery facilities and provides the Tribe with considerable flexibility to allocate funding within that project. *Id.* ¶¶ 12–15. This demand by the Nez Perce Tribe, a non-party, against Bonneville, another non-party, has no place in this case.

Further, and lest it be ignored, the Injunction would raise wholesale power rates and place the cost burden on Bonneville's utility customers, impacting millions of regional retail consumers. *See* Dibble ¶ 67 (describing $141 million in reduced revenues or increased power acquisition costs each year if the Injunction is in place). For all these reasons, the public interest weighs in Defendants' favor against any Injunction.

## CONCLUSION

For the reasons described more fully above, this Court must deny Plaintiffs' motions for a preliminary injunction.

DATED: December 15, 2025

ADAM R. GUSTAFSON
Principal Deputy Acting Assistant Attorney General
MICHAEL R. EITEL
Acting Assistant Section Chief

*/s/ John H. Martin*
JOHN H. MARTIN, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street, N. Terrace Ste. 600
Denver, Colorado 80202
Tel: 303-319-5359; Fax: 303-844-1350
Email: John.H.Martin@usdoj.gov

ROMNEY PHILPOTT, Senior Trial Attorney
Natural Resources Section
999 18th Street, N. Terrace Ste. 600
Denver, Colorado 80202
Tel: 303-844-1810; Fax: 303-844-1350
Email: Romney.philpott@usdoj.gov

AMANDA K. RUDAT, Trial Attorney
Natural Resources Section
P.O. Box 7611, Washington, D.C. 20044-7611
Tel: 202-532-3201; Fax: 202-305-0275
Email: Amanda.rudat@usdoj.gov

ELIZABETH A. KIRBY, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611, Washington, D.C. 20044-7611
Tel: 202-353-5588; Fax: 202-305-0275
Email: elizabeth.kirby@usdoj.gov

KIERAN O'NEIL, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611, Washington, D.C. 20044-7611
Tel: 202-598-0409; Fax: 202-305-0275
Email: Kieran.o'neil@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I certify that on December 15, 2025, I filed the foregoing through the Court's CM-ECF system, which will automatically notify counsel of record.


_/s/ John H. Martin_
JOHN H. MARTIN
U.S. Department of Justice


Attorney for Federal Defendants