THE HONORABLE MICHAEL H. SIMON

AMANDA W. GOODIN (WSB #41312)
agoodin@earthjustice.org
MICHAEL MAYER (WSB #32135)
mmayer@earthjustice.org
CHARISA GOWEN-TAKAHASHI (WSB #63091)
cgowentakahashi@earthjustice.org
Earthjustice
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340 | Phone

DANIEL J. ROHLF (OSB #99006)
rohlf@lclark.edu
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Boulevard, MSC 51
Portland, OR  97219
(503) 768-6707 | Phone
(503) 768-6642 | Fax

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION et al., <br>            Plaintiffs, <br><br>    and <br><br> STATE OF OREGON et al., <br>            Intervenor-Plaintiffs, <br><br>    v. <br><br> NATIONAL MARINE FISHERIES <br> SERVICE et al., <br>            Defendants, <br><br>    and <br><br> PUBLIC POWER COUNCIL et al., <br>            Intervenor-Defendants. | Civ. No. 3:01-cv-00640-SI <br><br><br><br> NWF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

TABLE OF CONTENTS

GLOSSARY OF ACRONYMS.................................................................................... iv

TABLE OF AUTHORITIES ....................................................................................v

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................2

I.     THE PROPOSED PRELIMINARY INJUNCTION WILL REDUCE
IMMINENT, IRREPARABLE HARM..................................................................2

     A.    The Proposed Order Relies on Well-Established Measures To
Reduce Harm. ............................................................................3

     B.    Most Measures in the Proposed Order Have Been Implemented
Before.........................................................................................5

     C.    Federal Defendants Cannot Justify the Dramatic Curtailment of
Operations to Protect the Listed Species in the Proposed 2026
FOP. ..........................................................................................7

     D.    The Targeted Repairs and Emergency Conservation Measures
NWF Seeks Are Necessary and Narrowly Tailored. .................................11

     E.    The Dire Status of ESA-Listed Salmon and Steelhead Supports the
Need for Immediate Injunctive Relief. .......................................12

     F.    Plaintiffs Have Demonstrated Likely Irreparable Harm to
Themselves. ..............................................................................16

II.    NWF IS LIKELY TO SUCCEED ON THE MERITS.........................................16

     A.    The Court Has Ample Authority To Find that the Corps and
Bureau of Reclamation Have Violated the ESA.........................................17

     B.    NMFS's Jeopardy Analysis Relies on an Unlawful Comparative
Framework. ..............................................................................19

     C.    NMFS's Jeopardy Conclusion Arbitrarily Disregards the Dire
Consequences of Implementing the Proposed Action in A
Changing Climate. ....................................................................22

     D.    The 2020 BiOp Fails to Rationally Address Risks to Recovery...............27

     E.    The 2020 BiOp Relies on Uncertain Benefits from Unidentified
Actions. ....................................................................................30

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

-ii-

F.     The 2020 BiOp's Reasoning is Impossible to Trace. ................................33

III.     THE BALANCE OF HARM AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.....................................................................................34

A.     Reducing Harm to Tribes and the Environment Supports Injunctive Relief.......................................................................................35

B.     NWF's Requested Injunction Will Not Harm Bull Trout, Other Fish, or Birds.................................................................................36

C.     The Requested Injunction Will Not Compromise Power System Reliability..................................................................................38

D.     Flood Risk Management, Water Supply, and Navigation. ........................40

CONCLUSION.......................................................................................................42

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-iii-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

GLOSSARY OF ACRONYMS

| | |
|---|---|
| 2020 BiOp | Biological Opinion for the Continued Operation and Maintenance of the Federal Columbia River Power System, July 24, 2020 |
| 2020 RODs | Columbia River System Operations Environmental Impact Statement Records of Decision, September, 2020 |
| BA | Biological Assessment |
| CSS | Comparative Survival Study |
| CRS | Columbia River System |
| ESA | Endangered Species Act |
| FOP | Fish Operations Plan |
| ICTRT | Interior Columbia Technical Recovery Team |
| LOLP | Loss of Load Probability |
| MOP | Minimum Operating Pool |
| MPG | Major Population Group |
| NLAA | Not Likely to Adversely Affect |
| NMFS | National Marine Fisheries Service |
| NWF | National Wildlife Federation *et al.* (Plaintiffs) |
| QET | Quasi-Extinction Threshold |
| RPA | Reasonable and Prudent Alternatives |
| SARs | Smolt-to-Adult Returns |
| sp/su | Spring/Summer |
| TDG | Total Dissolved Gas |

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-iv-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,
   926 F.3d 1061 (9th Cir. 2019) ................................................................34

*Amoco Prod. Co. v. Gambell*,
   480 U.S. 531 (1987)................................................................................36

*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) ..................................................................22

*Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv.*,
   849 F. Supp. 2d 1017 (D. Or. 2011) ......................................................14

*Calcutt v. Fed. Deposit Ins. Corp.*,
   598 U.S. 623 (2023)................................................................................18

*Center for Biological Diversity v. Environmental Protection Agency*,
   141 F.4th 153 (D.C. Cir. 2025)..............................................................21

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971)........................................................................17, 18

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)...............................................................................17

*M.R. v. Dreyfus*,
   697 F.3d 706 (9th Cir. 2012) ..............................................................4, 16

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) .................................................................3

*Nw. Coal. for Alts. to Pesticides v. EPA*,
   544 F.3d 1043 (9th Cir. 2008) ...............................................................30

*NWF v. NMFS*,
   422 F.3d 782 (9th Cir. 2005) ...........................................................7, 17

*NWF v. NMFS*,
   No. 01-cv-0640, 2005 WL 1398223 (D. Or. June 10, 2005)..................19

*NWF v. NMFS (NMFS II)*,
   No. 01-cv-0640, 2005 WL 1278878 (D. Or. May 26, 2005)............19, 20

*NWF v. NMFS (NMFS III)*,
   524 F.3d 917 (9th Cir. 2008) ...................................................... *passim*

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

*NWF v. NMFS* (*NMFS V*),
    184 F. Supp. 3d 861 (D. Or. 2016) ............................................................ *passim*

*NWF v. NMFS* (*NMFS VI*),
    No. 01-cv-0640, 2017 WL 1829588 (D. Or. Apr. 3, 2017) ....................................18

*NWF v. NMFS* (*NMFS VII*),
    886 F.3d 803, 815 (9th Cir. 2018) ............................................................ *passim*

*Oceana, Inc. v. Pritzker*,
    75 F. Supp. 3d 469 (D.D.C. 2014) ...........................................................25

*Patterson v. Comm'r of Soc. Sec. Admin.*,
    846 F.3d 656 (4th Cir. 2017) ...............................................................34

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) .............................................................19

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
    161 F.4th 590 (9th Cir. 2025) .........................................................36, 38

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978).......................................................................40

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025).......................................................................17

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) .........................................................23, 25

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ............................................................16

*Willamette Riverkeeper v. NMFS*,
    763 F. Supp. 3d 1203 (D. Or. 2025) .......................................................27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................18

**Statutes**

16 U.S.C. § 839b....................................................................................39

16 U.S.C. § 1536....................................................................................18

**Regulations**

50 C.F.R. § 402.02..................................................................................33

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

50 C.F.R. § 402.14 ......................................................................................................21

50 C.F.R. § 402.16 ......................................................................................................33

**Federal Register**

84 Fed. Reg. 44976 (Aug. 27, 2019) .........................................................................21, 24

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-vii-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

## INTRODUCTION

Salmon and steelhead in the Columbia River Basin—and especially the populations that return to the Snake River—have been in decline for decades. Many populations now hover near or even below extinction thresholds. According to the National Marine Fisheries Service ("NMFS") itself, impacts from the past and ongoing operation of the hydrosystem are the largest threat to the survival of the most imperiled of these species in their freshwater lifestage. Plaintiffs National Wildlife Federation *et al.* ("NWF") have asked the Court to reduce this ongoing irreparable harm by ordering modest and narrowly tailored changes to the operation of eight of the federal dams that make up the hydrosystem.

In response, Federal Defendants offer a jumble of legal and factual arguments that strip all context from NWF's injunctive request and exaggerate its effects. Federal Defendants cherry pick data without reference to scientifically credible benchmarks to argue that salmon and steelhead populations are improving. They contend that prior precedent in this matter is now largely irrelevant based on newer cases that simply reaffirm long-settled law. And they present a parade of horribles that they predict will ensue from Plaintiffs' requested relief without acknowledging that they have implemented nearly all of these operational measures in recent years without incident.

Even more disturbing, Federal Defendants disclose for the first time their proposed 2026 hydrosystem operations, operations that would reduce spill—the safest dam passage route for juvenile salmonids—to levels far lower than 2025 or 2024, and below even the levels in the 2020 Records of Decision ("RODs"). Federal Defendants' proposed 2026 operations would also maintain increased, harmful reservoir elevations that delay juvenile migration. NWF asks the Court to act now to prevent the serious and imminent harm that would result from implementation of this plan.

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-1-

ARGUMENT

I.    THE PROPOSED PRELIMINARY INJUNCTION WILL REDUCE IMMINENT,
      IRREPARABLE HARM.

NWF has grounded its Proposed Preliminary Injunction Order in measures that have been
the cornerstone of operations to reduce harm to salmon for decades. Most centrally, the
injunction request includes increased spill, as that provides the safest route past the dams for out-
migrating juveniles, and decreased reservoir elevations to reduce the substantial migration delays
the impounded system causes. Virtually all the specific operational measures requested by NWF
have been implemented in recent years—many in 2024 and 2025—without the myriad
complications Federal Defendants have suddenly discovered. Targeted non-operational measures
in the injunction request, including critical repairs and emergency conservation actions to benefit
specific imperiled populations, will additionally reduce irreparable harm.

In response to the motions for preliminary injunction, Federal Defendants disclosed for
the first time the operations they propose to implement in 2026. ECF 2570-2. The proposed 2026
Fish Operations Plan ("FOP") includes dramatic reductions in spill even relative to the
challenged 2020 Biological Opinion ("BiOp") and RODs—let alone relative to the operations
implemented in 2025 or those requested in the Proposed Order. *Compare* ECF 2570-2 at 17–20
(2026 FOP), *with* 2020 BiOp at 56–58 [ACE1056275–77] *and* ECF 2530-2 at 3–6 (Proposed
Order) *and* ECF 2450-1 at 84–92 (RCBA, Appx. B).

This dramatic curtailment of spill in the 2026 FOP threatens to turn the clock all the way
back to 2019 and earlier. Federal Defendants offer scant justification for how this reduction in
spill *below* the floor set by the challenged 2020 BiOp and RODs is even permissible under those
(flawed) decisions. And Federal Defendants' ill-founded rationale for dramatically curtailing the
safest passage route for juveniles ignores decades of settled science, including their own findings
in the 2020 BiOp. In short, this Court should waste no time finding that the Proposed Order is
necessary to reduce irreparable harm to salmon and steelhead caused by dam operations and
reject the dramatic rollback in actions to protect these species in the proposed 2026 FOP.

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-2-

A.     The Proposed Order Relies on Well-Established Measures To Reduce Harm.

Decades of settled science support the general principles behind Plaintiffs' Proposed Order: increased spill (and the corresponding reduction in powerhouse encounters) and shortened fish travel time reduce the irreparable harm that dam operations cause to salmon and steelhead. *See, e.g.*, ECF 2531 ¶¶ 57–74 (Bowles Decl.); BiOp 54–55 [ACE1056273–74] (spill at 125% gas cap intended to increase spillway passage, reduce forebay residence time, and reduce powerhouse encounter rates); *id.* at 201 [ACE1056420] (increased spill expected to increase juvenile survival and population productivity); ECF 2529-3 at 261 (2025 CSS) (powerhouse encounters and travel time both strongly influence smolt-to-adult returns and of the two, travel time may be even more important).

