DAN RAYFIELD
Attorney General
DEANNA CHANG #192202
CHRISTINA L. BEATTY-WALTERS #981634
AUSTIN D. SAYLOR #085614
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Deanna.J.Chang@doj.oregon.gov
        Tina.BeattyWalters@doj.oregon.gov
        Austin.Saylor@doj.oregon.gov

Attorneys for Intervenor-Plaintiff/Counter-Defendant State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, AMERICAN RIVERS, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, SIERRA CLUB, IDAHO RIVERS UNITED, NORTHWEST SPORTFISHING INDUSTRY ASSOCIATION, NW ENERGY COALITION, COLUMBIA RIVERKEEPER, IDAHO CONSERVATION LEAGUE, and FLY FISHERS INTERNATIONAL, INC., | Case No. 3:01-cv-00640-SI  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| and | |
| STATE OF OREGON, SPOKANE TRIBE OF INDIANS, and COEUR D'ALENE TRIBE, | |
| Intervenor-Plaintiffs, | |
| v. | |

STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

NATIONAL MARINE FISHERIES
SERVICE, U.S. ARMY CORPS OF
ENGINEERS, U.S. BUREAU OF
RECLAMATION and U.S. FISH AND
WILDLIFE SERVICE,

       Defendants,

  and

PUBLIC POWER COUNCIL, COLUMBIA-
SNAKE RIVER IRRIGATORS
ASSOCIATION, NORTHWEST RIVER
PARTNERS, CONFEDERATED SALISH
AND KOOTENAI TRIBES, STATE OF
MONTANA, INLAND PORTS AND
NAVIGATION GROUP, STATE OF IDAHO,
and KOOTENAI TRIBE OF IDAHO,

       Intervenor-Defendants.

STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITES .......................................................................................................iii

INTRODUCTION .......................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.      PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF IS LEGALLY SOUND. ..............2

    A.      Case law, and the law of this case, confirm this Court's authority to order
    Plaintiffs' proposed preliminary injunctive relief. .......................................................2

        1.      The foundations and parameters of the Court's equitable authority remain
        unchanged from prior proceedings. .........................................................................3

        2.      As with similar injunctions previously granted in this case, the Court has
        authority to grant Plaintiffs' requested relief. ..........................................................4

            a.      Plaintiffs' requested relief would not "supplant" Federal Defendants'
            water management and fish passage operations and is in accord with
            Rule 65(d). ....................................................................................................5

            b.      No threshold barriers foreclose Plaintiffs' non-operational relief. ..................6

            c.      Plaintiffs' requested relief does not violate the ESA or Clean Water
            Act.................................................................................................................9

    B.      Oregon has established that it will be irreparably harmed during the pendency
    of these proceedings..................................................................................................12

        1.      Oregon possesses a sovereign interest in listed salmonids. ...............................12

        2.      Irreparable harm to both listed salmonids and Oregon is likely and
        imminent. ..............................................................................................................14

    C.      The Corps is not immune to the requested injunctive relief. ....................................16

II.     PLAINTIFFS' REQUESTED RELIEF IS APPROPRIATE AND NARROWLY
    TAILORED TO REDUCE IRREPARABLE HARM ....................................................17

    A.      The status of the species has not markedly improved................................................17

        1.      Federal Defendants misunderstand the purpose and use of QET analyses..........17

        2.      Recent data does not support Federal Defendants' claim of a trend of
        increasing abundance. ...........................................................................................18

    B.      The requested suite of injunctive relief is far better for fish than either the
    operations set forth in the 2020 ROD or Draft 2026 FOP. .......................................20

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1.   The Federal Defendants' own analysis shows an increase in harm to fish from the operations in the Draft 2026 FOP and reduction in harm from Plaintiffs' PI request. ............................................................... 22

2.   The Fish Passage Center confirms that the Draft 2026 FOP operations are worse for fish than the 2020 BiOp/ROD. ............................................. 23

3.   Plaintiffs' requested spill will not harm fish. ....................................... 24

4.   Lower MOP elevations will provide benefits to the fish. ...................... 25

III.  THE FEDERAL DEFENDANTS' ANALYSIS OF THEIR OBLIGATIONS UNDER THE ESA IS CONTRARY TO WELL-ESTABLISHED LAW. ..................... 27

A.   Federal Defendants' decisions are not entitled to significant deference or a presumption of validity. ............................................................................. 27

B.   Federal Defendants' jeopardy analysis is arbitrary and capricious. .......................... 27

1.   The 2020 BiOp's flawed comparative approach precluded a holistic analysis of harms that could appreciably reduce likelihood of survival and recovery. ............................................................................................... 28

2.   The 2020 BiOp fails to clearly consider risks to recovery. .................. 30

3.   The 2020 BiOp and ROD rely on ill-defined future spill operations, stripped of any specific contingency actions. ........................................ 32

IV.  THE EQUITIES AND PUBLIC INTEREST SUPPORT PLAINTIFFS' INJUNCTIVE RELIEF REQUEST. ...................................................................... 34

CONCLUSION ........................................................................................................ 37

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITES

Page(s)

## CASES

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ....................................................................... 13

*Ctr. for Biological Diversity v. Env't Protect. Agency*,
    141 F.4th 153 (D.C. Cir. 2025) ..................................................................... 30

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992) ........................................................................ 6

*Env't Def. Ctr. v. Bureau of Ocean Mgmt.*,
    36 F.4th 850, 890 (9th Cir. 2022) ................................................................. 13

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...................................................................................... 34

*Fortyune v. American Multi-Cinema, Inc.*,
    364 F.3d 1075 (9th Cir. 2004) ........................................................................ 6

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ........................................................................................ 3

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ........................................................................................ 7

*Hedges v. Dixon County*,
    150 U.S. 182 (1893) ........................................................................................ 7

*I.N.S. v. Pangilinan*,
    486 U.S. 875 (1988) ................................................................................. 7, 10

*In re Clean Water Act Rulemaking*,
    60 F.4th 583 (9th Cir. 2023) ........................................................................... 3

*In re Google Play Store Antitrust Litigation*,
    147 F.4th 917 (9th Cir. 2025) ......................................................................... 6

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ......................................................................... 15

*Loper Bright Enters. v. Raimundo*,
    603 U.S. 369 (2024) ...................................................................................... 27

Page iii -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
          INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Nw. Env't Def. Ctr v. U.S. Army Corps of Eng'rs*,
    558 F. Supp. 3d 1056, 1076 (D. Or. 2021) ...................................................................... 10

*NWF v. NMFS*,
    422 F.3d 782 (9th Cir. 2005) ................................................................................... 4, 10

*NWF v. NMFS (NMFS III)*,
    524 F. 3d 917 (9th Cir. 2008) .................................................................................. *passim*

*NWF v. NMFS (NMFS IV)*,
    839 F. Supp. 2d 1117 (D. Or. 2011) ................................................................................ 4

*NWF v. NMFS (NMFS V)*,
    184 F. Supp. 3d 861 (D. Or. 2016) ..................................................................... *passim*

*NWF v. NMFS (NMFS VI)*,
    2017 WL 1829588 (D. Or. April 17, 2017) ................................................. 4, 14, 15, 35

*NWF v. NMFS (NMFS VII)*,
    886 F.3d 803 (9th Cir. 2018) ................................................................................. *passim*

*NWF v. NMFS (NMFS VIII)*,
    2005 WL 3576843 (D. Or. Dec. 29, 2005) ......................................................................... 4

*Or. Council for Humanities v. U.S. DOGE Serv.*,
    794 F. Supp. 3d. 840 (D. Or. 2025) ...................................................................................... 3

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ................................................................................... 17

*Portland Fish Co. v. Benson*,
    56 Or. 147 (1910) ........................................................................................................... 14

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 1014) ....................................................................................... 10

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
    161 F.4th 590 (9th Cir. 2025) ..................................................................................... 35

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ..................................................................................................... 36

*Trump v. CASA*,
    606 U.S. 831 (2025) .................................................................................................. 3, 4

*United States v. Oregon & C.R. Co.*,
    186 F. 861 (D. Or. 1911) ................................................................................................ 7

Page iv -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
           INJUNCTION

*United States v. V–1 Oil Co.*,
63 F.3d 909 (9th Cir. 1995) ........................................................................ 6

## STATUTES, REGULATIONS, RULES

Pacific Northwest Electric Power Planning and Conservation Act of 1980,
16 U.S.C. § 839 *et seq.* ......................................................................... 23

16 U.S.C. § 1536(a)(2) ........................................................................... 10, 29

Flood Control Act of 1962, Pub. L. No. 87-874, tit. II, 76 Stat. 1180 ......................... 11

Rivers and Harbors Act of 1945, Pub. L. No. 79-14, 50 Stat. 10 ............................... 11

50 C.F.R.
§ 402.02 (2019) ............................................................................... 29
§ 402.03 ....................................................................................... 10

Fed. R. Civ. P. 65 ................................................................................. 3

ORS 498.002(1) .................................................................................... 14

Wash. Admin. Code § 173-201A-200(1)(f)(ii)(B)(I) ............................................... 12

## OTHER AUTHORITIES

Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 439 (1836) ......................................................................... 7

Letter from Frances E. Coffey, Programs Dir., U.S. Army Corps of Eng'rs, to Leah Feldon, Dir., Or. Dep't of Env't Quality (July 9, 2024), https://ormswd2.synergydcs.com/HPRMWebDrawer/Record/6827530/File/document ...................................................................................... 11

Or. Env't Quality Comm'n, Order Approving a Modification to Oregon's Water Quality Standard for Total Dissolved Gas in the Columbia River Mainstem (Dec. 31, 2024), https://www.oregon.gov/deq/wq/Documents/tmdlTDGmod0225.pdf ................... 11

Page v -    STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## INTRODUCTION

The Federal Defendants' opposition (Fed. Br.) to the NWF Plaintiffs' and Oregon's (collectively, Plaintiffs) motions for injunctive relief (Opening Br.) raise a multitude of issues that have already been litigated at some point in the very long history of this case and decided in favor of the Plaintiffs. This Court and the Ninth Circuit have been clear for decades what is required of the Federal Defendants in order to comply with Section 7 of the Endangered Species Act. The explanations and instructions from this Court have been clear, concise, and have formed the basis of a significant amount of ESA jurisprudence. The Federal Defendants cannot simply ignore the prior rulings, many of which are law of the case, and all of which are precedential, and begin anew as if the slate were blank. The Federal Defendants' defenses boil down to: (1) attacks on this Court's ability to enter injunctive relief of the type requested in the Plaintiffs' motion and sought, granted, and/or agreed to in the past; (2) use of incomplete, contradictory, and unsupported science to attempt to discredit years of research and study of listed fish, much of which has been conducted by their own scientists and is contained in their own documents; (3) arguments that the analysis contained in the 2020 BiOp and ROD are appropriate despite this Court, the Ninth Circuit, and many other courts finding similar analyses in violation of Section 7 of the ESA; and (4) a recitation of a litany of catastrophes that will result if the Plaintiffs' motion is successful – even though much of the relief sought has been performed before or identified by the Action Agencies themselves as appropriate and/or necessary measures. The result is a hodge-podge of arguments, many internally inconsistent, many unsupported by law or science, and none of which defeat the clear legal and technical bases for Plaintiffs' request for preliminary injunctive relief.

