DAN RAYFIELD
Attorney General
DEANNA CHANG  #192202
CHRISTINA L. BEATTY-WALTERS #981634
AUSTIN D. SAYLOR #085614
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Deanna.J.Chang@doj.oregon.gov
          Tina.BeattyWalters@doj.oregon.gov
          Austin.Saylor@doj.oregon.gov

Attorneys for Intervenor-Plaintiff/Counter-Defendant State of Oregon

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NATIONAL WILDLIFE FEDERATION**, et al. | Case No.  3:01-cv-00640-SI |
| Plaintiffs, | REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION |
| and | |
| **STATE OF OREGON**, et al., | |
| Intervenor-Plaintiffs, | |
| v. | |
| **NATIONAL MARINE FISHERIES SERVICE**, et al., | |
| Defendants, | |
| and | |
| **PUBLIC POWER COUNCIL**, et al., | |
| Intervenor-Defendants. | |

Page 1 -    REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
            OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

I, Edward Bowles, declare:

1.      This reply declaration supplements my original declaration (ECF 2531) (Declaration of Edward Bowles in Support of State of Oregon's Motion for Preliminary Injunction ("Bowles Decl.")) in response to claims made by opposing declarants and reply briefs. The vast majority of opposing claims are already fully covered in my original declaration as well as prior declarations in this case. As such, I will reiterate summary key points already made that address opponents' claims and refer to my original declaration as necessary for further details, and I will provide specific responses to claims not already covered in my original declaration.

2.      **Section I** provides a recentering summary of urgent needs of the fish in the near term to reduce irreparable harm from the Columbia River System (CRS). **Section II** provides updated context for the proposed relief relative to the newly proposed 2026 Fish Operations Plan (FOP), which was not disclosed before the October filing and which significantly rolls back fish conservation measures from the status quo of the 2020 Biological Opinion (BiOp; NMFS 2020) and 2020 through 2025 FOPs. **Section III** recenters the science regarding status of listed species, cause for alarm and urgency, and the necessity of the requested relief to reduce irreparable harm in contrast to the 2026 FOP which increases irreparable harm. Because the 2026 FOP rollback pivots to a prior federal policy of prioritizing fish transportation at the expense of river conditions, this section refreshes the science on this issue that has been considered by this Court in prior chapters of this case. **Section IV** addresses a mix of other defendant claims regarding conservation actions Plaintiffs seek in their motion and that are needed to reduce irreparable harm from the CRS.

Page 2 -      REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
                OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**Section I: The simplicity, feasibility, and necessity of the requested relief are clear and the requested measures are within the range of precedented CRS operations.**

*Claim: The relief requested is unprecedented, extreme, infeasible, ineffective and a harbinger of CRS failures to meet authorized purposes if implemented (Federal Defendants' Brief (Fed. Br.) p. 14 and throughout; Feil Decl. ECF 2570, Marshall Decl. ECF 2571, etc.)*

3. This is incorrect on all fronts. The relief requested is surgical, simple, and precedented. It does not include managed spill levels above established total dissolved gas (TDG) allowance; it does not include spill levels above what has occurred at these dams before; it does not include reservoir elevations below normal lower operation levels; it does not include reservoir operating ranges outside of normal operating ranges; it does not negate or diminish deferential provisions within existing Water Management Plans (WMP) or FOPs for emergencies and variances necessary to ensure human and infrastructure safety, energy reliability, flood control, commodity transport or other authorized purposes.

4. What the relief requested does include are modest scientifically-supported conservation actions that are feasible within the existing configurations of the CRS to provide immediate improvement in fish survival necessary to help reduce risk of additional generational decline of listed species and thus reduce irreparable harm caused by the CRS.

5. When compared to the status quo, embodied in the 2020 BiOp and 2025 FOP (FPP 2025b), spring and summer spill in the proposed order for 2026 simply seeks to fill in times of the day and season where spill was previously curtailed by the legacy "power pillar" of prior stay agreements ensuring power related revenues did not drop below levels associated with the 2017 Court ordered spills. These concessions of lower spill were not associated with fish needs and were solely driven by revenue-focused concerns in the Flexible Spill Agreement 2018 and Resilient Columbia Basin Agreement 2023 (RCBA) (Bowles Decl. ¶¶ 78-80, 84-85). Removing this revenue constraint and filling in the temporal holes it created with effective conservation actions (i.e., restored spill) will help reduce powerhouse passage and fish travel time (FTT).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Even federal analysts suggest this will likely improve both reach survival and smolt-to-adult return survival (SAR) for in-river migrants (e.g., Faulkner Decl. ¶¶ 14 and 41). The fall, winter and early spring spill requests are also a simple expansion of status quo operations to include additional months and days of the week while continuing to avoid periods of potential icing conditions (Bowles Decl. ¶¶ 89-108).

6.      The Plaintiffs' requested reduced reservoir elevations and operating ranges are necessary to decrease water transit time (WTT), fish travel time (FTT) and reservoir heating caused by the CRS (Bowles Decl. ¶¶ 115 - 124). This request for 2026 is also fully precedented within the normal operations of the CRS, as it uses the Corps' own designated base level of their operating range for the proposed elevation.  The requested operating range (e.g., 1 ft in Snake River and 1.5 ft in the Columbia River) is also within the range that the Corps uses now. Additionally, the proposed relief should not compromise juvenile and adult fish passage structures because the Corps can use the in-season adaptive management provisions to adjust elevations if necessary to ensure fish passage structures remain operable.

7.      The request for expedited repair of infrastructure currently constraining the effectiveness of spill is modest and aligned with priorities already recognized and in the queue for implementation by the Corps (Bowles Decl. ¶¶ 55, 56, 59). Many of these recognized priority needs have been languishing for years and the requested relief seeks their expediated implementation (Bowles Decl. ¶¶ 109–113).

8.      The request for a limited number of non-operational conservation measures is consistent with the use of this option in prior BiOps and will help address urgent threats to multiple listed species (e.g., through management of avian and piscine predation) and specific imperiled species or populations (e.g., Snake River sockeye trap and haul, Snake River steelhead kelt reconditioning, Tucannon spring Chinook).

9.      Collectively, the conservation measures in the requested relief will help reduce irreparable harm caused by the CRS by helping reduce risk of additional generational declines of

Page 4 -     REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
                 OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

listed salmon and steelhead and help reduce risk of extirpation of any remaining extant populations.  This reduced risk is essential now to preserve the ability of listed species and their constituent populations to respond favorably toward recovery once the region is able to get back on track toward a comprehensive, science-based solution for the Columbia Basin salmon crisis (Bowles Decl. ¶ 48).

**Section II: The requested relief will reduce irreparable harm from the CRS.**

10.     The requested relief will fill in deficiencies of the 2020 BiOp and 2025 FOP, both of which already embraced spill caps at the state water quality allowances for TDG (e.g., 125% TDG spill caps) (Bowles Decl. ¶¶ 56, 62, 82, 84).  The requested relief seeks to restore areas where the 2020 BiOp and 2025 FOP had curtailed or limited spill solely for purposes of ensuring power revenues stayed at least as strong as those associated with 2017 Court ordered spills (Bowles Decl. ¶¶ 78-80, 84-85).

11.     As such, the requested relief would increase 2026 spring spill only where these curtailments had occurred, such as John Day Dam relative to the RCBA and 2025 FOP and the temporally reduced spill for eight hours for power production at multiple dams relative to the 2020 BiOp and FOP associated with the Flexible Spill Agreement (Bowles Decl. ¶¶ 78–84).  For summer spill, the requested relief would restore previous spill ordered by this Court in 2005 that had been curtailed by the power revenue objective in the Flexible Spill Agreement (incorporated into the 2020 BiOp, curtailing the last two weeks of August spill) and the RCBA (incorporated into the 2024 and 2025 FOPs, curtailing all four weeks of August spill) (Bowles Decl. ¶¶ 85–88).  The Plaintiffs do not seek to increase summer spills beyond what this Court ordered in 2005, even though those levels are below TDG allowances (Bowles Decl. ¶¶ 85–88).

12.     From a conservation and scientific standpoint, it was disappointing to discover federal declarants and defendants submitted their planned 2026 FOP in response to the Plaintiffs' motion, representing significant additional rollback of important conservation measures even

Page 5 -     REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

compared to their own 2020 BiOp and 2025 FOP. State and tribal sovereigns and salmon managers had no forewarning of these rollbacks within any existing communication channels.

13.      From both a conservation and scientific standpoint, the planned 2026 FOP moves species conservation backward, not forward. The 2026 FOP reestablishes a decades-old failed policy of prioritizing smolt transportation over improving in-river conditions, actually degrading river conditions and survival of in-river migrants in order to collect and remove more smolts for transportation. The justification relies on flawed analyses inconsistent with their own CRSO EIS regulatory documents, which I will cover in more detail in Section III, claiming reduced spill to collect more fish will yield more adult returns. However, as described below, the 2026 FOP does not just curtail spill at the three smolt collector dams on the Snake River, but it curtails spill at all dams throughout the CRS, making their spill curtailment justification for transportation ring hollow.

14.      Spill reductions in the 2026 FOP are significant. The 2026 FOP rolls back spill caps to 120% TDG levels, increases the daily time periods where spill is constrained further for power revenues and continues the curtailment of spill throughout August (compared to 2005 Court ordered spill), which was only put in place for power revenues. The 2026 FOP dismisses actions outlined in the proposed order that would provide modest spillway passage prior to the start of the spring season to aid smolts that may be emigrating earlier due to climate change. The 2026 FOP also dismisses the Plaintiffs' attempts to expand existing fall, winter and early spring spill at some spillway weirs to help reduce steelhead fallbacks and kelts from only having powerhouses available for essential downriver passage.

15.      It is concerning that the 2026 FOP generally includes every power-benefit concession made by plaintiff parties during the two stay negotiations (Flexible Spill Agreement and RCBA) (e.g., curtailed summer spill, temporally curtailed spring spill, additional curtailed spring spill at John Day Dam, increased elevation operating range at lower Snake River dams from 1 ft to 1.5 ft), yet it rolls back some of the most important conservation measures secured in

Page 6 -     REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
                   OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

those same stay agreements (e.g., 125% spill caps, removal of temporal spill curtailments at several dams, slight increases in early spring spill for earlier emigrating smolts). The universal roll back of base spring spill levels in the 2026 FOP (e.g., reducing spill caps at all dams to 120% TDG levels) reestablishes a decades-old and failed federal policy of prioritizing fish transportation over in-river migrants and conditions (e.g., reducing spill to force more smolts to sound and enter powerhouses for collection and transport).

16.     Opposing declarants and defendants pose a flurry of purported justifications for these conservation rollbacks and dismissals and reasons they can't implement the requested relief. Many of these claimed concerns and justifications recycle arguments previously litigated in this case, such as that increased spill and reduced transportation is bad for fish (Bowles Reply Decl. 2017 ECF 2165). Many of the claimed justifications hide behind proffered fish concerns, ignoring the fact that conservation measures included in the proposed order are supported by the vast majority of state and tribal salmon manager and scientist entities whose primary purpose (by statute and/or policy) is to protect and restore fish runs to healthy levels supporting cultural and ecological benefits (e.g., Columbia Basin Restoration Initiative 2023; Bowles Decl. ¶ 49). As I discuss in more detail in Section III, the 2026 FOP is inconsistent with the science and conclusions from the federal government's own CRSO EIS process and analyses used to select an alternative, and even NOAA's own models and analyses (e.g., Faulkner Decl. ¶¶ 14, 41) indicate likely reductions in reach survival and SARs for in-river migrants if the 2026 FOP is implemented. The 2026 FOP demonstrates a pattern of curtailing or rejecting fish conservation measures in place now or proposed in the proposed order that impact power, whether it be loss of water flowing through the turbines or loss of power head above the turbines.

**Section III: The status of the fish warrants urgency to reduce irreparable harm but the proposed 2026 FOP will increase irreparable harm.**

17.     My original declaration comprehensively describes the status of listed salmon and steelhead, with particular emphasis on highly imperiled Snake River spring/summer Chinook and

Page 7 -     REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

summer steelhead (Bowles Decl. ¶¶ 5-7). Nothing filed by opposing declarants or defendants effectively counters my status summary or the urgency to reduce irreparable harm caused by the CRS.

*Claim: The fish are actually doing much better recently and any downturns are more related to climate change than the CRS and thus there is no urgency to reduce irreparable harm (Fed. Br. p. 30; e.g., Swieca Decl. ¶¶ 9-23).*

18.    This claim is inconsistent with good science and NOAA's own documents. My declaration clearly identifies that NOAA's own recent 5-year status reviews do not indicate any change in status adequate to warrant change in listing delineations, and as such Snake River spring/summer Chinook, summer steelhead, and sockeye remain threated or endangered and remain in peril (e.g., Bowles Decl. ¶¶ 5-7).

19.    My declaration (and deposition) clarified that abundances can increase and decrease based on the relative favorability of environmental conditions (e.g., snowpack and melt, flows, temperatures, ocean conditions) for a given year or timeframe (Bowles Decl. ¶ 11). However, these temporary ups and downs of abundance in response to favorable and unfavorable environmental conditions do not necessarily mean their "status" has changed for each uptick or downtick. To warrant a positive change in status, the increases would have to be sustained even when environmental conditions worsen (Bowles Decl. ¶¶ 32, 36).

20.    Instead, what we have observed are Snake River spring/summer Chinook and steelhead populations remaining listed with abundance and productivity remaining far too low when environmental conditions are average or poor, and abundance and productivity upticks occurring primarily only when environmental conditions are good (Bowles Decl. ¶¶ 11-13). This observed pattern results in a higher frequency of generational declines than generational growth and populations hovering around chronically low abundances (Bowles Decl. ¶¶ 36-39).

21.    My declaration clearly identifies the somewhat recent uptick in abundances coincident with improved ocean conditions in 2021 and to a lesser extent in 2022 and 2023

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(Bowles Decl. ¶¶ 14, 24, 32). These improved conditions were associated with improved fish returns one to three years later (2022-2025).

22.     My declaration also proposes that some of the recent uptick in abundance might be associated with additional spill (up to 125% TDG spill caps) for juvenile emigrants that began in 2020, which also resulted in less smolt transportation. Comparative Survival Study (CSS) models predicted better survival based on the improved in-river conditions associated with this additional spill. However, this was tempered by the coincidence of improved ocean conditions which was likely an important factor (e.g., Bowles Decl. ¶¶ 14, 24, 32, 51, 52, 62).

23.     Although there have only been three years of adult return data associated with higher spill levels that began in 2020 under implementation of the Preferred Alternative, associated SARs have improved generally consistent with expectations. After accounting for variable freshwater and ocean conditions, Snake River spring/summer Chinook and steelhead were expected to have relative improvements in SARs of 35% and 28% respectively under the PA, according to the CSS models used for that regulatory process and cited in the CRSO EIS Executive Summary (USACE et al. 2020). For the outmigration years we have adult returns for (2020-2022), and after accounting for variable freshwater and ocean conditions, Snake River spring/summer Chinook and steelhead SARs have shown relative improvements of 58% and 27% respectively, fairly consistent with expectations (McCann et al. 2025, Chapter 2, Table 2.14).

24.     The federal government creates a quandary for themselves by claiming stocks are doing much better recently but then claiming that the increased spill levels since 2020 have been detrimental to fish and thus spill needs to be rolled back in the 2026 FOP.

25.     Snake River fall Chinook are generally sustaining improved abundances at or above delisting levels, but these abundances are artificially propped up by hatchery supplementation, population productivity remains well below criteria, and the ESU remains limited to one population which is not achieving "highly viable" status as required by the

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

recovery plan scenarios (NMFS 2017a), so no change in listing status is warranted (Ford 2022; NMFS 2022a) (e.g., Bowles Decl. ¶¶ 6, 85, 86, 88).

26.    The improvement in abundance of Snake River fall Chinook is associated with improved summer spill conditions resulting from Court order in 2005. As such, federal defendants' use of improved fall Chinook abundance as partial justification for curtailment or removal of summer spill in August is indefensible. Prior to those increased spill levels, Snake River fall Chinook were highly imperiled and curtailment of those beneficial spill levels ordered by this Court will likely irreparably harm the ability of fall Chinook to maintain gains in abundance across diversity characteristics associated with increased spill (Bowles Decl. ¶¶ 76, 85-88). The summer spill (in August) component of Plaintiffs' requested relief will reduce irreparable harm to Snake River fall Chinook.

27.    Likewise, Snake River sockeye have experienced recent increases in abundance, although overstated by federal declarants, but that improvement is compared to near zero abundance levels and has not warranted change in NOAA's assessment of extreme risk of extinction (e.g., Bowles Decl. ¶¶ 5, 6, 138). Federal declarants chose not to use 2025 data for sockeye in their filings (e.g., Swieca Decl. ¶ 23), which shows over a 50% decline in returns last year and are indicative of the highly volatile status of this precarious species. Snake River sockeye remain on life support, totally dependent on captive broodstock conservation hatchery programs (IDFG 2022). Recent improvements are likely associated with recent increases in spring spill and decreases in smolt transportation coupled with hatchery improvements and increased hatchery production. Any decrease in spill and corresponding increase in transportation, like planned in the 2026 FOP, is likely to irreparably harm Snake River sockeye's ability to sustain this modest improvement (FPC 2025c).

*Claim: Recent upticks in abundance for Snake River salmon and salmon and steelhead disprove that negative trends have continued and show that species can and do rebound from low abundance (e.g., Fed Br. p. 30; Swieca ¶¶ 9-23, 29-34).*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

28.     As described above, simply looking at negative or positive abundance trends over short periods of time to imply status change is not scientifically defensible, particularly when the backdrop of environmental conditions is not considered.

29.     Comparative Survival Study (CSS) assessments did not focus on simple abundance trends up or down but instead focused on patterns of generational decline or growth associated with SARs, and the primary explanatory variables for observed variations in SARs. As such, current risk of generational decline remains too high for chronically depressed populations, and the 2026 FOP is likely to increase that risk further, rather than reduce it as proposed in Plaintiffs' requests (FPC 2026d; e.g., Bowles Decl. ¶¶ 38, 39, 51-53). I discuss this assessment of the 2026 FOP relative to Plaintiffs' requests in more detail later in this section.

30.     My declaration (Bowles Decl. ¶¶ 11, 26, 46, 47) discusses the dynamics of populations at low abundance, increasing and decreasing against a backdrop of better or worsened environmental conditions. Those populations retaining inherent resilience can still rebound if given the chance (e.g., better background environmental conditions, such as snowpack, runoff, temperature, ocean upwelling, coupled with improved managed conditions, e.g., spill, flow, temperature, predators). However, the longer populations are depressed, the higher the risk of losing that inherent resilience necessary for persistence now and rebuilding once better conditions are provided.

*Claim: Plaintiffs resort to outdated metrics like AMIP, which plaintiffs misapply and use to misstate the severity of conditions. (e.g., Swieca Decl. ¶¶ 24-27).*

31.     This claim is false. Plaintiffs did not raise AMIP as a necessary tool for conservation risk management.  We raised it as an example of a previous federal tool supposedly put in place to help manage conservation risk (Bowles Decl. ¶¶ 7-9). When first introduced by NOAA, Oregon and other salmon managers provided numerous comments criticizing the AMIP approach and highlighting its ineffectiveness to address conservation emergencies.

Page 11 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
             OREGON'S MOTION FOR PRELIMINARY INJUNCTION

32.     My declaration clarified that the federal government never expected the AMIP to be triggered, and once it was, the federal response was to simply maintain status quo operations. And then the entire concept, flawed as it was, was then discontinued in the 2020 BiOp without replacement of an alternative approach to address conservation emergencies (Bowles Decl. ¶¶ 7-9). Some plaintiff-aligned amicus parties updated the AMIP assessments based on recent data for comparative purposes, which we summarized and cited (Bowles Decl. ¶¶ 7-9), but that updated assessment did not provide the basis for our separate assessments based on CSS analyses, QET analyses, and NOAA 5-yr status reviews.

*Claim: QET analyses are not credible, just a proxy for risk, not a predictor of extinction, and unaligned predictions with observations (e.g., Faulkner ¶ 24; Courter ¶ 22).*

33.     My declaration describes the science around QET and its role as a management tool to assess conservation risk (e.g., Bowles Decl. ¶¶ 21-33). I highlight that QET serves as a tipping point where, both mathematically and biologically, one can no longer be confident that the trajectory of further decline will not accelerate nor in the ability to rebuild. (e.g., Bowles Decl. ¶¶ 23, 26, 33).

34.     I also highlight that, because of this dynamic, conservation managers and scientists often use QET as a surrogate for population loss and a tipping point for potential extinction vortex. "Because avoiding extinction can no longer be assumed or predicted once below QET, conservation scientists and managers typically use QET, not zero fish, as the 'floor' for assessing extinction risk and population viability." Bowles Decl. ¶ 26. "A quasi-extinction threshold reflects the fact that a population may be doomed to extinction even if there are still individuals alive." Bowles Decl. ¶ 23. Opposing declarants failed to provide any conservation science citations or legitimate rebuttal to these statements. Federal declarants and defendants also ignore that NOAA used and cited the same 2021 QET analyses I relied on in my declaration for NOAA's Rebuilding Interior Columbia Bain Salmon and Steelhead report (NOAA Fisheries 2022).

