# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**NATIONAL WILDLIFE FEDERATION, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, SIERRA CLUB, IDAHO RIVERS UNITED, NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION, NW ENERGY COALITION, COLUMBIA RIVERKEEPER,** and **FEDERATION OF FLY FISHERS,**

       Plaintiffs,

and

**STATE OF OREGON, SPOKANE TRIBE OF INDIANS,** and **COEUR D'ALENE TRIBE,**

       Intervenor-Plaintiffs,

    v.

**NATIONAL MARINE FISHERIES SERVICE, U.S. ARMY CORPS OF ENGINEERS, U.S. BUREAU OF**

Case No. 3:01-cv-640-SI

**AMENDED OPINION AND ORDER**[1]

---

[1] In response to Plaintiffs' Motion for Clarification, ECF 2669, the Court issues the following Amended Opinion and Order, filed concurrently with the Amended Preliminary Injunction Order. The amendments correct scrivener's and other non-substantive errors. No changes substantively affect the Court's reasoning or holding. Federal Defendants either take no position on or do not object to the amendments. ECF 2670 at 2 n.2.

**RECLAMATION**, and **U.S. FISH AND WILDLIFE SERVICE**,

              Defendants,

and

**PUBLIC POWER COUNCIL, COLUMBIA-SNAKE RIVER IRRIGATORS ASSOCIATION, NORTHWEST RIVER PARTNERS, CONFEDERATED SALISH AND KOOTENAI TRIBES, STATE OF MONTANA, INLAND PORTS AND NAVIGATION GROUP, STATE OF IDAHO, KOOTENAI TRIBE OF IDAHO, NORTHWEST IRRIGATION UTILITIES, FRANKLIN COUNTY FARM BUREAU FEDERATION, GRANT COUNTY FARM BUREAU FEDERATION, WASHINGTON FARM BUREAU FEDERATION**, and **NORTHWEST REQUIREMENTS UTILITIES**,

              Intervenor-Defendants.

Amanda W. Goodin, Michael B. Mayer, Charisa Gowen-Takahashi, and Nicolas Wedekind, EARTHJUSTICE, 810 Third Avenue, Suite 610, Seattle, WA 98104; Daniel J. Rohlf, EARTHRISE LAW CENTER, Lewis & Clark Law School, 10015 SW Terwilliger Boulevard, MSC 51, Portland, OR 97219. Of Attorneys for Plaintiffs.

Dan Rayfield, Attorney General; Deanna J. Chang, Christina L. Beatty-Walters, and Austin D. Saylor, Senior Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Intervenor-Plaintiff State of Oregon.

Theodore. C. Knight, Special Legal Counsel, SPOKANE TRIBE OF INDIANS, 9121 NE Briar Rose Lane, Bainbridge Island, WA 98110. Of Attorneys for Intervenor-Plaintiff the Spokane Tribe of Indians.

Richard K. Eichstaedt, REY-BEAR MCLAUGHLIN, LLP, 421 W. Riverside Avenue, Suite 1004, Spokane, WA 99201. Of Attorneys for Intervenor-Plaintiff Coeur d'Alene Tribe.

Sean E. Martin, Assistant United States Attorney, U.S. DEPARTMENT OF JUSTICE, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Portland, OR 97204; Romney S. Philpott III, Senior Trial Attorney, U.S. DEPARTMENT OF JUSTICE, P.O. Box 7611, Washington, DC 20044; Michael R. Eitel and John H. Martin III, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT AND

NATURAL RESOURCES DIVISION, 999 18th Street, North Terrace, Suite 600, Denver, CO 80202; Amanda Rudat, Elizabeth Kirby, and Frederick Turner, Trial Attorneys, U.S. DEPARTMENT OF JUSTICE, WILDLIFE AND MARINE RESOURCES SECTION AND NATURAL RESOURCES SECTION, P.O. Box 7611, Washington, DC 20044; Kieran O'Neil, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT AND NATURAL RESOURCES DIVISION, 150 M. Street NE, Washington, DC 20002. Of Attorneys for Federal Defendants.

Irion Sanger and John Maxwell Greene, SANGER GREENE, PC, 4031 SE Hawthorne Blvd., Portland, OR 97214. Of Attorneys for Intervenor-Defendant Public Power Council.

James L. Buchal, MURPHY & BUCHAL LLP, P.O. Box 86620, Portland, OR 97286. Of Attorneys for Intervenor-Defendant Columbia Snake River Irrigators Association and *Amicus Curiae* Washington State Potato Commission and Eastern Oregon Irrigators Association.

Ryan P. Steen and Jason T. Morgan, STOEL RIVES LLP, 600 University Street, Suite 3600, Seattle, WA 98101. Of Attorneys for Intervenor-Defendant Northwest RiverPartners.

Stuart M. Levit, John T. Harrison, and Joseph P. Hovenkotter, TRIBAL LEGAL DEPARTMENT, CONFEDERATED SALISH AND KOOTENAI TRIBES, 42487 Complex Boulevard, P.O. Box 278, Pablo, MT 59855; Julie A. Weiss, HAGLUND KELLEY LLP, 2177 SW Broadway, Portland, OR 97201. Of Attorneys for Intervenor-Defendant Confederated Salish and Kootenai Tribes.

Jeremiah D. Weiner, 1539 Eleventh Avenue, Helena, MT 59601. Of Attorneys for Intervenor-Defendant State of Montana.

Lindsay M. Thane, Aukjen Ingraham, and Lawson E. Fite, SCHWABE, WILLIAMSON & WYATT, P.C., Pacwest Center, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Intervenor-Defendant Inland Ports and Navigation Group.

Raúl R. Labrador, Attorney General; Joy M. Vega, Cherese D. McLain, Marshall W. Toryanski, and Rowdy J. Keller, Deputy Attorneys General, OFFICE OF THE ATTORNEY GENERAL, STATE OF IDAHO, NATURAL RESOURCES DIVISION, P.O. Box 83720, Boise, ID 83720. Of Attorneys for Intervenor-Defendant State of Idaho.

Julie A. Weis and Christopher T. Griffith, HAGLUND KELLEY LLP, 2177 SW Broadway, Portland, OR 97201; William K. Barquin, KOOTENAI TRIBE OF IDAHO, Portland Office, 1000 SW Broadway, Suite 1060, Portland, OR 97205. Of Attorneys for Intervenor-Defendant Kootenai Tribe of Idaho.

Matthew A. Schroettnig, 825 NE Multnomah Street, Suite 1135, Portland, OR 97232. Of Attorneys for Intervenor-Defendants Northwest Irrigation Utilities and Northwest Requirements Utilities.

David J. Cummings, NEZ PERCE TRIBE, OFFICE OF LEGAL COUNSEL, P.O. Box 305, Lapwai, ID 83540; Geoffrey M. Whiting ATTORNEY AT LAW, P.O. Box 591, Joseph, OR 97846; Jane G. Steadman, KANJI & KATZEN, PLLC, 811 1st Ave., Suite 640, Seattle, WA 98104. Of Attorneys for *Amicus Curiae* Nez Perce Tribe.

Alison Toivola and Josh Newton, BEST BEST & KRIEGER LLP, 360 SW Bond Street, Suite 400, Bend, OR 97702. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Warm Springs Reservation of Oregon.

Nick Brown, Attorney General, Kristen K. Mitchell and Andrew A. Fitz, Senior Assistant Attorneys General, and John Heidinger and Adam L. Levitan, Assistant Attorneys General, Public Lands & Conservation Division, STATE OF WASHINGTON, OFFICE OF THE ATTORNEY GENERAL, 1125 Washington Street SE, P.O. Box 40100, Olympia, WA 98504. Of Attorneys for *Amicus Curiae* State of Washington.

Joseph R. Pitt, OFFICE OF LEGAL COUNSEL, CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION, 46411 Timine Way, Pendleton, OR 97801. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Umatilla Indian Reservation.

Kathryn E. Marckworth, Lead Attorney, and Jöelle C. Klein, Staff Attorney, YAKAMA NATION OFFICE OF LEGAL COUNSEL, P.O. Box 150, Toppenish, WA 98948. Of Attorneys for *Amicus Curiae* The Confederated Tribes and Bands of the Yakama Nation.

Brian C. Gruber, Beth A. Baldwin, and Anna E. Brady, ZIONTZ CHESTNUT, 2101 Fourth Avenue, Suite 1230, Seattle, WA 98121. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Colville Reservation.

John Shurts, NORTHWEST POWER AND CONSERVATION COUNCIL, 851 SW Sixth Avenue, Suite 1100, Portland, OR 97204. Of Attorneys for *Amicus Curiae* Northwest Power and Conservation Council.

Román D. Hernández, CABLE HUSTON LLP, 1455 SW Broadway, Suite 1500, Portland, OR 97201; Michael B. Schon, LEHOTSKY KELLER COHN LLP, 200 Massachusetts Avenue, NW, Washington, DC 20001; Adeline K. Lambert, LEHOTSKY KELLER KOHN LLP, 940 Longley Avenue NW, Atlanta, GA 30318; Danielle K. Goldstein, LEHOTSKY KELLER COHN LLP, 3280 Peachtree Road NE, Atlanta, GA 30305. Of Attorneys for *Amicus Curiae* National Rural Electric Cooperative Association.

Harold S. Shepherd, CENTER FOR WATER ADVOCACY, P.O. Box 331, 90 West Center Street, Moab, UT 84532. Of Attorneys for *Amicus Curiae* Center for Tribal Water Advocacy.