The fact that the benefits of spill and reduced reservoir elevations are well-established hardly makes NWF's evidence outdated, as Federal Defendants contend. ECF 2569 at 29 ("Fed. Br."). Nor is there any real tension between NWF's agreement with Federal Defendants that spill has increased since 2014 and NWF's candid acknowledgement that even with the additional spill and other measures requested in the Proposed Order, the system remains one that cries out for a major overhaul. Federal Defendants characterize the requested relief as tantamount to commandeering the hydrosystem (e.g., at 1, 32), but the operational changes Plaintiffs seek are similar to those granted by this Court in the past and are justified here, especially in light of Federal Defendants' repeated failure to comply with the ESA. *See Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (an "enjoined party's 'history of noncompliance with prior orders can justify greater court involvement'") (internal citation omitted).

Federal Defendants' insistence (at 40–41) that more recent evidence calls into question the benefits of spill fundamentally mistakes correlation for causation. Higher spill in recent years is only one of many factors affecting juvenile survival; simply noting that increased spill was *correlated* with lower juvenile survival in recent years says nothing about whether those changes were *caused* by higher spill or by a combination of other key variables (such as the lower-than-average flows that occurred in 2024 and 2025). *E.g.*, ECF 2570 ¶ 20 (Feil Decl.); ECF 2581 ¶ 7

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(Smith Decl.). Analyzing the relationship between spill in a particular year and adult abundance also takes time as adults do not return until two to five years after their juvenile out-migration. We do not yet have enough data to conclusively show how spill from 2020 to 2025 specifically impacted adult returns relative to other key factors such as ocean conditions. ECF 2531 ¶ 32 (Bowles Decl.); a*ccord* ECF 2569-1 at 85:22–86:8 (Bowles Tr.). Nonetheless, decades of data do show that increased spill in fact causes higher juvenile survival and ultimately higher smolt-to-adult returns, and nothing in the more recent data so far calls that into question. *See* ECF 2531 ¶¶ 57–74 (Bowles Decl.), *accord* ECF 2529-3 at 248–62 (2025 CSS).

Federal Defendants again confuse correlation with causation in claiming that increased spill has caused recent delays in adult upstream migration. Fed. Br. 43. Decades of data show that the level of spill is not a significant indicator of adult migration success. *See* Fish Passage Center, Upstream Passage Delay (Jan. 16, 2026) (attached to Bowles Reply Decl. filed concurrently by Plaintiff-Intervenor State of Oregon). Instead, the most significant variables include water temperature (hot water and temperature differentials slow adult migration), and whether out-migrating juveniles were transported, with fish that were transported as juveniles showing substantially reduced adult migration survival. *See* ECF 2529-3 at 170–247 (2025 CSS); ECF 2529-4 at 190–237 (2024 CSS).

As for reservoir elevations, Federal Defendants (at 45) dismiss the reductions in travel time that would result from lowering reservoir elevations to minimum operating pool ("MOP") as insignificant, but reducing the harm caused by delayed migration is critical even if it does not eliminate the delay entirely. *See M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012) (plaintiff "need not . . . show that the action sought to be enjoined is the exclusive cause of the injury"). And both the BiOp and Federal Defendants' responsive declarations support the uncontroversial proposition that lowering reservoir elevations to minimum operating pool ("MOP") would lead to faster travel time, and that faster travel time benefits juvenile salmon. *Accord* 2020 BiOp at 202 [ACE1056421] (noting that in general increased reservoir operating ranges increases travel

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

time and reduces smolt to adult returns); ECF 2573 ¶ 36 (Turner Decl.) (MOP at mid-Columbia dams would decrease travel time by more than a day under low-flow conditions; largest impact from John Day).

Similarly, while increased spill (and corresponding reduced powerhouse encounters) and reduced travel time are by far the most significant factors driving the reduced harm from the Proposed Order, a decrease in water temperature—even a very small one—would nonetheless benefit salmon and steelhead. *See, e.g.*, ECF 2529-3 at 242 (2025 CSS) (showing significant predicted decline in adult sockeye migration survival per degree of water temperature increase). Federal Defendants attempt to disclaim responsibility (at 34) for the Columbia River System's (CRS) contribution to too-warm water temperatures, but they have already acknowledged that the thermal inertia caused by CRS operations warms the reservoirs in summer and fall—the time when temperature becomes most problematic. *See, e.g.*, 2020 BiOp at 183, 195 [ACE1056402, ACE1056414]; ECF 2531 ¶ 70 (Bowles Decl.) (thermal violations in July, August, September); *see also* FEIS at 3-286 [ACE1061042] (continuous spill to 125% gas cap under Multiple Objective Alternative 4 ("MO4") would not change temperature in Lower Snake River); *but see* Fed. Br. 33–34 (asserting high spill "may" lead to warmer water temperatures).

B.    Most Measures in the Proposed Order Have Been Implemented Before.

Federal Defendants portray the Proposed Order as novel and risky, but many of the specific measures requested in the Proposed Order were implemented in 2024 and 2025 under the stay of litigation—and Federal Defendants represented to this Court that they would be able to implement these operations *until 2033*. *See* ECF 2450-1 at 84 (MOU); ECF 2450 at 5. This history belies Federal Defendants' new assertions that these same measures are now infeasible. For example, operations implemented in 2024 and 2025 under the stay included the *same* amount of spill in the spring—the season when the greatest number of juvenile salmonids out-migrate and when spill levels are highest—at seven of the eight dams addressed in the Proposed Order. *Compare* ECF 2530-2 at 3–6 (Proposed Order), *with* ECF 2450-1 at 84–92. At the one remaining

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

dam (John Day), the stay included spill to 125% gas cap at night (around 8 hours per day), and the Proposed Order increases that duration to 24 hours per day—in other words, additional spill for around 16 hours a day at one of the eight dams at issue here is the *only* difference between spring spill levels in the Proposed Order and the levels actually implemented in 2024 and 2025. *Id.* Critical repairs NWF seeks would allow additional increases—as currently some dams are unable to spill to the 125% spill cap—but those increases would not occur until 2027 (or later, if the Corps continues to delay repairs). ECF 2530-2 at 9–10 (complete repairs in 2027).

In summer, when the levels of spill are lower than they are in spring, the primary difference between the Proposed Order and recent operations is that the Proposed Order extends summer spill through the end of August—an operation that was in place for many years under prior operation plans and orders of this Court. ECF 2530-2 at 3–6 (Proposed Order). For fall and winter, when spill is at its lowest levels, the Proposed Order requires only modestly increased spill duration relative to the stay. *Compare id. with* ECF 2450-1 at 84–92, *and* ECF 2298-1 at 18, Tbl.1.2; *see also* ECF 2541 ¶ 59 (Hesse Decl.).

For reservoir elevations, the Proposed Order requires the four Lower Snake River dams to operate within a one-foot operating range while the stay required a one-foot soft constraint and a 1.5-foot hard constraint. *Compare* ECF 2530-2 at 7–9 (Proposed Order), *with* ECF 2450-1 at 89. The Corps' own data, however, show they were often able to maintain operations within the one-foot range at the Lower Snake River dams. *See* Fish Passage Center, Summary of reservoir elevation operation levels 2023–2025 (Jan. 16, 2026) at 2–17 (attached to Bowles Reply Decl. filed concurrently by Oregon). And while the Corps typically operated the four mid-Columbia dams well above MOP, the Corps' data also show that for at least three of these dams, the Corps almost always managed them within a 1.5-foot range, as Plaintiffs request here. *Id.* at 19, 23, 27, 31 (Bonneville within 1.6' range 75% of the time; Dalles within a 1.4' range 90% of the time, John Day within a 1.2' range 95% of the time, McNary within 1.4' range 90% of the time).

Despite the long list of potential problems that they fear could arise from the Proposed

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-6-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Order, Federal Defendants largely fail to point to any evidence that these problems have in fact arisen in recent years when measures very close to those requested here were actually in place. Even more telling, the annual Fish Operation Plans governing spill and reservoir elevations have long required Federal Defendants to report monthly on the ways in which they have modified spill and reservoir elevation provisions to accommodate issues ranging from adult passage delays to gas bubble trauma to minimum tailwater elevations. *E.g.* Goodin Decl. Ex. 11 at 28–29 (2025 FOP); *id.* Ex. 12 at 27–28 (2024 FOP). These publicly available monthly implementation reports for 2024 and 2025 demonstrate that Federal Defendants were able to occasionally and temporarily modify operations to address navigational safety, transmission reliability, and adult fish passage delays. Goodin Decl. Exs. 13–22 (2024 and 2025 reports). Modifications to address minimum tailwater elevations and total dissolved gas exceedances were necessary only once each (both in July 2025)—indeed, such modifications arose far less frequently than the 27 instances of modifications for human and program error. *Id.*; *see also* ECF 2571 ¶ 24, Tbl.2 (Marshall Decl.) (minimum tailwater may not be met only at some dams and only at low flows). As has been true under this Court's past orders, these routine adjustments would remain available under the Proposed Order. *E.g.*, ECF 2258 at 7, ¶ 3 (In-Season Adjustments); *NWF v. NMFS* (*NMFS VII*), 886 F.3d 803, 815 (9th Cir. 2018) (recognizing off-ramps); ECF 2530-2 at 6–7 (retaining planned and unplanned adjustments to injunction spill). The vast majority of Federal Defendants' objections to the feasibility of the Proposed Order (*e.g.*, at 44) appear to rest on the mistaken belief that the Proposed Order would eliminate these longstanding tools.

In short, the overwhelming evidence, including the evidence that has supported this Court's past orders increasing spill and reducing reservoir elevations, supports the Proposed Order Plaintiffs seek here. Federal Defendants' insistence that these operations are harmful or infeasible cannot be squared with their recent uneventful implementation.

    C.    <u>Federal Defendants Cannot Justify the Dramatic Curtailment of Operations to Protect the Listed Species in the Proposed 2026 FOP.</u>

In stark contrast to the protections in the Proposed Order, Federal Defendants' proposed

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

2026 FOP reduces spill far below even the floor in Corps' inadequate 2020 ROD. These spill reductions would have devastating impacts for salmonids. *See* Fish Passage Center, Review of a draft Fish Operations Plan document (Jan. 16, 2026) (attached to Bowles Reply Decl. filed concurrently by Oregon) (comparing 2026 FOP to Corps' 2020 ROD).

Specifically, in spring—the season when the highest number of juvenile salmonids are out-migrating—the 2026 FOP substantially *reduces* the level of fish passage spill (to only 120% gas cap rather than 125%) for a 16-hour block relative to the Corps' 2020 ROD, while retaining the same lower spill levels to increase power generation for the remaining 8-hour block. In summer, another critical season for out-migrating juvenile salmonids, the 2026 FOP terminates higher summer spill levels earlier—on July 31, as opposed to August 14 under the Corps' 2020 ROD (and August 31 under Plaintiffs' Proposed Order). In fall and winter, a season when some species of juvenile and adult salmon and steelhead are still moving in the system, the 2026 FOP includes limited spill similar to the Corps' 2020 ROD but lower than the Proposed Order. The 2026 FOP also includes higher reservoir operating ranges for the four Lower Snake River dams and does not prescribe any minimum operating pool levels at the four mid-Columbia dams, as opposed to the lower elevations to speed fish travel time under the Proposed Order. *Compare* ECF 2570-2 at 15 (2026 FOP) (LSR MOP) *with* ECF 2530-2 at 7–8 (Proposed Order).