The same is true of the arguments raised by Defendant-Intervenors, the State of Idaho, the Public Power Council, Northwest Requirements Utilities, and the Inland Ports and Navigation Group. Plaintiffs' requested relief is not breaking new ground, it is not seeking to wrest control over the Columbia River System (CRS) from Federal Defendants, nor is it

Page 1 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
            INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

removing the Federal Defendants' flexibility to adjust operations to respond to energy emergencies, human safety, or infrastructure integrity emergencies.[1] Because none of the oppositions raise any serious doubt regarding the need for immediate operational and non-operational conservation measures, the irreparable harm that will result if the Federal Defendants are allowed to implement the operations set forth in either the 2020 BiOp and ROD or the proposed 2026 Fish Operations Plan (FOP), or the likelihood of Plaintiffs' success on the merits, Plaintiffs' motions should be granted.

## ARGUMENT

## I. PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF IS LEGALLY SOUND.

### A. Case law, and the law of this case, confirm this Court's authority to order Plaintiffs' proposed preliminary injunctive relief.

Mischaracterizing these proceedings as a "dramatic and intrusive" effort to "seize control over the CRS," Federal Defendants assert that this Court lacks equitable authority to enter Plaintiffs' requested preliminary injunctive relief. Fed. Br. (ECF No. 2569) at 23, 14. This counterfactual hyperbole ignores decades of injunctive rulings in this case, which Federal Defendants concede have "modifie[d] CRS operations, overriding the[ir] plans." *Id.* at 15. Attempting to sidestep that precedent, Federal Defendants contend that assessing whether Plaintiffs' requested relief is of a kind "traditionally accorded by courts of equity" is a new legal lens that should yield a different result. *Id.* Federal Defendants further lament that the requested relief is in various ways unprecedented and unworkable, infringing on some federal agencies' discretion but beyond the purview of other federal agencies—and, in any event, too ambiguous to implement. *Id.* at 16–19. Finally, in a last-ditch effort to flip the script, Federal Defendants argue that Plaintiffs' requested relief is unlawful. *Id.* at 20–23. None of these arguments have merit.

---

[1] To the extent the proposed order is unclear, Plaintiffs agree that it is important to retain existing provisions in the applicable FOPs that allow the Corps to temporarily deviate from the requested relief regarding spill and reservoir levels to protect human safety or respond to energy or infrastructure integrity emergencies.

Page 2 -    STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
              INJUNCTION

1.  **The foundations and parameters of the Court's equitable authority remain unchanged from prior proceedings.**

The Court has granted equitable relief in this case many times, over many years. Contrary to Federal Defendants' suggestion that the Court's authority in this preliminary injunction proceeding is now more limited under *Trump v. CASA*, 606 U.S. 831 (2025), neither that case nor others they cite present any new limitations in this context. *See* Fed. Br. at 15. The Supreme Court's analysis and holding in *CASA* focused on district courts' equitable authority to issue "universal" injunctions affording relief to non-parties. *See CASA*, 606 U.S. at 841. Notably, the decision did not purport to limit the scope of interim or permanent injunctive relief available under the Administrative Procedure Act (APA). *See id.* at 847 n.10 (stating that "[n]othing" in that decision "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"); *see also Or. Council for Human. v. U.S. DOGE Serv.*, 794 F. Supp. 3d, 840, 898 (D. Or. 2025) ("the Court does not agree . . . that relief granted under the APA must comport with the principles of *CASA* . . . ."). Here, Plaintiffs' requested relief as to CRS operations and related conservation measures does not seek to enjoin Federal Defendants nationwide nor does it seek to enjoin any non-parties. *CASA* is inapposite.

Federal Defendants' reliance on *CASA* for the proposition that litigants must "show that their requested relief is of the kind traditionally accorded by courts of equity" is puzzling, as that basic constraint derived from the Judiciary Act of 1789 was already well-established prior to *CASA*. *See* 606 U.S. at 841, 846 (citing *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Indeed, Federal Defendants themselves cite to older cases and Federal Rule of Civil Procedure 65 for this same proposition, undercutting the notion that *CASA* has changed the analysis from "past iterations of this case." *See* Fed. Br. at 15 (citing *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593 (9th Cir. 2023)); *id.* at 17 (asserting that Fed. R. Civ. P. 65 "codified existing law on the longstanding constraints on the Court's equitable authority"). Just as on prior occasions where the Court has granted relief modifying CRS operations, so too here does such equitable relief fall within the bounds of the Court's equitable

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

authority.

### 2. As with similar injunctions previously granted in this case, the Court has authority to grant Plaintiffs' requested relief.

Federal Defendants' facial attack on Plaintiffs' requested injunction hinges on two primary arguments: that the relief would impermissibly (1) "supplant" federal agencies' authorities and documents governing CRS operations in an ambiguous way, and (2) create "new legal rights and obligations" among the parties concerning infrastructure, predation, and habitat measures. Fed. Br. at 16–23. These arguments are inconsistent with Federal Defendants' own overarching assertion that Plaintiffs' injunction is not "sufficiently 'analogous'" to relief "traditionally accorded by courts of equity." *See CASA*, 606 U.S. at 841–50 (assessing 18th and 19th century equity practices). Indeed, despite their ostensible emphasis on "tradition," Federal Defendants deliberately ignore the extensive history of injunctive relief in this very case.

Prior orders of this Court upheld on appeal—as well as Federal Defendants' voluntary operations—provide precedent for the key elements of Plaintiffs' proposed injunction, including spill, reservoir levels, and non-operational conservation measures. *See, e.g.*, *NWF v. NMFS*, 422 F.3d 782, 797–99 (9th Cir. 2005) (affirming relief as to summer spill and implementation reporting); *NMFS VI*, 2017 WL 1829588 at *9–11 (D. Or. Apr. 3, 2017) (ordering an implementation plan for increased spill); *NMFS VII*, 886 F.3d 803 (9th Cir. 2018), (affirming relief as to spill, reservoir levels, juvenile bypass facilities, and fish monitoring systems); *NMFS IV*, 839 F. Supp. 2d 1117, 1131 (D. Or. 2011) (granting spring and summer spill injunction "[i]n light of the clear survival benefits associated with spill and Federal Defendants' history of attempting to curtail spill without adequate justification"); *NMFS VIII*, 2005 WL 3576843 at *4, 8 (D. Or. Dec. 29, 2005) (granting spill relief and outlining expectations for federal government on remand, including ending transportation by truck and studying options for increasing water available for flow). In evaluating Plaintiffs' current proposed injunction, it is appropriate for the Court to consider its "findings from previous opinions and orders issued as part of this litigation." *See NMFS VII*, 886 F.3d at 815. Misapplying *CASA* in hopes of wiping that slate

Page 4 -    STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

clean, Federal Defendants do not even attempt to compare to Plaintiffs' requested relief to those prior orders. None of Federal Defendants' critiques pose valid reasons to disregard or distinguish that precedent.

      **a.  Plaintiffs' requested relief would not "supplant" Federal Defendants' water management and fish passage operations and is in accord with Rule 65(d).**

      Plaintiffs' proposed injunction is a narrowly tailored set of measures to reduce irreparable harm pending entry of permanent relief. The requested relief would alter only defined aspects of—but not "supplant"—CRS operational documents (e.g., Fish Passage Plans, Fish Operating Plans, and Water Management Plans). *See* Fed. Br. at 16, 18. Nor will the proposed injunction "wrest control of CRS operations" and "de-federalize" dam operations. *Id.* at 1, 3. Plaintiffs do not seek to limit federal agencies' authority or flexibility except as specifically described. Like prior injunctions, the requested injunction will not impermissibly "intrud[e] upon the administrative province." *See NMFS VII*, 886 F.3d at 824 (upholding 2017 injunction for increased spring spill as "well within the ambit of the district court's authority"). Federal Defendants rehash the same predicted calamities that will result from the proposed changes to CRS operations, none of which have ever come to pass. Fed. Br. at 16–17. Nor will those problems occur now, given that the proposed injunctive relief is not nearly as novel or profound as Federal Defendants portray it. In implementing the requested spill operations, the Corps would retain its existing authorities to respond to emergency situations.[2] As the Ninth Circuit has specifically confirmed, it is not an improper intrusion on federal agency administrative functions for the Court to enjoin aspects of CRS operations. *NMFS VII*, 886 F.3d at 824.

      Plaintiffs' requested injunction is in accord with Federal Rule of Civil Procedure 65. The Ninth Circuit "will not set aside injunctions under Rule 65(d) 'unless they are so vague that they

---

[2] As noted above, Plaintiffs intend that the injunction for reservoir pool elevations will include flexibility analogous to that specified in § I.B.3 of the Proposed Order (ECF No. 2530-2), including allowance for FOP-based "planned or un-planned adjustments" to spill operations as necessary to address "energy emergencies, human safety, or infrastructure integrity emergencies."

Page 5 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

have no reasonably specific meaning.'" *United States v. V–1 Oil Co.*, 63 F.3d 909, 913 (9th Cir. 1995) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992)). Here, the requested relief is nowhere near "so vague." *See Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (rejecting argument that Rule 65(d) requires the court to "also elucidate *how* to enforce the injunction," instead expressing confidence in defendant's ability to "devis[e]" the required policy). The proposed injunction provides "reasonable detail" by specifying key operational and non-operational endpoints (i.e., the "acts . . . required") without dictating every interim step for Federal Defendants to accomplish those requirements. Fed R. Civ. P. 65(d)(1)(C).