Page 12 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

35.     Opponent filings attempting to discredit QET analyses are fraught with shortcomings and deflections. The primary purpose of our QET analyses in 2021 and in 2025 was to assess whether listed Snake River spring/summer Chinook and steelhead populations *were already at* QET at those times. This was necessary because federal defendants never did this assessment within their regulatory documents (e.g., AA 2020b, NOAA 2020). Each year we assessed we found that several populations had already fallen below 50 spawners for four consecutive years (QET(50)) (Bowles Decl. Exhibit 1). This is not a forecast or projection. This is real time, and cause for alarm. Loss of any additional extant populations erodes the spatial structure and diversity (and abundance) of the listed ESU/DPS and further jeopardizes their survival and recovery compared to if those populations were allowed to persist.

36.     As discussed in my original declaration, one of the likely reasons fewer populations were at QET in 2025 than in 2021 is because ocean conditions improved temporarily, resulting in some populations rising above 50 spawners around 2022 or 2023.  Any bump above 50 spawners requires starting the clock over again for the QET assessment (Bowles Decl. ¶¶ 23, 26, 30, 32, Exhibit 1). Improved spill conditions may have also contributed to this welcome uptick in adult returns, but definitive assessment is difficult given the coincident improvement in ocean conditions and only a few years of adult return data. As stated in my original declaration, "reliance on temporary environmental improvement to address extinction risk is not prudent nor sustainable for resilience against the next inevitable environmental downturn." (Bowles Decl. ¶ 32). Regardless, both years assessed show too many populations already below QET, and far too many hovering around QET levels right now, with over 80% of Snake River spring/summer Chinook and steelhead also currently below critical abundance thresholds (CAT) (e.g., Bowles Decl. ¶¶ 11, 22, 32, 47, 48, Exhibit 1). Attempts to deflect alarm are inconsistent with conservation biology principles and NOAA's own documents (e.g., Crozier et al. 2019, 2020, 2021, NOAA Fisheries 2022).

Page 13 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
            OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731
                                    Department of Justice
                                    100 SW Market Street
                                    Portland, OR 97201
                              (971) 673-1880 / Fax: (971) 673-5000

37.    A secondary purpose of our QET assessments was to forecast QET levels in the near future. This required modeling existing data and variation to project that dynamic forward (e.g., Bowles Decl. ¶¶ 22-33 and Exhibit 1). As stated above, this modeling does not affect the reality of where populations are now, which the federal government does not dispute. The 2021 analyses were embraced by NOAA (NOAA Fisheries 2022). Federal declarants and defendants claim that because projections in 2021 for 2025 were lower than what was actually evident in 2025, therefore our models must be flawed, biased toward pessimistic outcomes, and not credible. This claim misunderstands our approach and application of this type of model.

38.    In essence, for the secondary purpose of projections, our QET analysis simply examined the pattern of variation in adult spawner estimates available (typically beginning in about 1980). We then applied that same observed variation dynamic to the current adult spawner estimates to predict likely spawner abundance in the next five years, assuming the past patterns of variation are collectively mimicked in the future (e.g., Bowles Decl. Exhibit 1). This approach reflects both stochastic and deterministic pattern dynamics of the variation in past spawner estimates, but it does not try to cherry-pick or presume any specific attribute of that overall variation dynamic to represent the future. It is also a much more robust modeling approach than just applying recent trends that may have been driven primarily by temporary environmental fluctuations.

39.    Obviously, modelers cannot know the actual environmental conditions that fish will experience in the future, such as the improved ocean conditions that occurred in 2021 and to a lesser extent in 2022 and 2023, so it is appropriate to simply use the past dynamics observed to help predict the future. That does not mean that the actual environmental backdrop of conditions unfolding in real time will be the same as the modeled approach that embraces the full range and dynamic of past variation. The fact that spawner abundance increased slightly from a temporary improvement in ocean conditions during intervening years, and that spawners thus exceeded 50 adults for a year or two, causing some populations in 2025 to not meet explicit QET(50) criteria

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(i.e., 50 or fewer spawners for four consecutive years), does not mean the modeling approach is wrong or not credible. Conversely, if ocean conditions had turned poor during the intervening years (e.g., lack of upwelling, marine heat wave) then it is likely fewer spawners would have returned and our prediction would have been too optimistic.

40.    This approach for modeling near-term predicted outcomes of small data sets is not new or controversial. The approach is referred to as ARIMA (autoregressive integrated moving average) for fitting potential models, with the best models selected based on the lowest Akaike Information Criterion (see Bowles Decl. Exhibit 1). This approach has been used to inform the conservation of species (e.g., Shuai et al. 2017), and has been applied to characterize dynamics when exogenous environmental factors driving those dynamics are unknown or have not been quantified (e.g., Koutroumanidis et al. 2006).

41.    The bottom line is that too many populations are currently at or hovering around quasi extinction thresholds, as affirmed real time in both the 2021 and 2025 analyses and not dependent on projections. As such, risk of losing additional populations is too high and additional immediate conservation actions are needed to reduce the irreparable harm this loss would cause.

*Claim: The role and importance of individual populations can vary in recovery plans, and having populations below QET50 does not mean the ESU or DPS is at imminent danger of extinction or extirpation (Fed. Br. p. 31).*

42.    This perspective seems to imply that it might be okay if some populations remain teetering on the brink of extirpation or are lost. This conflates recovery with extinction risk. Although not all remaining extant populations within an ESU or DPS are required to be **viable** for potential delisting as recovered, that in no way implies that some remaining extant populations are not important for the species and thus can be allowed to be lost.

43.    Not viable does not equate to extirpated. As discussed in my declaration (Bowles Decl. ¶¶ 26, 27), NOAA's own recovery plans and 2020 BiOp assessed extinction risk (e.g., 50

Page 15 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

or fewer spawners for four consecutive years (QET50) for some future time horizon (24, 50 or 100 yrs), typically requiring less than a 5% chance of reaching QET50 for that time horizon for populations to be viable. But these recovery plans and BiOp never looked at current status relative to QET50, which shows one or more populations of Snake River spring/summer Chinook and steelhead already at or below this threshold (Bowles Decl. ¶¶ 28-33). As an example of the critical importance of not losing constituent populations, the last remaining population group of Snake River fall Chinook are not considered for delisting in part because other historical population groupings have been extirpated, so delisting requires either restoration of this element of spatial structure and diversity or, at a minimum, the remaining extant fall Chinook to be highly viable and naturally self-sustaining (NMFS 2017a).

44.    Plaintiffs' requested relief is not targeted at recovery, but it concerns reducing near-term extinction risk and avoiding loss of any remaining populations, which are essential for spatial structure and diversity of species and the overall species resilience and adaptive potential associated with a deteriorating climate (Bowles Decl.¶¶ 21, 33, 91). All listed Snake River salmon and steelhead have significant portions of their historical populations extirpated (NMFS 2017b; Hesse Decl. ¶ 36 ECF 2538). Loss of any additional populations would compound an already diminished spatial structure and diversity and, by definition, will increase the extinction risk of the ESU/DPS and jeopardize the likelihood of recovery compared to if that remaining population was allowed to persist.

*Claim: Plaintiffs do not explain why CRS operations are likely to cause irreparable harm within the next year.*

45.    My declaration covers in detail the risks of harm for the 2021 FOP (i.e., the single year of defined operations under the 2020 BiOp) and 2025 FOP relative to Plaintiffs' requested relief (e.g., Bowles Decl. ¶¶ 49-53, 55, 59, 61, 73, 74, 76, 84-86). My original declaration did not provide this assessment for the 2026 FOP because we did not have it until the federal government's December 15, 2025 filings opposing Plaintiffs' requested relief. This declaration

Page 16 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
                OREGON'S MOTION FOR PRELIMINARY INJUNCTION
           DC4/rn1/1011821731
                                        Department of Justice
                                        100 SW Market Street
                                        Portland, OR 97201
                                (971) 673-1880 / Fax: (971) 673-5000

does provide that assessment, and it concludes the 2026 FOP is even worse for risk of additional generational decline than status quo operations. The Fish Passage Center (FPC) has assessed the 2026 FOP based on longstanding peer-reviewed key explanatory variables (e.g., PITPH, WTT). The FPC analysis demonstrates the 2026 FOP has higher PITPH, slower WTT and FTT, compared with Plaintiffs' requested relief as well as the 2021 and 2025 FOPs (FPC 2026d). A true and correct copy of the Fish Passage Center memorandum is attached to this declaration as Exhibit 1. These worsened metrics (e.g., PITPH, WTT, FTT) increase risk of generational decline (e.g., frequency of SARs below 1%) and populations at or near QET cannot afford any additional risk of generational decline (Bowles Decl. ¶¶ 35-39).

46.    CRS operations continue to pose a major threat to listed species. Per NOAA's 2022 synthesis report, "hydrosystem impacts are the largest threats" with "the highest magnitude of impacts" causing direct (mainstem) and latent (indirect) mortality to the majority of ESA-listed and non-listed interior Columbia River basin salmon and steelhead stocks (pp. 11-12, Table 3, NOAA Fisheries 2022).

47.    *Any* additional loss of remaining populations is unacceptable and further jeopardizes overall stock health. The CSS modeling approach demonstrates that the 2026 FOP will likely result in a higher frequency of cohorts having SARs below 1% and lower frequency above 2%, resulting in higher risk of generational decline, which is explicitly "a cause for alarm" (e.g., Bowles Decl. ¶¶ 35-39). The 2026 FOP reduces spill and increases transportation, which is specifically detrimental to Snake River sockeye. Snake River sockeye are one of the most highly imperiled listed stocks in the basin, are universally recognized as surviving poorly when transported, and are currently doing slightly better under recent higher spill and lower transportation operations (Ford 2022; FPC 2025c).

*Claim: By definition, all ESA listed species are in perilous condition so that status alone does not prove irreparable harm.*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

48.     Healthy species have a natural productivity and abundance "cushion" that allows them to ebb and flow within a backdrop of stochastic and deterministic variations in environmental conditions. This cushion is a function of the inherent resilience (abundance, productivity, spatial structure and diversity) of the species themselves and the quality and diversity of their habitats. When their habitats are degraded, such as through ongoing operation of the CRS, that cushion diminishes to the point that any additional downturns, or even continued suppression at low levels, threatens that inherent resilience and the ability of species and their populations to persist.

49.     ESA listings should, and typically do, occur prior to full erosion of this cushion, with the overarching goals of stopping additional decline and rebuilding toward viability and recovery. Against a backdrop of increasing frequency, magnitude and scope of environmental downturns from ongoing climate change, the cushion constricts further until it no longer can withstand additional downturns without heightened genetic and demographic risk of extinction of remaining populations and, in turn, the species itself. We are teetering near this brink now for several listed species. Their inherent cushion, or discretionary mortality budget, is depleted and thus any additional downturns heighten extinction risk.

*Claim: Plaintiffs' recognition that harms to stocks can be remediated and rehabilitated undermines plaintiffs' requests for urgent action. (e.g., Fed. Br. p. 36-37).*

50.     Most listed stocks still retain enough of their inherent resilience to still respond positively to improved conditions. This resilience is evident from abundance and productivity improvements during upturns in environmental conditions, such as improved snowpack and runoff, better ocean conditions, and higher unmanaged spill (Bowles Decl. ¶¶ 47, 91). Without that characteristic, listed species and constituent populations would be functionally extinct, without hope of survival and recovery even if more favorable conditions were provided. To imply that species need to have already fully lost resilience before additional conservation actions are required is inconsistent with conservation science.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Claim: Plaintiffs did not show a nexus between the status of fish over the next year and CRS operations in 2026 (Fed. Br. p. 37).*

51.    Plaintiffs' requested relief seeks to increase spill as compared to the 2020 BiOp and the 2025 FOP. The proposed 2026 FOP would reduce spring spill even more, curtailing spill levels well below allowances provided by state water quality entities and even constraining this lower spill temporally during each day. Spill curtailment in the proposed 2026 FOP is not just at the smolt collector dams, but is applied for all dams, affecting all in-river migrants from the Snake and Columbia rivers.

52.    The proposed 2026 FOP would increase the number of smolts having to sound in the forebay and pass the dams via the powerhouse, increasing PITPH and FTT and reducing reach survival and SARs for in-river migrants. This is evident not just for the CSS models, but also NOAA's COMPASS model and life cycle analysis conceding lower freshwater survival and later estuary arrival for in-river migrants, which results in lower SARs for in-river fish. This accentuates further when reduced SARs associated with increased powerhouse bypass passage are considered. The increased reliance on transportation will also likely result in additional harm to Snake River sockeye and increase steelhead overshoot and straying. All of this, coupled with increasingly frequent environmental downturns associated with climate change, increases the likelihood of additional generational declines of listed fish at a time when there is little to no cushion left to absorb such declines.

53.    The proposed 2026 FOP puts unnecessary risk on species recently doing better, such as Snake River fall Chinook. The proposed 2026 FOP's continued reduction of summer spill would undermine one of the key actions that helped Snake River fall Chinook begin rebuilding.

*Claim: CSS modeling and analyses are inaccurate and irrelevant (Fed. Br. p. 33), and 2019 CSS modeling predictions did not materialize and were less accurate than NOAA life cycle modeling. (e.g., Feil ¶¶ 23-24, 35; Faulkner ¶ 53).*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

54.     Federal declarants and defendants erroneously claim that CSS modeling for the CRSO EIS MO4 alternative was the appropriate surrogate for CSS modeling of current operations (i.e., Proposed or Selected Alternative) (e.g., Feil Fig 8).  But current operations (e.g., Proposed or Selected Alternative) do not include nearly as high spill levels as CSS modeled for the CRSO EIS MO4 alternative, so current operations resulted in higher PITPH than modeled by CSS for MO4, making this comparison moot. Considering actual spill levels (such as CRSO EIS CSS modeling of the Proposed Alternative taking into account actual spills), the resulting adult returns actually are consistent with CSS expectations (McCann et al. 2019, cf. McCann et al. 2025).

55.     CSS represents a collaboration among state, tribal, and federal salmon managers except NOAA. This collaboration includes annual reviews (including by independent scientists), regular validation updates based on real-time data, and full transparency of model development, validation updates, inputs, assumptions and parameters. This is not the case for NOAA's COMPASS and life cycle models, where calibration updates, retrospective validations, and many aspects of the models are not openly provided to the states and tribes. This includes the novel and highly speculative recent additions of Bonneville Dam spill impacts on returning adults that federal declarants and defendants appear to be relying heavily on without transparency, review or certainty (Faulkner Decl. ¶¶ 21-22).

56.     In opposing Plaintiff's requested relief, federal declarants and defendants seek to discredit CSS rather than considering both modeling approaches as a weight of evidence to inform decisions. That is a reversal of their more inclusive approach evident in the CRSO EIS where both modeling approaches were used to help describe potential outcomes. It is also inconsistent with NOAA's Rebuilding Interior Columbia Basin Salmon and Steelhead report (NOAA Fisheries 2022). In that synthesis report, NOAA strove to diffuse the "dueling science" narrative and instead provide a synthesized convergence of the science as a weight of evidence

Page 20 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
           OREGON'S MOTION FOR PRELIMINARY INJUNCTION
           DC4/rn1/1011821731
                                        Department of Justice
                                        100 SW Market Street
                                        Portland, OR 97201
                                    (971) 673-1880 / Fax: (971) 673-5000

for conservation and rebuilding recommendations (NOAA Fisheries 2022). Federal declarants and defendants provide no rationale for this reversal.

57.    The 2020 BiOp and 2020 ROD relied on CSS modeling to show the benefits of spill. (USACE et al. 2020).  NOAA's COMPASS and life cycle models do not recognize enough benefit from spill (primarily because they ignore delayed mortality associated with migrating through the CRS for in-river migrants despite embracing delayed mortality for transported smolts). Presumably because the benefits of spill are not apparent using only NOAA's COMPASS and life cycle models, federal defendants relied primarily on CSS model results in the 2020 BiOp and ROD. The future is bleak indeed under the COMPASS and NOAA life cycle view of the world, with little chance for species improvement in the face of ongoing climate change except under the lower Snake River breach scenario (AA 2020b; NOAA Fisheries 2022).

58.    Federal declarants and defendants also raise the incongruous hypothesis that CSS modeling has an optimistic bias for survival of spilled fish because they are larger than bypassed fish (i.e., because the fish screens on the turbine bypasses are not as effective at deflecting larger smolts into the bypass system (e.g., Faulkner ECF 2575)). This hypothesis raises numerous concerns.

59.    First, the whole purpose of screening turbine intakes is to keep smolts that have already sounded from actually entering those turbines and instead divert them into the bypass system. If screens are ineffective bypassing larger smolts, that means those larger smolts are going through the turbines, not the spillways (spillways are not anywhere near the turbine intakes).  If CRS screens are indeed size-selective and disproportionally sending the larger smolts through the turbines, that is a more significant concern than any asserted modeling bias. Turbine passage is universally accepted as the worst route of dam passage for fish.

60.    This federal hypothesis necessitates prioritizing spillway passage to reduce the number of smolts sounding toward the turbine intakes in order to help minimize this threat of additional size-selective mortality of larger smolts. Additionally, if the federal hypothesis is true,

Page 21 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
              OREGON'S MOTION FOR PRELIMINARY INJUNCTION

the Corps should replace the turbine intake screens as soon as possible and ensure the new screens are not size selective and not continuing to contribute toward irreparable harm by causing higher mortality of larger smolts.

61.     Second, when Dr. Faulker first published this hypothesis, other scientists brought up shortcomings with the analyses and inferences (McCann et al. 2019, Storch et al. 2021).  In response to those critiques, Dr. Faulkner conceded that, "[w]e acknowledge that length does not explain a large amount of variation in bypass probability. It is, in fact, not a large effect." (Faulkner et al. 2021).

*Claim: The proposed 2026 FOP will produce more adult returns and lower extinction probabilities than Plaintiffs' requested relief, based on their modeling of a small subset of Snake River spring/summer Chinook populations. (e.g., Faulkner Decl. ¶¶ 27-32, 57).*

62.     There are many foundational and ancillary problems with this argument, but the primary flaws are: 1) consistent with their own modeling, Plaintiffs' requested relief is better than the proposed 2026 FOP for both juvenile reach survival and SARs for in-river migrants; 2) their claim of the proposed 2026 FOP being better than Plaintiffs' requested relief for adult returns is solely driven by their assumed transportation benefits, which have in the past used wrong comparisons for their analyses and ignored sockeye and the decades-long error of prioritizing transportation over improved in-river conditions; and 3) they ignored the modeling approach used in their own CRSO EIS regulatory process and documents, as well as updated CSS modeling and analyses, which indicate the proposed 2026 FOP will be worse for adult fish returns and extinction risk than both Plaintiffs' requested relief and status quo operations.

63.     Based on Dr. Faulkner's declaration and NOAA's own models, analyses and assumptions, it appears that Plaintiffs' requested relief provides better reach survival and SARs for inriver migrants than the proposed 2026 FOP. COMPASS showed that Plaintiffs' requested relief is better than the proposed 2026 FOP for reach survival, fish travel time and avoiding powerhouse bypasses, and they acknowledge analyses showing increasing powerhouse bypass

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

encounters (which the proposed 2026 FOP will do) were associated with lower SARs for in-river migrants (see Faulkner Decl. ¶¶ 14 and 41). As such, federal declarants and defendants had to rely on a claim of heightened transportation benefits and reduced adult conversion at Bonneville Dam mentioned earlier in order to predict that the proposed 2026 FOP will increase overall adult returns and reduce extinction risk compared to Plaintiffs' requested relief, which is inconsistent with modeling in the CRSO EIS and discussed later in this declaration.

64.     To increase smolt transportation, the proposed 2026 FOP actually degrades in-river conditions throughout the CRS by reducing spill (at all dams, not just including the three smolt collector dams), thus increasing powerhouse encounters (PITPH), forebay delay, and FTT throughout the CRS. The apparent intent is that more fish will be forced to sound deeper in the forebay and enter the turbine intakes where a portion will be deflected by the intake screens and routed into the juvenile bypass system (which at the three collector dams, on the Snake River, allows a higher proportion of fish to be transported).

65.     In essence, this approach assumes the river is too lethal to allow smolts to emigrate in it, and as such smolts must be collected and taken out of the river and put on barges and trucks to avoid jeopardizing their potential for recovery—even if that means making the river even *more* lethal (e.g., higher powerhouse passage, forebay delay, FTT, and lower reach survival) for all the remaining smolts left in the river (which includes the majority of Snake River fish and all of the Columbia River fish).

66.     This approach of prioritizing transportation at the expense of improving in-river conditions and in-river survival was the federal approach for decades beginning in the 1980s, until court-ordered relief. Over time, such relief has secured a more balanced approach where in-river conditions are improved within the existing CRS limitations and where smolts bypassed and collected are transported as prudent. But in-river conditions have not been purposely degraded simply to get more fish out of the river and onto barges and trucks.