Scott William Levy, PO Box 504, 309 Andora Lane #132, Ketchum, ID 83340. *Pro se Amicus Curiae.*

**Michael H. Simon, District Judge.**

For decades, the battle for the life of threatened and endangered salmon and steelhead has not been fought at the end of a hook and line, nor in the woven threads of a fishing net, nor even based on the appetites of sea lions, avian predators, or killer whales. Instead, the greatest battle has been waged in the courts.[2] Although people have debated various definitions of "jeopardy" and whether mitigation actions are sufficiently "certain" to occur, the abundance of these salmonids has dwindled to near extinction levels. One of the foundational symbols of the West, a critical recreational, cultural, and economic driver for Western states, and the beating heart and guaranteed resource protected by treaties with several Native American tribes is disappearing from the landscape. And yet the litigation continues in much the same way as it has for 30 years.

---

[2] The 2020 Biological Opinion ("BiOp"), at issue in this Opinion and Order, is the latest in a series of biological opinions issued by NOAA Fisheries (originally known as the "National Marine Fisheries Service" or "NMFS") since 1992 relating to operations of the Federal Columbia River Power System. NOAA Fisheries previously issued biological opinions that were challenged in this lawsuit in 2000, 2004, 2008, a supplemental biological opinion in 2010, and 2014. Each time, the Court, first acting through U.S. District Judge James A. Redden, and then through the undersigned judge, found certain conclusions by NOAA Fisheries in the biological opinions to be arbitrary and capricious. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196 (D. Or. 2003) ("*NMFS I*") (2000 BiOp); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1278878 (D. Or. May 26, 2005) ("*NMFS II*"), *aff'd by Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ("*NMFS III*") (2004 BiOp); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117 (D. Or. 2011) ("*NMFS IV*") (2008/2010 BiOp); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016) ("*NMFS V*") (2014 BiOp).

Additionally, in 2005 and 2014 the courts hearing this case also litigated preliminary injunctions, predominately involving spill. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1398223 (D. Or. June 10, 2005) ("*NMFS VI*"), *aff'd in part, remanded in part*, 418 F.3d 971 (9th Cir. 2005), *withdrawn from bound volume, opinion amended and superseded*, 422 F.3d 782 (9th Cir. 2005) ("*NMFS VII*"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2017 WL 1829588 (D. Or. April 3, 2017) ("*NMFS VIII*"), *aff'd in part, appeal dismissed in part by Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) ("*NMFS IX*").

In 2016, the Court concluded that the 2014 Biological Opinion ("BiOp") "continue[d] down the same well-worn and legally insufficient path taken during the last 20 years" by "impermissibly rel[ying] on supposedly precise, numerical survival improvement assumptions from habitat mitigation efforts that, in fact, have uncertain benefits and are not reasonably certain to occur," "fail[ing] adequately to consider the effects of climate change," and "rel[ying] on a recovery standard that ignores the dangerously low abundance levels of many of the populations of the listed species." *NMFS V*, 184 F. Supp. 3d at 876. But in addition to invalidating the 2014 BiOp, the Court also found that the Federal Defendants[3] violated the National Environmental Policy Act ("NEPA"). The Court required the Federal Defendants to prepare a comprehensive environmental impact statement ("EIS"). This was a new requirement for the Federal Columbia River Power System ("FCRPS" or "CRS"), which the Court noted could provide an opportunity for "new and innovative solutions" that "may be able to break through any logjam that simply maintains the precarious status quo." *Id.* The Federal Defendants, over Plaintiffs' objection, requested five years, until March 2021, to complete the comprehensive EIS and next BiOp, which the Court granted.

The first Trump administration accelerated the schedule to complete the EIS and BiOp before the end of his presidency. The 2020 BiOp and the 2020 Columbia River System Operations Final Environmental Impact Statement ("FEIS") offered business-as-usual solutions. Indeed, the 2020 BiOp, taking a page from the 2004 BiOp, concluded that the operation of the FCRPS is not likely to jeopardize the continued existence of the threatened and endangered

---

[3] The Court refers to Defendants National Marine Fisheries Service, U.S. Army Corps of Engineers, the Bureau of Reclamation, and U.S. Fish and Wildlife Service as the "Federal Defendants." For purposes of this Opinion and Order, the Court refers collectively to the Federal Defendants and Intervenor-Defendants as "Defendants."

salmonids. Plaintiffs immediately returned to court, challenging the 2020 BiOp and the 2020 FEIS.

When President Joseph R. Biden, Jr. took office, the parties stayed the litigation. The parties worked in mediation toward a global resolution of issues relating to FCRPS operations and a lasting path forward to restoring salmonids in the Columbia River Basin. Based on the terms of the parties' agreement, and upon the motion of the parties, the Court stayed this litigation through December 13, 2028. After President Donald J. Trump took office for his second term, he invalidated the agreement between the parties. Plaintiffs then moved to lift the stay in this case.

Before the Court are Plaintiffs'[4] motions for preliminary injunction. Plaintiffs move under the Endangered Species Act ("ESA") for an injunction requiring the U.S. Army Corps of Engineers ("Corps") and the Bureau of Reclamation ("Reclamation") (together, "Action Agencies") to carry out certain operational and non-operational activities with respect to the FCRPS and management of the Columbia River Basin. For the reasons stated in Plaintiffs' respective briefs and related filings, with particular emphasis on those reasons discussed below, the Court grants in part and denies in part Plaintiffs' motions.

## STANDARDS

"A plaintiff seeking a preliminary injunction must demonstrate that she is likely to succeed on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555

---

[4] For purposes of this Opinion and Order, the Court refers collectively to the NWF Plaintiffs and Intervenor-Plaintiff Oregon as "Plaintiffs."

U.S. 7, 20 (2008)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

A preliminary injunction also "may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The Ninth Circuit has a "'sliding scale' approach, in which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1131). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

The already high standard for granting a preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original).

"If a court determines that injunctive relief is warranted, such relief must be tailored to remedy the specific harm." *NMFS VIII*, 2017 WL 1829588, at *2 (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015)).

## BACKGROUND

After 25 years, the facts of this case are well-established and well-known to the parties. The case stems from the declining abundance of salmon and steelhead species in the Columbia and Snake Rivers. Every year, these fish must travel up the rivers to spawn, and their offspring must return down river to the Pacific Ocean. In the course of this journey, both adult and juvenile salmonids must navigate the dams, powerhouses, and reservoirs of the FCRPS. Since the beginning of this case, this Court and the Ninth Circuit, as well as the Federal government, have all found that this difficult and sometimes lethal odyssey is a major contributor to the dwindling numbers of salmonids returning to the Columbia and Snake Rivers each year. *See, e.g.*, *NMFS IV*, 839 F. Supp. 2d at 1131 ("As I have previously found, there is ample evidence in the record that indicates that the operation of the FCRPS causes substantial harm to listed salmonids. . . . NOAA Fisheries[5] acknowledges that the existence and operation of the dams accounts for most of the mortality of juveniles migrating through the FCRPS."); *NMFS IX*, 886 F.3d at 819-20 (concluding that irreparable harm to the listed species from the FCRPS as a whole was sufficient to support the spill injunction). There are now 13 populations of salmon and steelhead, and one smelt population, listed under the ESA and affected by the FCRPS.

In 2000, 2008, 2010, and 2014, in providing Section 7 consultations for the Action Agencies, National Marine Fisheries Service ("NMFS") found that FCRPS operations jeopardized the listed species, but with reasonable and prudent alternatives, jeopardy could be avoided. In 2004, using a novel approach to defining jeopardy, NMFS found that the FCRPS did

---

[5] NOAA Fisheries is the operational name of Defendant National Marine Fisheries Service and is referenced in case law referring to that agency.

not jeopardize the listed species. That BiOp was swiftly found unlawful by this Court and the Ninth Circuit.

When Plaintiffs challenged the 2014 BiOp, they also raised a challenge under NEPA. The Court found in Plaintiff's favor and required the Federal Defendants to prepare a comprehensive EIS, as well as a new BiOp.

In 2020, NMFS performed another Section 7 consultation and completed the BiOp. The scope of the 2020 BiOp is described as:

> NMFS considers the effects of the Action Agencies' proposed action (the continued operation and maintenance of the CRS dams; tributary and estuary habitat mitigation programs; conservation and safety net hatchery programs; predator management programs; and research, monitoring, and evaluation [RME] programs) on eight species of salmon (ESUs), five species of steelhead (DPSs), and the Southern DPS of Pacific Eulachon and their designated critical habitat.

2020 BiOp at 45.[6] This BiOp, similar to the 2004 BiOp, used a novel approach to evaluating jeopardy and concluded that the FCRPS operations did not jeopardize the continued existence of the listed species or result in the destruction or adverse modification of their habitat. The Federal Defendants also completed the EIS as directed by the Court.

Following the completion of the 2020 BiOp, the Corps and Reclamation, together with non-party Bonneville Power Administration ("BPA") issued a Joint Record of Decision ("ROD") on the operation of the FCRPS. For purposes of ESA compliance, the ROD relied on the conclusion by NMFS in its 2020 BiOp that the Proposed Action reflected in the ROD did not

---

[6] The continued operation and maintenance of the CRS dams; tributary and estuary habitat mitigation programs; conservation and safety net hatchery programs; predator management programs; and RME programs are referred to in this Opinion and Order as the "Proposed Action."

jeopardize the continued existence of listed salmon and steelhead. Plaintiffs filed an Eighth

Supplemental Complaint in this case, challenging both the 2020 BiOp and the 2020 FEIS.

In 2021, after President Biden took office, the parties requested that the Court stay this

case so they could engage in mediation. In 2023, the parties entered into a Memorandum of

Understanding ("MOU") that showed great promise for resolving the myriad challenges facing

the ecological and economic future of the Columbia River Basin. As a result of that MOU, the

Court stayed this litigation through December 2028. In June 2025, this budding consensus

collapsed as the Federal Defendants withdrew from the MOU. Thus, the Court lifted the stay.