Federal Defendants claim that they may reduce spill below the floor established by the Corps' 2020 ROD under the guise of adaptive management, but in no way does this proposed unilateral rollback of salmon protections comport with the adaptive management sideboards and process in the 2020 BiOp, including the principle that adaptive management modifications must be as good or better for salmon. BiOp at 90–91 [ACE1056309–10]; FEIS R-4-1 & n.3 [ACE1066383] (improved fish benefit measured through indices of improved smolt-to-adult returns such as powerhouse encounters, reservoir reach survival, fish travel time). Even more troubling, in the 2020 CRSO FEIS, the action agencies have already considered—and rejected— an alternative similar to the 2026 FOP. Multiple Objective Alternative 1 ("MO1") would have

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

alternated spring spill levels in a block pattern, with spill to a 120% gas cap some of the time and lower-level base spill at other times. *See* FEIS 2-43 [ACE1056176]. Notably, this alternative was predicted to lead to smolt-to-adult returns below 1% (indicating population decline) 46% of the time, and to smolt-to-adult returns above 2% (indicating population growth) only 29% of the time. 2019 CSS at 47, Tbl.2.12 [NMFS374390]; *id.* at 53, Fig.2.18 [NMFS374396]; *see also* ECF 2531 ¶¶ 51–53 (Bowles Decl.) (discussing CSS 2019 evaluation of FEIS alternatives).

Federal Defendants' assertion that the dramatic curtailment of spill and increased reservoir elevations in the 2026 FOP would somehow benefit salmon cannot withstand scrutiny. As Federal Defendants concede (at 40), the 2026 FOP would likely decrease juvenile in-river survival and increase travel time and powerhouse encounters—in other words, the 2026 FOP would be worse than the Proposed Order for migrating juvenile salmon across nearly every metric that has long been used to evaluate harm. ECF 2575 ¶ 14, Tbls.1, 2 (Faulkner Decl.). Undeterred, Federal Defendants base their claim (at 39–40) that the 2026 FOP would nonetheless be better for salmon on lifecycle modeling conducted specifically for this litigation finding purported benefits from transporting significantly higher percentages of juvenile salmon past the dams in trucks or barges, as well as purported benefits from reduced adult passage delays. ECF 2575 ¶ 14, Tbls.1, 2 and ¶ 31 (Faulkner Decl.). The fact that the 2026 FOP more than doubles the percentage of juveniles that will be transported relative to the Proposed Order is especially alarming in light of the well-established negative impact of juvenile transportation on adult migration survival. And as discussed above, there is no evidence that recent operations have caused problematic adult delays; instead, high water temperatures and temperature differentials, as well as the significant negative effect of juvenile transportation, are the main factors affecting adult migration success. *See supra* Sec. I.A.

Federal Defendants' heavy reliance on the alleged benefit of transporting salmon via barges or trucks also fails to grapple with the physical limits of this ill-founded plan. First, transportation only occurs at three of the eight dams subject to the Proposed Order. *See* ECF

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

2570-2 at 16 (2026 FOP). Accordingly, even if reducing spill to increase transportation were beneficial at those three dams (it is not), spill reductions at the remaining five would not be.

Moreover, Federal Defendants base their claims of transportation benefit on lifecycle modeling examining only eight (out of 28) populations of Snake River sp/su Chinook. *See* ECF 2575 ¶ 17 (Faulkner Decl.). This does not fully capture the risks posed to other stocks. For example, Federal Defendants ignore the evidence that Snake River sockeye, which are the closest to extinction of any species at issue here, fare far worse when transported than other species. *See* ECF 2529-3 at 170, 229, 238, 240, 245 (2025 CSS) (transported sockeye 35% less likely to survive adult migration than in-river migrants); *accord* 2020 BiOp at 466 [ACE1056685] (increases in water temperatures cause decreases in survival and other harms to migrating adult Snake River sockeye; "[t]his is especially true for fish transported as juveniles."); *id.* at 467 [ACE1056686] (noting transported SR sockeye have lower survival rates and explaining that transport rate will "decrease substantially" with higher spill). And Upper Columbia Chinook, including listed stocks that are in dangerous decline do not migrate past any of the three dams on the Lower Snake River where fish are transported and will unequivocally be harmed by the 2026 FOP's spill reductions at the four mid-Columbia dams. ECF 2526 at 6–8 ("NWF Br.") (stocks in serious decline).

Finally, there is no compelling evidence that increased transportation would benefit any species relative to in-river migration under the improved conditions the Proposed Order would create (reduced powerhouse encounters and reduced travel time). *See* ECF 2529-3 at 115 (2025 CSS) ("The relative effectiveness of transportation has been observed to decline as in-river conditions and juvenile survival improves."); 2019 CSS at 47 [NMFS374390] (showing decreased Transport to In-river ratios as spill increases); *accord* 2020 BiOp at 147–48 [ACE1056366–67] ("The alternative to transportation is to improve inriver migration conditions to the point where transportation provides little benefit."). While Federal Defendants claim new modeling conducted for this litigation shows a major benefit from transportation even relative to

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the significantly improved in-river conditions under the Proposed Order, Federal Defendants have failed to adequately explain their conclusions—neither Federal Defendants' briefs, nor their declarations, nor their supporting materials describe what changes in data or assumptions drove these new and different results.[1] *Accord* ECF 2608 at 1, 4 (Opp. to Mtn. to Compel) (reasons or lack thereof for experts' positions go to weight). Nor have Federal Defendants adequately explained why they now apparently afford no weight to the Comparative Survival Study findings and methods they have relied upon for years. *See* FEIS at 3-388 [ACE1061144] (describing both COMPASS and CSS as "best available model systems").

In sum, the 2026 FOP represents an unjustifiable rollback in salmon protections below even the floor established by the Corps' illegal 2020 ROD and BiOp, and in the absence of relief from this Court, its implementation will increase irreparable harm to salmon.

> D.    <u>The Targeted Repairs and Emergency Conservation Measures NWF Seeks Are Necessary and Narrowly Tailored.</u>

This Court should exercise its equitable authority to direct Federal Defendants to implement the limited number of critical repairs and emergency conservation measures in the Proposed Order. These measures will enable full implementation of other urgently needed injunction measures, and they will address specific threats to populations that face unique risks.

First, studying and planning for actions to reduce reservoir elevations at John Day Dam and repairs to the dams themselves are both plainly within the Corps authority—and Federal Defendants do not argue to the contrary. Instead, Federal Defendants argue (at 46–47) that such relief is inappropriate in a preliminary injunction because it cannot be implemented immediately. But the Corps cannot finish what it does not start. Reducing reservoir elevations at John Day Dam is one of the most significant operational measures the Corps can take to benefit salmon, NWF Br. at 50, and the repair and maintenance issues identified by Plaintiffs are limiting the

---

[1] Federal Defendants may have relied on an inapposite comparison in their modeling by comparing transported juveniles to in-river migrants that passed some dams via powerhouse passage routes instead of in-river migrants that passed exclusively via spill, which may have biased the results of their modeling. *See* Bowles Reply Decl. ¶ 74 (filed concurrently by Oregon).

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Corps' ability to actually provide spill up to the 125% gas cap, *see, e.g.*, ECF 2531 ¶ 111 (Bowles Decl.). Given the dire condition of listed salmonids and the critical benefit provided by increased spill and reduced travel time, this Court should exercise its authority to direct the Corps to prioritize and complete the specific repairs identified in the Proposed Order, and complete a study and plan for reduced reservoir elevations at John Day so they can be implemented as soon as possible. And Federal Defendants' opposition (at 46) to ending transportation at Lower Monumental dam fails for the same reasons their heavy reliance on transportation in the 2026 FOP is misplaced. *See also* 2020 BiOp at 147 [ACE1056366] (transport less beneficial at Lower Monumental).

Additionally, Plaintiffs have requested a limited number of targeted emergency conservation measures to address the extremely precarious status of a few key populations. Specifically, the Tucannon sp/su Chinook are currently below the Quasi-Extinction Threshold (QET) (even with the small and un-sustained increase in 2022 returns that restarted the QET four-year count for some other populations) and are the only remaining extant population in that Major Population Group. Likewise, Snake River sockeye face an extreme risk of extinction and have been reliant on conservation hatchery support for many years. This Court has authority to order emergency measures to benefit these highly imperiled populations. *See* NWF Br. at 51–52.

    E.    <u>The Dire Status of ESA-Listed Salmon and Steelhead Supports the Need for Immediate Injunctive Relief.</u>

Federal Defendants ignore both undisputed facts and settled law in arguing that the status of salmon and steelhead has "improved" such that harm caused by CRS operations is no longer imminent. Instead, salmon and steelhead continue to face a substantial (and in some cases worsening) risk of extinction. *E.g.*, ECF 2529-6 at 21 (Snake River Sockeye Status Review); NWF Br. at 5–8. Many populations of Snake River sp/su Chinook and Snake River Steelhead are currently below their QET levels, with more predicted to follow soon, and nearly all are below critical abundance thresholds. *See* NWF Br. at 5–6. As even NMFS has acknowledged, if CRS operations continue as planned, and climate change continues to advance as predicted, many

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

populations of Snake River sp/su Chinook will soon be lost. 2020 BiOp at 275–76 [ACE1056494–95]; *see also* ECF 2529-7 at 22 (Rebuilding Report) ("in the near-term, progress away from a quantifiably large risk of extinction for these stocks is paramount").

Federal Defendants' assertions (at 30) that salmon abundance is increasing relies on cherry-picked data, divorced from credible benchmarks. *See* ECF 2584 ¶¶ 12–23 (Swieca Decl.). While Snake River sp/su Chinook and Snake River Steelhead experienced a minor recent uptick in abundance for one or two years, many populations are now once again *currently below* their QET and others are rapidly approaching it; this is hardly a case where only a "single population" is at risk. Fed. Br. 31. Moreover, as NMFS has acknowledged, these same stocks were at nearly all-time lows in 2017 to 2019. 2020 BiOp at 111 [ACE1056330] ("The past three years (2017 through 2019) have shown the lowest returns since 1999."). Slightly higher than the bottom of the barrel is not the standard for delisting or recovery. *See* ECF 2541 ¶¶ 37–47 (Hesse Decl.) (abundance of Snake River stocks relative to delisting abundance and other objective thresholds); *see also infra* Sec. II.D (discussing this Court's rejection of one more fish recovery standard).

Federal Defendants tellingly offer no response at all to the alarming fact that multiple populations of Snake River sp/su Chinook salmon and Snake River steelhead are *currently* below QET thresholds. *See* ECF 2531 ¶¶ 25, 32 (Bowles Decl.). Instead, Federal Defendants attempt to discredit modeling predicting *future* QET status by noting (at 32–33) that state and tribal fisheries experts predicted in 2021 that many populations would be below QET by now, but some of those predictions did not bear out. It is indeed the case that fewer populations are currently below QET than predicted in the 2021 analysis—as Plaintiffs explained, a modest uptick for one or two recent years caused a number of populations to bump above the QET threshold of 50 fish, which restarts the four-year QET count. *See* ECF 2531 ¶ 32 (Bowles Decl.). While this modest uptick is welcomed, it does not appear to be sustained: since then, unfortunately, many populations have again fallen below the 50-fish threshold. *See* ECF 2541 ¶¶ 30–33 (Hesse Decl.). And a species can be in a "precarious" state warranting injunctive relief

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-13-

when some populations are at high risk, even if not below QET and even if some other populations face less risk. *NMFS VII*, 886 F.3d at 820; *Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv.*, 849 F. Supp. 2d 1017, 1046–47 (D. Or. 2011) ("[a] court need not wait until the species is immediately threatened with extirpation to issue injunctive relief") (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1207 (E.D. Cal. 2008); *see also* 2020 BiOp at 283 [ACE1056502] (noting 2016 status that all but one population of Snake River sp/su Chinook "remained at high overall risk"); ECF 2541 ¶ 47, Tbl.1 (Hesse Decl.).