The Ninth Circuit recently confirmed that injunctions need not specify in exhaustive detail every nuance of how a defendant must comply. *See In re Google Play Store Antitrust Litigation*, 147 F.4th 917, 952 (9th Cir. 2025) (rejecting a Rule 65 challenge to a district court's establishment of a "framework" for a technical committee to adjudicate injunction implementation issues and other relief that the defendant argued would "leave open too many questions about compliance."). Here, Plaintiffs' requested relief is far less open-ended. The requested operational relief clearly delineates requested spill and reservoir elevations on a dam-by-dam and season-by-season basis, Prop. Order (ECF No. 2530-2) at 3–9, and the requested non-operational measures have similarly precise terms, *see, e.g., id.* at 9–10 ("Federal Defendants shall begin efforts to ensure that there are no nesting Caspian terns and no more than 1,000 nesting gulls on the Blalock Islands on March 1 of each year"). The Proposed Order easily passes muster under Rule 65's reasonableness standard.

**b.   No threshold barriers foreclose Plaintiffs' non-operational relief.**

Federal Defendants disparage Plaintiffs' non-operational measures as "parochial prerogatives" "designed to enrich participants in this case" and as precluded because they would allegedly "create new legal rights and obligations." Fed. Br. at 14, 17. Plaintiffs' non-operational requests for relief are emphatically *not* designed to enrich anyone, parties to this case or

Page 6 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
             INJUNCTION

otherwise—several have roots in existing undertakings (e.g., steelhead kelt reconditioning) and are focused squarely on reducing irreparable harm to threatened and endangered salmonids (and to Plaintiffs and Plaintiff-aligned amici). In any event, no "new legal rights and obligations" allegedly associated with Plaintiffs' non-operational relief preclude the Court from awarding those measures. *Id.* at 17. Federal Defendants gesture toward "fundamental principles of administrative law and separation of powers" that "preclude" the Court from awarding Plaintiffs' non-operational relief, but fail to identify concrete grounds for any such prohibition. *Id.*

The axiom that "equity follows the law," which Federal Defendants excerpt from one of Justice Story's 150-year old treatises, simply means that a court cannot award equitable relief that is *in contravention of* a statute. *See, e.g.*, *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893) ("[A] court of equity has no jurisdiction to enforce [an invalid] contract . . . or . . . to so modify it as to make it legal, and then enforce it."). This does not foreclose equitable relief that *supplements* legal remedies, as inadequate remedies at law are the very reason for equitable jurisdiction. To likewise quote Justice Story, '[t]he beautiful character or pervading excellence . . . of equity jurisprudence, is that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes." *United States v. Oregon & C.R. Co.*, 186 F. 861, 930 (D. Or. 1911) (quoting Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 439 (1836)). Here, as discussed below, Plaintiffs do not ask the court to violate or rewrite what any law requires. *Cf. I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988) ("Once it has been determined that a person does not qualify for citizenship, the district court has no discretion to ignore the defect and grant citizenship.") (citation modified). To the contrary, Plaintiffs' requested relief directly furthers the ESA's species conservation objectives. *See Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944) (court's discretion to award injunctive relief "must be exercised in light of the large objectives" of the statute at issue). Federal Defendants chafe at having to "engage in new processes, seek and expend funds, issue contracts, and perform other measures." Fed. Br. at 17.

Page 7 -    STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

But they have cited no legal authority that would as a threshold matter preclude such injunctive relief.

Plaintiffs' proposed infrastructure and conservation measures are targeted undertakings to facilitate and amplify the benefits to salmonids associated with the spill and reservoir elevation elements of the proposed injunction. Federal Defendants wave off these components of Plaintiffs' relief as variously infeasible, ineffective, and unwarranted. Fed Br. at 46–48. Closer analysis of these critiques, however, does not bear out those broad-brush characterizations.

Federal Defendants assert that it "is not possible to undertake" the infrastructure relief during "the presumed one or two-year period of interim relief." Fed. Br. at 47. The cited declaration from the Corps, however, mainly focuses on constraints like in-water work windows and a current lack of specific congressional appropriations—and concedes that the John Day Dam fish ladder cooling structure *is* feasible within Plaintiffs' proposed timeline. Declaration of Daniel Feil (Feil Decl.) (ECF No. 2570) at 46, 54–58. Such concerns should be addressed through good-faith efforts upon execution or (as to asserted funding constraints) a more robust evaluation as to whether particular relief may fall within existing broad authorizations. Federal Defendants' asserted inability to accomplish Plaintiffs' conservation measures due to a lack of "statutory" or "land management" authority is similarly flimsy. Fed. Br. at 47. That court-ordered relief may require coordination among federal agencies, or with state agencies and tribes, is unremarkable and resolvable. Federal Defendants cannot dodge entry of court-ordered relief by feigning helplessness to engage in basic problem-solving efforts that may be required to implement it.

Federal Defendants also impugn Plaintiffs' conservation measures as "ill-conceived" and ineffective, specifically highlighting their apparent concern that holding ponds at Dworshak Hatchery "would expose sockeye to infectious hematopoietic necrosis virus" and "could contribute to higher rates of mortality in this listed species." Fed. Br. at 47. Risks posed by infectious diseases are already well-known to fisheries managers, who employ strict quarantine

Page 8 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

and biosecurity protocols to prevent pathogen spread. Bowles Reply Decl. ¶ 136. And Federal Defendants' declarant acknowledges the benefits of "safety net programs" like the broodstock program at Dworshak Hatchery to "further decrease the potential for catastrophic population loss" and represents that the U.S. Fish and Wildlife Service "generally could support the transport of adult Snake River sockeye salmon." Declaration of Dr. Kyle Hanson (Hanson Decl.) (ECF No. 2576) ¶ 8. The requested holding ponds are just one ancillary element of the Plaintiffs' broader proposed relief to maximize adult Snake River sockeye trap-and-transport operations. *See* Prop. Order (ECF No. 2530-2) § IV.C. As with Federal Defendants' other concerns, this is a potential implementation fix rather than a fatal flaw that should altogether foreclose the requested sockeye relief. Nor have Federal Defendants substantiated their stark assertion that "*[n]one*" of Plaintiffs' non-operational measures can be implemented in 2026 "or in a similar period." Fed. Br. at 48 (emphasis added). Plaintiffs' proposals may not be in accord with Federal Defendants' own processes or priorities, but they are nonetheless achievable and will benefit listed salmonids. As such, they should be ordered as preliminary relief to reduce irreparable harm

### c.  Plaintiffs' requested relief does not violate the ESA or Clean Water Act.

Federal Defendants' assertion that Plaintiffs' requested injunction "would result in new ESA and Clean Water Act violations" does not withstand scrutiny. Fed. Br. at 20. This argument hinges on the idea that courts cannot "mandate Federal agencies to implement operations outside the ESA's [Section 7] consultation framework." *Id.* at 21. However, prior injunctions in this case ordered particular CRS operations, which Federal defendants concede "overr[ode] the plans [they] adopted." *Id.* at 15; *see, e.g., NMFS VII*, 886 F.3d at 823 (upholding 2017 spill injunction). Moreover, Federal Defendants have plainly not applied this principle to their own activities. Federal Defendants did not reinitiate consultation regarding the now-defunct RCBA operations prior to implementing them in 2024. Nor have they indicated that they intend to reinitiate consultation as to the proposed 2026 FOP, which includes spill above Oregon's 110% TDG standard and other measures markedly less protective of fish than those described in the 2020

Page 9 -    STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

BiOp.

Federal Defendants' attempt to use Section 7 as a shield against injunctive relief fails where, as here, the request for interim relief is driven by Section 7 violations associated with ongoing operations (i.e., failure to ensure that an activity "is not likely to jeopardize the continued existence" of a listed species, 16 U.S.C. § 1536(a)(2)). *See NWF v. NMFS*, 422 F.3d at 796 ("our situation is unlike that of a timber sale, which can be postponed in order to permit the agency to correct the ESA violations before the planned operation commences"). If the Court determines that Plaintiffs have satisfied the criteria for preliminary injunctive relief tied to those alleged Section 7 violations, it would be perverse to interpret Section 7 to foreclose the Court's ability to enter such relief to reduce irreparable harm. *See* 50 C.F.R. § 402.03 (Section 7 consultation requirements apply to "all actions in which there is *discretionary* Federal involvement or control") (emphasis added); *cf. San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 1014) ("[a] court may not issue an injunction *under NEPA* that would cause a violation of *other* statutory requirements, such as those found in Section 7 of the ESA") (emphasis added).

Federal Defendant's reliance on *I.N.S. v. Pangilinan*, 486 U.S. 875 (1988), is misplaced. Fed. Br. at 20–22. In that case, the Supreme Court held that the lower courts' equitable remedy directly contravened the statutory requirements for naturalization. Here, by contrast, the requested relief to address ESA violations is squarely *in furtherance of* the ESA's goals and terms. That was also true in *Northwest Environmental Defense Center v. U.S. Army Corps of Engineers*, where Judge Hernandez issued a detailed remedial order requiring the Corps to implement "volitional downstream fish passage and water quality measures to mitigate irreparable harm to the listed salmonids." 558 F. Supp. 3d 1056, 1076 (D. Or. 2021). Many of the plaintiffs' requested remedies consisted of measures that NMFS had already deemed necessary in consultation. *Id.* at 1066. But because NMFS created those measures "under the incorrect assumption that the Corps lack[ed] statutory authority to conduct deep drawdowns or other

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

operational measures that reduce hydropower generation," the Court fashioned an expert panel (which included plaintiffs' representatives) to "flesh out the implementation details of numerous interim mitigation measures." *Id.* at 1076. Just as the lack of ESA Section 7 consultation as to those subsequent operational details posed no barrier to injunctive relief there, it does not here.

Federal Defendants' additional argument that the requested spill operations will force them to violate the Clean Water Act fails due to the same flawed premise that those operations are "outside the boundaries of ESA consultation." Fed Br. at 21.[3] It is also wrong for additional reasons. In July 2024, to support operations agreed to under the RCBA, the Corps requested that Oregon re-authorize specified exceedances of its water quality standards for total dissolved gas (TDG) in the lower Columbia River at McNary, John Day, The Dalles, and Bonneville Dams (up to 125% (spring) or 120% (summer)). *See* Letter from Frances E. Coffey, Programs Dir., U.S. Army Corps of Eng'rs, to Leah Feldon, Dir., Or. Dep't of Env't Quality (July 9, 2024), https://ormswd2.synergydcs.com/HPRMWebDrawer/Record/6827530/File/document. Oregon did so, and that authorization remains in effect through 2029. Or. Env't Quality Comm'n, Order Approving a Modification to Oregon's Water Quality Standard for Total Dissolved Gas in the Columbia River Mainstem at 4 (Dec. 31, 2024), https://www.oregon.gov/deq/wq/Documents/tmdlTDGmod0225.pdf.[4] Oregon's reauthorization of those exceedances includes several conditions, including that for spring spill the tailrace maximum TDG criteria must be "applied in a manner consistent with the applicable requirements of the federal Endangered Species Act." *Id.* That condition does not specifically

---

[3] The State of Idaho argues that the requested minimum operating pool (MOP) relief would violate the Rivers and Harbors Act of 1945, Pub. L. No. 79-14, 50 Stat. 10, and the Flood Control Act of 1962, Pub. L. No. 87-874, tit. II, 76 Stat. 1180. Idaho's Corrected Resp. in Opp'n to Mot. for Prelim. Inj. (ECF No. 2598) at 12–15. But this rests on the erroneous premise that Plaintiffs seek MOP relief "without any flexibility" regarding navigation. *Id.* at 14.