Page 23 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

67.     Even if it were true that the benefits of transportation outweigh these increased risks to in-river migrants, the proposed 2026 FOP goes well beyond this to decrease spill and increase power production. This is evident because the proposed 2026 FOP reduces spill at all dams, not just the three collector dams which are located in the Snake River. This will increase PITPH, forebay delay, and FTT throughout the CRS, which as discussed above, CSS and NOAA modeling indicates will reduce reach survival and SARs for in-river migrants.

68.     Based on NOAA's own models and recognition of other studies showing reduced SARs associated with increased powerhouse bypasses, if the federal government wished to optimize reach survival and adult returns they would only curtail spill at the three collector dams on the Snake River and not universally at all dams. Additionally, listed mid- and upper Columbia River stocks are never transported, so reducing spill in favor of increasing transportation only further undermines in-river conditions for all mid- and upper Columbia River outmigrants. Because their own models and analyses cannot justify the dramatic spill curtailments throughout the CRS, the federal declarants and defendants posit numerous other speculative reasons to reduce spill, such as gas bubble trauma, tailrace eddies, and infrastructure/human safety, all of which I address later in this response.

69.     Regardless, the claimed benefits associated with increased transportation are based on flawed analyses and not supported by the science, including the models used in the CRSO EIS regulatory process to select an alternative.  The following discussion helps clarify the problems associated with this transportation analyses.

70.     Transportation has been a centerpiece of the federal approach for salmon and steelhead restoration for decades, but was inadequate to avoid ESA-listing of the majority of these species in the 1990s, inadequate to rebuild depressed populations for delisting, and inadequate to provide even the minimum SARs necessary to avoid population declines and allow sustained population growth.

Page 24 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

71.     Transportation has remained largely unchanged over recent decades, and the process improvements made over time (relative to collection, holding, loading, barge containers and operations, circulation and releases) remain inadequate to provide minimum necessary SARs for survival and recovery (e.g., Petrosky et al. 2020; McCann et al. 2025). Over time, transportation from McNary Dam was discontinued due to poor results, so no mid- or upper Columbia River stocks are transported and all must migrate in-river. There is general consensus that smolt transportation is ineffective for highly imperiled Snake River sockeye with generally poorer returns for transported fish than in-river migrants (FPC 2025c). There is emerging evidence and growing consensus that transported smolts have impaired imprinting and less homing integrity to their natal watersheds, particularly steelhead (Tattam and Ruzycki 2020; FPC 2025d) and are more prone to adult migration delays and subsequent exposure to elevated temperatures (FPC 2025d).

72.     In addition to these known problems with transportation, the currently-proffered benefits over in-river migration are based on novel analyses that appear inconsistent with modeling done within the federal regulatory CRSO EIS process, and fail to account for diminishing transportation benefit as river conditions and subsequent SARs for in-river migrants improve. The proposed 2026 FOP is inconsistent with the federal CRSO EIS, which provided the basis for the 2020 BiOp and ROD. The proposed 2026 FOP will reduce spring and summer spill compared to the Selected Alternative and Plaintiffs' requested relief.  CSS analyses have shown that juveniles passing a dam via the powerhouse have a relative 9% - 13% lower SAR than their spillway-passed cohort for each dam encountered (CSS Annual Reports Tuomikoski et al. 2010, McCann et al. 2016, McCann et al. 2023). Unlike the CRSO EIS process, the proposed 2026 FOP has not been reviewed and analyzed by regional state and tribal partners. Comparing the proposed 2026 FOP to the CRSO EIS alternatives indicates that it has less spill and higher powerhouse encounters than the Preferred Alternative (FPC 2026d (Exhibit 1)).

Page 25 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

73.     Federal analyses of transportation benefits often erroneously use fish that encountered at least one powerhouse at the lower Snake River collector dams as the primary in-river component for comparing SARs with transported fish. CSS analyses clarify that as powerhouse encounters go up, SARs go down. Similarly, and as stated earlier, Dr. Faulkner's declaration (¶ 41) acknowledges studies showing that increasing bypass detections is associated with decreasing SARs. As such, using bypassed fish at any of the lower Snake River collector dams to represent in-river migrants provides a biased comparison with transportation, particularly relative to Plaintiffs' requested relief, which further reduces PITPH. Instead, federal analysts should have used in-river migrants that were never detected at collector dams to better represent in-river migrants under more optimized migration conditions (e.g., spillway passage routes instead of powerhouse bypass routes) reflected in Plaintiffs' proposed relief.

74.     Federal analysts did attempt to use fish detected at the Lower Granite Dam spillway weir site as an alternative comparison with transported fish, which is a better approach. However, detection capabilities have only been available at this site since 2020, so only three years of adult return data is available for those out-migrating cohorts, making conclusions from those results premature. Additionally, Dr. Faulkner and Dr. Smith did not disclose the full PIT tag detection history for those "spilled" fish at Lower Granite Dam in their declarations. However, based on the limited information provided by defendants in January 2026, it appears this "spilled" group often passed through one or more powerhouse bypass systems at subsequent collector dams. As such, those fish are inappropriate representatives of true in-river migrants not subjected to powerhouse bypass systems at collector dams, calling into question the federal analyses.

75.     In contrast, CSS has a long history of comparing SARs of non-bypassed fish at collector dams with SARs of transported fish (most recently, McCann et al. 2025), and incorporating powerhouse encounter impacts into those SARs consistent with analyses used in the CRSO EIS regulatory process and documents.  Federal declarants and defendants ignored

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

these CSS analyses in their filings. The CSS results generally show marginal transportation benefits for summer steelhead, mixed results for spring/summer Chinook and fall Chinook, and a detriment for sockeye.

76.    Both CSS and federal analyses show that as in-river conditions and subsequent SARs improve, transportation benefits diminish (see McCann et al. 2025 and AA 2020b).  And that increasing bypass encounters (e.g., via reduced spill) is associated with lower SARs for in-river migrants (e.g., McCann et al. 2025). As described earlier, the assertion that the proposed 2026 FOP is better than Plaintiffs' requested relief is inconsistent with the federal government's own regulatory documents for CRS operations. The CRSO EIS relied primarily on CSS modeling to justify the Preferred Alternative, and under that modeling approach the proposed 2026 FOP would be worse than the Proposed Alternative (which became the Selected Alternative), thus worse than Plaintiffs' requested relief (FPC 2026d (Exhibit 1)). The Fish Passage Center analyzed the proposed 2026 FOP in the context of the CRSO EIS regulatory documents and confirmed that the proposed 2026 FOP would increase PITPH (including bypass encounters), WTT, and FTT, all detrimental to in-river migrants. When combined with scientifically appropriate transportation benefits, the proposed 2026 FOP would be worse for fish than Plaintiffs' requested relief, or even the status quo (FPC 2026d (Exhibit 1)).  Instead of reducing irreparable harm from the CRS as Plaintiffs' requested relief intends, the proposed 2026 FOP would actually increase such harm.

77.    Transportation has some utility as a base operation for collected fish, but in-river conditions should not be undermined simply to get more fish transported. The best available science firmly supports: 1) optimizing in-river migration conditions (e.g., spill to gas caps to reduce forebay delay and powerhouse passage), 2) transportation of those fish that are collected (Snake River only) absent a compelling reason not to (e.g., delaying spring transport until April 24), and 3) never undermining in-river conditions simply to obtain more fish to transport, as this will adversely impact all remaining in-river migrants as well as all Snake River sockeye.

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

78.     Plaintiffs' requested relief embraces that science-based approach. The science and proper context for transportation and spill issues have been considered by the Court in prior rounds of this litigation, and my prior declarations remain relevant for broader context.

**Section IV: Operational and non-operational conservation measures in Plaintiffs' requested relief are necessary, effective, and implementable in the near-term to reduce irreparable harm caused by the CRS**

*Claim: CRS operations have evolved and are not the same as in 2014, and thus do not pose the same risk of harm they did then (Fed. Br. p. 29), referencing increases in spring spill and resulting reductions in powerhouse passage. (Feil ¶ 19; Swieca ¶ 31-33; Smith ¶ 6, 29). Reliance on decade-old data cannot prove irreparable harm in the next year.*

79.     Managed spring spill has increased since 2017 but CRS operations relative to spill proportions have not "evolved" by choice or adaptive management by the federal government. Every increase in spill proportions has resulted from Court order or negotiated agreement, with the federal government arguing or negotiating against increases in spill at each juncture.

80.     These increases in managed spring spill have reduced powerhouse passage and the associated risk of harm to spring-emigrating listed stocks, but that is compared to decades of failed operations prioritizing smolt transportation and minimal managed spring spill, as evidenced in numerous illegal BiOps. That is a very low bar to gauge improvement from and does not counter the fact that listed populations continue to suffer from too high a frequency of generational decline associated with the CRS (e.g., PITPH > 1) (Bowles Decl. ¶¶ 36-39), and CRS risks are exacerbated by ongoing climate change, which increases the frequency, magnitude, scope and/or duration of environmental downturns (Bowles Decl. ¶¶ 11-13, 20, 41, 46).

81.     The CSS is not "decade-old data." CSS is based on decades of empirical data and analyses that are updated and refined to reflect the latest information on key explanatory variables helping explain variations observed in fish survival rates (McCann et al. 2024).  This

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

approach provides insight into risk of additional irreparable harm. The proposed 2026 FOP will have higher powerhouse encounters (PITPH) and slower WTT and FTT, which are associated with lower SARs and higher risk of generational decline for any given backdrop of environmental conditions that may occur in the next couple years (FPC 2026d (Exhibit 1)). The proposed 2026 FOP will also increase transportation and reduce spillway passage for Snake River sockeye, which will increase risk of irreparable harm to an already highly imperiled ESU compared to the proposed order or even status quo operations (FPC 2025c).

*Claim: Oregon is wrong that elevated water temperatures from recent heat waves prove irreparable harm (Fed. Br. p. 31).*

82.    Oregon does not claim elevated water temperatures from recent heat waves prove irreparable harm, but elevated temperatures are amplified by the CRS contributing to existing irreparable harm from the CRS. A suite of actions must be taken to reduce this irreparable harm, including actions to reduce CRS amplification of temperature risk, during this current fish conservation emergency (Bowles Decl. ¶¶ 16, 18, 49, 50, 55, 59, 68, 112, 115, 146).

83.    The magnitude and frequency of elevated temperature and other environmental downturns are increasing associated with ongoing climate change, as referenced in NOAA Fisheries 2022 and numerous other federal documents (Bowles Decl. ¶¶ 12, 13, 16, 20, 33). The CRS exacerbates the effects of elevated water temperatures from heat waves through increased irradiation associated with larger surface area and slower moving water of the impounded reservoirs as referenced in NOAA Fisheries 2022 and numerous EPA documents (Bowles Decl. ¶¶ 18, 19, 41, 68). The effects of increasing temperatures associated with climate change, and the amplification of those effects by the CRS, have contributed to an alarming increase in the exceedances of water quality temperature standards in the CRS (Bowles Decl. ¶¶ 41, 70).

*Claim: There is no evidence that heat waves are likely to re-occur in 2026 or 2027 and climate change does not prove conditions will re-occur in the next year or two.*

Page 29 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

84.     In light of climate change, the obvious trend is for warmer, not cooler, temperatures. The frequency and magnitude of heat waves are increasing, and any uncertainty whether elevated temperature conditions will in fact occur should not be borne on the backs of the fish, but instead requires proactive actions to help mitigate the trend toward warmer temperatures (NOAA Fisheries 2022; Crozier et al. 2019, 2020, 2021; NOAA 2025; NOAA 2026). My original declaration relies primarily on the federal government's own scientists, publications, and websites to clarify this reality (Bowles ¶¶ 12-20). NOAA's own Climate Prediction Center shows above average temperatures predicted July-September 2026 for the Columbia and Snake Rivers (https://www.cpc.ncep.noaa.gov/products/predictions/long_range/lead07/off07_temp.gif NWS 2026).

85.     To assume temperature will not be a problem in the next two years and put that burden of risk on the fish would be irresponsible given recent trends.  As stated in my original declaration (Bowles ¶ 17) "It is noteworthy that 2024 was the warmest ever recorded for the globe since records began in 1850, exceeding the prior record set in 2023, that the warmest ten years in that 174 year period have all occurred in the last decade, and that there has not been a year with below average temperature for nearly 50 years (1976) (NOAA 2025)."

*Claim: Plaintiffs' requested relief will not address temperature issues or be more effective than current CRS operations (Fed. Br. p. 33), and MOP elevations will not change temperatures downstream and may increase temperatures (Turner ¶ 36-37).*

86.     The elevations specified in the proposed order (MOP in the lower Snake River and above MOP in the lower Columbia River) with a restricted operating range will decrease solar irradiation and WTT. Solar irradiation of surface area waters of the CRS is not the sole source of thermal inputs to the CRS but does contribute. That is simply physics and math. This heated water moves slowly through the system due to impoundments. There is no scientific basis

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

for claiming reduced reservoir elevations will not change temperatures downriver or that they will actually increase temperatures.

*Claim: Proposed spill operations may impede adaptive management decisions (such as increasing powerhouse flow and decreasing warm surface spill) and thereby lead to warmer temperatures in spring/summer. (Turner ¶ 38-41).*

87.     The proposed order shifts some base assumed operations for the CRS but it does not change other elements of the Water Management Plans or FOPs which already, and always, include the ability to adaptively manage the CRS in-season to address fish passage, infrastructure and human safety, power emergencies, and water quality requirements. Moving forward, this inherent flexibility should include full collaboration among state, tribal and federal salmon managers to guide appropriate balance for tradeoffs between fish passage and temperature reduction/mitigation, and exhausting all alternatives before pitting one against the other (Bowles Decl. ¶¶ 18, 19, 55, 73).

88.     These federal claims are incorrect and misrepresent flexibility for addressing elevated temperatures. As described earlier, it is not scientifically disputed that the CRS amplifies elevated water temperature risks associated with climate change, such as increased surface area of impoundments contributing to increased solar irradiation and slower water movement, and that actions must be taken to help mitigate this risk and occurrence.

89.     However, actions to fully mitigate elevated water temperature risks amplified by the CRS are limited under current configurations of the CRS, so all available options should be implemented to reduce current impacts and avoid additional amplification. Plaintiffs' requested relief seeks to partially address this need by reducing reservoir levels (e.g., MOP/MIP with reduced operating range) which will reduce surface area and WTT which in turn will decrease solar irradiation, water retention and length of fish exposure (e.g., FTT).

90.     De minimis arguments like those posed by federal declarants and defendants are unpersuasive given the already highly altered and impacted fish habitats of the CRS, chronic

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

history of CRS exceedances of water temperature standards, federal recognition of CRS amplification of temperature risks associated with climate changes (e.g., NOAA Fisheries 2022, Crozier et al. 2020), the paucity of alternative options available within the constraints of the existing CRS configurations and authorized purposes (e.g., Bowles Decl. ¶ 19), and the emergency conservation status of the fish. There should be no disputing the relationship of reduced reservoir elevation on surface areas and WTT.

*Claim: Oregon is wrong that the CRS is why temperatures in the Snake River or Columbia River exceed Water Quality criteria (Fed. Br. p. 34). Oregon ignores warm water upstream of Snake River dams, widespread temperature exceedances, high temperatures that existed pre-dams, and that outflow temperature depends on inflow temperature. (Turner ¶ 21-29).*

91.     Oregon does not claim the CRS is the sole source of elevated water temperatures. Oregon recognizes that elevated temperatures are caused by ongoing climate change affecting external inputs to the CRS and historical seasonal high temperatures and heatwaves. But that does not negate or change the scientific fact that the CRS contributes to thermal impacts and amplifies external impacts (e.g., see NOAA Fisheries 2022; Crozier et al. 2020). As clarified in NOAA Fisheries 2022, a backdrop of deteriorating environmental conditions increases, not diminishes, the responsibility to do more in the CRS (Bowles Decl. ¶ 20).

*Claim: CRS operations improve temperatures, especially from Dworshak Dam cold-water releases which help mitigate warming caused by Snake River dams. (Turner ¶ 26, 28-29, 30).*

92.     In a highly altered and impounded mainstem lower Snake River, releases of stratified cold hypolimnetic water from Dworshak Dam are a valuable tool for helping mitigate elevated water temperatures in the lower Snake River. Regrettably, the benefits are diluted dramatically in the first few reservoirs because of the high water volume of the impoundments

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

compared to a free-flowing river, and as such provide little to no real-time cooling benefit for lower impoundments (EPA 2021c).

*Claim: CRS operations mitigated the impact of the 2021 heat wave. (Turner ¶ 29 31).*

93.     As covered in my original declaration, the Corps has been unable to fully mitigate extreme heat events which are increasing in frequency and magnitude due to ongoing climate change. High mortality, migration delay and stress are often associated with these events. The Corps' efforts to help mitigate have often come at the expense of other essential conservation measures (e.g., reduced spill and increased powerhouse passage, earlier use of Dworshak diminishing availability of cool water later in summer when weather is hottest). The 2021 heat event fortunately occurred after the peak of the sockeye run so a disaster like 2015 was averted. However, adult delays with increased exposure to high temperatures were observed (Bowles Decl. ¶ 16).

*Claim: The Corps already takes all feasible measures to reduce temperatures in fish ladders. (Turner ¶ 32).*

94.     More can be done to address thermal constraints and risks associated with some of the fish ladders, which is why that is included in Plaintiffs' requested relief (Bowles Decl. ¶ 112).

*Claim: Defendants have a technical process in place regarding temperature issues and ongoing processes to develop improvements. (Turner ¶ 33-35, 39).*

95.     I agree that a process framework is available to potentially address ongoing and emerging temperature issues. However, as mentioned above and in my original declaration, the existing forum to address water temperature and other CRS risks lacks meaningful collaboration with state and tribal salmon managers. As such, some state and tribal recommendations have been dismissed and selected mitigation measures have come at the expense of other necessary conservation measures, such as reduced spill (which has increased PITPH) and premature use of

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Dworshak water. Using the existing forums with full collaboration among salmon managers could greatly improve this process (Bowles Decl. ¶ 18).

*Claim: Data and studies from recent years of higher spill do not support the requested relief and recent data do not support that SARs will be substantially higher under "very high spill levels." (Faulkner ¶¶ 53, 57).*

96.     CSS includes periodic updates and validations based on additional years of data to ensure these models still reflect the latest scientific information. The latest validation was included in the 2025 CSS annual report and demonstrated that the primary explanatory variables explaining variations in SARs (e.g., PITPH, WTT, FTT, ocean conditions) remained consistent with prior years. As such, recent observed SARs are incorporated into CSS analyses and these observed SARs remain consistent with expectations given the specific explanatory variables associated with those SARs (McCann et al. 2019, McCann et al. 2025).

97.     As covered above, Mr. Feil compared CSS forecasts for MO4 in the CRSO EIS to observed SARs recently. But MO4 was never implemented, so that comparison is moot. Recently observed SARs actually are within the variation expected based on what occurred for the explanatory variables (e.g., PITPH, WTT, FTT, ocean conditions) (McCann et al. 2019, McCann et al. 2025).

98.     Implying that the proposed order would establish "very high spill levels" is misleading and incorrect. For 2026, the proposed order does not specify any higher spill levels than what has previously been in place during at least portions of the day for each dam.  At Bonneville Dam, the proposed order defers higher spill levels until the tailrace stilling basin is modified to prevent boulders from contributing to erosion. The maximum spills requested in the proposed order are all significantly less than the maximum spills the CRS frequently experiences during spring runoff, and the associated unmanaged spill. These high unmanaged spill and flow events have been associated with some of the highest subsequent adult returns observed since ESA listings (Bowles Decl. ¶¶ 46-47).

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Claim:  In-river juvenile survival since 2020 has not increased with increased spill. (Feil Decl. ¶ 20).*

99.     CSS analyses continue to demonstrate that juvenile reach survival for spring migrants is negatively associated with powerhouse passage, WTT, and day of the year. Based on these explanatory variables, in-river juvenile survival since 2020 has been consistent with expectations.  Higher spill (and corresponding lower PITPH) has been coincident with lower flows and warmer temperatures.

100.     As covered above and in my original declaration, high in-river reach survival is important and necessary, but it does not reflect the full impacts associated with the CRS, including delayed mortality in the estuary and ocean associated with stress and delay of juveniles migrating through the CRS (Bowles Decl. ¶¶ 34-35). Lower PITPH is highly associated with improved SARs, more so than it is with reach survival (McCann et al 2019).  As such, benefits of higher spill should not be judged simply by reach survival but instead SARs.  And both reach survival and SARs should not assess spill in a vacuum without full consideration of other explanatory variables (McCann et al. 2019, McCann et al. 2025) (Bowles Decl. ¶¶45-45, 64-68).