Plaintiffs filed the pending Motions for Preliminary Injunction, requesting relief

beginning on March 1, 2026, and remaining in place until further order of the Court. *See*

ECF 2530-2. In order to reduce alleged irreparable harm to the listed salmonids, Plaintiffs ask

that the Court require Federal Defendants to do the following:

> (1) increase spill to the maximum level that meets but does not
> exceed state water quality standards at the federal dams on the four
> lower Columbia and four lower Snake Rivers for the spring spill
> season;
>
> (2) restore summer spill at all eight of these projects to the levels
> set in prior Biological Opinions ("BiOps") for the entire summer
> spill season;
>
> (3) provide continuous 24-hour spill from during the fall and
> winter spill seasons at all eight projects through the operation of at
> least one spillway weir or other surface passage route;
>
> (4) operate the reservoirs above the four lower Snake River dams
> at their minimum operating pool ("MOP") elevations with a one-
> foot operating range from March 1 through August 31;
>
> (5) operate the reservoirs above three of the four mid-Columbia
> (Bonneville, the Dalles, and McNary) at their MOP
> elevations with a 1.5-foot operating range from March 1 through
> August 31;

(6) operate the reservoir above the John Day dam at its minimum irrigation pool ("MIP") elevation with a 1.5 foot operating range from March 1 through June 15 and MIP plus one foot with a 1.5 foot operating range from June 16 through August 31, beginning in 2026, and develop and submit to the Court within one year of entry of an order for an implementation plan to operate the John Day reservoir at its MOP elevation with a 1.5-foot operating range from March 1 through August 31; and,

(7) implement emergency conservation measures for several deeply imperiled populations.

ECF 2526 at 9-10.

## DISCUSSION

### A. The Court has the Jurisdiction and Authority to Enter an Injunction

The Federal Defendants argue that the Court lacks jurisdiction to rule on Plaintiffs' motions, for the reasons argued in the Federal Defendants' separate motion to dismiss. ECF 2567. As the Court will explain in a separate and forthcoming Opinion and Order resolving that motion to dismiss, the Court rejects the arguments made by the Federal Defendants and concludes that this Court has subject matter jurisdiction over this case.

Additionally, the Federal Defendants argue that "Plaintiffs' Injunction oversteps traditional bounds of equity in multiple and unjustified ways" because the relief requested is "systemic." ECF 2569 at 30-31. The Federal Defendants further assert that the Supreme Court's recent ruling in *Trump v. CASA Inc.*, newly limits the Court's equitable powers to grant injunctive relief to that which "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." 606 U.S. 831, 841 (2025) (cleaned up); ECF 2569 at 30.

The Court disagrees with the Federal Defendants' characterization of *CASA*. The Supreme Court in *CASA* did not fundamentally alter the boundaries of a district court's equitable powers. Rather, in considering a district court's ability to issue universal injunctions, the

Supreme Court clarified that a district court, acting in equity, may award up to complete relief between the parties, but no more. 606 U.S. at 851-54. The Court does not today enter a universal or nationwide injunction, nor has it been asked to do so.

Further, the Court is not granting the full relief requested by Plaintiffs. The Court declines to impose many of Plaintiffs' requests challenged by the Federal Defendants as outside of this Court's equitable authority to grant. But it is undisputed that this Court previously has entered injunctions that "modif[y] CRS operations," as Defendants acknowledge. ECF 2569 at 30; *see also NMFS VII*, 422 F.3d at 797-99 (affirming Judge Redden's preliminary injunction requiring spill); *NMFS IX*, 886 F.3d at 817-824 (affirming the undersigned judge's preliminary injunction requiring spill and PIT tag monitoring). The injunction granted by the Court here is not fundamentally different than those that have come before. The Court grants relief only to the parties. To the extent that Plaintiff's Injunction requires tailoring, the Court does that below.

## B. The *Winter* Factors

### 1. Plaintiffs are Likely to Succeed on the Merits[7]

#### a. Legal Standards for Plaintiff's Claims

Congress passed the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b). The ESA contains a broad and ambitious definition for the term "conservation," including "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no

---

[7] The Court makes this determination on a truncated preliminary injunction record, with a shortened briefing and evidentiary record. The Court makes this determination without prejudice to fully consider all arguments and evidence when evaluating Plaintiffs' claim on the merits.

longer necessary." *Id.* § 1532(3). The law imposes many requirements on federal agencies, including a requirement that agencies ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of such species' habitat." *Id.* § 1536(a)(2).

In order to achieve this requirement, any federal agency intending to carry out an action that may affect a listed species or their critical habitat must first consult with either NMFS or the Fish and Wildlife Service ("FWS"), depending on the species. *Id.* §§ 1536(a)-(c); 50 C.F.R. § 402.01. In this case, the relevant service is NMFS. After the consultation is initiated, NMFS must prepare a biological opinion that determines whether the proposed action is likely to "jeopardize the continued existence" of a listed species or result in the destruction or adverse modification of a critical habitat. 16 U.S.C. § 1531(b)-(c).

An action jeopardizes the continued existence of a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In making a jeopardy determination, NMFS must employ "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). If jeopardy is likely, NMFS must also provide "reasonable and prudent" alternatives to the action that would avoid jeopardy. *Id.* §§ 1536(b)-(c). As explained by the Federal Defendants, "[t]o prepare its BiOp, NMFS evaluates the current status of a species and critical habitat, the environmental baseline, and the effects of the action and cumulative effects on the listed species and critical habitat in the action area." ECF 2569 at 19 (citing 50 C.F.R. § 402.14(g)(2)-(3)).

ESA claims are reviewed under the well-established standards of the Administrative Procedure Act ("APA"). Under those standards, an agency action must be upheld unless it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A). "[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). "[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (cleaned up); *see also Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1187 (9th Cir. 2019) ("An agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43)). *Post-hoc* rationalizations cannot justify an agency's actions. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The Supreme Court has often observed that the reasoned decisionmaking requirement includes a duty to explain any "departure from prior norms." *Atchison, T. & S. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

### b. Discussion

Here, Plaintiffs are likely to succeed on their underlying challenge to the 2020 BiOp, and thus are likely to succeed on their challenge to the 2020 ROD that relies heavily on that 2020

BiOp. Plaintiffs are likely to succeed on their arguments that the BiOp, and thus the ROD, fails

for at least four reasons. First, the BiOp's jeopardy analysis improperly considered the

environmental baseline, resulting in a flawed analytic approach that is both impermissibly

comparative and unacceptably limited in its evaluation of the Proposed Action's anticipated

impacts. Second, the BiOp's jeopardy analysis impermissibly relies on uncertain benefits. Third,

the BiOp does not properly account for climate change in its jeopardy analysis. Finally, the BiOp

fails properly to engage in a recovery analysis as required by the ESA.

### i.   Preliminary Arguments

The Federal Defendants argue that a flawed BiOp does not doom the ROD because the

Action Agencies conducted independent analyses of the action's impact on listed species, citing

ACE000068214-23. The cited pages, however, reflect *BPA's* statement of its final agency

finding.[8] The Corps' final agency finding is set forth in Section 6.1 and consists of a single

paragraph, which summarizes the Corps' NEPA analysis and adoption of the Preferred

Alternative in the FEIS and then states: "Further, the Corps has determined, and the NMFS and

USFWS Biological Opinions demonstrate, based on the best available commercial and scientific

information that the Corps' implementation of the Selected Alternative will not jeopardize listed

species or adversely modify or destroy critical habitat." ACE000068212; *see also*

ACE000068160 (Corps' Decision Summary, summarizing its adoption of the FEIS and stating

"Consultation on the Selected Alternative has been completed per Section 7(a)(2) of the

Endangered Species Act (ESA) and incorporated into the Selected Alternative. The Corps has

determined, and the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife

---

[8] In addition to the cited pages being BPA's agency finding, they also contain significant discussion and quotations from the 2020 BiOp, and do not represent an "independent" analysis.

Service (USFWS) CRS Biological Opinions demonstrate, based on the best available commercial and scientific information, that the Corps' implementation of the Selected Alternative will not jeopardize listed species or adversely modify or destroy critical habitat.").

Reclamation's final agency finding, in Article 6.2, is even shorter and provides no specific Section 7 statement, focusing instead solely on NEPA and Reclamation's adoption of the Preferred Alternative. ACE000068213. Reclamation, however, includes at the beginning of the ROD, in its Decision Summary, that "[t]he NMFS and and USFWS CRS Biological Opinions demonstrate, based on the best available commercial and scientific information, that Reclamation's implementation of the Selected Alternative will not jeopardize listed species or adversely modify or destroy critical habitat." ACE000068161.

Whether looking at the Action Agencies' Decision Summary or Final Agency Findings, the statements do not contain any independent analysis. And even considering the entire ROD as a statement of agency findings, they are not independent of the 2020 BiOp.

The ROD expressly incorporates the 2020 BiOp. ACE000068160. The ROD largely cites the 2020 FEIS, because it primarily is a NEPA document that also serves as a Section 7 consultation ROD. There is substantial overlap between the 2020 FEIS and 2020 BiOp in the relevant sections. Additionally, with respect to the ROD's sections relating to the ESA, the statements are brief, conclusory, and either expressly rely on the 2020 BiOp or do not represent independent analysis from the 2020 BiOp. Thus, the Court rejects the Federal Defendants' argument that the Action Agencies' findings in the ROD represent independent analyses that immunize the Action Agencies if Plaintiffs are found likely to succeed on their claim that NMFS violated the APA in issuing the 2020 BiOp.