Moreover, the difference between the 2021 predictions and the current QET count does not discredit the use of QET modeling. It simply reflects the fact that QET modeling represents forward-looking projections based on average rates of population change over the last decade. ECF 2541 ¶ 31 (Hesse Decl.). Because salmon returns fluctuate annually, actual future returns in any given year may be above or below the projections. By way of analogy, climate change models show average warming trends but cannot predict whether a specific future year will be warmer or colder than average. Failing to predict the weather in 2030 does not discredit climate modeling that shows increased warming trends, and failing to predict actual salmon returns in 2030 does not undermine the significance of QET modeling showing increasing extinction risk. Federal Defendants complain this means QET modeling is unreliable (at 32–33). But QET modeling is not meant to predict specific returns in a future year; instead, it shows persistent risk of population declines to the point that recovery becomes highly uncertain. *See* ECF 2531 ¶¶ 21–33 (Bowles Decl.); ECF 2541 ¶¶ 28–36 (Hesse Decl.). *See also* 2020 BiOp at 223 [ACE1056442] (QET is an "estimate of the probability" of populations falling below critical levels); ECF 2575 ¶¶ 24–25 (Faulkner Decl.). This risk remains unacceptably high for Snake River sp/su Chinook and steelhead. ECF 2531 ¶ 26 (Bowles Decl.) (NMFS viability standard usually requires 5% or lower probability of reaching QET over 24, 50, or 100 years).

The gravity of the extinction crisis facing Snake River sp/su Chinook and steelhead is in

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-14-

no way lessened by the fact that falling below QET does not guarantee extinction for that population. Luckily, some populations can and have increased even after falling below the QET, but falling below this threshold exposes these populations to substantially increased extinction risk from a population downturn or even a single year of bad conditions. Federal Defendants complain (at 29) that the risk posed by a single bad year cannot justify injunctive relief, but this Court has held, and the Ninth Circuit has affirmed, that the continued perilously low abundance of these species supports injunctive relief because it makes them vulnerable to "extinction from shock events," that become more likely as climate change advances. *NMFS VII*, 886 F.3d at 821; *accord* 2020 BiOp at 223 [ACE1056442] ("Small populations are also more at risk from demographic stochasticity, genetic processes, and environmental variability."); ECF 2541 ¶ 34 (Hesse Decl.). Just as populations recently experienced a temporary uptick, they may soon face a downturn—and even a modest or short-lived downturn could be enough to fully extirpate such low populations.

Federal Defendants again ignore this Court's prior holdings in arguing (at 36–37) that Plaintiffs have failed to show extinction-level risk to support a preliminary injunction before the Court resolves this case on the merits. To the contrary, NWF has shown that the ongoing irreparable harm caused by hydrosystem operations makes the task of preserving the species all the more difficult. Showing extinction-level risk within the coming year is not required. *NMFS VII*, 886 F.3d at 818 ("The district court did not err when it found irreparable harm without finding an extinction-level threat to the listed species in the remaining two years of the remand period."). And Federal Defendants' argument (at 37) that Plaintiffs failed to show harm in their opening brief from the specific operations proposed in 2026 is absurd; Federal Defendants refused to disclose (despite repeated requests) what operations were planned for 2026 until filing their opposition brief. As discussed *infra*, these proposed 2026 operations would increase irreparable harm.

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

F.    Plaintiffs Have Demonstrated Likely Irreparable Harm to Themselves.

Finally, Federal Defendants argue (at 35–36) that Plaintiffs cannot seek to remedy the irreparable harm to salmonids caused by ongoing CRS operations because (1) many factors harm salmon, and (2) some of Plaintiffs' members harvest salmon. As NMFS has found, fisheries are heavily regulated and rank sixth or seventh (out of seven) on the list of threats to the most imperiled Snake River species (Snake River sp/su Chinook, Steelhead, Sockeye). ECF 2529-7 at 12, Tbl.3 (Rebuilding Report). Hydrosystem impacts, in contrast, rank first. *Id.* Plaintiffs "need not . . . show that the action sought to be enjoined is the exclusive cause of the injury," *Dreyfus*, 697 F.3d at 728, and neither harvest nor other threats negate the substantial harm caused by CRS operations or the need for injunctive relief here.

Nor have courts ever required Plaintiffs to demonstrate a "personal relationship with individual salmonids" (Fed. Br. 35) to be entitled to relief, and this is hardly a case where only a single fish is harmed. Plaintiffs' standing declarations plainly document specific recreational and aesthetic connections to Snake River salmon and steelhead and detail past and future activities in the Columbia River Basin. ECF 2527 (Bogaard Decl.); ECF 2528 (Hamilton Decl.). Federal Defendants acknowledge this material only once, in passing, Fed. Br. 27 n.16, but then expend considerable energy reciting black letter law and attempting to distinguish the multiple decisions in this matter where the linkage between the plaintiffs' injury and injunctive relief was sufficient for the courts to grant the requests. Federal Defendants' attempt to draw granular distinctions between harm to Plaintiffs and harm to species is "slic[ing] the salami too thin." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013).

II.    NWF IS LIKELY TO SUCCEED ON THE MERITS.

Federal Defendants open by offering reasons this Court may not even reach the merits, none of which warrant a lengthy response. As to likelihood of success on the merits, NWF explained in its opening brief that there are at least five fundamental flaws in the 2020 BiOp. First, the analysis and no-jeopardy findings define the action and its effects by comparison to past and ongoing operations in order to conclude that the Proposed Action will have only

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

minor—and possibly even beneficial—effects, despite this Court's previous rejection of a similar comparative approach. Second, Federal Defendants irrationally and illegally dismiss their own conclusion that the effects of the Proposed Action in a warming world will likely drive many populations of salmon to extinction. Third, Federal Defendants failed to rationally address the likelihood of recovery for listed salmon and steelhead, despite this Court's prior holdings that such analysis is required. Fourth, Federal Defendants irrationally rely on benefits from uncertain measures—such as habitat actions—with decidedly uncertain outcomes. Finally, the reasoning of the Federal Defendants' no jeopardy conclusion is impossible to trace, failing even a basic test of rationality. Each of these flaws is fatal to Federal Defendants' analysis.

A.     The Court Has Ample Authority To Find that the Corps and Bureau of Reclamation Have Violated the ESA.

Federal Defendants' threshold arguments run the gamut from empty truisms ("equity follows the law") to indecisive statements (the injunction "may or may not" allow the exercise of independent judgment). Fed. Br. 17–19. All are easily rejected.

First, Federal Defendants (at 15) characterize the recent decision in *Trump v. CASA, Inc*., 606 U.S. 831 (2025), as having "clarifi[ed]" that equitable relief is grounded in the Judiciary Act of 1789. There is no clarification needed; the Supreme Court has recognized this principle for close to a century. *See, e.g*., *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 318 (1999) (citing *Atlas Life Ins. Co. v. W.I. Southern, Inc*., 306 U.S. 563 (1939)). As such, the repeated imposition of operational measures and other injunctive relief in this matter over the last two decades has occurred in the wake of that longstanding principle. *NWF v. NMFS*, 422 F.3d 782 (9th Cir. 2005) (per curiam); *NMFS VII*, 886 F.3d 803; *cf*. Fed. Br. 15 (dismissing previous "iterations" of this case), 22 (claiming to distinguish cases cited by NWF as "predat[ing] the Supreme Court's clarification in *Trump v. Casa*").

Second, while it is well established that a court is not "empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), even a presumption of regularity does not "shield [an] action from a thorough, probing,

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-17-

in-depth review." *Id*. at 415; Fed. Br. 16–17 & n.10. Federal Defendants also draw upon authority applying the ordinary remand rule, entirely inapplicable here as it is simply a limit on courts' interference with agency decisionmaking on remand. *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 628–29 (2023) (describing the rule); *cf.* Fed. Br. 16 (citing *Fed. Power Comm. v. Idaho Power Co.*, 344 U.S. 17 (1952)).

Third, Federal Defendants (at 20–21) resort to misreading the statute to argue that the requested injunction would violate the ESA because the injunction will not have undergone consultation. Federal Defendants know better: a court is not an agency, and a court-ordered injunction is not subject to Section 7. 16 U.S.C. § 1536(a)(2) (obligating agencies to consult). Taken at face value, Federal Defendants' misinterpretation would mean no matter the inadequacies of an existing biological opinion, a court would be powerless to provide relief for struggling species, something this Court has repeatedly found necessary. *See, e.g.*, *NWF v. NMFS* (*NMFS VI*), No. 01-cv-0640, 2017 WL 1829588, at *16 (D. Or. Apr. 3, 2017). Similarly, preliminary injunctive relief is premised on "likelihood" of eventual success on the merits, *see, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and is plainly available prior to a final decision on the merits. Fed. Br. 24–25.

Finally, Federal Defendants (at 24) insist that the 2020 RODs, along with statements in the EIS and Biological Assessment ("BA"), constitute an "independent analysis" of the agencies' compliance with the ESA. But the purported independent review by the Corps and Bureau does not reveal any daylight between their assessments and NMFS's BiOp, and tellingly, the Federal Defendants point to none. *Cf.* Corps ROD at 2 [ACE339665] ("[T]he Corps has determined and the NMFS and U.S. Fish and Wildlife Service (USFWS) CRS Biological Opinions demonstrate" compliance with the ESA); *id*. at 3 [ACE339666] ("The NMFS and USFWS CRS Biological Opinions demonstrate . . . that Reclamation's implementation of the Selected Alternative will not jeopardize listed species[.]"). The portion of the RODs devoted to ESA compliance is largely a recapitulation of the legal and factual material from the 2020 BiOp. RODs at 19–22

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-18-

[ACE339682–85]. Federal Defendants cite no authority—because there is none—allowing an agency to ignore a biological opinion in favor of such self-consultation that contains no new or different information. *See NWF v. NMFS*, No. 01-cv-0640, 2005 WL 1398223, at * 3 (D. Or. June 10, 2005) ("The RODs reveal that these agencies embraced the same fundamental legal flaws that NOAA attempted to use . . . ."), *accord Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) (noting that an agency's decision to rely on a biological opinion "must not have been arbitrary and capricious").

B.    NMFS's Jeopardy Analysis Relies on an Unlawful Comparative Framework.

Federal Defendants (at 48–49) open their argument on the merits by claiming to have repudiated earlier "novel" CRS-specific BiOps, assuring the Court that they have "returned to the ESA's statutory text and the agency's longstanding regulations[.]" It is clear from the 2020 BiOp itself, however, that what NMFS has returned to instead is its previous effort to isolate the effects of the action and compare them to existing conditions. Although Federal Defendants concede that they must make a comprehensive jeopardy determination, the 2020 BiOp instead defines the harms attributed to the Proposed Action by comparison to recent conditions. This comparative framework is unlawful, as was its prior iteration. *See NWF v. NMFS* (*NMFS II*), No. 01-cv-0640, 2005 WL 1278878, at *13 (D. Or. May 26, 2005) (faulting NMFS for not assessing "the proposed action in its entirety").

NMFS relies on comparative assessments throughout its "Integration and Synthesis"— the crucial portion of the BiOp—for example, by finding for Snake River sp/su Chinook that flexible spring spill would be expected to "improve" juvenile survival through the migration corridor as compared to current conditions. 2020 BiOp at 290 [ACE1056509]; *see also id.* (Proposed Action would have "small negative effects" but would not "measurably alter survival estimates"); *id.* at 285 [ACE1056504] (modeling predicts in-river survival rates will "increase slightly" due to flexible spill as compared to prior operations). But for each element of this analysis, NMFS unlawfully focused on the effects of aspects of the Proposed Action *as*

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*compared to* past and ongoing actions. *See NMFS II*, 2005 WL 1278878, at *13.