[4] The exceedance allowance applies between April 1 and August 31 each year, but the Director of the Oregon Department of Environmental Quality may approve additional periods of application upon one week's notice from the Corps. To date, the Corps has not made such a request for 2026. But, once it does, approval is a straightforward administrative exercise that has never been denied.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

mention consultation, nor does it otherwise suggest that the allowance would be unavailable under court-ordered preliminary injunctive relief to address alleged violations of ESA Section 7.

Washington's authorization of TDG exceedances similarly specifies that "tailrace maximum TDG criteria at hydropower dams shall be applied in accordance with Endangered Species Act consultation documents associated with spill operations on the Snake and Columbia rivers, including operations for fish passage." Wash. Admin. Code § 173-201A-200(1)(f)(ii)(B)(I) (2024). That regulation defines "ESA consultation documents" in a way that encompasses relief issued via court order. *See id.* (defining "Endangered Species Act consultation documents" broadly as "those by which dams may legally operate during the time that the adjusted criteria" are in use). Federal Defendants are thus wrong that the absence of additional ESA consultation specifically associated with the injunction's terms would automatically "render[] unavailable" Oregon's and Washington's allowances for TDG exceedances. Fed. Br. at 21.

### B. Oregon has established that it will be irreparably harmed during the pendency of these proceedings.

#### 1. Oregon possesses a sovereign interest in listed salmonids.

Federal Defendants argue that Oregon lacks "any cognizable personal interests" to support its request for preliminary injunctive relief. Fed Br. at 35. Oregon's sovereign interests in "the survival and recovery of [ESA-]listed salmon and steelhead in the Columbia River Basin" are well-established in this litigation. *See* Oregon's Fifth Supp. Compl.-In-Intervention (Oregon's Fifth Supp. Compl.) (ECF No. 2325) ¶ 5.[5] Indeed, Federal Defendants have never before challenged those interests as insufficient to warrant preliminary injunctive relief, or otherwise. In an inexplicable about-face, Federal Defendants impugn the adequacy of Oregon's interests on three grounds: i.e., that Oregon has failed to show irreparable harm (1) "to itself," (2)

---

[5] Oregon's Fifth Supplemental Complaint further alleges that "Oregon also has a unique sovereign interest in the beneficial attributes of the CRS, including power production, navigation, flood control, and irrigation. In view of those interests, Oregon has a clearly cognizable interest in the lawful operation of the CRS." Oregon's Fifth Supp. Compl. (ECF No. 2325) ¶ 5.

Page 12 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

that is likely to occur within one year, and (3) that is "focused on any cognizable personal interests" in individual salmonids. Fed. Br. at 25–28, 35–37. These threshold arguments lack merit, and ring hollow against the backdrop of Oregon's decades of participation in this litigation. None are effective to forestall entry of preliminary injunctive relief in Oregon's favor.

In affirming this Court's entry of a 2017 injunction, the Ninth Circuit expressly rejected arguments made by Intervenor-Defendant Northwest River Partners that Plaintiffs had failed to identify irreparable harms "to themselves" rather than to fish or the environment. *NMFS VII*, 886 F.3d at 822. Federal Defendants now embrace this very same attack, despite previously having not seen fit to join it. There is nothing materially different here to explain that shift, or to warrant a different result. Oregon does not dispute that a litigant seeking a preliminary injunction must show harm to itself. But Federal Defendants' framing parses the matter too finely. Here, as in many ESA cases, there is no need for a particularly nuanced distinction between harms to species and to the plaintiffs themselves. *See Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) ("[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs."); *see also Env't Def. Ctr. v. Bureau of Ocean Mgmt.*, 36 F.4th 850, 890 (9th Cir. 2022) ("potential harm to endangered species supports a finding of irreparable harm because 'once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult.'") (quoting *NMFS VII*, 886 F.3d at 818).

As the Ninth Circuit recognized in *NMFS VII*, the basic question is whether Plaintiffs "have adequately shown how harm to the listed species will affect" them. 886 F.3d at 822. Oregon is not asserting a *quasi*-sovereign *parens patriae* claim on behalf of third parties. Oregon's standing, and legal interest in these preliminary injunction proceedings, is as a sovereign seeking to vindicate its own rights vis-à-vis listed species that will be adversely impacted by CRS operations. There can be no serious dispute that, for Oregon, harm to the listed

Page 13 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

species is harm to its sovereign interests. "Wildlife is the property of the state." ORS 498.002(1).

Oregon holds title to wildlife within its borders, including fish, "in trust for all its citizens." *See*

*Portland Fish Co. v. Benson*, 56 Or. 147, 154 (1910) (title to wild animals, "before they are

captured, is in the state in its sovereign capacity"); *see also* Excerpts of Tr. from the Dep. of

Edward Bowles (ECF No. 2569-1) at 3 (33:3–4) ("the fish are part of Oregon's culture and

they're not independent from Oregon and Oregon's value."). In addition, Oregon "also play[s] a

role in dam management through the governance of water diversions from the rivers and through

state conservation programs." *NMFS VII*, 886 F.3d at 812. Those fundamental legal interests,

which Federal Defendants do not address, are alone sufficient to establish Oregon's harms.

Oregon indisputably has a legal interest in, and is injured through, harms to listed salmonids

caused by the challenged CRS operations.

### 2. Irreparable harm to both listed salmonids and Oregon is likely and imminent.

Federal Defendants also challenge the likelihood and imminence of harms absent an

injunction, contending that their actions are not likely to inflict lasting damage "over the period

of months" until the merits of the case are resolved and any permanent injunctive relief has

issued. Fed. Br. at 26–27, 37. The Court has previously rejected such myopic views, noting its

prerogative to order modified spill operations during a two-year period without a need for any

"separate finding that during the time remaining in [that] period the species is in imminent

danger of becoming extinct." *NMFS VI*, 2017 WL 1829588 at *6.

Moreover, the prospect of any permanent resolution is far more distant than mere

"months" or even one year, especially considering the likelihood of appellate proceedings no

matter who prevails here. But even if the Court were to cabin its analysis to that unfounded

timeframe, Oregon has provided ample evidence that irreparable harms are both likely and

imminent within that period. As discussed below in Section II.B., the operations set forth in the

Draft 2026 FOP provide all that is needed to establish that irreparable harm to the listed fish and

Oregon would occur within the next year. In the absence of an injunction, the Federal

Page 14 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

Defendants will significantly decrease both the amount and duration of spill beginning in a matter of weeks. With a strained analogy to non-environmental cases, Federal Defendants suggest that those harms cannot be considered imminent because "ESA-listed stocks can be remediated or rehabilitated." Fed. Br. at 36–37. Even assuming it were true that particular species or populations have the ability to rebound, there is no basis to speculate that will actually occur here absent preliminary injunctive relief. Moreover, such potential resilience depends on numerous complex and interacting factors, some of which (e.g., ocean conditions) are beyond any party's direct ability to control. Listed species' potential to rebound is sound reason to *grant* interim relief, not deny it.

Federal Defendants also assert that because Oregon regulates fisheries that include ESA-listed species, it "cannot show that *any* impacts to the abundance of ESA-listed salmon and steelhead, no matter how small, irreparably harms them." Fed. Br. at 35. This argument is ill-conceived. Oregon disputes that its fisheries regulation is comparable to CRS operations. Even if it were, preliminary injunctive relief is available even if the requested relief will not fully remedy the harms (e.g., where there are other contributing factors). *NMFS VII*, 886 F.3d at 819 ("a plaintiff need not further show that the action sought to be enjoined is the exclusive cause of the injury") (citation modified); s*ee also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("We have never made a rule that a plaintiff must challenge all related harms to maintain an ability to challenge the harm that it views as the most serious.").

Even taking Federal Defendants' logic at face value, it does not undercut Plaintiffs' request for relief because Oregon is not seeking a preliminary injunction based on any trivial or *de minimis* losses of individual salmonids or decreases in abundance. *See NMFS VI*, 2017 WL 1829588 at *6 ("This is not a case where the court is considering the loss of only a small number of animals within the listed species."). Rather, Oregon has identified multiple serious threats to species abundance posed by the challenged CRS operations. Thus, even if Federal Defendants

Page 15 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

were correct that Oregon lacks a "personal relationship with individual salmonids" (which is neither the standard nor accurate here, given Oregon's sovereign interests), that limitation would have no bearing on the much broader and deeper evidence of further abundance and survivability decline impacts for populations and entire species already imperiled that Oregon has offered to establish irreparable harm. *See NMFS VII*, 886 F.3d at 821 ("the district court did not need to find an extinction-level threat to the listed species in the short term," but "even if a focus only on short-term survival were required, the district court found that the continued low abundance of the listed species made them vulnerable to extinction.").

### C. The Corps is not immune to the requested injunctive relief.

Federal Defendants assert that the Court should deny Plaintiffs' requests due to a "disconnect" between ESA Section 7 "merits arguments and the relief sought." Fed. Br. at 23. Specifically, Federal Defendants argue that it would be improper to enjoin the Corps (1) because it undertook an "independent analysis" of ESA issues in the 2020 ROD and other documents, or (2) until the Court invalidates the 2020 BiOp. *Id.* at 24–25. Oregon has alleged that the Corps violated ESA Section 7 in multiple ways, including that it cannot meet its substantive duty to avoid jeopardy under Section 7(a)(2) by relying on NMFS' unlawful 2020 BiOp. Oregon's Fifth Supp. Compl. (ECF No. 2325) ¶¶ 114, 116–118. Even assuming for the sake of argument that the Corps' own analyses were sufficiently "independent" rather than merely parroting the flawed assumptions and reasoning from NMFS' BiOp, the Corps ultimately determined in the 2020 ROD "to implement the 2020 CRS BiOps." ACE000339708 (2020 ROD); *id.* at ACE000339683 ("agree[ing] with the determinations of [the U.S. Fish and Wildlife Service] and NMFS" in the 2020 BiOps). Given that reliance, the 2020 ROD cannot survive if NMFS' 2020 BiOp is likely to be set aside. If the Court rules that Plaintiffs are likely to succeed on their challenges to the 2020 BiOp, then it follows that the Corps' express (and legally necessary) reliance on it is also likely to be deemed unlawful. As such, all Federal Defendants are subject to Plaintiffs' requested

Page 16 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION

injunction, which seeks "relief of the same character as that which may be granted finally." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015).