101.     NOAA's own models and analyses discussed earlier as well as CSS analyses indicate the relief requested would provide better reach survival and SARs for in-river migrants than the 2026 FOP. And CSS analyses demonstrate that increased powerhouse passage of in-river migrants (e.g., from reduced spill throughout the CRS) is associated with lower SARs (Tuomikoski et al. 2010, McCann et al 2016, McCann et al 2023).

*Claim: During my deposition I admitted it was speculative whether increased spill under the proposed order will improve adult returns (Fed. Br. p. 41, citing Bowles dep. 85:22-86:18 and 106:19), and that data (as opposed to speculative predictions) do not support that higher spill will improve survival. (Feil Decl. ¶ 24; Swieca Decl. ¶ 34).*

102.     This is a misrepresentation of what I said and the context in which I said it. The section of my deposition referenced here centered on the recent uptick in abundances associated

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

with improved ocean conditions in 2021 and to a lesser extent in 2022 and 2023.  In my declaration (and deposition) I posited that increased spill levels may have also contributed to that uptick, but that it was difficult to tease out because of the coincident improved ocean conditions and the lack of more years of data (Bowles Decl. ¶ 32). That discussion has no bearing on the science behind spill and our confidence in the ability of the requested relief to reduce irreparable harm.

103.    Over the years, each step of enhanced spill only occurred when ordered by the Court or as part of a negotiated settlement. Yet the 2020 BiOp has spill as a foundational plank and CSS models were necessary for that BiOp to conclude CRS operations avoided jeopardy (by their standards) (USACE et al. 2020). Now, once again, federal defendants are claiming any further increase in spill is too much and will harm the river and its species, and that recent spill must be rolled back.  Yet their own models and analyses say such rollback will be bad for in-river migrants (e.g., reach survival, powerhouse encounters, fish travel times, and SARs). Prioritizing transportation over in-river conditions was a failed experiment and policy for decades.

*Claim: Plaintiffs ignore that the requested relief will worsen conditions for bull trout (Fed. Br. p. 42); specifically, increased spill will adversely impact bull trout by increasing mortality and having other impacts. (Kuttel ¶ 45).*

104.    Federal assumptions about operations associated with the proposed order assume only negative outcomes for bull trout, which are largely speculative and beyond the scope of the available data. These federal assumptions also fail to consider potential benefits of the requested relief for bull trout and potential negative outcomes associated with the 2026 FOP. Quantitative bull trout data in the mainstem Snake River is scarce, and the paucity of it makes drawing solid conclusions regarding operations difficult (FPC 2026a). A true and correct copy of a Fish Passage Center memorandum regarding a summary of bull trout-PIT-Tag detection data in the Lower Snake River and the Imnaha River is attached to this declaration as Exhibit 2.

Page 36 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

105.    Although available data makes it difficult to assess impacts from any proposed actions, based on a review of bull trout life history characteristics, state and tribal fishery experts agree that in addition to providing benefits to salmon and steelhead the requested relief will be at least as beneficial to bull trout as the 2020 ROD and the proposed 2026 FOP operations, and potentially more so. The proportion of overall bull trout in the basin that are active in the lower Snake River appears relatively small, as only 30 unique PIT tags have been detected at the Snake River dams between 2020 and 2025 when at the same time there were a significant number of PIT tagged bull trout in the Snake River basin from tributaries (FPC 2026a (Exhibit 2)). Based on analysis of hydrosystem detections there appears to be little interaction with the hydrosystem of tributary bull trout, and only two or three re-ascensions, so general directionality of movement could not be determined (FPC 2026a (Exhibit 2)). This means that foraging, migrating, and overwintering bull trout could benefit from increased river connectivity, but there is simply not sufficient data to support the claim that they were being harmed by entrainment through the spillways. Furthermore, this claim ignores potential entrainment and harm through the bypass system if spill were reduced.

106.    Bull trout frequently (though not always) use deeper water habitats (Barrows et al. 2016), which would make them susceptible to entrainment into the bypass system. Based on limited detections of PIT tagged fish we know that bull trout are detected in the juvenile bypass system (FPC 2026a (Exhibit 2)). The proposed 2026 FOP will increase the amount of water heading toward the bypass and collection system and could increase the overall amount of bull trout being transported. Yet federal defendants do not appear to fully take this potential outcome into consideration in their analysis of potential harm. When bull trout are transported, they are lost to the population (Kuttel Decl. ¶ 31).

107.    Plaintiffs' requested relief would provide additional spill during the fall and winter which is when many fluvial bull trout move out of tributaries to forage (Barrows et al. 2016). Providing additional surface passage spill provides a non-turbine route of passage for

Page 37 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

listed bull trout that may be foraging and over-wintering in the mainstem. Although Ms. Kuttel seems to recognize this by admitting this will provide a dam passage route not currently available, she speculates without specific bull trout data that surface passage will somehow be more injurious to bull trout than other routes (Kuttel ¶ 45), even though the only other route available at this time of year is a turbine passage route.

*Claim: High and frequent spill will harm salmonids (Feil ¶ 20 & 41; Kuttel ¶ 54; Marshall ¶ 50; Renholds ¶ 33; Smith ¶ 10; Turner ¶ 20).*

108.    This claim has been repeated and considered throughout the history of this case (e.g., Bowles 2017 Reply Decl.). Federal defendants argue each time that every additional increment of spill will create eddies impeding juvenile and adult ingress and egress, increase fallback, create migration delays, and kill resident and anadromous fish from GBT. These claims have been consistently proven wrong through actual implementation (e.g., Bowles Decl. ¶ 111). Where concerns have been observed, there have been proactive and real-time changes to operations.

109.    Plaintiffs are not requesting novel increases in spill higher than what has already occurred at these dams (except Bonneville Dam, as discussed earlier). The requested relief expands spill where necessary to fill in the "holes" of the temporary 2019 flexible spill agreement (and largely carried forward as the one year of defined "base operations" in the 2020 BiOp as well as the 2025 FOP).

110.    The proposed order establishes this spill as the base program for implementation, but does not change the deference provisions in the WMPs or FOPs for addressing human and infrastructure safety, energy emergencies, flood control, and other matters. Nor does it change the Corps and Regional Forum provisions for adaptive management to address biological issues such as adult delays or fishway conditions. Nor does it change the Corps' requirements for monitoring and appropriately responding to TDG and GBT as established by state water quality entities.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Claim: Spring spill will create tailrace eddies that can impede upstream passage (Renholds ¶ 28-29, 33-34; Feil ¶ 22, 33-34, 37), and spring spill interferes with attraction flows from fish entrances.*

111.    Claims of adult passage delay and implications for mortality associated with high managed spill are inconsistent with the data. Numerous technical documents from the FPC have addressed similar claims in the past, as well as these latest claims, and they appear to be based on flawed analyses misunderstanding the actual data (FPC 2026b). A true and correct copy of the Fish Passage Center memorandum regarding upstream passage delay is attached to this declaration as Exhibit 3. Federal declarants claimed that there was a delay of 24 days in 2022 in the Snake River (Feil Decl. ¶ 22), but based on an FPC analysis, the median adult fish passage time from Ice Harbor to Lower Granite Dam was 6.8 days, and the conversion rate was over 95% (FPC 2026b (Exhibit 3)). And all of this occurred while flow and spill conditions were at or above the 125% managed spill cap for much of the spring (FPC 2026b (Exhibit 3)). But even if modest adult migration delay is observed, it is important to understand the biology and history of these species in order to find the right balance for tradeoffs between actions for juveniles and adult migrants.

112.    Adult passage delay does not necessarily equate with adult mortality. All listed anadromous fish evolved and prospered for millennia in a free-flowing river with rapids, cascades, turbulence and eddies created by slope and geomorphology. Adult spring/summer Chinook and summer steelhead also evolved and prospered by migrating upriver during spring and early summer coincident with spring snowmelt and highest flows, water velocities, turbulence and resulting eddies of the year. These river dynamics caused temporary impediments and delays for returning adults as they sought and found passage. The most obvious example being Celilo Falls before it was flooded by The Dalles Dam, creating what is now called Celilo Lake. Interior origin adult anadromous fish were well known and sought after for their exceptionally high fat and muscle content, required for the naturally arduous journey.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

113.    Development of the CRS flooded all this natural slope and geomorphology, resulting in less energy demand for adults migrating through the impoundments and faster migration times. Now the primary sources of impediment, turbulence, and eddies are the dams themselves, but these types of challenges are not novel to the genetic and evolutionary legacy of these migrating adult salmon and steelhead. This does not mean managers shouldn't continue to ensure adult passage at the dams is as safe and effective as possible within the larger context of both juvenile and adult passage.

114.    This context requires recognition that the largest component of the CRS threat is to juvenile outmigration survival, not adult migration survival (e.g., NOAA Fisheries 2022). My prior declarations have described this threat in detail, but in essence, CRS impoundments slowed the water about ten-fold and created dams that impede and delay passage, creating direct mortality and stress and delay contributing toward delayed mortality in the estuary and ocean (Bowles Decl. ¶ 64).

115.    In contrast with anadromous adults, anadromous juveniles have nothing in their genetic or evolutionary legacy that equip them to handle these CRS threats to juvenile migration. Historically, juvenile spring/summer Chinook and summer steelhead rode the wave of spring snowmelt to the ocean in days, rather than weeks. These juveniles, in the process of smoltification, are highly vulnerable, on a time clock for reaching the ocean, and do not have the bioenergetics to actively swim and navigate reservoirs, avoid avian and piscine predators amplified by the CRS, or sound and find powerhouse passage at the dams. As long as these dams remain in place, spill is the most effective tool to reduce forebay delay and reduce powerhouse encounters, which even federal declarants concede are the worst dam passage routes for reach survival and SARs of in-river migrants.

116.    As such, and recognizing this important context, the Regional Forum, with strong collaboration with salmon managers, can play a vital role in balancing tradeoffs between adult and juvenile passage at the dams, with care taken to avoid undermining juvenile passage

Page 40 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
            OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

                        Department of Justice
                        100 SW Market Street
                        Portland, OR 97201
                  (971) 673-1880 / Fax: (971) 673-5000

conditions (e.g., spill) unless absolutely necessary to avoid adult mortalities. Proof that this collaboration can work is evident in operations at Little Goose Dam and real-time considerations that take place most years.

117.    This process of salmon manager collaboration is increasingly important as elevated temperatures from climate change, amplified by the CRS, become more frequent.  In reaches with lethal temperatures, avoiding excessive delay becomes obviously important in the salmon managers' consideration.  Emerging data indicates transported fish are more prone to adult delays than adults allowed to migrate inriver (Tattam and Ruzycki 2020, FPC 2025d), which is intuitive given the importance of imprinting during migration.

*Claim: The 2026 FOP provides more favorable conditions for returning adults and less delay. (Feil ¶ 35).*

118.    This point has been addressed above. Delay does not equate to mortality. The proposed 2026 FOP spill reductions come at the expense of juvenile passage by increasing forebay delay and increasing powerhouse bypass passage that is associated with lower reach survival and SARs for in-river migrants.

*Claim: The 2026 FOP is likely to benefit juveniles by alleviating degraded tailrace conditions from higher spill. (Renholds ¶ 22-27).*

119.    This assertion is highly speculative and lacks broader context. Consistent with both CSS and NOAA's COMPASS and life cycle models, juvenile in-river survival and subsequent adult returns to the Columbia River would be higher under the proposed order than the proposed 2026 FOP for in-river migrants. Federal Defendants retain the ability to utilize the processes set forth in the annual FOP and WMPs to address significant tailrace conditions impacting juveniles or adults if they arise.

*Claim: High spill will cause gas bubble trauma for non-salmonid fish. (Fed. Br. p. 43; Turner ¶ 4-20; Renholds ¶ 18-21; Plumb (generally); Feil ¶ 40; Kuttel ¶ 33-35, 41).*

Page 41 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
             OREGON'S MOTION FOR PRELIMINARY INJUNCTION

120.    State water quality agencies already require monitoring and provide criteria for appropriate response, including potential spill curtailment if necessary. This dynamic has occurred in the past and will likely occur in the future.

121.    As described in detail earlier, managing a highly degraded CRS requires balancing "lesser of multiple evils" to avoid extinction and jeopardizing the recovery of listed species. Powerhouse passage is the worst dam passage route for juvenile migrants, reducing both reach survival and SARs. The best way to avoid powerhouse passage is spill. Spill can increase TDG and associated GBT. State water quality entities, in coordination with state, federal and tribal fish managers, established limits for TDG and monitoring requirements to contain TDG and GBT risks within acceptable limits. Risks and concerns were fully vetted and considered in this process. Ongoing assessment can and does occur to consider new information and make adjustments as necessary. The existing TDG/GBT allowances and protocols from state water quality agencies remain in place.

*Claim: MOP elevations will exacerbate TDG problems because low water levels increase TDG at some dams. (Turner ¶ 16).*

122.    This claim is speculative. Regardless, if MOP creates higher TDG exceeding allowances, then the Corps is required to curtail spill accordingly, making this concern moot.

*Claim:  The proposed relief will more than double spring days exceeding 120% TDG compared to the 2026 FOP, but TDG can be bad even below the 125% standard. (Renholds ¶¶ 19-21; Turner ¶¶ 10, 12, 15-16, 18-20).*

123.    This statement is misleading and inaccurate. For 2026, the requested relief includes only modest increases in spring spill compared to the 2025 FOP (which was implemented last year, so is the status quo). Compared to the 2025 operations there are no increases at lower Snake River dams and several of the lower Columbia River dams.  The main increase is at John Day Dam, filling in holes created in the 2025 FOP for power revenue, not for fish benefits (Bowles Decl. Table 3, Feil Decl. Fig. 2).

Page 42 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION

124.    In contrast, the 2026 FOP rolls back spill dramatically from both the 2020 BiOp and 2025 FOP, so of course the requested relief would result in more days with higher TDG levels (still within water quality allowances).  The requested relief would also have far lower PITPH and powerhouse bypass encounters and lower WTT, which NOAA's own models and assumptions clarify will likely improve reach survival and FTT, and as such, likely improve SARs for in-river migrants compared to the 2026 FOP. Regardless, spill levels will continue to be managed by the Corps to meet TDG allowances, including appropriate spill curtailment if necessary.

Claim:  Lowering reservoir elevations will hurt salmon and steelhead (Fed. Br. p. 44-45), and the proposed order's MOP elevations would force some dams to operate outside normal ranges and outside fish passage criteria in fish ladders. (Feil ¶¶ 42-49; Renholds ¶¶ 17, 26; Marshall ¶¶ 19-24).

125.    The requested relief would not require operating reservoirs outside of normal operating ranges and does not anticipate elevations to cause fish ladders to operate outside of fish passage criteria. During the spring, the Snake River reservoirs have all operated for the majority of hours at MOP + 1-ft. for the last three years (FPC 2026c). And Columbia River reservoirs have all spent at least some time at MOP/MIP + 1.5-ft. in the last three years, demonstrating that it is possible (FPC 2026c). A true and correct copy of the Fish Passage Center memorandum summarizing reservoir elevation operation levels 2023-2025 is attached to this declaration as Exhibit 4.

Claim:  The proposed order's MOP elevations would degrade surface passage routes, making them less effective at attracting juveniles. (Feil ¶ 48).

126.    For any given discharge, spill proportions would remain basically the same, driven primarily by TDG levels used to estimate spill caps. As such, the proportion of juveniles allowed to pass dams via non-powerhouse routes should not be impacted by reservoir elevations. If spillway weir or non-spillway surface passage routes have less flow at lower elevations, then

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

more fish will be passed via traditional spillways. Federal Defendants retain the ability to utilize the processes set forth in the annual FOP and WMP to collaborate with salmon managers on appropriate tradeoffs should any issues arise.

*Claim: Plaintiffs did no analysis quantifying temperature decreases they think would occur, and the Corps did modeling that shows proposed order operations would not meaningfully change temperatures. (Turner ¶¶ 36-41).*

127.    Temperature exceedances in the CRS are rampant and the CRS amplifies temperature risks as explained earlier.  As such, any incremental improvement is both needed and warranted.  Di minimis arguments when the CRS is already so impacted and listed stocks so imperiled are inconsistent with conservation science and stewardship. Reducing surface elevations and limiting operating ranges will reduce surface area, reduce solar irradiation and speed up the water, helping to address water temperature.

*Claim: In low flow years with high air temperatures, the proposed order would increase temperatures during the sockeye run at John Day, The Dalles, and Bonneville dams. (Turner ¶¶ 36-41).*

128.    Low flow years with high air temperatures are a problem for all listed species throughout the CRS, and the CRS amplifies the threat by dramatically increasing WTT, solar irradiation, and heat traps as discussed earlier. Lowering surface elevation and reducing operating ranges will decrease WTT, FTT, surface area for solar irradiation and water retention. Federal Defendants retain the ability to utilize the processes set forth in the annual FOP and WMP to collaborate with salmon managers on specific issues if they arise.

*Claim: The PI will likely have minimal effect on WTT and FTT due to complex hydraulics. (Turner ¶ 36).*

129.    Reducing surface elevations will reduce WTT and FTT in the reservoirs. This is simple physics and math and is supported by declarants' own analyses, which indicates that WTT will decrease by 2 to 18 hours in each reservoir (Turner Decl. ¶ 36). Reduce the cross-

Page 44 -   REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF
             OREGON'S MOTION FOR PRELIMINARY INJUNCTION

sectional area of a reservoir for a given flow, and the water will move faster. WTT is highly correlated with FTT. If anything, the water will move faster, not slower than predicted by the math because flooded littoral areas are more complex causing additional friction and backwater than the main channel.

*Claim:  Lower reservoir elevations would increase avian predation. (Marshall ¶ 25; Feil ¶¶ 49-50).*

130.    Lower proposed reservoir elevations would create less heating, less littoral backwaters and faster water and fish movement. All of these reduce risk of avian and piscine predation; they do not increase it. The relief requested would also require alternative actions to address avian predation at Blalock Islands, so predation is unlikely to go up (Bowles Decl. ¶¶ 131-132).

*Claim:  Reducing fish transport will decrease juvenile survival and adult returns (Fed. Br. p. 46), and reducing juvenile fish transport from Lower Monumental Dam should be denied for lack of evidence it will benefit fish (Smith ¶¶ 10, 56).*

131.    The requested relief is based on a System Operational Request (SOR) drafted by the Idaho Department of Fish and Game and supported by state and tribal salmon managers (SOR 2024-1) (Bowles Decl. ¶¶ 52, 114).  The SOR and my declaration clarify the evidence in support of this action. Less than 7% of all spring/summer Chinook and less than 10% of all steelhead in recent years are transported from Lower Monumental Dam, and to do so requires disrupting riverine processes (SOR 2024-1). The cost is simply not worth any potential minimal benefit. This measure in the proposed order has universal support among state and tribal salmon managers, including Idaho, who are focused on what's best for the fish.

*Claim:  Plaintiffs' non-operational measures are overbroad and beyond agency authority (Fed. Br. p. 46; Feil ¶ 59-74; McDowell ¶ 36-38), and the court should deny the plaintiffs' requests to undertake these measures, planning exercises, and maintenance.*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

132.    The non-operational measures and maintenance fixes in the proposed order are urgently needed by the fish. They are not overbroad, they are not beyond federal agency authority to effect and implement, they are not new or novel concepts, and they are all possible to implement or make substantive progress within the next year or two. In some cases, federal defendants have interpreted the requested relief as more expansive than written, which creates a false sense of impossibility.

133.    In the case of urgently needed maintenance, the Corps, not always through their own fault, does not have a track record of getting things accomplished in timely fashion. Many of the actions identified in the proposed order have been prioritized for years and all are in the late stages of planning or simply awaiting funding for implementation.

134.    The Corps argues that it does not have authority to relocate or fund relocation of cormorants from the state-owned Astoria-Megler Bridge to the federally-owned East Sand Island (Feil ¶¶ 64-66). However, the Corps has funded the creation of at least three artificial islands on state lands in Oregon over the last two decades at Crump Lake and Summer Lake Wildlife Management Area (Roby et al. 2021). If the Corps can build entire islands on State of Oregon lands, they should be able to address the cormorant issue on the state-owned Astoria-Megler Bridge. This is especially true because the Corps' own actions were a key driver of the cormorant colony's relocation from East Sand Island—a dredge-material island created and administered by the Corps—to the Astoria-Megler Bridge (Roby et al. 2021, Lawonn 2023).

135.    The Corps also argues that it cannot assist with or conduct hazing of avian predators on the Blalock Islands because the Fish and Wildlife Service (FWS) is the manager of the Blalock Islands through the Umatilla National Wildlife Refuge; ordering dissuasion of migratory birds there would conflict with a grant of rights to the FWS (Feil ¶ 62). But the FWS has allowed tern management on Crescent and Badger islands (both administered by McNary National Wildlife Refuge) in McNary Reservoir, and the Corps itself has conducted substantial avian management on Crescent Island (Roby et al. 2021). There should not be a material

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

difference in the grant of rights between McNary and Umatilla National Wildlife Refuges such that would prevent management on Blalock Islands. Further, the Corps routinely manages Caspian terns, gulls, and other avian predators on other non-Corps-administered lands, including on Rice Island and Miller Sands Spit, two islands in the Columbia River estuary that are owned by the State of Oregon.