The Federal Defendants also argue that Plaintiffs cannot possibly succeed on the merits because the Court has not *yet* invalidated the 2020 BiOp, and thus there is no basis to argue that the Corps or Reclamation was arbitrary or capricious in relying on NMFS's 2020 BiOp when adopting it in the 2020 ROD. The Federal Defendant's reasoning here is unclear. A court will never have invalidated a BiOp at the time it is adopted by an action agency. A preliminary injunction in the context of ESA consultation generally will require a court to evaluate whether the plaintiff is likely to succeed on the merits of its challenge to the underlying BiOp, and thus to the action agency's conduct in adopting that BiOp.

Further, the Federal Defendants' argument is particularly specious in *this* case, where the Action Agencies have the benefit of nearly 30 years of litigation over the FCRPS, and 25 years of litigating this specific case. In the direct history of this case, this Court, including with affirmance by the Ninth Circuit, repeatedly has rejected BiOps by NMFS with similar deficiencies as Plaintiffs allege in the pending complaint. *See, e.g.*, *NMFS III*, 524 F.3d at 928-33 (affirming district court rejection of 2004 BiOp for deficiencies including an improperly comparative jeopardy analysis that considered the FRCPS in a "vacuum," failed to consider the severely degraded baseline condition, and attempted a "sleight of hand" to "manipulat[e] the variables" to avoid acknowledging that the operations of the dams are discretionary and must be included in the jeopardy analysis, and failing to properly to analyze recovery); *NMFS V*, 184 F. Supp. 3d at 897-901 (discussing failing to analyze recovery in 2014 BiOp); *id.* at 901-14 (actions with uncertain benefits); *id.* at 914-23 (climate change). Even if some notice were required to Action Agencies of the potential arbitrary and capricious nature of the specific consultation, which the Court does not agree is required, the Action Agencies were on notice of the potential

arbitrary and capricious nature of adopting NMFS's BiOps, which were found to violate the ESA

the last *four times* they were challenged *in this case*.

### ii. Jeopardy Analysis—Environmental Baseline

Plaintiffs are likely to succeed in their contention that in the 2020 BiOp, NMFS's

approach to the required jeopardy analysis was improperly evaluated the environmental baseline,

resulting in an impermissible comparative analysis, similar to the one from the 2004 BiOp that

was rejected by this Court and the Ninth Circuit. The Federal Defendants argue that this analysis

is proper under the revised regulations promulgated in 2019. The Court rejects this argument.

In 2019, NMFS and USFWS revised some of the regulations under the ESA, including

the definition of the term "environmental baseline." Endangered and Threatened Wildlife and

Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44976, 45016 (Aug. 27, 2019)

("2019 Am.").[9] The definition established at the time was:

> Environmental baseline refers to the condition of the listed species
> or its designated critical habitat in the action area, without the
> consequences to the listed species or designated critical habitat
> caused by the proposed action. The environmental baseline
> includes the past and present impacts of all Federal, State, or
> private actions and other human activities in the action area, the
> anticipated impacts of all proposed Federal projects in the action
> area that have already undergone formal or early section 7
> consultation, and the impact of State or private actions which are
> contemporaneous with the consultation in process. The
> consequences to listed species or designated critical habitat from
> ongoing agency activities or existing agency facilities that are not
> within the agency's discretion to modify are part of the
> environmental baseline.

*Id.* A consultation, however, must still analyze "the effects of all of the discretionary

---

[9] This term was redefined under the Biden administration in 2024, *see* 89 Fed.
Reg. 24268, and the second Trump administration has proposed new rules in November 2025
setting a definition of environmental baseline similar to its 2019 definition, *see* 90 Fed.
Reg. 52600.

PAGE 19 – AMENDED OPINION AND ORDER

operations" of a proposed action, "even those operations that the Federal agency proposes to keep the same." *Id.* at 44978.

Plaintiffs argue that the Federal Defendants include general operations of the FCRPS in the environmental baseline and have considered only the effect of the *changes* in their operational plan rather than the effects of the entire Proposed Action. By way of example, if normal operation of Bonneville Dam kills 1000 fish, and the proposed 2020 operation includes modifications that would result in only killing 900 fish, then the Federal Defendants' analysis is that the proposed action saves 100 fish, thereby benefitting the species and not causing jeopardy, instead of that the action kills 900 fish. If the entire fish population is 1100, then killing 900 might jeopardize the species, regardless of whether dam operations improved the final number of fish by 100.

The Federal Defendants object generally to the proposition that they improperly assessed the environmental baseline or the effects of FCRPS operations. They argue that Plaintiffs must identify specific discretionary hydropower operations that were inappropriately included in the baseline, as opposed to NMFS having to identify the nondiscretionary elements it included in the assessment. The Federal Defendants also argue the 2020 BiOp is dissimilar to the 2004 BiOp because that analysis used a "reference" hydropower operation in its baseline and the 2020 BiOp does not.

The jeopardy analysis in the 2020 BiOp is a "novel" approach that is "completely at odds with NMFS's prior scientific approaches, [thus] it merits little deference." *See NMFS III*, 524 F.3d at 928. Plaintiffs are likely to succeed in their argument that the 2020 BiOp suffers from the same fatal defects as the 2004 BiOp. The 2004 BiOp used the "reference" dam operation in its environment baseline "to avoid 'trying to precisely determine the extent of the Action Agencies'

discretionary operation.'" *Id.* The 2020 BiOp does not use a "reference" operation to avoid trying

to precisely determine the extent of discretionary versus nondiscretionary operations—it just

ignores making that determination. Instead, NMFS repeatedly offers a boilerplate statement that

"[t]he consequences to listed species . . . from ongoing agency activities or existing agency

facilities that are not within the agency's discretion to modify are part of the environmental

baseline (50 CFR 402.02)." *See* 2020 BiOp at 125, 320, 452, 556, 663-64, 778, 890, 984, 1048,

1116-17, 1185, 1245-46, 1297, 1342. But simply issuing that statement without identifying what

activities are and are not within the agency's discretion provides no assurance that NMFS

actually distinguished between the two and does not provide a discernable path for the Court to

review whether NMFS made accurate determinations. What NMFS did was focus on the effects

of the *changes* in the proposed operations, thereby silently including existing operations as part

of the baseline. *See* ECF 2526 at 24-26 (identifying examples in the 2020 BiOp). The bottom line

is that "NMFS may not avoid determining the limits of the action agencies' discretion . . . thereby

excluding them from the requisite ESA jeopardy analysis," *NMFS III*, 524 F.3d at 929, whether

by "using a reference operation to sweep" operations into the baseline, *id.*, or silently sweeping

operations into the baseline. *See id.* at 928 (explaining that an agency may not "ignore potential

jeopardy risks by labeling parts of an action nondiscretionary").

 The 2020 BiOp's inclusion of dam operations in the baseline is improper under

*NMFS III*. The 2019 definition of environmental baseline that distinguishes between

discretionary and nondiscretionary conduct does nothing to change the key holding of *NMFS III*.

That regulation is not a change from the Ninth Circuit's decision. The Ninth Circuit amended its

decision after the Supreme Court issued *National Ass'n of Home Builders v. Defenders of*

*Wildlife*, 551 U.S. 644 (2007), which granted *Chevron* deference to the ESA regulation stating

that consultation applies to discretionary federal involvement or control.[10] *See NMFS III*, 524

F.3d at 927. The Ninth Circuit then considered whether FCRPS dam operations were

discretionary, and unequivocally concluded that they were. *See id.* at 928-29. The court stated

that the *existence* of the dams was part of the environmental baseline, but the *operation* of the

dams was discretionary. *Id.* at 930-31.

Nor may the Federal Defendants simply compare the proposed operation to a baseline

that includes FCRPS operations. A similar comparison approach was rejected by the Ninth

Circuit in reviewing the 2004 BiOp:

> NMFS argues that, under this definition, it may satisfy the ESA by
> comparing the effects of proposed FCRPS operations on listed
> species to the risk posed by baseline conditions. Only if those
> effects are "appreciably" worse than baseline conditions must a
> full jeopardy analysis be made. Under this approach, a listed
> species could be gradually destroyed, so long as each step on the
> path to destruction is sufficiently modest. This type of slow slide
> into oblivion is one of the very ills the ESA seeks to prevent.

*NMFS III*, 524 F.3d at 930. This conclusion was not altered by the amended environmental

baseline definition.

Plaintiffs are likely to succeed in their argument that at its core, the 2020 BiOp's jeopardy

analysis reverted back to the 2004 BiOp's attempt to "manipulat[e] the variables to achieve a 'no

jeopardy' finding." *Id.* at 933.

### iii. Jeopardy Analysis—Uncertain Benefits

Plaintiffs also challenge the 2020 BiOp as improperly basing its "no jeopardy" finding in

part by relying on benefits from uncertain and ill-defined future mitigation actions. Courts in this

case repeatedly have found lacking NMFS's reliance on future benefits that were not sufficiently

---

[10] These opinions were issued before *Loper Bright Enters. v. Raimondo*, 603 U.S. 369
(2024).

certain to occur. *See, e.g.*, *NMFS III*, 524 F.3d at 935-36; *NMFS IV*, 839 F. Supp. 2d at 1125;

*NMFS V*, 184 F. Supp. 3d at 914.