Federal Defendants (at 57) purport to recognize the need for a comprehensive approach to jeopardy that aggregates the effects of the action along with the existing baseline, species status, and cumulative effects, citing 50 C.F.R. § 402.14(g)(4). But this comprehensive approach is tellingly absent where it matters most: the integration and synthesis of NMFS's findings to reach a no-jeopardy conclusion. So too in their brief, where Federal Defendants (at 57–58) rely on the same flawed comparative elements. Federal Defendants reference (at 68–69) other portion of the BiOp where NMFS acknowledged the the harm caused by ongoing CRS operations, but this acknowledgement means nothing if it vanishes at the point where NMFS draws its ultimate conclusion.

Alternatively, Federal Defendants (at 70–71) offer that the 2020 BiOp's Life-Cycle Model serves as a holistic assessment. The 2020 BiOp conducted Life-Cycle Modeling for a limited number of ESUs, including 20 of 28 populations of Snake River sp/su Chinook. 2020 BiOp at 97–98 [ACE1056316–17]. Yet the results of the Life-Cycle Model referenced in the Integration and Synthesis section of the BiOp found a "substantial threat" to the continued survival and recovery of Snake River sp/su Chinook from the Proposed Action in a warming world (*i.e.*, the real world), 2020 BiOp at 285 [ACE1056504]; 289 [ACE1056508], a determination that NMFS labors to avoid in its jeopardy conclusion. *See infra* Sec. II.C. NMFS claims this modeling shows that the Proposed Action will cause Snake River sp/su Chinook to "decline less," taking yet another comparative approach to minimize the otherwise catastrophic projections. 2020 BiOp at 289 [ACE1056508]. But NMFS cannot demonstrate compliance with the ESA with modeling that predicts the widespread extirpation of Snake River sp/su Chinook populations were the Proposed Action to go forward.

Federal Defendants next assert (at 54–55) that adding a 35% bonus to the productivity predicted by NMFS's Life-Cycle Model demonstrates that the Proposed Action could reduce the declines in Snake River sp/su Chinook abundance that otherwise will result from implementing

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-20-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

the Proposed Action. But even the predictions incorporating this 35% bonus show that the Proposed Action in a warming world will cause "extinction risk to increase[.]" 2020 BiOp at 289 [ACE1056508]. And critically, the ESA requires agencies to "[e]nsure" they avoid the likelihood of jeopardy—not hypothesize that they possibly might. *See* 2020 BiOp at 290–91 [ACE1056509–10] ("potential" improvements from a decrease in latent mortality are "possible").

Federal Defendants (at 50, 66) nevertheless maintain that the baseline should serve as metric "against which" the effects of the action can be measured. Determining the net change from the status quo is relevant to a "not likely to adversely affect" (NLAA) determination, 50 C.F.R. § 402.14(b)(1), as the D.C. Circuit confronted in *Center for Biological Diversity v. Environmental Protection Agency*, 141 F.4th 153 (D.C. Cir. 2025). Fed. Br. 64–66. But the precise delineation between baseline and effects is immaterial for a jeopardy analysis that must account for the aggregate effects of the action, as the case law and regulations require. Here, instead, NMFS used a comparison with the baseline to avoid considering the real-world effects of continuing to operate and maintain the dams. The end result approximates NMFS's discredited 2004 "reference operation" in its effect, if not its precise details.

Federal Defendants insist that there is no "existing status of being 'in jeopardy' . . . such that any additional adverse impacts must be found to meet the regulatory standards" for a jeopardy finding. 84 Fed. Reg. 44976, 44987 (Aug. 27, 2019); Fed. Br. 63 (same); 2020 BiOp at 46 [ACE1056265] (same). NWF agrees that jeopardy arises from a federal agency taking action. NWF Br. at 28. At the same time, NMFS must evaluate this federal action in the context of the real-world conditions facing a species that is on the precipice of terminal decline. 84 Fed. Reg. at 44987 (acknowledging that for "very imperiled" species, the amount of harm that can occur without triggering a "jeopardize" or "destruction or adverse modification" determination "may be small"); *see also NWF v. NMFS* (*NMFS III*), 524 F.3d 917, 930 (9th Cir. 2008) (finding that "[t]he current existence of the FCRPS dams constitutes an 'existing human activity' which is

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-21-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

already endangering the fishes' survival and recovery") (citation omitted). Here, this requires NMFS to consider the effects of operating and maintaining the dams in the context of the very real risk of extinction faced by listed salmon and steelhead in light of their precarious status and surrounding conditions, including climate change. While the 2020 BiOp includes the declining status of listed salmon and steelhead, NMFS failed to actually account for this together with the ongoing dangers from continued operation of the CRS. *Cf.* 2020 BiOp at 107 [ACE1056326] (noting that NMFS's 2016 status review revealed that, with one exception, "[a]ll extant populations" of Snake River sp/su Chinook "faced a high risk of extinction"); *id*. at 111 [ACE1056330] (finding a "substantial downward trend" in natural-origin spawner abundance from 2014–2019); *id*. at 283 [ACE1056502] (same).

As the Ninth Circuit warned, a jeopardy standard that is myopically concerned only with whether the incremental change from a Proposed Action will make current conditions worse risks allowing the "slow slide into oblivion" that is one of "the very ills the ESA seeks to prevent." *NMFS III*, 524 F.3d at 930; *see also Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 279 (4th Cir. 2022) ("if a species is already speeding toward the extinction cliff, an agency may not press on the gas"). That is the case whether NMFS employs a fictional "reference operation" as it did in 2004 or—as here—compares the Proposed Action to baseline conditions to isolate incremental effects. In both, NMFS employs an analytic slight-of-hand to avoid an aggregated evaluation of the action in the context in which it will occur, as the law requires. *NMFS III*, 524 F.3d at 933.

C.      NMFS's Jeopardy Conclusion Arbitrarily Disregards the Dire Consequences of Implementing the Proposed Action in A Changing Climate.

The 2020 BiOp is clear that the proposed operation of the hydrosystem in a warming world will have devastating consequences for salmon and steelhead, including the likely extirpation of many extant populations. *See, e.g.*, 2020 BiOp at 275 [ACE1056494]. Federal Defendants do not dispute these alarming outcomes; instead, they attempt to disclaim responsibility for them. But the ESA demands that federal agencies base their jeopardy

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

conclusion on the combined effects of their proposed action together with real-world conditions.

Federal Defendants' response stems from a fundamental misunderstanding of NWF's arguments regarding the treatment of climate change in the 2020 BiOp. Federal Defendants emphasize (at 78) that NMFS "extensively analyzed the impacts of climate change" in relation to the species' status and environmental baseline and via its use of a climate-based model with multiple climate projections. But this does not address the disconnect between the dire results predicted by NMFS's climate-based modeling and its no-jeopardy conclusion. It is one thing to model the dire impacts of advancing climate change on listed species; it is quite another to irrationally discount those effects in a jeopardy analysis. NWF's objections do not arise from a failure to conduct climate-based modeling, but rather from NMFS's arbitrary dismissal of the results of that modeling in reaching its no-jeopardy conclusion.

For instance, Federal Defendants emphasize NMFS's use of conservative climate projections to "improve clarity"—but conservative inputs into a model mean nothing if NMFS disregards the results. Fed. Br. 79 (quoting 2020 BiOp at 244 [ACE1056463]); *see Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 738 (9th Cir. 2017) (rejecting no-jeopardy conclusion for lack of rational connection between the best available science and its conclusion despite NMFS's "heav[y]" reliance on the "conservative nature of its calculations.").

NMFS unconvincingly attempts to justify its no-jeopardy conclusion by claiming that 1) the predicted dire results are almost entirely attributable to climate change and ocean conditions; 2) Snake River sp/su Chinook are resilient to climate change; and 3) elements of the Proposed Action will offset to some extent some of the effects of climate change. These points cannot save NMFS's no-jeopardy conclusion from its own predictions of significant declines in abundance and increases in extinction risk from the Proposed Action in a warming world.

First, Federal Defendants (at 80) compare the results of their modeling with and without climate change impacts and observe that without advancing climate change, Snake River sp/su Chinook would not face such a dire future. But these fish do not live in that imaginary world and

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

such a comparison irrationally disregards the real-world impacts of the Proposed Action. Climate change and the Proposed Action are not blocks that may be stacked (or ignored) however NMFS wishes; the two interact with each other in complex ways that can only be understood through modeling incorporating both. *See* Crozier *et al*. 2019, at 32 [ACE821958] ("Climate change presents an array of specific threats that can act synergistically with other threats, dramatically increasing the impacts"); 84 Fed. Reg. at 44989 (assessing "effects of the action" requires "the consideration of . . . consequences resulting from any synergistic, or compounding factors"). Repeatedly insisting that the dire results predicted by its own modeling are "not caused by" the Proposed Action, does not make it truer. Fed. Br. 80 (citing 2020 BiOp at 279 [ACE1056498]). By its plain terms, NMFS' modeling predicts the impacts of the *Proposed Action* on Snake River sp/su Chinook in a warming world. *See* NWF Br. at 31.

Federal Defendants (at 80–81) complain that if NMFS were required to "apply the jeopardy inquiry to climate change effects," the result would almost always be a jeopardy conclusion, even without including the effects of a proposed action. But NWF is not asking NMFS to conduct a jeopardy analysis *for* climate change; the ESA requires a jeopardy analysis of the Proposed Action *with* climate change. And while it is indeed deeply troubling that the climate crisis has reached a point where a progressively warming world poses significant risks to salmon and steelhead, that is not a rational reason to avoid engaging with the impacts of climate change in a jeopardy analysis. The ESA does not prevent "any federal action once background conditions place a species in jeopardy," but the Ninth Circuit also made clear that avoiding jeopardy in such a situation may be difficult and may even require extraordinary measures. *NMFS III*, 524 F.3d at 930. Difficult decisions are not a license to disregard the effects of an action in the context of the real world. *Id.* (NMFS must evaluate "'what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts.*'") (quoting *Pac. Coast Fed'n. of Fisherman's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093 (9th Cir. 2005)).

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Federal Defendants (at 81) also attempt to blame the ocean and isolate the effects of the Proposed Action by emphasizing NMFS's findings that ocean conditions are the "dominant driver" of reduced abundance and productivity. This finger-pointing is simply another chapter in avoiding a comprehensive jeopardy analysis. And as even Federal Defendants recognize, "[Snake River] sp/su Chinook were found especially vulnerable to climate change, *especially during adult and juvenile freshwater stages.*" Fed. Br. 78 (emphasis added); *see also* Crozier *et al*. 2019, at 23 [NMFS00291878] ("[e]xposure factors that indicated the highest vulnerabilities to climate change were encountered in *both* freshwater and marine environments.") (emphasis added); *id.* at 10  [NMFS00291865] ("Temperature and flow patterns affect all aspects of salmon behavior and physiology in freshwater, often with consequences for the marine life stage as well."). The ESA does not require the Proposed Action to be the "dominant driver" of decreased abundance or increased extinction risk for it to cause jeopardy; it does, however, require the effects of the action to be analyzed in the full context in which they will occur. *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 491 (D.D.C. 2014) ("if baseline conditions are already dire, then *even a small additional impact* . . . may require a jeopardy determination) (emphasis added).