## II.    PLAINTIFFS' REQUESTED RELIEF IS APPROPRIATE AND NARROWLY TAILORED TO REDUCE IRREPARABLE HARM

The Federal Defendants put themselves in an awkward position, arguing both that the status of the species has improved to such a degree that irreparable harm cannot be shown, but that higher level of spills implemented since 2017 have led to decreased juvenile survival rates and no statistically significant improvements to smolt to adult returns (SARs), thereby justifying the dramatic decreases in spill in the proposed 2026 FOP. Fed. Br. at 24, 30. In reality, neither is true.

### A.  The status of the species has not markedly improved.

#### 1.  Federal Defendants misunderstand the purpose and use of QET analyses.

The Federal Defendants attempt to discredit Oregon's and the Nez Perce Tribe's QET analysis, arguing that the models are not credible because QET predictions in 2021 for 2025 abundances were higher than what actually occurred. Fed. Br. at 32. This statement misses the point of the QET generally and the specific QET analyses that were performed. First, and as described in Oregon's opening brief, QET is used to evaluate a population and a stock's risk of collapse and represents a potential tipping point for a population where it can no longer be assumed that extinction can be avoided, even with improved conditions. Opening Br. (ECF No. 2530) at 7–8. Plaintiffs have never "insinuated' that an entire ESU or DPS is "always in imminent danger of extinction" when at or below QET. Fed. Br. at 31.

The primary purpose of the QET analyses performed in 2021 and in 2025 was to determine whether listed Snake River spring/summer Chinook and steelhead constituent populations were already at QET – not to predict QET status in the future. Bowles Reply Decl. ¶ 35. Those analyses showed that in both 2021 and 2025, multiple populations were at or below QET *at that time*. *Id.* That is, multiple populations were at or below 50 spawners for four consecutive years in 2021 and 2025. *Id.* These assessments of current QET at these two points in

Page 17 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

time – 2021 and 2025 – are not a forecast or prediction. *Id.* And while there was a distinct, secondary predictive component of the 2021 QET analyses that, in this instance, over-predicted the number of populations at QET in the future, the misalignment of future QET occurred because of temporarily improved environmental conditions that resulted in some populations reaching more than 50 spawners in one year, re-setting the QET clock. *Id.* ¶ 36. Regardless of the cause, imprecision in the forecasting of future QET levels in no way detracts from the model's ability to accurately determine current QETs, and its use to identify serious risk of extinction of remaining populations within an already imperiled species. *Id.* ¶ 39.

### 2. Recent data does not support Federal Defendants' claim of a trend of increasing abundance.

Federal Defendants argue that "the best available *recent* data on abundance and population trends . . . show increasing abundance" that "disproves Plaintiffs' assertions that negative trends prior to 2020 have continued." Fed. Br. at 30. However, NMFS's own reports and statements of their declarants show that is not true. Moreover, short term increases or decreases in abundance do not equate to improved status.

As discussed in Oregon's opening brief, status reviews of ESA-listed Snake River salmon and steelhead stocks conducted by NMFS in 2016 status review indicated that all Snake River spring-summer Chinook except one were functionally extirpated or faced a high risk of extinction. Opening Br. (ECF No. 2530) at 6; Declaration of Edward Bowles (Bowles Decl.) (ECF No. 2531) ¶ 5. NMFS's most recent status report in 2022 found that the majority of spring-summer Chinook continued to be at *high* risk of extinction and Snake River sockeye remained at *extreme* risk of extinction. Opening Br. (ECF No. 2530) at 6; Bowles Decl. (ECF No. 2531) ¶ 6.

Daniel Feil, the Corps' fishery biologist, appears to agree with the assessment of NOAA in the status reports. In his declaration, Mr. Feil states unequivocally, "[T]there have not been striking upward trends in juvenile survival or SARs" since 2017. Feil Decl. (ECF No. 2570) ¶ 19 (emphasis in original). He goes on to explain:

Page 18 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
            INJUNCTION

> In fact, in-river juvenile survival through the CRS in recent years, notably since 2020 with increased spill up to 125% TDG levels, has not shown a marked corresponding increase with increased spill. Instead, survival estimates have progressively declined, and in some years, survival of both juvenile steelhead and Chinook salmon are lower than years prior to 2018, when spill levels were much lower (Figure 3).

*Id*. ¶ 20.

Similarly, Steven Smith, a mathematical statistician with NMFS, concluded, "for both yearling Chinook salmon and steelhead, <u>mean estimated survival was lower in the 2020-2025 period than in 2007-2019</u>." Declaration of Steven Smith (Smith Decl.) (ECF No. 2581) ¶ 7 (emphasis added). And Kelsey Swieca, a fish biologist with NMFS agrees that, with the exception of Upper Columbia River steelhead, "interior Columbia Basin salmon and steelhead listings have remained consistent with their original listing status." Declaration of Dr. Kelsey Swieca (Swieca Decl.) (ECF No. 2584) ¶ 7. In discussing Snake River sockeye, Dr. Swieca admits that: (1) the past decade has seen "significant dips" in abundance that "warrant extreme concern;" (2) that NMFS continues to consider their extinction risk category to be "high"; and (3) that returns at Lower Granite dam in 2025 were lower than the prior three years. *Id*. ¶ 23.

Nonetheless, in an effort to disprove imminent harm to listed fish, Federal Defendants cast those assessments of the status of the fish aside and instead rely on data from the last four years that Dr. Swieca believes may show a trend of increasing abundance for Snake River salmon and steelhead. Dr. Swieca's declaration discusses her review of adult returns of Snake River fall Chinook, Snake River spring-summer Chinook, Snake River steelhead and Snake River sockeye at Lower Granite Dam. Swieca Decl. ¶¶ 9–23. For each ESU, a graph showing abundance since the 1970s – 1980s is included. With respect to fall Chinook, the graph shows approximately 8000 adult returns in 2020, 9000 in 2021, nearly 16,000 in 2022, approximately 7500 in 2023, and less than 7000 in 2024. *Id*. at Fig. 1. Those numbers indicate an increase from 2020-2022, then a decrease by more than 50% from 2022 levels in 2023, and another decrease in returns from 2023 levels in 2024. *Id.* When reviewing the numbers and the graph, it is difficult to discern any pattern at all, much less a trend toward increasing abundance. The same is true of the

Page 19 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

data associated with spring-summer Chinook, steelhead, and sockeye. *Id*. at Figs. 2–4. Contrary to the Federal Defendants' claims, data from recent years does not show a trend of increasing abundance.

Moreover, the emphasis placed on short-term changes in abundance has little to do with the status of the species. The status of a species is a function of both abundance and productivity. Abundance can fluctuate up and down against a backdrop of good or bad environmental conditions. If a population is already at low abundance, there must be adequate productivity to avoid additional generational decline even during periods of poor environmental conditions. Opening Br. at 33–36; Bowles Reply Decl. ¶¶ 18–27.

## B. The requested suite of injunctive relief is far better for fish than either the operations set forth in the 2020 ROD or Draft 2026 FOP.

Faulty analysis and contradictory statements also form the basis for Federal Defendants' assertion that the Plaintiffs' requested relief is worse for the fish than either the operations set forth in the 2020 BiOp and ROD or their planned operations for 2026.[6] Fed. Br. at 38–39. In fact, the spill levels in the Draft 2026 FOP are significantly less than spill levels seen in the recent past, and include a roll back of spill caps from 125% TDG to 120% TDG, increased hours within the day where spill is further curtailed, and significantly curtailed summer spill. Bowles Reply Decl. ¶¶ 14, 124.

The chart below is based on a similar chart provided by Mr. Feil in his declaration. Feil Decl. (ECF No. 2570) at Fig. 2. Whereas Mr. Feil neglected to include the proposed spring spill operations in the Draft 2026 FOP, they are included in the chart below, prepared by Jay Hesse, the Director of Biological Services in the Nez Perce Tribe's Department of Fisheries Resources Management.

---

[6] FOPs are prepared annually and set forth the Corps' planned operations at the 4 lower Snake River dams and 4 lower Columbia River dams. The Draft 2026 FOP was first disclosed on December 15, 2025, with the filing of the Federal Defendants' opposition to the motion for a preliminary injunction and, as a result, was not addressed in Oregon's Motion.

Page 20 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Average daily spill volumes during the spring period using median flows

This chart demonstrates several key points related to the Federal Defendants' claims: (1) the Plaintiffs' requested spring spill relief has been implemented by the Federal Defendants before;[7] (2) spring spill in the Draft 2026 FOP is significantly lower than that requested by the Plaintiffs; (3) spring spill in the Draft 2026 FOP is significantly lower than what the Federal Defendants agreed to implement in the 2025 FOP; and (4) spring spill in the Draft 2026 FOP is significantly lower than even that in the 2020 BiOp/ROD.

If not prevented by this Court, Federal Defendants will roll back spill caps to 120% TDG levels (decreased from 125% TDG), increase the number of hours per day where spill is constrained to benefit power revenue, curtail spill for the entire month of August, continue with

---

[7] Spill at Bonneville under the PI request is shaded at the top because that extra volume of water would only be spilled once barriers in the stilling basin have been installed as requested by the Plaintiffs. Prop. Order (ECF No. 2530-2) § III.B. As explained by Mr. Bowles in his original declaration supporting the motion for a PI, spill has been constrained since 2018 because of large boulders entrained in the spillway. Bowles Decl. (ECF No. 2531) ¶ 111. Thus, until the boulders are removed, spill up to 125% TDG will not be possible. *Id.*

Page 21 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

elevated reservoir levels, and prioritize transportation of smolts at the expense of providing better conditions for in-river migrants. *See e.g.,* Bowles Reply Decl. ¶¶ 51, 52, 67. Each of those actions independently has adverse effects on listed fish, and the combined effects of all of them will be significant. Despite the significantly fewer number of protections for fish in the Draft 2026 FOP, Federal Defendants contend that it is better for fish than the Plaintiffs' requested relief. This simply is not so, as confirmed by multiple analyses, including their own. *Id.* ¶¶ 13–16, 45, 47, 52, 63.