136.    The Federal Defendant and Defendant-Intervenor responses cite nothing that would preclude any of the non-operational conservation measures on sockeye. Federal declarants do not see any reason for a change in access to the adult trap (Feil Decl. ¶ 69), and NMFS does not provide any reasons why the Lower Granite adult trap could not be operated seven days per week. Even Intervenor-Defendant Idaho's (Hebdon Affidavit ECF 2568) concerns are easily addressed through increased coordination. All state and tribal fish managers share the generalized fish health concerns raised by some opposition filings. At the time of sockeye holding and transport, these concerns are less problematic due to minimal host species overlap and strict biosecurity protocols that will be in place. For Snake River kelt reconditioning, which would provide short and long-term benefits for Snake River steelhead, NMFS has offered no explanation for why this critical program should not be fully implemented as requested in the proposed order.  Federal Defendants' argument that changes in the spill regime are the limiting factor for maximizing collection and reconditioning of kelts (Fed. Br. p. 97; Sweet Decl. ¶ 16) ignores that the program itself – and the request for relief – includes expanded collection at tributary weirs in the Snake River Basin.

137.    Furthermore, it appears that the Federal Defendants have missed the intent of the proposed order on developing a Hatchery and Genetic Management Plan (HGMP) for a secondary non-captive broodstock source for Snake River Sockeye. They apparently interpreted the intent as requiring approval and funding of a new captive broodstock program, rather than a non-captive broodstock program. Moreover, Intervenor-Defendant Idaho's request for greater coordination (Hebdon Affidavit, ECF 2568) on the development of the HGMP is supportable.

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

138.    The Corps' project development and budget processes have not been effective to date in prioritizing and accomplishing urgent infrastructure needs. The Corps maintains a list of critical non-routine fish passage infrastructure items (USACE 2025c). This list contains over 100 issues that have been prioritized by the Corps and regional fish managers. In reviewing the list, it appears that since 2006, only three projects have been completed, and the list grows every year as the dams age. The infrastructure projects the proposed order identifies are all at the late stages of planning, and they are ripe for completion within a year or two.


**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on January __22__, 2026.


_____ _s/ Edward Bowles_ _____
EDWARD BOWLES

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

References

AA (Action Agencies). 2020b. Columbia River System Operations Draft Environmental Impact Statement. Appendix V, Endangered Species Act Consultation; Part 1, Columbia River System 2020 Biological Assessment. Available at: https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/14968.

Arpad, I. W., J. T. Kiss, and D. Kocsis. Role of the volume-specific surface area in heat transfer objects: A critical thinking-based investigation of Newton's law of cooling. International Journal of Heat and Mass Transfer 227, 125535.

Barrows, M. G., D. R. Anglin, P. M. Sankovich, J. M. Hudson, R. C. Koch, J. J. Skalicky, D. A. Wills, and B. P. Silver. 2016. Use of the Mainstem Columbia and Lower Snake Rivers by Migratory Bull Trout. Data Synthesis and Analyses. Final Report. U.S. Fish and Wildlife Service, Columbia River Fisheries Program Office, Vancouver, WA.

CBRI (Columbia Basin Restoration Initiative). 2023. A proposal to the Biden Administration from the "Six Sovereigns". Available at: https://critfc.org/wpcontent/uploads/2024/02/CBRI-overview.pdf.

Crozier, L. G., M. M. McClure, T. Beechie, S. J. Bograd, D. A. Boughton, M. Carr, T. D. Cooney, J. B. Dunham, J, C. M. Greene, M. A. Haltuch, E. L .Hazen, D. M. Holzer, D. D. Huff, R. C. Johnson, C. E. Jordan, I. C. Kaplan, S. T. Lindley, N. J. Mantua, P. B. Moyle, J. M. Myers, M. W. Nelson, B. C. Spence, L. A. Weitkamp, T. H. Williams, and E. Willis-Norton. 2019. Climate vulnerability assessment for Pacific salmon and steelhead in the California Current Large Marine Ecosystem. PLoS ONE 14(7): e0217711. https://doi.org/10.1371/journal.pone.0217711.

Crozier, L. G., J. E. Siegel, L. E. Wiesebron, E. M. Trujillo, B. J. Burke, B. P. Sandford, and D. L. Widener. 2020. Snake River sockeye and Chinook salmon in a changing climate: Implications for upstream migration survival during recent extreme and future climates. PLoS ONE 15(9): e0238886. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0238886.

Crozier, L. G., B. J. Burke, B. E. Chasco, D. L. Widener, and R. W. Zabel. 2021. Climate change threatens Chinook salmon throughout their life cycle. Communications Biology 4: 22. Available at: https://www.nature.com/articles/s42003-021-01734-w.pdf

EPA (Environmental Protection Agency). 2021c. Columbia and Lower Snake Rivers Temperature Total Maximum Daily Load, Appendix D RBM10 Model Scenario Report. U.S. Environmental Protection Agency, Seattle, WA. May 2021. Available at: https://www.epa.gov/system/files/documents/2021-08/tmdl-columbia-snake-temperatureappendix- d.pdf.

Faulkner, J. R., B. L. Bellerud, D. L. Widener, S. G. Smith, and R. W. Zabel. 2021. Associations among Fish Length, Dam Passage History, and Survival to Adulthood in Two At-Risk Species of Pacific Salmon: Response to Comment. Transactions of the American Fisheries Society 150, 196-206.

FPC (Fish Passage Center). 2025c. Technical Memorandum 27-25. Sockeye Adult Migration and Survival. Memorandum to Michele DeHart from Gabe Scheer August 22, 2025. Available at: https://www.fpc.org/documents/memos/27-25.pdf

Page 49 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

FPC (Fish Passage Center). 2025d. Technical Memorandum 37-25. Adult passage Delay at John Day Dam. Memorandum to Fish Passage Advisory Committee from Michele DeHart November 5, 2025. Available at: https://www.fpc.org/documents/memos/37-25.pdf

FPC (Fish Passage Center). 2026a. Technical Memorandum 1-26. A Summary of Bull Trout PIT-Tag Detection Data in the Lower Snake River and Imnaha River. Memorandum to Tucker Jones (ODFW) from Jerry McCann January 8, 2026. Available at: https://www.fpc.org/documents/memos/01-26.pdf

FPC (Fish Passage Center). 2026b. Technical Memorandum 5-26. Upstream Passage Delay. Memorandum to Tucker Jones (ODFW) from Michele DeHart January 16, 2026. Available at: https://www.fpc.org/documents/memos/05-26.pdf

FPC (Fish Passage Center). 2026c. Technical Memorandum 6-26. Summary of reservoir elevation operation levels 2023-2025. Memorandum to Tom Lorz (CRITFC) from Michele DeHart January 16, 2026. Available at: https://www.fpc.org/documents/memos/06-26.pdf

FPC (Fish Passage Center). 2026d. Technical Memorandum 7-26. Review of a draft Fish Operations Plan document. Memorandum to Tucker Jones (ODFW) from Michele DeHart January 16, 2026. Available at: https://www.fpc.org/documents/memos/07-26.pdf

FPP (Fish Passage Plan). 2020. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control CENWD-PDW-R. Available at: https://public.crohms.org/tmt/documents/fpp/2020/final/FPP20_AppE_FOP.pdf

FPP (Fish Passage Plan). 2021a. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control CENWD-PDW-R. Available at: https://public.crohms.org/tmt/documents/fpp/2021/final/FPP21_AppE_03-31-21.pdf.

FPP (Fish Passage Plan). 2022. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control CENWD-PDW-R. Available at: https://public.crohms.org/tmt/documents/fpp/2022/final/FPP22_AppE.pdf

FPP (Fish Passage Plan). 2023. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control CENWD-PDW-R. Available at: https://public.crohms.org/tmt/documents/fpp/2023/final/FPP23_AppE_03-27-2023.pdf.

FPP (Fish Passage Plan). 2024. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control CENWD-PDW-R. Available at: https://public.crohms.org/tmt/documents/fpp/2024/final/FPP24_AppE_FOP_03-22-2024.pdf

FPP (Fish Passage Plan). 2025b. Appendix E Fish Operations Plan. U.S. Army Corps of Engineers Northwestern Division Columbia Basin Water Management, Reservoir Control

Page 50 -  REPLY DECLARATION OF EDWARD BOWLES IN SUPPORT OF STATE OF OREGON'S MOTION FOR PRELIMINARY INJUNCTION
DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

CENWD-PDW-R. Available at:
https://public.crohms.org/tmt/documents/fpp/2025/final/FPP25_AppE_04-08-2025.pdf

Flexible Spill Agreement. 2018. 2019-2021 Spill Operation Agreement. Parties: State of Oregon, State of Washington, Nez Perce Tribe, U.S. Army Corps of Engineers, U.S. Bureau of Reclamation, and Bonneville Power Administration. Available at: https://www.oregon.gov/deq/wq/Documents/FlexspillAgreement.pdf

Ford, M. J., editor. 2022. Biological Viability Assessment Update for Pacific Salmon and Steelhead Listed Under the Endangered Species Act: Pacific Northwest. U.S. Department of Commerce, NOAA Technical Memorandum NMFS-NWFSC-171. Available at https://doi.org/10.25923/kq2n-ke70.

Gerber, L., and M. Gonzalez-Suarez. 2010. Population Viability Analysis: Origins and Contributions. Nature Education Knowledge 3(10), 15.

IDFG (Idaho Department of Fish and Game). 2022. Snake River Sockeye Salmon Hatchery and Genetic Management Plan. Stanley Basin/Upper Salmon River, Custer County, Idaho. Available at: https://www.fisheries.noaa.gov/s3/2023-08/HGMP-SRSockeye20230728.pdf

Koutroumanidis, T., L. Iliadis, and G. K. Sylaios. 2006. Time-series modeling of fishery landings using ARIMA models and Fuzzy Expected Intervals software. Environmental Modelling and Software 21, 1711-1721.

Lawonn, M. J. 2023. A Status Assessment of the Double-crested Cormorant (*Nannopterum auritum*) in the Columbia River Estuary and Implications for Predation on Outmigrating Juvenile Salmonids. Science Bulletin 2023-01. Oregon Department of Fish and Wildlife, Salem, Oregon.

McCann, J., B. Chockley, E. Cooper, T. Garrison, H. Schaller, S. Haeseker, R. Lessard, C. Petrosky, T. Copeland, E. Tinus, E. VanDyke and R. Ehlke. 2016. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2016 Annual Report. Project No. 1996-020-00. Available at: https://www.fpc.org/documents/CSS/2016-CSS-Report-Fix.pdf

McCann, J., B. Chockley, E. Cooper, B. Hsu, G. Scheer, S. Haeseker, R. Lessard, T. Copeland, E. Tinus, A. Storch, and D. Rawding. 2019. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2019 Annual Report. Project No. 1996-020-00. Available at: https://www.fpc.org/documents/CSS/2019CSSAnnualReport.pdf.

McCann, J., B. Chockley, E. Cooper, G. Scheer, R. Tessier, S. Haeseker, B. Lessard, T. Copeland, J. Ebel, A. Storch, and D. Rawding. 2024. Comparative Survival Study of the PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2024 Annual Report. Project Number 1996-020-00. Available at: https://www.fpc.org/documents/CSS/2024%20CSS%20Final.pdf.

McCann, J., B. Chockley, E. Cooper, G. Scheer, R. Tessier, J. Harris, B. Lessard, T. Copeland, J. Ebel, A. Storch, and K. See. 2025. Comparative Survival Study of the PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2025 Annual Report.

DC4/rn1/1011821731

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Project Number 1996-020-00. Available at:
https://www.fpc.org/documents/CSS/2025%20CSS%20Annual%20Report.pdf

NMFS (National Marine Fisheries Service). 2017a. ESA Recovery Plan for Snake River Fall Chinook Salmon (*Oncorhynchus tshawytscha*). NOAA NMFS, West Coast Region, Portland, Oregon.

NMFS (National Marine Fisheries Service). 2020. ("2020 BiOp"). Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Columbia River System. Available at: https://www.fisheries.noaa.gov/resource/document/biological-opinion-operation-andmaintenance- fourteen-multiple-use-dam-and.

NMFS (National Marine Fisheries Service). 2022a. 2022 5-Year Review: Summary and Evaluation of Snake River Fall-Run Chinook. NMFS West Coast Region, Portland, OR. 87 pages. Available at: https://repository.library.noaa.gov/view/noaa/45370.

NOAA (National Oceanic and Atmospheric Administration) Fisheries. 2020. AMIP Abundance and Trend Indicators. Presented by Josie Thompson and Ritchie Graves (NMFS) to the Regional Implementation and Oversight Group (RIOG) meeting February 4, 2020.

NOAA (National Oceanic and Atmospheric Administration) Fisheries. 2022. Rebuilding Interior Columbia Bain Salmon and Steelhead. September 30, 2022. Available at: https://repository.library.noaa.gov/view/noaa/46461/noaa_46461_DS1.pdf.

NOAA (National Oceanic and Atmospheric Administration). 2025. Monthly Global Climate Report for Annual 2024. National Centers for Environmental Information. Published online January 2025. Available at: https://www.ncei.noaa.gov/access/monitoring/monthly-report/global/202413 [https://perma.cc/LJS9-N8HQ].

NOAA (National Oceanic and Atmospheric Administration). 2026. Monthly Global Climate Report for Annual 2025. National Centers for Environmental Information. Published online January 2025. Available at: https://www.ncei.noaa.gov/access/monitoring/monthly-report/global/202513 [https://perma.cc/UCU7-7K9P].

NWS (National Weather Service). 2026. Seasonal Temperature Outlook Aug-Sep-Oct 2026, issued January 15, 2026.  National Oceanographic and Atmospheric Administration Center for Weather and Climate Prediction. Available at: https://www.cpc.ncep.noaa.gov/products/predictions/long_range/lead07/off07_temp.gif [https://perma.cc/3YTT-WC8K]

Petrosky, C. E., H. A. Schaller, E. S. Tinus, T. Copeland, and A. J. Storch. 2020. Achieving productivity to recover and restore Columbia River stream-type Chinook salmon relies on increasing smolt-to-adult survival. North American Journal of Fisheries Management 40:789–803. DOI: 10.1002/nafm.10449.

Roby, D. D., A. F. Evans, and K. Collis (editors). 2021. Avian Predation on Salmonids in the Columbia River Basin: A Synopsis of Ecology and Management. A synthesis report submitted to the U.S. Army Corps of Engineers, Walla Walla, Washington; the

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Bonneville Power Administration, Portland, Oregon; the Grant County Public Utility District/Priest Rapids Coordinating Committee, Ephrata, Washington; and the Oregon Department of Fish and Wildlife, Salem, Oregon. 788 pp. Available at: https://birdresearchnw.org/wp-content/uploads/2025/11/Avian20Predation20Synthesis20Report20Final_v2.pdf

Shuai, F., S. Lek, X. Li, Y. Li, and J. Li. 2017. Forecasting population dynamics of the black Amur bream (*Megalobrama terminalis*) in a large subtropical river using a univariate approach. International Journal of Limnology 53, 35-45.

Storch, A. J., S. L. Haeseker, G. Scheer, J. A. McCann, B. R. Chockley, T. Copeland, and R. B. Lessard. 2021. Comment: Associations among Fish Length, Dam Passage History, and Survival to Adulthood in Two At-Risk Species of Pacific Salmon. Transactions of the American Fisheries Society 150, 189-195.

Storch, A. J., H. A. Schaller, C. E. Petrosky, R. L. Vadas Jr., B. J. Clemens, G. Sprague, N. Mercado-Silva, B. Roper, M. J. Parsley, E. Bowles, R. M. Hughes, and J. A. Hesse. 2022. A review of potential conservation and fisheries benefits of breaching four dams in the Lower Snake River (Washington, USA). Water Biology and Security, 1(2), 100030. doi.org/10.1016/j.watbs.2022.100030. Available at: https://www.sciencedirect.com/science/article/pii/S2772735122000440.

SOR (System Operational Request). 2024-1. Subject: Cease smolt transportation at Lower Monumental Dam in 2024. Submitted by Jonathan Ebel (Idaho Department of Fish and Game) May 16, 2024 to Corps of Engineers Northwestern Division Walla Walla District. Available at: https://public.crohms.org/tmt/sor/2024/0517_SOR_2024-1.pdf.

Tattam, I. A., and J. R. Ruzycki. 2020. Smolt Transportation Influences Straying of Wild and Hatchery Snake River Steelhead into the John Day River. Transactions of the American Fisheries Society 149(3), 284-297.

Tuomikoski, J., J. McCann, T. Berggren, H. Schaller, P. Wilson, S. Haeseker, J. Fryer, C. Petrosky, E. Tinus, T. Dalton, and R. Ehlke. 2010. Comparative Survival Study of PIT-tagged Spring/Summer Chinook and Summer Steelhead. 2010 Annual Report. Project No. 1996-02-00. Available at: https://www.fpc.org/documents/CSS/2010-CSS-Report-Fix.pdf

USACE (United States Army Corps of Engineers). 2024a. White Paper Bonneville Spillway—High flows and tailwater impacts. Prepared by Laurie Ebner. 17 pages. Available at: https://public.crohms.org/tmt/documents/FPOM/2010/FFDRWG/CY2025/Bonneville%20Spillway%20-%20High%20Flows%20and%20Tailwater%20Impacts%20Final.pdf.

USACE (United States Army Corps of Engineers). 2025c. NWW and NWP critical non-routine fish items ranks 14 August 2025. Available at: https://public.crohms.org/tmt/documents/FPOM/2010/Plans%20lists%20charts/NWW%20and%20NWP%20critical%20nonroutine%20fish%20items%20ranks%2005June2025.xlsx.

USACE (United States Army Corps of Engineers), Bureau of Reclamation, and Bonneville Power Administration. 2020. Executive Summary Columbia River System Operations Environmental Impact Statement. Available at: https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/14957

DC4/rn1/1011821731



# FISH PASSAGE CENTER

**847 NE 19th Ave., Suite 250, Portland, OR 97232**
Phone: (503) 833-3900          Fax: (503) 232-1259
http://www.fpc.org/
e-mail us at fpcstaff@fpc.org

## MEMORANDUM

TO:          Tucker Jones, ODFW

*Michele DeHart*

FROM:      Michele DeHart, FPC

DATE:       January 16, 2026

RE:           Review of a draft Fish Operations Plan document

In response to your request, the Fish Passage Center (FPC) staff reviewed what appears to be a draft Fish Operations Plan (FOP) for 2026. This Draft or Final FOP has not been developed through the regional process which includes the state, tribal, and federal fishery managers. The development of the annual FOP is usually coordinated via the Regional Implementation Oversight Group (RIOG) and finalized as Appendix E of the Fish Passage Plan, typically in February or March. To our knowledge, the Draft 2026 FOP (herein referred to as the Draft FOP) has not undergone regional review. Our review focused on the operations specified in the Draft FOP compared to what was outlined in the 2020 National Marine Fisheries Service Biological Opinion (2020 NMFS BiOp) and the 2025 FOP. Below is a summary of our findings, followed by more detailed information regarding each finding.

- **Spring and summer spill operations outlined in the Draft FOP are inconsistent with the 2020 NMFS BiOp and, in fact, are reductions from the 2020 NMFS BiOp.**

- **The lower spill levels outlined in the Draft FOP were not part of the CRSO-EIS analyses that led to the 2020 NMFS BiOp.**

- **Reduced spill under the Draft FOP will result in increased powerhouse passage (i.e., PITPH) and increased bypass encounters, which are associated with slower fish travel times, lower juvenile survivals, and lower smolt-to-adult returns (SARs).**

- **The operations outlined in the Draft FOP will not change water transit times (WTT). Water Transit Time is an important factor in FTT, juvenile survival, and SARs. With no change to WTTs, reductions in spill are expected to result in reduced juvenile fish survival and reduced SARs.**

- **Under the Draft FOP, fall and winter spill (i.e., steelhead overshoot spill) at most sites are reduced, when compared to the 2025 FOP.**

- **Non-salmonid GBT monitoring would not be necessary under the Draft FOP, as spill to the 125% TDG Standard would not occur.**

**Spring and summer spill operations outlined in the Draft FOP are inconsistent with the 2020 NMFS BiOp and, in fact, are reductions from the 2020 NMFS BiOp.**

In the introduction, the Draft FOP states that it is consistent with spill operations for fish passage and the adaptive management and in-season management provisions outlined in several documents, including the Record of Decision for the Columbia River System Operations Environmental Impact Statement (CRSO EIS ROD) from September 2020, the CRSO Final EIS, the 2020 NMFS BiOp, and the 2020 U.S. Fish and Wildlife Service Biological Opinion. This statement is not true. The spring and summer spill operations outlined in the Draft FOP are inconsistent with the 2020 NMFS BiOp (Tables 1 and 2). In fact, spring and summer spill operations in the Draft FOP are reductions from the 2020 NMFS BiOp.