In 2019, the EPA also amended its regulations regarding its interpretation of what the

ESA required in terms of mitigating actions. The EPA explained:

> The regulatory change to § 402.14(g)(8) is to make it clear that,
> just like aspects of the proposed action with adverse effects, the
> Services are not required to obtain binding plans or other such
> documentation prior to being able to lawfully evaluate the effects
> of an action as proposed, including any measures included in the
> proposed action that would avoid, minimize, or offset adverse
> effects. However, the Services are also moving forward with
> revisions to § 402.14(c)(1). Those revisions require a Federal
> agency seeking to initiate formal consultation to provide a
> description of the proposed action, including any measures
> intended to avoid, minimize, or offset effects of the proposed
> action. If the description of proposed measures fails to include the
> level of detail necessary for the Services to understand the action
> and evaluate its effects to listed species or critical habitat, then the
> Services will be unable to take into account those effects when
> developing our biological opinion. To avoid confusion and
> reinforce that an appropriate level of specificity regarding the
> description of measures included in the proposed action may be
> necessary to provide sufficient detail to assess the effects of the
> action on listed species and critical habitat, the Services eliminated
> the reference to "specific" plans in our final revisions to
> § 402.14(g)(8). The Services do not intend to hold these actions to
> either a higher or lower standard than any other type of action or
> measure proposed by a Federal agency. Any type of action
> proposed by a Federal agency receives a presumption that it will
> occur, but it must also be described in sufficient detail that the
> Services can both understand the action and evaluate its adverse
> effects and beneficial effects.

2019 Am., 84 Fed. Reg. at 45003.[11]

---

[11] The revised § 402.14(g)(8) provided: "In formulating its biological opinion, any
reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will
use the best scientific and commercial data available and will give appropriate consideration to
any beneficial actions as proposed or taken by the Federal agency or applicant, including any
actions taken prior to the initiation of consultation. Measures included in the proposed action or a
reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an
action are considered like other portions of the action and do not require any additional

The analysis in the 2020 BiOp for estuary and tributary habitat improvement projects likely fails even under the 2019 revised regulations. For estuary habitat improvement projects, the 2020 BiOp describes the intent to "prioritize habitat improvement sites by identifying regions with the greatest potential to benefit yearling and subyearling life-history types of ESA-listed salmon and steelhead" and provides a list of example projects. 2020 BiOp at 74. It then establishes a "5-year rolling review" to "evaluate the acreage restored to date and projects available for the next 5-year period." *Id.*

Under the 2019 amended regulations, the burden was on the Action Agencies to provide NMFS with sufficient detail of proposed mitigating actions (such as estuary and tributary habitat improvement), including location; specific components of the mitigating action and how it will

_____

demonstration of binding plans."

    The revised § 402.14(c)(1) provided:

> A written request to initiate formal consultation shall be submitted to the Director and shall include:
>
> (i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:
>
> > (A) The purpose of the action;
> >
> > (B) The duration and timing of the action;
> >
> > (C) The location of the action;
> >
> > (D) The specific components of the action and how they will be carried out;
> >
> > (E) Maps, drawings, blueprints, or similar schematics of the action; and
> >
> > (F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

be carried out; maps, drawings, or similar schematics; and other similar documents describing the scope of the proposal. The revised regulations ensured that there need not be "binding plans," but the projects were still required to be described with specificity. This is so that NMFS could then "assess the effects of the action on listed species and critical habitat." 50 C.F.R. § 402.14 (g)(8), (c)(1)(i).

The 2020 BiOp provides an insufficient analysis with respect to estuary habitat. There is no description of specific projects nor any assessment of the benefits to the species or habitat of any detailed project. Plaintiffs are likely to succeed on their claim that NMFS's reliance on certain benefits from estuary habitat projects that were not reasonably certain to occur was arbitrary and capricious.

For tributary habitat improvement, the 2020 BiOp incorporated by reference the Biological Assessment ("BA") submitted by the Action Agencies. The Federal Defendants cite the pages of the BA that provided "proposed habitat metrics" that the Action Agencies hope to achieve through tributary habitat restoration. ACE00105608-14. These metrics included the amount of flow protected (by cfs); flow enhanced (by acre-feet); number of entrainment screenings; habitat access (in miles); stream complexity (in miles); and riparian habitat improvement (in miles). ACE001059609. These are end goals. They are not *projects* that reach those goals. In other words, it is great to state that the Action Agencies intend to improve 156 acres of riparian habitat in the Lower Snake River and enhance 9,680 acre-feet of flow on the Upper Salmon, but how do they intend to achieve that goal? The 2019 revised regulations included a requirement that the Action Agencies detail the "specific components of the action and how they will be carried out," not simply the end result. 50 C.F.R. § 402.14(c)(1)(i)(D)

The BA contained a similar plan for monitoring, evaluating, and reporting tributary habitat projects as estuary projects—"a series of prospective 5-year implementation plans" with annual reporting. *See* ACE001059611. Again, this discussion did not include any project or how that project would be carried out. Plaintiffs are likely to succeed in their argument that NMFS simply accepting that these end achievements will be realized and calculating the benefit to the species of all of these being accomplished is contrary to the ESA. As the Court previously explained, "NOAA Fisheries places all of the risk of that uncertainty on the species. This is precisely what the ESA does not permit." *NMFS V*, 184 F. Supp. 3d at 906; *see also Tenn. Valley Auth. v. Hill* ("*TVA*"), 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"); *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir.1987) (noting that the "benefit of the doubt" must be given to the endangered species and that the risk of failure of mitigation must fall on the project), *abrogation on other grounds recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). Additionally, given the history in this case of habitat restoration projects falling significantly behind in expected completion, NMFS had even more reason to be cautious in relying on the Action Agencies' assurances that all projects will be completed and all benefits will be achieved within the BiOp time frame.

### iv. Jeopardy Analysis—Climate Change

Plaintiffs contend that NMFS essentially gave lip service to climate change, noting that it exists and agreeing that it will cause significant increase in mortality to the life cycle of salmonids, without taking that increased mortality into consideration. The Federal Defendants respond that NMFS only need consider harms caused by the Proposed Action, and harm by climate change is not harm caused by the Proposed Action.

PAGE 26 – AMENDED OPINION AND ORDER

The Federal Defendants are missing the crux of Plaintiffs' argument. Plaintiffs contend

that the *Proposed Action* is causing the harm. Plaintiffs point to the Federal Defendants' own

modeling showing that the harm caused by the Proposed Action is significantly greater when

climate change is considered. It is not the separate mortality from, for example, salmonid death

in warming oceans that is being added, but the increased mortality and potential jeopardy to the

species caused by the FCRPS as climate change effects are considered.[12] Yet the 2020 BiOp

discounts that increased mortality as not caused by the Proposed Action. NMFS, however, is

required to evaluate "what jeopardy might result from the agency's proposed actions *in the*

*present and future human and natural contexts.*" *NMFS III*, 524 F.3d at 930 ((emphasis added in

*NMFS III*), quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426

F.3d 1082, 1093 (9th Cir. 2005)). In other words, if FCRPS operations kills more salmonids

because they are weakened by the effects of climate change, or if the amount of salmonids killed

by FCRPS operations is more of a threat to the sustainability of the species because they are

dying in greater numbers due to climate change, that is the reality in which NMFS must assess

the effects of the Proposed Action. Plaintiffs are likely to succeed in their argument that NMFS

failed properly to assess the effects of the Proposed Action with climate change. *See Willamette*

*Riverkeeper v. Nat'l Marine Fisheries Serv.*, 763 F. Supp. 3d 1203, 1237-38 (D. Or. 2025)

(agreeing with the plaintiffs that NMFS failed properly to account for climate change and

"evaluate the consequences" of the proposed action along with "projected worsening

---

[12] *See, e.g.*, NMFS00291878 (discussing that freshwater environments demonstrate "highest vulnerabilities to climate change" as well as marine environments); NMFS00291865 (same); ACE000821951 (including in a study of climate vulnerability for Pacific salmon and steelhead a chart of "highly vulnerable life stages" to climate change by species population, with several of the listed species in this case included as highly vulnerable in the "juvenile freshwater stage" and "adult freshwater stage").

conditions"; NMFS needed to assess the project "on top of climate change effects"); *see also NMFS V*, 184 F. Supp. 3d at 917 ("The Court finds that NOAA Fisheries' analysis and conclusion that the effects of climate change have been adequately assessed in the 2014 BiOp is not 'complete, reasoned, [or] adequately explained.'" (quoting *Nw. Coal. for Alts. to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1052 n. 7 (9th Cir. 2008)). "NOAA Fisheries' analysis does not apply the best available science, overlooks important aspects of the problem, and fails properly to analyze the effects of climate change, including: its additive harm, how it may reduce the effectiveness of the [RPA] actions, particularly habitat actions that are not expected to achieve full benefits for 'decades,' and how it increases the chances of [a catastrophic] event." *Id.* at 874.

### v. Recovery Analysis

A valid BiOp must "analyze effects on recovery as well as effects on survival." *NMFS III*, 524 F.3d at 932. An "agency may not resolve this difficulty by ignoring recovery needs and focusing entirely on survival." *Id.* at 932 n.11. "NMFS must conduct a full analysis of those risks and their impacts on the listed species' continued existence." *Id.* at 933. It is particularly important in this case, as the Ninth Circuit emphasized when NMFS made a "no jeopardy" finding in 2004—"the highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis." *Id.*

The Federal Defendants argue that recovery adequately was assessed by NMFS. NMFS first measured current key viable salmonid parameters ("VSP") of abundance, productivity, spatial structure, and diversity. It then performed COMPASS and life-cycle modeling to quantitatively estimate population abundance and productivity under the Proposed Action. NMFS finally considered that data along with other information to evaluate the Proposed Action as a whole and whether it reduced appreciably the likelihood of survival and recovery.

NMFS's final analysis primarily focused on survival. Although survival and recovery are "intertwined needs," they both must be considered. *Id.* at 932. Recovery may be out of reach even while a species clings to survival. *Id.* (rejecting NMFS's contention that it need only consider survival "[b]ecause a species can often cling to survival even when recovery is far out of reach"). NMFS's statements regarding recovery are conclusory, and based on positive VSP survival metrics. *See, e.g.*, ACE001056508 (discussing Salmon River spring/summer Chinook and concluding that "in many ways the proposed action is expected to improve the functioning of VSP parameters and thus positively contribute to the survival and recovery of the species"); ACE1056646 (same, for Snake River Basin Steelhead); ACE001056858 (same, for Snake River fall Chinook Salmon); ACE1056973 (same, for Upper Columbia River spring Chinook Salmon).