Federal Defendants cite the dissent in *Turtle Island*, but the majority opinion there in fact supports NWF's position. Fed. Br. 81.[2] In *Turtle Island*, the Ninth Circuit assessed the adequacy of a BiOp that analyzed the impacts of a longline fishery on endangered loggerhead turtles. 878 F.3d at 737–39. NMFS ran a climate-based model excluding the effects of proposed longlining and found that 99.5% of the tests showed the loggerhead falling below the QET within 25 years. *Id.* at 737. NMFS compared that result with the results of modeling including the longlining and found that the "results were similar" between the two, with a 4–11% additional decline in population with the proposed longlining. *Id.* The court concluded that "NMFS's 2012 BiOp's no jeopardy finding as to the loggerhead sea turtles was arbitrary and capricious because the

---

[2] Federal Defendants (at 80) also cite *Turtle Island* for the noncontroversial proposition that "NMFS is 'entitled to rely on [a] climate-based population assessment model' in performing jeopardy analysis"—true, but NMFS must then grapple with the results. It failed to do so here.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

scientific data suggested that the loggerhead population would significantly decline, and the *agency failed to sufficiently explain the discrepancy* in its opinion and the record evidence." *Id.* at 741 (emphasis added). This case confirms NWF's point: an agency action need not be the "dominant driver" affecting the species for it to cause jeopardy.

Second, Federal Defendants point to NMFS's finding that Snake River sp/su Chinook are relatively resilient during their freshwater life stage. Fed. Br. 79 (citing 2020 BiOp at 277 [ACE1056496]). But Federal Defendants do not contest that NMFS concluded climate change "poses a substantial threat to SR spring/summer Chinook salmon." 2020 BiOp at 279 [ACE1056498]; *see also id.* at 289 [ACE1056508] (citing the Crozier study's finding that Snake River sp/su Chinook are rated as having a "very high" vulnerability to climate change); *id.* at 121 [ACE1056340] (noting that the flexible migration timing that contributes to the species' adaptive capacity may reduce genetic diversity and increase energetic costs). NMFS does not even attempt to explain how it weighed such claimed resilience against the dire predictions of its modeling combined with the species' very high vulnerability to climate change. Reciting one finding and ignoring another is not rational. Moreover, NMFS mentions, but does not grapple with the fact that Snake River sp/su Chinook were specifically found to be highly vulnerable to climate effects in their juvenile and adult *freshwater* stages. *See* Crozier at 25 [ACE821951]; 2020 BiOp at 120 [ACE1056339]. The finding also raises the question: resilient relative to what? Comparing resilience relative to another species that may fare even worse does not amount to a determination that the Proposed Action will not jeopardize the species in question. *See* 2020 BiOp at 277 [ACE1056496] (comparing heat stress mortality of Snake River sp/su Chinook with Snake River sockeye). Finally, this finding of "relative resilience" only applies to Snake River sp/su Chinook and NMFS does not and cannot employ it as a basis for its no-jeopardy conclusions for other species. *See, e.g.*, 2020 BiOp at 445–51 [ACE1056664–70] (Snake River sockeye); *id.* at 657–63, 743 [ACE1056876–882; ACE1056962] (upper Columbia spring/summer Chinook).

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Finally, Federal Defendants emphasize NMFS's unsupported conclusion that declines in Snake River sp/su Chinook abundance would actually be lower with the Proposed Action than they otherwise would be in a warming world. 2020 BiOp at 289 [ACE1056508]. But this is yet another example of an irrational comparative approach that cherry picks certain "elements of the proposed action" that they expect will improve climate resilience instead of a comprehensive review. Fed. Br. 79. Indeed, NMFS has no basis to even make such a comparison, as it did not conduct a comparison of a model with climate change and *no* Proposed Action to a model of climate change *with* the Proposed Action. Nor does NMFS provide an alternative narrative explanation that rationally accounts for its conclusion. This failure is all the more apparent for the species for which NMFS conducted only a qualitative analysis. *See, e.g.*, 2020 BiOp at 445–51 [ACE1056664–70] (Snake River sockeye); *id.* at 657–63, 743 [ACE1056876–882; ACE1056962] (upper Columbia spring/summer Chinook). NWF's point is not that a qualitative analysis is a *per se* violation of Section 7, but rather that the jeopardy analysis for Snake River sp/su Chinook—which employs a quantitative approach—fails to explain why the devastating effects predicted by its climate modeling would not result in jeopardy and that the qualitative analyses for the other species are even less comprehensive. *See Willamette Riverkeeper v. NMFS*, 763 F. Supp. 3d 1203, 1237–38 (D. Or. 2025) (holding that the failure of a BiOp to address the effects of climate change in conjunction with additional environmental stressors was insufficient analysis, thus arbitrary and capricious).

D.    The 2020 BiOp Fails to Rationally Address Risks to Recovery.

A valid BiOp must "analyze effects on recovery as well as effects on survival." *NMFS III*, 524 F.3d at 932. Although the two concepts are interrelated, the Ninth Circuit has emphasized that the Services "may not resolve this difficulty [of overlap] by ignoring recovery needs and focusing entirely on survival[.]" *Id.* at 932 n.11. And yet that is precisely what NMFS did here: NMFS cannot show any "clear consideration" of Snake River sp/su Chinook's prospects for recovery, and Federal Defendants' scattered references (at 72–77) to portions of the

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

2020 BiOp do not show otherwise. *Id.* at 926.

Federal Defendants (at 73–74) maintain that the COMPASS and Life-Cycle Model results provide the metrics for NMFS to assess impacts to recovery. That quantitative evidence, Federal Defendants urge, allowed for a qualitative determination in the Integration and Synthesis section that the Proposed Action would not appreciably reduce the likelihood of both survival and recovery. Fed. Br. 74 (citing 2020 BiOp at 284–90 [ACE1056503–09]). But, as with the BiOp's conclusions as to survival, the BiOp's Integration and Synthesis does not explain how modeling results showing the likely extirpation of many populations and dramatically reduced abundance of others could support a no-jeopardy finding for impacts to recovery.

NMFS relies on COMPASS modeling to claim that in-river survival rates will "increase slightly" with the Proposed Action. 2020 BiOp at 285 [ACE1056504]. In a similar vein, it claims that the Proposed Action "is likely to improve" a number of recovery factors. 2020 BiOp at 290 [ACE1056509]; *see also* Fed. Br. 74–75 (Proposed Action is "not expected to measurably reduce" the current "reproduction, numbers or distribution" of listed salmon and steelhead). As explained, *supra* Section II.B & C, such conclusions are based on a comparative assessment that fails to address the harmful effects of ongoing hydrosystem operations in their real-world context. Moreover, NMFS' reliance on a "slight increase" or an "improve[ment]"in survival rates or recovery factors—no matter how small—functionally resurrects the equally vague "trending towards recovery" standard previously rejected by this Court because it looks to population "*growth* regardless of actual population numbers." *NWF v. NMFS* (*NMFS V*), 184 F. Supp. 3d 861, 888 (D. Or. 2016) (emphasis in original).

What NMFS's Life-Cycle Model actually shows is "severe, negative consequences to the overall productivity (and abundance)" that would make "recovery of this ESU more challenging[.]" 2020 BiOp at 289 [ACE1056508]. Even taking into consideration non-operational conservation measures and optimistic survival rates, NMFS expects abundance to decrease and "extinction risk to increase." *Id*. In light of these alarming conclusions about future

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-28-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

population declines and extinction risk, NMFS does not explain how the results of the Life-Cycle Model could possibly support a finding that the likelihood of recovery will not be appreciably reduced.

Federal Defendants (at 72) lean into the claim that survival and recovery are part of a "joint analysis." *NMFS III*, 524 F.3d at 932. But that description elides the fact that they remain distinct inquiries, and a finding of "survival" is not a rational basis for concluding that the likelihood of recovery will not be appreciably reduced. *Id.* at 931 (holding that even "if there is no appreciable reduction of survival odds" recovery may be in question because "a species can often cling to survival even when recovery is far out of reach."); *see also NMFS V*, 184 F. Supp. 3d at 890–91 ("the regulatory definition of jeopardy . . . does not mean that an action agency can 'stay the course' just because doing so has been shown slightly less harmful to the listed species than previous operations") (quoting *ALCOA v. BPA*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999)). Under this precedent, at a minimum NMFS must explicitly consider the species' prospects of recovery, including a recovery goal line and the chances of reaching it. *Id.* at 895 ("Without identifying 'rough' recovery abundance levels and time frames, NOAA Fisheries cannot logically conclude that the . . . actions will not appreciably reduce the likelihood that recovery will be attained.") (citation omitted). Federal Defendants (at 76) raise the specter of unavoidably inflexible metrics were they required to articulate recovery goals. But this Court has already found the need for some "metric or goal that considers whether the incremental improvements to the currently low abundance levels are sufficient to avoid creating a 'new risk of harm' by decreasing the chances of recovery of the listed species." *Id.* at 892; *see also id.* at 891 (noting the absence of "what growth trends would be necessary in each population to ensure the likelihood of recovery").

Federal Defendants strenuously argue (at 77) that this Court's findings were limited to rejecting NMFS's "trending towards recovery" metric, but the Court's conclusion extends well beyond those specific facts. Without a defined end point, NMFS cannot "rationally determine"

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

that the Proposed Action "will not appreciably diminish the likelihood of reaching that unidentified end point." *NMFS V*, 184 F. Supp. 3d at 894. The fundamental problem is that NMFS does not articulate, even qualitatively, what the recovery factors are, how many of these factors must improve, or to what degree or by when to avoid an appreciable reduction in the likelihood of recovery. *See Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (noting that an agency's explanation must include sufficient information for a court to determine whether the "conclusions are rationally supported").

Snake River sp/su Chinook were first listed in 1992, and NMFS's 2016 Status Review affirmed that all populations, save one, remain at high risk of extinction. 2020 BiOp at 107 [ACE1056326]. The Services' Consultation Handbook recognizes that "the longer a species remains at low population levels, the greater the probability of extinction from chance events, inbreeding depression, or additional environmental disturbance." *NMFS V*, 184 F. Supp. 3d at 891 (cleaned up); ECF 2529-8 at 4-21 (Consultation Handbook); *see also supra* Sec. I.E. NMFS has failed to "conduct a full analysis" of these risks to reach a rational conclusion about the species' prospects for recovery. *NMFS III*, 524 F.3d at 933.

E.    The 2020 BiOp Relies on Uncertain Benefits from Unidentified Actions.

The 2020 BiOp concluded that loosely identified habitat programs and flexible spill operations in the Proposed Action supported NMFS's findings of no jeopardy. But those measures are no more than a series of "plans to make a plan," with markedly uncertain outcomes. The ESA demands that consequences and effects of an action be "reasonably certain to occur." Fed. Br. 86 (citing 50 C.F.R. § 402.02). These plans to make a plan are not.

First, none of the habitat programs have specific plans for restoration activities; they identify neither the projects nor their timing. *See, e.g.*, 2020 BiOp at 74-76 [ACE1056295]. For the tributary restoration program, the action agencies proposed a series of prospective five-year implementation plans, *id.* at 76 [ACE1056295], and the BiOp provides only an outside marker of 2036 for completion of all projects. 2020 BiOp at 208, Tbl.2.2-17 n.1 [ACE1056427]. Given

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

salmonids' "short life-cycles" and "extremely poor habitat conditions," Federal Defendants cannot count on benefits that are "reasonably certain to occur" based on a timeline that undermines their near-term value. *NMFS III*, 524 F.3d at 934. Compounding those unknowns, "[r]elatively little" has "been done to examine the physical and biological response" of the projected benefits for a number of broad tributary restoration categories. 2020 BiOp, Appx A, at 9 [ACE1057725] (referring to riparian planting, flow augmentation, sediment reduction (road removal), and acquisition and protection). Given that it "could take 50 years or more" to see benefits from some restoration, *id.* at 287 [ACE1056506], there are limits to what options will offset more the immediate harms caused by the hydrosystem. *Id.* (further noting that "substantial benefits" from tributary work would require implementation over 25 years).