### 1. The Federal Defendants' own analysis shows an increase in harm to fish from the operations in the Draft 2026 FOP and reduction in harm from Plaintiffs' PI request.

The Federal Defendants describe a modeling exercise performed by NMFS scientists using the Comprehensive Passage Model (COMPASS) and Life Cycle Model, which they describe as much more accurate than the CSS modeling used by Plaintiffs.[8] Fed. Br. at 39. This new study purports to evaluate the impact of Plaintiffs' requested relief compared to the 2020 BiOp and ROD and Draft 2026 FOP. Fed. Br. at 39; Declaration of James R. Faulkner (Faulkner Decl.) (ECF No. 2575) ¶¶ 12–13. However, rather than demonstrating that the Plaintiffs' requested relief is worse for fish than the 2020 BiOp or the Draft 2026 FOP, NMFS's COMPASS modeling shows that Plaintiffs' requested relief would result in increases in in-river survival, improvement in fish travel time, and a significant decrease in the number of fish requiring transport, Faulkner Decl. (ECF No. 2575) ¶¶ 14–16, all of which improve the likelihood of survival. Bowles Reply Decl. ¶ 63. In fact, Tables 1 and 2 in Dr. Faulkner's Declaration do not show a single metric in which fish fared worse under the Plaintiffs' requested

---

[8] Plaintiffs do not agree that COMPASS and LCM are better or more accurate than the CSS model. They are different models designed to predict different things. Contrary to Federal Defendants' claims, though, CSS is based on decades of empirical data and are updated and recalibrated to reflect the latest information on key variables that help explain variables in fish survival rates. Bowles Reply Decl. ¶¶ 81, 96. Moreover, CSS modeling was used by the Federal Defendants in the 2020 BiOp and ROD to show the benefits of spill in the various alternatives, and embraced by NOAA it is Rebuilding Interior Columbia Basin Salmon and Steelhead report (NOAA Fisheries 2022). Bowles Reply Decl. ¶¶ 55–57.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

spill operations than either the 2020 BiOp or the Draft 2026 FOP.[9] Faulkner Decl. (ECF No. 2575) at p.8. Dr. Faulkner's found that "[i]n general, for both yearling Chinook salmon and juvenile steelhead, mean in-river survival was approximately one percentage point higher, travel times were 0.5 to 0.7 days shorter, and proportion destined for transportation was 15-17 percentage points lower for the PI 2025 compared to [sic] Draft 2026 FOP." *Id.* ¶ 16. In other words, Plaintiffs' requested relief would improve multiple key variables associated with in-river survival and SARs. Federal Defendants' claim that fish fare better under their proposed 2026 FOP does not comport with their own analyses.

### 2. The Fish Passage Center confirms that the Draft 2026 FOP operations are worse for fish than the 2020 BiOp/ROD.

Independent analysis performed by the Fish Passage Center (FPC) further belies Federal Defendants' claim of improved conditions under their proposed 2026 FOP. The Fish Passage Center was created by the Northwest Power Planning and Conservation Council, which, in turn, was created by the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. § 839 *et seq.*, and it is funded primarily by the Bonneville Power Administration. The Fish Passage Center provides technical assistance to regional fish and wildlife agencies and tribes on matters related to the implementation of water management, spill, and passage measures in the region.

As discussed in Mr. Bowles's reply declaration, the Fish Passage Center reviewed the Draft 2026 FOP and compared it to the 2020 BiOp/ROD and the 2025 FOP (operations under the Resilient Columbia Basin Agreement).[10] Bowles Reply Decl. ¶¶ 45, 76; *id.* Ex. 1, Memorandum

---

[9] Table 1 shows that dam survival for Snake River yearling Chinook would be the same under the 2020 BiOp and the PI request (78.3%), with dam survival under the Draft 2026 FOP being slightly higher (78.6%). Mean gas exposures were higher for the PI request but under 120% (118% and 118.6%). Faulkner Decl. (ECF 2575) at p. 8. As noted by NMFS in the 2020 BiOp, the CRS Gas Bubble Trauma Monitoring Program looked at data from 1996 to 2019 and concluded that "signs of GBT were almost non-existent below 120 percent TDG." ACE001056414.

[10] As noted above, the Draft 2026 FOP had not been disclosed to regional fish managers until the Federal Defendants' opposition brief was filed on December 15, 2025. The Fish Passage Center

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

re: Review of a Draft Fish Operations Plan Document, from Michele DeHart, FPC to Tucker Jones, ODFW (Jan. 16, 2026). The Fish Passage Center found that not only were the spring and summer spill operations in the Draft 2026 FOP reductions from the 2020 BiOp/ROD operations and 2025 FOP, but also that implementation of the Draft 2026 FOP is "expected to result in reduced juvenile fish survival and reduced SARs." *Id.* at 2, 6. Specifically, the Fish Passage Center's analysis found that the reduced spill in the Draft 2026 FOP will result in increased powerhouse encounters (higher PITPH), which is associated with longer fish travel times, though it will not have an impact on water transit times. *Id.* at 2. With less spill and no reduction of fish travel time, juvenile survival rates will decline, as will smolt-to-adult returns. *Id.* The Fish Passage Center's conclusion that the Draft 2026 FOP will result in harm to fish is consistent with the decades of research and study that have been devoted to identifying key factors affecting survival of these listed fish on which Plaintiffs rely.

### 3. Plaintiffs' requested spill will not harm fish.

The Federal Defendants argue that rather than improving conditions for the fish, the increased spill requested by Plaintiffs will have negative impacts on the fish by creating impediments to accessing fish ladders, increasing fallback, increasing predation, impeding juvenile egress from tailraces, and increasing rates of gas bubble trauma. Fed. Br. at 43. The Federal Defendants state that "[c]ontinuous high levels of spill have, in the past, caused adult migration delays for multiple days," and Mr. Feil claims that "the Action Agencies have observed adult delays ranging from four days in 2023 up to 24 days in 2022." *Id.*; Feil Decl. (ECF No. 2570) ¶ 37. Neither claim is true.

First, the requested relief does not seek higher spill than what has already occurred at the CRS dams. *See* Bowles Reply Decl. ¶¶ 3, 5, 10–11, 98, 109. And second, the data simply does not support the Federal Defendants' claim that high managed spill results in adult passage delay

---

notes that FOPs are typically coordinated through a regional group of fishery managers, but that the Draft 2026 FOP had not undergone such regional review. Bowles Reply Decl. Ex. 1 at 1.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

or increased mortality. *Id*. Ex. 1 at 1–2, 5–6.

      The Fish Passage Center evaluated whether existing data supports a claim of delayed upstream passage during high managed spill, and in particular, Mr. Feil's claim that fish passage delays up to 24 days were observed in 2022. Bowles Reply Decl. Ex. 2, Memorandum re Upstream Passage Delay, from Michele DeHart, FPC to Tucker Jones, ODFW (Jan. 16, 2026). After reviewing adult fish passage metrics including CSS Annual Reports of adult upstream survival and travel time, the Fish Passage Center concluded that "[d]uring years with high spill and during years with low spill, adult upstream survival is consistent," ranging from 94-98% each year. *Id.* at 1. Similarly, the Fish Passage Center found that "median adult fish travel times through this reach are also remarkably consistent regardless of spill for passage, with a range between 4-7 days." *Id*. While migration and survival timing were within average ranges, flow and spill were both above normal, with spill at or above the 125% managed spill level for much of the spring. Bowles Reply Decl. ¶ 111.

      With respect to Mr. Feil's claim of a 24 day passage delay in 2022 (a very high flow spring), the Fish Passage Center found that "the actual adult passage data and metrics does not provide any evidence of a 24-day adult passage delay in 2022." *Id.* Ex. 2 at 2. Instead, "upstream passage survival was within the range of past years at 95.3%, and fish travel time was near the long-term average for Ice Harbor to Lower Granite." *Id*. Federal Defendants' claim that high managed spill results in adult passage delay is not substantiated by the data.

      Finally, even if there was a delay in adult passage, it does not necessarily equate to mortality since adult salmonids have evolved by migrating upriver during periods of high flows, high water velocity, and high turbulence which cause delays in upriver migration. Bowles Reply Decl. ¶ 112. Simply put, adult salmonids have the ability to withstand modest passage delays, but the same cannot be said for juvenile passage. *Id*. ¶¶ 111–15.

### 4. Lower MOP elevations will provide benefits to the fish.

      Federal Defendants also claim that the requested MOP elevations and ranges will not

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

improve conditions for fish but, instead, will cause delays in adult passage because decreased reservoir elevation will require some dams to operate outside of normal operating ranges, and will adversely affect juvenile survival by reducing surface passage attraction. Fed. Br. at 44–45. Moreover, Federal Defendants argue that the proposed MOP operations would not have an effect water temperature, water travel time or fish travel time, but will increase predation, all of which will harm listed fish. Again, these arguments fail.

First, as described by Mr. Bowles, the requested MOP operation ranges do not require the Corps to operate reservoirs outside of normal operating range. Bowles Reply Decl. ¶ 125. Prior to 2018 the lower Snake River projects utilized the same 1-foot operating range that is requested by Plaintiffs. *Id*; Bowles Decl. (ECF No. 2531) ¶ 117. And the mid-Columbia River dams are routinely operated within the 1.5-foot operating range requested the vast majority of the time. Bowles Reply Decl. Ex. 4 at 1, Memorandum re: Summary of Reservoir Elevation Operation Levels 2023-2025, from Michele DeHart, FPC, to Tom Lorz, CRITFC (Jan. 16, 2026). Thus, Federal Defendants' claims that the requested relief will require dams to operate outside of normal operating conditions should not deter the Court from requiring that relief.

With respect to water temperature, water travel time, and fish travel time, the Federal Defendants admit that the requested MOP operations will result in benefits to fish, but dismiss them as insignificant. Fed. Br. at 44–45. But as described in Oregon's opening brief, there are no large-scale measures that can be ordered as part of a preliminary injunction that will dramatically reduce or eliminate irreparable harm to listed species. Opening Br. (ECF No. 2530) at 48. Instead, Plaintiffs must look to changes in a number of areas that will combine to have a larger effect. And modeling conducted by Daniel Turner, a civil engineer for the Corps, showed decreases in water travel time ranging from 2 to 18 hours at each project from Plaintiffs' proposed MOP operations. Declaration of Daniel Turner (Turner Decl.) (ECF No. 2573) ¶ 36.

Despite the numerous claims of harm resulting from Plaintiffs' proposed injunctive relief and assertions of benefits from their proposed 2026 FOP operations, a closer inspection of those

Page 26 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
             INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

claims demonstrates they are, at a minimum, overstated.