**Table 1. Spring spill operations under the Draft FOP versus the 2020 NMFS BiOp. Under both documents, spring spill occurs from April 3-June 20 at Snake River projects and April 10-June 15 at Mid-Columbia projects.**

| Project | Draft FOP | 2020 NMFS BiOp |
|---|---|---|
| Lower Granite | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 40% | 16 hours/day: 125% TDG Spill Cap<br>8 hours/day: 20 Kcfs |
| Little Goose | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 30% | 16 hours/day: 125% TDG Spill Cap<br>8 hours/day: 30% |
| Lower Monumental | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 40% | 16 hours/day: 125% TDG Spill Cap (uniform)<br>8 hours/day: 30 Kcfs (bulk) |
| Ice Harbor | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 30% | 16 hours/day: 125% TDG Spill Cap<br>8 hours/day: 30% |
| McNary | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 48% | 16 hours/day: 125% TDG Spill Cap<br>8 hours/day: 48% |
| John Day | Nighttime: 120% TDG Spill Cap<br>Daytime: 32% (except when river flow ≥300 Kcfs, then 40%) | 16 hours/day: 120% TDG Spill Cap<br>8 hours/day: 32% |
| The Dalles | 24 hours/day: 40% | 24 hours/day: 40% |
| Bonneville | 16 hours/day: 120% TDG Spill Cap[1]<br>8 hours/day: 100 Kcfs | 16 hours/day: 125% TDG Spill Cap[1]<br>8 hours/day: 100 Kcfs |

[1] Spill at Bonneville is capped at 150 Kcfs due to erosion concerns. Under the 2020 NMFS BiOp, gas cap spill would be capped at 150 Kcfs. Under the Draft FOP, gas cap spill would be approximately 130 Kcfs.

**Table 2.  Summer spill operations under the Draft FOP versus the 2020 NMFS BiOp. Under both documents, summer spill is broken into early and late summer periods, but the duration of these periods differs between documents.**

| Project | Draft FOP | | 2020 NMFS BiOp | |
|---|---|---|---|---|
| | *Early Summer* June 21/16 to July 31 | *Late Summer* August 1-31 | *Early Summer* June 21/16 to August 14 | *Late Summer* August 15-31 |
| Lower Granite | 18 Kcfs | RSW Flow or 7 Kcfs | 18 Kcfs | RSW Flow or 7 Kcfs |
| Little Goose | 30% | ASW Flow or 7 Kcfs | 30% | ASW Flow or 7 Kcfs |
| Lower Monumental | 17 Kcfs | RSW Flow or 8 Kcfs | 17 Kcfs | RSW Flow or 7 Kcfs |
| Ice Harbor | 30% | RSW Flow or 9 Kcfs | 30% | RSW Flow or 8.5 Kcfs |
| McNary | 57% | 2 TSWs Flow or 20 Kcfs | 57% | 2 TSWs Flow or 20 Kcfs |
| John Day | 35% | 2 TSWs Flow or 20 Kcfs | 35% | 2 TSWs Flow or 20 Kcfs |
| The Dalles | 40% | 30% | 40% | 30% |
| Bonneville | 95 Kcfs | 50 Kcfs | 95 Kcfs | 50 Kcfs |

### *Spring Spill Operations*

In the spring, most of the spill reductions under the Draft FOP come from two specific changes. First, the Draft FOP calls for 16-hours of gas cap spill to the 120% TDG spill cap at Lower Granite, Little Goose, Lower Monumental, Ice Harbor, McNary, and Bonneville dams (Table 1). Under the 2020 NMFS BiOp, these projects would provide 16-hours of gas cap spill to the higher 125% TDG spill cap.

Second, the spring spill operation at John Day is also a reduction, when compared to the 2020 NMFS BiOp. While both documents specify the same levels of gas cap (120% TDG spill caps) and performance standard spill (32%), the Draft FOP has more hours of the reduced performance standard spill and fewer hours of gas cap spill (Table 1). Under the Draft FOP, the reduced performance standard spill occurs during daytime hours, which equates to 13-16 hours of performance standard spill, depending on the date. This means that gas cap spill would occur for only 8-11 hours per day, depending on the date. Under the 2020 NMFS BiOp, reduced performance standard spill occurs for only 8 total hours, and gas cap spill occurs for 16-hours per day, over the entire spring spill season (Table 1).

It is worth noting that the performance standard spill levels at Lower Granite and Lower Monumental are different under the Draft FOP compared to the 2020 NMFS BiOp (Table 1). At lower flows, performance standard spill of 40% at these projects would result in a further reduction in spill, compared to what is specified in the 2020 NMFS BiOp. At Lower Granite, flows below 50 Kcfs would result in spill levels of less than 20 Kcfs under the Draft FOP. At Lower Monumental, flows below 75 Kcfs would result in spill levels of less than 30 Kcfs. The 2020 NMFS BiOp calls for performance standard spill of 20 Kcfs at Lower Granite and 30 Kcfs at Lower Monumental. At flows above these levels, the 40% performance standard spill level

would result in higher spill than the set volumes that are specified by the 2020 NMFS BiOp. However, it is unlikely that these higher spill volumes would negate the reduced spill during the gas cap spill periods mentioned above.

### Summer Spill Operations

In the summer, the spill reductions under the Draft FOP come from one major change. While both documents call for a reduction in summer spill volumes in August, the Draft FOP calls for this reduction to occur for the entire month of August while the 2020 NMFS BiOp calls for this reduction to occur from August 15th through August 31st (Table 2). This equates to an additional two weeks of reduced summer spill under the Draft FOP compared to the 2020 NMFS BiOp.

### Other Differences in Spring and Summer Spill Operations

There are several other occasions where operations outlined in the Draft FOP differ from what has occurred in more recent years. Below, we provide a brief description of these occurrences.

- Although obvious, it should be noted that spring and summer spill operations under the Draft FOP are also a reduction from what was outlined in the 2025 FOP.

- The Draft FOP states that projects spilling to a percent spill target will adjust spill once per day to the target, based on the daily average flow from the previous day. This way of adjusting spill once per day (when targeting a certain spill percentage) has been used at McNary Dam over the last two summers. However, this is the first time it will occur at other projects and in the spring. The once per day adjustments will result in more variable in spill percentages from one day to the next.

- The Draft FOP reinstates some level of flexibility in the timing of performance standard spill at all projects except Little Goose and Lower Monumental.

- Past Fish Operations Plans have included a fixed spill operation at Little Goose Dam when summer flows are ≤32 Kcfs. The Draft FOP does not include this fixed spill operation.

**The lower spill levels outlined in the Draft FOP were not part of the CRSO-EIS analyses that led to the 2020 NMFS BiOp.**

As part of the CRSO-EIS process, the Comparative Survival Study (CSS) was tasked with analyzing six federal operational alternatives. Results from those analyses were included in Chapter 2 of the 2019 CSS Annual Report (McCann et al. 2019). One of the federal alternatives, the Preferred Alternative (PA), is what was incorporated into the 2020 NMFS BiOp. The operations outlined in the Draft FOP were not among the six federal alternatives considered for the CRSO-EIS or analyzed by the CSS.

As discussed above, the spill operations described in the Draft FOP are reductions from the 2020 NMFS BiOp (i.e., the PA). CSS modeling of the PA resulted in only slightly better

performance than the No Action Alternative (i.e., 2016 FOP) but, on average, SARs under the PA did not meet the regional 4% average SAR goal for either spring/summer Chinook or steelhead (McCann et al. 2019). Furthermore, the lower end of the predicted SAR range for the PA was less than 1% for both species, which is below the minimum to avoid population decline. Given that spill operations under the Draft FOP are reductions from the PA, it is likely that these operations would result in even poorer performance than the PA.

Two of the federal alternatives modeled by the CSS (MO3-breach of the lower Snake Dams and spill to the 120% TDG spill cap at Mid-Columbia projects and MO4-gas cap spill to the 125% TDG spill cap at all projects) resulted in average SARs that either consistently met the 4% average SAR goal (MO3) or were slightly below the 4% average SAR goal (MO4; McCann et al. 2019). The lower end of the predicted SAR for MO3 was also above 1% minimum to avoid population decline while that for MO4 was slightly below the 1% minimum.

**Reduced spill under the Draft FOP will result in increased powerhouse passage (i.e., PITPH) and bypass encounters, which are associated with slower fish travel times, lower juvenile survivals, and lower smolt-to-adult returns (SARs).**

The CSS developed an index variable called PITPH, which is an estimate of the average number of powerhouses a cohort of fish would encounter in a reach, given the flow and spill at each dam in that reach. The relationships between powerhouse encounter probability and flow and spill at each dam were derived from PIT-tag data and were described in detail in Chapter 8 of the 2023 CSS Annual Report (McCann et al. 2023). In general, as spill increases, PITPH decreases (i.e., fish encounter fewer powerhouse passages).

Over the years, CSS analyses have shown that PITPH is a significant factor in juvenile fish travel time (FTT), juvenile survival, and smolt-to-adult returns (SARs; McCann et al. 2025). Higher PITPH (i.e., increased powerhouse passage) is associated with longer FTT, lower juvenile survival, and lower SARs for both spring/summer Chinook and steelhead. Higher PITPH is also associated with lower ocean survival for Chinook (McCann et al. 2025). CSS analyses have also consistently demonstrated that bypass encounters result in hydrosystem-related delayed mortality and reduced SARs (see Chapter 7 of McCann et al. 2023). Odds of adult returns were reduced by around 12% for Chinook and 8-9% for steelhead for each location-specific bypass encountered.

The spill reductions associated with the Draft FOP will result in increases in PITPH and increases in bypass encounters. Based on these CSS analyses, these increases in PITPH and bypass encounters will result in prolonged FTTs, lower juvenile survival, and lower SARs.

**The operations outlined in the Draft FOP will not change Water Transit Time (WTT). Water Transit Time is an important factor in FTT, juvenile survival, and SARs. With no change to WTT, reductions in spill are expected to result in reduced juvenile fish survival and reduced SARs.**

CSS analyses have also demonstrated that water transit times (WTTs) are a significant factor in FTT, juvenile survival, and SARs. Longer WTTs are associated with longer FTT, lower juvenile survival, lower SARs, and lower ocean survival (McCann et al. 2025). Water transit time is a function of reservoir storage (i.e., forebay elevations) and reservoir discharge (i.e., flows; FPC 2025).

In their analyses of the six federal alternatives, the CSS found that MO3 (breach of the lower Snake Dams and spill to the 120% TDG spill cap at Mid-Columbia projects) was the only alternative that reduced WTTs. This was due to breaching the four Lower Snake Dams. Water transit times for the other alternatives were higher than MO3, and nearly identical to each other, because they did not call for significant changes to reservoir elevations. Likewise, the operations outlined in the Draft FOP are not expected to affect WTTs, as it does not call for changes to reservoir elevations over what has occurred in recent years.

CSS modeling has shown that, without improvements in WTTs, increases in PITPH are expected to result in reduced SARs (Figures 1-3; McCann et al. 2025). These modeling efforts clearly demonstrate that, at any single level of WTT, SARs for Snake River yearling Chinook, steelhead, and subyearling Chinook decline as PITPH increases (Figures 1-3). Therefore, increased PITPH from the Draft FOP spill operations can be expected to result in reduced survivals and SARs.

| | PITPH | | | | | |
|---|---|---|---|---|---|---|
| WTT | 0.5 | 1.0 | 1.5 | 2.0 | 2.5 | 3.0 |
| 2 | 3.0% | 2.5% | 2.1% | 1.8% | 1.5% | 1.3% |
| 3 | 2.8% | 2.4% | 2.0% | 1.7% | 1.4% | 1.2% |
| 4 | 2.6% | 2.2% | 1.9% | 1.6% | 1.3% | 1.1% |
| 5 | 2.5% | 2.1% | 1.8% | 1.5% | 1.2% | 1.0% |
| 6 | 2.3% | 2.0% | 1.6% | 1.4% | 1.2% | 1.0% |
| 7 | 2.2% | 1.8% | 1.5% | 1.3% | 1.1% | 0.9% |
| 8 | 2.1% | 1.7% | 1.4% | 1.2% | 1.0% | 0.8% |
| 9 | 1.9% | 1.6% | 1.4% | 1.1% | 1.0% | 0.8% |
| 10 | 1.8% | 1.5% | 1.3% | 1.1% | 0.9% | 0.8% |
| 11 | 1.7% | 1.4% | 1.2% | 1.0% | 0.8% | 0.7% |
| 12 | 1.6% | 1.3% | 1.1% | 0.9% | 0.8% | 0.7% |
| 13 | 1.5% | 1.2% | 1.1% | 0.9% | 0.7% | 0.6% |
| 14 | 1.4% | 1.2% | 1.0% | 0.8% | 0.7% | 0.6% |
| 15 | 1.3% | 1.1% | 0.9% | 0.8% | 0.6% | 0.5% |
| 16 | 1.2% | 1.0% | 0.9% | 0.7% | 0.6% | 0.5% |
| 17 | 1.2% | 1.0% | 0.8% | 0.7% | 0.6% | 0.5% |
| 18 | 1.1% | 0.9% | 0.8% | 0.6% | 0.5% | 0.4% |
| 19 | 1.0% | 0.8% | 0.7% | 0.6% | 0.5% | 0.4% |
| 20 | 0.9% | 0.8% | 0.7% | 0.6% | 0.5% | 0.4% |

**Figure 1. Mean SARs at varying levels of WTT and PITPH for hatchery and wild yearling Chinook. Colors represent similar SAR ranges (taken from Chapter 9 of McCann et al. 2025).**

| | PITPH | | | | | |
|---|---|---|---|---|---|---|
| WTT | 0.5 | 1.0 | 1.5 | 2.0 | 2.5 | 3.0 |
| 2 | 4.3% | 3.6% | 3.1% | 2.6% | 2.2% | 1.8% |
| 3 | 4.0% | 3.4% | 2.8% | 2.4% | 2.0% | 1.7% |
| 4 | 3.7% | 3.1% | 2.6% | 2.2% | 1.8% | 1.6% |
| 5 | 3.4% | 2.9% | 2.4% | 2.0% | 1.7% | 1.4% |
| 6 | 3.1% | 2.6% | 2.2% | 1.9% | 1.6% | 1.3% |
| 7 | 2.9% | 2.4% | 2.0% | 1.7% | 1.4% | 1.2% |
| 8 | 2.7% | 2.2% | 1.9% | 1.6% | 1.3% | 1.1% |
| 9 | 2.5% | 2.1% | 1.7% | 1.5% | 1.2% | 1.0% |
| 10 | 2.3% | 1.9% | 1.6% | 1.3% | 1.1% | 0.9% |
| 11 | 2.1% | 1.7% | 1.5% | 1.2% | 1.0% | 0.9% |
| 12 | 1.9% | 1.6% | 1.4% | 1.1% | 1.0% | 0.8% |
| 13 | 1.8% | 1.5% | 1.2% | 1.0% | 0.9% | 0.7% |
| 14 | 1.6% | 1.4% | 1.2% | 1.0% | 0.8% | 0.7% |
| 15 | 1.5% | 1.3% | 1.1% | 0.9% | 0.7% | 0.6% |
| 16 | 1.4% | 1.2% | 1.0% | 0.8% | 0.7% | 0.6% |
| 17 | 1.3% | 1.1% | 0.9% | 0.8% | 0.6% | 0.5% |
| 18 | 1.2% | 1.0% | 0.8% | 0.7% | 0.6% | 0.5% |
| 19 | 1.1% | 0.9% | 0.8% | 0.6% | 0.5% | 0.4% |
| 20 | 1.0% | 0.8% | 0.6% | 0.5% | | 0.4% |

**Figure 2. Mean SARs at varying levels of WTT and PITPH for steelhead. Colors represent similar SAR ranges (taken from Chapter 9 of McCann et al. 2025).**



**Figure 3. Mean SARs at varying levels of WTT and PITPH for subyearling Chinook. Colors represent similar SAR ranges (taken from Chapter 9 of McCann et al. 2025).**

**Under the Draft FOP, fall and winter spill (i.e., steelhead overshoot spill) at most sites are reduced, when compared to the 2025 FOP.**

The 2020 NMFS BiOp discusses the provision of surface spill in the winter and fall as a means of providing safe and effective downstream passage for adult steelhead that overshoot their natal streams. This steelhead overshoot spill began on an experimental basis in 2019 and has continued to some degree ever since. Although the 2020 NMFS BiOp does not provide specific operations for overshoot spill, recent Fish Operation Plans have provided specific fall and winter spill operations. Similarly, the Draft FOP provides specific operations for steelhead overshoot spill in the winter and fall for 2026. The amount of fall and winter overshoot spill provided under the Draft FOP is greatly reduced from that was specified in the 2025 FOP (Tables 3 and 4). These reductions occur at nearly all sites in the winter and all sites in the fall.

For winter spill, the reductions occur at all four Lower Snake River dams and McNary Dam, over the period of March 1st through March 20th, where the frequency of overshoot spill is reduced to only three days per week. Under the 2025 FOP, overshoot spill at these projects occurred seven days per week (Table 3). John Day is the only project where there is no reduction in winter overshoot spill, compared to the 2025 FOP.

For the fall, the reductions in spill occur at all four Lower Snake River projects and McNary, over the entire period.  This reduction is also in the form of reduced frequency. Under

the Draft FOP, fall overshoot spill will only occur three days per week. Under the 2025 FOP, fall overshoot spill occurred seven days per week (Table 4)

**Table 3. Winter surface spill operations under the Draft FOP versus the 2025 FOP.**

| Project(s) | Draft FOP | 2025 FOP |
|---|---|---|
| Lower Granite, Little Goose, Lower Monumental, Ice Harbor | **Mar. 1-20** <br> 4 hours/day – 3 days/week <br> **Mar. 21-Apr. 2** <br> 24 hours/day – 7 days/week | **Mar. 1-20** <br> 4 hours/day – 7 days/week <br> **Mar. 21-Apr. 2** <br> 24 hours/day – 7 days/week |
| McNary | **Mar. 1-20** <br> 4 hours/day – 3 days/week <br> **Mar. 21-Apr. 9** <br> 24 hours/day – 7 days/week | **Mar. 1-20** <br> 4 hours/day – 7 days/week <br> **Mar. 21-Apr. 9** <br> 24 hours/day – 7 days/week |
| John Day | **Mar. 21-Apr. 9** <br> 24-hours/day – 7 days/week | **Mar. 21-Apr. 9** <br> 24-hours/day – 7 days/week |

**Table 4. Fall surface spill operations under the Draft FOP versus the 2025 FOP.**

| Project(s) | Draft FOP | 2025 FOP |
|---|---|---|
| Lower Granite, Little Goose, Lower Monumental, Ice Harbor, McNary | **Sept. 1-Nov. 15** <br> 4 hours/day – 3 days/week | **Sept. 1-Nov. 15** <br> 4 hours/day – 7 days/week |

**Non-salmonid GBT monitoring would not be necessary under the Draft FOP, as spill to the 125% TDG Standard would not occur.**

Section 2.1 of the Draft FOP provides details on the current state water quality standards for total dissolved gas (TDG), including details on the need for gas bubble trauma (GBT) monitoring. At the end of this section, the Draft FOP notes that non-salmonid GBT monitoring in the spring will continue in 2026, unless the Washington Department of Ecology determines otherwise. However, the implementation of GBT monitoring on non-salmonid species was mandated by the state water quality agencies in response to the new 125% TDG standards that became effective in 2020 for spring spill. Non-salmonid GBT monitoring was not necessary under the 115%/120% TDG standard that was in place prior to 2020. As noted above, the Draft FOP reduces spill at all projects to the 120% TDG standard. Therefore, under the Draft FOP, non-salmonid GBT monitoring in the spring would not be necessary, as the 125% TDG standard would not be used.

**Literature Cited**

Fish Passage Center (FPC). 2025. Water Transit Time Equations and WTT Significance in Relation to Temperature. December 12, 2025 memorandum to Thomas Starkey-Owens (WDOE). https://www.fpc.org/documents/memos/41-25.pdf

McCann, J. B. Chockley, E. Cooper, B. Hsu, G. Scheer, S. Haeseker, R. Lessard, T. Copeland, E. Tinus, A. Storch, and D. Rawding. 2019. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye, 2019 Annual Report. BPA Contract #19960200. December 2019 https://www.fpc.org/documents/CSS/2019CSSAnnualReport.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, R. Tessier, S. Haeseker, B. Lessard, T. Copeland, J. Ebel, A. Storch, and D. Rawding. 2023. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye, 2023 Annual Report. BPA Contract #19960200. December 2023 https://www.fpc.org/documents/CSS/CSS%20Annual%20Report%202023.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, R. Tessier, J. Harris, B. Lessard, T. Copeland, J. Ebel, A. Storch, and K. See. 2025. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye, 2025 Annual Report. BPA Contract #19960200. December 2025 https://www.fpc.org/documents/CSS/2025%20CSS%20Annual%20Report.pdf



# FISH PASSAGE CENTER

**847 NE 19th Avenue, #250, Portland, OR 97232**
Phone: (503) 833-3900          Fax: (503) 232-1259
www.fpc.org/
e-mail us at fpcstaff@fpc.org

## MEMORANDUM

TO:          Tucker Jones, ODFW

FROM:        Jerry McCann

DATE:        January 8, 2026

RE:          A Summary of Bull Trout PIT-Tag Detection Data in the Lower Snake River and
             the Imnaha River

**Summary**

- Only 30 bull trout were detected in the Lower Snake River since 2020. A large majority of these (22) were marked in the Tucannon River.
- The movement of PIT-tagged bull trout in the Lower Snake River was not directed. Fish moved either upstream, downstream, or both directions after entering the Snake River from the Tucannon River.
- Because of the low sample sizes and lack of directed migration, it would be extremely difficult to determine the impacts of specific dam operations on the survival or migration behavior of bull trout.
- 80% of bull trout detected at both Lower Imnaha River PIT-tag arrays (between river km 7 and 10) were last detected moving upriver.
- Of the 4,238 bull trout PIT-tagged in the Imnaha River since 2006, only 1 has been detected at the Lower Snake River dams.