The Court previously rejected that recovery can be based on positive VSPs, without regard to overall abundance. *See NMFS V*, 184 F. Supp. 3d at 888 (rejecting NMFS's standard because the VSP "metrics considered by NOAA Fisheries [did] not take into account whether populations remaining at significantly low abundance numbers, even though the populations may be growing incrementally, appreciably diminish the likelihood of recovery"); *see also id.* ("The three [VSP] metrics indicate a trend in growth from wherever an existing population may be, but provide no rational connection from that existing population or the incrementally larger population anticipated after the RPA actions to ensuring no decreased risk of reaching recovery. A population that is dangerously low in abundance could be increasing, but by only a very few fish per year for the BiOp period, resulting in an abundance level at the end of the BiOp period that remains dangerously low despite the increase in population."). This type of analysis is "untethered to actual population levels and is not tied to any rough understanding of what

constitutes recovery so that NOAA Fisheries can reasonably determine that the RPA actions do not appreciably diminish the chances of reaching recovery." *Id.* at 898.

NMFS's focus on the positive VSP metrics is a focus on an increase in population. "An increasing population, however, does not necessarily equate to a 'no jeopardy' finding." *Id.* at 888. Plaintiffs are likely to succeed on their assertion that NMFS did not properly evaluate recovery.

### 2. Irreparable Harm

Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. The Proposed Action is largely a continuation of previous FCRPS operations found to be in violation of the ESA. *See* Bowles Decl. ¶¶ 50-56, ECF 2531. Given the current record, it is reasonable to conclude that the listed species' prognosis is as bad as—or worse than—it has ever been. As discussed at length by Plaintiffs and their aligned *amici* many of the populations have reached the quasi-extinction threshold (meaning that the population has 50 or fewer natural-origin spawners for four consecutive years, Hesse Decl. ¶ 29, ECF 2541). Others are on trend to reach this threshold within a few years. This places the species at an alarming risk for extirpation. For the reasons discussed by Plaintiffs and their aligned *amici*, the Court rejects Defendants' arguments that a few intermittent strong returns means the species are improving or on the road to recovery. *See, e.g.*, ECF 2623 at 25-27; 2630 at 3-5; *see, also, e.g.*, ACE001056502 (evaluating Snake River spring/rummer Chinook salmon and noting that "[t]he most recent status review (NMFS 2016b) indicated that most populations (19 of 22 populations for which estimates were available) increased in abundance, compared to the previous review, but that all but one population remained at high overall risk" and that "[m]ore recent adult returns (2014 to 2019) have been substantially below average for most, but not all, populations/MPGs"); NMFS, *Rebuilding Interior Columbia Basin Salmon and Steelhead*, at 22 (Sept. 30, 2022) (ECF 2529-7)

("*Rebuilding Report*") (stating that "in the near-term, progress away from a quantifiably large risk of extinction for these stocks is paramount"). When returns and abundance levels are at historic lows, a slight increase for one or two years says little about a species survival or recovery.

The Court finds persuasive the evidence submitted by Plaintiffs and their aligned *amici* that FCRPS operations are harmful to the species. The 2020 BiOp itself acknowledges that the FCRPS operations contemplated in the Proposed Action will kill a substantial amount of the listed fish. 2020 BiOp at 1377-1412 (Incidental Take Statement). For some populations, the rate of slaughter is likely to be so high as to result in generational decline. Bowles Decl. ¶¶ 51-53. Thus, as the Court has held before, the Proposed Action is likely to "strongly contribute to the endangerment of the listed species and irreparable injury will occur if changes are not made." *NMFS VI*, 2005 WL 1398223, at *4; *see also NMFS VIII*, 2017 WL 1829588 at *5.

The Federal Defendants assert that FCRPS operations have changed, relying on recent increases in spill. But the 2026 Draft Fish Operations Plan ("FOP") reduces spill. *See, e.g.*, Bowles Reply Decl. Ex. 1, ECF 2624 at 55 (Fish Passage Center Memorandum, Review of draft Fish Operations Plan document, January 16, 2026) (explaining that "[s]pring and summer spill operations outlined in the Draft FOP are inconsistent with the 2020 NMFS BiOp and, in fact, are reductions from the 2020 NMFS BiOp"). Thus, absent a spill injunction order, the recent operational changes and the concomitant benefits to fish will disappear. *See, e.g.*, *id.* (describing that "Reduced spill under the Draft FOP will result in increased powerhouse passage (i.e., PITPH) and increased bypass encounters, which are associated with slower fish travel times, lower juvenile survivals, and lower smolt-to-adult returns (SARs)"). Moreover, even with increased spill, the FCRPS is still the number one contributor to fish mortality in the Interior

Columbia Basin. *See Rebuilding Report*, at 12 T.3 (ranking limiting factors to the listed salmonids, with the hydrosystem well in the lead).

The Federal Defendants also argue that Plaintiffs cannot request equitable relief because many factors harm salmonids, some Plaintiffs harvest salmon, and Oregon manages fisheries that take the listed species. The loss of listed species from other factors, however, is much less than the loss from the FCRPS operations. *See Rebuilding Report*, at 12. T.3. And the mere fact that Plaintiffs are challenging the biggest threat to the species while not challenging other threats does not doom their claim. *See NMFS IX*, 886 F.3d at 819 (stating that "a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury'" (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("We have never made a rule that a plaintiff must challenge all related harms to maintain an ability to challenge the harm that it views as the most serious.").

The Federal Defendants further argue that the Court must find that the species will go extinct during the pendency of this lawsuit in order to grant preliminary relief. The Ninth Circuit, however, has expressly rejected this argument—the Court does "not need to find an extinction-level threat to the listed species in the short term." *NMFS IX*, 886 F.3d at 821. Nonetheless, the Court finds that the threats to the listed species are dire and immediate.

The Federal Defendants contend that Plaintiffs, as individuals, will not suffer irreparable harm and cannot claim generalized harm to the species. The Court rejected this argument in issuing the preliminary injunction in 2017, finding that Plaintiffs "ha[d] adequately shown how harm to the listed species will affect [Plaintiffs]." *NMFS VIII*, 2017 WL 1829588, at *5 n.7. The Ninth Circuit agreed, concluding that "plaintiffs have shown irreparable harm to their own

interests stemming from the irreparable harm to the listed species. For example, in support of its motion for the injunction, NWF submitted a declaration from Kevin Lewis that described his recreational and aesthetic pursuits on Idaho's rivers that depend on the health of listed salmonid populations." *NMFS IX*, 886 F.3d at 822.

Plaintiffs submitted here the same type of evidence accepted by the Ninth Circuit in *NMFS IX*. For example, Plaintiffs submitted the Declaration of Liz Hamilton, describing her recreational and aesthetic pursuits on the Columbia River that depend on the health of the listed salmonid populations. ECF 2528. Ms. Hamilton described her long history of fishing on the Columbia River, and noted her ongoing harm from reduced salmon, including with bringing her grandchildren to fish and being required to take multiple trips before they got their first catch due to reduced salmon in the river, and needing to stay longer on fishing trips (with the associated extra cost) when salmon abundance is low. She "connected her injuries to the anticipated irreparable injuries to salmonids from dam operations," *NMFS IX*, 886 F.3d at 822, by describing how operations are anticipated to reduce salmon populations and how fewer salmon make it difficult to fish.

Plaintiffs also submitted a declaration from Joseph Bogaard. ECF 2527. He explains that his family regularly boats, camps, and swims in and along the rivers within the Columbia Basin. He describes "the immense beauty and power of seeing adult salmon and steelhead returning from the ocean in search of their natal spawning gravels." Bogaard Decl. ¶ 8. He explains how he has watched tribal fishing and listened to stories about salmon from local residents. He describes how the loss of the salmonids in the Columbia Basin affect his enjoyment of the area and that these fish represent a "special and irreplaceable part of the fabric of the areas where I recreate."

*Id.* ¶ 9. He further notes that he used to fish but has not done so in years because of the decline in salmonid populations.

Oregon, as a sovereign, also is personally damaged by the potential loss of the listed and endangered species. "Wildlife is the property of the state." ORS 498.002(1). Oregon has a right to protect and defend the wildlife in its borders. Because the Court has found that the species are facing irreparable harm during the pendency of this litigation, Oregon's sovereign interest in the species suffices to show that they have a personal loss for purposes of injunctive relief. The Court rejects the Federal Defendants' argument that Plaintiffs have failed to establish harm to themselves.

Currently, the abundance of salmon and steelhead populations in the Columbia and Snake Rivers make them vulnerable to extinction. Further degradation of that abundance is irreparable harm. Defendants' Proposed Action not only fails to avoid that irreparable harm, but also directly contributes to it. Plaintiffs have met their burden to show irreparable harm.

### 3.  The Balance of the Equities and the Public Interest

In cases under the ESA, these two *Winter* factors are treated differently. "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities[.]" *TVA*, 437 U.S. at 194. In the Ninth Circuit, generally in ESA cases, courts "do[] not consider the balance of equities and the public interest when deciding whether to issue preliminary injunctions under the ESA." *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 593 (9th Cir. 2025); *see also Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) (concluding that because Congress has "strip[ped] courts of at least some of their equitable discretion in determining whether injunctive relief is warranted," "courts do not have discretion to balance the parties' competing interests in ESA cases" (citing *TVA*, 437 U.S. at 185)); "In cases involving

the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *NMFS VII*, 422 F.3d at 793-94 (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994)).