Moreover, the anticipated benefits for Snake River sp/su Chinook appear to be relatively modest. Efforts are planned for only three of the five major population groups ("MPG"), and for one of the three (Upper Salmon), habitat actions are expected only to "slightly improve" productivity. 2020 BiOp at 241 [ACE1056460]. Results in the Grande Ronde may be better, but only as measured far into the future. *Id.* at 215 [ACE1056434] (summer rearing capacity "after full implementation" and parr capacity 24 years after implementation). The projected benefits are not spelled out for the third MPG (Lower Snake). *Id.* at 216–17 [ACE1056435–36].

Similar issues plague the proposed estuary restoration work, with another five-year review cycle needed to name the currently unidentified projects. *Id.* at 206 [ACE1056425]. While the BiOp refers to the action agencies' commitment to "reconnect an average of 300 acres of floodplain per year," there remains "uncertainty in forecasting exactly what restoration actions will be performed, and when." *Id.*; *see also* at 74 [ACE1056293]. That uncertainty extends even further: the action agencies have not, in fact, pledged to reconnect 300 acres per year on average for the full 15-year term of the BiOp. The agencies consider an annual average of restoring 300 acres to be "a reasonable target for the initial 10 years of the consultation," but adjusting the target may be subject to the five-year review cycle. BA at 2-106 [ACE1067185]. And NMFS

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

itself has acknowledged that "it has been difficult to quantify the survival benefits of estuary habitat restoration." 2020 BiOp at 206 [ACE1056425].

Second, NMFS ignored the direction of this Court to consider "whether the effectiveness" of the actions designed to offset the harms caused by the hydrosystem would "be diminished by climate change." *NMFS V*, 184 F. Supp. 3d at 918. For the estuary work, the 2020 BiOp simply asserts that the "adaptive management framework" will enable the action agencies to "discuss relevant climate change science" with an Expert Regional Technical Group and conduct an annual plan review. 2020 BiOp at 207 [ACE1056426]. But "attention to climate change considerations," *id.*, cannot substitute for actually using the best available information to describe rationally "what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts.*" *NMFS III*, 524 F.3d at 930 (cleaned up).

Third, the flexible spill operations primarily flex to benefit power generation. As NWF previously observed, flexible spill was never intended to be adequate long-term and is expressly constrained by a cost principle with no tie to the ESA: "the understanding that Bonneville must, at a minimum, be no worse financially" than it was under the spill injunction ordered in 2018. NWF Br. at 9; Columbia River Systems Operation Draft Environmental Impact Statement, App. R, Part 2, at R-8 [ACE428695] (Flex Spill Power Principle). The draft 2026 FOP includes significant reductions in spill that seem likely to minimize costs, but not to protect salmon. *See supra* Sec. I.C. That Federal Defendants believe this substantial curtailment of spill is consistent with the 2020 RODs only highlights the vague and uncertain nature of the river operations addressed in the 2020 BiOp, and the purported "sideboards" (Fed. Br. 83) appear to provide little actual protection.

Federal Defendants counter that the ESA's procedures for reinitiation of consultation (at 83–84, 86–87) and the existence of adaptive management measures (at 83–85) provide enough certainty for reliance on the uncertain benefits of these undefined measures. But the existence of the ESA's reinitiation process cannot suffice when the underlying measures have not been

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

-32-

adequately explained in the first place—an explanation that includes the where, when, and what level of survival benefits the work is expected to produce. NMFS cannot meet the regulatory requirement for "reasonable certainty" with conclusory assertions based on generalized, overarching goals. *See, e.g.*, 2020 BiOp at 206 [ACE1056425] (restoring an average of 300 estuary acres per year over 10 years); *id*. at 208, Tbl.2.2-17 n.1 [ACE1056427] (meeting tributary metrics by 2036). Nor can reinitiation fill the gap. "Reasonable certainty" must be met at the time a BiOp is issued, and agencies may not duck their obligation to avoid jeopardy simply because they might change course later. *Compare* 50 C.F.R. § 402.16(a), *with* 50 C.F.R § 402.02.

This Court has stressed the need for specifics in past adaptive management plans. *NMFS V*, 184 F. Supp. 3d at 908 ("without any replacement or supplemental projects identified, [the plan] constitutes no more than a generalized aspiration that benefits will be achieved"). Adaptive management is not a magic incantation that compensates for inadequate analysis. *Cf. NMFS III*, 524 F.3d at 936 & n.17 (if agencies cannot ensure actions will occur "the proper course is to exclude them from the analysis"); *see also NMFS V*, 184 F. Supp. 3d at 903–06 (finding that loosely defined measures with uncertain benefits place the burden of uncertainty on the listed species). Given the sheer number and significance of the uncertainties, NMFS's reliance on the habitat proposals and flexible spill program to bolster its no jeopardy conclusion is arbitrary.

F.       The 2020 BiOp's Reasoning is Impossible to Trace.

Notwithstanding the precarious status of Snake River salmon and steelhead, the harms that will continue to accrue from operation and maintenance of the lower Snake and Columbia River dams, the vague and uncertain actions addressed in the 2020 BiOp, and the inevitability of significant additional harm from advancing climate change, the 2020 BiOp unaccountably arrives at a conclusion of "no jeopardy" for each listed species of salmon and steelhead. But the BiOp does not explain how various factors were weighted or combined, and NMFS's reasoning appears to hang on the unilluminating finding that the "proposed action includes some elements

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-33-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

that will harm salmonids and some that will benefit salmon." 2020 BiOp at 290 [ACE1056509];
*see, e.g.*, *id*. at 428 [ACE1056647], 640 [ACE1056859], 754 [ACE1056973]. Federal
Defendants' defense of this conclusion is equally unilluminating. Fed. Br. 55–59. Rather than
finding that salmon will meet any articulated standard for viability or recovery, they reiterate the
ways in which the Proposed Action will "improve" or at least not significantly degrade
conditions relative to past operations. Notably, Federal Defendants do not even attempt to defend
the BiOp's failure to explain the significance of its abundance predictions in light of standards
such as the Interior Columbia Technical Review Team's viability analyses and threshold
abundance goals. NWF Br. at 39–40.

NMFS' cursory conclusion that a little harm and a little benefit add up to no jeopardy
stands in sharp contrast to real-world facts, particularly NMFS's own recognition that salmon
face a "substantial" existential threat from hydrosystem operations when factoring in the effects
of climate change. 2020 BiOp at 291 [ACE1056510]); *see also id*. at 428 [ACE1056647], 755
[ACE1056974]. Vital linkages are missing from NMFS' conclusion; the BiOp has fundamentally
failed to "[s]how [the] work" necessary to justify the leap from the bleak prospects for survival
and recovery to a finding of no jeopardy. *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d
656, 663 (4th Cir. 2017) (urging decisionmakers to follow "the admonition they have no doubt
heard since their grade-school math classes"). The "touchstone of 'arbitrary and capricious'
review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of
Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019). And it is conspicuously absent here.

III.    THE BALANCE OF HARM AND PUBLIC INTEREST FAVOR INJUNCTIVE
        RELIEF

In its opening brief, NWF demonstrated how the balancing of harms and the public
interest favors an injunction to protect imminent harm to listed species. In response, Federal
Defendants (at 13, 89) maintain that NWF's claims arise under the APA rather than the ESA.
NWF's request for injunctive relief, however, is indisputably directed at the Army Corps based
on a substantive violation of Section 7 of the ESA. ECF 2396 ¶¶ 153–57 (Eighth Corrected

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Supp. Complaint); NWF Br. at 13. Accordingly, the Court presumes "that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *NMFS VII*, 886 F.3d at 817 (cleaned up).

Even if the Ninth Circuit's presumption in favor of imperiled species did not apply here, the balance of hardships and the public interest nevertheless favor granting the requested injunctive relief. Federal Defendants do not contest any of the points raised in NWF's opening as to Tribal and environmental interests, or the recognized need to "tip the scales" in favor of listed species outside of the Ninth Circuit's amended four-factor test. NWF Br. at 54–55 (citing *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 27–28 (1st Cir. 2010)).

Moreover, Federal Defendants' allegations of countervailing harms to bull trout, other native fish, and birds are unfounded, and in any case, do not outweigh the very real injuries to ESA-listed salmon and steelhead. As to issues related to power supply, flood risk management, water supply, and navigation, Federal Defendants' arguments appear to rest almost entirely on the mistaken assumption that the Proposed Order would eliminate the agencies' ability to modify operations as needed under the longstanding provisions of the annual plans implementing hydrosystem operations. These include both provisions allowing modification or suspension of fish operations under emergency conditions under the annual Water Management Plan, and provisions allowing routine pre-coordinated operations modifications and variances under the annual Fish Operations Plans. Goodin Decl. Exs. 11 (2025 FOP), 12 (2024 FOP), 23 (TMT Emergency Protocols); *see supra* Sec. I.C.

A.    Reducing Harm to Tribes and the Environment Supports Injunctive Relief.

Nowhere do the Federal Defendants address the likely injuries to Tribes and the environment, both of which should weigh heavily in assessing the balance of harms and the public interest. The decision to ignore this harm undoubtedly stems from the simple fact that Federal Defendants have no response to offer.

The Supreme Court has directed that the "balance of harms will *usually* favor the

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-35-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987) (emphasis added). As NWF demonstrated, listed salmon and steelhead will suffer irreparable harm from the status quo, leading to likely population loss, disruption of the larger ecosystem, and limits on the region's sportfishing industry. NWF Br. at 52–54. And equities strongly favor the Tribes that support this request for injunctive relief, as illustrated by Amici Yakama Nation and the Nez Perce Tribe. The Yakama Nation depends on the health of salmon and steelhead and its Treaty-reserved fishing rights, which are "crucial to the continued vitality of its culture and traditions, and to the livelihood of future generations." ECF 2537 at 1 (Yakama Br.); *see also id*. at 26 (noting that fish are an "irreplaceable part of Yakama Nation's heritage, and oral tradition emphasizes the longstanding and historic relationship between its people and the river's abundant resources"). Similarly, the Nez Perce identify themselves as "salmon people: salmon are a first food, and the Nez Perce people's identity, culture, lifeways, health, religion, and economy are dependent on salmon." ECF 2541 ¶ 16 (Hesse Decl.); *see also id*. ¶ 18 ("Nez Perce describe their relationship with the salmon as a covenant that includes the solemn responsibility to protect these sacred fish"); *see also* ECF 2529-9 (Tribal Circumstances Analysis). Strikingly, in the Federal Defendants' response, the Tribes merit attention primarily to dismiss their arguments (and Washington's) as amici despite the Court's order resolving this issue. Fed. Br. 10 n.8 & 18 n.11; *cf*. ECF 2502 at 1–2 (Scheduling Order). The balance of equities strongly favors the Tribes here, notwithstanding Federal Defendants' failure to acknowledge it.

B.    NWF's Requested Injunction Will Not Harm Bull Trout, Other Fish, or Birds.

While the Court must balance the equities and consider the public interest with regard to ESA-listed bull trout, doing so does not counsel against the measures NWF seeks to aid salmon and steelhead teetering on the edge of extinction. *See San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025) (a "court must balance the equities and consider the public interest as to the other listed species"); Bowles Reply Decl. at ¶¶ 104–07

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(filed concurrently by Plaintiff-Intervenor State of Oregon).