III.    **THE FEDERAL DEFENDANTS' ANALYSIS OF THEIR OBLIGATIONS UNDER THE ESA IS CONTRARY TO WELL-ESTABLISHED LAW.**

A.    **Federal Defendants' decisions are not entitled to significant deference or a presumption of validity.**

Federal Defendants' 2020 BiOp, which purports to be a straightforward application of statutory and regulatory terms, is not entitled to significant deference. See *Loper Bright Enters. v. Raimundo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."). Having "repeatedly changed its jeopardy standard over the past several BiOps," NMFS' past interpretations of its jeopardy obligations under the ESA have not earned any such deference. *See NMFS V*, 184 F. Supp. 3d. at 894. Here, Plaintiffs again challenge significant and fundamental flaws with the 2020 BiOp's approach to the jeopardy analysis, not scientific or technical nuances. As the latest installment in the chronicle of NMFS' ever-shifting approaches, the Court should assess the 2020 BiOp and ROD without deferring to Federal Defendants' determinations.

B.    **Federal Defendants' jeopardy analysis is arbitrary and capricious.**

Federal Defendants defend the 2020 BiOp as a back-to-basics exercise that adhered to statutory and regulatory fundamentals so rigorously as to render prior decisions in this case "inapplicable." Fed. Br. at 48, 61. This framing spurns law of the case in favor of a jeopardy framework that, despite masquerading as ESA-grounded, marginalizes the "highly precarious status" of threatened and endangered species that the statute is intended to protect. *NMFS III*, 524 F.3d at 933. Federal Defendants unabashedly abandon, rather than fix, "novel CRS-specific standards" previously found deficient. Fed Br. at 48. They fail to define fourteen years of operations between 2022 and 2035, instead relying on an overly pliable "adaptive management" framework that does not preclude reductions in spill and lacks any defined protocols for actions that will be taken if future conditions defy expectations. And they resurrect a comparative

Page 27 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

approach similar to that from the 2004 BiOp that has already been deemed to preclude a sincere, holistic analysis of the effects of continuing to operate the dams. In each case, the upshot is unlawful agency action imperiling fish. Plaintiffs are likely to succeed, once again, in overturning these analytical sleights-of-hand tainting Federal Defendants' ultimate determinations.

### 1. The 2020 BiOp's flawed comparative approach precluded a holistic analysis of harms that could appreciably reduce likelihood of survival and recovery.

The 2020 BiOp and ROD compare the effects of the (narrowly defined) proposed action against a degraded environmental baseline, rather than engaging in a thorough and comprehensive analysis of the real-world harms the species face. *See, e.g.*, 2020 BiOp at 93–98 [ACE001056312–17] (overall analytical approach), 290–91 [ACE001056509–10] (as applied to Snake River spring/summer Chinook). The "no jeopardy" determination that predictably resulted from this artificially constrained analysis is unlawful.

As described in Oregon's opening brief, Federal Defendants' approach in the 2020 BiOp and ROD echo the unlawful "reference operation" employed in the 2004 BiOp. Opening Br. (ECF No. 2530) at 30–31. Judge Redden, and the Ninth Circuit, rejected that similarly piecemeal analysis as permitting the species' "slow slide into oblivion." *NMFS III*, 524 F.3d at 930; *see also id.* at 926, 927–28. This Court acknowledged that precedent, and the problems associated with casting proposed actions as not appreciably worse than environmental baseline conditions (alone), when setting aside the 2014 BiOp. *NMFS V*, 184 F. Supp. 3d at 890–91.

Federal Defendants ignore that case law, and the imperative for an aggregated analysis, in favor of a "simple cause-and-effect relationship" between the proposed action and the consequences to listed species. Fed. Br. at 62; *see id.* at 49 (referring to the "simple question posed by the statutory text")). Specifically, Federal Defendants insist that their jeopardy analysis comports with the plain terms of the statute, 16 U.S.C. § 1536(a)(2), which is "singular[ly] concern[ed]" with whether "the *proposed action* at issue affirmatively causes jeopardy in light of . . . other factors" including "the status of the species, baseline conditions, cumulative effects,

Page 28 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
                INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

[or] climate change." Fed. Br. at 52. But the 2020 BiOp and ROD do not actually assess the proposed action's potential for jeopardy "in light of" these factors (i.e., in the aggregate). Rather, they assess the proposed action *compared with* a baseline that already subsumes nearly all of the ills associated with the discretionary decision to continue CRS operations. *See, e.g.*, 2020 BiOp at 240–41 [ACE001056459–60] (concluding that spill in Preferred Alternative would benefit Snake River spring/summer Chinook as compared with prior spill operations); *id.* at 46 [ACE001056265] (characterizing the term "jeopardize the continued existence of" as a "determination[] . . . made about the effects of Federal actions" and "not determinations made about the environmental baseline for the proposed action or about the pre-action condition of the species."). Not only does the statute on its face not mandate this comparative approach, but many prior decisions in this case preclude it.

Because ongoing CRS operations are largely discretionary, those effects should not be subsumed within the environmental baseline. *See NMFS III*, 524 F.3d at 929 (holding that the ESA does not allow agencies to "immunize discretionary agency actions [from consultation] simply because they are taken in pursuit of a non-discretionary goal."). That is in accord with the ESA regulations in effect at the time of these decisions, which disallowed inclusion of ongoing nondiscretionary actions in the environmental baseline. 50 C.F.R. § 402.02 (2019).[11] Thus, it was unlawful for Federal Defendants to relegate effects of ongoing discretionary CRS operations to the environmental baseline and thereby largely skirt them. *See* Opening Br. (ECF No. 2530) at 27–28, 31. But even if it were proper for Federal Defendants to have done so,[12] that would not

---

[11] Whereas Federal Defendants disclaim that the regulations in effect in 2019 did more than merely clarify existing requirements, Fed. Br. at 49 n.26, 51 n.27, Intervenor Public Power Council insists that those regulations "resulted in a significant change in the substantive requirements for Biological Opinions," PPC Br. (ECF No. 2553) at 15. Oregon's arguments (which include an as applied challenge to the 2019 regulations) do not hinge on reconciling those disparate views, but Oregon disputes that evolving regulations render prior decisions in this case inapplicable.

[12] On this issue, Federal Defendants and aligned Intervenors rely heavily on the D.C. Circuit's recent decision in *Center for Biological Diversity v. Environmental Protection Agency*, which affirmed an environmental baseline that included the regulatory program's "cumulative effects on endangered species since the program's outset." 141 F.4th 153, 178 (D.C. Cir. 2025). That

Page 29 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
                   INJUNCTION

save the 2020 BiOp because the central defect persists: a comparative approach that excluded a holistic assessment of the full panoply of harms the species face. *See, e.g.*, 2020 BiOp at 283–94 [ACE001056502–13] (contrasting effects of portions of the proposed action on Snake River spring/summer Chinook against past and ongoing actions). Federal Defendants should have assessed the status of the species, the environmental baseline, and effects of the action in the aggregate. *See, e.g.*, *NMFS III*, 524 F.3d at 930–31. Their failure to do so means that Plaintiffs will succeed on the merits of their ESA Section 7 claims.

### 2. The 2020 BiOp fails to clearly consider risks to recovery.

In 2016, this Court found that the "trending toward recovery" standard in the 2008 and 2014 BiOps was unlawful because it did "not include any metric or goal that considers whether the incremental improvements to the currently low abundance levels are sufficient to avoid creating a 'new risk of harm' by decreasing the chances of recovery of the listed species." *NMFS V*, 184 F. Supp. 3d at 892. Rather than address that defect, Federal Defendants in the 2020 BiOp altogether abandon *any* meaningful evaluation of the species' prospects for recovery. Instead, they "returned to" what they describe as "the clear inquiry posed by the ESA and regulations: whether, given the species' *current* status, conditions, and threats, the proposed action will reduce *current* 'reproduction, numbers, or distribution' in a way that pushes the species toward extinction or precludes its recovery." Fed. Br. at 77 (emphasis added). Federal Defendants purport to have "preserv[ed] a path to recovery" with this superficial (and mostly survival-oriented) inquiry. *Id.* at 75. But there is no way to discern so, given the 2020 BiOp's reliance on then-current data and projections that, like the standard and metrics in the 2008 and 2014 BiOps, are not anchored to "any rough estimated recovery abundance level or time frame." *NMFS V*, 184 F. Supp. 3d at 894.

---

case is distinguishable because (1) it concerned an agency's decision that its action was "not likely to adversely affect" listed species (rather than a "no jeopardy" decision), *id.* at 179, and (2) concerned a limited-term Clean Air Act rulemaking rather than a long-term, ongoing operation like the CRS.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

NMFS' logic for ducking recovery benchmarks is unsound. NMFS represents that, in its combined assessment of the "intertwined needs" of survival and recovery, it employed its assessment of the species' current statuses to perform "COMPASS and life-cycle modeling to quantitatively estimate population abundance and productivity under the proposed action." Fed. Br. at 73. Federal Defendants assert that this predictive modeling is dispositive: "It follows that, if the proposed action is not expected to measurably reduce a species' current 'reproduction, numbers or distribution,' the action also would not 'appreciably reduce' its likelihood of maintaining survival and preserving a path to recovery." *Id*. at 75. This improperly assumes that survival parameters, as they stood in 2020, will *necessarily* persist and accommodate recovery. That shortcut is specious, especially in the context of undefined future operations and life-cycle modeling (i.e., projections of median abundances and QET thresholds)[13] showing decreased abundances and increased extinction risk for multiple populations over the next 24 years, "even when taking into account the benefits of the proposed non-operational conservation measures and the most optimistic hypotheses related to reduced latent mortality." 2020 BiOp at 289 [ACE001056508]; *id.* at 228–29 [ACE001056447–48] (Table 2.2-19b); *id.* at 233 [ACE001056452] (Table 2.2-21). NMFS' quantitative assessments revealing such risks cannot be squared with its ultimate qualitative determination that the proposed action will not appreciably reduce the species' likelihood of survival and recovery. Fed. Br. at 74.

Many of the Court's critiques of the "trending toward recovery" standard and its metrics resonate with equal force as to the 2020 BiOp, as it does not meaningfully "take into account whether populations remaining at significantly low abundance numbers" appreciably diminish the likelihood of recovery. *NMFS V*, 184 F. Supp. 3d at 888. For example, NMFS relies on modeling predicting that spring spill will cause juvenile survival rates "increase slightly"—and

---

[13] As employed in the 2020 BiOp, QET modeling is an academic exercise with no direct bearing on recovery. *See NMFS V*, 184 F. Supp. 3d at 892 (rejecting NMFS' "trending toward recovery" standard, which estimated the level of improvement necessary to achieve a five percent or less risk of extinction during the following 24 years).