**Bull Trout Detection and Movement in Lower Snake River**

We examined the number of PIT-tagged bull trout detected at Lower Snake River dams from 2020 to 2025. A total of 30 tagged bull trout were detected a total of 45 times at the dams: either in the bypasses (3), ladders (37) or Lower Granite RSW (5). There was no dominant directionality to their movements. Of the ten fish detected multiple times, 2 moved downriver, 2 moved upriver, and 6 showed a combination of upriver and downriver movement. It is unclear what impact spill had on passage. It may have facilitated random movements down river, while ladders provided passage upriver. There is not sufficient data to determine survival impacts.

**Table 1. Number of Bull trout detections at dams in the Lower Snake River, by year.**

| Year Detected | Lower Granite | Little Goose | Lower Mon. | Ice Harbor |
|---|---|---|---|---|
| 2020 | | 1 | | |
| 2021 | 2 | | | |
| 2022 | 4 | | 1 | |
| 2023 | 7 | 7 | 6 | 1 |
| 2024 | | 1 | 2 | |
| 2025 | 3 | 3 | 6 | 1 |

Of the fish detected at the Lower Snake River dams, 22 were marked in the Tucannon River, 6 were marked at the Lower Granite Dam ladder, 1 was marked in the Imnaha River and 1 was marked in Asotin Creek.

**Imnaha River Bull Trout**

We also looked at the numbers of Imnaha River bull trout that were moving into the Snake River after having been detected at either of two PIT-tag interrogation arrays in the Lower Imnaha River. There are arrays at river kilometer 7 and 10 in the Imnaha River. We looked at the PIT-tags that had been detected at both arrays to determine direction of final movement based on which array the fish were last detected. A total of 1,373 distinct bull trout were detected on both arrays between 2011 and 2026. Of those 1,105 (80%) were last detected at the upstream array indicating likely upriver movement. Only 268 (20%) were detected last at the downstream array, indicating downriver movement. Over half of the bull trout last detected moving downriver were marked in the Snake River, in the Hells Canyon Reach.

Exhibit 2 to Reply Declaration of Edward Bowles
Page 2 of 2



# FISH PASSAGE CENTER

**847 NE 19th Ave., Suite 250, Portland, OR 97232**
Phone: (503) 833-3900        Fax: (503) 232-1259
http://www.fpc.org/
e-mail us at fpcstaff@fpc.org

## MEMORANDUM

TO:            Tucker Jones, ODFW

FROM:        Michele DeHart, FPC

DATE:        January 16, 2026

RE:            Upstream passage delay

In response to your request the Fish Passage Center (FPC) reviewed monitoring data and analyses to investigate the occurrence of a reported 24-day adult fish passage delay occurring in 2022 and a four-day passage delay in 2023 attributed to spill for fish passage. In response to your request, the FPC staff reviewed adult fish passage metrics from recent years utilizing existing data and analyses available to the public on the FPC website. This includes analyses, in the Comparative Survival Study (CSS) Annual Reports, of adult upstream survival and adult upstream travel time.

The direct response to your question is that the available data does not support or suggest a 24-day passage delay in 2022 due to spill for fish passage. Review of 2022 adult fish travel times and survival metrics indicates that spill operations did not adversely affect adult passage from Ice Harbor to Lower Granite. Historically, adult survival through this reach has ranged from 94-98%, every year (FPC 2025). Ice Harbor to Lower Granite survival was 95.3% in 2022, which is well within this historical data range. Specifically, 2022 adult passage resulted in an overall survival rate that is similar to survival in 2023, and statistically indistinguishable from the historic average. During years with high spill and during years with low spill, adult upstream survival is consistent (see Chapter 5 of McCann et al 2022, McCann et al 2023, McCann et al 2024, McCann et al 2025).

Similarly, median adult fish travel times through this reach are also remarkably consistent regardless of spill for fish passage, with a range between 4-7 days. Median adult travel times from Ice Harbor to Lower Granite in 2022 was 6.8 days, only 1.5 days slower than the average travel time from 2005-2022 of 5.3 days (FPC 2022). It is important to recognize the flow and

spill conditions that occurred in 2022. Although the adult upstream survival and adult fish travel times which occurred in 2022 were within the expected historical range, the flow and spill conditions were not.

In 2022, weekly and daily average flows were above the flow objectives from mid-May through all of June, during which spill to the 125% spill caps was possible according to the Fish Operations Plan. In fact, for much of June, flows were so high that spill exceeded the 125% spill cap at most projects, due to project-specific limitations in hydraulic capacity. On the week of June 12-18, weekly average flows at Lower Granite and McNary peaked at 172.8 and 435.4 Kcfs, respectively. For much of June, flows in the Snake and Mid-Columbia rivers reached levels to warrant spill above the 125% TDG spill cap and/or prescribed Fish Operations Plan, spill levels. Overall, spring spill exceeded the 125% spill cap for the period of, June 11-16 at the Snake River sites, June 12-15 at McNary and The Dalles projects, and June 6-15 at Bonneville Dam. In addition, spill at The Dalles exceeded Fish Operations Plan spill levels for much of June 11-15.

Even with extended exceedances of the 125% gas cap spill levels in 2022, upstream passage survival was within the range of past years at 95.3% and fish travel time was near the long-term average for Ice Harbor to Lower Granite.

Investigation of the actual adult passage data and metrics does not provide any evidence of a 24-day adult passage delay in 2022.  The DART "PIT-Tag Adult Reach Distribution and Delay" tool for the Ice Harbor to Lower Granite reach could be the source of the contention of "24-day delay". The contention that there was a 24-day delay appears to be based upon the sum of the total black dot days in the DART tool's presentation for the spring migration period in 2022 and 2023, not consecutive days, just a count of any day in which there was a black dot.

The DART presentation, "PIT-tag Adult Reach Distribution and Delay" tool does not provide a biologically meaningful representation of adult passage. The DART tool does not draw any distinctions for individual or population level travel times, consecutive days of extended travel times, actual conversion rates, or daily sample sizes. In some cases, a single PIT-tag detection with extended travel time can generate a black dot for an entire day. The DART tool "black dot" indicators are arbitrary, are not based on any empirical or biological data, and have been repeatedly flagged for using incorrect math that biases their estimates lower.

The FPC has repeatedly cited the "black dot" criteria as a wholly arbitrary and biologically meaningless metric. There is no underlying biological basis for this threshold, there is no historic run timing analysis that correlates with this metric, it is a wholly arbitrary threshold with no biological significance. The FPC has repeatedly identified these critical technical issues about using the DART criteria for management decisions. The FPC has reviewed it on several occasions, highlighting these technical flaws (FPC 2020, FPC 2023, FPC 2024a, FPC 2024b). These repeated technical reviews emphasize that the DART delay criteria are not based on any biologically relevant findings, studies, or data. The basis of the DART delay criteria are completely static estimates that misinform confidence in the estimates themselves and disregard all other environmental and management conditions. The black dot criteria have been repeatedly found to incorporate erroneous data, inaccurate math, and metrics that do not describe fish passage in any biologically meaningful way.  Despite this, even when the FPC found that the underlying math being used to calculate the "black dot" metric was demonstrably wrong and biased the resulting metric low, NOAA insisted on continuing to use it, without correcting the

2

Exhibit 3 to Reply Declaration of Edward Bowles
Page 2 of 5

math, in service of continuity (see FPAC notes from May 7, 2024, through June 11, 2024: https://www.fpc.org/documents/Q_fpacmeetingminutesandactionnotesv2.php).

A 24-day delay in adult passage, based on the DART black dot criteria, is not supportable by actual upstream passage metrics of survival and travel time based upon monitoring data.

**References**

Fish Passage Center (FPC). 2020. Use of online tools in adult salmon passage management decisions.  September 4, 2020 memorandum to the Fish Passage Advisory Committee.  https://www.fpc.org/documents/memos/41-20.pdf

FPC. 2022. Review of 2022 Spring Spill Operations.  September 27, 2022 memorandum to Tucker Jones, Michael Harringrton, and Ed Bowles (ODFW), Charlene Hurst and Michael Garrity (WDFW), John Cassinelli and Jonathan Ebel (IDFG), Rob Lothrop and Christine Golightly (CRITFC), Jay Hesse (NPT), Ritchie Graves (NOAA), Janine Castro (USFWS), and Tom Iverson (YN).  https://www.fpc.org/documents/memos/51-22.pdf

FPC. 2023. A Review of the DART tool for spill management.  December 15, 2023 memorandum to the Fish Passage Advisory Committee.  https://www.fpc.org/documents/memos/42-23.pdf

FPC. 2024a. A Review of the DART tool Conversion Rate Calculations.  May 17, 2024 memorandum to the Fish Passage Advisory Committee.  https://www.fpc.org/documents/memos/22-24.pdf

FPC. 2024b. DART adult passage representation.  May 31, 2024 memorandum to Erick Van Dyke (ODFW). https://www.fpc.org/documents/memos/24-24.pdf

FPC. 2025. Summary of the 2025 Spring Migration.  November 5, 2025 memorandum to Charlene Hurst, Andrew Murdoch, and Michael Garrity (WDFW), John Cassinelli and Jonathan Ebel (IDFG), Jay Hesse (NPT), Nancy Munn (NOAA), David Blodget, Tom Iverson, and Keely Murdoch (YN), Jerimiah Bonifer (CTUIR), Lyman Jim and Jennifer Graham (CTWSR), Tucker Jones, Michael Harrington, and Ed Bowled (ODFW), and Christine Golightly and Donella Miller (CRITFC).  https://www.fpc.org/documents/memos/36-25.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, S. Haeseker, B. Lessard, T. Copeland, J. Ebel. A. Storch, and D. Rawding. 2022. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2022 Annual Report. BPA Contract #19960200.  https://www.fpc.org/documents/CSS/CSS%20Final%20Revised%202022.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, R. Tessier, S. Haeseker, B. Lessard, T. Copeland, J. Ebel. A. Storch, and D. Rawding. 2023. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2023 Annual Report. BPA Contract #19960200.  https://www.fpc.org/documents/CSS/CSS%20Annual%20Report%202023.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, S. Haeseker, B. Lessard, T. Copeland, J. Ebel. A. Storch, and D. Rawding. 2024. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2024 Annual Report. BPA Contract #19960200.
https://www.fpc.org/documents/CSS/2024%20CSS%20Final.pdf

McCann, J. B. Chockley, E. Cooper, G. Scheer, J. Harris, B. Lessard, T. Copeland, J. Ebel. A. Storch, and K. See. 2025. Comparative Survival Study of PIT-tagged Spring/Summer/Fall Chinook, Summer Steelhead, and Sockeye. 2025 Annual Report. BPA Contract #19960200.
https://www.fpc.org/documents/CSS/2025%20CSS%20Annual%20Report.pdf



# FISH PASSAGE CENTER

**847  NE 19th Ave., Suite 250, Portland, OR 97232**
Phone: (503) 833-3900          Fax: (503) 232-1259
http://www.fpc.org/
e-mail us at  fpcstaff@fpc.org

## MEMORANDUM

TO:          Tom Lorz, CRITFC

FROM:      Michele DeHart, FPC

DATE:       January 16, 2026

RE:          Summary of reservoir elevation operation levels 2023-2025


In response to your request the Fish Passage Center (FPC) has summarized the following, historical reservoir elevation operation levels which occurred in 2023, 2024, and 2025 from April through August of each year.

These calculations represent the proportion of time (i.e., fraction of all hourly observations), per month and project, that measured forebay elevations were above Minimum Operating Pool (MOP) or Minimum Irrigation Pool (MIP). In the Lower Snake, calculations were categorized in relation to the 1.5' MOP range. In the Middle Columbia, forebay elevations were categorized in relation to the 2.0' MIP range at John Day.

## Methods
Hourly forebay elevation records were divided by project and month across 2023, 2024, and 2025, April - August. Forebay elevation values were broken into categories based on their elevation above that project's Minimum Operating Pool elevation. In the case of John Day, MOP is replaced with Minimum Irrigation Pool (MIP). Bonneville, The Dalles, and McNary do not have MOP range restrictions in place through the Fish Passage Plan.
The data utilized in the following summaries were acquired from, and are publicly available on, the U.S. Army Corps of Engineers website at https://public.crohms.org/dd/common/dataquery/www/.

## Results

### Lower Snake

### *Lower Granite*

At Lower Granite, MOP (733') is in effect from April 3-August 31. From April-August since 2023, Lower Granite has operated within 1' of MOP 85.3% of hours (Table 1, Figure 1).

**Table 1. Monthly proportions within each forebay elevation band at Lower Granite.**

| Year | Month | Proportion of hours between MOP - MOP +1' | Proportion of hours between MOP+1' - MOP+1.5' | Proportion of hours above MOP+1.5' |
|------|-------|------|------|------|
| 2023 | April | 0.73 | 0.27 | 0 |
| 2023 | May | 0.81 | 0.17 | 0.01 |
| 2023 | June | 0.75 | 0.25 | 0 |
| 2023 | July | 0.85 | 0.15 | 0 |
| 2023 | August | 0.8 | 0.2 | 0 |
| 2024 | April | 0.87 | 0.12 | 0.01 |
| 2024 | May | 0.98 | 0.02 | 0 |
| 2024 | June | 0.87 | 0.13 | 0 |
| 2024 | July | 0.91 | 0.09 | 0 |
| 2024 | August | 0.88 | 0.12 | 0 |
| 2025 | April | 0.9 | 0.09 | 0.01 |
| 2025 | May | 0.96 | 0.04 | 0 |
| 2025 | June | 0.94 | 0.06 | 0 |
| 2025 | July | 0.68 | 0.32 | 0 |
| 2025 | August | 0.86 | 0.14 | 0 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 2 of 35



**Figure 1. The distribution of hourly deviations from MOP (733') at the Lower Granite forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.0 ft.**

Lower Granite rarely operates within its full 1.5' MOP range over a short period of time (Figure 2). Forebay elevations within one foot of MOP were most common across all months (Figure 3). From 2023-2025, on average Lower Granite operated within 0.9-, 0.8-, 0.6-, and 0.6-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A1).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 3 of 35



**Figure 2. Lower Granite hourly forebay elevations across MOP range dates since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 4 of 35



*MOP = 733', MOP operating range is currently 733 - 734.5'*

**Figure 3. Lower Granite forebay elevation proportions by month since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 5 of 35

*Little Goose*

From April-August since 2023, Little Goose has operated within 1' of MOP (633') 53.3% of all hours (Table 2, Figure 4). It has exceeded its usual MOP range 17.9% of these hours. At Little Goose, MOP runs from April 3-August 15.

The Corps of Engineers raised the MOP elevation range to 1.0' above MOP from August 7-August 15, 2023, 0.5' from April 5-May 2024, and 0.5' from June 9-August 15, 2025.

**Table 2. Monthly proportions within each forebay elevation band at Little Goose.**

| Year | Month | Proportion of hours between MOP - MOP +1' | Proportion of hours between MOP+1' - MOP+1.5' | Proportion of hours above MOP+1.5' |
|------|-------|------|------|------|
| 2023 | April | 0.35 | 0.63 | 0.02 |
| 2023 | May | 0.8 | 0.18 | 0.02 |
| 2023 | June | 0.9 | 0.1 | 0 |
| 2023 | July | 0.54 | 0.34 | 0.12 |
| 2023 | August | 0.01 | 0.21 | 0.77 |
| 2024 | April | 0.98 | 0.02 | 0 |
| 2024 | May | 0.94 | 0.06 | 0 |
| 2024 | June | 0.85 | 0.15 | 0.01 |
| 2024 | July | 0.33 | 0.56 | 0.11 |
| 2024 | August | 0.07 | 0.21 | 0.72 |
| 2025 | April | 0.98 | 0.02 | 0 |
| 2025 | May | 0.94 | 0.06 | 0 |
| 2025 | June | 0.41 | 0.46 | 0.14 |
| 2025 | July | 0.05 | 0.71 | 0.24 |
| 2025 | August | 0.15 | 0.31 | 0.54 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 6 of 35



**Figure 4. The distribution of hourly deviations from MOP (633') at the Little Goose forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.0 ft.**

Forebay elevations higher than the regular MOP range are common in the summer months. This is at least partially due to raised MOP elevation ranges, and partially due to the end of MOP operating range on August 15 (Figure 5, Figure 6). Additionally, the project periodically holds the pool at a higher elevation when flows are low due to navigation concerns. Despite these deviations, across months (Apr-Aug) and years (2023-2025), on average Little Goose operated within 1.3-, 1.2-, 1.0-, and 0.9-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A1).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 7 of 35



**Figure 5. Little Goose hourly forebay elevations across MOP range dates since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 8 of 35



*MOP = 633', MOP operating range is currently 633 - 634.5'*

**Figure 6. Little Goose forebay elevation proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 9 of 35

### *Lower Monumental*

At Lower Monumental, MOP (537') is in effect from April 3-August 15. From April-August since 2023, Lower Monumental has operated within 1' of MOP 61.6% of all hours (Table 3, Figure 7).

Due to tailwater elevations and conditions related to barging operations at Little Goose, the Corps of Engineers raised the minimum MOP elevation at Lower Monumental to MOP+0.7' from May 5-May 9, 2025; and MOP+0.3' from May 19-June 29, 2025.

**Table 3. Monthly proportions within each forebay elevation band at Lower Monumental.**

| Year | Month | Proportion of hours between MOP - MOP+1' | Proportion of hours between MOP+1' - MOP+1.5' | Proportion of hours above MOP+1.5' |
|------|-------|------|------|------|
| 2023 | April | 0.63 | 0.36 | 0.01 |
| 2023 | May | 0.79 | 0.17 | 0.03 |
| 2023 | June | 0.59 | 0.35 | 0.06 |
| 2023 | July | 0.31 | 0.55 | 0.14 |
| 2023 | August | 0.13 | 0.56 | 0.31 |
| 2024 | April | 0.84 | 0.14 | 0.03 |
| 2024 | May | 0.85 | 0.14 | 0.01 |
| 2024 | June | 0.81 | 0.19 | 0 |
| 2024 | July | 0.8 | 0.19 | 0 |
| 2024 | August | 0.55 | 0.32 | 0.13 |
| 2025 | April | 0.9 | 0.08 | 0.02 |
| 2025 | May | 0.7 | 0.25 | 0.04 |
| 2025 | June | 0.49 | 0.48 | 0.03 |
| 2025 | July | 0.79 | 0.21 | 0 |
| 2025 | August | 0.5 | 0.24 | 0.26 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 10 of 35



**Figure 7. The distribution of hourly deviations from MOP (537') at the Lower Monumental forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.0 ft.**

Fluctuations in forebay elevation at Lower Monumental are common (Figure 8). Higher forebay elevations have generally been more common in the summer months, partially due to the end of MOP operating range on August 15 (Figure 9). Additionally, the project periodically holds the pool at a higher elevation when flows are low due to navigation concerns. Despite these deviations, across months (Apr-Aug) and years (2023-2025), on average Lower Monumental operated within 1.2-, 1.0-, 0.8-, and 0.7-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A1).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 11 of 35



**Figure 8. Lower Monumental hourly forebay elevations across MOP range dates since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 12 of 35



*MOP = 537', MOP operating range is currently 537 - 538.5'*

**Figure 9. Lower Monumental forebay elevation proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 13 of 35

*Ice Harbor*

At Ice Harbor, MOP (437') runs from April 3-August 15. From April-August since 2023, Ice Harbor has operated within 1.0' of MOP for 56.9% of all hours (Table 4, Figure 10).