There is an exception, however, when there are competing interests of other endangered species. *San Luis Obispo Coastkeeper*, 161 F.4th at 600 ("[W]e hold that district courts retain their equitable discretion when considering a mandatory preliminary injunction under the ESA that could endanger other listed species. The exception to the traditional test, created in *TVA*, does not apply. The court must balance the equities and consider the public interest as to the other listed species."). Thus, the Court confines its analysis on balance of the equities and public interest to the pending motions' likely impact on endangered species.

As discussed above, Plaintiffs have demonstrated a likelihood of success on the merits. The dire situation for the 14 endangered and threatened populations of salmonids and smelt are well documented. Defendants and some *amici* point to some stronger returns for some populations. For the reasons discussed by Plaintiffs and their aligned *amici*, the Court does not find persuasive the evidence about the intermittent stronger returns for these few populations as support that the listed species are out of danger.

Plaintiffs request short term measures that might stem the slide into extinction. On the other side of the scale, the Federal Defendants have placed concerns about the injunction's impact on bull trout, another endangered species. ECF 2569 at 105-109. Simply weighing the number of species, the lone bull trout to the 14 listed species weighs in favor of protecting the many over the one. More importantly, the relief sought for the salmon and steelhead tracks the best practices articulated in this case's quarter-century-long record. The record about the potential impacts to bull trout is limited, deeply contested, and less well-established. The Court

also can infer from the bull trout's current existence that it has survived past dam operations that are similar to those that Plaintiffs now want the Federal Defendants to implement. Conversely, in the absence of injunctive relief, the Federal Defendants plan an approach to FCRPS operations that the available evidence shows will threaten the continued existence of many salmonid populations in the Columbia and Snake Rivers.

Consideration of another listed species does not require denial of requested relief. *San Luis Obispo Coastkeeper*, 161 F.4th at 601 (clarifying that "our holding does not require a district court to deny relief whenever another species might be affected"). The Court must determine "whether a mandatory preliminary injunction for the protection of one species is appropriate despite the risks to others." *Id.* Considering the potential risk to bull trout, the Court finds that the preliminary injunction here is warranted.

Even were the Court to expand the scope of its analysis on the balancing of the equities and the public interest, it would still find that these factors weigh heavily in favor of preliminary relief for two reasons. First, further harm to the listed species would be catastrophic to the tribes of the Columbia River Basin. The salmon and steelhead of the Columbia River are integral to the cultural, religious, social, and economic life of many of these tribes, "not much less necessary to [their existence] than the atmosphere they breathe[]." *United States v. Winans*, 198 U.S. 371, 381 (1905). The federal government "has charged itself with moral obligations of the highest responsibility and trust" to protect tribal treaty rights. *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). Those obligations extend to rights created by treaties with the Yakama, Umatilla, Warm Springs, and Nez Perce tribes, among others, respecting access to fish stocks in the Columbia River. *See, e.g.*, Treaty with the Yakamas, June 9, 1855, 12 Stat. 951; Treaty with the Tribes of Middle Oregon, June 25, 1855, 12 Stat. 963, 965; Treaty with the Wallawalla,

Cayuse, etc., June 9, 1855, 12 Stat. 945, 947; Treaty with the Nez Perces, June 11, 1855, 12 Stat. 957, 959. Those rights include not just "a fair share of the fish produced by the Columbia River system," *Sohappy v. Smith*, 302 F. Supp. 899, 911 (D. Or. 1969), but inherently also include the protection of listed fish against destruction so that they will be present for harvest. *See United States v. Washington*, 853 F.3d 946, 965 (9th Cir. 2017) (inferring from the treaties a promise that "the number of fish would always be sufficient to provide a 'moderate living' to the Tribes." (quoting *Washington v. Wa. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 686 (1979))).

Upholding the promise of these treaties is a vital public interest, not least because, like other treaties, they form part of the "supreme law of the land." *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876); *see also, e.g.*, *Oglala Sioux Tribe v. United States*, 674 F. Supp. 3d 635, 686 (D.S.D. 2023) (upholding treaty obligations to tribes "generally advances the public interest"); *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1516 (W.D. Wash. 1988) (enforcement of tribal treaty rights "is an important public interest"); *United States v. State of Mich.*, 471 F. Supp. 192, 267 (W.D. Mich. 1979) ("it continues to be in the national interest to observe and enforce treaty obligations owed to Indians."). Indeed, nothing less than the honor, reputation, and trust of the nation is at stake in that effort.

Second, Defendants' public interest arguments either lack merit or are outweighed by countervailing interests. The Federal Defendants contend that Plaintiffs' requested injunctive relief would negatively impact treaty-protected migratory birds, and that public health and financial interests support a rejection of preliminary relief. As for the birds, as discussed below, the Court does not grant Plaintiffs' requested non-operational measures with respect to the Caspian terns and double-crested cormorant. Similarly, the financial and logistical concerns that

the Federal Defendants articulate in their brief are moot, because the Court does not grant the non-operational components of the requested injunction regarding dam facilities.

Defendants also raise concerns relating to power system reliability, flood risk, transportation, irrigation, and availability of water supplies and clean drinking water. Many of those concerns appear ameliorated by the Court's imposition of an injunction at Minimum Irrigation Pool ("MIP"), instead of Plaintiffs' requested injunction at Minimum Operating Pool ("MOP"). Additionally, these concerns are belied by the reality of recent CRS operations. Since the stay of litigation, the Northwest Power and Conservation Council ("Council"), the organization responsible for assessing regional power demand and reliability, has found the regional power system to be reliable and anticipates that the system will continue to meet reliability standards for at least three more years. Hirsh Decl. ¶¶ 12-18. Moreover, the routine variances and adjustments that have helped to support that reliability will continue to be available to Federal Defendants under the injunction. So too would the emergency protocols previously used to prevent and mitigate flooding remain available to Federal Defendants. Federal Defendants' own BA suggests that the FCRPS operations at MOP for substantial portions of the year, ACE1067136-37, and thus operating at MIP should not create the problems feared by Defendants. The Court, therefore, would give more weight to the interests of the listed and endangered species even if the Court were able to balance those interests against other economic and social interests.

## C. Conclusion on the Preliminary Injunction

Because they have shown that they are likely to succeed on the merits, that they will suffer irreparable harm in the absence of a preliminary injunction, and that the balance of the equities and public interest weigh in their favor, Plaintiffs have met their burden to show they are

entitled to preliminary injunctive relief. The Court thus grants Plaintiffs' motions for preliminary injunction. The Court turns to the specific relief requested relief, and grants that relief in part.

## D. Tailored Injunctive Relief

Plaintiffs request a myriad of operational and non-operational preliminary relief, arguing that all of this relief is required during the pendency of this litigation to keep the listed species from sliding into extinction. "[I]n the context of the ESA, 'the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute.'" *NMFS VII*, 422 F.3d at 795 (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002)). The Court recognizes the dire situation these species are facing. The Court agrees that doing nothing during the pendency of this litigation would not effectuate the congressional purpose behind the ESA. The "basic purpose of the ESA [is] to protect endangered and threatened species and prevent their further decline." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064 (9th Cir. 1996), *as amended on denial of reh'g* (June 26, 1996) (quoting *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995).

This case has a long history of failed BiOps, Court intervention and monitoring, and Federal Defendants' attempts to "manipulate" variables and engage in "sleight of hand" conduct to avoid making hard decisions and face the consequences of its actions. *See NMFS III*, 524 F.3d at 933. It appears that the 2020 BiOp and 2020 FEIS follow this disappointing history of government avoidance and manipulation instead of sincere efforts at solving the problem and genuinely remediating the harm. And the government has shown with its draft 2026 FOP that it intends to make significant changes to FCRPS operations in the wrong direction. It proposes spill below the level proposed in the 2020 BiOp, changing its position about the benefits of spill and altering how the dams have been operated over the last several years to the detriment of the listed

species. Nonetheless, the Court must craft an injunction that is narrowly tailored to address the harm, that works as a *preliminary* injunction, and that falls within the Court's equitable authority. The Court turns to each of the types of relief requested by Plaintiffs. The Court separately will enter the injunction order, but here discusses what requested relief the Court will grant and why.[13]

### 1. Spill

The Court in the past has ordered spill, which the Ninth Circuit has affirmed. *See NMFS VI, NMVS VII, NMVS VIII,* and *NMFS IX.* The Court continues to find that it has authority to order spill. Spill offers immediate benefit to the listed species and is appropriate for preliminary injunctive relief. The evidence submitted by the Federal Defendants challenging the benefits of spill primarily was created for this litigation and is contrary to the established scientific evidence in the record. The Court gives it little weight.

Plaintiffs ask for spring spill at the same levels that were implemented in 2024 and 2025, except at John Day. *See* Corrected Hesse Decl., ECF 2541 at 41-46 (setting out in Tables 1-4 Plaintiffs' requested spill compared to spill levels previously implemented). For John Day, Plaintiffs request the level of spill that was applied for eight hours at night to be applied for the full 24 hours. The Court accepts this requested spill as reasonable.

For summer spill, Plaintiffs ask for the same level of spill implemented in 2024 and 2025, with the exception of John Day and Ice Harbor. Plaintiffs ask for more spill at these dams. Intervenor-Defendants request lower spill for Ice Harbor and John Day, to match the 2025 FOP. From Mr. Hesse's chart showing where Plaintiffs' spill levels previously have been

---

[13] Unless specifically discussed herein, the Court has considered and rejected objections and suggested revisions raised by Defendants.

implemented, these two spill levels derive from the 2018 FOP, but with alterations. In the 2018

FOP, the spill levels at Ice Harbor and John Day alternated. Plaintiffs take the higher spill level

and seek to continue it 24/7. Thus, these spill levels have not previously been implemented. The

Court accepts this proposed change by Intervenor-Defendants and adopts the 2025 FOP spill

level for Ice Harbor and John Day.