Federal Defendants' claims of harm to bull trout rely on a highly speculative analysis that fails to holistically weigh impacts to bull trout. *See, e.g.*, ECF 2577 ¶ 7 (Kuttel Decl.) ("proposed injunctive measures *may* impact bull trout"), ¶ 19 (changes to flow operations "*can* . . . impact [] upstream migration"), ¶ 21 (noting that it is "unclear" whether bull trout may be taking longer in fish passage facilities because they are feeding or because the facilities delay them), ¶ 45 (proposed operations "*may* result in higher frequency of entrainment or fallback"). Federal Defendants concede that "bull trout will 'depth compensate' for elevated [total dissolved gas ("TDG")] levels at the surface and likely experience minimal impacts directly from elevated TDG." *Id*. ¶ 38. And while they speculate that "prolonged exposure to TDG . . . *may* reduce the availability and diversity of prey species," there is no evidence of population-level effects on native non-salmonid fishes within the Snake and Columbia River reservoirs. *Id.* ¶ 42; ECF 2580 ¶ 23 (Plumb Decl.). Context also matters: even if increased spill doubled the predicted bull trout mortality from entrainment at the eight dams at issue here (neither likely nor predicted by FWS, *see* Kuttel Decl. at ¶ 46), bull trout mortality at these eight dams would remain a very small percentage of the overall take projections that FWS concluded would not cause jeopardy. *See* FWS BiOp at 304 [ACE1058142] (estimated bull trout mortality); *id.* at 299 [ACE1058137] (no jeopardy).

Federal Defendants also largely ignore the ways that the Proposed Order would benefit (and the 2026 FOP would harm) bull trout. Most importantly, bull trout that are transported to below Bonneville dam are "lost to their populations" entirely—in other words, even if they survive the ride, they cannot contribute to recovery because there is no evidence that bull trout can migrate back upstream to rejoin their population group. *See* ECF 2577 ¶ 31 (Kuttel Decl.); *see also* FWS BiOp at 222 [ACE1058060] ("juvenile transport programs likely have the most significant impact on bull trout individuals of all downstream passage routes."); *id.* ("The Service does not expect these bull trout can or will return to natal waters."); *id.* at 223

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

[ACE1058061] ("When juvenile transport occurs, the Service anticipates a *significant loss* of individuals from populations.") (emphasis added). As discussed *supra* Section I.C, the Proposed Order decreases transportation and the 2026 FOP nearly doubles it. In asserting that the Proposed Order may harm bull trout, Federal Defendants make no attempt to weigh speculative harm from entrainment against the likely benefit of reduced transportation. ECF 2577 ¶ 46 (Kuttel Decl.).

Federal Defendants (at 93–94) summarily conclude that the alleged harm to bull trout *and* salmon and steelhead outweigh any benefit to salmon and steelhead from the preliminary injunction—but risk to another listed species alone is not sufficient to quash a preliminary injunction and as established *supra* Section I.A, the Proposed Order reduces irreparable harm to salmon and steelhead. *See San Luis Obispo*, 161 F.4th at 601 ("our holding does not require a district court to deny relief whenever another species might be affected."). The Court must determine "whether a mandatory preliminary injunction for the protection of one species is appropriate despite the risks to others." *Id.* Federal Defendants have not established that the uncertain and cherry-picked harms to bull trout outweigh even the benefit to bull trout from reduced transportation, let alone the established benefits to salmon and steelhead in dire need. Similarly, there is no reason to believe that other native fishes or birds will be significantly harmed—and in any event, courts are not required to balance the equities for non-ESA-listed species. *See id.* at 600–01 ("That does not mean, however, that the door is open to every and all interests. . . . the only equities that matter here are those related to the interest of other ESA-listed species.").

      C.    <u>The Requested Injunction Will Not Compromise Power System Reliability.</u>

There is no reason to believe that the Proposed Order will lead to blackouts or other power system and transmission reliability crises, as Federal Defendants fear. Fed. Br. 95–96. Instead, the Northwest Power and Conservation Council ("Council") concluded in its most recent resource adequacy assessment that operations under the stay of litigation have not had any significant impact on the reliability of the regional power system, and that the regional system

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

meets reliability standards through 2029. *See* Declaration of Nancy Hirsh ¶¶ 12–18. Initial

modeling that Council staff conducted in support of their next fish and wildlife program likewise

does not reveal any major reliability impacts that would result from the Proposed Order. Hirsh

Decl. ¶¶ 22–26. While these modeling results (and others) do predict some reliability issues in

the decades to come, those are driven by factors such as load growth, decarbonization, and data

centers—not fish operations. Hirsh Decl. ¶¶ 17–18, 25, 27, 31.

Federal Defendants' modeling conducted for this litigation reached very different results,

ECF 2574 ¶¶ 26–31 (Dibble Decl.) (predicting significant loss of load probability or LOLP), but

Federal Defendants have not offered any explanation of the assumptions that drove them to

conclude that even their proposed 2026 operations will lead to such significant reliability

shortfalls. Hirsh Decl. ¶¶ 19–20; *see also id.* ¶¶ 11–12 (explaining that the updated version of

GENESYS has shifted to a more advanced reliability metric than LOLP). Federal Defendants'

recent announcements of a potential power surplus and failure to acquire new resources are also

difficult to square with their insistence here that reliability is severely at risk. Hirsh Decl. ¶¶ 51–

52. Notably, it is the Council that is charged by statute with developing regional power plans

assessing demand and reliability, and Bonneville Power Administration (BPA) must ensure its

decisions are consistent with the Council's plans. 16 U.S.C. § 839b(d)(1)&(2). The Council's

clear findings that reliability is *not* at risk in the near term and the initial modeling indicating that

the Proposed Order has similar reliability impacts as operations under the stay of litigation and

the 2020 RODs, should carry great weight.

Moreover here, as elsewhere, Federal Defendants' fears appear to be based on their

incorrect assumption that routine variances under the annual FOP would suddenly be

unavailable. Federal Defendants claim that routinely relying on emergency declarations would be

irresponsible and reckless, ECF 2574 ¶ 20 (Dibble Decl.), but they elide the distinction between

a declaration of power system emergency under the emergency protocols, Goodin Decl. Ex. 23

(TMT Emergency Protocols), and the routine planned and unplanned adjustments that the

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

agencies implement regularly under the FOP, Goodin Decl. Exs. 11, 12 (2025 and 2024 FOP). Indeed, it is difficult to take BPA's strident accusations seriously when the Corps used these same variances for 383 hours of adjustments across multiple dams in 2020 alone to either increase or deploy reserves to maintain transmission reliability. Hirsh Decl. ¶¶ 36–38 & Ex. A. In contrast, in 2024 and 2025 under stay operations, the Corps' reporting shows only two hours of modifications for power reliability. *Id.*[3] Instead, these overblown fears most closely track BPA's warnings in opposition to NWF's past requests for injunctive relief, none of which have come to pass. *E.g.*, ECF 2143 ¶ 6 (2017 Anasis Decl.) ("Plaintiffs' requested spill operation reduces the operational flexibility Bonneville depends on to maintain the reliability of the transmission system, including system stability, to avoid blackouts and the associated impacts to public health and safety."); ECF 2145 ¶¶ 13–19 (2017 Connolly Decl.) (requested changes in spill operations "remov[e]" many of the FCRPS projects from providing "services to support transmission system reliability").

Finally, Federal Defendants insist that the Proposed Order would increase power rates by 6.4%. ECF 2574 ¶ 67 (Dibble Decl.). Here too, BPA's opaque assertions are difficult to square with their other public statements, such as their sworn congressional testimony that operations under the stay of litigation would *reduce* costs by $1 million per year. Hirsh Decl. ¶ 53. But even if BPA were correct that rates would modestly increase, that is no reason to deny injunctive relief to prevent irreparable harm to critically imperiled species. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 187–88 (1978) (noting the "incalculable" value of listed species).

    D.    <u>Flood Risk Management, Water Supply, and Navigation.</u>

Federal Defendants' concerns (at 96) that the Proposed Order will affect flood risk management, water supply, annual maintenance, and navigation safety are also unfounded. First,

---

[3] As explained in NWF's Opposition to the Motion to Dismiss, ECF 2613 at 27–28, the Proposed Order reinstates reporting requirements for power variances but does not change their availability. Moreover, the proposed 2026 FOP does not appear to retain the reporting exemption for reserves included in the 2025 FOP. *Compare* Goodin Decl. Ex. 11 at 12, Tbl.1& n.D (2025 FOP) (reporting exemption), *with* ECF 2570-2 at 11–12, Tbl.1 (2026 FOP) (no exemption).

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

-40-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the Proposed Order in no way limits the Corps' ability to rely on John Day Dam for flood risk management. The Corps has explained John Day Dam can provide some limited flood storage, which requires drawing John Day Dam down to its minimum elevation of 257.0 feet, well below its typical elevation. BA at 2-30 [ACE1067109]; *id*. at 2-7 to 2-9 [ACE1067086–88]. Evacuating the reservoir to that level would happen "just prior to a flood event," which the Corps predicts based on weather and other forecasting. ECF 2571 ¶ 38 (Marshall Decl.). A forecasted flood event that risks "loss of life, property damage, and long-term economic damages in the lower Columbia River," *id.* ¶ 40, would plainly justify invocation of long-standing emergency protocols that allow the Corps to adjust fish protection measures to address "flood control" among other issues. Goodin Decl. Ex. 23 (TMT Emergency Protocols). Second, the Corps has pointed to no evidence that drinking water will be impacted when John Day Dam is operated within a range of 262.0 to 263.5 feet, *see* ECF 2571 ¶ 41 (Marshall Decl.)—instead, the Corps has represented that 262.0 feet is within John Day's normal operating range for much of the year, BA 2-57 to 2-58 [ACE1067136–37].

Finally, neither annual maintenance nor navigation will be significantly impacted by the Proposed Order. The Corps has long relied on provisions in the annual FOP allowing modifications to fish operations when necessary to address maintenance and navigation needs. Goodin Decl. Ex. 11 at 9–10 & n.11 (2025 FOP) (adjustments for scheduled and unscheduled maintenance); *id.* at 15–16 (adjustments for navigation and minimum tailwater elevations); Goodin Decl. Exs. 14, 19, 24 (May 2025 report at 6–7; May 2024 report at 7–8; May 2020 report at 3, 8). Additionally, Federal Defendants acknowledged that the negotiated operations supporting the stay of litigation would not impact navigation because they "do not create 'new' conditions on the river; they merely change the duration and frequency of past operations." ECF 2459 at 14; ECF 2460 ¶ 15 (Ammann Decl.); *see also* Goodin Decl. Ex. 25 (Corps One-Pager). Here too, Plaintiffs' Proposed Order primarily changes the "duration and frequency" of past operations, *supra* Section I.B, and does not create new conditions on the river.

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

CONCLUSION

For the foregoing reasons, NWF respectfully requests that the Court grant it a preliminary injunction for the Corps' violations of the ESA as requested herein.

DATED January 22, 2026.

/s/ Amanda W. Goodin
AMANDA W. GOODIN (WSB #41312)
*Admitted Pro Hac Vice*
MICHAEL MAYER (WSB #32135)
*Admitted Pro Hac Vice*
CHARISA GOWEN-TAKAHASHI (WSB #63091)
*Admitted Pro Hac Vice*
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340 | Phone
agoodin@earthjustice.org
mmayer@earthjustice.org
cgowentakahashi@earthjustice.org

DANIEL J. ROHLF (OSB #99006)
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Boulevard, MSC 51
Portland, OR 97219
(503) 768-6707 | Phone
(503) 768-6642 | Fax
rohlf@lclark.edu

*Attorneys for Plaintiffs*

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

-42-

## CERTIFICATE OF COMPLIANCE

This brief complies with Local Rule 7-2(b) and the Court's Order of January 14, 2026, (ECF 2612) granting NWF's motion to file a reply in support of its motion for a preliminary injunction of up to 45 pages in length. The reply filed herewith is 42 pages long including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, exhibits, and any certificates of counsel.

*/s/ Amanda W. Goodin*
AMANDA W. GOODIN (WSB #41312)

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

-43-

## CERTIFICATE OF SERVICE

I certify that on January 22, 2026, I filed the foregoing Motion for Judgment on the

Pleadings through the Court's CM-ECF system, which will automatically notify counsel of

record.

*/s/ Amanda W. Goodin*
AMANDA W. GOODIN (WSB #41312)

NWF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*