Page 31 -   STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

even hypothesizes that adult returns will increase "by about 35 percent." 2020 BiOp at 285 [ACE001056504]. Even if those predictions were correct, it would not save NMFS' analysis: "[O]ver time," NMFS concludes, these increases would simply "reduce the severity of expected declines in abundance and productivity caused by a warming climate and deteriorating ocean conditions." *Id.* This comparative approach, focused merely on reduced severity decoupled from minimum viable abundances or any recovery thresholds, runs afoul of the Court's prior decisions regarding recovery because it lacks "some idea of what constitutes recovery in order then to evaluate whether the agency action at issue diminishes the chances of recovery." *NMFS V*, 184 F. Supp. 3d at 893.

Section 7 requires this approximate end goal. Indeed, it is "only logical" that a BiOp must identify "roughly at what point survival and recovery will be placed at risk" before it can conclude that the agency action will not tip a species "too far into danger." *NMFS III*, 524 F.3d at 936. Federal Defendants' stance is now that "[n]othing in regulation or statute requires" such an estimated benchmark. Fed. Br. at 76; *see also* 2020 BiOp at 46 [ACE1056265] ("NMFS is not required to identify a 'tipping point' beyond which the species cannot recover from any additional adverse effect, or recovery benchmarks in making section 7(a)(2) determinations."). But this Court has already interpreted the law otherwise. Due to these errors, Plaintiffs will likely succeed on their Section 7 claims.

### 3. The 2020 BiOp and ROD rely on ill-defined future spill operations, stripped of any specific contingency actions.

The 2020 BiOp defines only one year of spill operations, 2020 to 2021, thereafter relying exclusively on an "adaptive implementation framework" for the "flexible spill component of the CRS operations." 2020 BiOp at 55–56 [ACE001056274–75]; *see* Opening Br. (ECF No. 2530) at 13. This is unlawful for at least two main reasons. First, this malleable framework means that spill operations after 2021 are largely speculative for purposes of the jeopardy analysis. There are few guardrails to ensure that spill operations will not be curtailed between 2021 and 2035 as compared with the lone year of defined spill operations. Indeed, operations for those 14 years are

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

expressly constrained by broad objectives often in tension with benefits to fish. *See* 2020 BiOp at 54 [ACE001056273] (describing spring spill intended to provide fish benefits but also "Federal power system benefits" and "operational feasibility"). Operations are also subject to various unilateral authority- and discretion-based caveats. Columbia River Systems Operation Draft Environmental Impact Statement (CRSO FEIS) App'x R, Part 2 at R 2-1, R-5-1 [ACE001066379, -387]; 2020 BiOp at 57 (footnotes) [ACE001056276]. Second, and compounding these problems, Federal Defendants pivoted away from specific contingency plans (e.g., abundance and trend triggers) in favor of the action agencies simply coordinating with federal, state, and tribal managers on an ad hoc basis. 2020 BiOp at 91 [ACE001056310]. Both of these choices gravely undermine the "no jeopardy" determination.

Federal Defendants' reliance on adaptive management means that "flexible spill" operations are inherently ill-defined post-2021. Their rejoinder that they "spelled out in detail" the 2021 "base operations" misses the point: implementation of all subsequent operations through an adaptive management framework affords ample leeway to depart from that single year of defined operations. Fed. Br. at 82. Those operations are a "reference point," not a binding or enforceable floor. *See* CRSO FEIS, App'x R, Part 2 at R-3-1 [ACE001066381]. The adaptive management approach for spill is also expressly tied to competing objectives—including "power system benefits" and "operational feasibility"—without any up-front clarity as to how the action agencies will balance those ends at any given time or what specific spill operations those future decisions may yield. *See* CRSO FEIS, App'x R, Part 2, at R-2-1, R-4-1 [ACE0066379, -383]. Moreover, those agencies have "discretion to deviate from planned operations . . . to meet biological, energy, and health and safety needs." Fed. Br. at 83. All of this belies Federal Defendants' assertion that this framework "is not a blank check that allows the Action Agencies to control spill at will." *Id.* at 82–83.[14] Despite the window dressing, it effectively is.

---

[14] Despite the baked-in uncertainty to what extent the 2021 reference operations would continue, the BiOp relies heavily on purported benefits from those operations to justify its "no jeopardy" conclusion. *See* 2020 BiOp at 290 [ACE001056509] (finding that "the proposed flexible spring spill operation is expected to improve juvenile survival through the mainstem migration corridor

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Nor is there any assured set of response actions or other specific backstops to address further declines in abundance beyond those already acknowledged in the 2020 BiOp itself. Concluding that the Adaptive Management Implementation Plan ("AMIP") used in prior BiOps was "outdated," NMFS' solution was to abandon it altogether rather than improve it or replace it with something different. *See* 2020 BiOp at 91 [ACE001056310]. Instead, they simply rely on ESA regulations' reinitiation requirements. *See* Fed Br. at 83. Federal Defendants, having previously argued that contingency plans should be viewed as assisting in addressing risk and satisfying legal obligations, now attempt to change the subject by taking the position that "there is no legal obligation for an agency to include a contingency plan." *Id.* at 89. But where, as here, there *was* one, it is arbitrary and capricious to simply abandon the safeguard altogether without a well-reasoned explanation. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009) (explaining that it would be arbitrary and capricious to not provide "a more detailed justification" where a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account"). Federal Defendants also assert that the 2020 BiOp passes muster in this regard because it incorporates *past* contingency actions (including flexible spill) into the operations. Fed. Br. at 88. But that is not how contingency plans function—they are supposed to address *future* events. Nor is aspirational, non-binding coordination with regional fish managers a valid substitute for a contingency plan. *See id.* It is merely a plan to make a plan. Based on these flaws, too, Oregon is likely to succeed on the merits of its ESA claims.

## IV.    THE EQUITIES AND PUBLIC INTEREST SUPPORT PLAINTIFFS' INJUNCTIVE RELIEF REQUEST

Ignoring prior precedent in this case and others, Federal Defendants argue that this case is, at heart, an APA case. And because it is an APA case, the well-established presumption in favor of relief for endangered species in ESA cases does not apply and the Court should conduct

for all populations" and citing their hypothesis that flexible spring spill will "increase[] adult returns by up to 35 percent").

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

a standard balance of harms and public interest. Fed. Br. at 89. This Court and the Ninth Circuit have consistently applied the ESA's presumption that "the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *NMFS VII*, 886 F.3d at 817; *NMFS VI*, 2017 WL 1829588, at *2; *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025) ("courts have no discretion to balance equities or the public interest when considering . . . any injunction, preliminary or permanent, sought in any ESA case."). That presumption applies here.

The Ninth Circuit's recent ruling that the "court must balance the equities and consider the public interest *as to the other listed species*," does not weigh in favor of denying injunctive relief in this case. *San Luis Obispo Coastkeeper*, 161 F.4th 600 (emphasis added). Federal Defendants argue that the interests of bull trout, Caspian terns, and double-crested cormorants must be considered and weighed against the entry of injunctive relief to benefit listed fish. In support of their argument, Federal Defendants claim that ESA-listed bull trout will be harmed by longer periods of high spill that could increase upstream passage impediments, cause entrainment, and increase incidence of gas bubble trauma. These arguments fail because the PI request does not entail higher spill than the 2025 FOP called for. But also, the Federal Defendants present no evidence or data to support the contention that spill is harmful to bull trout, instead relying solely on speculation.

The Declaration of Erin Britton Kuttel, the Columbia River System Coordinator for the US Fish and Wildlife Service, (ECF No. 2577), provides a significant amount of information about bull trout generally, but she provides no information to support that bull trout will be adversely affected by the requested relief. For example, Ms. Kuttel states that "dam operations *can* slow or prevent upstream movement," "*can* make bull trout disoriented," and "*can* interfere with sensory cues." Kuttel Decl. (ECF No. 2577) ¶ 19. But she also concedes that "[i]t is unclear whether . . . the [passage] facilities themselves delay or impact bull trout behaviors and migration." *Id.* ¶ 21. She also concedes that "migration delays as a result of spill operations

Page 35 -  STATE OF OREGON'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

delaying ladder entry . . . combined with other passage delays (such as fallback), *may* result in *slight* decreases to spawning success and reproduction in the Entiat and Tucannon core areas. A few individuals from the John Day core area are expected to experience the effects described above, but the *impacts are not expected to be measurable* at the core area scale, based on the low levels of observations of individual bull trout at the lower Columbia River dams." *Id.* ¶ 25 (emphasis added). Consideration of these admittedly unmeasurable and unproven harms to bull trout do not weigh against entry of an injunction. With respect to the other interests that Federal Defendants claim must be considered – non-ESA listed birds, navigation, and the amount of Bonneville Power Administration's profit associated with selling and marketing hydropower – the Ninth Circuit made it clear that its ruling in *San Luis Obispo* "does not mean, however, that the door is open to every and all interests and equities. We reject the County's position that this holding resurrects all the usual equities—economic, developmental, or otherwise." 161 F. 4th at 600–601. The Ninth Circuit has not deviated from the clear language of the statute or the U.S. Supreme Court's mandate that "endangered species come first, 'whatever the cost.'" *Id.* at 601 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)).

However, even if consideration of impacts to non-ESA listed birds, navigation, and Bonneville's economic interests were appropriate considerations, it bears repeating that the Plaintiffs' proposed injunction does not seek relief that is substantially different from relief that has been implemented before by the Federal Defendants. Also, there are mechanisms available in the FOPs and other annual CRS operational documents to alter operations to protect human safety and address energy emergencies and infrastructure emergencies. *See e.g.,* Prop. Order (ECF No. 2530-2) § I.B.3.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## CONCLUSION

For the foregoing reasons, Oregon respectfully requests that the Court grant Plaintiffs'
motions for preliminary injunctive relief.

DATED January 22, 2026.

Respectfully submitted,

DAN RAYFIELD
Attorney General


_s/ Deanna Chang_
DEANNA J. CHANG #192202
CHRISTINA L. BEATTY-WALTERS #981634
AUSTIN D. SAYLOR #085614
Senior Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Deanna.J.Chang@doj.oregon.gov
Tina.BeattyWalters@doj.oregon.gov
Austin.Saylor@doj.oregon.gov
Of Attorneys for Intervenor Plaintiff/Counter-
Defendant State of Oregon

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000