**Table 4. Monthly proportions within each forebay elevation band at Ice Harbor.**

| Year | | Proportion of hours below MOP | Proportion of hours between MOP - MOP +1' | Proportion of hours between MOP+1' - MOP+1.5' | Proportion of hours above MOP+1.5' |
|------|--------|------|------|------|------|
| 2023 | April  | 0.63 | 0.36 | 0 |
| 2023 | May    | 0.54 | 0.41 | 0.04 |
| 2023 | June   | 0.5  | 0.49 | 0.01 |
| 2023 | July   | 0.66 | 0.33 | 0 |
| 2023 | August | 0.34 | 0.3  | 0.36 |
| 2024 | April  | 0.60 | 0.3  | 0.11 |
| 2024 | May    | 0.61 | 0.32 | 0.07 |
| 2024 | June   | 0.73 | 0.27 | 0.01 |
| 2024 | July   | 0.76 | 0.24 | 0 |
| 2024 | August | 0.33 | 0.28 | 0.39 |
| 2025 | April  | 0.67 | 0.28 | 0.05 |
| 2025 | May    | 0.46 | 0.51 | 0.03 |
| 2025 | June   | 0.72 | 0.27 | 0.01 |
| 2025 | July   | 0.71 | 0.29 | 0 |
| 2025 | August | 0.27 | 0.32 | 0.41 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 14 of 35



**Figure 10. The distribution of hourly deviations from MOP (437') at the Ice Harbor forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.0 ft.**

Fluctuations in forebay elevation at Ice Harbor are common in the upper half of MOP range (Figure 11). Higher forebay elevations within MOP were more common in May than in other months (Figure 12). From 2023-2025, on average Ice Harbor operated within 1.2-, 1.0-, 0.8-, and 0.7-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A1).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 15 of 35



Figure 11. Ice Harbor hourly forebay elevations across MOP range dates since 2023.

Exhibit 4 to Reply Declaration of Edward Bowles
Page 16 of 35



*MOP = 437', MOP operating range is currently 437 - 438.5'*

**Figure 12. Ice Harbor forebay elevation proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 17 of 35

**Middle-Columbia Projects**

Of the four Middle Columbia projects, John Day is the only one to have a restriction on operating range under the Fish Passage Plan. Minimum Irrigation Pool (MIP) is applied to John Day from April 10 – August 31.

John Day operated within 1.5' of MIP slightly under 50% of hours. The Dalles and Bonneville operate well above MOP+2' regularly, while McNary is more restricted by its three-foot operating range.


*Bonneville*

Bonneville does not operate under a restricted MOP range, so may fill to any elevation within its operating range during the spring and summer migration periods; its minimum operating pool is 71.5'. From April-August since 2023, Bonneville has operated within 1.5' of MOP 9.7% of all hours (Table 5, Figure 13). It operated more than two feet above MOP for 77.8% of all hours.

**Table 5. Monthly proportions within each forebay elevation band at Bonneville.**

| Year | Month | Proportion of hours between MOP - MOP +1.5' | Proportion of hours between MOP +1.5' - MOP+2' | Proportion of hours above MOP+2' |
|------|-------|------|------|------|
| 2023 | April | 0.01 | 0.05 | 0.94 |
| 2023 | May | 0.02 | 0.15 | 0.83 |
| 2023 | June | 0 | 0 | 1 |
| 2023 | July | 0 | 0.01 | 0.98 |
| 2023 | August | 0.07 | 0.13 | 0.79 |
| 2024 | April | 0.17 | 0.13 | 0.7 |
| 2024 | May | 0.46 | 0.36 | 0.17 |
| 2024 | June | 0.25 | 0.29 | 0.46 |
| 2024 | July | 0.05 | 0.13 | 0.83 |
| 2024 | August | 0 | 0.01 | 0.99 |
| 2025 | April | 0.16 | 0.21 | 0.63 |
| 2025 | May | 0.18 | 0.29 | 0.53 |
| 2025 | June | 0.08 | 0.09 | 0.84 |
| 2025 | July | 0 | 0 | 1 |
| 2025 | August | 0 | 0.02 | 0.98 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 18 of 35



**Figure 13. The distribution of hourly deviations from MOP (71.5') at the Bonneville forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.5 ft.**

Bonneville forebay elevations are rarely within two feet of MOP and tend to be higher more frequently in the summer months (Figure 14, Figure 15). From 2023-2025, on average Bonneville operated within 2.5-, 2.2-, 1.8-, and 1.6-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A2).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 19 of 35



**Figure 14. Bonneville hourly forebay elevations across MOP range dates since 2023. Bonneville does not operate within a MOP range under the Fish Passage Plan.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 20 of 35



**Figure 15. Bonneville forebay elevation range proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 21 of 35

### The Dalles

The Dalles does not operate under a restricted MOP range, though it's minimum operating pool elevation is 155'. Thus, it may fill to any elevation within its operating range through the spring and summer migration periods. The Dalles almost always operates more than two feet above MOP from May through August (Table 6, Figure 16).

**Table 6. Monthly proportions within each forebay elevation band at The Dalles.**

| Year | Month | Proportion of hours between MOP – MOP+1.5' | Proportion of hours between MOP+1.5 – MOP+2' | Proportion of hours above MOP+2' |
|------|-------|--------|--------|------|
| 2023 | April | 0 | 0 | 1 |
| 2023 | May | 0 | 0 | 1 |
| 2023 | June | 0 | 0 | 1 |
| 2023 | July | 0 | 0 | 1 |
| 2023 | August | 0 | 0 | 1 |
| 2024 | April | 0 | 0 | 1 |
| 2024 | May | 0 | 0 | 1 |
| 2024 | June | 0 | 0 | 1 |
| 2024 | July | 0 | 0 | 1 |
| 2024 | August | 0 | 0 | 1 |
| 2025 | April | 0 | 0 | 1 |
| 2025 | May | 0 | 0 | 1 |
| 2025 | June | 0 | 0.01 | 0.99 |
| 2025 | July | 0 | 0 | 1 |
| 2025 | August | 0 | 0 | 1 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 22 of 35



**Figure 16. The distribution of hourly deviations from MOP (155') at The Dalles forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.5 ft.**

The Dalles consistently operates many feet above MOP (Figure 17, Figure 18). However, forebay elevations are still typically managed within a relatively narrow band for much of the time; from 2023-2025, on average The Dalles operated within 1.7-, 1.4-, 1.1-, and 1.0-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A2).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 23 of 35



**Figure 17. The Dalles hourly forebay elevations across MOP range dates since 2023. The Dalles does not operate within a MOP range under the Fish Passage Plan.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 24 of 35



**Figure 18. The Dalles forebay elevation range proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 25 of 35

*John Day*

From April-August since 2023, John Day has operated within 1.5' of MIP 42.9% of all hours (Table 7, Figure 19). MIP range is in effect from April 10-August 31.

April, May, and early June experience higher forebay elevations due to Blalock Island avian operations, which raise the operating range to 264.5-266.5' until early/mid-June. 71.5% of all hours in June, July, and August, which target a range of 262.5-264.5' fell within 1.5' of MIP.

**Table 7. Monthly proportions within each forebay elevation band at John Day.**

| Year | Month | Proportion of hours between MIP - MIP+1.5' | Proportion of hours between MIP+1.5' - MIP+2' | Proportion of hours above MIP+2' |
|------|-------|---|---|---|
| 2023 | April | 0 | 0 | 1 |
| 2023 | May | 0 | 0 | 1 |
| 2023 | June | 0.49 | 0.29 | 0.22 |
| 2023 | July | 0.85 | 0.15 | 0 |
| 2023 | August | 0.59 | 0.41 | 0 |
| 2024 | April | 0 | 0 | 1 |
| 2024 | May | 0 | 0 | 1 |
| 2024 | June | 0.71 | 0.23 | 0.07 |
| 2024 | July | 0.75 | 0.25 | 0 |
| 2024 | August | 0.9 | 0.09 | 0 |
| 2025 | April | 0 | 0 | 1 |
| 2025 | May | 0 | 0 | 1 |
| 2025 | June | 0.64 | 0.23 | 0.13 |
| 2025 | July | 0.71 | 0.29 | 0 |
| 2025 | August | 0.8 | 0.2 | 0 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 26 of 35



**Figure 19. The distribution of hourly deviations from MIP (264.5' through mid-June, 262.5' thereafter) at the John Day forebay monitor, by year and month. The dashed vertical line corresponds to MIP + 1.5 ft.**

John Day tends to operate near the middle or top of its two-foot MIP range, with some exceptions (Figure 20, Figure 21). From 2023-2025, on average John Day operated within 1.2-, 1.0-, 0.8-, and 0.7-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A2).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 27 of 35



**Figure 20. John Day hourly forebay elevations across MOP range dates since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 28 of 35



*MIP = 262.5', MIP operating range is currently 262.5 - 264.5' or 264.5 - 266.5' during Blalock Island avian operations*

**Figure 21. John Day forebay elevation range proportions by month.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 29 of 35

*McNary*

McNary does not operate under a restricted MOP range; the project's MOP is 337'. Thus, it may fill to any elevation within its operating range through the spring and summer migration periods. From May-August since 2023, McNary has operated within 1.5' of MOP 31.6% of all hours (Table 8, Figure 22).

**Table 8. Monthly proportions within each forebay elevation band at McNary.**

| Year | Month | Proportion of hours between MOP - MOP+1.5' | Proportion of hours between MOP+1.5' - MOP+2' | Proportion of hours above MOP+2' |
|------|-------|-----|-----|-----|
| 2023 | April | 0.02 | 0.42 | 0.56 |
| 2023 | May | 0.42 | 0.33 | 0.24 |
| 2023 | June | 0.02 | 0.38 | 0.59 |
| 2023 | July | 0.25 | 0.17 | 0.58 |
| 2023 | August | 0.38 | 0.35 | 0.27 |
| 2024 | April | 0.19 | 0.48 | 0.33 |
| 2024 | May | 0.3 | 0.4 | 0.3 |
| 2024 | June | 0.25 | 0.4 | 0.34 |
| 2024 | July | 0.15 | 0.28 | 0.57 |
| 2024 | August | 0.14 | 0.38 | 0.48 |
| 2025 | April | 0.6 | 0.26 | 0.14 |
| 2025 | May | 0.8 | 0.19 | 0.01 |
| 2025 | June | 0.68 | 0.31 | 0.01 |
| 2025 | July | 0.2 | 0.61 | 0.19 |
| 2025 | August | 0.34 | 0.27 | 0.39 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 30 of 35



**Figure 22. The distribution of hourly deviations from MOP (337') at the McNary forebay monitor, by year and month. The dashed vertical line corresponds to MOP + 1.5 ft.**

McNary tends to operate across the spectrum of its three-foot operating range (Figure 23, Figure 24). While it frequently operates above MOP + 1.5', forebay elevations are nonetheless managed within a relatively narrow band for much of the time; from 2023-2025, on average McNary operated within 1.6-, 1.4-, 1.2-, and 1.0-foot ranges, 95%, 90%, 80%, and 75% of the time, respectively (Appendix Table A2).

Exhibit 4 to Reply Declaration of Edward Bowles
Page 31 of 35



**Figure 23. McNary hourly forebay elevations across MOP range dates since 2023.**

Exhibit 4 to Reply Declaration of Edward Bowles
Page 32 of 35



**Figure 24. McNary forebay elevation range proportions by month.**

*MOP = 337'*

Exhibit 4 to Reply Declaration of Edward Bowles
Page 33 of 35

**Appendix Table A1.** Percentile values from hourly forebay elevation distributions at Lower Snake projects depicted in the histograms above, averaged across 2023-2025. Inter-percentile ranges depicted in the right four columns depict the difference in upper and lower elevation values for each percentile pair and indicate the degree to which elevations were consistent, irrespective of a particular elevation target (e.g., MOP or MIP).

| Project | Month | MOP (ft) | Hourly forebay elevation percentile value (ft) | | | | | | | | | Upper - lower percentile range (ft) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2.5 | 5 | 10 | 12.5 | 50 | 87.5 | 90 | 95 | 97.5 | 2.5-97.5 (95%) | 5-95 (90%) | 10-90 (80%) | 12.5-87.5 (75%) |
| Lower Granite | April | 733 | 733.3 | 733.4 | 733.5 | 733.5 | 733.7 | 734.0 | 734.0 | 734.1 | 734.2 | 0.9 | 0.7 | 0.6 | 0.5 |
| | May | 733 | 733.2 | 733.3 | 733.4 | 733.4 | 733.7 | 733.9 | 734.0 | 734.1 | 734.1 | 0.9 | 0.8 | 0.6 | 0.6 |
| | June | 733 | 733.4 | 733.4 | 733.5 | 733.5 | 733.7 | 734.0 | 734.1 | 734.1 | 734.2 | 0.8 | 0.7 | 0.6 | 0.5 |
| | July | 733 | 733.4 | 733.4 | 733.5 | 733.5 | 733.8 | 734.0 | 734.1 | 734.1 | 734.2 | 0.8 | 0.7 | 0.6 | 0.5 |
| | August | 733 | 733.2 | 733.3 | 733.4 | 733.4 | 733.7 | 734.0 | 734.1 | 734.2 | 734.3 | 1.0 | 0.9 | 0.7 | 0.7 |
| Little Goose | April | 633 | 633.4 | 633.5 | 633.5 | 633.6 | 633.8 | 634.0 | 634.1 | 634.1 | 634.1 | 0.7 | 0.6 | 0.5 | 0.5 |
| | May | 633 | 633.3 | 633.3 | 633.4 | 633.4 | 633.7 | 634.0 | 634.0 | 634.1 | 634.2 | 0.9 | 0.8 | 0.6 | 0.6 |
| | June | 633 | 633.4 | 633.5 | 633.5 | 633.6 | 633.9 | 634.2 | 634.2 | 634.3 | 634.4 | 1.0 | 0.9 | 0.7 | 0.6 |
| | July | 633 | 633.7 | 633.7 | 633.8 | 633.8 | 634.1 | 634.5 | 634.5 | 634.6 | 634.7 | 1.0 | 0.9 | 0.8 | 0.7 |
| | August | 633 | 633.9 | 634.0 | 634.1 | 634.1 | 634.9 | 636.3 | 636.4 | 636.5 | 636.7 | 2.8 | 2.6 | 2.3 | 2.2 |
| Lower Monumental | April | 537 | 537.4 | 537.4 | 537.5 | 537.5 | 537.8 | 538.1 | 538.1 | 538.3 | 538.4 | 1.1 | 0.8 | 0.6 | 0.5 |
| | May | 537 | 537.2 | 537.3 | 537.4 | 537.4 | 537.7 | 538.1 | 538.2 | 538.3 | 538.4 | 1.2 | 1.1 | 0.8 | 0.7 |
| | June | 537 | 537.4 | 537.5 | 537.5 | 537.6 | 537.9 | 538.2 | 538.3 | 538.4 | 538.4 | 1.0 | 0.9 | 0.7 | 0.7 |
| | July | 537 | 537.4 | 537.5 | 537.6 | 537.6 | 537.9 | 538.2 | 538.2 | 538.3 | 538.4 | 0.9 | 0.8 | 0.7 | 0.6 |
| | August | 537 | 537.5 | 537.6 | 537.7 | 537.7 | 538.1 | 538.7 | 538.8 | 538.9 | 539.1 | 1.6 | 1.4 | 1.1 | 1.0 |
| Ice Harbor | April | 437 | 437.5 | 437.5 | 437.6 | 437.6 | 437.9 | 438.3 | 438.3 | 438.5 | 438.7 | 1.3 | 0.9 | 0.7 | 0.6 |
| | May | 437 | 437.4 | 437.5 | 437.6 | 437.6 | 438.0 | 438.3 | 438.3 | 438.5 | 438.7 | 1.3 | 1.0 | 0.8 | 0.7 |
| | June | 437 | 437.4 | 437.5 | 437.6 | 437.6 | 437.9 | 438.2 | 438.2 | 438.3 | 438.3 | 0.9 | 0.8 | 0.6 | 0.5 |
| | July | 437 | 437.4 | 437.5 | 437.6 | 437.6 | 437.9 | 438.1 | 438.1 | 438.2 | 438.3 | 0.9 | 0.7 | 0.6 | 0.5 |
| | August | 437 | 437.6 | 437.7 | 437.7 | 437.8 | 438.2 | 439.1 | 439.2 | 439.3 | 439.4 | 1.8 | 1.7 | 1.4 | 1.4 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 34 of 35

**Appendix Table A2.** Percentile values from hourly forebay elevation distributions at Lower Columbia projects depicted in the histograms above, averaged across 2023-2025. Inter-percentile ranges depicted in the right four columns depict the difference in upper and lower elevation values for each percentile pair and indicate the degree to which elevations were consistent, irrespective of a particular elevation target (e.g., MOP or MIP [John Day]).

| Project | Month | MOP (ft) | Hourly forebay elevation percentile value (ft) | | | | | | | | | Upper - lower percentile range (ft) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2.5 | 5 | 10 | 12.5 | 50 | 87.5 | 90 | 95 | 97.5 | 2.5-97.5 (95%) | 5-95 (90%) | 10-90 (80%) | 12.5-87.5 (75%) |
| McNary | April | 337 | 338.1 | 338.2 | 338.3 | 338.4 | 338.8 | 339.2 | 339.3 | 339.4 | 339.5 | 1.5 | 1.3 | 1.0 | 0.9 |
| | May | 337 | 337.6 | 337.7 | 337.8 | 337.9 | 338.5 | 339.0 | 339.1 | 339.2 | 339.2 | 1.6 | 1.5 | 1.2 | 1.1 |
| | June | 337 | 338.0 | 338.1 | 338.2 | 338.3 | 338.8 | 339.2 | 339.2 | 339.3 | 339.4 | 1.4 | 1.2 | 1.0 | 0.9 |
| | July | 337 | 337.8 | 337.9 | 338.1 | 338.3 | 339.0 | 339.4 | 339.5 | 339.6 | 339.7 | 2.0 | 1.8 | 1.4 | 1.2 |
| | August | 337 | 337.8 | 338.0 | 338.2 | 338.2 | 338.8 | 339.4 | 339.4 | 339.5 | 339.6 | 1.8 | 1.5 | 1.2 | 1.1 |
| John Day | April | 264.5 | 264.9 | 265.0 | 265.1 | 265.1 | 265.6 | 265.9 | 265.9 | 266.0 | 266.0 | 1.2 | 1.0 | 0.8 | 0.7 |
| | May | 264.5 | 264.9 | 265.1 | 265.2 | 265.2 | 265.6 | 265.8 | 265.8 | 265.9 | 266.0 | 1.0 | 0.9 | 0.7 | 0.6 |
| | June | 264.5/262.5 | 263.3 | 263.4 | 263.5 | 263.5 | 263.9 | 264.6 | 264.7 | 265.1 | 265.3 | 2.0 | 1.7 | 1.2 | 1.1 |
| | July | 262.5 | 263.2 | 263.3 | 263.4 | 263.5 | 263.8 | 264.1 | 264.1 | 264.2 | 264.2 | 1.0 | 0.8 | 0.7 | 0.6 |
| | August | 262.5 | 263.3 | 263.4 | 263.5 | 263.5 | 263.8 | 264.1 | 264.1 | 264.1 | 264.2 | 0.9 | 0.7 | 0.6 | 0.5 |
| The Dalles | April | 155 | 157.9 | 158.0 | 158.3 | 158.3 | 158.9 | 159.3 | 159.4 | 159.5 | 159.6 | 1.7 | 1.4 | 1.1 | 1.0 |
| | May | 155 | 157.5 | 157.7 | 157.9 | 158.0 | 158.6 | 159.2 | 159.2 | 159.4 | 159.5 | 2.0 | 1.7 | 1.3 | 1.2 |
| | June | 155 | 157.8 | 158.0 | 158.3 | 158.3 | 158.9 | 159.3 | 159.4 | 159.5 | 159.6 | 1.8 | 1.5 | 1.1 | 1.0 |
| | July | 155 | 158.0 | 158.2 | 158.4 | 158.4 | 158.9 | 159.4 | 159.4 | 159.5 | 159.6 | 1.6 | 1.4 | 1.1 | 1.0 |
| | August | 155 | 158.3 | 158.5 | 158.6 | 158.6 | 159.1 | 159.5 | 159.5 | 159.7 | 159.7 | 1.4 | 1.2 | 0.9 | 0.8 |
| Bonneville | April | 71.5 | 72.7 | 72.8 | 73.0 | 73.1 | 74.2 | 75.2 | 75.3 | 75.5 | 75.6 | 2.9 | 2.6 | 2.2 | 2.0 |
| | May | 71.5 | 72.5 | 72.6 | 72.8 | 72.9 | 73.5 | 74.2 | 74.2 | 74.5 | 74.6 | 2.1 | 1.9 | 1.4 | 1.3 |
| | June | 71.5 | 73.0 | 73.0 | 73.2 | 73.3 | 74.3 | 75.0 | 75.1 | 75.3 | 75.4 | 2.4 | 2.2 | 1.9 | 1.7 |
| | July | 71.5 | 73.5 | 73.7 | 74.0 | 74.0 | 74.7 | 75.5 | 75.6 | 75.7 | 75.9 | 2.4 | 2.1 | 1.6 | 1.5 |
| | August | 71.5 | 73.3 | 73.5 | 73.8 | 73.9 | 74.7 | 75.4 | 75.5 | 75.7 | 75.8 | 2.4 | 2.1 | 1.7 | 1.6 |

Exhibit 4 to Reply Declaration of Edward Bowles
Page 35 of 35