Intervenor-Defendants also request to reduce spill in August, when fewer fish are

migrating, as was done in the 2025 FOP. Although this may be a reasonable request if the benefit

to fish is low and need for water for other uses is high, the Federal Defendants agreed in the

MOU to operate the dams for years maintaining unchanged summer spill levels from June

through July 31st. *See* ECF 2450-1 at 86-87. Those spill levels are identical to the levels being

ordered by the Court. Additionally, previous summer spill orders maintained the same level of

spill through August 31st. *See* ECF 1015 at 21-22. Thus, the Court grants the full summer spill

duration as requested by Plaintiffs, without prejudice to any defendant to seek modification if

problems arise due to spill levels in August.

For fall and winter spill, Plaintiffs request more spill, spill for longer hours, and spill for

more days, in various combination, at the dams. For the reasons articulated by Plaintiffs, *see,*

*e.g.*, Bowles Decl. ¶¶ 79-104, the Court finds that expanding fall and winter spill will provide

immediate benefit to the listed species.

The Court builds into the injunction flexibility for the Action Agencies to adjust spills for

emergency power generation and transportation needs. The Court is unpersuaded by arguments

that spill will create various catastrophic results. Defendants have raised these concerns each

time spill is litigated without them coming to fruition. The majority of the spill has been

implemented over the years without such negative repercussions, and the Court does not

anticipate such calamities will ensue from the current spill order. The Court grants Plaintiffs

requested spill as modified.

### 2. Reservoir Levels

Plaintiffs request specific reservoir forebay levels, primarily at minimum operating pools

("MOP"). Plaintiffs describe that reducing reservoir levels to MOP would result in immediate

benefit to salmonids because it decreases travel time of juveniles. Indeed, NMFS has calculated

that reducing reservoir levels could decrease travel time by 2-18 hours per dam. *See* Declaration

of Daniel ¶ 36 (ECF 2573). Defendants object, arguing that mandatory continuous operations at

MOP will result in serious harm to power generation, transportation, and irrigation. These

arguments are somewhat hollow, given that the Federal Defendants *agreed* in the MOU to

operate the Lower Granite, Little Goose, Lower Monumental, and Ice Harbor dams at MOP for

years. *See* ECF 2450-1 at 89-90. And the Federal Defendants have actually operated the lower

Snake River dams at MOP for years. *See* Bowles Decl. ¶ 117.

Plaintiffs contend that the 2020 BiOp allows higher reservoir levels that are a rollback

from previous BiOps and are detrimental to the listed species. *See* ECF 2530 at 21-22; ECF 2526

at 57-58. Given the seriousness of the harm facing the listed species, ensuring that reservoir

levels are maintained in a manner that prioritizes the species is a reasonable request for

preliminary relief. Defendants, however, argue that the levels requested by Plaintiffs will result

in significant harm to power generation, transportation, and irrigation.

To ensure that reservoir levels do not cause unforeseen negative consequences, the Court

orders reservoir levels at the 2025 operating levels. The Federal Defendants successfully

operated the dams at those levels and thus all parties can be assured of the viability of the

operations for power generation, transportation, and irrigation. Additionally, the Court includes

flexibility for the Action Agencies to deviate from these levels for transportation and power

generation emergencies. These levels are higher than what Plaintiffs request, but lower than what are allowed in the 2020 BiOp. They provide additional protection for the species while minimizing unintended negative consequences. The Court declines at this stage Plaintiffs' request to order the Federal Defendants to study MOP reservoir levels at John Day. That does not preclude the Federal Defendants from doing so, it simply is not required as part of this injunction.

### 3. Infrastructure Repair and Maintenance

Plaintiffs ask the Court to order the Federal Defendants to complete specific dam infrastructure repair and maintenance projects at several of the dams, as well as infrastructure projects aimed at benefitting the Tucannon River spring Chinook. Plaintiffs argue that these projects are vital to reducing the mortality caused by the FCRPS, and that the Federal Defendants have unreasonably delayed implementing the projects to the detriment of the species. Plaintiffs contend that given the dire situation of the species, ordering the Federal Defendants to engage in the most critical projects is essential.

The Court declines to order the requested repair and maintenance projects. Though Plaintiffs make compelling arguments as to the long-term necessity of these projects, this request is more appropriate for final relief rather than preliminary relief. The time horizon on the requested repairs extends far into the future, with benefits likely not reaped until future seasons, possibly even after a final decision on the merits of this case. That sort of distant relief is not calibrated to address the imminent harms for which preliminary injunctions are intended. *See State of Conn. v. Com. of Mass.*, 282 U.S. 660, 674 (1931) (holding that preliminary injunctions "will not be granted against something merely feared as liable to occur at some indefinite time in the future.").

### 4. Remaining Non-Operational Conservation Measures

Plaintiffs ask the Court to order Federal Defendants to conduct a range of additional non-operational conservation measures:

- Avian and piscine predation reduction, including measures to relocate or remove a double-crested cormorant colony nesting on the Astoria-Megler Bridge, Blalock Island Caspian terns and gulls, and non-native piscine species.

- Collection and transportation of steelhead kelt from Snake River tributary weirs and Lower Granite, Little Goods, and Lower Monumental Dams, to the Nez Perce Tribal Hatchery for reconditioning.

- Maximize adult-trap-and-transport operations of Snake River Sockeye by expanding operation of the Lower Granite Dam trap during migration season, targeting 25 to 50 percent of the adult sockeye return for collection, providing adult sockeye holding ponds at the Dworshak Hatchery, and collaborating with the Nez Perce Tribe to develop a Hatchery and Genetic Management Plan.

The Court declines to order the above requested non-operational conservation measures. "A preliminary injunction ordering Defendants to do something they said that are already going to do is unnecessary." *Elko, Inc. v. Peters*, 2022 WL 256975, at *7 (D. Nev. Jan. 27, 2022). Given the rule that preliminary injunctions should be narrowly tailored to that which is "necessary to effectuate the congressional purpose" behind the ESA, *NMFS VIII*, 422 F.3d at 795, and this Court's previous admonition that "[c]ourts should not micromanage an agency's procedures under the guise of judicial review", *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 2007 WL 1072112, at *5 (D. Or. Apr. 3, 2007), it is prudent in the instant case to avoid unnecessary

mandatory preliminary injunctions. The 2020 BiOp already contains measures similar to those that Plaintiffs request, including:

- Avian predation management, including of Caspian terns, double-breasted cormorants, and gulls. *See* 2020 BiOp Appx. B.

- Non-native piscine predation control efforts. *See id.* at 696-702.

- Continued collection, transportation, and reconditioning of kelt at the Nez Perce hatchery. *See id.* at 426.

- Continued transportation efforts for Snake River sockeye salmon. *See id.* at 471-76.

Though these measures are not *exactly* what Plaintiffs request, they generally represent an effort to address the problems about which Plaintiffs are concerned via similar means. The Court will not order the Action Agencies to carry out actions they already plans to carry out, or to carry out similar actions. Understanding the importance of these non-operational measures to the survival of the listed species, however, the Court *does* order quarterly reporting to the Court on progress made with respect to its commitments on predation reduction, Snake River steelhead kelt transportation and reconditioning, and Snake River Sockeye transportation efforts. Should these reports demonstrate operations insufficient to enable the survival of and eventually restore the listed species, Plaintiffs have leave to refile on an expedited basis for preliminary injunctive relief.

### E.  Stay Pending Appeal

Defendants request a stay pending appeal. *See* ECF 2650. "A stay is 'an exercise of judicial discretion,' which should be issued 'dependent upon the circumstances of the particular case.'" *Manrique v. Kolc*, 65 F.4th 1037, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556

U.S. 418, 433 (2009)). The party requesting the stay "bears the burden of showing that the circumstances justify an exercise of that discretion" because "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433-34. To consider the appropriateness of a stay, the Court should "balance the relative equities," *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam), by considering four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (*quoting Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

There is "substantial overlap" between the stay factors and "the factors governing preliminary injunctions." *See id.* Just as the Court concludes that Plaintiffs are likely to succeed on the merits of their claims for purposes of the preliminary injunction, it concludes that the Federal Defendants are unlikely to succeed on the merits for purposes of the stay. The second stay factor does not weigh in the Federal Defendants' favor because the relief the Court grants— pertaining only to spill and reservoir levels—is narrowly tailored and essentially maintains the *status quo*. The Federal Defendants have, for years, maintained a safe and reliable power system and dam operations with the nearly the same spill levels as ordered here, and with the same reservoir levels from 2025. "The first two factors of the traditional standard are the most critical," *id.* at 434, so the Federal Defendants' failures of proof here doom their request for a stay pending appeal.

The third and fourth stay factors also do not weigh in the government's favor. These factors do not merge when the government is the party seeking a stay. *See id.* at 435 ("These factors merge when the Government is the *opposing* party" (emphasis added)). Staying the injunction pending appeal poses a significant risk that the government will be unable to

implement *any* protective measures during 2026, causing significant harm to the species. Finally, as explained, the public interest always weighs in favor of protecting endangered species.

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for Preliminary Injunction, ECF 2526, and Intervenor-Plaintiff Oregon's Motion for Preliminary Injunction, ECF 2530, and GRANTS IN PART and DENIES IN PART their requested relief, as set forth in a separate order titled "Amended Preliminary Injunction Order."

**IT IS SO ORDERED**.

DATED this 2nd day of March, 2026.

Michael H. Simon
United States District Judge